**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division**

| |
|---|
| **WILLIAM D. CARMACK,** |
| **Plaintiff,** |
| **v.** |
| **COMMONWEALTH OF VIRGINIA,** *et al.*, |
| **Defendants.** |

Civil Action No. 1:18-cv-31

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**</u>

# INTRODUCTION

On August 26, 2016, David Matlock was notified by the Governor's office that all state agencies must present budget savings proposals for fiscal years 2017 and 2018. This notice emphasized that the budget reduction strategies must include a recurring savings plan. Within his first year as Executive Director of the Center, Matlock observed significant overlap in responsibilities between senior administrators that created wasteful use of agency resources. To create a long-term solution that would meet Governor Terry McAuliffe's budget mandate, Matlock worked with the University of Virginia ("UVA"), Department of Planning and Budget ("DPB") and Department of Human Resource Management ("DHRM") to create a Workforce Transition Act ("WTA") proposal that included the elimination of several positions, including the Chief Financial Officer position held by Plaintiff, William D. Carmack. Matlock's proposal was approved by the Center's Executive Committee, DHRM, DPB, and UVA, and three employees, including Carmack, were laid off under the WTA.

Carmack's lawsuit seeks to upend this managerial prerogative by claiming First Amendment and whistleblower protection for unsubstantiated complaints Carmack made to the Office of State Inspector General ("OSIG") in July 2017. But allegations of wrongful or retaliatory discharge fail as a matter of law where the employer has a legitimate business reason for making the employment decision. Such a justification is easily met in this case where multiple independent entities and state agencies approved of Matlock's WTA proposal, which was developed well before Carmack made his complaint to OSIG. Because Carmack can offer only speculation and conjecture as to why this decision was mere pretext for political or retaliatory animus, the undisputed facts compel the complete dismissal of Carmack's Amended Complaint under Rule 56 of the Federal Rules of Civil Procedure.

1

## STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed and are demonstrated by the cited pleadings and exhibits, which are appended to the Declarations of David Matlock, Deborah Rigdon, Michael Maul, Timothy Sadler, and Ryan Hardy.

### I. Organization of the Center

1.     Established in 1991, the Center partners with public and private colleges and universities to provide degree programs, certificates, and professional development courses. (Matlock Decl. ¶ 3.) The core responsibilities of the Center are to 1) encourage the expansion of higher education degrees, adult and continuing education, workforce training, and professional development through partnerships with public institutions of higher education and private institutions of higher education; 2) facilitate the delivery of teacher training programs leading to licensure and undergraduate and graduate degrees; 3) serve as a resource and referral center by maintaining and disseminating information on existing educational programs and resources; and 4) develop, in coordination with the Council, specific goals for higher education in Southwest Virginia. Va. Code § 23.1-3125.

2.     David Matlock was appointed Executive Director of the Center, effective November 2, 2015. (Matlock Decl. ¶ 1.) As Executive Director, Matlock is responsible for overseeing all aspects of the management and operation of the Center. (*Id.* at ¶ 2.)

3.     The Center is governed by a 23-member Board of Trustees that includes members of the Virginia General Assembly, university presidents, agency heads, and citizen members appointed by the Governor. (*Id*. at ¶ 4.) As Executive Director, Matlock reports to the Board of Trustees and the Virginia Secretary of Education. (*Id.*)

2

4.     Within the Board of Trustees is an Executive Committee comprised of five members of the full Board, which oversees the affairs of the Center between Board meetings. (*Id*. at ¶ 4.) The Executive Committee also takes up sensitive issues such as personnel matter (where confidentiality is required and would be hard to ensure with a larger group) and offers input into decisions that need a timely resolution for the efficient operation of the Center. (*Id.*) The Executive Committee also performs an annual evaluation of the Executive Director. (*Id.*)

5.     At the time Matlock started working at the Center, Carmack was the Chief Financial Officer ("CFO") of the Center. (*Id*. at ¶ 6.) Carmack was hired in 2012. (*Id.*)

6.     Prior to Carmack's arrival, the Center had operated without a CFO for approximately 15 years. (*Id*. at ¶ 7.) The CFO position had been created to develop the Clean Energy Research and Development Center ("Energy Center") and secure tenants involved in the research, manufacture, and/or development of "Clean Fuel Energy" products and systems. (*Id.*) The CFO was also tasked with securing research and development grants to develop growth-oriented, investment-worthy technology companies to rural southwestern and southern Virginia. (*Id.*)

7.     In 2009 a separate Foundation was formed to support the educational programs and activities of the Center and the Energy Center. (Matlock Decl. ¶ 5; Hardy Decl. ¶ 3, Ex. 2 at 54:6.) The Foundation also administers the Tobacco Region Scholarship Program on behalf of the Virginia Tobacco Region Revitalization Commission. (Matlock Decl. ¶ 5.) The Foundation is a private entity that is separate from the Center. Workshare agreements between the Foundation and the Center have existed in the past, but steps have been taken to keep the activities of the Center—which is a public state agency—separate from the Foundation. (*Id.*)

8.     Since its inception, the Center contracted with UVA to administer and manage human resource issues for the Center. (*Id*. at ¶ 8.) These services, among others provided by UVA,

3

were eventually put into a formal five-year agreement in 2011. (*Id.*) UVA discontinued providing the Center human resource services on July 1, 2018, at which point the Center shifted to the Shared Services Center with DHRM. Matlock's primary contact with UVA was Donna Kauffman, the UVA Human Resource Specialist assigned to the Center. (*Id.*)

## II.    <u>Matlock Receives a Budget Reduction Mandate from Governor McAuliffe</u>

9.    On August 26, 2016, Matlock received an email from Paul Reagan, Chief of Staff for Governor Terry McAuliffe, requesting that all agency heads submit budget savings plans for fiscal year 2017. (Matlock Decl. ¶ 9, Ex. 1.) Matlock was instructed to prepare savings strategies "equal to five (5) percent of [the Center's] adjusted legislative general fund appropriation." (*Id.* at 2.) The email stressed that the majority of reduction strategies emphasize "recurring savings." (*Id.*) The email advised that the modification or elimination of existing responsibilities that are not "mission critical" to the Center should be considered. (*Id.* at 3.)

