**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

**WILLIAM D. CARMACK,**

           **Plaintiff,**

v.

**COMMONWEALTH OF VIRGINIA,** *et al.,*

           **Defendants.**

**Civil Action No. 1:18-cv-31**

## DECLARATION OF DAVID MATLOCK

I, David Matlock, hereby declare and state as follows:

1.     I am the Executive Director at the Southwest Virginia Higher Education Center ("the Center"), a position I have held since November 2, 2015. Prior to that position, I worked at the Virginia Highlands Community College ("VHCC") for twenty-four years. I have twenty-seven years of experience in the community college and education system in the Commonwealth of Virginia.

2.     As Executive Director, I am responsible for overseeing all aspects of the management and operation of the Center. In this capacity, I have access to true and accurate copies of emails, documents, systems, and all other contemporaneous business records at the Center, records that I regularly rely upon for business decisions. My administrative responsibilities have required familiarity with the facts and circumstances related to this lawsuit.

**A.**     **Organization of the Center**

3.     Established in 1991, the Center partners with public and private colleges and universities to provide degree programs, certificates, and professional development courses. The core

1

responsibilities of the Center are to 1) encourage the expansion of higher education degrees, adult and continuing education, workforce training, and professional development through partnerships with public institutions of higher education and private institutions of higher education; 2) facilitate the delivery of teacher training programs leading to licensure and undergraduate and graduate degrees; 3) serve as a resource and referral center by maintaining and disseminating information on existing educational programs and resources; and 4) develop, in coordination with the Council, specific goals for higher education in Southwest Virginia. Va. Code § 23.1-3125.

4.      The Center is governed by a 23-member Board of Trustees that includes members of the Virginia General Assembly, university presidents, agency heads, and citizen members appointed by the Governor. As Executive Director, I report to the Board of Trustees and the Virginia Secretary of Education. Within the Board of Trustees is an Executive Committee comprised of five members of the full Board, which oversees the affairs of the Center between Board meetings. The Executive Committee also takes up sensitive issues such as personnel matters (where confidentiality is required and would be hard to ensure with a larger group) and offers input into decisions that need a timely resolution for the efficient operation of the Center. The Executive Committee also usually performs an annual evaluation of the Executive Director's performance.

5.      In 2009 a separate Foundation was formed to support the educational programs and activities of the Center and the Energy Center. The Foundation also administered the Tobacco Region Scholarship Program on behalf of the Virginia Tobacco Region Revitalization Commission until 2018. The Foundation also administers research and development grants from the Tobacco Commission. At one point, the Foundation's grant and scholarship portfolio

2

exceeded $18 million. The Foundation is a private entity that is separate from the Center. Workshare agreements between the Foundation and the Center have existed in the past, but steps have been taken to keep the activities of the Center—which is a public state agency—separate from the Foundation.

6.     When I started working at the Center, William "Duffy" Carmack was the Chief Financial Officer ("CFO"). Carmack was hired in 2012. Two immediate things I noticed about Carmack was his dependence on Business Manager, Deborah Hensley, and the amount of time he was spending doing work for the Foundation. First, I noticed that when I would ask Carmack for financial data from the Center, he would often ask Hensley to prepare the data for him. Second, it appeared that Carmack was spending significantly more time performing work for the Foundation than his workshare agreement allowed. Because the Center was taking steps to create more separation from the Foundation, Carmack would no longer be responsible for a significant portion of his workload that related to the Foundation.

7.     Prior to Carmack's arrival, the Center had operated without a CFO for approximately 15 years. The CFO position had been created to develop the Clean Energy Research and Development Center ("Energy Center") and secure tenants involved in the research, manufacture, and/or development of "Clean Fuel Energy" products and systems. The CFO was also tasked with securing research and development grants to develop early-stage growth-oriented, investment-worthy technology companies to rural southwestern and southern Virginia.

8.     Since its inception, the Center contracted with the University of Virginia ("UVA") to administer and manage human resource issues for the Center. These services, among others provided by UVA, were eventually put into a formal five-year agreement in 2011. UVA discontinued providing the Center human resource services on July 1, 2018, at which point the

3

Center shifted to the Shared Services Center with the Virginia Department of Human Resource Management ("DHRM"). My primary contact with UVA was Donna Kauffman, the UVA Human Resource Specialist assigned to the Center. I relied upon Kauffman's advice for the vast majority of my human resource questions.

