CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

April 5, 2019

JULIA C. DUDLEY, CLERK
BY: K. Ayersman
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **WILLIAMS D. CARMACK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:18-cv-00031** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COMMONWEALTH OF VIRGINIA,** | ) | **By: Hon. Michael F. Urbanski** |
| et al., | ) | **Chief United States District Judge** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter before the court is a motion to dismiss plaintiff William D. Carmack's

Amended Complaint. Carmack filed his original Complaint in the Circuit Court for the

County of Washington in Abingdon, Virginia on May 30, 2018, alleging three claims related

to his termination on January 4, 2018, as the Chief Financial Officer of the Southwest

Virginia Higher Education Center ("SWVHEC"). Count I alleged a violation of Virginia's

Fraud and Abuse Whistle Blower Protection Act, Va. Code § 2.2-3009, et seq. (1950)

("Act"), Count II set forth a cause of action for retaliation in violation of First Amendment

protections afforded speech brought pursuant to 42 U.S.C. § 1983, and Count III alleged a

state common law wrongful termination claim (Bowman claim) — against three defendants:

(1) the Commonwealth of Virginia, (2) the Commonwealth of Virginia: Southwest Virginia

Higher Education Center (collectively "institutional defendants"), and (3) David N. Matlock,

Executive Director of the SWVHEC, in his individual and official capacities. ECF Nos. 1-2.

On July 9, 2018, the defendants removed this case to the United States District Court for the

1

Western District of Virginia pursuant to 28 U.S.C. § 1331. ECF Nos. 1-3.[1] The court assumes familiarity with its previous Memorandum Opinion, ECF No. 31.

The conduct undergirding Counts I through III is a July 2017 complaint Carmack made to Virginia's Fraud, Waste, and Abuse Hotline ("Hotline"), in which he alleged multiple instances of workplace misconduct by Matlock (and others) at the SWVHEC. Five months after filing this complaint, Carmack's employment as the Chief Financial Officer ("CFO") at the SWVHEC was terminated. On November 6, 2018, this court entered an order denying in part and granting in part the defendants' motion, providing Carmack with leave to amend.[2] ECF No. 32. Carmack timely filed his Amended Complaint on November 29, 2018, in which he attempted to remedy deficiencies identified by the court in his original Complaint. ECF No. 38. In addition to reasserting Counts I-III, Carmack added Count IV, asserting political affiliation retaliation in violation of the First and Fourteenth Amendments, brought pursuant to 42 U.S.C. § 1983. ECF No. 38. The matter before the court is defendants' motion to dismiss Carmack's Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 38.

In their renewed motion to dismiss, ECF No. 42, the defendants allege that Carmack again failed to plead facts sufficient to support a plausible inference of causation. More specifically, the defendants contend that Carmack neither proffered facts sufficient to bridge the temporal gap between the "protected activity" (OSIG complaint) and his termination nor adequately advanced a "sufficient explanation" for the gap. With respect to Count II, the

---

[1] This court has jurisdiction over the federal (Count II and Count IV) and state claims (Count I and Count III) pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

[2] On October 17, 2018, the court also granted Carmack's voluntary motion to dismiss Count III so that he could complete the procedural requirements of the Virginia Torts Claims Act, Va. Code Ann. § 8.01-195.1, et seq.

2

defendants conceded previously that the record was inadequate to conclude as a matter of law that Carmack's OSIG complaint is unprotected by the First Amendment.[3] ECF No. 17, at 8. They have shown no indication of having changed their position vis-à-vis the propriety of disposing of Count II at this early stage in the litigation except to the extent the court finds that causation has not been adequately pled. ECF No. 41. Therefore, the court assumes the defendants stand by their earlier position and, accordingly, denies the motion as to Count II in light of its finding below regarding causation. The defendants next allege that Carmack has not pled an adequate statutory basis to state a <u>Bowman</u> claim in Count III and that the availability of alternative remedies precludes Carmack from bringing such a claim in the first place. Lastly, the defendants allege that Carmack's newly-asserted Count IV claim should fail for the same reason that Counts I-III should fail, namely a failure to adequately plead causation. Upon review of the record and for the reasons set forth herein, the court **DENIES in part** and **GRANTS in part** the defendants' motion to dismiss.

## I.

Carmack was hired by and worked for the SWVHEC as its Chief Financial Officer ("CFO") on August 1, 2012, with responsibility for oversight of the center's financial affairs. ECF No. 38, at 2. The SWVHEC, located in Abingdon, Virginia and established in 1992, is a multi-college and university institution in Virginia that partners with public and private colleges and universities to provide degree programs, certificates, and professional development courses. <u>Id.</u> Carmack briefly served as its Interim Director from June 2015,

---

[3] The defendants correctly point out that the court should have, but did not, dismiss Count II in accordance with its prior finding that plaintiff failed to adequately plead causation. Having determined that plaintiff has adequately pled causation in his Amended Complaint, this issue is moot.

when the previous Executive Director, Dr. Rachel Fowlkes, retired, to October 2015, when defendant David Matlock took over as Executive Director. For two years and three months, Carmack reported to Matlock. Id. Carmack was paid 75% by the SWVHEC and 25% by the Southwest Virginia Higher Education Foundation ("Foundation"). Id.

In 2016, Senior Assistant Attorney General Elizabeth Griffin designated the Foundation as a separate entity from the SWVHEC. Id. at 2. The Foundation managed all grants exceeding $25,000,000 and built the "Energy Center" at the request of the Virginia Tobacco Commission. Id. at 2-3. Carmack was the Chief Executive Officer ("CEO") of the Foundation. Id. at 3. Carmack alleges that he worked 40 or more hours each week for the SWVHEC, often on weekends and was recognized for his "superior performance," including being selected to attend the Virginia Executive Institution and being appointed by the governor to serve on the Virginia Solar Authority. Id. at 3. Carmack, a Democrat, claims that Matlock was selected for the Executive Director position because of the substantial political influence of Senator Bill Carrico, a fellow Republican and chairman of the Board of Trustees for the SWVHEC. Id. Carmack was allegedly told not to apply for the position by Senator Carrico in April 2015 because he was going to hire Matlock for the position, and that he was going to speak with the individuals who oversaw the hiring to see that Matlock was appointed. Id.

When Carmack asked about an increase in pay for filling in as Interim Director, Senator Carrico told him to ask Matlock when he arrived, even though Matlock had not yet been hired for the position. Id. Matlock was allegedly chosen over three highly qualified candidates. Id. Carmack claims that although Matlock was scheduled to begin work as the

4

Executive Director on October 1, 2015, he did not appear on the job until October 15, 2015. Id. Carmack claims that he was hired by Dr. Fowlkes, a Democrat, and that Carmack was her "pick" to be her successor as Executive Director. Id. at 3. Carmack claims that sometime after Matlock was hired, Matlock and others made comments to him that he "belonged to the wrong party" or "you belong to the other party," or "words to that effect." Id. Further, in November 2015, Matlock called Carmack into his office and relayed a story about "needling." Id. Matlock allegedly explained that "needling" is when a mother bird places sharp objects in her nest to encourage baby birds to leave the nest. Id. at 3-4. Matlock further stated that this was the way he got rid of employees he did not want. Id. at 4.

Carmack alleges that during his time as the CFO, he discovered that Matlock and others were "wasting and misusing" SWVHEC funds and resources and engaging in other financial improprieties. Id. Carmack specifically alleges the following:

> (1) On February 13, 2017, Matlock submitted an invoice to the Foundation for payment of $1,250 to reimburse his son, Jason Matlock, a middle school principal, for travel by his students to a robotics competition at James Madison University. Carmack alleges this "favored" expense was neither approved by the Foundation nor a budgeted item. When asked about the invoice, Matlock allegedly told Carmack that he offered this reimbursement to all schools in southwest Virginia, although he provided no evidence substantiating this claim. Carmack believes this is not true, claiming that it was improbable that only Jason Matlock accepted the offer.

> (2) Matlock told Carmack to "back off" of a husband and wife "computer team" with control over a $50,000 grant awarded by the Virginia Tobacco Commission and another $50,000 to perform work for the SWVHEC who were "working in a questionable manner from home" and collecting overtime pay in a way that Carmack suspected was fraudulent. Carmack complained to Matlock and Jeff Webb, SWVHEC's information technology director, about the suspected fraud. Specifically,

5

Carmack complained about 111 hours of overtime Webb approved for the wife between July and November 2016. In response, Matlock allegedly told Carmack that he no longer wanted the couple to report to or file their timesheets with him, despite the fact that that they were "supposed to have 'worked' for him." The couple were allegedly "close personal friends" of Webb. Carmack claims to have raised this issue with Matlock by letter dated January 31, 2017.