10.    Matlock received another email from Reagan on September 27, 2016 that provided additional guidance with respect to budget savings plans. (Matlock Decl. ¶ 10, Ex. 2.) The email stressed that agencies should prepare for an additional five-percent cut in fiscal year 2018. (*Id.* at 1.) Matlock was reminded that savings strategies for fiscal year 2018 should provide ongoing savings in future fiscal years to maintain structural balance. (*Id.* at 2.)

11.    After receiving the Governor's budget reduction mandate, Matlock began to research available budget savings options. (Matlock Decl. ¶ 11.) In Matlock's opinion, using general funds to cover the budget reductions would not be a viable long-term strategy because the mandate stressed recurring savings strategies for multiple fiscal years. (*Id.*)

12.    Matlock identified reorganization of the Center as a sustainable long-term option because he observed a significant responsibility overlap between senior administrators. (*Id.* at ¶ 11.) By

4

streamlining the administrative responsibilities of the Center, Matlock believed that he could ensure that the Center would become a more effective and efficient state agency.

13.     Matlock was familiar with the WTA as a viable method of reorganizing the Center. (*Id.* at ¶ 12.) To determine whether the WTA could be used at the Center, Matlock contacted Chris Fields, the Vice President of Finance at the nearby Virginia Highlands Community College ("VHCC") and former Director of Finance & Legislative Affairs at the Center, to discuss the WTA process. (*Id.*)

14.     On or around October 28, 2016, Matlock called Kauffman, to discuss a possible WTA proposal for the Center. (Matlock Decl. ¶ 13.) During this phone conversation, Matlock stated that the positions of Joyce Brooks, William Carmack, and Douglas Viers might be possible candidates in the WTA proposal. (*Id.*)

15.     On November 4, 2016, Matlock asked Kauffman to provide him the WTA cost for eliminating Brooks' position. (Matlock Decl. ¶ 14, Ex. 3.) On November 9, 2016, Matlock received an email from Kauffman with the estimated WTA cost for eliminating the positions of Carmack and Viers. (Matlock Decl. ¶ 15, Ex. 4.)

16.     After receiving the WTA estimates for Carmack and Viers, Matlock asked if Kauffman needed to wait until Carmack's five-year anniversary to ensure he would be eligible for WTA benefits. (Matlock Decl. ¶ 16, Ex. 5.) Kauffman emailed Matlock that same day to confirm that Carmack did not need to wait until his anniversary date in order to be eligible for the WTA. (*Id.*) Kauffman advised Matlock not to inform any of the individuals whose positions were being considered for elimination until more details had been fleshed out. (*Id.* at ¶ 16.)

17.     On or around January 16, 2017, Matlock had a phone conversation with Fields to review the WTA process to get a clear understanding of what steps he needed to take. (*Id.* at ¶ 17.)

Fields explained that Matlock needed approval from DPB before moving forward. Fields explained that with DPB approval, the Virginia Retirement System ("VRS") would absorb the costs related to the WTA, which would save the Center money.[1] Thus, Matlock had a strong incentive to keep DPB involved in the WTA process. (Maul Decl. ¶ 2.)

18. Matlock arranged for a meeting with Kauffman for January 26, 2017. (Matlock Deck. ¶ 20, Ex. 6.) Prior to that meeting, Matlock indicated that the positions of Janet Williams and Patricia Ball should be considered for elimination under the WTA. (*Id.*)

19. On January 26, 2017, Matlock met with Kauffman and Michelle Small of UVA to discuss the steps necessary to move forward and submit a WTA request. Adam Tolbert of the Center also attended the meeting. (Matlock Decl. ¶ 21, Ex. 7.) Matlock received an email from Kauffman that same day with WTA estimates for Ball, Viers, Brooks, and Carmack. (*Id.*)

20. On January 26, 2017, Kauffman forwarded to Matlock a WTA Exemption Letter template from Deborah Rigdon of DHRM. (Matlock Decl. ¶ 22, Ex. 8.) Thus, DHRM became aware of Matlock's intent to use the WTA.

21. On February 2, 2017, Matlock met with Michael Maul and Adam Henken of DPB to discuss his intention to go forward with the WTA for the Center. (Matlock Decl. ¶ 23, Ex. 9; Maul Decl. ¶ 3.) Maul reviewed the WTA steps with Matlock and stressed the importance of seeking DPB and DHRM approval at the beginning of the process. (*Id.*) He stated that with DPB and DHRM approval, VRS would cover the cost of the WTA. (*Id.*)

---

[1] An individual whose position is eliminated under the WTA may choose to receive either severance benefits or enhanced retirement. (Matlock Decl. ¶¶ 18; 58, Ex. 33 at 41-42.) Severance benefits are simply a lump sum that is calculated based on the years of service, a credit for health insurance premiums, and a credit for life insurance premiums. Enhanced retirement is a calculation that adds a certain number of years to the individual's years of continuous state service. (*Id.*) The more years of continuous state service an individual has, the higher their monthly retirement benefit will be once they retire. VRS would absorb the cost only if the individual chose the enhanced retirement option. (*Id.* at ¶ 19; Maul Decl. ¶ 2.)