**B.    Mandated Budget Reduction**

9.    On August 26, 2016, I received an email from Paul Reagan, Chief of Staff for Governor Terry McAuliffe, requesting budget savings plans for fiscal year 2017. A true and accurate copy of this email, SWVHEC25988-25990, has been attached hereto as **Exhibit 1.** I was instructed to prepare savings strategies equal to five percent of the Center's adjusted legislative general fund appropriation. (Ex. 1 at 2.) The email welcomed any and all valid savings strategies, but stressed that the majority of reduction strategies emphasize recurring savings. (*Id.*) The email advised that the modification or elimination of existing responsibilities that are not "mission critical" to the Center should be considered. (*Id.* at 3.)

10.    I received another email from Reagan on September 27, 2016, that provided additional guidance with respect to budget savings plans. A true and accurate copy of this email, SWVHEC25984-25987, has been attached hereto as **Exhibit 2**. The email stressed that I should prepare for an additional five percent cut in fiscal year 2018. (Ex. 2 at 1.) I was reminded that savings strategies for fiscal year 2018 should provide ongoing savings in future fiscal years to maintain structural balance. (*Id.* at 2.)

11.    After receiving the Governor's budget reduction mandate, I began to research budget saving options available to me as agency head. Because the mandate stressed recurring savings strategies for multiple fiscal years, using general funds to cover the budget reductions would not be a sustainable long-term strategy. Upon arriving at the Center, I observed a great deal of

4

responsibility overlap between senior administrators. By streamlining the administrative responsibilities of the Center, I believed I could ensure that the Center would become a more effective and efficient state agency.

12. During my time at VHCC, the community college has used the Workforce Transition Act ("WTA") multiple times to find recurring savings options. I called Chris Fields, the Vice President of Finance at VHCC, to discuss the WTA process. Fields had worked at the Center as the Budget Manager from March 1, 1996 until March 24, 2007, and as Director of Finance & Legislative Affairs from March 25, 2007 until she left on May 22, 2012 to join VHCC.

13. On or around October 28, 2016, I called Kauffman, to discuss a possible WTA proposal for the Center. During this phone conversation, I stated that Joyce Brooks, William Carmack, and Douglas Viers might be possible candidates in my WTA proposal.

14. On November 4, 2016, I asked Kauffman to provide me the WTA cost for eliminating Brooks' position. A true and accurate copy of this email, SWVHEC4278-4279, has been attached hereto as **Exhibit 3.**

15. On November 9, 2016, I received an email from Kauffman with the estimated WTA cost for Carmack and Viers. A true and accurate copy of the email, SWVHEC6204, has been attached hereto as **Exhibit 4.**

16. After receiving the WTA estimates for Carmack and Viers, I asked Kauffman if Carmack had the requisite years of state service to ensure he would be eligible for WTA benefits. Kauffman emailed me that same day to confirm that Carmack did not need to wait until his five-year anniversary date in order to be eligible for the WTA. A true and accurate copy of this email, SWVHEC4274, has been attached hereto as **Exhibit 5.** This was important because when a position is eliminated under the WTA, the affected individual may be eligible for enhanced

retirement benefits. Kauffman advised me not to inform any of the individuals whose positions were being considered for elimination until more details had been fleshed out.

17. On or around January 16, 2017, I had a phone conversation with Fields to review the WTA process to get a clear understanding of what steps I needed to take. Fields explained that I needed approval from the Virginia Department of Planning and Budget ("DPB") before moving forward. Fields explained that with DPB approval, the Virginia Retirement System ("VRS") would absorb the costs related to the WTA process, which would save the Center money.

18. Essentially, an individual whose position is eliminated under the WTA may choose to receive either severance benefits (essentially, a lump sum based on years of state service) or enhanced retirement (credit to be applied to their retirement). Severance benefits are calculated using the years of service, a credit for health insurance premiums, and a credit for life insurance premiums. Receiving severance benefits also entitles the individual to preferential hiring rights for the same classified staff role in another state agency for twelve months. Enhanced retirement applies when an individual retires immediately, but have a certain number of years added to that individual's years of continuous state service. The more years of continuous state service an individual has, the higher their monthly retirement benefit will be once they retire.