(3) Matlock failed, after repeated requests, to submit invoices in a timely manner on the 15th day of the month for payment per SWVHEC policy.

(4) Matlock allegedly hired a longtime friend, Joe Mitchell, on or about September 7, 2016, to work as a maintenance supervisor without first scheduling Mitchell for an interview by a selection committee as required by SWVHEC policy. When Carmack cautioned Matlock about pre-selecting employees for hiring in contravention of SWVHEC policy, Matlock allegedly told him not to worry about it because Senator Carrico "had his back." Carmack inquired "numerous times" with Matlock because Mitchell "would appear and disappear out of the payroll," but never received a response besides "leave it alone."

(5) Shortly after Matlock took over as Executive Director in October 2015, he excluded the finance department from financial decisions, thereby making it impossible for Carmack, as CFO, to do his job. Matlock and others allegedly began to purchase non-budgeted items without the finance department's knowledge and failed to submit invoices in a timely manner. Matlock also allegedly organized a community golf tournament under the name of the Foundation but failed to account for receipts and expenditures associated with this and other events.

(6) Matlock also allegedly instructed SWVHEC employees not to speak with Carmack and began to conduct SWVHEC business in "secret," apparently replacing a "door with a window" with a "solid wood door with no window." He also allegedly placed additional locks on his door so that he "could control access to his office."

(7) In December 2016, Matlock allegedly had an art installation, produced at a cost of $9,900 and dedicated to retired Executive Director, Dr. Fowlkes, removed. Carmack claims that despite

6

repeated requests from members of SWVHEC's Board of
Trustees and other employees to return the artwork, it remains
"missing."

(8) Carmack alleges that Matlock's reassignment of an information
technology employee, Adam Tolbert, to human resources in
December 2015, and decision to grant him access to
confidential employee information, including social security
numbers, salary information, and performance reviews, was
improper and violated SWVHEC policy.

(9) Lastly, proceeds related to a fundraiser hosted by Virginia
Highlands Community College that Matlock was involved are
allegedly missing.

Id. at 4-8.

In February 2017, Carmack met with the ombudsman of the University of Virginia,

which provides human resources and other oversight to the SWVHEC, to share his

concerns about the foregoing. Id. at 8. The ombudsman allegedly referred Carmack to the

Commonwealth's Department of Human Resources Management ("DHRM"), which in turn

suggested he contact the Commonwealth's Office of State Inspector General ("OSIG"). Id.

In mid-July, Carmack filed a complaint with the OSIG via their online website. Id. On or

about July 21, 2017, the OSIG requested Carmack send supporting documentation to Shawn

Cowardin, an OSIG Investigator. Id. In addition to filing a complaint via the Hotline, on or

about July 31, 2017, Carmack submitted a letter to the OSIG disclosing the suspected

wrongdoing and abuses alleged above. Id. Carmack claims to have relied in "good faith" on

the above-referenced assurances when he lodged his complaint with the OSIG. Id.

Carmack also spoke with Cowardin in July 2017 about whether Carmack wished to

remain anonymous. Id. Carmack and Cowardin agreed that because the information in the

complaint would be known only to the CFO, i.e., Carmack, there was no reason to remain

7

anonymous. Id. Cowardin allegedly assured Carmack that Matlock could not retaliate against him. Id. Cowardin also offered to notify Carmack prior to speaking with Matlock about Carmack's concerns. Id. In early October 2017, Carmack was notified that an investigator would be speaking with Matlock later that day. Id. at 8-9. That same day, Matlock called Kathy Heitala, Jeff Webb, Joyce Brooks, and Adam Tolbert into his office and reportedly slammed the door. Id. at 9. It was at this point that Carmack believes Matlock was contacted by the OSIG investigator. Id.

Carmack alleges that before Matlock was notified of the OSIG complaint in October 2017, each department manager had a weekly meeting with Matlock. Id. However, after learning about Carmack's OSIG complaint, Matlock ceased meeting with Carmack on a weekly basis. Id. Further, Carmack alleges after Matlock learned of his OSIG complaint, he was no longer included in any financial "[b]usiness of the [c]enter." Id. Indeed, instead of relying on the CFO, Matlock allegedly sought advice from an unnamed former employee about the budget. Id. Carmack claims that he was essentially cut off from communication with the Department of Planning and Budgeting. Id. Carmack's emails to Senior Assistant Attorney General Elizabeth Griffin were also allegedly blocked. Id. Carmack claims that Griffin was left with the impression that Carmack was ignoring her. Id.

Thereafter, an OSIG investigator came to the SWVHEC on or about October 29, 2017 to investigate a separate OSIG complaint filed by a former contract employee. Id. Carmack states, somewhat unclearly, that based on questions he was asked, it was clear that Matlock knew of his own complaint with the OSIG. Id. On November 17, 2017, the OSIG reportedly sent a letter to the Commonwealth's Secretary of Education (1) stating that it had

investigated a complaint and (2) directing the SWVHEC to provide a response to its report and to explain the "corrective action(s)" it planned to take within 30 days. Id. The letter, featuring the "subject line 'Hotline Case # 16077,'" allegedly stated, verbatim, that the OSIG had conducted "an investigation based on a complaint to the State Fraud, Waste, and Abuse Hotline (Hotline)" regarding the SWVHEC. Id. Upon information and belief, Carmack asserts that Matlock knew that the recommendations made by the OSIG were based on his complaint. Id. at 10. Further, Carmack alleges that on December 4, 2017, Joyce Brooks (who was in the closed-door meeting with Matlock described above) announced to a group of employees in the administrative hallway that "David [Matlock] had taken care of the OSIG complaint. It was Duffy [Carmack] trying to cause trouble." Id.

In addition to freezing Carmack out of SWVHEC business, Matlock allegedly took it upon himself to report the SWVHEC's financial information at the SWVHEC Board of Directors meeting in December 2017, instead of allowing Carmack to do so as was the norm given his position as CFO. Id. This same month, "in an effort to . . . undermine [Carmack's] authority and impair his ability to do his job," Matlock scolded one of Carmack's subordinate employees, Paula Moad, for requesting that human resources at the University of Virginia post a position which Matlock ultimately "gave" to the daughter of his administrative assistance, Kathy Heitala. Id. at 10, 12. Matlock further instructed Moad not to speak with Carmack. Id. at 10. Carmack wrote a letter (dated December 7, 2017) to the members of the Board of Trustees of SWVHEC informing the Board of his concerns and the reporting process with the OSIG. Id. In this letter, Carmack also informed the Board of the DHRM's suggestion that the SWVHEC utilize a third-party mediator to resolve the

issues noted in Carmack's OSIG complaint. Id. at 11. Just before the December 2017 Board meeting started, at which time Carmack's concerns were to be addressed, Senator Bill Carrico allegedly pulled Carmack aside and stated, "What is your issue? This matter will not be brought up at the meeting today! Do you understand?," or words to that effect. Id. At the meeting, Board member Steve Cochran made a motion for the Board to go into "Executive Session" to discuss Carmack's letter. Id. Under the advice of Senior Assistant Attorney General Elizabeth Griffin and Senator Carrico, the motion to discuss Carmack's letter was reportedly denied. Id.

On January 4, 2018, approximately five months after the OSIG complaint was filed, Matlock terminated Carmack without a specific allegation of misconduct. Id. at 21-22. Matlock first denied knowing Carmack was the one who made the OSIG complaint but then admitted knowing Carmack was the complainant. Id. Matlock also told Carmack that the decision to terminate Carmack was his alone. Id. at 12. Later, Matlock stated that he had discussed his decision with the Board and the Board agreed with Matlock's decision. Id. In later conversations with Board members, two members told Carmack that they were unaware of Matlock's decision to fire Carmack. Id. However, the Board members did say they knew Carmack was the OSIG complainant. Id.