22.     During that meeting, Matlock discussed abolishing Carmack's position as part of the WTA proposal, a decision Maul said could be implemented under the WTA. (Maul Decl. ¶ 3.)

23.     On February 3, 2017, Matlock received an email from Kauffman with the updated WTA estimates for eliminating the five positions. (Matlock Decl. ¶ 24, Ex. 10.)

24.     On or around February 15, 2017, Matlock had a lengthy discussion with Dr. Rachel Fowlkes, the former Executive Director for the Center, to discuss his plans to move forward with a WTA proposal that would address ongoing savings in future fiscal years. (Matlock Decl. ¶ 25.) Matlock informed Fowlkes that he had discussions with DHRM, DPB, and UVA and that they were all aware of his intentions. (*Id.*) Fowlkes agreed that the Center could be more efficient and that moving forward with a WTA proposal would address the ongoing savings mandate from Governor McAuliffe. (*Id.*)

25.     Between March and April of 2017, in order to identify potential improvements, Matlock took time to observe all departmental daily operations and conduct a thorough evaluation of productivity, departmental budgets, stewardship, and program development and support. (*Id.* at ¶ 26.) Matlock consulted senior members of the Center's leadership team, Center partners, and members of the Center's Board of Trustees. (*Id.*) Matlock also talked with community business leaders to seek their opinions about the operation of the Center and their knowledge of services and programs offered. (*Id.*)

26.     Based on his research and correspondence with UVA, DPB, Fields, and Fowlkes, Matlock decided that reorganization was necessary to streamline duplicative administrative responsibilities and meet the required fiscal accountability requested by Governor McAuliffe. (*Id.* at ¶ 28.) Matlock also decided to seek the approval of the Executive Committee. (*Id.*)

### III.    **Going Forward with the WTA**

27.    By May of 2017, Matlock confirmed his decision to go forward with the WTA.  With respect to the CFO position, Matlock noted that the Center had operated without a CFO position from 1992 until 2012.  (Matlock Decl. ¶ 29.)  In addition, the position had been created to develop the Energy Center and secure specialized tenants.  (*Id.*)  The CFO was also tasked with securing research and development grants to develop growth-oriented, technology companies to rural southwestern and southern Virginia.  (*Id.*)  A long-term lease was secured in March 2017 to a non-research client (medical practice) with the lease being managed by the Foundation.  (*Id.*)  With the leasing of the Energy Center, a declining portfolio of research grants, and a shift to separate activities of the Center from the Foundation, Matlock believed that Carmack's workload would decrease significantly with no corresponding decrease in salary.  (*Id.*)

28.    With the anticipated reduction in Carmack's responsibilities, Matlock had to analyze his remaining job responsibilities.  Matlock felt that day-to-day operations—such as advanced fiscal bookkeeping, accounting, budgeting, and managing accounts receivable—could be managed by Hensley at a significantly lower salary than what the CFO was being paid.  (Matlock Decl. ¶ 30, Ex. 11.)  This would create a net yearly savings to the budget of $154,276.  (*Id.* at ¶ 30.)

29.    On May 1, 2017, Matlock asked Joyce Brooks to arrange a conference call with UVA to discuss the WTA.  (*Id.* ¶ 31, Ex. 12.)  Around this time, Matlock took steps to limit Brooks' involvement in the WTA proposal because she was potentially affected.  (Matlock Decl. ¶ 32.)  Matlock also did not inform Carmack that he was considering abolishing the CFO position, and Matlock did not include him on any discussions related to the WTA proposal.  (*Id.*)

30.    On May 1, 2017, Matlock had a phone conversation with Maul and Henken to verify agency exemption from paying the VRS costs of enhanced retirement.  (Maul Decl. ¶ 4.)

31.     On May 2, 2017, Matlock directed Tolbert to email Kauffman and provide her with a link to the relevant provisions of the Virginia Code and state policy that explained the steps necessary for agency exemption.  (Matlock Decl. ¶ 34, Ex. 13.)

32.     On May 22, 2017, Matlock received two emails from Kauffman informing him that Susan Harris, Interim UVA Human Resource Benefits Supervisor, would be assisting with the WTA paperwork along with the WTA waiver template.  (*Id*. at ¶ 35, Ex. 14.)

33.     On May 25, 2017, Matlock called Fields at VHCC and asked if she could share a copy of the cover letter used by VHCC when requesting WTA approval.  (*Id*. at ¶ 36.)  Fields sent two emails within hours of the request.  (*Id.*, Ex. 15, 16.)

34.     On June 30, 2017, Matlock met with the Executive Committee to conduct his annual review and discuss the reorganization plan and WTA proposal.  (*Id*. ¶ 37, Ex. 17, 18.)  Matlock informed the Executive Committee that Carmack was included in the WTA proposal and that the Center did not require a CFO position.  (*Id.*)  Matlock reminded the Executive Committee that he intended the Center's finance division to operate in the manner in which it operated for the first 15 years prior to Carmack's arrival.  (*Id.*)

35.     The Executive Committee accepted the WTA proposal and instructed Matlock to move forward with the plan.  (*Id*. at ¶ 37, Ex. 17, 18; ¶ 38.)

36.     Upon receiving approval from the Executive Committee, Matlock stayed in regular communication with UVA to keep them apprised of the status of the WTA proposal and provide them documents justifying the decision.  (*Id*. at ¶ 40, Ex. 19.)

37.     In October 2017, Deborah Rigdon, Senior Human Resource Management Consultant with DHRM, became involved in providing assistance to Matlock in the implementation of the WTA.  (Rigdon Decl. ¶ 4.)

9

38.    On October 24, 2017, Matlock received an email from Carol Summers, Senior Employee Relations Specialist at UVA, requesting a conference call to include Bobbi Thibo, Employee Relations Manager at UVA.  (Matlock Decl. ¶ 41, Ex. 20.)