19. Enhanced retirement under the WTA potentially entails higher costs to the agency than simply providing a lump sum severance benefit. However, if the WTA proposal receives approval from DPB and DHRM, then VRS would absorb the costs of the enhanced retirement. Thus, I had a strong incentive to keep DPB and DHRM involved in the WTA process.

20. I arranged for a meeting with Kauffman for January 26, 2017. Prior to that meeting, I requested that Janet Williams and Patricia Ball be added for consideration. A true and accurate copy of this email, SWVHEC11899, has been attached hereto as **Exhibit 6**.

6

21.     On January 26, 2017, I met with Kauffman and Michelle Small of UVA to discuss the steps necessary to move forward and submit a WTA request.  Adam Tolbert of the Center also attended the meeting.  I received an email from Kauffman that same day with WTA estimates for Ball, Viers, Brooks, and Carmack.  A true and accurate copy of this email, SWVHEC11712, has been attached hereto as **Exhibit 7.**

22.     On January 26, 2017, Kauffman forwarded to me a WTA Exemption Letter template from Deborah Rigdon of DHRM.  A true and accurate copy of this email and attachment, SWVHEC11790-11791, has been attached hereto as **Exhibit 8.**

23.     On February 2, 2017, I met with Michael Maul and Adam Henken of DPB to discuss my intention to go forward with the WTA for the Center.  Maul reviewed the WTA steps with me and stressed the importance of seeking DPB approval at the beginning of the process.  He stated that with DPB approval, VRS would cover the cost of enhanced retirement under the WTA.  During that meeting, I discussed including Carmack in the WTA proposal.  Maul affirmed my decision to include Carmack.  A true and accurate copy of an email confirming this meeting, SWVHEC12169, has been attached hereto as **Exhibit 9.**

24.     On February 3, 2017, I received an email from Kauffman with the updated WTA estimates for Brooks, Viers, Williams, Ball, and Carmack.  A true and accurate copy of this email, SWVHEC10837-10838, has been attached hereto as **Exhibit 10.**

25.     On or around February 15, 2017, I had a lengthy discussion with Dr. Rachel Fowlkes, the former Executive Director for the Center, to discuss my plans to move forward with a WTA proposal that would address ongoing savings in future fiscal years.  I informed Fowlkes that I had discussions with DHRM, DPB, and UVA and that they were all aware of my intentions.  Fowlkes was the founding agency head and knew all of the Center's history, plus she had a good

7

understanding of the Center's budget. Fowlkes agreed with me that the Center could be more efficient and that moving forward with a WTA proposal would address the ongoing savings mandate from Governor McAuliffe.

26.     Between March and April of 2017, in order to identify potential improvements, I took time to observe all departmental daily operations and conduct a thorough evaluation of productivity, departmental budgets, stewardship, and program development and support. I consulted senior members of the Center's leadership team, Center partners, and members of the Center's Board of Trustees. I also talked with community business leaders to seek their opinions about the operation of the Center and their knowledge of services and programs offered. During my research, I attempted to keep all conversations centered on agency effectiveness, efficiency, and long-term sustainability. I also shared my plans with Elizabeth Griffin, the Senior Assistant Attorney General who was assigned to the Center as lead counsel.

27.     I decided ultimately that the WTA proposal could not include Viers or Ball because I could not sustainably shift their responsibilities to other Center employees.

28.     It became very clear to me during my research that reorganization was necessary to streamline redundant and duplicative administrative responsibilities and meet the required fiscal accountability requested by Governor McAuliffe. I also realized that I would need to seek the approval of the Executive Committee.

**C.     Going Forward with the WTA**

29.     By May of 2017, I believed I had conducted the necessary research to move forward with the WTA. With respect to the CFO position, I noted that the Center had operated without a CFO position from 1992 until 2012. In addition, the position had been created to develop the Energy Center and secure tenants involved in the research, manufacture, and/or development of "Clean

8

Fuel Energy" products and systems. The CFO was also tasked with securing research and development grants to develop early-stage growth-oriented, investment-worthy technology companies to rural southwestern and southern Virginia. A long-term lease was secured in March 2017 to a non-research client (medical practice) with the lease being managed by the Foundation. With the leasing of the Energy Center, a declining portfolio of research grants, and a shift to separate the activities of the Center from the Foundation, I believed that Carmack's workload would decrease significantly with no corresponding decrease in salary.