## II.

The purpose of a Rule 12(b)(6) motion to dismiss is to test the legal sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, plaintiff must plead sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

10

Twombly, 550 U.S. 544, 555, 570 (2007). A complaint is "facially plausible" when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see also Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 (4th Cir. 2012) ("[T]hough we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). In considering a motion to dismiss, the court is "generally limited to a review of the allegations of the complaint itself." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016). If, after accepting all well-pleaded allegations in plaintiff's favor, it appears that plaintiff cannot prove any set of facts in support of his claim entitling him to relief, a motion to dismiss under Rule 12(b)(6) should be granted. Edwards, 178 F.3d at 244.

**III.**

The gravamen of the defendants' averments concerning Count I is that Carmack has again failed to sufficiently plead causation between his complaint to the OSIG on or about July 31, 2017 and his termination as CFO of the SWVHEC on January 4, 2018. The defendants claim both that there are not enough facts to buttress Carmack's allegation of causation and that the five-month delay between these events indicates that the termination was made without consideration of the protected activity in question, namely Carmack's OSIG complaint. The defendants further claim Carmack's amended allegations are insufficient to overcome the deficiencies this court identified in its November 6, 2018 Memorandum Opinion. ECF No. 42, at 4.

## A.

To state a claim for retaliatory discharge, the Fourth Circuit generally requires a plaintiff to plausibly allege (1) engagement in protected activity, (2) materially adverse employment action, and (3) that a causal relationship existed between the protected activity and the adverse employment activity." Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). The court previously determined that Carmack's allegations plainly satisfy the first and second elements of his retaliation claim. His filing of the OSIG complaint was a "protected activity," and his termination from the SWVHEC indisputably constitutes adverse employment action. However, the court identified two deficiencies regarding the third prong in Foster. First, the facts as alleged in Carmack's Complaint did not allow the court to reasonably infer that Matlock or anyone else at the SWVHEC was aware that he filed the OSIG complaint in question. ECF No. 31, at 15-16; see Mohammed v. Cent. Driving Mini Storage, Inc., No. 2:13cv469, 2015 WL 3607527, at *10 (E.D. Va. June

12

5, 2015). Next, the court found that Carmack did not put forth a sufficient explanation for the five-month delay between the protected activity and the alleged retaliation as required under Fourth Circuit precedent in situations where temporal proximity is lacking. ECF No. 31, at 18; see Hinton, 185 F.Supp.3d at 837-38 (relying on Perry v. Kappos, 489 Fed. Appx. 637, 643 (4th Cir. 2012)); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (indicating that a delay of five months between the protected activity and the adverse action is too long to establish causation by temporal proximity alone). For the foregoing reasons, the court finds that these deficiencies have been remedied.

With respect to the first deficiency—the threshold knowledge requirement—Carmack alleges facts sufficient to allow the court to reasonably infer that Matlock and the institutional defendants were aware that Carmack filed a complaint with OSIG in July 2017. On or about July 21, 2017, the OSIG requested Carmack submit further documentation to Shawn Cowardin, an OSIG investigator. Cowardin and Carmack later concluded because the information contained in the complaint was known only to Carmack, it would naturally be imputed to Carmack regardless of whether it was filed anonymously. Further, in October 2017, Cowardin notified Carmack that an investigator would be speaking with Matlock regarding the complaint later that day. Carmack alleges heightened hostility between Matlock and Carmack immediately after Matlock was notified about the OSIG complaint. Carmack also claims to have observed a group of employees discussing Matlock's handling of an OSIG complaint which the employees knew Carmack had lodged. Indeed, one of those

employees, Joyce Brooks,[4] stated to the group that, "David [Matlock] had taken care of the OSIG complaint. It was Duffy [Carmack] trying to cause trouble." Finally, upon Carmack's termination, Matlock also allegedly admitted to Carmack that he knew Carmack filed the complaint with the OSIG. These facts provide a sufficient basis for the court to reasonably infer that Matlock knew Carmack was the complainant.

In connection with the second deficiency identified by the court, i.e., Carmack's failure to provide a sufficient explanation bridging the five-month temporal gap, the court finds that sufficient factual matter has been set forth to survive this motion to dismiss.[5] Under the second Hinton "sufficient explanation" option, where, as here, temporal proximity between a protected activity and allegedly retaliatory conduct is missing and/or attenuated, a "sufficient explanation" must be set forth for the extended temporal gap. In assessing whether a plaintiff has proffered a "sufficient explanation," the Fourth Circuit and its courts look to factors articulated in the Third Circuit's Farrell decision in analyzing the causation prong. See, e.g., Lee v. Wade, No. 3:15CV37, 2015 WL 5147067, at *5 (E.D. Va. Aug. 31, 2015) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000)); Mohammed v. Cent. Driving Mini Storage, Inc., No. 2:13cv469, 2015 WL 3607527, at *10 (E.D. Va. June 5, 2015)); Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007). These additional factors include, inter alia, (1) antagonism or retaliatory animus during the intervening period or (2) inconsistent reasons for termination indicative of pretext. See, e.g.,

---

[4] Carmack indicates that Joyce Brooks was among those employees who met with Matlock in Matlock's office the day that Carmack believes the OSIG investigator met with Matlock. ECF No. 38, at 9.

[5] Carmack's alleges in his Amended Complaint that Matlock did not become aware of the OSIG complaint until early October, and therefore the 5-month gap is a 3-month gap. Carmack cites Hernandez v. Fairfax Cty., 719, 189 (4th Cir. 2018) and Williams v. Ceberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) for the proposition that a three-month gap suggests a finding of "strong" temporal proximity. ECF No. 44, at 15. The court need not and will not address this argument as it finds on other grounds that a sufficient explanation was proffered for the delay.

14

Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) (where temporal proximity is lacking, "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation").

In his Amended Complaint, Carmack adequately alleges both (1) antagonism and retaliatory animus directed at him in the intervening period between the date on which he filed the OSIG complaint (on or about July 31, 2017), and his termination (January 4, 2018), and suggests (2) that Matlock was inconsistent regarding who was responsible for Carmack's termination. With respect to retaliatory animus, Carmack alleges that after learning of his OSIG complaint in October 2017:

> (1) Matlock stopped meeting with Carmack once per week for managers meetings and ceased involving Carmack in any financial business of the SWVHEC. Matlock also allegedly circumvented Carmack as CFO, soliciting the assistance of a former employee to help with the SWVHEC budget.
>
> (2) Matlock cut Carmack off from communicating with the Department of Planning and Budgeting.
>
> (3) Carmack's emails to Senior Assistant Attorney General Elizabeth Griffin were blocked, giving Griffin the impression that Carmack was ignoring her.
>
> (4) In December 2017, Matlock also reported pertinent SWVHEC financial information directly to the Board, instead of allowing Carmack to present this information as was normal given his position as CFO.
>
> (5) Matlock "chastised" one of Carmack's subordinates, Paula Moad, and instructed her to not speak with Carmack. This incident allegedly followed Moad's filing of a grievance with human resources at the University of Virginia.[6]

---

[6] The grievance filed by Moad, which Matlock and Brooks allegedly "stopped," concerned a position that Matlock and Kathy Heitala improperly filed with Heitala's daughter without posting. ECF No. 38, at 10-11. Carmack apparently filed his own grievance, noting that he felt Matlock's actions vis-à-vis Moad was in retaliation for his OSIG complaint, and that since filing the OSIG complaint, he has been "ostracized by Matlock." Id. at 11.

(6) Just before the start of a Board meeting in December 2017, Carmack was pulled aside by Senator Carrico, Matlock's purported benefactor. Senator Carrico allegedly stated to Carmack, "What is your issue? This matter will not be brought up at the meeting today! Do you understand?"

ECF No. 38, at 5-12. This alleged conduct evinces sufficient retaliatory animus in the intervening period to raise a plausible inference of causation. Indeed, other courts in the Fourth Circuit have held that similar conduct may support a finding of causation.