39.    On November 13, 2017, Matlock emailed the WTA proposal to Sara Wilson, Agency Head of DHRM, and Dan Timberlake, Agency Head of DPB.  (Matlock Decl. 42, Ex. 21; Maul Decl. ¶ 5, Ex. 1.)

40.    The WTA Proposal mapped out Matlock's reorganization plan along with the respective savings and costs to the Center.  (Matlock Decl. ¶ 43.)  For example, abolishing the CFO position and moving those responsibilities to a lower administrative position would net yearly savings of $154,276.  (*Id.*, Ex. 21 at 3.)  Matlock also proposed creating a part-time Grant Writer position that would focus on securing funds for the development of educational programs and services.  (*Id.*)  The net yearly cost to create this position was $41,355.  (*Id.*)  Once all these costs and savings were tallied, the total net savings to the budget was $108,058.00, which was equal to the 5% budget reduction mandate for fiscal years 2017 and 2018.  (*Id.* at 2, 4.)  Abolishing the CFO position was essential to this reorganization plan.  (Matlock Decl. ¶ 43.)

41.    On November 22, 2017, Matlock received an email from Rigdon seeking additional information about the WTA proposal and to offer her assistance in making the needed strategic organizational changes.  (Matlock Decl. ¶ 44, Ex. 22.)  Matlock and Rigdon also had a phone conversation that same day to review the WTA proposal and the steps Matlock needed to complete to receive the approval of DHRM.  (*Id.*)

42.    On November 21, 2017, Matlock received approval from DPB for the WTA proposal. (Matlock Decl. ¶ 45; Maul Decl. ¶ 7, Ex. 2.)

43.     DPB had reviewed the proposal to ensure it contained the statutory language necessary to allow VRS to absorb the cost of the enhanced retirement options. (Maul Decl. ¶ 6.) From DPB's perspective, the timing of the WTA request had to be consistent with a budget cut or reorganization plan. (*Id.*) Because the Center had been mandated by Governor McAuliffe to enact budget reductions for fiscal years 2017 and 2018, DPB was satisfied that Matlock's WTA proposal was proper. (*Id.*)

44.     On November 27, 2017, Matlock forwarded to Rigdon his timeline of the WTA process and other documents that she had requested. (Matlock Decl. ¶ 46, Ex. 23.) Rigdon also requested job descriptions for Carmack and Hensley and the minutes from the June 30, 2017 Executive Committee meeting. (*Id.*)

45.     Rigdon wanted to make sure that Matlock had provided sufficient justification to support the abolishment of Carmack's position. (Rigdon Decl. ¶ 5.) Rigdon acknowledged that approximately 25% of Carmack's duties would be eliminated regardless because they were tied to the functions of the Foundation and needed to be separated. (*Id*. at ¶ 6.) The separation of Foundation activities and Center activities was consistent with best practices in state government, specifically within education agencies. (*Id.*)

46.     In addition, Rigdon agreed with Matlock that many of Carmack's responsibilities had been delegated to Deborah Hensley. (*Id*. at ¶ 6.) After comparing Hensley's employee work profile ("EWP") to Carmack's EWP, Rigdon agreed that Hensley could absorb more of Carmack's duties, which would create substantial savings because her salary was a fraction of Carmack's salary. (*Id.*, Ex. 1, 2.) Finally, Rigdon knew that the Center had operated without a CFO for a number of years prior to Carmack's arrival at the Center, and the position was therefore not essential to the operation of the Center.

11

47.     Based on the totality of the facts, Rigdon believed that eliminating the CFO position made sense in the long run.  (Rigdon Decl. ¶ 6; Matlock Decl. ¶ 48.)

48.     On December 8, 2017, Rigdon forwarded to Matlock edits to a restructuring analysis for the WTA proposal.  (Matlock Decl. ¶ 49, Ex. 24.)

49.     On December 18, 2017, Rigdon forwarded severance benefit calculations for Carmack, Brooks, and Williams.  (*Id*. ¶ 50, Ex. 25.)  These calculations showed the costs if the impacted individual elected to receive severance benefits or enhanced retirement.  (*Id.* at 1.)

50.     On December 21, 2017, Matlock emailed Rigdon, Griffin, Kauffman, and Summers the final documents for the WTA proposal for their review.  (*Id*. ¶ 52, Ex. 27.)

51.     On January 2, 2018, Matlock emailed Kauffman, Rigdon, and Summers edits WTA documents after multiple phone conversations during the day.  (*Id*. ¶ 54, Ex. 29.)

52.     On January 3, 2018, Matlock received an email from Rigdon indicating her approval of all the WTA documents.  Rigdon had no further edits.  (*Id*. ¶ 55, Ex. 30.)  Rigdon confirmed that the WTA proposal conformed to state policy and the Virginia Code.  (Rigdon Decl. ¶ 9.)

53.     On January 3, 2018, Matlock received an email from Kauffman with all final WTA documents attached.  (Matlock Decl. ¶ 56, Ex. 31.)

54.     On January 3, 2018, Matlock emailed Rigdon, Kauffman, Summers, and Griffin the finalized WTA packets for their final review.  (*Id*. ¶ 57, Ex. 32.)

**IV.     Matlock Informs Carmack, Brooks and Williams of the WTA**

55.     On January 4, 2018, Matlock called Carmack into a conference room and informed him that his position was being eliminated under the WTA.  (*Id*. ¶ 58.)  Matlock provided him a letter explaining that the decision was due to budgetary restrictions.  (*Id.*, Ex. 33.)   Matlock also provided him with documents explaining all the benefits he was owed under the WTA.