30.     With the anticipated reduction in Carmack's responsibilities, I had to analyze his remaining job responsibilities. I noted that Hensley provided a great deal of the Center's leadership pertaining to budget oversight, procurement, reconciliation, and budget development, all of which were in Carmack's job description. A true and accurate copy of representative emails in which Hensley often worked lockstep with Carmack, SWVHEC23507-23523, has been attached as **Exhibit 11**. I felt that day-to-day operations—such as advanced fiscal bookkeeping, accounting, budgeting, and managing accounts receivable—could be managed by Hensley at a significantly lower salary than what the CFO was being paid. This would create a net yearly savings to the budget of $154,276.

31.     On May 1, 2017, I asked Brooks to arrange a conference call with UVA to discuss the WTA. A true and accurate copy of this email, SWVHEC11581, has been attached hereto as **Exhibit 12**.

32.     Around this time, I took steps to limit Brooks' involvement in the WTA proposal because she was potentially affected. I also did not inform Carmack that I was considering abolishing the CFO position, and I did not include him on any discussions related to the WTA proposal.

9

33.     On May 1, 2017, Tolbert and I had a phone conversation with Maul and Henken to verify agency exemption from paying the VRS costs of enhanced retirement due to the WTA.

34.     On May 2, 2017, I directed Tolbert to email Kauffman and provide her with a link to the relevant provisions of Virginia Code and state policy that explained the steps necessary for agency exemption.  A true and accurate copy of the email, SWVHEC10829, has been attached hereto as **Exhibit 13**.

35.     On May 22, 2017, I received two emails from Kauffman informing me that Susan Harris, Interim UVA Human Resource Benefits Supervisor, would be assisting with the WTA paperwork along with the WTA waiver template.  A true and accurate copy of the email, SWVHEC10832-10834, has been attached hereto as **Exhibit 14**.

36.     On May 25, 2017, I called Fields at VHCC and asked if she could share a copy of the cover letter used by VHCC when requesting WTA approval.  Fields sent two emails within hours of my request.   True and accurate copies of the emails, SWVHEC4047-4051 and SWVHEC4055-4056, have been attached hereto as **Exhibit 15** and **Exhibit 16**, respectively.

37.     On June 30, 2017, I met with the Executive Committee to conduct my annual review and discuss my reorganization plan and WTA proposal.  I informed the Executive Committee that Carmack was included in the WTA proposal and that the Center did not require a CFO position. I reminded the Executive Committee that I intended the Center's finance division to operate in the manner in which it operated for the first 15 years prior to Carmack's arrival.  A true and accurate copy of the meeting minutes, SWVHEC686-688, have been attached hereto as **Exhibit 17.**  A true and accurate recording of the meeting has been attached hereto as **Exhibit 18**.

38.     The Executive Committee accepted the WTA proposal and instructed me to move forward with the plan.  (Ex. 17.)

39.    At this time, the Executive Committee consisted of Chairman Senator Bill Carrico, VHCC President Gene Couch, UVA-Wise Chancellor Donna Henry, Saul Hernandez, and Radford University President Brian Hemphill. The Executive Committee entered into "closed session" when I discussed the WTA proposal, meaning the details of those conversations are exempt from the Virginia Freedom of Information Act and are not recorded.

40.    Thereafter, I stayed in regular communication with Kauffman and UVA to keep them apprised of the status of the WTA proposal and provide them documents justifying the decision. A true and accurate copy of one of these emails, SWVHEC12372-12375, has been attached hereto as **Exhibit 19**.

41.    On October 24, 2017, I received an email from Carol Summers, Senior Employee Relations Specialist at UVA, requesting a conference call to include Bobbi Thibo, Employee Relations Manager at UVA. These emails demonstrate the continued input and guidance I received from UVA throughout the WTA process. A true and accurate copy of these emails, SWVHEC11948-11949 and SWVHEC12005-12007, have been attached hereto as **Exhibit 20**.

42.    On November 13, 2017, I emailed the WTA proposal to Sara Wilson, Agency Head of DHRM, and Dan Timberlake, Agency Head of DPB. A true and accurate copy of the email, SWVHEC12010-12014, is attached hereto as **Exhibit 21**.