In Lettieri v. Equant Inc., 478 F.3d 640 (4th Cir. 2007), for example, seven months lapsed between the time the plaintiff lodged her complaint of gender discrimination with her employer and the time her employer terminated her. Immediately after the plaintiff filed her gender discrimination complaint, she was denied a previously approved office transfer and "stripped of significant job responsibilities." Id. at 648. Furthermore, the defendant "reduced [the her] supervisory responsibilities over the sales team and took away [her] authority to set prices and meet with clients" —"steps [that] made it easier for [the plaintiff's employer] to take the position later that [the plaintiff] was not needed and should be terminated." Id. at 651. Therefore, the court found that although the plaintiff could not establish causation based on temporal proximity alone, the employer's conduct during the period between the plaintiff's complaint and her termination displayed a retaliatory animus against the plaintiff which was sufficient support of a causal connection. Id.; accord Miles v. Dell, Inc., 429 F.3d 480, 491 (4th Cir. 2005) (holding that a rational jury could conclude that there was a causal connection between the plaintiff's pregnancy and her eventual termination where defendant reduced plaintiff's sales territory, increased her quotas, and otherwise "set her up for . . . failure"); Pinkett v. Apex Commc'ns Corp., No. 1:08CV790 (JCC), 2009 WL 1097531, at *6

(E.D. Va. Apr. 21, 2009) (holding that plaintiff submitted sufficient evidence of defendants' retaliatory animus during intervening period sufficient to show causal link where defendants' "changed [plaintiff's work responsibilities, hours, equipment, and general working environment, and . . . assigned her impossible tasks," as well as gave her an old computer without providing a password to access it).

Here, as in Lettieri, Carmack alleges that his responsibilities and/or supervisory role as CFO were diminished significantly following the filing of his complaint with the OSIG. Specifically, Carmack claims that Matlock (1) sought out budgetary advice from another employee rather than from Carmack, the CFO of the SWVHEC; (2) ceased holding weekly manager meetings with Carmack; (3) himself delivered a report regarding the financial standing of the SWVHEC to the Board of Directors, despite this ostensibly being Carmack's responsibility as CFO; and (4) instructed several SWVHEC employees, including one of Carmack's subordinates, Paula Moad, to not speak with him, making Carmack's supervisory role more difficult. Carmack also alleges that his emails to Senior Assistant Attorney General Elizabeth Griffin were "blocked" and that he was excluded generally from finance department decision-making. The court finds that these allegations are sufficient at this early stage in the litigation to bridge the temporal gap between the OSIG complaint and the adverse employment action at issue in this case.

In addition to his allegations of retaliatory animus in the intervening period, Carmack alleges that Matlock was inconsistent with respect to who was responsible for the termination. Matlock initially told Carmack the decision to terminate him was Matlock's decision alone. Matlock then allegedly stated that he had discussed Carmack's termination

with the Board of the SWVHEC and suggested that the Board agreed with his decision. Marcia Gilliam, a former Board member and past chair of the Foundation, allegedly told Carmack that she was not aware of the decision to terminate Carmack. ECF No. 38, at 12. Donna Henry, an Executive Committee member, also reportedly told Carmack that she was unaware Carmack was going to be terminated. Id. In several other conversations, other members of the Board told Carmack that they had no knowledge of plans to restructure the SWVHEC or any other alleged financial issues of the sort cited by the defendants in justifying his termination. Id. Indeed, contrary to Matlock's claim that Carmack was terminated along with two other employees for budgetary reasons, Carmack alleges that the (1) other employees "laid-off" in fact retired and had planned to do so for many months, and that (2) there was no budget shortfall, evidenced by the fact that new positions were created after Carmack's termination. Id. Carmack further claims that there was an excess of $700,000 in non-general fund revenue available to cover staff salaries if the budget was reduced unexpectedly. Id. at 13.

Following at least one of the above-referenced retirements, Matlock allegedly filled a position that had been "frozen" for four years with the daughter of his administrative assistant, Kathy Heitala. Id. at 12. This was done despite the alleged budgetary shortfall and the fact that Carmack was qualified for this position. This latter fact is relevant because per the terms of Virginia's Workforce Transition Act of 1995, which was advanced as the justification for Carmack's termination, a state agency in the executive branch, prior to involuntarily separating an employee, must "make every effort to place the employee in any vacant position within the agency for which the employee is qualified." § 2.2-3201.

The only fact qualifying as an inconsistency in the "reasons" for the termination, as opposed to an inconsistency as to who was responsible for the termination, relates to the alleged budgetary shortfall. If the alleged shortfall was in fact non-existent, then the defendants' invocation of it to justify Carmack's termination would appear pretextual. See, e.g., Allen v. Garden City Co-op, Inc., 651 F. Supp. 2d 1249, 1258 (D. Kan. 2009) (holding that a "plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action"); Brooks v. Cty. Comm'n of Jefferson Cty. Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (holding that plaintiff "may succeed . . . directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"); Ham v. Washington Suburban Sanitary Comm'n, 158 F. App'x 457, 463 (4th Cir. 2005) (holding that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision" (citation omitted)); accord Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 134 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). The court, drawing all reasonable inferences in Carmack's favor, holds that his pleadings and allegations of inconsistencies and dissembling by Matlock suffice at this stage in the litigation.

In sum, Carmack sufficiently remedied the causation issues identified by the court, He has alleged facts which allow the court to reasonably infer that the defendants were

aware of the OSIG complaint. He has also plead facts indicative of retaliatory animus during the relevant intervening period and adequately alleged various inconsistencies surrounding his termination, supporting a plausible inference of causation necessary to maintain a retaliatory discharge in violation of Virginia's Fraud and Abuse Whistle Blower Protection Act. The defendants' motion to dismiss Count I is **DENIED**.

## IV.

In Count III, Carmack asserts that he was wrongfully discharged for reporting instances of wrongdoing at the SWVHEC in violation the public policy of the Commonwealth of Virginia. The defendants assert that Count III should be dismissed because Carmack failed to plead a sufficient statutory basis for a <u>Bowman</u> claim.[7] More specifically, they argue that Carmack's reliance on the First Amendment of the United States Constitution is misplaced, as it cannot support a <u>Bowman</u> claim because it is not a "Virginia statutory authority." The defendants also claim that Article 1, Section 12 of the Virginia Constitution is not sufficiently tailored to support a <u>Bowman</u> claim. Finally, they assert that Virginia's grievance procedure for state employees, Va. Code Ann. § 2.2-3000 (1950), cannot support a <u>Bowman</u> claim because the statute itself provides a remedy. The defendants argue that the existence of a such a statutory remedy precludes Carmack from using a <u>Bowman</u> claim to vindicate the public policy articulated in Va. Code Ann. § 2.2-3000 (1950).

---

[7] There is no single case adumbrating the prima facie elements of a wrongful termination claim under <u>Bowman</u>. However, several Virginia court holdings suggest that a plaintiff must establish (1) that her employer terminated her, (2) that her termination violated a public policy of the Commonwealth of Virginia, and (3) that there is a causal link between her termination and the named public policy violation. <u>See</u> <u>Shaw v. Titan Corp.</u>, 498 S.E.2d 696, 699 (Va. 1998); <u>see also</u> <u>Eslami v. Global One Comm'n, Inc.</u>, 48 Va. Cir. 17, 18 (1999).

Virginia adheres to a strong presumption that employment is at will, meaning employment lasts for an indefinite term and can be terminated for almost any reason. See Lockhart v. Commonwealth Educ. Sys. Corp., 247 Va. 98, 102, 439 S.E.2d 328, 330 (1994). However, there is an exception to this doctrine for at-will employees who claim to have been discharged in violation of public policy. See Bowman v. State Bank of Keysville, 229 Va. 534, 331 S.E.2d 797, 801 (1985). The Supreme Court of Virginia has recognized three situations in which a litigant may show her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy" (e.g., "It is the public policy of the Commonwealth of Virginia that . . . "); and (3) "where the discharge was based on the employee's refusal to engage in a criminal act." Rowan v. Tractor Supply Co., 263 Va. 209, 559 S.E.2d 709, 711 (2002).

Here, Count III alleges that Carmack was wrongly terminated in violation of the public policy underlying Virginia law, and, as a direct result, Carmack suffered and will continue to suffer "pecuniary loss, loss of employment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss." ECF No. 38, at 15. Carmack alleges that his claim falls under the second Bowman category: a termination in contravention of a public policy of the Commonwealth of Virginia. He advances three distinct sources expressing a public policy proscribing retaliation for speech of the sort alleged in this case: (1) the First Amendment to the United States Constitution; (2) Article 1, Section 12 of the Constitution of Virginia; and (3) Va. Code Ann. § 2.2-3000

(1950). The court will address each of the three alleged bases for Carmack's <u>Bowman</u> claim in turn.