12

56.     On January 19, 2018, Matlock forwarded to Carmack additional documents, including a "Blue Card" that would enable him to have preferential hiring for any position within a state agency that is in the same role as his former position and for which he is minimally qualified. (*Id*. ¶ 61, Ex. 35.)

57.     Carmack signed and returned the documents on January 19, 2018.  (*Id*. ¶ 62, Ex. 36.) Carmack expressed his desire to receive the severance benefit rather than the enhanced retirement option.  (*Id.*, Ex. 36 at 8.)  Carmack chose to leave his employment at the Center rather than retire.  (*Id*. at ¶ 62.)

58.     Joyce Brooks and Janet Williams were also informed that their positions were being abolished under the WTA and were provided similar WTA packets.  (*Id*. ¶ 63.)  Both Brooks and Williams opted to receive enhanced retirement.  (*Id.*)

59.     Because Brooks and Williams officially announced their retirement, they were invited to an annual cookout the Center hosts.  (*Id*.)  It has been the practice of the Center to invite any employee who retired that year to the luncheon and recognize their contributions to the Center. (*Id.*)  Employees who left the Center but did not retire are not invited to the luncheon.

60.     Matlock continued to work with DHRM to finalize the WTA Exemption request that would allow VRS to absorb the costs of the WTA.  (*Id*. at ¶ 68.)  On March 30, 2018, Rigdon provided Matlock with additional edits to the WTA exemption documents.  (*Id.*, Ex. 38.)

61.     On June 12, 2018, Matlock received final approval from DHRM on the WTA Exemption Request, which exempted the Center from paying costs to VRS for any enhanced requirement benefits under the WTA.  (*Id*. ¶ 69, Ex. 39.)

## V.    OSIG Complaint

62.    Carmack alleges that he noted many instances of policy violations, misuse of state resources, and fraud.[2]  (Dkt. 38 at ¶ 14.)   These alleged violations include: 1) requesting reimbursement for invoices paid a middle school where his son was a principal as part of a robotics competition; 2) approving overtime for a husband and wife computer team even though cheaper alternatives were available; 3) failure to submit invoices in a timely manner; 4) hiring a personal friend without going through the interview process; 5) failing to account for money received during various fundraisers; 6) allowing a large piece of art (a mobile) to go missing; and 7) granting Tolbert access to human resource systems without proper clearance.  (*Id.*)

63.    Carmack first lodged his complaints to Brad Holland, ombudsman of UVA, on February 8, 2017.  (Hardy Decl. ¶ 2, Ex. 1 at Response to Interrogatory ("ROG") 3.)  Thereafter, Carmack spoke to various individuals at DHRM, including Rigdon, (*Id.*; Rigdon Decl. ¶ 3.)  Carmack was ultimately advised that he should take his concerns to the Office of State Inspector General. (Rigdon Decl. ¶ 3, Hardy Decl. ¶ 3, Ex. 2 at 134:3-137:22.)

64.    Carmack attempted to file his complaint with the Virginia Fraud, Waste and Abuse Hotline ("Hotline") in June 2017, but was asked to refile in July 2017.  (Hardy Decl. ¶ 2, Ex. 1 at ROG 3.)

65.    The matter was assigned to Tim Sadler, State Hotline Manager.   He ultimately determined that six of the complaints merited an investigation by OSIG.  (Sadler Decl. ¶ 3.)

66.    On October 16, 2017, Matlock received a phone call from Sadler who explained that someone had called the Hotline and reported Matlock for possible waste and abuse.  (Matlock Decl. ¶ 70.)  Sadler explained that the Hotline provides an anonymous and confidential method

---

[2] Defendants dispute most of the facts underlying Carmack's complaints against Matlock. (Matlock Decl. ¶ 73.)

for state employees and citizens to report suspected fraud, waste, or abuse in state agencies. (*Id.*) Sadler informed Matlock he would be investigating six areas and that he would follow up with an email for each area. (*Id.*) Sadler did not identify Carmack as the individual who made the complaint. (Sadler Decl. ¶ 4; Matlock Decl. ¶ 75.)

67.     Matlock informed Sadler that he was in the middle of a WTA proposal. (Matlock Decl. ¶ 67; Sadler Decl. ¶ 5.) Matlock reviewed the steps he had taken with respect to the WTA and the timing of each step, and informed Sadler that the WTA proposal included Brooks, Williams, and Carmack. (Matlock Decl. ¶ 71; Sadler Decl. ¶ 6.) Sadler told Matlock that the WTA process should continue if Matlock had begun the process prior to his knowledge of the anonymous caller's complaint (October 16, 2017). (*Id.*) Matlock shared with Sadler that the WTA process with UVA was initiated 12 months earlier. (*Id.*) Sadler did not include Matlock's WTA proposal as part of his investigation. (Sadler Decl. ¶ 6.)

68.     On October 17, 2017, Matlock received an email from Sadler documenting their phone conversation from the day prior. (Matlock Decl. ¶ 72, Ex. 40.) Matlock cooperated fully with Sadler with his investigation and provided him with all the information and documents he requested. (*Id.* at ¶ 72.)

69.     On November 8, 2017, Matlock received an email from Sadler stating that he had completed his investigation. (*Id.* at ¶ 73, Ex. 41.)

70.     The Hotline Report found that three allegations were unsubstantiated, two of the allegations were partially substantiated, and one allegation was substantiated. (*Id.* at ¶ 74, Ex. 42.) Matlock took corrective action to address the issues Sadler identified. (*Id.* at ¶ 74.) None of the substantiated allegations involved the misuse of state funds or fraud.