43.    The WTA proposal mapped out my reorganization plan along with the respective savings and costs to the Center. For example, abolishing the CFO position and moving those responsibilities to a lower administrative position would net yearly savings of $154,276. (Ex. 21 at 3.) I also proposed creating a part-time Grant Writer position that would focus on securing funds for the development of educational programs and services. The net yearly cost to create this position was $41,355. (*Id.*) Once all these costs and savings were tallied, I was able to

11

calculate a total net savings to the budget of $108,058.00, which is equal to the 5% budget reduction mandate for fiscal years 2017 and 2018. (*Id.* at 2, 4.) Abolishing the CFO position was essential to this reorganization plan.

44.     On November 22, 2017, I received am email from Rigdon seeking additional information about the WTA proposal and to offer her assistance in making the needed strategic organizational changes.  We had a phone conversation that same day to review the WTA proposal and the steps I needed to complete to receive the approval of DHRM.  A true and accurate copy of the email, SWVHEC4213-4217, has been attached hereto as **Exhibit 22**.

45.     On November 21, 2017, I received approval from DPB for the WTA proposal.

46.     On November 27, 2017, I forwarded to Rigdon my timeline of the WTA process and other documents that she had requested.   A true and accurate copy of the email, SWVHEC11921-11922, has been attached hereto as **Exhibit 23**.  Rigdon explained that she wanted to make sure that my research was correct and that she was interested in the timeline up to November 2017.  She requested job descriptions for Carmack and Hensley and the minutes from the June 30, 2017 Executive Committee meeting.  She did not share with me why she wanted this information other than it was part of DHRM's review of my WTA proposal.

47.     At no time did Rigdon inform me or imply that Carmack had called DHRM employees to complain about my performance.

48.     After reviewing the documents, Rigdon agreed that there was a great deal of duplication between the job descriptions of Carmack and Hensley, and that including Carmack in the WTA proposal would be the easiest for her to defend.

12

49.     On December 8, 2017, Rigdon forwarded to me edits to a restructuring analysis for the WTA proposal.  A true and accurate copy of the email, SWVHEC5306-5308, has been attached hereto as **Exhibit 24**.

50.     On December 18, 2017, Rigdon forwarded severance benefit calculations for Carmack, Brooks, and Williams.  A true and accurate copy of this email and attachments relating to Carmack, SWVHEC10944-10954, has been attached hereto as **Exhibit 25**.  These calculations showed the costs if the impacted individual elected to receive severance benefits or enhanced retirement. (Ex. 25 at 1.)

51.     On December 21, 2017, I received an email from Griffin that contained correspondence with UVA counsel regarding the WTA process at the Center.  UVA counsel stressed the importance of having a police officer and security available on the day I made the WTA plans public.  I received legal advice that Carmack, Brooks, and Williams should be escorted to their cars.  A true and accurate copy of the email, SWVHEC12183-12186, has been attached hereto as **Exhibit 26.**

52.     On December 21, 2017, I emailed Rigdon, Griffin, Kauffman, and Summers the final documents for the WTA proposal for their review.  A true and accurate copy of the email, SWVHEC5745-5763, has been attached hereto as **Exhibit 27**.

53.     On December 21, 2017, I received an email from Griffin with her suggested edits.  A true and accurate copy of the email, SWVHEC12241-12242, has been attached hereto as **Exhibit 28**.

54.     On January 2, 2018, I emailed Kauffman, Rigdon, and Summers edits WTA documents after multiple phone conversations during the day.  A true and accurate copy of the email, SWVHEC11635, has been attached hereto as **Exhibit 29**.

55.     On January 3, 2018, I received an email from Rigdon indicating her approval of all the WTA documents.   Rigdon had no further edits.   A true and accurate copy of the email, SWVHEC12149, has been attached hereto as **Exhibit 30**.

56.     On January 3, 2018, I received an email from Kauffman with all final WTA documents attached.   A true and accurate copy of the email and attachments, SWVHEC11021-11033, has been attached hereto as **Exhibit 31**.

57.     On January 3, 2018, I emailed Rigdon, Kauffman, Summers, and Griffin the finalized WTA packets for their final review.   A true and accurate copy of the email, SWVHEC12147, has been attached hereto as **Exhibit 32**.