## A.

In their motion to dismiss, the defendants argue that because the United States Constitution is not "Virginia statutory authority," it cannot support a <u>Bowman</u> claim. The court concurs. Indeed, it is clear in Virginia that plaintiffs cannot cite federal statutes as the source of a public policy exception to the at-will doctrine. <u>See</u> <u>Lawrence Chrysler Plymouth Corp. v. Brooks</u>, 251 Va. 94, 94, 465 S.E.2d 806, 807 (1996) (noting that the plaintiff "does not have a cause of action for wrongful discharge because he is unable to identify any Virginia statute establishing a public policy"); <u>see also</u> <u>Oakley v. May Dep't Stores Co.</u>, 17 F. Supp. 2d 533, 536 (E.D. Va. 1998) (holding that Title VII cannot serve as a public policy and noting that the plaintiff's claim must be based on public policies "derived from Virginia statutes, not federal laws"); <u>Wenig v. Hecht Co.</u>, 47 Va. Cir. 290, 1998 WL 972350, at *3 (Fairfax Cty. Oct. 29, 1998) ("Wenig [the plaintiff] argues that a federal statute can serve as the basis for her wrongful termination action. This argument fails in that Wenig is obliged to cite a Virginia statute to support her claim."); <u>Anderson v. ITT Indus. Corp.</u>, 92 F. Supp. 2d 516, 519 (E.D. Va. 2000) (holding that plaintiff "alleged only violation of a federal law, namely the False Claims Act, which is insufficient to state a claim for wrongful discharge under Virginia law").

In <u>McCarthy v. Texas Instruments, Inc.</u>, 999 F. Supp. 823, 829 (E.D. Va. 1998), a female employee terminated from her job brought an action against her employer, alleging gender discrimination under federal and state laws. The plaintiff based her <u>Bowman</u> claim

on, <u>inter alia</u>, Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment to the United States Constitution. <u>Id.</u> at 830-31. The court held that the plaintiff's reliance on Title VII was "facially unavailing," as Title VII, a federal statute, "does not provide an expression of Virginia's public police," and a <u>Bowman</u> claim "must find root in state statute." <u>Id.</u> at 829 (citing <u>Lawrence Chrysler Plymouth Corp. v. Brooks</u>, 251 Va. 94, 465 S.E.2d 806, 809 (1996)). For this same reason, the <u>McCarthy</u> court found that the plaintiff's reliance on the Fourteenth Amendment to the United States Constitution to be equally unavailing. <u>Id.</u> In accordance with the holding in <u>McCarthy</u> and the holdings of numerous Virginia courts, Carmack cannot rely on the First Amendment to the United States Constitution to support a <u>Bowman</u> claim.

## B.

Next, the defendants, citing several Virginia state court holdings, argue that Article 1, Section 12 of Constitution of Virginia cannot serve as a basis for a speech-related <u>Bowman</u> claim because that public policy is not sufficiently tailored. Article I, Section 12, establishes the free speech rights of citizens of the Commonwealth of Virginia. This section provides, In relevant part, that "any citizen may freely speak, write, and publish sentiments on all subjects." Va. Const. Art 1, § 12. Carmack, while acknowledging the Virginia state court precedent cited by the defendants refusing to recognize the Virginia Constitution as a basis for a <u>Bowman</u> claim, contends (1) that this precedent is not binding on the court and that, in any event, (2) "it defies credulity to suggest that the public policy of Virginia is not set forth in the Constitution of Virginia . . . ." ECF No 44, at 18-19. Carmack is correct that the question of whether or not the Constitution of Virginia can support a <u>Bowman</u> claim has

not been definitively decided by the Supreme Court of Virginia. Nevertheless, the court finds

the reasoning of Virginia's lower courts persuasive on this issue.

To rely on any given statute in support of a common law action for wrongful

discharge, an employee must be a member of the class of persons that the specific public

policy was designed to protect. See City of Virginia Beach v. Harris, 259 Va. 220, 233, 523

S.E.2d 239, 245 (2000). In Baldwin v. Baker, 94 Va. Cir. 366, 367 (Cir. Ct. 2016), the plaintiff

asserted a common law tort claim against two defendants for wrongful discharge in violation

of Article I, Section 12 of the Virginia Constitution (hereinafter, "Article I, Section 12"). The

plaintiff relied on Bowman and the third policy exception to the employment at-will doctrine

listed in Rowan, 263 Va. at 209, 559 S.E.2d at 711. The Baldwin court rejected the plaintiffs'

reliance on Article I, Section 12, stating:

> Article I, Section 12, does not provide an explicit right for a
> narrow class of persons, namely employees of the CSB
> [Community Service Board], to exercise their right of free
> speech. Article I, Section 12, has no provision for employee
> rights and does not create a class of persons directly entitled to
> protection into which employees of the CSB belong. Plaintiffs'
> concede that there is no direct authority applying a Bowman
> cause of action to the public policy of Article I, Section 12. The
> Court, therefore, finds that Plaintiffs fail to state a claim for an
> intentional tort for wrongful discharge under the public policy
> of Article I, Section 12, of the Virginia Constitution.

Id. at 377. In accordance with the holding in Baldwin that Article I, Section 12 is not

sufficiently tailored to a specific class to support a Bowman claim and the Supreme Court of

Virginia's "consistent[] characterize[ation] [of] [Bowman] exceptions as narrow" and limited,

Harris, 259 Va. at 232, 523 S.E.2d at 245, the court finds no basis in Virginia law for

expanding the scope of Bowman by allowing for claims to be brought pursuant to broad

pronouncements in the Virginia Constitution. See Rowan v. Tractor Supply Co., 263 Va.

209, 213, 559 S.E.2d 709, 711 (2002) ("While virtually every statute express a public policy of

some sort, we continue to consider this exception to be a 'narrow' exception and to hold

that 'termination of an employee in violation of the public policy underlying any one [statute]

does not automatically give rise to a common law cause of action for wrongful discharge.'").

Indeed, the court's survey of Virginia law revealed not one example of a Virginia

court allowing a speech-related Bowman claim predicated on Article 1, Section 12.[8]

Moreover, in Clossin v. Morris, No. CIV.A. 3:05-CV-00039, 2006 WL 1134149, at *4–5

(W.D. Va. Apr. 24, 2006), the district court declined to exercise supplemental jurisdiction

over a Bowman claim based on Article, Section 12, holding, in relevant part:

> In this case, the Court is uncertain how a Virginia court would
> rule on Plaintiff's Bowman claim. On one hand, Virginia courts
> agree that the scope of the Bowman exception is narrow and
> that not all state statutes give rise to a Bowman claim. Further,
> at least one Virginia circuit court has ruled that the Virginia
> Constitution is not a permissible source of public policy for a
> Bowman claim. Glaser v. Titan Corp., No. 159607, 1997 WL
> 1070646 (Va. Cir. Ct.1997) (unpublished). In addition, Article 1,
> Section 12 is coextensive with the protections of the federal
> First Amendment. Elliott v. Com., 267 Va. 464, 473, 593 S.E.2d

---

[8] In McCarthy v. Texas Instruments, Inc., 999 F. Supp. 823, 829 (E.D. Va. 1998), the district court stated that although the "Virginia Constitution is not a statute . . . to hold that the requirement of Lawrence Chrysler Plymouth precludes plaintiff's reliance on the state constitution as a basis for her wrongful termination claim would be to elevate form over substance. Unlike the case with local ordinances, there can be no doubt that the Virginia Constitution expresses, as Bowman and its progeny require, 'the public policy . . . underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general.'" Ultimately, however, and for reasons inapposite to the case before this court, the McCarthy court did not permit the Bowman claim based in part on the Virginia Constitution to proceed. Moreover, the Supreme Court of Virginia has pirouetted around the question of whether the Virginia Constitution is properly considered as a source of "public policy" for purposes of a Bowman claim. In Lawrence Chrysler Plymouth Corp. v. Brooks, 251 Va. 94, 465 S.E.2d 806 (1996), Virginia's highest court noted that the plaintiff "does not have a cause of action for wrongful discharge because he is unable to identify any Virginia statute establishing a public policy that [defendant] violated. We also reject [plaintiff's] attempt to expand the narrow exception we recognized in Bowman by relying upon so-called 'common law duties of the dealership.'" In a later case, Bailey v. Scott-Gallaher, Inc., 253 Va. 121, 127, 480 S.E.2d 502, 505 (1997), the Supreme Court of Virginia indicated that Brooks created a "requirement" for "identifying a statutory embodiment of the public policy of the Commonwealth." Brooks and Bailey appear to require that Bowman claims be grounded in an expression of policy embodied in a specific Virginia statute.