15

71.    Another Hotline complaint was made against Carmack for activities related to his work with the Foundation.  (*Id*. ¶ 76.)  Matlock was interviewed as part of that investigation.  At no point during that interview did Matlock learn or infer that Carmack was the anonymous Hotline caller for the complaint against him.  (*Id.*)

72.    When Rigdon became involved in assisting Matlock with his WTA proposal in October 2017, Rigdon knew that Carmack had lodged numerous complaints against Matlock.  (Rigdon Decl. ¶ 5.)    Rigdon therefore wanted to make sure that Matlock had provided sufficient justification to ensure that the WTA process complied with state policy and protected the rights of individuals affected by the WTA plan.  (*Id.* ¶ 4.)  At no point did Rigdon tell Matlock that Carmack had made complaints against him.  (*Id.* ¶ 5; Matlock Decl. ¶ 47.) Rigdon  believed  that Matlock had sufficient justification for eliminating Carmack's position.  (Rigdon Decl. ¶ 9.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party bearing the burden of proof on an issue at trial must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The mere existence of some alleged factual dispute between the parties does not defeat an otherwise properly supported motion for summary judgment because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks and citation omitted).

16

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmoving party. *See Celotex Corp.*, 477 U.S. at 322-24. Critically, however, "a nonmoving party may not meet its burden by resting upon mere allegations or bald assertions in the pleadings." *Cottom v. Town of Seven Devils*, 30 F. App'x 230, 234 (4th Cir. 2002). Instead, the "party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Rule 56 requires that a nonmoving party's supporting affidavits be based on personal knowledge and set forth facts that would be admissible in evidence at a trial. Therefore, statements based solely on information and belief do not satisfy the requirements of Rule 56." *Cottom*, 30 F. App'x at 234 (citing Fed. R. Civ. P. 56(e)). And "mere speculation by the nonmoving party cannot create a genuine issue of material fact" sufficient to survive a motion for summary judgment. *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001).

## ARGUMENT

The Amended Complaint contains four allegations of wrongful discharge. Count I alleges a violation of Virginia's Fraud and Abuse Whistle Blower Protection Act ("Whistleblower Act"), Va. Code Ann. § 2.2-3009, *et seq.* Count II alleges retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983. Count III alleges a state common law claim (*Bowman* claim). The speech undergirding Counts I through III is the July 2017 Hotline complaint Carmack made to OSIG in which he alleged multiple instances of misconduct. (Dkt. No. 38 at ¶ 16.) Count IV alleges Carmack was terminated due to his political affiliation in violation of the First Amendment.

### I. Plaintiff Failed to Plead Sufficient Facts to Prove Causation for Counts I-IV.

17

The critical failing of Plaintiff's wrongful termination claims is that he cannot dispute that his layoff was the result of a year-long analysis into how the Center should be reorganized to meet a budget reduction mandated by Governor McAuliffe. Matlock researched the areas in which the Center could be streamlined, consulted with various individuals on how the WTA process worked, and sought the approval of multiple independent agencies to ratify the WTA proposal. All these efforts, which Carmack cannot credibly dispute, provided Defendants with a legitimate business justification for abolishing Carmack's position as CFO. This thorough process inescapably surmounts any inference of political or speech-based retaliatory animus.

      a.      **Plaintiff Has Failed to Present Sufficient Evidence that Defendants' Political Animus Was a Motivating Factor for His Layoff Under Count IV.**

"The First Amendment also contains protections for an individual's right to association and political affiliation." *Vanterpool v. Cuccinelli*, 998 F. Supp. 2d 451, 458 (E.D. Va. 2014). "A State may not condition public employment on an employee's exercise of his or her First Amendment rights. Further, absent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression." *Jenkins v. Medford*, 119 F.3d 1156, 1160 (4th Cir. 1997) (footnotes and quotation marks omitted) (quoting *O'Hare Truck Serv. V. City of Northlake*, 518 U.S. 712, 717 (1996)).

"A public employee's claim that an adverse employment decision was motivated by the exercise of the employee's First Amendment right of political affiliation is analyzed under the burden-shifting framework set forth in *Mt. Healthy*, [*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, (1977)]." *Chadwell v. Lee County Sch. Bd.*, 535 F. Supp. 2d 586, 597 (W.D. Va. 2008) (alterations in original, citation omitted). In order to prevail under *Mt. Healthy*, the plaintiff must first establish by a preponderance of the evidence: "(1) that the plaintiff's conduct at issue was constitutionally protected, and (2) that it was a substantial or motivating factor in the

18

employment decision." *Id.* The plaintiff must provide "some factual or evidentiary foundation for his claim of a violation of his associational rights, because 'mere speculation is not enough to meet this burden.'" *Pignato v. Va. Dep't of Envtl. Quality*, 948 F. Supp. 532, 541 (E.D. Va. 1996) (quoting *Munson v. Milwaukee Bd. of Sch. Directors*, 969 F.2d 266, 270 (7th Cir. 1992)). Once this burden is met, the defendant may escape liability only by proving by a preponderance of the evidence that the employer would have reached the same decision even in the absence of the protected conduct. *See Crawford-El v. Britton*, 523 U.S. 574, 593 (1998).

Defendants dispute Plaintiff's evidence with respect to his allegations of political animus. (Matlock Decl. ¶¶ 78-83.) But even taking Plaintiff's allegations as true, they are insufficient to provide any evidence to establish his *prima facie* case for political affiliation retaliation. Specifically, Plaintiff's evidence amounts to:

1. A September 7, 2016 remark by Matlock to an unidentified employee, "You are a member of the wrong party," while he looked at Plaintiff, "grinning." (Hardy Decl. ¶ 1 at ROG 1.)