**D.     Informing Carmack of his Layoff**

58.     On January 4, 2018, I called Carmack into the Presidential Conference Room and informed him that his position was being eliminated under the WTA.   Kauffman attended the meeting as well.   I provided Carmack a letter explaining that the decision was due to budgetary reductions and the need to make the Center more efficient and effective.   I also provided him with documents explaining all the benefits he was owed under the WTA.   A true and accurate copy of the WTA packet, SWVHEC10759-10807, has been attached hereto as **Exhibit 33**.

59.     To prepare for this meeting, I drafted talking points in which I outlined the WTA process and explained the available benefits that were owed.   A true and accurate copy of the talking point, SWVHEC11020, has been attached hereto as **Exhibit 34.**

60.     During this meeting, Carmack informed me that he was the individual who made the anonymous Hotline complaint against me.   I told Carmack that I had no knowledge or proof that he was in fact the anonymous caller until he disclosed it just now.

14

61.  On January 19, 2018, I forwarded to Carmack additional documents, including a "Blue Card" that would enable him to have preferential hiring for any position within a state agency that is in the same Role as his former position and for which he is minimally qualified. A true and accurate copy of these documents, SWVHEC10808-10812, has been attached hereto as **Exhibit 35**.

62.  Carmack signed and returned the documents on January 19, 2018. A true and accurate copy of the documents, SWVHEC10813-10820, has been attached hereto as **Exhibit 36**. Carmack chose to receive the severance benefit rather than the enhanced retirement option. (Ex. 36 at 8.) Thus, Carmack did not retire.

63.  I provided Joyce Brooks and Janet Williams similar WTA packets. Both Brooks and Williams opted to receive enhanced retirement. Because they officially announced their retirement, they were invited to an annual cookout the Center hosts. It has been the practice of the Center, which predated my tenure, to invite any employee who retired that year to the luncheon and recognize their contributions to the Center. Employees who left the Center but did not retire are not invited to the luncheon. If Carmack had announced his retirement, he would have received an invitation. My administrative assistant, Kathy Hietala, organizes the event.

64.  All three individuals were escorted out of the Center. This was a decision made upon the advice of legal counsel. (Ex. 26.)

65.  On January 4, 2018, I informed the full Board of Trustees of the implementation of the WTA. I informed the Board that the mandated reductions over the last two budget cycles resulted in the need to eliminate the positions of Carmack, Brooks, and Williams. I further informed the Board that I worked with UVA and DHRM to take all necessary steps to insure that

I followed state policy and the Virginia Code. I invited any and all questions from the Board. A true and accurate copy of this email, SWVHEC4715, has been attached hereto as **Exhibit 37.**

66.     Three Board members reached out to me with their initial concerns: Cheryl Carrico, Joshua Ely, and Steve Cochran. Each member requested further explanation as to why the positions needed to be eliminated. I explained how it would not be sustainable to use general funds to meet the budget reductions, and I was looking for a long-term strategy. I also told them of the WTA process and all the steps I took to ensure compliance with state policy. All three individuals said they understood my decision, and I have not heard of any complaints from them since.

67.     Carmack was not terminated. Rather, his positon was eliminated due to the budget reduction mandated by Governor McAuliffe. I believed eliminating the CFO position was in the best interests of the Center to make it a more efficient and effective state agency. My implementation of the WTA has resulted in significant savings to the Center, positioned the Center for long-term financial viability, and allowed the Center to expand its program offerings to better serve the community. Laying off Carmack was an essential component of this plan.

68.     I continued to work with DHRM to finalize the WTA exemption request that would allow VRS to absorb the costs of the WTA. On March 30, 2018, Rigdon provided me additional edits to the WTA exemption documents. A true and accurate copy of the email and attachment, SWVHEC6102-6103, 6143, has been attached hereto as **Exhibit 38**.

69.     On June 12, 2018, I received final approval from DHRM on the WTA Exemption Request, which exempted the Center from paying costs to VRS for any enhanced requirement benefits under the WTA. A true and accurate copy of the email and attachment, SWVHEC10822-10823, has been attached hereto as **Exhibit 39**.

16

### E.  OSIG Investigation

70.  On October 16, 2017, I received a phone call from Tim Sadler, State Hotline Manager at the Office of State Inspector General ("OSIG"), who explained that someone had called the Virginia Fraud, Waste and Abuse Hotline ("Hotline") and reported me for possible waste and abuse. Sadler explained that the Hotline provides an anonymous and confidential method for state employees and citizens to report suspected fraud, waste, or abuse in state agencies. Sadler informed me he would be investigating six areas and that he would follow up with an email for each area.