25

> 263 (2004). Hence, a <u>Bowman</u> claim under Virginia's free
> speech provision would have exactly the same reach as a section
> 1983 First Amendment claim and would essentially be
> redundant, an interpretation which also casts doubt on
> Plaintiff's <u>Bowman</u> argument. <u>See</u> <u>Newton</u>, 843 F. Supp. at
> 1025. On the other hand, for a statute to create a cause of
> action under <u>Bowman</u>, it must be "designed to protect the
> property rights, personal freedoms, health, safety, or welfare of
> the people in general." <u>City of Virginia Beach v. Harris</u>, 259 Va.
> 220, 232, 523 S.E.2d 239 (2000). Article 1, Section 12 seems to
> comply with that requirement.

<u>Id.</u> In declining to exercise jurisdiction over the <u>Bowman</u> claim, the <u>Clossin</u> court explained

that because the plaintiff's reliance on Article 1, Section 12 claim raised a "novel or complex

issue of state law" as yet unresolved, and in light of the "possible repercussions a decision on

this issue could have for both the <u>Bowman</u> exception and the employment at will doctrine,"

it would be "improper for a federal court, without state law to guide it, to plow new ground

in a state law field." <u>Id.</u> This court is similarly circumspect about charting new waters for

public policy and/or rendering a decision on this question of state law. <u>See Joyner v. Fillion</u>,

17 F. Supp. 2d 519, 528 (E.D. Va. 1998) (rejecting plaintiff's reliance on the Virginia

Constitution and noting that "[s]ince <u>Bowman</u>, all subsequent Supreme Court of Virginia

cases upholding wrongful discharge claims have rested on the basis of statutes which, in

their text, announce public policies"); <u>see also</u> <u>Glaser v. Titan Corp.</u>, No. 159607., 1997 WL

1070646, at *2 (Va. Cir. Ct. July 16, 1997) ("No Virginia appellate decisions have addressed

whether the Virginia Constitution may serve as the basis of a wrongful termination action.

However, the Virginia Supreme Court has required plaintiffs in such cases to identify the

precise Virginia statute which the defendant allegedly violated.").

**C.**

The third and final source of public policy proffered in support of Carmack's

Bowman claim is Virginia's State Grievance Procedure, Va. Code Ann. § 2.2-3000 et seq.

(1950). In conjunction with the Virginia Personnel Act, Va. Code Ann. § 2.2-2900 et seq,

Virginia's General Assembly established the grievance procedure for handling state employee

complaints arising in the workplace. See Murphy v. Virginia Dep't of State Police, 68 Va.

App. 716, 719, 813 S.E.2d 21, 23 (2018). The grievance procedure regulates the conduct of

the Commonwealth of Virginia as an employer, and states, in relevant part:

> It shall be the policy of the Commonwealth, as an employer, to
> encourage the resolution of employee problems and complaints.
> To that end, employees shall be able to discuss freely, and
> without retaliation, their concerns with their immediate
> supervisors and management. To the extent that concerns
> cannot be resolved informally, the grievance procedure shall
> afford an immediate and fair method for the resolution of
> employment disputes that may arise between state agencies and
> those employees who have access to the procedure under
> Virginia Code § 2.2-3001.

Va. Code Ann. § 2.2-3000. Even if the court were to assume, arguendo, that Virginia's

grievance procedure implicates and/or is designed to protect the property rights, personal

freedoms, health, safety, or welfare of the people in general,[9] Virginia courts have repeatedly

refused to permit retaliatory discharge claims based on public policies contained in statutes

which themselves provide a remedy for enforcing and vindicating of that policy. Here, the

statute in question provides just such a remedy.

---

[9] See Lockhart v. Commonwealth Educ. Sys. Corp., 247 Va. 98, 104, 439 S.E.2d 328, 331 (1994) (holding that in Miller v. SEVAMP, Inc., 234 Va. 462, 362 S.E.2d 915 (1987), "we explained that the narrow exception recognized in Bowman is limited to discharges which violate *public* policy, that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." (italics in original)).

To "fully achieve the objectives" of the policy articulated in Va. Code Ann. § 2.2-3000 (hereinafter, "§ 2.2-3000"), the grievance procedure creates a formal process for resolving employment-related disputes. The statutory scheme provides for up to three successive levels of management review, followed by a formal hearing, review by an independent state agency, and finally, an appeal to the appropriate circuit court under specific circumstances. See Va. Code Ann. §§ 2.2-3003–3006. To initiate the grievance process, an employee must present a written complaint to management within 30 days of the employee's knowledge of the event forming the basis of the complaint. See Id. § 2.2-3003(C). Upon receipt of a timely written complaint, management must review the grievance, respond to the merits of the complaint, and provide "at least one face-to-face meeting between the employee and management." Id. § 2.2-3003(D). In the event the meeting does not resolve the grievance, the employee can request a grievance hearing. Those grievances qualifying for a hearing include, inter alia, "acts of retaliation as the result of the use of or participation in the grievance procedure or because the employee . . . has reported an incidence of fraud, abuse, or gross mismanagement." Id. § 2.2-3004(A).

The holdings of numerous Virginia courts suggest that an extensive statutory remedy and procedure of the sort contained in Va. Code Ann. § 2.2-3000 for violations of the policy articulated therein is the exclusive remedy available to state employees. In the case of Va. Code Ann. § 2.2-3000, one of the explicitly stated "grievances qualifying for a grievance hearing" are "acts of retaliation as the result of the use of or participation in the grievance procedure." In Jenkins v. Heilig-Meyers Co., 57 Va. Cir. 448 (1998), the plaintiff argued that Va. Code Ann. § 40.1-51.2:2 (1950) should be extended to establish a basis for a Bowman

claim. Section 40.1–51.2:2 provided two ways in which an employee who has been

terminated in a retaliatory manner may seek redress. Under § 40.1–51.2:2(A), the employee

may file a complaint with the Commissioner of Labor and Industry ("Commissioner"), and

if the Commissioner deems the complaint meritorious and cannot facilitate a voluntary

agreement with the employer, the Commissioner may bring a civil action in circuit court. In

holding that the remedy promulgated by § 40.1–51.2:2 is the "exclusive remedy" under

Virginia law, the Jenkins court stressed:

> If the termination is in violation of stated public policy, the law
> does not permit the aggrieved employee to pursue a common
> law remedy when a statutory remedy is clearly enunciated. The
> statutory relief is therefore the exclusive remedy for the
> violation. To allow a broader remedy than
> the statute specifically provides, would require a court to
> abandon the principle of "strict construction" and destroy the
> legislative scheme as contemplated and created by the General
> Assembly.

Id. at 448. This same principle, i.e., that "[when] a statute creates a right and provides a

remedy . . . , then that remedy is exclusive unless the statute says otherwise," Concerned

Taxpayers of Brunswick Cty. v. Cty. of Brunswick, 249 Va. 320, 330, 455 S.E.2d 712, 717-18

(1995), has been similarly applied by numerous Virginia courts to find that statutes

containing their own remedy cannot also support a Bowman claim. See, e.g., Humphrey v.

Columbia/HCA John Randolph, Inc., 46 Va. Cir. 109, 111 (Cir. Ct. 1998) (Virginia Drug

Control Act contains "a specific criminal penalty and enforcement mechanism" that

"underscores the intent of the legislature that this statute was not to have a separate

mechanism or civil enforcement under the exception to the employment-at-will doctrine");

Judy v. Nat'l Fruit Prod. Co., 40 Va. Cir. 244, 244-45 (Cir. Ct. 1996) (Va. Code Ann. § 40.1-

29

51.2:2 provides a remedy for employees "discharged or otherwise discriminated against . . . [because the employee has filed a safety or health complaint]," and therefore it cannot support a <u>Bowman</u> claim); <u>Pruitt v. Johnston Mem'l Hosp., Inc.</u>, 21 Va. Cir. 188, 188-89 (Cir. Ct. 1990) (holding that the availability of a statutory remedy for employee complaining of unsafe working conditions pursuant to the Virginia Safety Act, Va. Code Ann. § 40.1-44.1 <u>et seq.</u> precludes the bringing of a <u>Bowman</u> claim); <u>Cauthorne v. King</u>, 30 Va. Cir. 202, 203-05 (Cir. Ct. 1993) (Virginia Fair Housing Law, Va. Code Ann. § 36-96.1 <u>et seq.</u> provides its own remedies and therefore cannot support a separate <u>Bowman</u> wrongful discharge claim); <u>Gochenour v. Beasley</u>, 47 Va. Cir. 218, 224 (Cir. Ct. 1998) ("It has been long held that a civil statute which prohibits certain activity and provides specific remedies for an aggrieved party is self-contained and it is not the intent of the Legislature that it . . . could also serve as the basis of a <u>Bowman</u> type claim.").