2. Negative references to the Democratic Party, President Obama, and Governor McAuliffe made at unspecified times. (*Id.*)

3. "Derogatory comments about past Director Dr. Rachel Fowlkes and her influence within the Democratic Party." (*Id.*)

4. Matlock did not attend a visit by Governor McAuliffe during the summer of 2016. (*Id.*)

5. Statements by Senator William Carrico that Matlock was a "loyal supportor of his," and Plaintiff "assume[d] support would mean supporting [the Republican Party]." Hardy Decl. ¶ 3, Ex. 2 at 84:5-86:11.)

6. Carmack had a personalized license plate with a "G" on it, which Carmack assumed stood for "Grand Old Party." (*Id.* at 87:6, 270:10.)

19

7. Statements by Tolbert, Brooks, Kathy Hietala, and Jeff Webb.  (*Id.* at 102:13-111:13.)

8. Matlock made a "flippant" remark in the hallway that Carmack belonged to "the wrong party."  (*Id.* at 112:12.)

9. Twice, Matlock stated that he had the support of the Republican Party, so he did not need to worry about preparing a budget.  (*Id.* at 112:15.)

10. On or around the date in which Matlock started as Executive Director, Hietala, Tolbert, Brooks, and Webb all went into Matlock's office, closed the door, and did not invite Carmack to participate in a meeting.  (*Id.* at 115:3.)

11. In November 2015, Matlock shared a story with Carmack about "needling," in which a mother bird puts sharp objects in her nest, which incentivizes the young birds to leave the nest.  Matlock used the analogy to describe "the method he used to get people off the team that he did not want."  (*Id.* at 116:11.)

This evidence amounts to nothing more than stray remarks that cannot be used to establish discriminatory animus.  *See Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999).  "[T]hough such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers.'"  *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) (quoting *McMillan v. Ma. Soc'y for Prev. of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998)).  At most, the evidence establishes that Matlock identifies as a Republican, which is insufficient to establish that that alone creates an inference of animus.  In fact, the only remark even remotely pertaining to Carmack's employment is the "needling" story, which occurred one year prior to Matlock considered abolishing the CFO position as part of the WTA.

**b. Plaintiff Has Failed to Establish Causation for Counts I-IV Because the Undisputed Evidence Affirmatively Establishes that Plaintiff's Layoff Was Result of a Year-Long Process to Implement the WTA.**

For First Amendment speech claims, the "causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." *Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1999) (dismissing First Amendment § 1983 claim for failure to show "but for" causation). The "causation requirement was the result of the Court's desire to prevent a government employee from insulating himself from legitimate termination simply by engaging in protected speech." *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993). The "decisionmaker's knowledge of the protected activity is 'essential to a retaliation claim." *Jones v. HCA*, 16 F. Supp. 3d 622, 635 (E.D. Va. 2014) (citation omitted).

Under the Whistleblower Act, "No employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction." Va. Code § 2.2-3011(A). Although no court case has defined the causation standard under the Whistleblower Act, "the Fourth Circuit generally requires" a plaintiff to establish "that a causal relationship existed between the protected activity and the adverse employment activity." (Dkt. No. 31 at 14 (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).)

Here, the undisputed evidence establishes that Matlock formulated the idea to abolish Plaintiff's position on October 28, 2016. (SOF ¶ 14.) Carmack did not officially file his Hotline complaint with OSIG until July 2017, more than nine months later. (SOF ¶ 63.) The timing alone is fatal to Plaintiff's speech-based claims. Further, Matlock had a legitimate need to reorganize the Center because he was given a five percent budget reduction mandate for fiscal

years 2017 and 2018.  (SOF ¶¶ 9-10.)  Matlock researched what he needed to do to streamline the Center, and noted that the CFO position with an annual salary of $116,807.00, (SOF ¶ 49), could be performed by a lower level administrator at a fraction of the cost.  (SOF ¶¶ 27-28.)  And Matlock did not make the decision solely by himself.  Rather, he sought the input and approval of multiple independent state agencies such as UVA, DPB, and DHRM. (SOF ¶¶ 29-31, 36-54.)

Matlock also sought the approval of the Center's Executive Committee, which he received.  (SOF ¶¶ 34-35.)  Significantly, Rigdon was aware that Carmack had lodged complaints against Matlock and wanted to ensure that the WTA process was handled fairly. (SOF ¶ 72.)  Rigdon was satisfied that eliminating Carmack's position was fiscally sound.  (SOF ¶ 47.)  Sadler knew that Matlock was considering eliminating Carmack's position as he was investigating Carmack's allegations against Matlock, but he did not see fit to interfere.  (SOF ¶¶ 65-67, 70.)  As demonstrated by the record, Matlock underwent a laborious and document-intensive process to establish the best course of action for streamlining the Center to create a more efficient and effective state agency.  These labors belie any suggestion that Matlock was influenced by retaliatory animus.

Even if Carmack were to provide some suggestion that the WTA proposal was simply a relentless, fourteen-month plan to get rid of him, his own testimony establishes such animus preexisted his Hotline complaint.  Plaintiff testified that since November 2015, he "had been excluded to date from any conversation pertaining to the business of the Center or the finances of the Center."  (Hardy Decl. ¶ 3, Ex. 2 at 117:4.)  Plaintiff affirmed, "I never felt like we had a good relationship."  (*Id.* at 124:4.)  And Joyce Brooks, whom Plaintiff identified as a Republican, (*id.* at 87:11), was similarly laid off as part of the WTA proposal.  (SOF ¶ 58.)