71.  I informed Sadler that I was in the middle of a WTA proposal and asked him if I should stop. I reviewed the steps I had taken with respect to the WTA and the timing of each step, and informed Sadler that the WTA proposal included Brooks, Williams, and Carmack. I shared my concern that the Center could be exposed to legal liability if the anonymous caller was one of the three individuals included in the WTA proposal. Sadler told me that if I had documented that I started the WTA process well before my knowledge of the anonymous caller's complaint (October 16, 2017), then I should continue to move forward. I shared with Sadler that the WTA process with UVA was initiated 12 months earlier.

72.  On October 17, 2017, I received an email from Sadler documenting our phone conversation from the day prior. A true and accurate copy of this email, SWVHEC6206, has been attached hereto as **Exhibit 40**. I cooperated fully with Sadler with his investigation and provided him with all the information and documents he requested.

73.  On November 8, 2017, I received an email from Sadler stating that he had completed his investigation, and he attached a draft of his report for my review. A true and accurate copy of the email, SWVHEC6190, has been attached hereto as **Exhibit 41**.

74.     The Hotline Report found that three allegations were unsubstantiated, two of the allegations were partially substantiated, and one allegation was substantiated. I took corrective action to address the issues Sadler identified. Notably, none of the substantiated allegations involved the misuse of state funds or fraud. A true and accurate copy of the Hotline Report, SWCHEC4970-4974, has been attached hereto as **Exhibit 42**.

75.     At no point did Sadler inform me of or imply the identity of the anonymous caller.

76.     I am aware that another Hotline complaint was initiated against Carmack for activities related to his work with the Foundation. At no point during the course of that investigation did I learn or infer that Carmack was the anonymous Hotline caller for the complaint against me.

77.     With respect to the Hotline complaint, I deny any allegation of fraud, waste, or abuse. Many of the issues of which Carmack complained were trivial (the missing mobile), lacked any effort to corroborate beyond his own speculation (missing funds from various fundraisers), or were issues within his ability to correct (sole source justification). To the extent Sadler found that my actions did not comport completely with policy, I either provided a sufficient explanation (Tolbert had sufficient need to access human resource systems) or took the necessary corrective action (began submitting my travel vouchers in a timely manner). I deny that any funds or state resources were misused.

**D.      Political Affiliation**

78.     I am not registered under any political party in Virginia. In fact, I understand that Virginia does not allow official party registration. A true and accurate copy of this information has been attached here to as **Exhibit 43**. I have supported members of both major political parties both financially and professionally. Historically, the Board of Trustees contained

Members of the General Assembly from both major political parties, so it is not in the best interests of the Center to "take sides" in any hostile or confrontational manner.

79.     I was not aware of Carmack's political affiliation. After Carmack's departure from the Center, I became aware that he used his work email—to which I have access as Executive Director—to pledge contributions to Republican legislators. A true and accurate copy of these emails, SWVHEC23490-23491, has been attached hereto as **Exhibit 44**.

80.     I am aware that Senator Carrico is a legislator with the Republican Party. He is also the Chairman of the Executive Committee and has worked tirelessly to help the Center as Chairman since July of 2015. Senator Carrico has been a member of the Board of Trustees since 2002. I recall expressing my appreciation and support for Senator Carrico. However, this appreciation concerned Senator Carrico's work and interest in the Center and not his political affiliation.

81.     My license plate has the letter "G" on it. To me, this refers to "Governor," which is a personal, good-humroed joke that I work for the Governor as an agency head. I did not request the license plate to connote my affiliation with the Republican Party, which is commonly known as the "Grand Ole Party," or "GOP." I have never told anyone that "G" refers to any affiliation with the Republican Party. That I have to spell this out in a declaration as part of a federal lawsuit is bizarre.

82.     I have never made remarks at the Center that individuals who identified as Democrats or liberals "belonged to the wrong party."

83.     I have never shared with Carmack a story about "needling," as described in Paragraph 13 of his Amended Complaint.

I declare under penalty of perjury that the laws of the United States of America that the foregoing is true and correct. Executed on this 3rd day of April, 2019.

_____

David Matlock

I declare under penalty of perjury that the laws of the United States of America that the foregoing is true and correct. Executed on this 3rd day of April, 2019.

David Matlock

20