In the present case, the statute in question has its own mechanisms and extensive remedial scheme. The statute specifically contemplates employees pursuing their grievances, including a grievance of the sort alleged—retaliation as a result of the use of the grievance procedure or for reporting an incidence of fraud, abuse, and/or mismanagement—in the manner set forth in the procedure. The persuasive precedent cited above suggests that the existence of such a scheme alone disqualifies the underlying policy from also supporting a <u>Bowman</u> claim. Moreover, Carmack's pleadings do not clearly indicate that he availed himself or attempted to avail himself of the grievance procedure process mandated by Va. Code Ann. §§ 2.2-3003–3006 specifically. <u>Cf.</u> <u>Murphy v. Virginia Dep't of State Police</u>, 68 Va. App. 716, 719, 813 S.E.2d 21, 22–23 (2018). Instead, it appears that Carmack took a

more improvised approach to raising his concerns about alleged misconduct at the SWCHEC. There is no evidence, for example, that Carmack presented a written complaint to SWVHEC management as required by § 2.2-3003(C). Further, while Carmack alleges that he "attempted to file a grievance concerning Matlock," and that this grievance went "unaddressed" and/or was "never responded to," ECF No. 44, at 19-20, there is no indication that he attempted to hold the defendants accountable for this noncompliance in the manner set forth in § 2.2-3003(G). In short, it is not clear to the court that Carmack utilized the internal statutory remedy supplied by the Virginia legislature before invoking and attempting to leverage the underlying policy of the grievance procedure to support of an entirely different kind of remedy in federal court. There is no indication that the Virginia legislature, in crafting the remedial process through which to "fully achieve" the statutory objectives of Va. Code Ann. § 2.2-3000, intended that the policy articulated therein serve as an independent basis for a <u>Bowman</u> claim.

Furthermore, Carmack's reliance on <u>McFarland v. Virginia Ret. Servs. of Chesterfield,</u> L.L.C., 477 F. Supp. 2d 727, 732–33 (E.D. Va. 2007), is misplaced for many of the reasons alluded to above. In <u>McFarland,</u> the court permitted a <u>Bowman</u> wrongful discharge claim in finding in favor of a retirement home employee who was discharged from her employment for reporting deficiencies in the care of residents at the facility and answering a state investigator's questions truthfully. <u>Id.</u> at 733. The <u>Bowman</u> claim in <u>McFarland</u> was based upon Va. Code Ann. § 63.2–1606(B), which stated, in relevant part, that "[a]ll persons required to report suspected adult abuse, neglect or exploitation shall cooperate with the investigating adult protective services worker of a local department and shall make

31

information, records and reports which are relevant to the investigation available to such worker to the extent permitted by state and federal law." Id. at 733-34. The McFarland court held that the plaintiff adequately alleged that the defendants violated Virginia's policy mandating the reporting of suspected abuse or neglect of elderly residents by terminating her in retaliation for fulfilling her statutory duty. Id. at 733. However, the defendants in this case correctly note that quite unlike Va. Code Ann. § 2.2-3000, Va. Code Ann. § 63.2-1606 did not provide any remedy for redressing retaliatory conduct by a mandated reporter. This crucial dissimilarity explains why the recognition of a Bowman claim in McFarland was appropriate. See Cauthorne, 30 Va. Cir. at 202 ("The public policy exception recognized in Bowman contemplated the absence of another remedy[.]"); Shields v. P C-Expanders, Inc., No. 119505., 1993 WL 946038, at *3 (Va. Cir. Ct. Apr. 15, 1993) ("Unlike Bowman, here the goal of the statute can be fulfilled through the remedy provided by the statute itself. An additional remedy, fashioned through a public policy exception to the at-will employment doctrine, is not needed.").

For the foregoing reasons, the court believes that under the particular circumstances present in this case, where there was no clear showing that Carmack attempted to follow the specific remedial procedures set forth in detail Va. Code Ann. § 2.2-3000, that the Supreme Court of Virginia would permit his bringing of a Bowman claim. To allow a Bowman claim under such circumstances would enable a plaintiff to circumvent extensive remedial schemes crafted by the Virginia General Assembly, thereby rendering them a nullity.

**V.**

32

Count IV, brought in the alternative and pursuant to 42 U.S.C. § 1983, alleges a cause of action under the First Amendment of the United States Constitution. Carmack alleges that Matlock terminated him because he "is not a Republican," i.e., due to his political affiliation. ECF No. 38, at 16. Carmack claims that he "exercised or was perceived to exercise his First Amendment rights of political participation, association and speech," and that such conduct was "a substantial or motivating factor in the culpable defendants' actions." Id. at 16. The defendants claim that Carmack fails to assert facts which bridge the approximately 26-month period between the alleged political remarks, see id. at 3, and Carmack's termination. In asserting Count IV, Carmack did not allege any specific examples of political "speech" per se and thus the court will analyze Count IV as a claim asserting retaliation on the basis of political association/affiliation only. See Smith v. Frye, 488 F.3d 263, 267 (4th Cir. 2007) (noting that although district court did not err in finding that plaintiff's First Amendment claim failed to the extent it rested on speech that had not occurred, "we must also review the claim that her firing violated her First Amendment associational rights").

The First Amendment protects both an individual's freedom of speech and also "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). The First Amendment also contains protections for an individual's right to association and political affiliation. Indeed, a line of Supreme Court decisions has established that a public employee may not, consistent with the First and Fourteenth Amendments, be terminated for his political affiliation or lack thereof. See Elrod v. Burns, 427 U.S. 347 (1976) (plurality opinion); Branti v. Finkel, 445

U.S. 507 (1980). "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Rutan v. Republican Party of Ill., 497 U.S. 62 (1990). The Fourth Circuit has succinctly described the process for assessing First Amendment claims based on political affiliation:

> A public employee's claim that an adverse employment decision was motivated by the exercise of the employee's First Amendment right of political affiliation is analyzed under the burden-shifting framework set forth in Mt. Healthy. See Umbehr, 116 S. Ct. at 2347. In order to prevail under Mt. Healthy, the plaintiff must first establish by a preponderance of the evidence: (1) that the plaintiff's conduct at issue was constitutionally protected, and (2) that it was a substantial or motivating factor in the employment decision. See id. Once this burden is met, the defendant may escape liability only by proving by a preponderance of the evidence that the same employment action would have been taken absent the protected conduct. See id.

Cooper v. Lee County Bd. of Supervisors, No. 98–2083, 1999 WL 631240, at *6 (4th Cir. Aug. 19, 1999) (unpublished) (citations omitted); see Martinez–Velez v. Rey–Hernandez, 506 F.3d 32, 39 (1st Cir. 2007) ("To establish a prima facie case of political discrimination in violation of the First Amendment, . . . a plaintiff must properly plead, that: (1) the plaintiff and the defendant belong to opposing political affiliations, (2) the defendant has knowledge of the plaintiff's affiliation, (3) a challenged employment action occurred, and (4) political affiliation was a substantial or motivating factor behind the challenged employment action."). The defendants do not appear to address (or dispute) whether Carmack's political affiliation as such is constitutionally protected. They contend rather that Carmack has not adequately pled facts showing that his political affiliation was a substantial or motivating

34

factor in the adverse employment decision. For the reasons set forth below, the court agrees that the causation element of Count IV has not been adequately pled.

In assessing the issue of causation, the Fourth Circuit has indicated that "[o]ur causation analysis for . . . association claims is the same as for speech claims. The plaintiff bears the initial burden of proving that his exercise of his First Amendment rights was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." Bland v. Roberts, 730 F.3d 368, 375 (4th Cir. 2013), as amended (Sept. 23, 2013) (first citing, Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993), then citing, Sales v. Grant, 158 F.3d 768, 775–76 (4th Cir. 1998)). In order to prove that a retaliatory employment action violated a public employee's free speech rights, the employee must satisfy the three prong-test laid out in McVey v. Stacy, 157 F.3d 271 (4th Cir.1998) (the "McVey test"). The third prong of the McVey test requires a "sufficient causal nexus between the protected speech and the retaliatory employment action," which in turn requires a showing that the employee's speech was "substantial factor in the employee's termination decision." Id. at 277-78.