## II.   Count III Fails to Plead a Sufficient Statutory Basis Required for a *Bowman* Claim.

The Commonwealth of Virginia generally adheres to the doctrine of at-will employment, meaning that employment lasts for an indefinite term and can be terminated for almost any reason. *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 221 (4th Cir. 2015). "However, there is an exception to this doctrine for at-will employees who claim to have been discharged in violation of public policy."  *Id.*  The Supreme Court of Virginia has recognized three situations in which an at-will employee may establish that his discharge violated public policy:

> (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; and (3) "where the discharge was based on the employee's refusal to engage in a criminal act."

*Id.* (quoting *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2012)).

In this case, Plaintiff argues that Count III states a claim under the second scenario, since he alleges that he was terminated in violation of public policies against speech retaliation as embodied in Article I, section 12 of the Constitution of Virginia, the First Amendment to the Constitution of the United States, and Virginia Code § 2.2-3000.  None of these sources of policy support a *Bowman* claim.

First, the United States Constitution is not a "Virginia statutory authority," and thus cannot support a *Bowman* claim.  *See McCarthy v. Texas Instruments*, 999 F. Supp. 823, 829 (E.D. Va. 1998) (rejecting the plaintiff's reliance on the Fourteenth Amendment because a "*Bowman* claim must find root in a *state* statute" (emphasis in original)).

Second, the Virginia Constitution cannot serve as a basis for a speech-based *Bowman* claim because that source of public policy is not sufficiently tailored.  The Supreme Court of Virginia has admonished courts that "[w]hile virtually every statute expresses a public policy of

23

some sort, we continue to consider this exception to be a 'narrow' exception and to hold that 'termination of an employee in violation of the policy underlying any one [statute] does not automatically give rise to a common law cause of action for wrongful discharge.'" *Rowan*, 559 S.E.2d at 711 (quoting *City of Virginia Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000)). "[T]o rely on such a statute in support of a common law action for wrongful termination, an employee must be a member of the class of persons that the specific public policy was designed to protect." *Mitchem v. Counts*, 523 S.E.2d 246, 251 (Va. 2000).

Here, Article I, section 12 of the Virginia Constitution reads, "*any citizen* may freely speak, write, and publish his sentiments on all subjects." (Emphasis added). As one Virginia court has noted, "Article I, Section 12, does not provide an explicit right for a narrow class of persons, namely *employees* . . . , to exercise their right of free speech[,] . . . has no provision for employee rights[,] and does not create a class of persons directly entitled to protection into which employees of the [Commonwealth] belong." *Baldwin v. Baker*, 94 Va. Cir. 366, 377 (Prince Edward Co. Circuit Ct. 2006) (emphasis added). Indeed, Article I, Section 12 refers to "citizens" generally, and does not create a specific policy protecting the employment rights of those citizens who work for the Commonwealth. *See Shifflett v. Lewis*, 47 Va. Cir. 95, 101 (Rockingham Cnty. Circuit Ct. 1998) (noting that "it is not possible in this case to base a wrongful termination claim . . . on the Bill of Rights of the Virginia Constitution").

Finally, Virginia Code § 2.2-3000 cannot support a *Bowman* claim because it has a self-contained remedy by which certain Commonwealth employees may vindicate the rights specified in the statute. "[When] a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." *Vansant & Gusler, Inc. v.*

24

*Washington*, 429 S.E.2d 31, 33 (Va. 1993) (quoting *School Board v. Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989)).

Here, Virginia Code § 2.2-3000 states:

> It shall be the policy of the Commonwealth, as an employer, to encourage the resolution of employee problems and complaints. To that end, employees shall be able to discuss freely, and without retaliation, their concerns with their immediate supervisors and management. To the extent that such concerns cannot be resolved informally, *the grievance procedure shall afford an immediate and fair method for the resolution of employment disputes that may arise* between state agencies and those employees who have access to the procedure under § 2.2-3001.

(Emphasis added). Because the State Grievance Procedure provides a self-contained remedy to validate violations of the enunciated public policy, Plaintiff cannot use a *Bowman* claim to vindicate those rights. *E.g., Gochenour v. Beasley*, 47 Va. Cir. 218, 224 (Rockingham Cnty. Circuit Ct. 1998) (rejecting a *Bowman* claim based on Virginia Code § 8.01-40 because the "statute itself provides that an aggrieved party may bring suit and recover compensatory damages and that the jury may in its discretion also award exemplary damages").

## IV. CONCLUSION

For the reasons stated herein, Defendants ask this Court to grant the Motion for Summary Judgment, dismiss the Amended Complaint in its entirety, and grant all such relief as may be appropriate.

Respectfully submitted,

_____/s/ Ryan S. Hardy_____
Ryan S. Hardy (VSB No. 78558)
E. Lewis Kincer, Jr. (VSB No. 24148)
Assistant Attorney General
Office of the Attorney General
202 North 9th Street,
Richmond, Virginia 23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087

25

Email: rhardy@oag.state.va.us
Email: ekincerjr@oag.state.va.us

Mark R. Herring
Attorney General of Virginia

Samuel T. Towell
Deputy Attorney General

Tara Lynn R. Zurawski
Senior Assistant Attorney General/Trial Section Chief

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd of April 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to the following counsel of record for the Plaintiff:

Terry N. Grimes, Esq. (VSB No. 24127)
320 Elm Avenue, SW
Roanoke, Va. 24016-4001
(540) 982-3711
(540) 345-6572 (fax)
tgrimes@terryngrimes.com

Brittany M. Haddox, Esq. (VSB No. 86416)
STRELKA LAW OFFICE, PC
119 Norfolk Avenue, SW
Warehouse Row, Suite 330
Roanoke, Virginia 24011
(540) 283-0802
brittany@strelkalaw.com

*Counsel for Plaintiff*

      */s/ Ryan S. Hardy*
Ryan S. Hardy (VSB No. 78558)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087
Email: rhardy@oag.state.va.us

*Counsel for Defendants*

27