The Fourth Circuit's approach to the causation element in retaliatory discharge cases involving speech claims is the same as any other retaliatory discharge case involving, for example, discrimination in violation of Title VII. See Penley v. McDowell Cty. Bd. of Educ., 876 F.3d 646, 655–56 (4th Cir. 2017). In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity. See Tobey v. Jones, 706 F.3d 379, 387–88 (4th Cir. 2013) (examining causal connection for First Amendment retaliation claim); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (examining causal relationship in Title VII context); see

also Saleh v. Upadhyay, 11 Fed.Appx. 241, 256–57 (4th Cir. 2001) (per curiam). It follows

that "generally the passage of time . . . tends to negate the inference of [causation]." Price,

380 F.3d at 213; Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653,

657 (4th Cir. 1998) (holding that "[a] lengthy time lapse between the employer becoming

aware of the protected activity and the alleged adverse employment action . . . negates any

inference that a causal connection exists between the two."); see Clark Cty. Sch. Dist. v.

Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between

an employer's knowledge of protected activity and an adverse employment action as

sufficient evidence of causality to establish a prima facie case uniformly hold that the

temporal proximity must be very close.").

## A.

Carmack has not adequately or plausibly pled the causation element of McVey as

interpreted by courts in the Fourth Circuit. First, Carmack's allegations vis-à-vis the issue of

political affiliation are either unrelated to his termination or extraordinarily vague. To

support Count IV, Carmack first alleges: (1) that he is a Democrat, (2) Matlock is a

Republican, (3) and that Matlock was chosen for his political affiliation by the Chairman of

the Board for the SWVHEC, Senator Carrico (Republican), despite the fact that Carmack

was chosen by the prior Executive Director, Dr. Rachel Fowlkes (Democrat), to be her

replacement. ECF No. 44, at 17. None of these facts relate to Carmack's termination. The

court agrees with the defendants that Carmack appears to be asserting a failure to promote

to claim, although such a claim was not explicitly pled. In any event, although 18 U.S.C. §

1983 provides a federal cause of action, the length of the statute of limitations is governed by

the law of the state in which the cause of action arose. See Wallace v. Kato, 549 U.S. 384, 387-88 (2007). Federal law dictates that, for uniformity's sake, all § 1983 actions arising from events in Virginia are governed by its two-year, residual statute of limitations for all personal injury cases, Virginia Code Ann. § 8.01-243(A). Thompson v. Clarke, No. 7:17CV00010, 2018 WL 1955424, at *3 (W.D. Va. Apr. 25, 2018); see Owens v. Okure, 488 U.S. 235, 250 (1989) (finding that in states with multiple statutes of limitations for personal injury claims, "courts considering § 1983 claims should borrow the general or residual statute [of limitations] for personal injury actions")[10]

Irrespective whether the accrual date is held to have begun running on April 2015, when Senator Carrico advised Carmack not to apply for the Executive Director position, or October 2015, when Matlock began to work as Executive Director, any failure to promote claim brought pursuant to § 1983 would be time-barred by Virginia's statute of limitation for such actions. The record indicates that this suit was initiated by Carmack in the Circuit Court for Montgomery County in June 2018. If the court were to apply the April 2015 for statute of limitations purposes, the time elapsed would be approximately 3 years and 2 months. If the court were to instead apply the October 2015 date, the time elapsed would be 2 years and 8 months. In other words, regardless of when the accrual period begins, a failure to promote claim would be time-barred. See Va. Code Ann. § 8.01-243(A) ("[E]very action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues."). Therefore,

---

[10] Section 8.01-243(A) allows a litigant two years from the time his claim accrues to file that claim in court. A § 1983 claim accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir. 1995).

Carmack is left only with his retaliatory discharge claim, for which, as the court observed above, the first three facts proffered by Carmack are not particularly probative.

Carmack next alleges that (4) "at least Adam Tolbert, Jeff Webb, and David Matlock," made "comments" to Carmack that he "belonged to the wrong party" or "you belong to the other party," or "words to that effect." ECF No. 38 at 3. Further, Carmack alleges that in November 2015, shortly after Matlock assumed the position of Executive Director of the SWVHEC and "close in time to making the[ ] statements about belonging to the wrong party," (5) Matlock called Carmack "into his office and relayed a story about 'needling.'" ECF No. 38, at 3. Matlock allegedly explained that "needling" is "when a mother bird places sharp objects in the nest to encourage baby birds to leave the nest" and that this was the way Matlock "got rid of employees he did not want." Id. at 3-4. In his opposition to the motion to dismiss, Carmack stated that "Matlock proceeded to poke Carmack out of the bird[ ] nest thereafter." ECF No. 44, at 17. Neither the vague comments allegedly made by "at least" Tolbert, Webb, and Matlock nor the vague recapitulation of the "needling" story suffice for this court to infer that Carmack's political affiliation was a substantial or motivating factor in termination in January 2018. Indeed, Carmack has not provided sufficient context as to the vague "comments" and/or needling story or what he meant by the allegation that Matlock proceeded to "poke [him] out of the . . . nest thereafter" for the court to plausibly infer causation.

The court's inability to plausibly infer causation from the allegations above is undiminished by an examination of the issue of temporal proximity. Carmack was terminated on January 4, 2018, approximately two years and two months after the most

38

recent remark was allegedly made about his political affiliation in November 2015. This pronounced lack of temporal proximity substantially weakens any inference of causation. Indeed, as the Fourth Circuit found in Penley v. McDowell County Board of Education, "eight to nine months is too distant to raise an inference of causation." 876 F.3d at 656–57; see also Booth v. Maryland, 337 Fed. App'x 301, 310 (4th Cir. 2009) (nine month lapse too remote to prove a causal connection alone); compare Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (two year span between protected activity and adverse action not close enough for temporal proximity), Pascual v. Lowe's Home Ctrs. Inc., 193 Fed. App'x 229, 233–34 (4th Cir. 2006) (three to four months not close enough for temporal proximity), King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003) (two and a half month space between protected activity and adverse action held not close enough for temporal proximity); with Jenkins v. Gaylord Entertainment Co., 840 F. Supp. 2d 873, 881 (D. Md. 2012) (two-day span between protected activity and adverse action close enough for temporal proximity). In short, the approximately 2 year and 2-month delay between Carmack's protected activity (i.e., when his political affiliation ostensibly was known) and his termination is not close enough to raise a reasonable inference of causation. Further, the court agrees with the defendants' both that (1) Carmack's allegations vis-à-vis Count IV are too attenuated and vague to plausibly state a claim and that (2) the cases cited by Carmack, whose procedural postures and facts are exceedingly dissimilar from the present case, do not compel a different finding.[11] For the foregoing reasons, Count IV is **DISMISSED**.

---

[11] In Sales v. Grant, 158 F.3d 768, 770 (4th Cir. 1998), the plaintiff, a former assistant registrar for Lynchburg, Virginia, brought a § 1983 action against Lynchburg's electoral appointing board and several of its members alleging that she was not reappointed (i.e., terminated) following the election of a new governor due to her political affiliation. The procedural posture of that case and facts before the Fourth Circuit when deciding it, however, are quite dissimilar from those sub

## VI.

Accordingly, defendants' motion to dismiss (ECF No. 41) will be **GRANTED in part** and **DENIED in part**. The motion to dismiss is **GRANTED** as to Count III and Count IV. This same motion is **DENIED** as to Count I and Count II.

An appropriate Order will be entered this day.

Entered: 04-05-2019

/s/ Michael F. Urbanski

Michael F. Urbanski

Chief United States District Judge

---

judice such that reliance on its holding is misplaced. The Fourth Circuit was reviewing the district court's grant of defendants' motion for judgment as a matter of law at the close of a four-day trial, rather than at the motion to dismiss stage. Id. This case says almost nothing about what facts were before the district court at the motion to dismiss stage. Indeed, although the Fourth Circuit ultimately reversed the district court's grant of the defendants' motion, holding that there was sufficient evidence for a jury to reasonably infer that defendants' "conduct respecting the [a]ssistant [r]egistrar positions was substantially, if not entirely, motivated by political considerations," id. at 780, it did so with the benefit of a factual record absent in this case.