# EXHIBIT 2



## Planet Depos
We Make It *Happen*™

# Transcript of William D. Carmack

**Date:** March 12, 2019
**Case:** Carmack -v- Commonwealth

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of William D. Carmack
Conducted on March 12, 2019

---

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE WESTERN DISTRICT OF VIRGINIA
3  ABINGDON DIVISION
4  --------------------------
5  WILLIAM D. CARMACK,      )
6                           )
7        Plaintiff          )
8  -vs-                     )   Case No. 1:18-CV-00031
9                           )
10 COMMONWEALTH OF VIRGINIA, )
11 et al                    )
12                          )
13        Defendants        )
14 --------------------------
15        DEPOSITION OF WILLIAM D. CARMACK
16 DATE:     March 12, 2019
17 TIME:     10:00 a.m.
18 LOCATION: Law Office of Terry N. Grimes, PC
19           Franklin Commons
20           320 Elm Avenue, SW
21           Roanoke, Virginia  24016
   REPORTER:  MaryTheresa Ferris, RPR
22             Registered Professional Reporter #20149

---

**2**

1      APPEARANCES
2
3  FOR THE PLAINTIFF:
4    Law Offices of Terry N. Grimes, PC
     Franklin Commons
5    320 Elm Avenue, SW
     Roanoke, Virginia  24016
6    Phone: (540) 982-3711
     Fax (540) 345-6572
7    Email: tgrimes@terryngrimes.com
     BY: TERRY N. GRIMES, ESQ.
8    Email: bhaddox@terryngrimes.com
     BY: BRITTANY M. HADDOX, ESQ.
9
10 FOR THE DEFENDANT:
11   Office of the Attorney General
     202 North Ninth Street
12   Richmond, Virginia 23219
     Phone: (804) 786-0969
13   Email: rhardy@oag.state.va.us
     BY: RYAN S. HARDY, ESQ.
14   Email: ekincerjr@oag.state.va.us
     BY: E. LEWIS KINCER, JR., ESQ.
15
16 ALSO PRESENT:
17   David D. Matlock
18
19
20      * * * * *
21
22

---

**3**

1            I N D E X
2  EXAMINATION BY:              PAGE
3  E. Lewis Kincer, Jr., Esq. ................ 6
4
5            * * * * *
6
7        E X H I B I T S
8  EXHIBIT NO.                  PAGE
9  Exhibit 86  Chief Financial Officer - Last
              Approved Position Description   45
10
   Exhibit 87  Diploma Mill Police            51
11
   Exhibit 88  Amended Complaint              69
12
   Exhibit 89  E-mail from Duffy Carmack to
13            Susan Carkeek dated June 17, 2015  123
14 Exhibit 90  Letter to Dietra Trent from
              Michael C. Westfall, CPA        140
15            RE: Hotline Case #16077 Report
16 Exhibit 91  E-mail from Duffy Carmack to
              Deborah Hensley dated            158
17            August 11, 2016 re: Elizabeth
18 Exhibit 92  E-mail from Alicia Young to
              Duffy Carmack dated June 19, 2017  158
19            re: cash
20 Exhibit 93  E-mail from Alicia Young to David
              Matlock, cc:  Duffy Carmack      161
21            dated June 26, 2017
              re: end of year
22

---

**4**

1            E X H I B I T S
2  EXHIBIT NO.                  PAGE
3  Exhibit 94  E-mail from Duffy Carmack to
              Joyce Brooks, cc: David Matlock  173
4            dated March 31, 2017
              re: Interview Committee
5
   Exhibit 95  E-mail from Christie Heath to
6            Duffy Carmack dated November      177
              10, 2014 re: RSVP - Pillion
7
   Exhibit 96  Virginia Conflict of Interest
8            and Ethics Advisory Council       182
              Financial Disclosure Statement
9
   Exhibit 97  Virginia Conflict of Interest
10           and Ethics Advisory Council       184
              Financial Disclosure Statement
11
   Exhibit 98  9/5/2012 letter to Mr. Carmack
12           from Amberlea N. Breeding         190
              First Bank & Trust Company
13
   Exhibit 99  12/5/2015 e-mail to Duffy
14           Carmack from Betty re:            193
              Cash Flow Analysis.pdf
15
   Exhibit 100  E-mail from Duffy Carmack
16           to Deborah Hensley dated          195
              October 23, 2013 re: Duffy's
17           Password for DPB Log-In
18 Exhibit 101  11/4/2017 Grievance Form A     221
19 Exhibit 102  December 7, 2017 e-mail to     228
              Members of the Board of Trustees
20            Southwest Virginia Higher
              Education Center from William
21            D. "Duffy" Carmack, CFO
22

---

Transcript of William D. Carmack
Conducted on March 12, 2019

Page 5

E X H I B I T S

EXHIBIT NO.                                    PAGE

Exhibit 103   January 9, 2018 letter to
              William D. Carmack from        235
              Charles W. Carrico, Sr.

Exhibit 104   E-mail from Deborah Bourne
              to Duffy Carmack dated         240
              November 25, 2015 re: Greetings

Exhibit 105   E-mail from Betty Adams to
              Duffy Carmack dated September  260
              29, 2015 re: Thinking about you!

Exhibit 106   E-mail from Duffy Carmack to
              Alicia Young dated July 14, 2016  263
              re: Payroll to join UVAFinance

Exhibit 107   July 10, 2018 letter to Mr. Evan
              Feinman from Michael C. Westfall,  266
              CPA, State Inspector General

Exhibit 108   E-mail from Duffy Carmack dated
              November 25, 2013 re: deep throat  280
              hosting

Exhibit 109   E-mail from Duffy Carmack dated
              November 25, 2013 re: deep throat  283
              hosting

Exhibit 110   October 2013 Calendar           283

* * * * *

Page 6

WILLIAM D. CARMACK,
after having been duly sworn by Mary Theresa Ferris,
RPR, Notary Public in the Commonwealth of Virginia,
to tell the truth, the whole truth and nothing but
the truth, testified as follows:

(9:57 a.m.)

EXAMINATION

BY MR. KINCER:

Q      Good morning, Mr. Carmack.

A      **Good morning.**

Q      I'm Lewis Kincer. I have seen you in
several other depositions. You have seen me. You
have heard your attorney give numerous deponents
advice of how to give a deposition and what we are
doing here.

A      **Yes.**

Q      I won't repeat everything that
Mr. Grimes has previously said. Most important thing
is give a verbal response instead of nodding. Make

Page 7

sure the court reporter understands your response,
you know, whether it's yes, no, I don't know, instead
of uh-huh or huh-uh or, just so she can get it on the
record.

       If I ask you any questions that are
unclear to you or that you don't understand, stop me,
tell me the question, you don't understand it, it
makes no sense, and I will repeat it or rephrase it
until we are on the same page. All right?

A      **Okay.**

Q      If you answer a question, I will assume
you understood it. All right?

A      **Fine.**

Q      And I will ask you, are you feeling all
right to give a deposition today?

A      **I am.**

Q      And you have no health conditions that
would prohibit you from recollecting and giving
testimony?

A      **None.**

Q      Okay. And you're undergoing no
personal, family crisis or upsets that would affect

Page 8

you here today?

A      **None.**

Q      Okay. State your full name.

A      **William Duffy Carmack, Jr.**

Q      And how old are you?

A      **63.**

Q      And single or married?

A      **Married.**

Q      How long have you been married?

A      **33 years.**

Q      First marriage?

A      **Yes.**

Q      Any children?

A      **I have a stepdaughter.**

Q      And so your wife was married before?

A      **Correct.**

Q      What is your wife's name?

A      **Rebecca.**

Q      Does she work outside the home?

A      **She does not.**

Q      And what's your stepdaughter's name?

A      **Elizabeth Minnick.**

Transcript of William D. Carmack
Conducted on March 12, 2019

9

1    Q      Is she in the Abingdon area?
2    A      **She is.**
3    Q      And what does she do?
4    A      **She works for a company called Hapco,**
5 **H-a-p-c-o.**
6    Q      What is Hapco?
7    A      **It is a company that manufactures**
8 **aluminum poles for lighting and flags.**
9    Q      Is she married?
10   A      **She is.**
11   Q      What does her husband do?
12   A      **He is a surveyor.**
13   Q      And his name?
14   A      **Dan Pettingil, P-e-t-t-i-n-g-i-l.**
15   Q      Do they have any adult children?
16   A      **They do not.**
17   Q      Okay.  Where are you currently
18 employed?
19   A      **I am currently self-employed with a**
20 **company entitled Financial Health Solutions.**
21   Q      Okay.  What does Financial Health
22 Solutions do?

10

1    A      **It is a consulting company that works**
2 **with medical management of physician practices, and**
3 **it also does estate advisement and settlement.**
4    Q      What sort of estate advisement?
5    A      **When someone passes away, if there is**
6 **not an executor, I am appointed by the Court for**
7 **that.  Or I am named as executor in various wills or**
8 **administrators or some fiduciary role; it varies from**
9 **account to account.**
10   Q      But you don't purport to give legal
11 advice?
12   A      **No.**
13   Q      All right.  How long have you been
14 involved with Financial Health Solutions?
15   A      **I started Financial Health Solutions**
16 **last January of 2018.**
17   Q      Did you start it or did you convert a
18 previous corporation?
19   A      **I converted a previous corporation.**
20   Q      And tell me about that.
21   A      **In 2008 I set up a corporation called**
22 **Carmack Health Management.  And at that time I served**

11

1 **as administrator for a group of ten physicians in**
2 **Abingdon, surgeons, who owned real estate that they**
3 **leased back to the hospital that's used for an**
4 **ambulatory surgery center.  And I served as their**
5 **business administrator for that real estate**
6 **transaction, and real estate includes equipment**
7 **also.**
8    Q      What sort of equipment?  Office
9 equipment or medical?
10   A      **Medical equipment.**
11   Q      And this was -- the group that you did
12 this for was what group, what medical group?
13   A      **The name of the corporation is Abingdon**
14 **Physicians Ambulatory Surgery Center, which I like to**
15 **abbreviate ASC Management Group.**
16   Q      Right.  And what is their practice
17 specialty, if there is one?
18   A      **There is not one; they are**
19 **multi-specialty.**
20   Q      Okay.  Including surgeons?
21   A      **They are all surgeons.**
22   Q      They are all surgeons.  Who is -- is

12

1 there a Dr. McGarry?
2    A      **Yes.**
3    Q      Who's he?
4    A      **Dr. Timothy McGarry is an orthopedic**
5 **surgeon in the Abingdon area.**
6    Q      Okay.  Is he still in practice?
7    A      **He is.**
8    Q      Was he part of this group?
9    A      **He is one of ten members.**
10   Q      Okay.  Since you set it up in 2008,
11 have any of the members changed, of the professional
12 staff, professional members of the group?
13   A      **Not yet, no.**
14   Q      Okay.  From 2008, your Carmack Health
15 Management, was that an LLC?
16   A      **It was.**
17   Q      And were you the sole owner?
18   A      **Yes, indeed.  Yes, I was.**
19   Q      Okay.  And did you work out of your
20 home or do you have an -- do you have an --
21   A      **Yes, worked out of the home.**
22   Q      Okay.  And let's say the calendar year

Transcript of William D. Carmack
Conducted on March 12, 2019

---

**13**

1  2008, how much time per, whether you want to do it
2  day, week or month, did that occupy?
3      A    In 2008?
4      Q    Yes, sir.
5      A    During the formative years of building
6  the building, I would say it occupied 40 percent of
7  my time.
8      Q    Okay. How long did you continue to
9  actively participate in Carmack Health Management?
10     A    I continued to participate in Carmack
11 Health Management through December 31st. Well,
12 actually January, probably 15 of '18 until I changed
13 the name of the company.
14     Q    January 15th of 2018?
15     A    Yes.
16     Q    And then that was the conversion with
17 Financial Health Solutions?
18     A    That's correct.
19     Q    Okay. And what is Financial Health
20 Solutions?
21     A    Financial Health Solutions is a
22 consulting firm that offers physician practice

---

**14**

1  management, surgical center management, to any
2  surgical or dental or medical specialty of their
3  offices. And it also has a division that does
4  administrative estate settlement.
5      Q    That's what you mentioned earlier?
6      A    Yes.
7      Q    All right. So what is the substantive
8  change between what Carmack Health Management was
9  doing from 2008 through 2018 and what Financial
10 Health Solutions is doing now?
11     A    The substantive change in Carmack
12 Health Management took place in 2010. The first two
13 years that I worked for them was around 40 percent to
14 build the building, to equip the building and to hire
15 clinical operations managers of the building that's
16 there every day running the facility.
17          My role after that became simply the
18 administrator for the physicians, owners of the real
19 estate, and the equipment, because they had leases
20 back to the local hospital for the real estate and
21 the equipment. So the physicians, in essence, became
22 a landlord, and the hospital was the tenant. And I

---

**15**

1  oversaw the business aspect of the real estate, the
2  leasing of the real estate and the equipment.
3      Q    The leasing to the hospital?
4      A    Correct.
5      Q    Is it Johnson Memorial?
6      A    Johnston.
7      Q    Johnston Memorial?
8      A    Uh-huh.
9      Q    Okay. That's there in Abingdon?
10     A    Correct.
11     Q    Has either Carmack Health Management or
12 its successor, Financial Health Solutions, ever had
13 any other employees except you?
14     A    No.
15     Q    Has your work with Financial Health
16 Solutions, has that been your sole source of
17 employment since we, being the Southwest Virginia
18 Higher Ed Center --
19     A    It has.
20     Q    And unless either you or I qualify
21 somewhere else, let's say whenever we are talking
22 about that entity, I'm just going to say Center.

---

**16**

1      A    Okay.
2      Q    Unless we are talking about the
3  ambulatory surgical center, and we will differentiate
4  that.
5      A    Okay.
6      Q    So during the -- well, I think it would
7  make more sense. Tell me starting, starting with
8  your -- you're from Abingdon, correct?
9      A    That's correct.
10     Q    Went to high school in Abingdon?
11     A    I did.
12     Q    Graduated from Emory and Henry?
13     A    Correct.
14     Q    What year?
15     A    1978.
16     Q    Okay. And what years did you attend?
17     A    I graduated from high school in '74. I
18 attended the Virginia Highlands Community College
19 until '76.
20     Q    Okay.
21     A    And Emory, finished in '78.
22     Q    Okay. And you got an associate's

---

Transcript of William D. Carmack
Conducted on March 12, 2019

17

1  degree from --
2      A    No.  I simply used credits to
3  transfer.
4      Q    Okay.  Credits to transfer.  So your
5  degree from Emory and Henry was in what?
6      A    Bachelor of Arts in education.
7      Q    And when you got your BA in education,
8  you taught?
9      A    I taught seventh grade math.
10     Q    In Washington County?
11     A    In Washington County.
12     Q    What school?
13     A    Greendale Elementary.
14     Q    How many years did you do that?
15     A    Two-and-one-half.
16     Q    And would that have been from '78 until
17 mid-eighty?
18     A    I actually began teaching in December
19 of '77 before I graduated.  The school superintendent
20 came to me.  He knew that I lacked two courses
21 finishing at Emory.  He offered me a position at
22 Greendale.  They wanted a male teacher, and if I

18

1  could work out those two courses on independent
2  study, they gave me the job.
3           I worked it out.  So I went to work in
4  December of that year.  And I left, would have been
5  in '80 sometime.
6      Q    Okay.  And your reason for leaving?
7      A    I was offered a job with the State of
8  Virginia.  At that time it was the Virginia
9  Employment Commission Regional Office.
10     Q    Okay.  So you actually began teaching,
11 you became a full-time teacher without a
12 certificate?
13     A    That is correct.
14     Q    Okay.  And did you obtain a --
15     A    I did.
16     Q    All right.  You obtained a certificate,
17 you taught.  And the VEC job, what did that
18 involve?
19     A    It was called a contract officer.  It
20 was a regional job for the 17 counties in southwest
21 Virginia.  At that time Virginia Employment
22 Commission had federal grants for training industrial

19

1  workers in southwest Virginia.  So I administered
2  those funds from the Department of Labor through VEC
3  to the local industry.  It's called a contract
4  officer, was the title of the position.
5      Q    And that was from 1980 to when?
6      A    Probably '82.
7      Q    Okay.  And that was CETA money, wasn't
8  it?
9      A    Yes, it was.
10     A    C-E-T-A Comprehensive Education and
11 Training Act.
12     A    I'm impressed.
13     Q    All right.  Then that job, that program
14 ultimately ended?
15     A    It ultimately ended, yes.  I left prior
16 to its ending.
17     Q    Okay.  And you left VEC work for
18 what?
19     A    I was offered a position by the local
20 Washington County Chamber of Commerce Board of
21 Directors as the Executive Director of the Chamber.
22     Q    Executive Director pretty much what it

20

1  sounds, running the programs, setting --
2      A    At that time the Chamber had tourism as
3  one of its arms.  At that time they had a contract
4  to do all of the marketing for the Virginia Highlands
5  Festival, which was a big arts and crafts festival
6  each year.  We did all of the publications,
7  brochures, work for that.
8           Also, at that time we worked closely
9  with the Virginia Department of Economic Development
10 on recruitment of potential new industry into the
11 area.
12     Q    And was there a pay increase between
13 the VEC to when you went to the Chamber?
14     A    There was a pay increase with every
15 job.
16     Q    Okay.  Was that the primary reason for
17 leaving every job?
18     A    Yes.
19     Q    We will go through that.  And I have
20 got your resume, but I just want to see what you
21 remember.
22     A    It was professional growth and

Transcript of William D. Carmack
Conducted on March 12, 2019

21

1  financial benefit.

2      Q     All right.  Chamber of Commerce, how

3  long were you there?

4      A     I'm going to say two-and-a-half

5  years.

6      Q     And you left there because --

7      A     I was offered a position with what was

8  then Virginia National Bank.  It has merged into Bank

9  of America.  Virginia National Bank had a regional

10  office in Abingdon, and I was offered a position in

11  their management training program.

12     Q     What did that consist of?

13     A     Consisted of a year of training in

14  between Norfolk and Charlottesville.  It was a very

15  highly competitive program to enter.  You took a

16  barrage of tests.  I was fortunate enough to get in.

17  That consisted of working from beginning as a teller

18  and working your way up through every position in the

19  retail side of the bank, which took 12 months.

20          At that time you were placed in a

21  branch as either an assistant management or manager,

22  and then you were required to attend -- again, the

22

1  names have changed over the years, but at that time

2  it was called Virginia School of Bank Management, the

3  Darden School at UVA, for two years.

4      Q     Right, as a --

5      A     Certificate program.

6      Q     Right.  You were not on grounds?

7      A     Yes.  In summer we were there two

8  weeks.

9      Q     Okay.  A two-week program each summer,

10  but then it was, what, was it long distance?

11     A     It was long distance.  You had

12  assignments throughout the year with time lines to

13  turn in.

14     Q     Okay.  And then at the completion of

15  that program, you received a certificate?

16     A     Correct.

17     Q     From the banking association?

18     A     Yes.

19     Q     Not from Colgate Darden?

20     A     Correct.

21     Q     And so you successfully completed the

22  training program.  You got your certificate.  How

23

1  long were you at VNB?

2      A     12 years.

3      Q     At the same branch?

4      A     No.  My first position was branch

5  manager in Bristol, Virginia.  And they chose to open

6  a new branch in Bristol, and so I opened that branch

7  and moved to that location.  Approximately four years

8  later I was transferred to the Abingdon office, which

9  at that time was one of the larger offices in the

10  state with loans, deposits and services.  And I was

11  the senior vice-president and manager there.

12     Q     Okay.  And how many employees -- let's

13  go to the Abingdon bank.  How many employees directly

14  reported to you?

15     A     If my memory is correct, somewhere

16  between 30 and 35.

17     Q     Okay.  And so you were in Bristol and

18  you were in Abingdon for your bank job?

19     A     Yes.  I was in Bristol four years and

20  Abingdon for the balance.

21     Q     Okay.  Okay.  But through this point in

22  time, through the time of your, near the end of your

24

1  12-year period at VNB/BOA -- I don't know if they had

2  been bought out yet -- had they been bought out by

3  the time you left?

4      A     This was in the merger period.  Bank

5  mergers had just begun.  And so I was involved with

6  the initial merger, which was Sovereign, S-o-v-r-i-n,

7  (sic) Bank.  I became part of the merger team that

8  traveled around to various other smaller banks that

9  were bought.

10          We then became Nations Bank.  And then

11  following -- I left during Nations and then it became

12  Bank of America.

13     Q     And you left there for what reason?

14     A     I progressed as far as possible in the

15  professional realm with Nations in a rural market,

16  and they offered me a position to go to Charlotte.

17  At that time I was just not in a position personally,

18  with family members, my wife's business at that time

19  and her family, nor did I have the desire to leave

20  Abingdon.  So I began to seek employment elsewhere

21  while I was still employed.  I began to look around

22  for options to stay in that area.

Transcript of William D. Carmack
Conducted on March 12, 2019

25

1    Q    You weren't being eliminated --
2    A    Oh, no.
3    Q    -- during any of these mergers?
4    A    No, I was asked to move.
5    Q    All right.  What was your wife's
6  business?
7    A    My wife's family had been in the tire
8  business.  The name of the company was Roberts Tire
9  and Recapping.  Her father and seven brothers all had
10 stores throughout southwest Virginia for over 40
11 years.  And although not a very likely profession for
12 a woman, she was one of three daughters, and so she
13 worked with her father in the tire business until he
14 retired and it was sold.
15   Q    Okay.  On the business side or on the
16 tire side?
17   A    On the business side.
18   Q    All right.  Where did you go after you
19 left VNB?
20   A    I was approached by then Johnston
21 Memorial Hospital's administrator, whose name was
22 Clark Beil, that's B-e-i-l, and Clark -- this was in

26

1  the, I'm going to say the Clinton days of managed
2  care, when the term was being thrown about loosely.
3  And Clark said that he would like for me to come to
4  the hospital to work in a position, newly created
5  position, called director of contracts and managed
6  care.
7         And his interest in me was because the
8  physicians, most of which had been my customers,
9  already had a trust level for me.  And it was going
10 to require a real stretch for them to get involved in
11 managed care.  So he offered me a job in
12 administration and I accepted that.
13   Q    What year did you accept that?
14   A    Would have been in, I think in the
15 early nineties.
16   Q    And you would have left the bank
17 when?
18   A    I was at the bank 12 years from
19 whatever our Chamber date was, and then I went
20 straight to the hospital.
21   Q    Okay.  Actually, I don't think I
22 had a -- I had a VEC leave date.

27

1    A    Okay.  What was the VEC leave date?
2    Q    Was that '82?
3    A    '82.  Okay.  So Chamber, three, four,
4  five.  Virginia National, five, so '85, '95, '96,
5  '97.  So would have been around '97 when I went to
6  the hospital.
7    Q    Okay.  And what did you do for them?
8    A    Initially I established what was called
9  a physician hospital organization.  And the purpose
10 of that entity was to negotiate payor contracts with
11 all insurance companies.  In approximately a
12 year-and-a-half after beginning, the chief operating
13 officer resigned, and I assumed the duties of that
14 individual.
15         And that was oversight for the various
16 programs of the Emergency Department, contracts with
17 insurance companies, risk management, case
18 management, Social Services for the 25 departments
19 that reported to me.
20   Q    And were you an employee?
21   A    I was an employee.
22   Q    Have anyone report to you in that

28

1  job?
2    A    Yes.  I had approximately 50 people
3  report to me in that job.
4    Q    What type of personnel?
5    A    I had MDs and mid-level practitioners
6  in the Emergency Department.  And the remainder were
7  either social workers or registered nurses.  And
8  there were probably five clerical employees in that
9  staff.
10   Q    But, again, you mentioned quite a few
11 medical professionals, the nurses, doctors, etcetera,
12 you weren't managing their medical practice?
13   A    Not the medical side.  I managed the
14 hiring and recruitment for vacancies in those
15 departments.  I managed schedules.  I managed issues
16 that came about involving risk or involving
17 malpractice or risk management at the administrative
18 level, not clinical.
19   Q    And how long did you stay there?
20   A    Oh, I was at the hospital six years.
21   Q    And your reason for leaving?
22   A    A local ophthalmologist approached me,

Transcript of William D. Carmack
Conducted on March 12, 2019

8 (29 to 32)

29

1  and there were three small practices of ophthalmology
2  serving southwest Virginia. And they had agreed to
3  merge and become what's known as Eye Physicians of
4  Southwest Virginia. And they wanted to hire an
5  administrator to do their merger and to manage their
6  practices at various locations.
7        Also, one goal was to set up optical
8  shops and get into the retail business. So I went to
9  work for them as their CEO.
10   Q    And were you a salaried employee?
11   A    I was a salaried employee.
12   Q    Did you have any ownership interest in
13 the business?
14   A    I did not.
15   Q    And did optical shops get set up?
16   A    We established three optical shops.
17   Q    And I'm going to show you, before we
18 finish and introduce it, your resume. I'm just going
19 through and want to know what you remember. But I
20 have you working at Johnston Memorial Hospital from
21 '95 to '99.
22   A    Could be true.

30

1    Q    All right. So that would be four
2  years?
3    A    Close enough. I can't remember the
4  exact dates.
5    Q    I'm going to let you see that. And
6  then you went to Eye Physicians of Southwest
7  Virginia; that's what we have been talking about.
8    A    Following the hospital, yes, sir.
9    Q    And how long were you there?
10   A    Approximately ten years.
11   Q    Was that your full-time employment
12 during this ten years?
13   A    It was my full-time employment. The
14 last two years that I worked for them overlapped with
15 the building of the surgery center, ambulatory
16 surgery center. The ophthalmologists that were my
17 boss in that group were also going to be owners and
18 practitioners in the surgery center. So they agreed
19 to allow me to work, continue my full-time work at
20 Eye Physicians to do the work that was necessary to
21 get the surgery center opened.
22       But I paid them back for the hours over

31

1  40 hours -- I'm sorry -- under 40 hours that I had
2  used working for the surgery center. I reimbursed
3  them for my time so it came up to 40 hours a week.
4  So there was no financial loss to the Eye Physicians
5  at that time.
6    Q    They insisted on that, since you were
7  doing work elsewhere?
8    A    Yes. Since basically 40 percent of my
9  time was spent benefiting them indirectly, I felt
10 that was fair and they felt that was fair. But they
11 continued my benefits on a full-time basis since I
12 reimbursed them. Once the surgery center was built,
13 my time spent with Eye Physicians returned to
14 basically 99 percent.
15   Q    And the center was built when
16 approximately?
17   A    2008.
18   Q    Okay. And that's about, that is the
19 time that Carmack Health Management was founded?
20   A    That is correct. Because for liability
21 purposes I wanted that money to flow through an LLC,
22 in the event there was some bizarre incident in

32

1  building the building or it would fall down, harm
2  someone, that I would have a protection of an LLC
3  Over my personal assets.
4    Q    And you left -- what's your next job?
5    A    I went to Southwest Virginia Higher
6  Education Center as chief financial officer.
7    Q    And what year was that?
8    A    2005.
9    Q    Who hired you?
10   A    Dr. Rachel Fowlkes was the founding
11 director of the Higher Ed Center concept, and she had
12 been the original director at the Center. Dr.
13 Fowlkes approached me several years earlier about
14 coming to work there and I declined. She offered me
15 a job based on my experience in health care, and I
16 was interviewed by a panel and selected based on my
17 experience.
18       At that point in time with the Center
19 there was a great deal, there were funds from the
20 Virginia Tobacco Commission to build a medical school
21 in southwest Virginia and on the campus of the Higher
22 Education Center. And they were interested in my

Transcript of William D. Carmack
Conducted on March 12, 2019

9 (33 to 36)

---

33

1  background and experience and connections in health
2  care to assist in that if it came true.
3        Otherwise, Dr. Fowlkes was interested
4  in expanding health care programs at the Center at
5  the bachelor's level, and so that's why I was
6  hired.
7     Q   All right. And your, the title of your
8  position that you were hired for in 2005 was?
9     A   Chief financial officer.
10    Q   All right. Had that been the first
11 time that such a position existed at the Center?
12    A   Yes, that is correct.
13    Q   And what was it called before it was a
14 chief financial officer; do you know?
15    A   I don't know the exact name of that
16 position.
17    Q   So you were the first CFO at the
18 Center?
19    A   Yes.
20    Q   Named as such?
21    A   Correct.
22    Q   Okay. And Dr. Fowlkes had asked you

---

34

1  even a couple years earlier to come earlier to come
2  on board?
3     A   She had.
4     Q   And you declined because of why?
5     A   I just wasn't interested in what she
6  had to offer. The job wasn't challenging to me,
7  didn't offer any type of professional opportunity.
8  The pay was not satisfactory with me. I just didn't
9  have a good feeling about it, so I declined it.
10    Q   Okay. Did all of those things improve
11 in two years?
12    A   Yes, in the offer that was made to me
13 and the job description that was presented to me, it
14 did.
15    Q   And do you recall -- and I have got
16 your resume and, again, I'm going to give you this to
17 look at a copy if we need to refer to it.
18        What was your starting salary at the
19 Center?
20    A   I don't remember the exact number. It
21 was somewhere in the approximate $105,000 range.
22    Q   How did you -- strike that. Did you

---

35

1  know Ms. Fowlkes when she extended an offer to you?
2     A   I have known Ms. Fowlkes personally for
3  30 years, and her family.
4     Q   Okay. How so?
5     A   Members of the same church.
6     Q   Presbyterian?
7     A   Yes. Serving on boards together in the
8  community over the years.
9     Q   What's the name of Presbyterian
10 church?
11    A   Sinking Spring Presbyterian.
12    Q   You've been a member of that all your
13 life?
14    A   Since 27.
15    Q   Since when?
16    A   Since I was 27.
17    Q   All right. And are you still friends
18 with Ms. Fowlkes?
19    A   Yes.
20    Q   You and Ms. Fowlkes are on good terms
21 now?
22    A   Yes, uh-huh.

---

36

1     Q   Who did you directly report to when you
2  were hired as CFO at the Center?
3     A   Dr. Fowlkes.
4     Q   And how many people directly reported
5  to you as CFO when you started?
6     A   Approximately seven.
7     Q   Okay. And what type of positions?
8     A   All of the business office reported to
9  me, which included the employees paid by the Tobacco
10 Commission that administered the Tobacco Scholarship
11 Fund. They were part of the business office. Also,
12 the folks in the business department, the employee
13 who worked for the Foundation.
14        At various times I would, for specific
15 periods of time, I would have oversight into
16 maintenance. The maintenance director was involved
17 in a motorcycle accident and lost a leg and he was
18 out of work for almost a year. So the employees in
19 that department reported to me on an interim basis.
20    Q   All right. The Tobacco Commission, at
21 the time you started as CFO, what was the role or
22 relationship of the Commission with the Higher

---

37

1 Education Center? This gets confusing.
2     A    Okay. The Tobacco Commission was
3 created from a class action lawsuit, tobacco causing
4 cancer, sometime eons ago before my interest in it,
5 and the settlement was placed into a fund. The State
6 of Virginia elected instead of putting it as part of
7 the general fund monies, to set it aside and to let
8 the interest of that money benefit the two tobacco
9 regions of the state, that being southside Virginia
10 and southwest Virginia.
11         They appointed a Commission that was
12 approximately 25 members. Southside Virginia had
13 more members than southwest; I think it was based on
14 the percentage of tobacco growers in the area. They
15 set up various committees, for example, economic
16 development, education, are examples. They set up a
17 scholarship program. There were probably ten
18 different committees. And those committees all had
19 pools of money, millions of dollars of money.
20         And parties in southwest Virginia or
21 southside Virginia could make application for grants
22 for these funds. And the intent was to provide

38

1 economic development and jobs for the replacement of
2 the loss of tobacco funds in these markets.
3         Dr. Fowlkes had been very successful in
4 obtaining money for various types of educational and
5 economic development grants. And when you add those
6 grants to the scholarship program — and let me stop
7 right there and say that Dr. Fowlkes negotiated a
8 contract with the tobacco company to administer the
9 scholarship program; someone had to do that.
10         And so the Tobacco Commission paid the
11 Higher Ed Center 350, $400,000 a year, and that is to
12 set up an application process for scholarships, to
13 send that out, to receive the applications from the
14 students, to judge those applications as to who was
15 eligible and not, to receive payments from the
16 Tobacco Commission to send to the various schools.
17         As time grew and students transferred
18 and graduated, then the Tobacco Commission many times
19 switched between a loan program and a grant program.
20 So oftentimes the scholarship program changed its
21 rules, so we had to keep up with that. We had to
22 create a database that could help with that. We had

39

1 two funding cycles a year, and so for that work the
2 Center was paid a, through a grant, administrative
3 dollars for administering the scholarship program.
4         In addition to that, Dr. Fowlkes
5 probably received more tobacco grant dollars than any
6 other institution in the state. We, at one time, had
7 looked at that number, and counting the scholarship
8 dollars had received over $40,000,000 in tobacco
9 grants of some type.
10    Q    Over what period of time?
11    A    Well, really since the beginning of the
12 Tobacco Commission. And, I'm sorry, I don't know the
13 beginning date.
14    Q    Okay.
15    A    It would have probably been over a ten
16 to 15 year period of time.
17    Q    For what kind of programs? That's a
18 lot of money.
19    A    Yes. She was able to get grants for
20 various colleges to bring programs there. For
21 example, Virginia Commonwealth University, there was
22 a need for nurse anesthesiologists in our market;

40

1 there was a shortage. And she asked, worked with
2 VCU, and they said, yes, we will bring it there, but
3 we can't pay the faculty. We can't buy the
4 equipment. We can't make the video connections
5 between the two sites.
6         So the Tobacco Commission supplied
7 funds to do that. Most funds at the Tobacco
8 Commission were matching funds. If they put 500,000
9 into the project, VCU had to put $500,000 into the
10 project. So she was successful in bringing a number
11 of educational programs, degree programs, to
12 southwest Virginia to serve the citizens of southwest
13 Virginia that would not have otherwise been able to
14 obtain a certified nurse anesthetist degree or a
15 doctoral degree in education.
16         We have school superintendents that
17 have graduated from there. So primarily she used
18 those funds for building educational programs.
19    Q    I had asked you earlier when you first
20 took this CFO job at the Center what your pay was.
21 And you said approximately $105,000. Now, at that
22 time when you first came aboard, was that all paid by

Transcript of William D. Carmack
Conducted on March 12, 2019

11 (41 to 44)

41

1  the Center or was that paid some by the Commission?
2      A    Initially, it was all paid by the
3  Center.
4      Q    All right. And when did that change?
5  When did you start getting paid on a split basis?
6      A    Approximately a year before I came to
7  work there, Dr. Fowlkes created a Foundation for the
8  purpose of obtaining research and development grants
9  through the Tobacco Commission, and also for the
10 purpose of obtaining federal grants of various types
11 that would offer training programs for jobs in
12 southwest Virginia.
13         The Foundation, when I came on board,
14 consisted of Dr. Fowlkes, a chairman, and probably
15 two members. They had worked with an attorney in
16 Richmond to create their bylaws and their operating
17 agreements, not the Attorney General's office, a
18 private attorney in Richmond, who specialized in
19 this. And Dr. Fowlkes had hired an individual by the
20 name of Edwin Rogers who had a law degree, but did
21 not practice, whose position was to establish
22 research and development grant applications, both

42

1  federal, state and Tobacco Commission, to create
2  research and development in clean fuel energies in
3  our marketplace.
4      Q    And your pay became -- what --
5      A    Okay. We have attorney --
6
7         (Simultaneous colloquy interrupted by
8         the court reporter)
9
10 BY MR. KINCER:
11     Q    Your pay became split or apportioned,
12 when?
13     A    It became split two years after I began
14 working there, whatever year that was.
15     Q    What year was it?
16     A    Let's see, I started in 2012. Oh, no
17 2014.
18     Q    And take a look at the document I put
19 in front of you.
20     A    Uh-huh.
21        MR. KINCER: Off the record for a
22     second.

43

1         (Discussion off the record)
2
3  BY MR. KINCER:
4      Q    Now, look at the first page and I will
5  represent to you -- you can look through there -- I
6  will represent to you this is some materials for your
7  CFO application and the job when you came aboard.
8  You can just look through there and --
9      A    Uh-huh.
10     Q    It's a job description and resume.
11 Anything you think doesn't belong there, let me know.
12     A    (Witness complying).
13     Q    Did you review that, the documents that
14 I just handed you, which I'm going to ask be marked
15 as Exhibit 86?
16     A    Yes, I have reviewed them.
17        MR. GRIMES: Counsel, do you know the
18     Bates stamps of these documents, by chance?
19        MR. KINCER: No, I don't. I didn't run
20     mine from the Bates stamp, but we can get
21     that. I'm sure that they have been produced.
22     We can — I will just make an exhibit that

44

1     says what it says, and we can key them up
2     later if and when we use it.
3
4  BY MR. KINCER:
5      Q    That is your resume?
6      A    It is.
7      Q    And then does the CFO position, which
8  was vacant when you were hired, have you looked
9  through that?
10     A    Yes.
11     Q    Does that seem to be your
12 responsibilities?
13     A    That's correct.
14     Q    All right. And then I have a resume
15 from you?
16     A    It is correct.
17     Q    Okay. That is your resume?
18     A    Yes.
19     Q    That you submitted at the time?
20     A    Yes.
21     Q    And then help -- what is this? At the
22 very end of this stack of Exhibit 86 there is

**45**

1 something that's marked with the University of
2 Virginia symbol logo, and it says staff application.
3 What was that? Where did that come from?
4     **A    To apply for the CFO position at**
5 **Southwest Virginia Higher Ed Center you had to apply**
6 **through the University of Virginia. The Higher Ed**
7 **Center had a contract with UVA-Charlottesville to**
8 **administer the HR services for the Center. So you**
9 **applied through UVA-Charlottesville using their**
10 **documents.**
11     Q     And if we look at the very last
12 document on your stack, that is your cover letter to
13 UVA's Department of Human Resources applying for that
14 position, correct? Very last document is yours.
15     **A    That's correct.**
16     Q     Okay.
17
18         (Exhibit Number 86 was marked for
19     identification)
20
21 BY MR. KINCER:
22     Q     We had asked about your education. We

**46**

1 know about your education degree from Emory and
2 Henry, your bachelor's degree, and we know you got
3 the banking certificate.
4     **A    Uh-huh.**
5     Q     You also got an MBA?
6     **A    I did.**
7     Q     Tell me about that. That's from
8 California Coastal?
9     **A    Coastal University in Santa Barbara,**
10 **California. When I was working for Johnston Memorial**
11 **Hospital, to progress in hospital administration, you**
12 **needed a master's degree. I chose to do a master's**
13 **in business administration with a concentration in**
14 **health sciences.**
15         **And at that time there were not many**
16 **on-line programs east of the Mississippi. So I did a**
17 **lot of research. This was an accredited program. It**
18 **allowed me to obtain my master's within a two-year**
19 **period of time, visited campus twice in the summer**
20 **for a week.**
21     Q     You received that degree in 1999?
22     **A    If that's what that resume says.**

**47**

1     Q     Well, your resume, which is part of
2 a -- it's the resume you -- on your resume the first
3 thing listed is education, MBA 1999?
4     **A    That would be correct.**
5     Q     Then it says California. I'm assuming
6 that's a typo?
7     **A    It's a typo.**
8     Q     It's not California Costal?
9     **A    No, it's Coastal.**
10     Q     And that's the resume you submitted for
11 the Higher Ed position?
12     **A    I suppose so.**
13     Q     All right. Now, you also told me, you
14 told me that this California Coastal was accredited.
15 It wasn't accredited by anyone at the time that you
16 received your degree, was it?
17     **A    It was accredited when I received my**
18 **degree.**
19     Q     All right. And your degree was in '99.
20 And it's not California Coastal; it's California
21 Coast, isn't it?
22     **A    Yes, it was 1999.**

**48**

1     Q     All right. Just take a look. And I
2 have got it in a different format. I'm just doing
3 this for the, so we can get the hyper-link site for
4 the Diploma Mill Police.
5         Take a look at that report on
6 California Coast, and tell me if you agree or
7 disagree with their conclusion that California Coast
8 operated from 1973 to '05 without accreditation, and
9 it achieved DETC accreditation in 2005?
10     **A    I have no knowledge of this. When I**
11 **attended I had information that they were accredited**
12 **and the organization they were accredited by, because**
13 **I looked closely at that. I don't have that**
14 **information before me, nor have I looked at it in ten**
15 **years.**
16     Q     You have those documents? Are they in
17 existence?
18     **A    I have no idea.**
19     Q     Do you know the difference -- you went
20 to Higher Education Center as the CFO. Do you know
21 the difference between the geographical accreditation
22 agencies like the Association of Southern Schools and

Transcript of William D. Carmack
Conducted on March 12, 2019

13 (49 to 52)

49

1    Colleges that do Virginia Tech and Duke and UVA, and
2    the DETC, for example, which is a national
3    accreditation that California Coast received in
4    2005?
5        A    Yes, I do.
6        Q    What's the difference?
7        A    **One is nationally recognized, the other**
8    **is, I'm going to say, regionally or state**
9    **recognized.**
10       Q    Are you aware whether or not the only
11   purpose for DETC accreditation is to allow
12   for-Proffitt or proprietary schools to obtain
13   Department of Education benefits, money?
14       A    I have no knowledge of that.
15       Q    All right.  Did you pay for your
16   education or did you --
17       A    **Yes.  I paid cash for my education.**
18       Q    Okay.  There was no loans taken or no
19   federal money?
20       A    **No, no.**
21       Q    Was this program ineligible for federal
22   money at the time you attended?

50

1        A    I have no idea.
2        Q    You never applied for any financial aid
3    for that MBA from California?
4        A    I did not.
5        Q    Okay.  And is the -- would the typo in
6    your resume of California Costal, and then that, and
7    the on-line for California Coast -- is the
8    institution that you have an MBA from California
9    Coast University?
10       A    **It is.**
11       Q    All right.  Have you ever expressed any
12   concern or apprehension to anyone during any of the
13   job positions that you have made since receiving that
14   MBA from California Coast, that you were really
15   apprehensive that that was going to pass muster?
16       A    **No, sir.**
17       Q    Never told anyone that?
18       A    **I never had any reason to have**
19   **concern.**
20            MR. KINCER:  Would you make the Diploma
21       Police e-mail number 87.
22

51

1            (Exhibit Number 87 was marked for
2    identification)
3
4            MR. GRIMES:  Do we have another copy?
5            MR. KINCER: I will get you another
6    copy.  The only difference is this one is,
7    that's the one we want that he wrote, and this
8    one is straight up.  You see?
9            MR. GRIMES:  Off the record.
10
11           (Discussion off the record)
12
13   BY MR. KINCER:
14       Q    Okay.  Mr. Carmack, you began work at
15   the Center in 2012?
16       A    **That's correct.**
17       Q    And you worked at the Center from 2012
18   through?
19       A    **January 4, 2018.**
20       Q    As the CFO?
21       A    **Correct.**
22       Q    Your job title never changed?

52

1        A    **It did not change.**
2        Q    Tell me, since there is an obvious
3    overlap between your 2012 employment as CFO at the
4    Center and your association with Carmack Health
5    Management, how much work were you doing for Carmack
6    Health Management during any period of time that you
7    were employed by the Commonwealth of Virginia at the
8    Center?
9        A    **Yes.  That was grandfathered in in my**
10   **initial interview process.**
11       Q    Is it in writing?
12           MR. GRIMES:  Objection; you cut him
13       off.  He was right in the middle of his
14       answer.
15           MR. KINCER: I did.
16
17   BY MR. KINCER:
18       Q    Finish your answer.
19       A    **I, in the interview process, made all**
20   **parties aware that I had this relationship with**
21   **Abingdon Physicians, ASC Management, that I would be**
22   **continuing that.  My duties with that position were**

Transcript of William D. Carmack
Conducted on March 12, 2019

14 (53 to 56)

---

53

1  to attend a board meeting one night a month; that was
2  from six p.m. forward. It was to answer e-mails or
3  phone calls, which might be ten a week.
4      Q     Ten a week?
5      A     Maybe, that would come through. I
6  might get an e-mail, someone asking a question.
7  There was one employee -- it was the clinical nurse
8  administrator -- that I was responsible for insuring
9  that her paycheck was written each week. And I had
10 permission to house that information at the Center
11 and to do that information while at the Center.
12         And it was made very clear, I was paid
13 a salary, but I was to put in a minimum of 40 hours a
14 week. Most weeks I put in more like 60 hours a week
15 at the Center while Dr. Fowlkes was there. And at no
16 time, as I am a man of rules, at no time did I ever
17 use Center time that I did not work over or come in
18 early or insure that my 40 hours was put in by the
19 State, because ethically that is important to me.
20     Q     Now, so you're working 40 hours for the
21 Center, at least?
22     A     At least.

---

54

1      Q     At least. You're working how much for
2  the Tobacco Commission?
3      A     That was during the Center work,
4  because I was also -- two years into the job -- we
5  didn't finish answering this question awhile ago.
6         Two years into the job, the Attorney
7  General's Office came to Dr. Fowlkes and asked that
8  the Southwest Virginia Higher Education Center
9  Foundation be operationally split from the Center.
10 And that meant that Dr. Fowlkes could no longer be a
11 voting member of the board.
12         And our AG rep at that time was
13 Elizabeth Griffin, and she drafted a framework under
14 which she was comfortable with the Foundation
15 continuing. She asked that I serve as CEO of the
16 Foundation and all Foundation work, and that my time
17 for that be maintained and the Foundation reimburse
18 the Center for that. That was done each year.
19     Q     And when was that? When was this
20 split?
21     A     Somewhere around 2014.
22     Q     So then the Tobacco would just pay part

---

55

1  of your wage?
2      A     Correct. The Center was reimbursed out
3  of that tobacco grant that we got for administering
4  the program's portion of my salary.
5      Q     75/25?
6      A     And benefits. It varied from
7  year-to-year, but the maximum was 75/25.
8      Q     Okay. Do you know whether similar
9  allocations were used for your benefits?
10     A     Absolutely.
11     Q     And so it would have been at one point
12 as much as 75/25?
13     A     Yes.
14     Q     And that would be Center to
15 Foundation?
16     A     No, Foundation to Center.
17     Q     I'm sorry. Yes.
18     A     Foundation to Center.
19     Q     We weren't clear or I did, your
20 attorney did have a valid objection when I did
21 interrupt you. I want to know this.
22     A     Uh-huh.

---

56

1      Q     Do you have this, do you have this
2  permission to continue to do your Carmack Health
3  Management work in writing?
4      A     I do not.
5      Q     Who told you -- who granted you this
6  permission?
7      A     Dr. Fowlkes and the Board of Trustees
8  and the Interview Committee at that time was made up
9  of Senator William Wampler, a gentleman who worked at
10 the Center by the name of Jeremy Mitchell, Deborah
11 Hensley and Dr. Rachel Fowlkes, and it was discussed
12 openly with all.
13     Q     This was for an Interview Committee?
14     A     That was the Selection Committee,
15 yes.
16     Q     Okay. And that's when this was
17 discussed?
18     A     It was discussed at every point. It
19 was discussed in my interview initially with Dr.
20 Fowlkes. It was discussed in the formal interview
21 with the committee. And Dr. Fowlkes announced when
22 she introduced me to the Board of Trustees, which

---

Transcript of William D. Carmack
Conducted on March 12, 2019

15 (57 to 60)

57

1  many I knew, announced what I would be doing in the
2  new position of CFO, and that I would be an asset to
3  the Center because of my experience and connection in
4  the medical field.
5           And that was encouraged, that I
6  maintain that, so that as the programs grew and they
7  needed clinical sites and clinical managers, that
8  they would have inside party to be able to help
9  obtain those.
10      Q    All right.  Look, you mentioned the
11 grand vision or dream for all this tobacco money was
12 at one point we were going to have a medical school
13 in southwest Virginia.  Well, that didn't come to
14 fruition, did it?
15      A    No, it did not.
16      Q    So you remained on as CFO, but you
17 really weren't working much health care for the
18 benefit of the Center, were you?
19      A    Yes, I was working health care for the
20 benefit of the Center.  When I came on board, Dr.
21 Fowlkes was opposing the medical school being built.
22 So I did nothing with the medical school.  Frankly,

58

1  it was at its end of life when I came on board.  One
2  of the first things that she asked that I do is to
3  repair relationships between the Center and
4  Department of Planning and Budgeting in Richmond,
5  which had gone bad sometime over the previous four
6  years.
7           Then she asked that I become involved
8  in helping to recruit and develop what's called, the
9  program through Virginia Commonwealth University
10 called Clinical Lab Science.  She asked that I do
11 assessments with all -- at that time we had multiple
12 hospitals in southwest Virginia.  They were not all
13 merged under Ballad Health, as they are today.
14          I did health care needs assessments
15 where they were having issues in obtaining trained
16 employees.  We had several meetings with the
17 hospitals to determine what the training needs were.
18 We went to the Tobacco Commission to obtain funds to
19 set up these programs.  We established the programs
20 over a period of two to three years.
21          In all medical programs, following the
22 classroom instruction is always on-site or clinical

59

1  rotation time.  That requires the commitment of the
2  medical facility, whether that's a hospital or a
3  physician practice or a laboratory.  It also requires
4  an instructor or proctor on site, whether it be a
5  physician, nurse manager.  So my job was to establish
6  these relationships, get contracts in place where we
7  would offer these services to health care, meet the
8  health care employment demands in southwest Virginia.
9       Q    And when you say we, you were speaking
10 of whom?  I didn't want to interrupt you during your
11 lengthy answer, but when you were referring to we,
12 we, we, we, who were you talking of?
13      A    Dr. Fowlkes, myself operationally, and
14 the Center's Board of Trustees who was behind the
15 development of these programs and could approve
16 them.
17      Q    Did you and Dr. Fowlkes have a
18 collegial relationship during your period of
19 employment with the Center?
20      A    We did.
21      Q    That was true up until the time you
22 left?

60

1       A    Yes.
2       Q    You say that this outside, this work
3  for your Carmack Health Management, was discussed in
4  your interview and discussed with the folks that you
5  have identified earlier.
6       A    It was.
7       Q    And everyone said that was all right --
8       A    Yes.
9       Q    -- but you never obtained anything or
10 was given anything in writing?
11      A    That is correct, because I was told by
12 UVA at that time that they did not offer any sort of
13 contract.  It was no written document.
14      Q    Okay.  Told by -- UVA is a big place.
15 Who told you that?
16      A    UVA.  I don't recall the representative
17 of the Center at that time.  That rotated annually.
18 The lady -- it was a lady is all I can recall -- that
19 was working with me on my employment papers, did not
20 put anything in writing.  She said they did not offer
21 contracts.
22      Q    Moving forward then, but so you were --

Transcript of William D. Carmack
Conducted on March 12, 2019

16 (61 to 64)

61

1  the Center via Rachel Fowlkes, as head of the Center,
2  she was totally knowledgeable of this, your
3  affiliation with Carmack health Care?
4      **A      She was.**
5      Q      Health Management.  I'm sorry.  I
6  misstated it.
7      **A      She was.**
8      Q      Was David Matlock so equally
9  knowledgeable?
10     **A      Mr. Matlock and I never had any**
11 **conversations about that.**
12     Q      You never discussed that with him?
13     **A      I never had the opportunity.**
14     Q      Did you ever talk -- you knew -- now,
15 Mr. Matlock -- strike all that.
16         Mr. Matlock succeeds Rachel Fowlkes as
17 Executive Director of the Center, correct?
18     **A      Correct.**
19     Q      And you are still working at the Center
20 as the CFO, and you are answerable to the Executive
21 Director?
22     **A      Correct.**

62

1      Q      Okay.  And never during the entire
2  period of time that you were at the Center, did you
3  ever mention to Mr. Matlock this oral agreement that
4  you had with his predecessor and ask if he was all
5  right with that?
6      **A      Mr. Matlock never allowed that**
7  **opportunity for me to have a conversation, but he was**
8  **aware that I had the affiliation with the physicians,**
9  **because he asked me to establish a clinic, set up a**
10 **training clinic, for a primary care nurse**
11 **practitioner program that required knowledge of**
12 **equipment and instruments and so forth.**
13         **He was fully aware of it.  Again, I was**
14 **never given the opportunity to have a professional**
15 **conversation with him.**
16     Q      Okay.  How do you make the leap that
17 from setting up this program with the nurse
18 practitioner's program that made Matlock
19 aware?
20     **A      He said, you have this information.**
21 **You know how to get it.  Get it set up quick for**
22 **me.**

63

1      Q      You had this information being the
2  knowledge of?
3      **A      Establishing what would be required in**
4  **a clinic environment for a training program because**
5  **of my background in health care.**
6      Q      Did Mr. Matlock know you were
7  conducting Carmack Health Management business on
8  state time?
9      **A      Yes.**
10     Q      He did?  How did you learn this?
11     **A      Same way everyone else knew that.**
12     Q      Which is?
13     **A      I would have conversations during the**
14 **day by phone.  I might have someone drop by, visiting**
15 **the Center.  There were physician training programs**
16 **there.  Physicians would come out and speak with me**
17 **and talk with me.  Everyone at the Center was aware**
18 **of it.**
19     Q      Let me ask you, when you became CFO of
20 the Center in 2012, were you issued any -- strike
21 that.
22         What IT or communication devices were

64

1  you issued by the Center?
2      **A      I was provided a cell phone and a**
3  **laptop.  And I paid 50 percent of the phone bills so**
4  **that we could -- this was universal, not just for me.**
5  **As an employee there, you could pay 50 percent of the**
6  **phone bill and use them as your personal devices.**
7          **I also had a PC on my desk that**
8  **belonged to the Center.  And I had a PC on my desk**
9  **that belonged to me that I used for cutting a payroll**
10 **check twice a month.**
11     Q      Okay.  A PC that belonged to you?
12     **A      Yes.**
13     Q      And you used that in your Carmack
14 Health business?
15     **A      Yes.**
16     Q      And did you have a tablet?
17     **A      Only the laptop.**
18     Q      Is that what you refer to as a
19 tablet?
20     **A      I didn't recall a tablet.  I have a**
21 **cell phone.  iPad, I'm sorry.  I had a cell phone and**
22 **an iPad issued by the Center.**

Transcript of William D. Carmack
Conducted on March 12, 2019

---

65

1    Q    Uh-huh.
2    **A    And I had a traditional computer with a**
3 **monitor on the desk, and then I had my laptop for**
4 **personal use.**
5    Q    And the laptop was for personal use?
6    **A    Correct.**
7    Q    And that was for health care
8 business?
9    **A    Correct.**
10   Q    Only health care business?
11   **A    Primarily.**
12   Q    Well, primarily. What else did you use
13 it for?
14   **A    Yes.**
15 **specific.**
16   Q    Okay. Then you had your PC that you
17 devoted exclusively to cutting checks for the health
18 care business?
19   **A    That was that same PC.**
20   Q    Okay. That same -- Okay. Are you
21 referring to -- a PC and a laptop, are we talking two
22 different animals here? I always thought we were.

---

66

1    **A    It's a laptop like Terry is using.**
2    Q    I'm a dinosaur, but I thought a PC was
3 the big machine that sat on your desk.
4    **A    I had one of those provided by the**
5 **Center.**
6    Q    Okay. And then you had a laptop of
7 your own?
8    **A    Correct.**
9    Q    And then you had -- when I was saying
10 tablet I meant the iPad?
11   **A    Okay. iPad.**
12   Q    And that was issued by the Center?
13   **A    Correct.**
14   Q    And you didn't use that for health care
15 business?
16   **A    I used it for personal use, because I**
17 **paid half of the phone bill for the use of the iPad**
18 **and the telephone. And that was commonplace of all**
19 **employees who were issued those devices. We had**
20 **personal use.**
21   Q    No, we didn't -- you told me earlier
22 you paid half price for the cell phone. You paid 50

---

67

1 percent of your bill for the cell phone, as did all
2 the employees, right, that had the devices issued?
3    **A    That chose to do that. Some chose not**
4 **to use it as their personal phone.**
5    Q    But did others have the same deal with
6 the iPad, which I consider as different?
7    **A    Yes, they did.**
8    Q    Okay. So if you wanted to use it for
9 your personal device, you had to pay 50 percent?
10   **A    Which was included in the phone bill.**
11 **They were connected together through Verizon.**
12   Q    Okay. So you made one 50 percent
13 payment --
14   **A    Yes.**
15   Q    -- for any State-issued device?
16   **A    Yes.**
17
18       (Simultaneous colloquy interrupted by
19 the court reporter)
20
21       MR. GRIMES: Well, it goes both ways.
22       MR. KINCER: I think there is a worse

---

68

1 defender of that.
2       MR. GRIMES: Objection. Shall we vote
3 on that?
4       MR. KINCER: Sure, we can, only if we
5 do Australian ballot.
6       MR. GRIMES: Well, Sid will canvass the
7 25 employees in the litigation section of the
8 AG's office and have the answer.
9
10 BY MR. KINCER:
11   Q    Okay. Let me finish my question, and I
12 will let you finish my answer. I tend to have slow
13 questions, and you tend to have lengthy, lengthy
14 answers. So let's both be aware of that. All
15 right?
16       MR. GRIMES: Objection to the
17 characterization of the witness' testimony;
18 it's not accurate.
19       MR. KINCER: Whatever. I mean, you
20 know, we were doing so well.
21       MR. GRIMES: If you say whatever, why
22 did you bring it up?

---

Transcript of William D. Carmack
Conducted on March 12, 2019

69

1    MR. KINCER:  Because I want him to quit
2  cutting my questions off.
3    MR. GRIMES:  And we want you to quit
4  cutting his answers off.
5    MR. KINCER:  He has answered every
6  question and more.
7
8  BY MR. KINCER:
9    Q    All right.  Any other communication
10 devices issued by the Center for your use?
11   A    No, sir.
12   Q    All right.
13     MR. KINCER:  Can we take a five-minute
14 break.  I'm getting to the Amended Complaint
15 and that will be lengthy.
16     MR. GRIMES:  Off record.
17
18     (A recess was taken)
19
20     (Exhibit Number 88 was marked for
21 identification)
22

70

1  BY MR. KINCER:
2    Q    We are back from break.  I have handed
3  you a copy of an Amended Complaint.  You have seen
4  that document before, haven't you?
5    A    I have.
6    Q    And this lawsuit is presently pending
7  against the Commonwealth and the Center and
8  Mr. Matlock, and you're the plaintiff in that
9  lawsuit, correct?
10   A    Correct.
11   Q    All right.  And I just wanted you to
12 have it available for you.  I'm going to ask you some
13 questions about it, and then we will go back to what
14 we talked about.
15     Looking at page two of the Complaint,
16 paragraph 7, and I'm looking at the last line of
17 paragraph 7.  That says, "Carmack was paid 75 percent
18 by the Center and 25 percent by the Southwest
19 Virginia Higher Education Foundation."
20     And that's the numbers you gave me
21 earlier, but you weren't differentiating between,
22 that that had ever varied, that that...

71

1    A    It varied up to the 25, but the first
2  year that I was CEO of the Foundation it only
3  required maybe 15 percent of my time.  As grants
4  grew, my time involved with that, because activities
5  were greater, and so it worked up to 25.
6    Q    And in looking at the next paragraph, I
7  think you testified earlier, if I wrote your response
8  down correctly, that you thought it was about 2014
9  that the, Elizabeth Griffin from the OAG had made
10 that change, and that's my recollection too.
11     So is 2016 in paragraph eight, is that
12 incorrect?  Do you see in that, in 2016?
13   A    I think that would be 2014.
14   Q    Okay.  That's why we are doing this.
15   A    With that said --
16   Q    Go ahead.
17   A    With that said, Elizabeth brought to us
18 in 2014 an outline and excused herself from going any
19 further, because it was Foundation business.  The
20 Foundation hired their own attorney, who put together
21 the operating agreement and bylaws and was approved
22 by Elizabeth; however, Elizabeth became very

72

1  concerned in 2016 that the Center and the Foundation
2  were not totally separate.  And it had to do with the
3  collection process of the student loan program.
4    Q    Collection insofar as?
5    A    Student loans that were delinquent or
6  that we were making payments on.
7    Q    And if you turn the page and paragraph
8  8 continues.  I wanted to ask you about the last
9  line.  This is where the Foundation also built the
10 Energy Center.  Tell me about the Energy Center.
11   A    Prior to my coming on board, the
12 Tobacco Commission, through their research and
13 development division, had set aside money to build
14 three -- I'm going to refer to them as incubators or
15 three buildings throughout the tobacco region, whose
16 primary purpose was to be a place for start-up
17 companies that could get a foothold in the community
18 and hoped would grow and hire employees.
19     The other two regions, the other two
20 Centers were built first.  Dr. Fowlkes was very
21 reluctant to build the Center and she held out.  I
22 was on board probably a year, and the Tobacco

Transcript of William D. Carmack
Conducted on March 12, 2019

---

73

1  Commission finally said, Rachel, build it or lose the
2  money. We want it out there. And so she asked me to
3  take the project over, that it would be deeded to the
4  Foundation because it was a grant. The building
5  would be deeded to the Foundation, because it's grant
6  funded.
7        Preliminary studies had been done prior
8  to my coming that because southwest Virginia was the
9  coal bed for coal, natural gas, that it would be nice
10 if we could create jobs in those sectors. Connected
11 with education, research and development is an
12 important part, aspect. Dr. Fowlkes was very
13 academic minded and she wanted to see a building
14 built. We named it the Research Center.
15       The original intent of that building
16 was to create bays that companies that had an idea or
17 a start-up company could come in, use that space, do
18 further research and development that was grant
19 funded, to try to get their product to market to
20 create jobs in the area. So the building was built
21 for that purpose.
22    Q    All right. And was it later that you

---

74

1  had some role in leasing some space in that
2  building?
3     A    Much later.
4     Q    Much later. We're jumping far ahead,
5  aren't we?
6     A    Yes.
7     Q    All right. Let's continue on with the
8  Amended Complaint paragraph ten. And this is where
9  we begin, "Matlock was selected for the Executive
10 Director position as a result of the substantial
11 influence of Senator Bill Carrico, Chairman of the
12 Board of Trustees of the Southwest Virginia Education
13 Center, due to his political affiliation."
14       I want to ask you, what facts do you
15 have to support the allegation of that first sentence
16 of paragraph ten, that Carrico had any substantial
17 influence in getting Matlock hired?
18    A    Dr. Fowlkes announced to the Board of
19 Trustees in January of '15 that she would be retiring
20 June 30th. Sometime in the Spring of '15 a job
21 description was listed for her position and a posting
22 was put out for her position. And it was a

---

75

1  nationwide posting. It was not just limited to the
2  state.
3        There were a number of applications
4  coming in. I had access to those applications, and
5  at one time there were as many as 40, one of which
6  was mine. I attended the Tobacco Commission meeting
7  in April of '15, and Senator Carrico took me to the
8  side and he said, I know you're applying for the job,
9  but I want to make you aware that I'm giving the job
10 to David Matlock.
11    Q    And what was the exact date of that
12 conversation with Bill Carrico?
13    A    All I can tell you is it was at the
14 April Tobacco Commission meeting that was in
15 Martinsville. We would have to go back to look at
16 the Tobacco minutes to see the date.
17    Q    Okay. But so if that conversation
18 occurred in April of 2015, Carrico wouldn't have been
19 the Chairman of the Board of Trustees, would he? The
20 coal man was.
21    A    Kevin Crutchfield was chairman until
22 June.

---

76

1     Q    Okay. Well, you see how that reads in
2  paragraph 10? That's incorrect, isn't it, or
3  misleading, the way that reads in paragraph ten?
4     A    It depends on the time you're talking
5  about.
6     Q    It depends? What do you mean by is?
7     A    Because Senator Carrico became Chairman
8  of the Board in the middle of June that year. The
9  board met and named him chairman.
10    Q    He was not Chairman of the Board when
11 he allegedly had this conversation with you?
12    A    He was Chairman-elect at that time.
13    Q    Excuse me?
14    A    He was Chairman-elect at that time.
15    Q    Okay. And what did you say to this
16 announcement by Senator Carrico that he apparently
17 had decided that Mr. Matlock was going to become
18 Executive Director?
19    A    I said, that's certainly your
20 privilege.
21    Q    Okay. Well, who had the hiring
22 authority for that position? You applied for the

---

Transcript of William D. Carmack
Conducted on March 12, 2019

20 (77 to 80)

77

1  position.  Who would have had to have hired you, had
2  you been hired?
3        A      The Board of Trustees.
4        Q      And how many people were on the Board
5  of Trustees at that time back in 2015 when this
6  position --
7        A      Approximately 23.
8        Q      Okay.  And that would require a
9  majority of the board vote?
10       A      Correct.
11       Q      Not Senator Carrico's sole vote?
12       A      Correct.
13       Q      Okay.  So whether you wanted the
14  position that these other 40 applicants that you've
15  mentioned wanted the position, or Dave Matlock wanted
16  the position, 23 members of the Board of Trustees of
17  the Center would have to agree, a majority of the 23
18  would have to agree?
19       A      Correct.
20       Q      So where was Bill Carrico's substantial
21  influence factually?
22       A      He commented to me on that same date

78

1  that he was going to make a visit to Kevin
2  Crutchfield to let him know of his wishes.  Prior to
3  that time frame, Kevin Crutchfield had said to me
4  personally that he supported me for the position and
5  I thanked him for that.  But as I told him, I took
6  the job for retirement purposes.  I did not take it
7  to become Executive Director.
8             I needed ten years in VRS, and so I
9  felt like that -- there were maybe seven people
10  interviewed, selected to be interviewed by the
11  Interview Committee.  I was one of those, and I felt
12  like my interview was very cursory; it was ten
13  minutes, and that very evening before the interviews
14  were complete, I received a phone call that said that
15  they had a better qualified applicant.
16             And so I felt like that that was a
17  decision made quickly, and I felt like that that was
18  influenced by Senator Carrico's decision.
19       Q      Okay.  I felt like.  That's subjective
20  feelings.  What objective belief led you to feel that
21  way?
22       A      I had feedback from committee members

79

1  that Senator Carrico had contacted them and asked
2  them to support his desire.
3        Q      What committee member?  Which committee
4  members told you that?
5        A      Jeff Webb, Joyce Brooks, Philip
6  Puckett, Marcia Gilliam, Kevin Crutchfield, Sean
7  McMurray.
8        Q      Crutchfield, and who was our last?  You
9  mentioned Crutchfield.  I didn't catch the last?
10       A      Kevin Crutchfield.
11       Q      Okay.  And you named one more person,
12  didn't you?
13       A      Sean McMurray.
14       Q      Okay.  So those six people told you
15  that?
16       A      Yes.
17       Q      That Carrico had called them?
18       A      Yes.
19       Q      Any other board members except those
20  six tell you that, that Carrico had called them and
21  stated what you just said?
22       A      I think that's all.

80

1        Q      All right.  And what was there
2  objectively about your job interview -- you say you
3  were one of seven interviewed.  What was there
4  objectively about that interview that led you to your
5  subjective belief that it was cursory?
6        A      I was not asked questions specifically
7  related to my ability to do the job as director.
8  Each person had a question that they asked.  The
9  majority of those around the board started their
10  question with, well, we already know you, we know
11  what you have done or can do, but my question is X.
12             They would ask their question.  I would
13  answer it.  Went around the room.  The end.  Out.  20
14  minutes.
15       Q      All right.  And this was certainly a
16  private interview with you and the board?
17       A      Yes.
18       Q      And so you were not in attendance at
19  any of the other interviews of the six additional
20  people?
21       A      Yes, I was.
22       Q      You got to attend each other's

Transcript of William D. Carmack
Conducted on March 12, 2019

21 (81 to 84)

---

81

1 interviews?

2      A      No.  But as interim director — and I

3 had already been removed from the list -- I

4 participated in the interviews of two other

5 candidates.

6      Q      Who were they?

7      A      I don't recall.  Carol.  That's all I

8 can remember.  Dr. Carol someone from Minnesota.

9      Q      Hold one second.  Okay.

10     A      I don't remember the name of the other

11 candidate.

12     Q      Okay.  So it was a Carol from

13 Minnesota?

14     A      Uh-huh.

15     Q      And another candidate, male or

16 female?

17     A      It was female.

18     Q      And they were interviewed and you said

19 you participated.  What was your role in --

20     A      I asked Senator Carrico, who was

21 Chairman of the Board, as interim director did he

22 want me to participate in these activities, and he

---

82

1 said it was my choice.  I chose to be involved in all

2 aspects of the Center when I became interim

3 director.

4      Q      When did you become interim director?

5      A      July 1st when Dr. Fowlkes retired.

6      Q      When would you have been interviewed?

7      A      I was interviewed sometime that summer.

8 I could not tell you.

9      Q      Before or after July 1?

10     A      After.

11     Q      So you were the interim director when

12 you were interviewed?

13     A      Yes.

14     Q      So it would have to have been after

15 July 1?

16     A      Yes.

17     Q      You were named interim director by

18 whom?

19     A      The Board of Trustees.

20     Q      Okay.  The same Board of Trustees that

21 gave you a cursory interview?

22     A      Yes.

---

83

1      Q      Okay.  And what did you understand your

2 role as interim director to be?

3      A      To continue the sound fiscal and

4 operational work of the Center.  I received a letter

5 from Senator Carrico approximately four days into my

6 position telling me what my limits were, that I was

7 to move forth as usual, except for those limits.

8      Q      And we will look at that.  We'll look

9 at that communication.  Essentially, what the limit

10 is, you're not going to make any big hiring and

11 firing changes here, that were your limits was with

12 personnel?

13     A      That was his statement.

14     Q      Right.  That was your only limits?

15     A      I would have to look at the

16 statement.

17     Q      All right.  We'll look at that this

18 afternoon after lunch.  Now, I'm going back to

19 paragraph ten, because we got ahead of ourself (sic)

20 with interim directorship and the interview.  So I'm

21 going back to -- we say -- the sentence that we left

22 off, we talked about him hiring Matlock.

---

84

1             Where did, even in the statement that

2 you had earlier testified to that you say Carrico

3 made to you, the statements, where was political

4 affiliation ever discussed?

5      A      Mr. Carrico had made it very clear to

6 me that David had been a loyal supporter of his, and

7 that he had a lot of respect for Mr. Matlock's work

8 at the community college.  And Mr. Carrico runs on a

9 Republican ticket, so I would assume support would

10 mean supporting that.

11     Q      All right.  Carrico was familiar with

12 Matlock's work at the community college?

13     A      According to his statement, yes.

14     Q      According to Senator Carrico?

15     A      Yes.

16     Q      And you know that Senator Carrico, when

17 we see him on the TV screen, it's always Carrico and

18 it has got a little R after his name, correct?

19     A      Correct.

20     Q      He's a Republican?

21     A      I assume.

22     Q      So you assumed he was a Republican, and

---

Transcript of William D. Carmack
Conducted on March 12, 2019

---

**85**

1  you knew he knew David Matlock from the Community
2  College and thought highly of him, so, hence, you
3  make the leap that it's got to be because of his
4  political affiliation?
5  **A     Mr. Carrico indicated to me in that**
6  **April statement that David had supported him, and to**
7  **me that meant supported him politically.**
8  Q     But he didn't say that?
9  **A     He did not say politically.**
10  Q     Was there any other, in that April
11  statement, any other -- let's get the entire
12  statement, because this was additional to what we
13  talked about the first time.
14        Tell me everything else, if you haven't
15  stated it before, tell me anything else that Carrico
16  told you in that April statement except what we've
17  now discussed.
18  **A     He just made the comment he was going**
19  **to see Kevin Crutchfield, who was then Chairman of**
20  **the Board, who had verbalized his support for me, to**
21  **let him know of his wishes.**
22  Q     All right.  And then when is the

---

**86**

1  Matlock statement?
2  **A     That was prior to that.  He opened**
3  **with, I want you to know that I am supporting David**
4  **Matlock for that position.**
5  Q     All right.  Go ahead.  I'm sorry.
6  **A     He followed by saying, I will be**
7  **speaking with Kevin Crutchfield, who was Chairman of**
8  **the Interview Committee, as well as the Board to let**
9  **him know of my feelings.  That was the**
10  **conversation.**
11  Q     But Senator Carrico never directly or
12  expressly mentioned political affiliation at any time
13  he discussed this position with you?
14  **A     At that time, correct.**
15  Q     At any time?
16  **A     He inferred it.**
17  Q     My question was, did he ever expressly
18  say that?
19  **A     I don't recall.**
20  Q     All right.  Could have, could not
21  have?
22  **A     Could not have, could have.**

---

**87**

1  Q     Uh-huh.  Now, next sentence in
2  paragraph ten, "Both Matlock and Senator Carrico are
3  Republicans."  It's not hard to figure that Senator
4  Carrico is a Republican.  How did you know Matlock's
5  political affiliation, if any?
6  **A     He made it public throughout the**
7  **building, his comments of support of Senator Carrico.**
8  **When President Trump was running for office, he had a**
9  **personalized license plate with G, standing for grand**
10  **old party, on there.**
11        **He made it very obvious with**
12  **Ms. Brooks, who was a known Republican.  She would**
13  **tell you quickly that she was Republican.  They would**
14  **kind of laugh and make comments about the Republican**
15  **party.  And it appears that another employee, Adam**
16  **Tolbert, who was the 90th district congressional**
17  **chairman of the Republican party, had run for office,**
18  **local office on the Republican ticket.  He became**
19  **friendly with him, and they seemed to all support the**
20  **same beliefs with their comments they made at the**
21  **Center.**
22  Q     All right.  Now, you've jumped ahead

---

**88**

1  and you told me a lot, and we will go back into all
2  that.  I'm just reading the line in your complaint.
3  **A     Okay.**
4  Q     So after we immediately -- and I know
5  you provided information.  You probably did not write
6  this pleading, but right after we talk about the
7  political affiliation, our next sentence is, "Both
8  Matlock and Senator Carrico are Republicans," which
9  is just a statement of fact.
10        I want to know how, at the time before
11  David Matlock's hiring, did you know what his
12  political affiliation, if any, was.
13  **A     Prior to his hiring, I had no idea what**
14  **his political affiliation was.**
15  Q     Right.  And when you were saying it was
16  clear in the building, and in all the comments that's
17  going to be in the record, and I'm not going to try
18  to repeat them, or repeat them verbatim, but your
19  comments about Joyce Brooks and it was all over that
20  they were Republicans and Trump was running and all
21  this stuff, that was after Matlock was hired?
22  **A     Yes.**

---

89

1    Q    Okay.  I'm going through this paragraph
2 ten of the complaint where we are leading up to the
3 hiring.  So that's where my mindset is now.  So any
4 of that statement that you made earlier was after
5 Matlock had been hired?
6    A    Those statements were after Matlock was
7 hired.
8    Q    Okay.  Now, we have discussed -- no,
9 tell me this.  How, in the Commonwealth of Virginia,
10 does one register as a Democrat at age 18, or at any
11 age whatsoever?  How does one do that?
12    A    At the time I registered to vote, I had
13 to register as a Democrat or a Republican.
14    Q    Did you become a registered voter at
15 age 18 in another jurisdiction except the
16 Commonwealth of Virginia?
17    A    No, sir.
18    Q    So you don't know whether or not --
19 let's see, you say you're 63 years old.  You would
20 have registered to vote near the time I did.  Are you
21 saying at the time you registered to vote in
22 Washington County, Virginia, within the Commonwealth

90

1 of Virginia, that one expressed party affiliation
2 when they voted?
3    A    I did.
4    Q    That's your testimony under oath?
5    A    To the best of my memory I did.
6    Q    All right.  And then we talked,
7 "Carmack was told not to apply for the information."
8 You have already told me that.  Look at that
9 statement.  Have we already covered that with your
10 previous testimony?
11    A    Yes.
12    Q    Okay.  Anything additional you remember
13 except what is written and what we talked about,
14 "Carmack was told not to apply?"  Any other facts
15 come to you?
16    A    No.
17    Q    None?
18    A    None.
19    Q    Okay.  Thank you.  And then the next,
20 "In fact, when Carmack asked about an increase in pay
21 for filling in as interim, Senator Carrico told him
22 to ask Matlock when he arrived, despite the fact that

91

1 Matlock had not been hired for the position yet."
2    Q    When did that conversation occur?
3 That's another conversation.
4    A    That conversation took place after I
5 received the phone call from the Interview Committee
6 that I was not the selected candidate, but the final
7 candidate had not been named publicly.  And I spoke
8 with Bill, since he, quote, was my supervisor as
9 interim director, and suggested that they consider,
10 as is normal in state jobs when you take on
11 additional responsibilities, a temporary increase in
12 pay for the duties.
13    And he said that that would be up to
14 David, that I would need to ask him once he was on
15 board.
16    Q    And was this after your interview?
17    A    It was after my interview.
18    Q    Was it after the interview of these
19 other ladies that you participated in or before?
20    A    I can't remember.
21    Q    So you can't remember if you had
22 participated in any interviews as interim director at

92

1 the time this statement was made?
2    A    No, sir, I can't.  It was — mine had
3 been over.
4    Q    And one thing, and I want to make sure
5 your testimony is clear and I'm clear, because I get
6 it confused in going through this stuff.  But there
7 is a difference between the hiring committee that we
8 are talking about and the board of the Foundation,
9 isn't there?
10    A    Correct.
11    Q    And wasn't Kevin Crutchfield -- he was
12 not chairman of the hiring committee, just the
13 board?
14    A    No.  He was chairman of the hiring
15 committee.
16    Q    He was chairman of the hiring
17 committee?
18    A    He was.
19    Q    And wasn't Senator Puckett serving as
20 the committee chair?
21    A    Not that I recall.
22    Q    You would defer to whatever the

Transcript of William D. Carmack
Conducted on March 12, 2019

24 (93 to 96)

---

**93**

1 official records show?

2     **A**     **Sure.**

3     Q     Do you know Senator Puckett's political

4 affiliation, sir?

5     **A**     **All I know about Senator Puckett is**

6 **what was in the press when he was in Democratic**

7 **office and resigned.**

8     Q     Okay.  Look at, we are still on

9 paragraph ten.  You said, "Carmack never received

10 additional pay for being interim director."  Two

11 questions.  Did you ever ask for it?

12     **A**     **I did.**

13     Q     Who did you ask for it?

14     **A**     **David Matlock.**

15     Q     What did Mr. Matlock say when you asked

16 for interim pay for your short-term as director?

17     **A**     **He told me I was paid too much in**

18 **comparison to the other department directors and he**

19 **wasn't going to do it.**

20     Q     When did that conversation occur?

21     **A**     **That conversation would have occurred**

22 **in probably November or December of '15.**

---

**94**

1     Q     Well, after he had come on as --

2     **A**     **He came on 1st of November full-time.**

3     Q     Okay.  Well, actually, we will get into

4 the next sentence and see which is right, your

5 testimony or the allegation in the Amended Complaint.

6 "Matlock was to begin work as Executive Director on

7 October 1, 2015, but he did not appear on the job

8 until October 15, 2015."  Which is correct?

9     **A**     **Both.  I was told by Senator Carrico**

10 **that Mr. Matlock would begin work October 1st, but**

11 **because he had commitments at the community college**

12 **that he needed to fulfill, he would come down to the**

13 **building to say hello, but he was around two weeks**

14 **before he began to be there on any kind of regular**

15 **basis.  And for the month of October he was in and**

16 **out between the Higher Ed Center and community**

17 **college, which was next door.**

18     Q     Right.  So he was working at both of

19 them?

20     **A**     **Yes.**

21     Q     Like you were working for your health

22 management company?

---

**95**

1     **A**     **Yes.**

2     Q     All right.  But he was on the job

3 October '15?

4     **A**     **To the best of my knowledge.**

5     Q     All right.  Did you know Mr. Matlock

6 before he was hired as Executive Director?

7     **A**     **I knew him socially.**

8     Q     What do you mean by that?

9     **A**     **Well, I had met him in public many**

10 **times.  We belonged to the same Rotary Club.  Hello,**

11 **David, hello, Duffy was the extent of our**

12 **relationship, but yes, I knew him.**

13     Q     Prior to the time he was hired as

14 Executive Director had you ever been to his house?

15     **A**     **No.**

16     Q     Had he ever been to yours?

17     **A**     **No.**

18     Q     Ever gone out to dinner together?

19     **A**     **No.  Wait.  He invited us to a**

20 **Christmas dinner after he came on board.**

21     Q     Yes, sir.  Thank you for the

22 clarification.  Did you like him, dislike him, before

---

**96**

1 he came on board?

2     **A**     **I didn't have an opinion about**

3 **Mr. Matlock before he came on board.  I didn't have**

4 **enough interaction with him to have an opinion about**

5 **him.**

6     Q     And you didn't have any, whether

7 opinion or knowledge, factual knowledge, you didn't

8 know anything about his job responsibilities and

9 qualifications while at the Community College,

10 Virginia Highlands?

11     **A**     **I knew what his job title was at**

12 **Virginia Highlands, and I knew through public**

13 **speeches that he would make about the Foundation at**

14 **the community college or development or recruitment**

15 **of students, that those were the types of things that**

16 **he was involved with.**

17     Q     So you had no opinion one way or the

18 other about his service while he was employed at

19 Virginia Highlands Community College?

20     **A**     **Personally, no.**

21     Q     Well, hearsay, scuttlebutt, anything

22 you want to reminisce about?

---

Transcript of William D. Carmack
Conducted on March 12, 2019

97

1    A    No.
2    Q    So you would have no information from
3 any source?
4    A    No factual information from any
5 source.
6    Q    Okay.  Opinionated information?
7    A    I heard a lot of opinions about
8 Mr. Matlock through various committees that he served
9 on.
10    Q    When was that?
11    A    For years.
12    Q    And what opinions?
13    A    Didn't show up, late, didn't follow
14 through, always wanted to take credit for someone
15 else's work.  Those were the type of opinions I
16 heard, but I didn't know any of that to be true.
17    Q    Right.  You could not vouch for it but
18 you had heard such information?
19    A    Up to that point, that's correct.
20    Q    And that point would be before you even
21 started working for him?
22    A    Correct.

98

1    Q    So would it be fair to say, at least by
2 reputation, that you had heard, nothing that you
3 could swear to, but by scuttlebutt or reputation or
4 gossip or ever how we want to characterize it, you
5 had heard some negative things about his work at the
6 community college?
7    A    Correct.
8    Q    All right.  Looking at paragraph
9 eleven, it says, "Dr. Fowlkes was a strong Democratic
10 supporter and she hired Carmack.  Carmack was Dr.
11 Fowlkes' pick to be the successor Executive
12 Director."  Several questions from paragraph eleven.
13    A    Uh-huh.
14    Q    First of all, it is a fact that Fowlkes
15 hired you as CFO?
16    A    She did.
17    Q    Okay.  Now, tell me what factual
18 information, what allows you to say that you were,
19 Fowlkes' pick to be successor Executive Director?
20    A    She said to me on many occasions, even
21 prior to hiring me, that she was looking for a
22 successor for her position.  I never accepted that

99

1 answer, because I knew that that position would be a
2 very political position.
3         And what I looked at was that I was 57
4 years of age, and I didn't have a pension plan.  And
5 that state job looked very attractive to me, that if
6 I worked until the mandated age or worked until 70,
7 that I would have a reasonable pension from the
8 Commonwealth of Virginia.  So in talking to Dr.
9 Fowlkes, I never made the assumption I would be
10 director.  I negotiated a salary at the position that
11 I knew if I had that for ten years, I would receive a
12 nice retirement check.
13         Now, many people on the Board of
14 Trustees came up to me and said, oh, you would make a
15 great director.  We hope you're going to apply for
16 that.  I just took that as a compliment, said thank
17 you and went on, but that's not the reason I went to
18 work there.
19    Q    Who was making these at-a-boy
20 statements to you?
21    A    Members of Board of Trustees.
22    Q    Who?  Specifically which ones?

100

1    A    Dr. Ron Proffitt, Kevin Crutchfield,
2 Marcia Gilliam, Susan Short, from Virginia Tech,
3 Cecil Drane from Old Dominion University.
4    Q    Anyone else you recall?
5    A    I can't recall who the members were
6 back then.
7    Q    All right.  So looking for successors,
8 when were you ever led to believe that you were going
9 to be that person by Ms. Fowlkes, by Dr. Fowlkes?
10    A    She said that to me before she hired
11 me, I want you to be my successor.
12    Q    All right.  Well, that's not a contract
13 of employment, is it?
14    A    It's not.
15    Q    And you didn't take it as such?
16    A    I did not.
17    Q    It was a complimentary confidence
18 builder to an employee coming on board, don't you
19 think?
20    A    I just viewed it as a compliment from a
21 controlling lady.  That was it.
22    Q    All right.  We spoke earlier and you

Transcript of William D. Carmack
Conducted on March 12, 2019

26 (101 to 104)

101

1  told me that for one to become Executive Director at
2  the Center, it would take a majority vote of 23 board
3  members?
4      A    Correct.
5      Q    So Rachel Fowlkes was not the hiring
6  authority for her successorship (sic), was she?
7      A    No, and I knew that when she made that
8  comment to me.
9      Q    All right.  So this statement that you
10 testified to just now, what does the fact that you
11 subjectively was her pick to be successor, what does
12 that mean to you?
13     A    It's misleading.
14     Q    How do you know it was untrue when
15 made?
16     A    I think it was true on her part, but
17 she didn't have the authority to make those
18 statements, but I knew that at the time.
19     Q    Okay.
20     A    But someone who didn't have that
21 knowledge could have been well mislead by that.
22     Q    But you weren't because --

102

1      A    No, I was not.
2      Q    All right.  Now, this just now occurred
3  to me, looking at paragraph eleven.  "Dr. Fowlkes was
4  a strong Democratic supporter and she hired Carmack."
5  Why is that important?
6      A    Rachel was a well-known Democrat in
7  Washington County, Virginia.  She was very active in
8  the Democratic party, as well as her former husband.
9  They gave lots of money.  They participated.  They
10 campaigned actively.  They had bumper stickers.  I
11 mean it was a known fact.
12     Q    Uh-huh.
13     A    When I was hired, there was an
14 assumption made by a group of folks in the center who
15 did not care for Dr. Fowlkes and was just ready for
16 her to move on, felt like that she had stayed long
17 enough, who all represented themselves as Republican.
18 And they would make the comment, if you got the job,
19 it would just be a continuation of another Democrat.
20 They did not know my political affiliation.
21     Q    Excuse me?
22     A    They did not know my political

103

1  affiliation.  But the comment was made, if you got
2  the job, it would be a continuation of Rachel and the
3  Democratic party.
4      Q    How could anyone have any basis in fact
5  for making that statement if we don't know your
6  political affiliation?
7      A    They made the assumption that because I
8  was Rachel's pick, I was a Democrat.
9      Q    You believe that?
10     A    I believe that.  It was said to me.
11     Q    All right.  So just in the blatancy
12 department, how is that any different than -- if
13 everything you said is true for purposes of my
14 question, and Carrico is making all these
15 behind-the-scenes political dealings for Republicans,
16 how is that any different than what happened to you
17 by getting signed on to CFO?
18     A    It's inappropriate on both parts.
19     Q    All right.  Comments -- and I'm on
20 paragraph 12.
21     A    Okay.
22     Q    "Comments were made to Carmack after

104

1  Matlock was hired that he, quote, 'belonged to the
2  wrong party,' end quote or, quote, 'you belong to the
3  other party,' end quote, or words of that effect.
4  These comments were made by at least Adam Tolbert,
5  Jeff Webb and David Matlock."
6          My recollection is you testified a
7  little bit to that earlier, you had mentioned those
8  comments when we jumped ahead.  Now tell me every
9  time that Adam Tolbert made any partisan statement to
10 you.
11     A    Adam is a very introverted person.
12 He's a very intelligent person.  The only time I ever
13 heard Adam talk was about politics.  That was his
14 hobby, his passion, and he stayed current with
15 political actions.  And he was very active in the
16 Republican party and had worked as campaign chairman
17 for candidates in Roanoke and southwest Virginia in
18 the past, and would often make comments, you're on
19 the wrong side, the wrong party.
20     Q    Okay.  And the way you made it was
21 just, the way this sounded -- and this is not being
22 videotaped -- but that was just a matter-of-fact

Transcript of William D. Carmack
Conducted on March 12, 2019

27 (105 to 108)

105

1  statement?  Adam's statement to you was just a
2  matter-of-fact, you're in the wrong party?
3      **A      Correct.**
4      Q      Wouldn't any true believer, and I mean
5  true believer from the true blue to the true red,
6  isn't every true believer going to believe that their
7  opponents are of the wrong party or misguided?
8          MR. GRIMES:  Objection;
9  argumentative.
10         MR. KINCER:  It's not argumentative.
11  Are you telling him not to answer the
12  question?
13         MR. GRIMES:  I'm just trying to get my
14  objection on the record.  Wait just a moment
15  and I'll be finished.
16         MR. KINCER:  Okay.
17         MR. GRIMES:  Objection to the form of
18  the question; argumentative.  Go ahead and
19  answer the question, subject to objection.
20         THE WITNESS:  Dr. Fowlkes, despite the
21  fact that she was a Democrat in the community,
22  ran a very strict policy at the hiring center;

106

1  politics doesn't matter, because you are going
2  to always have a Republican administration or
3  Democratic administration and funding is going
4  to come from both, and that was instilled.
5  Everyone that worked there knew that, politics
6  was not discussed.  Politics was not brought
7  in during her administration.
8          Political division began when she
9  resigned and Senator Carrico became Chairman
10  of the Board.  And we had employees in the
11  building who became very vocal about being
12  Republican and supporting the Republican party
13  and they took the lead in surrounding
14  themselves with Mr. Matlock, and they began to
15  make comments openly about, positive comments
16  about the Republican party and Senator Carrico
17  and what a relief it would be to have Rachel
18  out of the building and new administration and
19  new leadership.
20
21  BY MR. KINCER:
22      Q      All right.  When did the shop that

107

1  Rachel ran, the non-partisan, the neutral, there's
2  both parties and we don't mention it here, when did
3  that atmosphere change?
4      **A      When David arrived.**
5      Q      After he was already hired?
6      **A      Yes.**
7      Q      All right.  But when were you getting
8  the comments during your candidacy or potential
9  candidacy for Executive Director, well, that would be
10  great, because we can have another Democrat, this
11  will be a continuation of the Democratic leadership?
12  When did those occur, sir?
13      **A      Those occurred to me during the**
14  **interview process by employees of the Center, two of**
15  **which were on the Interview Committee.**
16      Q      And who were they?
17      **A      Joyce Brooks and Jeff Webb.**
18      Q      That was said to you in the
19  interview?
20      **A      Said to me to my face at the Center.**
21      Q      Okay.  Not in the interview?
22      **A      Not in my interview.**

108

1      Q      Just pass them in the hall or --
2      **A      Yes.**
3      Q      Okay.  And that was before your
4  interview?
5      **A      I don't remember whether it was before**
6  **or after.**
7      Q      Okay.  So apparently Dr. Fowlkes'
8  non-partisanship had not extended to those two?
9          MR. GRIMES:  Objection to the form.  Go
10  ahead and answer the question.
11         THE WITNESS:  Dr. Fowlkes had already
12  left June 30.  This was after that.  This was
13  after David's announcement that he was going
14  to apply for candidacy and interviews were
15  taking place.
16
17  BY MR. KINCER:
18      Q      When was that announced?
19      **A      I think we interviewed probably in**
20  **August.**
21      Q      As interim director during you -- that
22  was from July 1 of 2015 and through when, October?

Transcript of William D. Carmack
Conducted on March 12, 2019

109

1     A     I say October 15 but until David was
2  there full-time.
3        Q     Okay.  Of 2015?
4     A     Of 2015.
5        Q     During the hiring or recruiting process
6  for the executive director's position, did you have
7  access to applicant files and information,
8  references, curriculum vitae, that type of stuff?
9     A     All applications that came in for the
10 position were to be directed to Joyce Brooks as
11 Director of Human Resources.  So I did not see the
12 written applications of any of those people.  I just
13 knew the numbers that came in.
14       Q     So your response tells me that you told
15 me what the preferred method would be, that they were
16 to go to Joyce Brooks?
17    A     Correct.
18       Q     All right.  So leaving aside whether
19 they were or not, is it your testimony that you never
20 reviewed any other applicant's --
21    A     No, I did not.
22       Q     Let me finish my question.

110

1     A     Okay.
2        Q     You never reviewed any other
3  applicant's hiring materials and supporting documents
4  while interim director?
5     A     I did not.
6        Q     Thank you.
7              MR. KINCER:  Off the record.
8
9              (Discussion off the record)
10
11 BY MR. KINCER:
12       Q     All right.  You told me about Adam
13 Tolbert's comments that you were the wrong party.
14 With what frequency were those comments made to you
15 by Adam Tolbert?
16    A     They were made three times.
17       Q     All right.  And let's talk about Jeff
18 Webb.  Who is Jeff Webb?
19    A     Jeff Webb was the manager of
20 Information Technology Department.
21       Q     And what comments did he make to you
22 concerning any partisanship or party membership?

111

1     A     His comments were around his support
2  for Senator Carrico as a Republican.  His comments
3  were that, although we differed -- and I say that as
4  a quote -- he supported the Republican party and
5  President Trump.  And so, again, he inferred that I
6  was a Democrat.
7        Q     But those matter-of-fact statements,
8  are those statements the extent of Webb's comments to
9  you?
10    A     Yes.
11       Q     Okay.  And how many times were those
12 comments made to you?
13    A     Twice.
14       Q     Okay.  And this was after Matlock's
15 hiring?
16    A     One was prior to.
17       Q     One prior.  Whose?  Webb's?
18    A     Webb's.
19       Q     One comment prior and two after?
20    A     Yes.
21       Q     Okay.  Let's talk about the defendant,
22 David Matlock.  How many comments did he make to you

112

1  concerning partisanship?
2     A     I'm going to say four.
3        Q     Okay.  And this was, obviously, after
4  he was hired as director?
5     A     Yes.
6        Q     All right.  Tell me what the comments
7  were and when, to the best of your recollection, they
8  were made?
9     A     The comments -- his political
10 favoritism to the Republican party became obvious in
11 the building and upon arrival.  Those comments were
12 made to me in 2016.  Once was just kind of a
13 flippant, in the hall, you're in the wrong party
14 conversation.
15           Twice in my office where we were trying
16 to discuss budgetary measures, and he was letting me
17 know that he had the support of the Republican party,
18 particularly Senator Carrico, that I didn't need to
19 worry about preparing budget or requesting additional
20 funds, that he had a sugar daddy that would take care
21 of that, referring to Dr. Carrico.
22       Q     That was in his exact words?

113

1    A    Yes.

2    Q    And that was in the budget discussion

3 with Matlock's office?

4    A    In my office.

5    Q    In your office in 2016?

6    A    Yes, sir.

7    Q    Anyone else present?

8    A    Debbie Hensley was present for one of

9 those comments.

10    Q    Which one was she present for?

11    A    That we didn't have to worry about

12 submitting a capital budget request, that Senator

13 Carrico would take care of that for us.

14    Q    Okay.  When is the sugar daddy comment

15 made?

16    A    Sugar daddy comment was made to me.  If

17 I remember correctly, it was in a manager's meeting

18 with Joyce Brooks, David, myself and Jeff Webb

19 present.

20    Q    All right.  And that's, so that's --

21 was there another statement made?  You prefaced your

22 answer that we're talking about that Matlock's

114

1 political favoritism was apparent upon his arrival

2 there.  Was that by way of comment or did you have

3 some other --

4    A    It was comments about his devotion

5 toward Senator Carrico, and how he supported Senator

6 Carrico, and that he would do great things for our

7 Center.  Senator Carrico would do great things for

8 our Center.

9    Q    And so what other comments did Matlock

10 ever make to you?

11    A    Those were behaviors.

12    Q    Excuse me?

13    A    Most were behaviors.

14    Q    What behaviors did he make evidencing

15 partisanship or predilections?

16    A    Shortly after arriving, I made -- as

17 interim director, prior to arriving, I went up to his

18 office to congratulate him on being named executor.

19 And he told me how relieved he was that I had come up

20 to speak with him, that he was concerned about the

21 fact that he got the job and I did not, and that he

22 looked forward to working with me hand-in-hand.  We

115

1 shook hands, and I went back to my office, and that

2 was that.

3        When he first started coming to the

4 building in October he came into the building, and

5 Kathy Heitala, who is his administrative assistant,

6 which is -- I'll tell you quick, she is a Republican,

7 and a very strong special friend of Senator

8 Carrico -- Joyce Brooks, Adam Tolbert and Jeff Webb,

9 who, at that time, your three department managers

10 were Joyce, Jeff and myself, and the maintenance guy,

11 Eddy Sproles, who, more than likely, was out on sick

12 leave during this time.

13        David came into the building.  Everyone

14 went in his office and closed the door except me.  I

15 was not invited.  Following whatever took place in

16 that conversation, it became very apparent that he

17 was taking his leads as to what the issues at the

18 Center were from Joyce, Kathy and Jeff.

19        In November of '15, I felt it

20 imperative to go in and say, I would like to bring

21 you up-to-date on what is going on as interim

22 director.  So, A, I let him know that the Higher

116

1 Education Center was fiscally sound, and I talked

2 with him about the various pots of money that we had.

3        Number two, I reminded him that I

4 operated by the rules, I was the kind of guy that

5 didn't deviate from that, and that we were very

6 careful to operate the Center according to -- it's

7 called CAPPs.  It stands for the Commonwealth

8 Accounting Policies and Procedures.  Those are the

9 guidelines under which UVA and the Commonwealth

10 operate from an audit perspective.

11        In that conversation he asked me if I

12 knew what needling meant, and I said I did not.  And

13 so he proceeded to tell me that needling was when a

14 mother bird built a nest, and she put sharp objects

15 pointing upwards.  After the birds were hatched, she

16 would begin to take threads of that nest loose,

17 leaving the sharp prongs, which incentivised the

18 birds to leave the nest.  And that that was the

19 method he used to get people off the team that he did

20 not want.

21    Q    Okay.  And that's November 2015?

22    A    Yes.

Transcript of William D. Carmack
Conducted on March 12, 2019

30 (117 to 120)

117

1    Q    What did you think about that?
2    A    I took that as a pretty clear message
3    that he didn't care for me being a part of his team
4    based on the fact that I had been excluded to date
5    from any conversation pertaining to the business of
6    the Center or the finances of the Center.
7    Q    From any conversation?
8    A    From any.
9    Q    But how long had Mr. Matlock been there
10   at the time this conversation occurred, a couple
11   weeks?
12   A    Six to seven weeks. When I say any,
13   I'm talking about individual conversations between he
14   and I.
15   Q    All right. Let's see if there is
16   something shorter than this. This is going to be a
17   long --
18       (Pause in proceedings)
19
20   BY MR. KINCER:
21   Q    That's for you to review.
22   A    (Witness complying).

118

1    Q    All right. Have you had a chance to
2    look at the June 17th Duffy Carmack?
3    A    Yes.
4    Q    Who is Susan Carkeek?
5    A    Susan Carkeek was at that time our HR
6    representative from UVA-Charlottesville.
7    Q    Is she the lady that told you, we don't
8    do any contracts, so don't worry, we know you work at
9    the ambulatory center?
10   A    I don't recall. Again, that position
11   turned over very frequently as to who our rep was.
12   Q    All right. And you wrote this
13   e-mail?
14   A    I did.
15   Q    All right. And go to the second page
16   of that. I'm going to have that marked as Exhibit
17   89, I believe, jointly, the two e-mails. Have you
18   had a chance to review that?
19   A    Yes.
20   Q    All right. And this is the -- at the
21   bottom is an e-mail from -- it's Senate District 40.
22   That's Bill Carrico's district, isn't it?

119

1    A    Yes.
2    Q    And it's an e-mail to you from the
3    Senator?
4    A    Yes.
5    Q    And that's advising of what? How did
6    you take that? Is that what we talked about earlier
7    about him limiting you?
8    A    No. He wrote a specific letter to me
9    limiting my power to hire, fire and to make other
10   changes at the Center, but that's separate from this
11   communication.
12   Q    Excuse me?
13   A    That's separate from this
14   communication.
15   Q    He said, "Please see enclosed..." --
16   and I don't have the attachment -- "...resolution
17   passed by Executive Committee during yesterday's
18   meeting, which outlines your roles and
19   responsibilities as interim Executive Director."
20   A    Correct.
21   Q    Did you recall seeing such an
22   attachment?

120

1    A    I do.
2    Q    Okay. And that limited of what the
3    Board wanted you to do?
4    A    What the Executive Committee asked,
5    yes.
6    Q    Right. The Executive Committee of the
7    Board?
8    A    Yes.
9    Q    Which consisted of how many people?
10   A    It varied. I couldn't tell you.
11   Q    Well, what's the most you remember and
12   what's the fewest?
13   A    I can remember three being on it. The
14   most I ever remember on it is probably five or six.
15   Q    All right. And then going up, did
16   you -- but did the information provided or this
17   e-mail from the Senator, did that upset you or bother
18   you?
19   A    I found it unusual under the situation
20   that I had been there for five years, and would be,
21   in a very short period of time. I had no plans to
22   make any major changes, only to keep the Center

121

1  running.  If someone left, I would attempt to fill a
2  position or post a position.  I had no agenda, so I
3  was surprised as to why he would send that.
4       Q     All right.  When you say you had been
5  there five years, you had been at the Center five
6  years.  You had been interim director for a grand
7  total of 31 days?
8       A     Sure.
9       Q     All right.  And had you made any
10 statements, whether orally or in writing, that there
11 was going to be some big changes made around here
12 during the Carmack interim?
13      A     None.
14      Q     Or words to that effect?
15      A     None.
16      Q     Okay.  But you seemed to thank Senator
17 Carrico for providing that information.  Is that what
18 the e-mail of July 31, which is going to be page two
19 of Exhibit 89, is that what that said?
20      A     I don't understand the question.
21      Q     "Bill, thanks for the information from
22 the Executive Committee.  It's helpful to have

122

1  direction from this group.  Please be advised we are
2  hiring additional wage employees part-time to fill
3  vacancies in our Conference Services Department, and
4  a receptionist to replace Nicole Farrar, who's
5  leaving next week.  These are all wage positions that
6  are needed to continue effective operations of the
7  Center."
8       So is that what you were telling him,
9  you had very limited changes?
10      A     Based on his correspondence to me of no
11 changes, I felt like I needed to have his permission
12 to make those changes.  So that's why I sent the
13 e-mail.
14      Q     And we will talk about some specific
15 individuals later.  But in reference to your July 31
16 e-mail to the Senator, where you're referencing a
17 vacancy in the conference service department, was
18 that one of the hourly, set-up-the-table jobs --
19      A     Those vacancies were, yes.
20      Q     -- that you were referring to.  Go
21 ahead.  I'm through.
22      A     Ms. Farrar worked as a receptionist at

123

1  the front desk.  And at that time that position came
2  under Conference Services.  She was leaving.  She was
3  moving.  And so that's what vacated the position as a
4  receptionist at Conference Services.  It was -- she
5  was wage, but she worked a lot of hours.  She was a
6  smiling face you saw most days when she came in
7  there.
8       Q     All right.
9            MR. KINCER:  And did you mark that 89?
10 Would you hand that to the court reporter?
11
12           (Exhibit Number 89 was marked for
13 identification)
14
15 BY MR. KINCER:
16      Q     During Mr. Matlock's Executive
17 Directorship of the Center and your duties as CFO of
18 this Center, did you two have a constructive
19 relationship?
20            MR. GRIMES:  Objection to the form, the
21 definition of the word constructive.  Go ahead
22 and answer, subject to the objection.

124

1  BY MR. KINCER:
2       Q     Positive, constructive relationship for
3  the good of the Center?
4       A     I never felt like we had a good
5  relationship.
6       Q     And tell me why that you thought that.
7       A     Having been interim director, when he
8  came down the first time, he did not set down and say
9  fill me in, bring me up-to-date.  He had some
10 individual group meetings by department, again
11 nothing in detail or executive level discussion with
12 me.
13            I was excluded immediately from
14 meetings with what I call his disciples, and that's
15 defined by Ms. Heitala, Mr. Webb, Mr. Tolbert,
16 Ms. Brooks.  And so I felt very much on the outside
17 from, upon his arrival.  And as he continued to work
18 there that relationship only grew more estranged.
19      Q     And more estranged from a professional
20 relationship?
21      A     From a professional relationship.
22      Q     And you grew more alienated and hostile

125

1  towards him, didn't you?
2      A     No, sir.
3      Q     All right. Let's look at paragraph 14
4  to the Complaint, and this is a preface before we
5  start getting into the OSIG complaint.  You say,
6  "Thereafter, overtime plaintiff discovered that
7  Matlock was wasting and misusing agency funds and
8  resources.  Examples include the following:"
9            Now, let me recap.  You are interim
10 director from July 1 of 2015 to sometime in October
11 of 2015?
12     A     Correct.
13     Q     And David Matlock comes on as Executive
14 Director of the Center.  We know he was hired on
15 October 1.  Whenever he was there or not there is of
16 no consequence for this.
17           During the period of time from October
18 of 2015 onward, how long did it take you to discover
19 that Mr. Matlock was wasting and misusing agency
20 funds and resources?
21     A     Beginning very early in 2016, I noticed
22 that policies and procedures that were in place at

126

1  UVA related to hiring, accounts payable, accounts
2  receivable, were not being followed.  We would make,
3  myself, Debbie Hensley, Alicia Young, all the Finance
4  Department would make comments to him or reminders of
5  him of, this need to be done or signed by a certain
6  date, to try to help him along.
7            Very early on in January it begins, we
8  begin to think about budget for the next fiscal year.
9  Ms. Hensley and myself met with him on two or three
10 occasions to talk about how the budget process
11 worked.  He was not a good listener.  He appeared
12 very disinterested in what we had to say, and made
13 the comment that he would contact Christine Fields,
14 who was the person in the finance position prior to
15 my arrival, who had worked, who was currently then
16 working at Virginia Highlands Community College.
17           Again, I perceived that as either no
18 confidence in what we had to offer or no interest in
19 what we had to offer regarding the budget.
20 Mrs. Brooks, Joyce Brooks, had -- while I was interim
21 director -- had said to me she would be retiring
22 sometime around November.  Her birthday was sometime

127

1  in November, and I assumed she turned 65.  That
2  precipitated my meeting with Susan Carkeek in
3  Charlottesville that was referenced in the earlier
4  e-mail.  She was a department manager.  She was the
5  head of HR.  She was also our operations director;
6  she wore a couple of hats.
7            So I wanted to talk to Susan about the
8  process of that decision, refilling that position,
9  the timeline in posting that position, because,
10 obviously, it was a management scale position.  I
11 knew that that might happen about the time
12 Mr. Matlock would be coming to work, but the
13 groundwork for that, as far as posting the position,
14 would have had to have been done while I was interim.
15           And back to January of '16.  As soon as
16 Ms. Brooks, again, let Mr. Matlock know that she was
17 thinking about retiring in the not too distant
18 future, he immediately moves Adam Tolbert, who is a
19 young man who had worked at the Center for maybe
20 three years in Information Technology, into, quote,
21 shadow Ms. Brooks or to train for her position.
22           I went to Mr. Matlock at that time and

128

1  said, pre-selection at UVA is an issue.  And you need
2  to follow the policies and procedures that are
3  outlined; you can't just put someone in that job.
4  The comment was, he's just shadowing her.  He's just
5  training.  The issue with that was he was given
6  access, total IT access, to all information that
7  Ms. Brooks had as a senior level management;
8  salaries, reviews, hiring, posting positions, the
9  whole nine yards and he was, frankly, an employee in
10 IT.
11           And I had several employees in IT -- I
12 had two employees in IT come to me and express
13 concern that their co-worker in the next cubicle had
14 access to their evaluations and their salaries.
15     Q     Who were the two that complained of
16 that?
17     A     Nicky Raley and Austin Deirks.
18     Q     And that complaint was made to you
19 approximately when?
20     A     Probably in the Winter of '16.
21     Q     All right.  And you thought -- well,
22 strike that.

Transcript of William D. Carmack
Conducted on March 12, 2019

33 (129 to 132)

---

129

1        There was nothing, per se, wrong with
2    anyone shadowing another employee to learn their
3    jobs, is there, at the Center?
4        A    To me that's a perception that they are
5    going to be given that job.
6        Q    Who's perception, Mr. Carmack's or
7    someone else's?
8        A    Mine and also, according to UVA policy,
9    if there is a job opening, it needs to be posted,
10   qualifications posted, applications taken, screened,
11   and a decision made. They frowned against
12   pre-selecting someone for the job prior to that
13   process.
14       Q    There was no job position open, was
15   there, at the time that you were fielding this
16   concern?
17       A    No.
18       Q    No position was open, so none of those
19   requirements came into play?
20       A    It was -- I considered it to be
21   unethical. The employees of the Center shared that
22   with me. They considered it unethical.

---

130

1        Q    Who shared that with you?
2        A    I can't think of an employee that
3    didn't.
4        Q    So --
5        A    Except, except Kathy Heitala and Jeff
6    Webb.
7        Q    So every employee considered that
8    unethical in the IT section?
9        A    Yes, except Jeff Webb.
10       Q    Well, Heitala wasn't in IT, was she?
11       A    Right.
12       Q    So this occurred, if I'm -- and I want
13   to go more in order, but this is where you started,
14   so this is where we will go. You're talking about --
15   if you will go to paragraph, page 7, and it's your
16   paragraph G. And I think that's what we are talking
17   about. That's OSIG number one.
18       A    Uh-huh.
19       Q    You see there in December of 2015?
20       A    Yes.
21       Q    "Upon retirement of on Human Resource
22   manager..." That's supposed to be of, isn't it?

---

131

1        A    It should be upon announcement of the
2    retirement.
3        Q    Okay. Thank you.
4        A    Although she didn't retire forever.
5        Q    Right, she did. So that, besides
6    grammatically in error, it's factually in error,
7    number g?
8        MR. GRIMES: Objection to the form.
9    What's the question?
10
11   BY MR. KINCER:
12       Q    14 g.? Question mark. Is that right?
13   Is that a correct statement?
14       MR. GRIMES: Is what a correct
15   statement?
16
17   BY MR. KINCER:
18       Q    "In December 2015, of upon the
19   retirement on Human Resource Manager, Joyce
20   Brooks..." Was Joyce Brooks retired in December of
21   2015?
22       A    She announced she was going to retire

---

132

1    in the future.
2        Q    Okay. With the certitude you have just
3    expressed, announced she was going to retire in the
4    future?
5        A    Yes.
6        Q    Okay. So the position wasn't open?
7        A    No.
8        Q    Okay. "...Matlock moved Information
9    Technology employee Adam Tolbert to Human Resources."
10   Is that what you were talking about, the shadowing?
11       A    He did.
12       Q    All right. While Adam Tolbert was
13   shadowing Joyce Brooks, when did Ms. Brooks
14   eventually leave employment at the Center?
15       A    January 4, 2018.
16       Q    So about three years later after this
17   approximately?
18       A    I guess.
19       Q    Well, do the math. December 2015.
20       A    Sure.
21       Q    All right. So why did it take -- so
22   that occurred in December, that incident occurred,

Transcript of William D. Carmack
Conducted on March 12, 2019

133

1 and you were aware of that when it occurred?
2     A     Yes, she made it publicly known
3 throughout the building, announced it several
4 times.
5     Q     I'm sorry. I might not have been
6 clear, or you made an assumption. But you were aware
7 of this shadowing that ethically offended you per
8 your earlier testimony, and you were aware of it in
9 December of 2015?
10    A     Yes.
11    Q     All right. And why does it wait over
12 two years to show up in an OSIG complaint?
13    A     There were a variety of abuse and
14 harassments that Mr. Matlock continued to put toward
15 me over '16 and '17. And I am not accustomed to
16 working in an environment in that level or being
17 treated in that manner. I don't take it lightly, and
18 I was always optimistic that he and I could find some
19 positive ground on which to work.
20          And so when it became so severe that it
21 was just almost intolerable for me to physically be
22 present, and certainly impossible for me to do my job

134

1 as chief financial officer, then I was forced with
2 the dilemma of his infractions were creating
3 audit exceptions. And so I went to the State to ask
4 for the most constructive way for resolution.
5 Immediately they told me to go to OSIG, and that
6 would have been February of 2017.
7          But I continued to work through the
8 various departments of DHRM, in hopes there would be
9 some mediation or some outside third party brought in
10 to bring a constructive, less damning outcome instead
11 of straight to OSIG. But that didn't happen, and so
12 in June I had no other choice, and upon
13 recommendation of five individuals at the State, I
14 filed a complaint.
15    Q     Let's talk. Five individuals. Tell me
16 all five individuals with the State that told you to
17 file, to do this?
18    A     I began my concern with setting down
19 with the ombudsman at the University of Virginia.
20 His name will come to me in a moment. He
21 immediately, after listening to my concerns, picked
22 up the phone and called DHRM in Richmond and asked if

135

1 they could meet with me the following morning. So I
2 went to Richmond and met with Gretchen White in DHRM,
3 who referred me to Amanda Monaco, who referred me to
4 Alex Morgan.
5          And there was an internal director of
6 DHRM — and, I'm sorry, I don't know his name at that
7 point — because there was question as to whether or
8 not as classification of an employee that I was with
9 UVA, whether I had the right to file a grievance or
10 not. And so they had to take it to the director who
11 said I was eligible to file a grievance, but he
12 suggested I just report it to OSIG.
13    Q     Do you have a written decision,
14 document that shows your eligibility to file a
15 grievance?
16    A     I don't know.
17    Q     Do you ever recall seeing such a
18 thing?
19    A     I recall getting word from the
20 Department of Human Resource Management, and I don't
21 remember if it was an e-mail or if it was a phone
22 call, that I had been deemed eligible to file a

136

1 grievance.
2    Q     But you don't have that e-mail?
3    A     Not with me, and I don't know that I
4 have it in my presence. I would have to look in my
5 files.
6    Q     And you don't know who sent you that
7 e-mail?
8    A     That e-mail would have come from Amanda
9 Monaco.
10    Q     Okay. And have we exhausted all the
11 five people you talked to? Are we missing -- is the
12 acting director the last one?
13    A     The acting director was the last one.
14 Now, following that visit, I had conversations with
15 the Secretary of Higher Education, who was Dietre
16 Trent's office, about this concern and that lady's
17 name was Alex Morgan. And OSIG asked my permission
18 to send my complaints on to Peter Blake, who was the
19 director of what we call SCHEV, State Counsel of
20 Higher Education, to review, and Peter sent it back
21 and said it was not a SCHEV issue, it needed to be
22 dealt with with DHRM and ORT.

Transcript of William D. Carmack
Conducted on March 12, 2019

137

1    Q    All right.  And what did you do next?

2    A    I waited.  Finally, by the end of June

3    I was feeling like that Mr. Matlock's errors, if I

4    didn't address them to OSIG, he would have just cause

5    in terminating me, because these errors had taken

6    place, and I had not followed up with them or

7    attempted corrective action.

8         So I filed a report online at the end

9    of June to OSIG and, ironically, it did not go

10   through.  When you do a case on-line it's assigned a

11   case number.  I did this Thursday, and by Tuesday I

12   hadn't heard.  So I picked up the phone and called,

13   and Shawn Cowardin happened to be the investigator

14   who answered the phone.  I explained what had

15   happened.  He went into the system and looked.  And

16   he said, I see nothing.  He said, I don't understand

17   what happened, but resubmit it right now.  I

18   resubmitted it, and within an hour I had a case

19   number.

20   Q    All right.  So is the fact it didn't go

21   through of any significance to you?

22   A    Not at this point.

138

1    Q    Okay.  You're just stating a fact?

2    A    Yes.

3    Q    All right.  But we started this, and we

4    will go back through the OSIG complaint in more

5    excruciating, painful detail after lunch.  But my

6    original question to you was, if you were aware in

7    December of 2015 that Mr. Matlock was doing something

8    unethical, why did you wait over two years to bring

9    that to anyone's attention?

10        MR. GRIMES:  Objection; asked and

11   answered.  Go ahead and answer that again.

12        THE WITNESS:  I had, first of all, it

13   smarts.  I thought, he's new, he'll learn,

14   he'll figure it out.  And it became apparent,

15   after six months of trying to assist him or

16   explain what the processes and policies were,

17   and those processes continued to be denied and

18   violated, they kind of grow on each other.

19        And so then the severity of them began

20   to increase.  And regardless of what feedback

21   we would give Mr. Matlock, it was ignored and

22   usually met with, I'm in a hurry.  I don't

139

1    have time.  I will deal with it later.

2         It wasn't until the end of '16 that I

3    felt like, this is severe enough that either I

4    could lose my job by not calling attention to

5    it, or I need to go to the state and ask for

6    assistance.

7

8    BY MR. KINCER:

9    Q    So you were concerned about any

10   nonfeasance on your part?

11   A    I was concerned that allowing it to

12   continue, I would be a party to it, having knowledge

13   of it.

14   Q    And that was one of the things that,

15   one of the factors that motivated you to file the

16   OSIG complaint when you did?

17   A    One of the factors.

18   Q    All right.

19   A    And may I just say, Brad Holland is the

20   ombudsman's name at UVA I could not recall.

21   Q    Thank you.  All right.

22        MR. KINCER:  What time is it?

140

1         MR. HARDY:  12:47.

2         MR. GRIMES:  Off the record.

3

4         (Discussion off the record)

5

6         (A lunch recess was taken)

7

8         (Exhibit Number 90 was marked for

9    identification)

10

11   BY MR. KINCER:

12   Q    Mr. Carmack, I put in an exhibit before

13   you marked number 90.  Have you seen that document

14   before?

15   A    I have.

16   Q    And what do you understand that

17   document to be?

18   A    I understand that to be correspondence

19   from the office of OIG that's addressed to then

20   Secretary Dietre Trent, Secretary of Education.

21   Q    You were hotline report 16077; were you

22   not?

---

**141**

1     A     According to this document, yes.

2     Q     All right.  Well, does this appear to

3  be the complaints that, or at least some of the

4  complaints you made to the --

5     A     Yes.

6     Q     -- Inspector General?

7     A     Yes.

8     Q     I want you to take a look through that

9  report, take all the time you need to, and you will

10 see there is an allegation and then some other stuff,

11 allegation, allegation.

12          Let me know after you look at Exhibit

13 90 if there were any other allegations that you

14 lodged that do not appear to be addressed in Exhibit

15 Number 90.

16     A     The document that I sent to the OSIG's

17 office had 16 items in those.  When I received a call

18 from Mr. Cowardin, several, probably two months after

19 I submitted it, he stated to me that a lot of those

20 items he felt like needed to be addressed by DHRM,

21 and he was sending those on to them, and that he was

22 going to address the ones that he felt like pertained

---

**142**

1  to fraud and abuse.

2     Q     So you originally made 16

3  allegations?

4     A     That's correct.

5     Q     And you told me -- was this the

6  investigator that you were talking with?

7     A     Yes, Mr. Cowardin at OSIG.

8     Q     And could you spell the last name?

9     A     C-o-w-d-i-n (sic).

10    Q     And the basic response to those that

11 are unaddressed in Exhibit Number 90 was that they

12 needed to be addressed to DHRM?

13    A     Correct.

14    Q     Did the investigator or anyone else at

15 OSIG ever tell you that of those 16 allegations you

16 filed, a good number of them were petty?

17    A     No, sir.

18    Q     All right.  Look on page 3 of 5 of

19 Exhibit 90, and this is allegation number four.  And

20 we won't go into it all, but your allegation was

21 essentially, well, stated here as being, "Mr. Matlock

22 does not submit travel reimbursement requests

---

**143**

1  timely."  You made that allegation to the Inspector

2  General?

3     A     I did.

4     Q     And tell me why did you feel that

5  untimely submittal of travel reimbursements were

6  worthy of an OSIG complaint?

7     A     According to the CAPP manual, any type

8  of travel or expense needs to be invoiced, entered

9  and paid within 30 days of the time it was incurred.

10 If an auditor goes through a file and finds it in

11 excess of that, it's an exception.  It's an audit

12 policy violation.

13    Q     Okay.  And, again, we are referring to

14 the Commonwealth Accounting Policies and

15 Procedures?

16    A     Yes.

17    Q     I think I got from your earlier

18 testimony before the luncheon break, you're a pretty

19 by-the-book person?

20    A     Most of the time I try to be.

21    Q     All right.  But you thought that this

22 should have been raised to a OSIG complaint?

---

**144**

1     A     As long as it went on, yes.

2     Q     Well, how many times did you ever

3  address that issue with Mr. Matlock?

4     A     It was addressed by me on two

5  occasions.  And I know it was addressed by

6  Ms. Heitala to him on one occasion that she

7  referenced to me that she had sent him a reminder by

8  e-mail, and addressed by Ms. Deborah Hensley at least

9  one time.

10    Q     All right.  So that's four times?

11    A     That I know of.

12    Q     That you know of, yes, sir.  And the

13 two times that you had addressed it, how did you do

14 that?

15    A     Just verbally, David, we need to have

16 these done within a 30 day time frame.

17    Q     What about Heitala; do you know how she

18 addressed it?

19    A     I don't.

20    Q     And what about Ms. Hensley?

21    A     Verbally.

22    Q     Okay.  Now, go back to page two of five

---

Transcript of William D. Carmack
Conducted on March 12, 2019

37 (145 to 148)

---

145

1   and look at allegation two.  It's "Two wage employees
2   waste state time for a system that handles
3   scholarships and loan funds."  Did you make that
4   complaint?
5       A    I did.
6       Q    And are these the Holts?
7       A    Barry and Elizabeth Tate.
8       Q    Tate.  I'm sorry.  So this concerned
9   the Tates?
10      A    Correct.
11      Q    Prior to filing an Inspector General
12  complaint against Mr. Matlock for that, did you ever
13  discuss that issue with him?
14      A    Many times.
15      Q    In what format?
16      A    Meetings.
17      Q    Always verbally?
18      A    No.  There were e-mails.  There were
19  verbal meetings.  There were meetings with Jeff Webb,
20  the Tobacco staff, Mr. Matlock and myself multiple
21  times.  There were meetings with the Tates present.
22  There were meetings with outside vendors to bid on

---

146

1   the job present.  It was discussed probably 15 times
2   in person and more times in e-mails.
3       Q    Well, you wanted to outsource that,
4   didn't you?
5       A    There came a time when I felt like in
6   order to get the deadline met and the program
7   developed, that it was cheaper to outsource the
8   program.  And the way we determined that was to have
9   a bid placed and a company place a bid to do the work
10  for around $50,000 less than what we were paying the
11  Tates combined annually.
12      Q    And was one of the vendors from whom
13  you sought a solicitation, was that Holston?
14      A    Holston IT.
15      Q    IT?
16      A    Uh-huh.
17      Q    Let me ask you this.  Did you have any
18  personal or business connection with that entity?
19      A    I did not.
20      Q    Through any of your companies or
21  otherwise?
22      A    I did not.

---

147

1       Q    Now, that was around arm's length
2   solicitation?
3       A    Yes, yes.
4       Q    Right.  So let's switch.  You can keep
5   that nearby, but would you go back to exhibit -- was
6   that our --
7            MR. HARDY:  What exhibit number is the
8       Amended Complaint?
9            MR. HARDY:  88.
10           MR. KINCER:  I guess I could look on
11      mine too.
12
13  BY MR. KINCER:
14      Q    Go to page four of the Complaint.  And
15  this is paragraph 14 b.  And that begins, that
16  sentence begins, "When plaintiff learned that a
17  husband and wife computer team were, quote, 'working'
18  in a questionable manner from home and were seldom in
19  the agency building," and it continues on.
20           Is that the Tates that we are talking
21  about in paragraph b?
22      A    It is.

---

148

1       Q    And then the complaint continues, and
2   I'm reading on page five.  "...the couple were close
3   personal friends of Agency Information Technology
4   Director Jeff Webb, and Webb had approved 111 hours
5   of overtime pay for the wife, between July and
6   November 2016..." and you say, "...plaintiff
7   complained about suspected fraud and abuse to Webb
8   and Matlock."  How did you make that complaint?
9       A    Multiple times in meetings between
10  Mr. Matlock, Mr. Webb, Mr. Tolbert was usually
11  present in those meetings and myself.  Oftentimes the
12  three ladies in the Tobacco Department would be
13  involved in these conversations.
14           It was repeatedly announced, repeatedly
15  complained about that we could not get the
16  scholarship program out of the Tates so that we could
17  keep up to date in posting scholarship payments and
18  keeping the ledgers up on each individual student.
19  We attempted initially to buy a canned program.  The
20  Tates volunteered to write it and they could have it
21  done within six months.  Two years later it was not
22  finished.

---

Transcript of William D. Carmack
Conducted on March 12, 2019

---

149

1          I complained multiple times, and in
2  several of those meetings where the Tates attended,
3  Mrs. Tate admitted that she did not have the
4  programming knowledge to do the work and was
5  dependent upon her husband Barry, who was a full-time
6  employee with Crutchfield Corporation, to do the work
7  on his own time.
8          And Barry became very upset every time
9  we questioned his wife's work. He became very angry,
10 and directed that anger toward me. And Barry was
11 always defended by Mr. Webb in these meetings;
12 however, I will add one caveat. When Mr. Webb and
13 Mr. Matlock and Mr. Tolbert and I met without the
14 Tates, Mr. Webb agreed that Ms. Tate did not have
15 those skills but Mr. Tate, did and we probably would
16 be better off to look at outsourcing and what it
17 would cost.
18         He also had concerns from a compliance
19 standpoint that that data that belonged to the
20 Tobacco Commission was actually being housed on
21 servers inside the Higher Ed Center. He wanted to
22 get that off into the cloud base, and he needed

150

1  someone else to do that because the Tates didn't have
2  that, quote, expertise. Mr. Tolbert and Mr. Webb
3  agreed to outsource that to Holston IT.
4      Q     Going back to -- and that is all in
5  that paragraph b, and thank you for expanding on
6  that. One of the issues that you had was when Webb,
7  we read it before, Webb had approved 111 hours of
8  overtime pay. Plaintiff complained about suspected
9  fraud and abuse to Webb and Matlock. That
10 happened?
11     A     I'm sorry. Who complained?
12     Q     Plaintiff. I'm assuming plaintiff is
13 William D. Carmack?
14     A     Yes. I just didn't understand your
15 word, yes.
16         MR. KINCER: Okay. There you go.
17
18 BY MR. KINCER:
19     Q     Okay. Take a look at this. That will
20 be 91?
21     A     Uh-huh.
22     Q     See if you can identify that?

---

151

1      A     Yes.
2      Q     Consists of seven pages. What are
3  those pages, Mr. Carmack?
4      A     Time sheet requests for Elizabeth
5  Tate.
6      Q     Who was one of the people at issue?
7      A     Most of them are issued to Debbie
8  Hensley from Duffy Carmack.
9      Q     And let's look at the first sheet.
10 That is August 11 of 2016. That e-mail was sent from
11 you to Deborah Hensley?
12     A     That's correct.
13     Q     We mentioned her name several times.
14 Did Ms. Hensley work for you?
15     A     She did.
16     Q     What was her title?
17     A     Business manager.
18     Q     All right. And she reported to you
19 some of Elizabeth Tate's overtime. This particular
20 one, this first sheet on Exhibit 91, is for $182.08;
21 is that correct?
22     A     That's correct.

152

1      Q     And Ms. Hensley is saying to you,
2  Elizabeth has $182.08 in overtime pay for pay period
3  16. Please approve. And then right above that is an
4  e-mail you sent, approved by William D. Carmack on
5  11/16?
6      A     Correct.
7      Q     So you were aware of this overtime?
8      A     I was aware that it was a continuing
9  process or issue problem.
10     Q     Okay. And approved it on that time
11 period?
12     A     Yes. This was what gave me the
13 awareness of it.
14     Q     Okay. And let's go to the second,
15 sheet two, which is an e-mail from you to Ms. Hensley
16 dated August 25th of 2016?
17     A     Uh-huh.
18     Q     And I'm not going to read it all but,
19 again, that's some more overtime for Elizabeth, and
20 she is, Ms. Hensley is asking you to approve that
21 overtime. And you write Ms. Hensley at 2:08 p.m. and
22 it says, "Overtime for Elizabeth Tate is approved for

Transcript of William D. Carmack
Conducted on March 12, 2019

153

1  pay period 17."  Did you write that?
2      A     Yes.
3      Q     All right.  So you approved another pay
4  period of Tate's overtime?
5      A     I did.
6      Q     Sheet three, your e-mail of September
7  9, 2016.
8      A     Yes.
9      Q     Is that another overtime request for
10 Elizabeth Tate?
11     A     Yes.
12     Q     Is that another overtime request that
13 you approved?
14     A     It is.
15     Q     Go to the October 10, 2016 e-mail.  And
16 this is a request for $564.43 in overtime pay for
17 Ms. Tate, please approve.  And you wrote her back,
18 approved overtime for Elizabeth Tate?
19     A     That's correct.
20     Q     Okay.  Let's go to the next e-mail in
21 Exhibit 91.  It's a October 26, 2016 e-mail from
22 Duffy Carmack to Deborah Hensley.  Overtime for

154

1  Elizabeth Tate in the amount of the $728.30 is
2  approved; is that correct?
3      A     That's correct.
4      Q     You wrote that?  You approved that?
5      A     I did.
6      Q     And let's go to your e-mail for
7  Wednesday, November 9, 2016, pay period 22.  That's
8  Ms. Hensley also asking you to approve 20 hours of
9  overtime pay?
10     A     Correct.
11     Q     And you just simply wrote back a one
12 word reply, approved?
13     A     Correct.
14     Q     And we will go to the next, number 6 in
15 Exhibit 91.  It's a November 21, 2016 e-mail.
16 "Elizabeth had 20 hours of overtime for pay period
17 23.  Please approve."  And you wrote Ms. Hensley
18 back, "approved OT, Elizabeth Tate," correct?
19     A     Correct.
20     Q     And the last one is pay period 24,
21 December 6, 2016 and that was approving six hours of
22 overtime for Elizabeth Tate and you wrote back,

155

1  "Approved E. Tate, six hours overtime," signed
2  Duffy?
3      A     That's correct.
4      Q     So there are six instances during the
5  time period that you put in your OSIG report citing
6  waste or fraud that you were not, you knew about, you
7  personally approved the expenditure?
8      A     Although I approved those expenditures,
9  you need to also understand that Mr. Webb had been
10 the approver of the Tates' time.  And in one of the
11 conversations that Mr. Matlock and Mr. Webb and I
12 had, sometime in July or August, about the Tates'
13 lack of performance and the fact that they did no
14 work for the Higher Ed Center, but worked exclusively
15 for the Foundation side, Mr. Matlock suggested that
16 the Tates report to me.  And so I began signing their
17 time sheets at that point.
18          Prior to that I had no awareness of how
19 much overtime was being incurred.  As the Fall
20 progressed, Mr. Matlock and Mr. Webb decided that if
21 the Tates continued to report to me and was held
22 accountable for their work, that they would quit or

156

1  they will take their data that they created and
2  leave, and we would be without a system.  So
3  Mr. Matlock made the decision to turn the approval
4  back over to Mr. Webb at the first of the year.
5          So it was that quarter of approving
6  time sheets that I realized it was an ongoing,
7  regular basis of overtime, and made the inquiry of
8  Ms. Brooks as to the total we paid since July.
9      Q     And thus cited as potential fraud and
10 abuse overtime that you had approved?
11     A     It was entirely fraud and abuse for
12 anything the Tates was paid when matched to
13 production.
14     Q     All right.  Go to page 7 of Exhibit 88,
15 which is the Amended Complaint.  And I'm looking at,
16 I'm looking at number or letter little h. at the
17 bottom of the page there that begins, "When Matlock
18 worked at Virginia Highlands Community College, the
19 college hosted a fundraiser," and it continues on,
20 "When Matlock was hired at the Center, he wanted the
21 fundraiser to be hosted by the Center.  He and the
22 Community College had disputes about the issue."

Transcript of William D. Carmack
Conducted on March 12, 2019

---

**157**

1          Let me just ask you a discrete question

2    there.  What kind of disputes about the issue?

3          A    **Mr. Matlock felt like that Richard**

4    **Leigh Songwriter Festival was an event that he**

5    **created and brought to the Community College.  And he**

6    **felt like it to continue that he should be**

7    **involved, and that in some manner that the proceeds**

8    **from that should also come to the Higher Ed Center**

9    **Foundation, in addition to the Community College.**

10         Q    All right.  And if we can continue, "He

11   and the Community College had disputes about the

12   issue, but ultimately the college hosted the

13   fundraiser.  Some of the proceeds of that fundraiser

14   though, have gone missing.  Moreover, Matlock, six

15   months later, attempted to host his own Richard Leigh

16   fundraiser on behalf of the Center, but the proceeds

17   of that fundraiser never made their way to the

18   Center."  Is that factually correct?

19         A    **To the best of my knowledge it is.**

20         Q    All right.

21

22         (Discussion off the record)

---

**158**

1          (Exhibit Number 91 and 92 were marked

2         for identification)

3

4    BY MR. KINCER:

5          Q    And I handed you an e-mail.  Who's

6    Alicia Young?

7          A    **Alicia Young is the grant's director**

8    **and the financial administrator for the Foundation.**

9          Q    Did she work for you?

10         A    **She did.**

11         Q    And I'm looking -- I think our exhibits

12   are straight.  I'm looking at an exhibit, it's an

13   e-mail from Alicia Young to you dated June 19,

14   2017?

15         A    **Correct.**

16         Q    Is the subject matter of this June 19

17   e-mail, is that explaining some proceeds from that

18   golf tournament and what she had done?  "We bought a

19   money order with the cash that was given to me for

20   the golf tournament.  I am not allowed to send cash

21   up to the UVA fund.  Could you tell me how to process

22   the $560?  I will need who paid, the amount paid and

---

**159**

1    what money was for, registration, sponsorship,

2    etcetera, for accounting purposes.  If I need to send

3    them a letter for sponsorship, I will also need the

4    complete address.  Thanks Alicia."  Did you receive

5    that e-mail?

6          A    **I did.**

7          Q    And are you on page two?  I started --

8    is there a page -- this prefaces -- this is a May 31,

9    2017 e-mail from Alicia dated Matlock and cc to Duffy

10   Carmack.  Is that correct?

11         A    **That's correct.**

12         Q    And it says subject is the golf

13   tournament?

14         A    **Yes.**

15         Q    And Alicia is saying to David Matlock,

16   you're copied on it, "I have a invoice from..." is

17   that Glenrochie?

18         A    **Glenrochie.**

19         Q    "...Glenrochie Country Club to pay for

20   the golf tournament.  Can you tell me who to contact

21   there to get a W9 so we can process payment to them?

22   Thanks, Alicia."  So was that done to your

---

**160**

1    knowledge?

2          A    **I had no knowledge of the golf**

3    **tournament.  Mr. Matlock did not include Finance in**

4    **any of his projects.  He did not, even though they**

5    **were operated under the Foundation name or the Center**

6    **name, no one from the Finance Department which would**

7    **have been myself, Debbie Hensley or Alicia, were ever**

8    **included in the planning.  We had no idea it was**

9    **going on.**

10         **Therefore, when it came time to post**

11   **proceeds, whether it was a contribution toward the**

12   **event, from patrons at the door, expenses, we had**

13   **nothing, because we were not there or involved in**

14   **setting up the checks and balances of the event**

15   **initially.**

16         Q    But you were copied on an e-mail

17   showing that funds were being accounted for?

18         A    **I was copied on an e-mail where Ms.**

19   **Young was asking questions as to, you know, what's**

20   **the 560, and how do we get cash, because we didn't**

21   **usually see cash, how do we get cash to**

22   **Charlottesville?**

---

Transcript of William D. Carmack
Conducted on March 12, 2019

161

1    Q     All right.  How do we get money from
2  this golf tournament to Charlottesville?
3    A     Correct.
4    Q     All right.
5         MR. KINCER:  And I will keep you in
6  charge, next sequential exhibit.
7
8         (Exhibit Number 93 was marked for
9  identification)
10
11 BY MR. KINCER:
12   Q     I have handed you Exhibit 93, which is
13 some, again, e-mails from Alicia Young to David
14 Matlock, cc to Duffy Carmack, starting at 9:06 a.m.
15 And this e-mail reads, "David, I need to send up the
16 fund from the golf tournament by Tuesday, June 27th
17 for the year end.  I will also need the expenses for
18 the golf tournament by Tuesday to record them in FY17
19 when the tournament was held.  Thanks Alicia."  Did
20 you get copied on that e-mail?
21   A     I'm listed as copied.
22   Q     Then if we go to the 9:08 a.m. e-mail

162

1  from David Matlock back to Alicia Young, copy to
2  Duffy Carmack shown on Exhibit 93, it says, "How
3  about we meet around two o'clock today to finish that
4  up?"  You were copied on that?
5    A     I was copied.
6    Q     All right.  So my question to you is,
7  looking at your Complaint concerning the fundraiser
8  and some of the proceeds of that money has gone
9  missing, what factual basis did you have to make that
10 allegation?
11   A     Based on comments that he made and
12 Sonia VanHook, who was another employee in the
13 building who attended the golf tournament, as to how
14 many people attended doesn't comprise the dollar
15 amounts collected.  And we did receive sponsorships
16 from some industry in the area, but no one was
17 advised what was to do with that money, if it went
18 toward paying the country club or toward food or
19 toward prizes.  There was no communication to Finance
20 at all.
21   Q     You didn't know about it?
22   A     No.

163

1    Q     All right.  So the fact that you didn't
2  know about it, you felt shut out?
3    A     The entire Finance Department felt shut
4  out, and complained to me about it.
5    Q     So that allowed you to tell the
6  Inspector General that funds had, quote, gone
7  missing?
8    A     We had no balance.  We were not able to
9  balance the income and receipts or expenses.
10   Q     And you don't know if that was done
11 through...
12   A     My last conversation with Ms. Young was
13 that it was never in balance.
14   Q     Is that by e-mail or was that...
15   A     Just verbally.
16   Q     Verbally.  All right.  Now, looking
17 back at the Amended Complaint, number 88, and this
18 is, this is f.  That was not in your OSIG complaint,
19 was it?
20         MR. GRIMES:  Objection; what is that?
21         MR. KINCER:  f, Sub-part f.  I thought
22 it would follow.

164

1         MR. GRIMES:  I thought you said that.
2  Sorry.
3         THE WITNESS:  I'm not following.  I
4  don't understand.
5         MR. GRIMES:  Let's try this again.
6  It's confusing.
7         MR. KINCER:  Confusing?
8
9  BY MR. KINCER:
10   Q     You're looking at Exhibit 88.  Look at
11 paragraph 14, little f on page 7.
12   A     Okay.
13   Q     Was that one of the, was that one of
14 the issues that you raised or attempted to raise with
15 Inspector General that they told you to take the
16 complaint to DHRM?
17   A     It is.
18   Q     This is some artwork, meaning this is a
19 $9,900 worth of artwork that was that mobile in the
20 center lobby?
21   A     That's correct.
22   Q     Going back, this complaint in f. was

Transcript of William D. Carmack
Conducted on March 12, 2019

**165**

1   that it had been removed?

2   A    We come back from Christmas break and

3   it's gone, right.

4   Q    And you said in other dep -- you know

5   that it was back, correct?  You know it is back,

6   correct?

7   A    Yes, I know it's back, uh-huh.

8   Q    You also know that it was removed due

9   to repairs to the ceiling of the Center?

10   A    That's what I hear in deposition.

11   Q    All right.  And do you personally have

12   any knowledge to the contrary, any facts to support

13   any allegation to the contrary?

14   A    I never understood why the mobile was

15   removed or missing for over a year.

16   Q    Okay.  We will go to another OSIG

17   complaint later, but staying on yours against

18   Mr. Matlock, did you, did you approve -- to the birth

19   of the mobile, did you approve this $9,900

20   expenditure without seeking Board approval?

21   A    This expenditure came through the

22   Foundation, and the Foundation, in discussion, agreed

**166**

1   that they wanted to put something in the building.

2   And a committee was created of Kathy Heitala, Joyce

3   Brooks, myself, I think Marcia Gilliam, and we

4   decided to do a piece of art and to also name a room,

5   which we called a tiered executive auditorium, after

6   Dr. Fowlkes in recognition of her work there.

7   Q    Well, did you have written authority to

8   expend $9,900 of Foundation funds for that mobile?

9   A    I had verbal authority from the

10   Foundation to do that.

11   Q    Okay.  The Foundation is an artificial

12   entity.  Who at the Foundation?  What person at the,

13   on the Foundation's behalf?

14   A    It was discussed openly at Foundation

15   meetings.  I don't know if it's in the minutes or

16   not, haven't looked.  It was approved.

17   Q    Can you name at least one person who

18   conveyed information to you that that would be a fine

19   thing?

20   A    Marcia Gilliam, who was the chairman of

21   the Foundation.

22   Q    And at which time was Gilliam chairman

**167**

1   of the Foundation?

2   A    Oh, goodness.  When I went to work

3   there she was chairman, and she served probably up

4   until 2000, maybe '16, '15, '16.

5   Q    Okay.  We are still on Exhibit 88.  Go

6   back to page four, paragraph 14, sub little a.

7   A    Okay.

8   Q    This is an invoice, Matlock's invoice

9   submitted for $1,250 to reimburse a Virginia middle

10   school for a robotics competition, correct?

11   A    Correct.

12   Q    Tell me about that allegation.

13   A    Again, having no former knowledge that

14   any of the dollars from the Center or the Foundation

15   were going to be spent -- and we did have budgets at

16   the Center that we tried to follow -- Foundation

17   money was not particularly earmarked for any one

18   project.  He laid this invoice on Ms. Young's desk

19   and asked that it be paid.

20        She brought it to me, and I found it

21   preposterous, actually, because, number one, the

22   Higher Ed Center had long time been a proponent of

**168**

1   STEM, and that's Science, Education, Technology and

2   Mathematics, particularly for girls.  And it exposed

3   young girls in southwest Virginia to jobs outside of

4   the traditional female stereotype roles.

5        So for a number of years the Higher Ed

6   Center hosted a STEM competition called Lego

7   Robotics.  You had to have teams, like a church group

8   or cub scout team or home school team.  It had to be

9   a team of students that would come in to compete in

10   these competitions.  The problem that we had in

11   southwest Virginia were finding adult sponsors of

12   these teams, because it's very time-consuming.

13        So the Higher Ed Center, through the

14   partnership with Virginia Tech, would always recruit

15   for adult leaders to create a team.  And we would

16   usually pay for two to three of these adult leaders

17   to go to the State training in hopes that they would

18   come back and create a Lego team.  At no time in the

19   history of the Center had I ever known us to pay for

20   students or a chaperone of students to go to a

21   robotics competition.

22   Q    All right.  And you say, continuing in

Transcript of William D. Carmack
Conducted on March 12, 2019

169

1  paragraph a. in the complaint, you state that, "When
2  questioned about this, Matlock stated that he had
3  offered this to all schools in southwest Virginia.
4  On information and belief, this is not true, and
5  Matlock produced no evidence that he had, in fact,
6  extended the offer to all the schools in southwest
7  Virginia, and it is improbable that only his son
8  accepted the offer."
9        Would you go back to the OSIG report,
10 Exhibit 90 please, on page two of five?  And this is
11 allegation three.
12     A    Oh, I'm sorry.  On the OSIG report?
13     Q    Yes, sir.  Has the seal?
14     A    Okay.
15     Q    And Inspector General addressing that
16 issue recites the basic allegation that we talked
17 about.  And the finding of fact to that allegation
18 that you made was that the OSIG reviewed records
19 related to the robotic support for FY2014 through
20 2017.  The disbursement summary shows the school
21 referred to above received support in FY2017 only.
22 Altogether, for the four fiscal years, disbursements

170

1  exceeded $22,000 for 22 items, including for six
2  other schools.
3      A    Correct.
4      Q    Could you not have found that out, that
5  information, not only the information and belief, but
6  on factual inquiry before filing a report with the
7  Inspector General?
8      A    The $22,000 for 22 items was not to pay
9  for teams of schools for children to go to
10 competitions; it was to pay for adults from various
11 localities to attend trainings to set up school
12 teams.
13     Q    So do you have any factual information
14 that that was, that that was any private, private
15 deal with, with that particular school?
16     A    It appears ironic to me that his son is
17 the middle school principal there.  And also having
18 lived and worked in southwest Virginia for 50 years
19 and knowing how poor the school systems are, if the
20 Higher Ed Center offered 1,200 or $1,500 to each
21 school, I can't imagine anyone not taking it.
22     Q    But you don't know any of that

171

1  factually?
2          MR. GRIMES:  Objection to the form.
3      What is that?
4          MR. KINCER:  What is that?
5
6  BY MR. KINCER:
7      Q    Any of the conjecture, and it seems
8  ironic to me, leaving the irony and the information
9  and belief of your complaint aside, what facts do you
10 have that this was any particular program that others
11 were not eligible for had they applied?
12     A    The fact is I have never seen the offer
13 made to any other school.
14     Q    All right.  And you thought that was
15 enough information to warrant the OSIG complaint?
16     A    Yes, I do.
17     Q    All right.  And you first discovered
18 that in -- did you discover that soon after the
19 disbursement was made in 2016, December 2016?
20     A    Yes.
21     Q    All right.  Look on -- go back to the
22 Amended Complaint, paragraph 88, and look at

172

1  sub-section, page five, little d. as in dog?
2      A    Uh-huh.
3      Q    And this complaint, this complaint was
4  not in the OSIG report, was it, the Joe Mitchell,
5  hired a long-time friend to work as maintenance
6  supervisor?
7      A    That's one of my 16 items that I
8  submitted to OSIG.
9      Q    That was not included in the final
10 report?
11     A    Correct.
12     Q    All right.  And what I want to ask you
13 about is, you say that Matlock, A, he hired one of
14 his long-time friends, Joe Mitchell.  By his friends,
15 you mean Matlock's friend?
16     A    Correct.
17     Q    Well, he was your long-time friend too,
18 wasn't he?
19     A    He was a long-time acquaintance that I
20 knew, did business with in the banking business.  He
21 was one of my customers, no one I knew on an intimate
22 or friendly basis.

Transcript of William D. Carmack
Conducted on March 12, 2019

44 (173 to 176)

---

173

1    Q       And you say that, "Matlock hired
2  Mitchell as a quote, 'wage' employee, without being
3  interviewed by selection committee as required by
4  Agency policy, then added him as a full-time employee
5  in July 2017."
6         So even though that was one of the
7  allegations not addressed by OSIG for the reasons
8  that you have stated before, that was one of the
9  allegations that you made, you felt warranted in
10 making to the Inspector General?
11   A       Correct.
12          MR. KINCER:  That is the next exhibit.
13
14          (Exhibit Number 94 was marked for
15       identification)
16
17 BY MR. KINCER:
18   Q       Would you take a look at Exhibit 94,
19 Mr. Carmack.  Is that an e-mail from you to Joyce
20 Brooks?
21   A       It is.
22   Q       She was in HR?

---

174

1    A       She was.
2    Q       And you copied David Matlock on that,
3  didn't you?
4    A       I did.
5    Q       And the subject of this e-mail was
6  Interview Committee?
7    A       Correct.
8    Q       And you say in this e-mail dated March
9  31, 2017, "Joyce, I received a notice that I have
10 been selected to participate on an Interview
11 Committee.  Normally I am glad to participate in
12 this; however, I have known Joe personally for many
13 years and do not feel it would be fair to participate
14 in this selection process.  Thanks.  Duffy."
15   A       Correct.
16   Q       All right.  So whether, despite
17 whatever the status of Joe was to you, whether a good
18 friend or a business acquaintance or someone you had
19 known, you were aware, when you made that OSIG
20 complaint, that there was an Interview Committee?
21   A       There was an Interview Committee at the
22 time they were looking to fill the job permanently.

---

175

1  There was not an Interview Committee at the time they
2  hired him in a wage position.
3    Q       Did you make that clear in your
4  complaint?
5    A       To OSIG?
6    Q       Yes?
7    A       As clear as I could make it.
8    Q       All right.
9          MS. HADDOX:  Do you know the Bates
10 stamps for Exhibit 94?
11         MR. HARDY:  I'm sure it requests, ask
12 for it, but I'm not finding it in the ESI that
13 we produced.
14         MS. HADDOX:  Okay.
15
16 BY MR. KINCER:
17   Q       Earlier this morning I think we
18 discussed it's your recollection that you had, when
19 you first registered to vote in Washington County,
20 Virginia -- this was when you were a teen, correct,
21 or thereabouts?
22   A       Correct.

---

176

1    Q       -- that you registered as a Democrat?
2    A       Yes.
3    Q       Do you consider yourself to be a
4  Democrat?
5    A       I do.
6    Q       Okay.  But I think you also told us
7  about Dr. Fowlkes' fairly even keeled, non-partisan
8  status, that there is Democrats and Republicans, and
9  we get along with everybody, words to that effect?
10   A       Correct.
11   Q       Well, in your professional career at
12 the Center and in business in general, do you think
13 it's wise to hedge your bets politically?
14         MR. GRIMES:  Objection.  What does that
15      mean?
16
17 BY MR. KINCER:
18   Q       Do you think it's wise to support both
19 political parties, at least nominally?
20         MR. GRIMES:  Same objection.
21
22

---

**177**

BY MR. KINCER:
2  Q    By cash financial contributions?
3        MR. GRIMES:  Same objection.  Go ahead
4  and answer the question, subject to objection.
5        THE WITNESS:  Do I feel like it's okay
6  to send cash to either party?
7
8  BY MR. KINCER:
9  Q    Uh-huh.
10  A    I do.
11  Q    And you have?
12  A    Yes.
13        MR. KINCER:  Next exhibit.
14
15        (Exhibit Number 95 was marked for
16  identification)
17
18  BY MR. KINCER:
19  Q    We will start on Exhibit 95 on the
20  second page, and this is an e-mail from Rachel
21  Fowlkes to Duffy Carmichael dated December 17, 2013.
22  And this is the forward, Speaker Howell Reception.

**178**

1  Who's Speaker Howell?  Or who was Speaker Howell in
2  October of 2013?
3  A    I have no idea, but I would make the
4  assumption he was speaker of the house.
5  Q    All right.  And Rachel is asking you,
6  "Duffy, I can't tell if we can attend free or if we
7  have to pay a lot of money.  Obviously, this is a
8  fundraiser.  I'm thinking we should not go, but will
9  rely on your judgment.  Perhaps Joe Johnson can
10  advise us what we should do."  Who's Joe Johnson?
11  A    Joe Johnson is a former member of the
12  House of Delegates.  He's an attorney.  He is on the
13  Board of Trustees of the Higher Education Center.
14  Q    Is he a Democrat or Republican?
15  A    He always ran on the Democratic
16  ticket.
17  Q    Does he still do that?
18  A    I have no idea.  He's retired.
19  Q    Okay.  And you respond to Rachel
20  Fowlkes' e-mail, "I will RSVP today!  I will talk to
21  you at 1:30 on the conference call."
22        So you and Ms. Fowlkes are going to a

**179**

1  fundraiser for Speaker Howe?
2  A    That's what this pertains to, yes.
3  Q    Okay.  And let's go to the front of
4  Exhibit 95.  And who is Christie Heath?
5  A    I have no idea.
6  Q    Okay.  Well, this is an e-mail from
7  Christie Heath, November 10, 2014, to Duffy Carmack,
8  and it says Re: RSVP - Pillion.  And she is
9  apparently responding to you because you write at the
10  bottom, "Christie, I will be attending the reception
11  for Todd Pillion on Wednesday, November 12.  I will
12  bring a check for Todd's friends with me that
13  evening.  Thanks, Duffy Carmack."
14  A    Uh-huh.
15  Q    Is this Delegate Pillion?
16  A    Yes, it is.
17  Q    Is this Republican Delegate Pillion?
18  A    Yes, it is.
19  Q    All right.  And did you attend this
20  fundraiser?
21  A    I sent money.  I have no idea whether I
22  went or not.

**180**

1  Q    Okay.  But you sent money?
2  A    Sure.
3  Q    All right.
4        MS. HADDOX:  Just for the record,
5  Exhibit 95, neither e-mail was produced in
6  discovery.
7        MR. HARDY:  Nor were they asked, would
8  be our position.
9        MS. HADDOX:  I'm just making a record.
10  I don't have before me all the discovery
11  requests.  I can look at it later.  For the
12  record, neither e-mail in Exhibit 95 was
13  produced.
14        MR. KINCER:  So the best thing for us
15  to do is just to move on.
16        MS. HADDOX:  Which would be the
17  definition of making a record.
18
19  BY MR. KINCER:
20  Q    Mr. Carmack, you told me that you did
21  not have to file a -- that you had not -- strike
22  that.

Transcript of William D. Carmack
Conducted on March 12, 2019

181

1        Mr. Carmack, you told me that you had
2  nothing in writing concerning the Center's knowledge
3  of your Carmack Health Management, that it was,
4  everyone knew you were doing that and it was fine
5  with them and there was going to be no contracts?
6        A    That's correct.
7        Q    When you were hired as CFO?
8        A    Correct.
9        Q    All right.  During your time either in
10 state government or as a citizen appointed in state
11 government, have you ever filed any conflict of
12 interest statements?
13       A    Yes, I have.
14       Q    How many do you recall filing?
15       A    Several years' worth.  I have served on
16 various public boards and authorities.
17       Q    What authorities have you served on?
18       A    Most recently, the last ten years, I
19 have been Chairman of the Board of Zoning Appeals for
20 Washington County, Virginia.
21       Q    All right.  What about insofar as a
22 state office?

182

1        A    I was appointed by the governor to the
2  Virginia Solar Authority.
3        Q    All right.  Let me make sure I have the
4  right date.  Yeah.
5
6            (Exhibit Number 96 was marked for
7        identification)
8
9  BY MR. KINCER:
10       Q    Mr. Carmack, I have handed you Exhibit
11 96.  Take your time to look at that.
12       A    Uh-huh.
13       Q    Do you know what it is?
14       A    It's a conflict of interest
15 statement.
16       Q    And was this the one electronically,
17 that purports to be electronically signed by you 1/31
18 of 2018?
19       A    Yes.
20       Q    And if you would take a moment to look
21 that over.  At least as of the time that you signed
22 this Conflict of Interest, is the, are these

183

1  disclosures that you list, are they accurate?
2        A    No.
3        Q    Why not?
4        A    Because I didn't work at the Southwest
5  Virginia Higher Ed Center January the 31st, 2018; I
6  had been terminated.
7        Q    Well, you were no longer in their
8  employ, were you?
9        A    I was no longer in their employ, and I
10 also resigned from the Virginia Solar Authority,
11 because that appointment was made because of my work
12 with Solar Energy Center, Research and Development
13 Center, and it was connected and I resigned.
14       Q    When did you resign?
15       A    I would have to look at the letter of
16 resignation.  It was sometime in January of 2018
17 following the termination.
18       Q    Okay.  Well, why did you even file a
19 Virginia Conflict of Interest Disclosure?
20       A    It came to me in the mail.
21       Q    And you filed it even though you were
22 no longer working there?

184

1        A    I sent it back in to them.
2        Q    And you knew that you had already
3  resigned from the Solar Authority?
4        A    I was going to resign from the Solar
5  Authority before their next meeting.
6        Q    Which was when?
7        A    In February.
8
9            (Exhibit Number 97 was marked for
10       identification)
11
12 BY MR. KINCER:
13       Q    Have you had a chance to review that
14 document?
15       A    Yes.
16       Q    What is Exhibit 97?
17       A    Conflict of Interest and
18 Ethics Advisory Council Financial Disclosure
19 Statement.
20       Q    Similar document to the prior
21 exhibit?
22       A    Yes.

Transcript of William D. Carmack
Conducted on March 12, 2019

47 (185 to 188)

185

1    Q    And what date does this show that you
2  electronically signed it?
3    A    **There is no date that I see by the**
4  **signature.**
5    Q    It's on the next to the last page on
6  the bottom?
7    A    **January 11, 2017.**
8    Q    All right.  You were still employed
9  with the Southwest Virginia Higher Ed Center?
10   A    **I was.**
11   Q    All right.  Were you still the sole
12 owner of Carmack Health?
13   A    **Yes, I was.**
14   Q    Is that listed on this form?
15   A    **It is not.**
16   Q    Why not?
17   A    **It's an omission, just an error.**
18   Q    What prompted your recall a year later
19 when you filed the 2018 disclosure where Carmack is
20 listed?
21   A    **I try to always be open and truthful on**
22 **every form I fill out.  I guess it came to my mind**

186

1  **when I was filling it out.  I didn't think about it**
2  **the previous year.  Sometimes I'm in a hurry filling**
3  **them out, sometimes I'm not.**
4    Q    It did not come to your mind that you
5  remained the sole owner of Carmack Health
6  Management?
7    A    **No, because it's very secondary in my**
8  **life.  My primary employment was Southwest Virginia**
9  **Higher Ed Center.**
10   Q    Well, let's go back from -- let's see,
11 you, in 2000, in 2014, for example, you were, in that
12 fiscal year, you were a CFO at the Center?
13   A    **Correct.**
14   Q    All right.  Well, how much income did
15 you make from your health care consultancy?
16   A    **$95,000.**
17   Q    All right.  And what was your salary
18 for the, for your services as CFO?
19   A    **Base probably 105, benefits probably**
20 **147.**
21   Q    Right.  But does -- and when you were
22 giving me the 95,000 figure for the health care work,

187

1  for Carmack Health Care, that was, that would have
2  been a profit?
3    A    **Yes, it would have been.**
4    Q    After expenses?
5    A    **Sure.**
6    Q    Sure.  And how much were you making
7  from the health management company in 2017?
8    A    **It's always been the same amount.  It's**
9  **a contract.  It never changes.**
10   Q    Thank you.  That will save us both.
11 It's always been 95,000 a year?
12   A    **Correct.**
13   Q    And so it's fixed rate, just whatever
14 comes your way you do.  And if a lot comes your way,
15 and if a little comes your way, you come out?
16   A    **Right.**
17   Q    Okay.  Thanks for clearing that up.
18   A    **I might add one other thing for the**
19 **record to help with that.**
20   Q    Okay.
21   A    **Having a secondary job was commonplace**
22 **at the Higher Ed Center.  Mr. Matlock had one.  Adam**

188

1  **Tolbert had one.  Sonia VanHook had one.  It was all**
2  **done on State time, so the standard had already been**
3  **established.**
4    Q    That's why they call them discovery
5  depositions.  What job did Mr. Matlock have?
6    A    **Counseled adolescents from his**
7  **church.**
8    Q    Excuse me?
9    A    **Counseled adolescents from his**
10 **church.**
11   Q    What is that job?
12   A    **It means that some parents brings their**
13 **teenage son or daughter into the Higher Ed Center.**
14 **They wait in the foyer.  The child goes into his**
15 **office and the door is closed for counseling.**
16   Q    All right.  Do you know if he makes any
17 money off that?
18   A    **He has made comment that he's a paid**
19 **youth minister, so I assume so.**
20   Q    Okay.  Go ahead.  Okay.  You finished?
21 What does Adam do in his part?
22   A    **Adam has taught for Old Dominion**

**189**

1   University on-line.  He has done a lot of work for
2   the Republican party -- I don't know that he's paid
3   for it -- on-line during Center time.  And
4   Ms. VanHook has taught for Savet, which is the
5   Governor's School.
6       Q    You don't know whether or not any of
7   those jobs have paid them $95,000?
8       A    I don't know what they were paid, but
9   they were paid.
10      Q    During your, let's say, last year of
11  employment at the Center, what were your work hours?
12      A    My normal work hours coming to the
13  Center -- the standard hours the Center is open is
14  basically, I'm going to say, 7:00, 7:30 in the
15  morning to nine or ten o'clock at night, because we
16  host all kind of students that go to night school and
17  public events.  Standard office hours were either
18  eight to four or nine to five.
19      Q    During those standard office hours that
20  you were there, approximately how much time, how much
21  time would you spend on working for your outside
22  interests?

**190**

1       A    Meaning Carmack Health?
2       Q    Yes, sir.  Unless there is more for
3   profit?
4       A    Probably two hours a week.
5       Q    How much?
6       A    Two to three hours a week.
7
8           (Exhibit Number 98 was marked for
9   identification)
10
11  BY MR. KINCER:
12      Q    Take a look at that document and let me
13  know when you're through with that, Mr. Carmack.
14      A    I'm very familiar with it.
15      Q    I have handed you Exhibit Number 98.
16  Who is Amberlea Breeding?
17      A    I have no idea.
18      Q    At firstbank.com?
19      A    I have no idea.
20      Q    Okay.  Is that an e-mail from her to
21  you dated 9/5 of 2012?
22      A    It is.

**191**

1       Q    And were you working at the Center at
2   that time?
3       A    I was.
4       Q    And this continues.  This is how many?
5   This is seven of seven pages after we get past the
6   e-mail introduction.  It's attorney/client privilege.
7   Is this from an attorney, the attorney/client
8   privilege document starting on page one of seven?
9       A    Yes, uh-huh.
10      Q    And what is this document?  What is
11  this seven page document?
12      A    Well, this seven page document came
13  about as a result of the -- there are three LLCs that
14  make up the surgery center group, and there was a lot
15  of questions about changes to the management
16  agreement and trying to renegotiate leases with the
17  hospital.  And this started back before I began with
18  the hospital, began with the surgery center.
19          Discussion started in 2012, early in
20  the year and continued out.  Takes a long time to
21  finalize items with the hospital, but we finally got
22  the leases negotiated.

**192**

1       Q    Okay.  All right.  And this was sent to
2   you at 9:38 a.m.?
3       A    Yes.
4       Q    All right.  And then if we can continue
5   through here, and I'm not reading it all.  But it
6   seems like there is some, an auditor asking questions
7   about expenditures --
8       A    Yes.
9       Q    -- for one of the practice groups.
10  Were you to review that?
11      A    That was an auditor for the hospital
12  that was auditing the hospital's books.  And these
13  were items that had been paid under the management
14  company, which is one of the LLCs of the surgery
15  center.  And they wanted to know -- there was missing
16  documentation or receipts.  So we resubmitted those
17  to satisfy the audit requirement.
18      Q    And it was part of your $95,000 a year
19  contract to review documents like this?
20      A    Sure.
21      Q    And that was sent to you on a workday
22  at 9:38 in the morning?

Transcript of William D. Carmack
Conducted on March 12, 2019

193

1      A      Uh-huh.
2      Q      Did you look at it while you were at
3  work?
4      A      I'm sure I read it.
5      Q      All right.
6             MR. KINCER:  Make that the next exhibit
7  please.
8
9             (Exhibit Number 99 was marked for
10     identification)
11
12 BY MR. KINCER:
13     Q      What is that document, sir?
14     A      At the end of the year the
15 distributions of the company are made to the
16 physicians, and so the accounting firm that does the
17 work is Brown Edwards and Company.  And this is a
18 letter from Betty Jessee to me where she had
19 calculated the year-end distributions for the
20 physicians.
21            And she had -- actually, her
22 administrative assistant lived in Abingdon.  And just

194

1  out of courtesy, they usually dropped things by the
2  front desk for me to pick up instead of paying
3  postage.
4      Q      All right.  Well, if I go back to the
5  first page of Exhibit -- that is 99 that you have in
6  your hand.  If I go back to the first page, I have
7  duffycarmack@hotmail.com?
8      A      Uh-huh.
9      Q      What's the hotmail.com address?
10     A      That is my personal e-mail address.
11     Q      Well, why do you use that for all your
12 outside business?
13     A      That's the only address I have other
14 than the Higher Ed Center address that I used.  There
15 may be old ones out there, but I don't remember the
16 names of them.
17     Q      All right.  Are you familiar with
18 HIPAA, H-I-P-P-A (sic)?
19     A      I am familiar.
20     Q      During the period of time that you
21 worked at the Center, would your various medical
22 clients send you HIPAA-sensitive information on

195

1  patients to your work e-mail?
2      A      I can't say they didn't.  I don't
3  recall any, but the doctors knew my Duffy Carmack
4  address, also knew I worked at the Higher Ed Center.
5  So I can't say some of them didn't address it to
6  Higher Ed.
7
8             (Exhibit Number 100 was marked for
9      identification)
10
11 BY MR. KINCER:
12     Q      I have handed you Exhibit 100, which
13 starts as an e-mail from Duffy Carmack to Deborah
14 Hensley, dated October 23, 2013.  First of all, who
15 is DPB?
16     A      Department of Planning and Budgeting.
17     Q      All right.  And Deborah Hensley is your
18 employee?
19     A      Yes.
20     Q      You shared your log-in passwords with
21 your --
22     A      Debbie was very knowledgeable in IT,

196

1  and sometimes I struggle, and I would have to get her
2  to help me connect to the various programs that I
3  didn't use every day.
4      Q      At the time you worked here in 2013,
5  are you familiar are State VITA policy?
6      A      Yes.
7      Q      Should you share your passwords?
8      A      You shouldn't.
9      Q      You did?
10     A      I could have changed it.
11     Q      All right.  Now, go to the very, go to
12 the very last two pages of Exhibit 100.  I want to
13 look at that one.  I asked you earlier about HIPAA.
14     A      Uh-huh.
15     Q      And this e-mail is from Robin Justice.
16 Who's msha.com?
17     A      Mountain State Health Alliance.
18     Q      Is that one of your clients?
19     A      No.  That's -- Johnston Memorial
20 Hospital was purchased by Mountain States Health
21 Alliance, who has now been purchased by Ballad
22 Health.

Transcript of William D. Carmack
Conducted on March 12, 2019

197

1    Q     Looking at this, and I see it's the
2  last addressee here is Duffy Carmack, and that's at
3  your southwestcenter.edu address?
4    A     Yes.
5    Q     That's your work e-mail?
6    A     It was.
7    Q     It was?  Now, I asked you earlier about
8  HIPAA, and you said you were knowledgeable with it.
9  And I'm not going to read these names, I will give
10 some initials.  If Exhibit 100 is to ever find its
11 way into the Court, I would recommend redaction.
12         Tell me this.  Looking at the, after
13 the good morning, and then the list of patients --
14   A     Uh-huh.
15   Q     -- do you think this patient should
16 know, this should be going to your work address, that
17 she's having this surgical procedure and that one is
18 having that one, and that one is having that one?
19 Isn't that privileged information?  Isn't that
20 protected health information?
21   A     Robin Justice is the manager of the
22 surgery center, and this was an e-mail that

198

1  Dr. McGarry had sent to her regarding scheduling
2  conflicts or, I'm going to say, canceled cases
3  because of issues with anesthesia.  So he was going
4  through these with her and he simply copied me on it
5  just so I was FYI, as the business administrator,
6  that this was an issue.
7          So I consider the fact that e-mails
8  between the physicians and myself or the physicians
9  and Robin are proprietary e-mails.
10   Q     Even if sent to a Commonwealth of
11 Virginia work address?
12   A     Yes.  That's not good judgment, but I
13 didn't make the choice to send it across that.
14   Q     You didn't send that e-mail to
15 yourself, someone sent it to you?
16   A     Correct, uh-huh.
17   Q     Okay.  All right.  Now, go to the next
18 document and it's from the back.  We are doing the,
19 looking at the HIPAA stuff.  Look at the finance
20 charge and an invoice and then an e-mail, Duffy
21 Carmack, Wednesday 7/26/17, 10:48 a.m., two
22 attachments.

199

1          It's talking about Debbie Ringley of
2  BTS Security, and she's sending you an e-mail to your
3  Center address and telling you this is past due?
4    A     Correct.
5    Q     And what is this invoice for?
6    A     It is for the burglar alarm line that
7  houses or transmits fire, smoke, burglar, whatever,
8  at the Energy Center.
9    Q     All right.  And let's see, this e-mail,
10 this e-mail is July 26.  When was this work done,
11 back in --
12   A     I don't know because it went to the
13 attention of Eddy Sproles, who was the Director of
14 Maintenance.  Eddy took care of all these invoices.
15 He had two really rough years in and out with health.
16 When he was not there, often these items would be
17 sent to me.  When he was there, he would take care of
18 them.  So that's all I know about it.
19   Q     And I think that, if I recall your
20 earlier testimony, I think that you, really his
21 department was under your bailiwick?
22   A     For a very, I'm talking three month

200

1  period of time; otherwise, he was under the
2  department of Joyce Brooks as operations.
3    Q     And under the CAPPS, C-A-P-P-S, you
4  would agree that it's not good for a State agency to
5  have an invoice that's overdue?
6    A     I don't think any agency should have an
7  invoice that's overdue.
8    Q     All right.
9    A     A lot of things went to Eddy's e-mail
10 and set there because no one was looking at it.
11   Q     Okay.  Turn back to -- all right.  This
12 is on Exhibit 100, and this will be page three of
13 five.  And it's an e-mail from Duffy Carmack to
14 Deborah Bourne Re: Health Fair Wednesday, dated
15 September 16 of 2014.
16         And we are talking about fair, and then
17 I'm going to the next page, which says page one of
18 two.  Who is Rod Harper?
19   A     On page?  I'm sorry what page are you
20 on again?
21   Q     Page one of two.  I just gave you
22 the -- I keyed you to the page three of five because

Transcript of William D. Carmack
Conducted on March 12, 2019

201

1  that looked pretty obvious.  Next one is the Energy
2  Center, says Energy Center.
3      A    Okay.  I will get there.
4      Q    Are you there?
5      A    Two of five?  Okay.
6      Q    Do you have that now?
7      A    I have page one of two that has Rod
8  Harper's name on it.
9      Q    Who's Rob Harper?
10     A    He worked for Bristol Sign.
11     Q    And what is Bristol Sign?  What did
12  Bristol sign do for the Center?
13     A    What did they do for the Center?
14     Q    What did they do, uh-huh.
15     A    I assume they made signs.
16     Q    All right.  Well, what I'm interested,
17  is Rod Harper to you, copy Alicia Young, January 18,
18  2016.  "Duffy, regarding your call today, 11/8/16,
19  the signs will be installed next week.  They are
20  getting close to completion.  Also, the invoice will
21  be dated for last year as you require.  If you need
22  to have it in hand sooner, let our bookkeeper know

202

1  that she needs to send it over to Alicia Young."
2          Well, why are you asking him to prepare
3  you back-dated invoices?
4      A    Yes.  When we built the Energy Center,
5  we put this very large sign that you could read from
6  the Interstate with the logo of the Higher Ed Center
7  on it.  And when we rented the building commercially,
8  I needed Rod to take that down.  And the Tobacco
9  Commission grant that funded the Energy Center, you
10  have three years to close a grant out.
11         And so we had some excess funds that
12  the Commission had asked us to hold onto, because
13  when we built the building it was a shell, and we
14  knew that there would be finishing work to be done.
15  And so when it was rented commercially, we needed to
16  pay to have our sign taken off the building.  And so
17  the Tobacco Commission asked that it be back-dated to
18  the previous year so they could run it through the
19  balance of that grant money.
20     Q    That's probably not CAPPS approved, is
21  it?
22     A    It probably would according to the

203

1  language of grant agreement.  You have 36 months
2  following the end of the grant.
3      Q    Go back to the first of Exhibit 100,
4  and go to the third page of that exhibit.
5      A    Uh-huh.
6      Q    Oh, I'm sorry, Mr. Carmack, the second
7  page.  And this is Hanging Display Systems, from Miss
8  Yanick Cusson.  Do you know who she was?
9      A    I do not.
10     Q    This an August 21, 2014 e-mail, and
11  Ms. Cusson is writing you telling you your order will
12  be shipped out tomorrow, delivered in four business
13  days starting Monday, at One Partnership Circle in
14  Abingdon.  That's the Center's address, isn't it?
15     A    That's right.
16     Q    And did she also give you an FYI,
17  quote, "As a person working in the, quote,
18  'E-commerce', I would recommend not sending a credit
19  card number in an e-mail as it is not safe.  Smiley
20  face.  Sideways smiley face."
21     A    Uh-huh.
22     Q    Did you send -- you just sent a credit

204

1  card number, if we look below there, and that's from
2  Duffy Carmack to that business with all the
3  expiration date, the number, everything, over
4  unencrypted e-mail.
5      A    The e-mails from our center were
6  encrypted.
7      Q    Okay.  How did she -- that was not in
8  compliance with State policy, was it?
9      A    Went across a State computer.  I gave
10  the credit card out all the time to vendors that
11  asked for it.  It's my understanding from IT that
12  everything that went across our Center was encrypted,
13  and the receiver on the other end, she was able to
14  get it.  She got it.  It was not uncommon.  I give my
15  personal credit card for everything I order on-line
16  today.  It was commonplace then, too.
17     Q    So you don't think there's anything
18  wrong with that?
19     A    Not a thing.
20     Q    All right.
21         MR. GRIMES:  Counsel, we have been
22  going an hour-and-a-half.  Let's take a

Transcript of William D. Carmack
Conducted on March 12, 2019

205

1      comfort break.

2              MR. KINCER:  Let's do.  Thanks.

3

4              (A recess was taken)

5

6      BY MR. KINCER:

7      Q      Mr. Carmack, looking at number, Exhibit

8      Number 88, which is the Amended Complaint --

9      A      I'm sorry.  Which one?

10     Q      You have the right exhibit now.  Turn

11     to page 9 of that Complaint.

12     A      Okay.

13     Q      And I'm looking particularly at

14     paragraph 20.  It says, "After learning of Carmack's

15     complaint..." and that's referring to your OSIG

16     Complaint, "...in October 2017, Carmack's e-mails

17     were blocked with Senior Assistant Attorney General

18     Elizabeth Griffith, leaving Griffith with the

19     impression Carmack was ignoring her."  Tell me about

20     that.  What's that allegation about?

21     A      Okay.  Earlier that calendar year the

22     Tobacco Commission asked me and Evan Feinman, the

206

1      Director of the Commission, asked if the Higher Ed

2      Center would assume the debt collection piece of the

3      scholarship program that had been done by his office

4      in the Department of Collections in Richmond.

5              I told him that we would.  He told us

6      he would pay us additional money for that.  I went to

7      Richmond, the AG's office, several times and we met

8      with Elizabeth Griffin, our AG for the Higher Ed

9      Center.  There was a variety of attorneys for the

10     Tobacco Commission, so they were always included.

11     Stephanie Kim, from the Tobacco Commission, and Evan

12     Feinman and myself laid out the structure of how the

13     debt collection piece would work.  The note, the

14     promissory note, that the students signed had to be

15     changed.

16             So we spent months working together as

17     a team to create the process and the documents to

18     make this functional.  David Matlock and I had

19     virtually no communication.  And one day in October,

20     late September, October, he comes into my office and

21     shoves the cell phone in my face and said, what did

22     you do to piss Elizabeth Griffin off?  She sent David

207

1      some scathing e-mail that I wasn't responding to the

2      questions she asked, so on and so forth.

3              I hadn't received any e-mails from her.

4      I went back and looked at my e-mails, tried to

5      research what the problem was.  Elizabeth traveled a

6      great deal.  I called.  I left her a voice message.

7      Couple days later he made the comment that he hoped

8      we got a new Governor, maybe they would replace

9      Elizabeth.  She could be very inconsistent with her

10     work with me, in my experience.

11             Finally, I reached her by phone.  She

12     said, why are you not responding to my questions?  I

13     said, I'm not seeing your e-mails.  So I got up and I

14     walked down to our IT Department, and I asked Jeff

15     and Adam, who were in Jeff's office -- that's Jeff

16     Webb and Adam Tolbert -- and I said I'm not receiving

17     E-mails from Elizabeth Griffin.

18             Jeff turns around, oh, it was blocked.

19     It's fixed.  And that was the only party that my

20     e-mails were blocked to, in addition to Peter Blake.

21     I have no idea why.  Once that was unblocked, I saw

22     Elizabeth's e-mail chains, and I understand why she

208

1      was angry.  I responded back to her.  Blocked, didn't

2      know why.  Apologized, and we moved forward.

3      Q      And you have no factual information

4      that Mr. Carmack was in any way responsible for the

5      e-mail solely to Elizabeth Griffin being blocked?

6      A      Mr. Carmack wasn't, but I think --

7      Q      I'm sorry.  That Mr. Matlock blocked

8      your e-mails?

9      A      I'm of the opinion that those e-mails

10     were blocked because they are the only e-mails that

11     didn't go out in a very crucial time.

12     Q      You're of the opinion.  You have no

13     facts to support that opinion?

14     A      I do have facts to support that someone

15     in IT would had to have had the knowledge to do

16     that.

17     Q      Who could have had that knowledge?

18     A      Adam and Jeff who stayed in his office

19     and he constantly ruled with their opinions, so,

20     yeah.

21     Q      He constantly what?

22     A      Worked against me as a group.

Transcript of William D. Carmack
Conducted on March 12, 2019

53 (209 to 212)

209

1    Q      All right.  So you are of the opinion
2    that Mr. Matlock had had your --
3    A      **I am of that opinion.**
4    Q      Based on what you just told me?
5    A      **Yes, sir.**
6    Q      And that's all?
7    A      **Correct.**
8    Q      All right.  Now, when was the first
9    time that you ever learned that you had been
10   mentioned as a possible candidate for a work force
11   transition at reduction?
12   A      **January 4, 2018.**
13   Q      Before January 4, 2018.  That was the
14   day you were given the WTA paperwork, correct?
15   A      **Correct.**
16   Q      It's your testimony under oath that no
17   one ever told you that or you never learned that from
18   any source before that date?
19   A      **That is correct.**
20   Q      Not one of your employees, not one of
21   your friends?
22   A      **No, sir.**

210

1    Q      Okay.  Didn't learning of that
2    information, wasn't that what really prompted you to
3    file that OSIG complaint?
4    A      **No, sir.  The harassment and abuse and**
5    **behavior of Mr. Matlock, who was wasting tax payers**
6    **money, fraud and abuse, is what prompted me to file**
7    **the complaint seven months before that date.**
8    Q      It was motivated by spite against
9    Matlock because he got the job that you wanted?
10   A      **Oh, no.  It was motivated by not doing**
11   **right by the citizens of the Commonwealth in the way**
12   **we used our funds and our services.  The Higher Ed**
13   **Center is an important gem to southwest Virginia.**
14   Q      When did you file your written
15   complaint with OSIG?
16   A      **It was filed the second time in July of**
17   **'17.**
18   Q      When did you attempt to file it the
19   first time?
20   A      **The very end of June, the previous**
21   **week.**
22   Q      So there is a week off?

211

1    A      **Sure.**
2    Q      All right.  And you called the
3    hotline?
4    A      **I called the hotline and Mr. Cowardin**
5    **answered.  I identified myself.  I told him I needed**
6    **to file a complaint and had not done that before.**
7    **And he sort of walked me through the process.  We**
8    **talked about did it need to be anonymous or not.  We**
9    **talked about the process.**
10          **He told me the first step in filing my**
11   **compliant would be a forensic audit.  That audit was**
12   **never done.**
13   Q      To your knowledge?
14   A      **To my knowledge.**
15   Q      Look at paragraph 19 of the Amended
16   Complaint, the last line.  We are talking about after
17   your learning of the OSIG complaint again.  Last line
18   is, "Carmack was also cut off from communication with
19   the Department of Planning and Budget."  Was this
20   some more e-mail tomfoolery?
21   A      **Prior to March of '16, I had direct**
22   **communication from our analyst or the director of DPD**

212

1    on all budget information.  Following a visit of
2    Mr. Matlock to that department, I received very few
3    e-mails.  And when I called to inquire about that, I
4    was told by our analyst that all correspondence now
5    had to go to the director.
6          So oftentimes we didn't know what the
7    budget submission deadlines were or the criteria,
8    because David did not communicate that to Ms. Hensley
9    or to myself.
10   Q      Do you know when your position was
11   first considered for WTA?
12   A      **As far as I know January the 4th of**
13   **2018.**
14   Q      We talked earlier today about your
15   interview with the Committee for the Executive
16   Director position.  During one of those interviews,
17   did you tell the members, any members of the
18   Committee that one of the first things that you would
19   do, if you were hired as Executive Director, was to
20   eliminate your job?  Did you make that statement?
21   A      **No, sir, never made that statement.**
22   Q      How much were you dependent upon your

Transcript of William D. Carmack
Conducted on March 12, 2019

54 (213 to 216)

213

1  staff, that we have identified and talked about
2  earlier, to do the day-to-day work of your
3  position?
4      A    I did my own day-to-day work. The
5  position of the chief financial officer is very
6  different from that of the Center director. It's
7  very different from the business manager or from the
8  grants administrator. My job was an executive level.
9  It should have and was, up until the time Mr. Matlock
10 came. I was involved very closely with our college
11 partners, which paid us rent.
12      I was involved in the negotiations of
13 new programs coming into the Center. Usually that
14 required obtaining matched money or State budgeted
15 funds. I was involved in the MOU, Memorandum of
16 Understanding, which is basically a contract with any
17 tenant in the building, which had to meet certain
18 guidelines for audit purposes, for finance purposes.
19      I was very active in the academic world
20 throughout the State in trying to help recruit
21 different programs and was very successful in laying
22 the groundwork, of which Mr. Matlock reaped the fruit

214

1  for East Tennessee University to have a nurse
2  practitioner program, Radford to have a licensed
3  clinical social work program, and ODU, I'm sorry, VCU
4  to have a clinical life science program.
5      Q    All right. When did you become aware
6  of any potential budget cuts coming, budget cut
7  reduction or requests coming from Richmond to the
8  Center?
9      A    We were notified -- gosh, I don't
10 remember the year, 2016 maybe -- that all State
11 agencies -- State was short in general funds and all
12 State agencies needed to prepare for a five percent
13 cut in budget. We had always prepared the budget at
14 the Center.
15      The budget is complicated. We received
16 general funds and had received approximately the same
17 amount of general funds every year since the Center
18 was established in 1987. That's about $2,500,000.
19 Our operations exceeded that, and we were responsible
20 as a Center for raising that money. And so the way
21 we did that was by renting space at our conference
22 service activities.

215

1      So we always had surplus money at the
2  end of the year. We were very conservative and
3  carried that money forward and had almost $1,000,000
4  in funds. And the purpose for that was in the event
5  of any type of layoff or mandated budget cut, we
6  would not have to lay off employees.
7      So when we saw the five percent
8  reduction, we went into the budget, and there was a
9  position there, a marketing position that had
10 formerly been filled. We eliminated that position,
11 which was about $89,000 of the 150 we needed to cut.
12 And then we went through and -- what we called
13 maintenance reserve, which is repairs to the
14 building, like carpet, HVAC, part of the real estate
15 fixture, was usually padded pretty heavy. And so we
16 reduced the balance of that $150,000 out of that, so
17 that made our cut.
18      Shortly into the next fiscal year, we
19 received notice that the State was in better shape
20 than they thought, and so they slowly began to give
21 some of that money back on to us. For the second
22 year, they did ask us to leave that frozen, but there

216

1  was never a budget shortfall. We always lived within
2  the budget and always had funds left over for a
3  contingency fund at the end of the year.
4      Q    Do you know of more than one reduction
5  request coming from Richmond?
6      A    There was the one the first year, and
7  then the second year they talked of one. But the
8  same five percent cut we made the previous year, we
9  used again going forth. They left it on the table.
10 They didn't make it ten percent, if that makes sense.
11 It was just a total five percent cut over two
12 years.
13      Q    But you didn't know that another one
14 would not be implemented?
15      A    Pretty much from what -- the
16 correspondence we had received from the Governor's
17 office was that that would be it, five percent should
18 be it.
19      Q    I'm looking at paragraph 26 of your
20 Complaint on page ten, and this is the Paula Moad
21 contacting UVA HR incident?
22      A    Yes.

Transcript of William D. Carmack
Conducted on March 12, 2019

55 (217 to 220)

---

217

1    Q    I believe you have been present in
2  Abingdon for all the, for the depositions we have
3  taken, Joyce Brooks' deposition, for example.
4    **A    Yes.**
5    Q    Now, did hearing Joyce Brooks'
6  testimony about what this incident was over Ms. Moad
7  contacting UVA, did that affect your, does that
8  affect your view of this paragraph number 26 in your
9  complaint, how it's drafted?
10   **A    No.  Because Ms. Brooks was untruthful**
11 **in her deposition.**
12   Q    She was?
13   **A    Yes.**
14   Q    All right.  So this did not have to do
15 with Ms. Moad contacting UVA about an applicant whose
16 application was rejected because of some adverse
17 information on a State Police background check?
18   **A    That is correct, and that information**
19 **is correct.**
20   Q    Okay.  What was untruthful about her
21 testimony?
22   **A    The position in of the Testing Center**

---

218

1  **had been opened for approximately a month.  We were**
2  **critically short, and we were trying to get someone**
3  **into those part-time wage positions because -- IT was**
4  **one, David and Jeff Webb were wanting to move Austin**
5  **Deirks, who was helping us in the Testing Center,**
6  **back to IT full-time.  And so they were really**
7  **pushing to get those positions filled.**
8    **I submitted the requisition to Joyce**
9  **and, in typical fashion, she held the requisition for**
10 **approximately a month because she didn't like me.**
11 **And so it became even more critical, and I would**
12 **mention it to her.  She would say, I will send up**
13 **today, I'll send it up to UVA today to post.  It**
14 **didn't happen.**
15    **Eventually, I was leaving to go to**
16 **Richmond for a meeting and Paula came into my office**
17 **that morning in December, and she said, is it okay if**
18 **I call and see what the status is on those postings?**
19 **I said, yes, because Ms. Brooks would not communicate**
20 **with me, and when she did, I had difficulty believing**
21 **what she said most of the time.**
22    **So with my permission, Paula called UVA**

---

219

1  **and UVA disclosed the information to her.  Paula is a**
2  **retired school principal, very professional, very**
3  **discrete.  And so when someone from UVA let Joyce**
4  **know that she had called, Joyce took Adam and went**
5  **upstairs and berated Paula to the point of tears.**
6  **Paula called me on my cell phone.**
7    **And we're talking about a 70-year-old**
8  **female, retired principal.  She's not a soft cookie.**
9  **And she said, I have never been talked to so rudely**
10 **in my life, and I want to file a complaint.  Joyce**
11 **all but yelled in my face that I didn't have the**
12 **right to do what I did, and Adam stood there and said**
13 **nothing.**
14    **So later that afternoon I was called to**
15 **Mr. Matlock's office with Ms. Brooks.  And he**
16 **basically chewed me out, and both told me never to**
17 **have a conversation with you again.  She said, I want**
18 **to file a grievance.  I said, I will be back in the**
19 **morning, and I will sign your grievance form.**
20   Q    But it was Moad reporting that
21 conversation to you?
22   **A    That is correct.**

---

220

1    Q    And you were not a party to that
2  conversation?
3    **A    Correct.**
4    Q    All right.  And she wants to file a
5  grievance?
6    **A    Correct.**
7    Q    And did she file a grievance?
8    **A    She filed a grievance form.  She pulled**
9  **it off line.  She filled it out.  She brought it to**
10 **me to sign as her supervisor, and it was sent to UVA.**
11 **Approximately about four days later it was laying in**
12 **my mailbox with a note on it, sent to the wrong**
13 **address, which I know that information would have**
14 **come back to Joyce Brooks' office, where Adam and**
15 **Joyce worked, because it was UVA HR information.**
16   Q    Do you have a copy of that?
17   **A    I have a copy of her grievance.**
18   Q    All right.  But this is in addition to
19 your grievance?
20   **A    I attempted to file a grievance in**
21 **early 2017.**
22   Q    Yes, sir.  In, well, in November of

---

Transcript of William D. Carmack
Conducted on March 12, 2019

56 (221 to 224)

221

1  '17, right?

2       A       I don't remember the month, but it was

3  in '17.

4       Q       Let's give your attorney that, make

5  this the next exhibit.

6

7              (Exhibit Number 101 was marked for

8       identification)

9

10 BY MR. KINCER:

11      Q       All right.  Have you had a chance to

12 see that?

13      A       Yes, sir.

14      Q       Is that the grievance you're referring

15 to?

16      A       It is.

17      Q       And but it's not early of '17, it's

18 November 14 of '17, correct?

19      A       My personal grievance I filed was early

20 in '17.  Ms. Moad's was filed toward the end of the

21 year of '17.

22      Q       All right.  But in this grievance you

222

1  say -- Exhibit 101 is your personal grievance,

2  correct?

3       A       No.  That's Paula Moad's grievance.

4       Q       Well, that's November 14 of '17.  Is

5  that not your signature there beside that date there

6  on Exhibit 101?

7       A       It is.  I made the assumption that

8  that's where the employer signed but, obviously, it's

9  employee.  That's her grievance.

10      Q       All right.  So she did file a

11 grievance?

12      A       She did.

13      Q       All right.  We are not going to read

14 the whole thing, but Exhibit 101, in that grievance

15 aren't you discussing what Ms. Moad's complaints and

16 your complaints?  I mean isn't it a conglomeration?

17 Take a look at it.

18      A       I share some of these concerns but they

19 are Ms. Moad's complaints.

20      Q       But Ms. Moad's signature is not on that

21 grievance, yours is?

22      A       That is correct, which is an error and

223

1  I suspect --

2       Q       Well, the document will speak for

3  itself, but I just want to read you a little bit

4  here.  Aren't you -- why would Ms. Moad be

5  complaining about, "When awareness of an OSIG

6  complaint was known I was blocked from seeing the

7  directors calendar.  I consider this a retaliatory

8  act."

9              That would not be Ms. Moad saying that;

10 that would be you saying that, wouldn't it, Mr.

11 Carmack?

12      A       It certainly would.

13      Q       All right.  So you still say Exhibit

14 101 is Ms. Moad's grievance?

15      A       I do.

16      Q       All right.  So her grievance was,

17 indeed, filed.  Is that correct?

18      A       We sent the grievance to UVA and it was

19 returned.

20      Q       And UVA was handling --

21      A       The HR.

22      Q       -- the HR work for the Center,

224

1  correct?

2       A       Uh-huh.

3       Q       All right.  Yes?

4       A       Yes.

5       Q       That's the first time you have done

6  that all day, and you should be commended.

7       A       Thank you.

8       Q       Now, so then Matlock and Brooks did not

9  stop the grievance process?

10      A       The grievance process was returned, and

11 I found it very unusual that when a grievance form is

12 filed with HR and UVA, that even if it had gone to

13 the wrong address, it would have been forwarded to

14 the proper address.

15      Q       Let's go to paragraph 27 then.  Looks

16 like we have another grievance we are talking about.

17 Paragraph 27 of the Complaint, of your Amended

18 Complaint.

19              It says, "After learning Matlock's

20 actions, Carmack filed his own grievance noting that

21 he felt this was retaliation for his OSIG complaint."

22              Isn't that in the grievance I read you

Transcript of William D. Carmack
Conducted on March 12, 2019

225

1   from excerpts --
2      A    Similar, yes.
3      Q    -- of 101?
4      A    Very similar, yes.
5      Q    You say this grievance also was not
6   addressed.  What happened to your personal grievance
7   you cite in 27?
8      A    I sent it to UVA and never heard
9   anything else.  I made the assumption it was returned
10  to Ms. Brooks and trashed.  She would do anything to
11  protect Mr. Matlock.
12     Q    Excuse me?
13     A    I assumed she threw it away.  And I
14  made the assumption she would do anything to protect
15  Mr. Matlock, so she destroyed the grievance.
16     Q    And you make that assumption because
17  you don't think Joyce Brooks liked you?
18     A    Well, she said in her deposition she
19  didn't like me.
20     Q    Well, yeah.  We'll have her deposition.
21  You don't like her either?
22     A    I don't trust her.  I don't find her to

226

1   be very integretous (sic) person.
2      Q    Look at the -- go back to Exhibit 101.
3   Do you still have that before you?
4      A    Uh-huh.
5      Q    Look at the grievance Form A, Duffy
6   Carmack.  That's your -- to Duffy Carmack.  You see
7   this is from EDR, edr@dhrm.virginia.gov?
8      A    Right.
9      Q    And it says, "Dear DHRM Employee,
10  Dispute Resolution Department.  Please find grievance
11  Form A for attention to a sizeable matter at
12  Southwest Virginia Higher Ed Center.  Please feel
13  free, Respectfully, and it's William D. Carmack."
14          And that's the grievance you filed
15  with --
16     A    Let me make a correction now that I
17  have read this.
18     Q    Okay.  All right.
19     A    This is the grievance I filed on my
20  behalf.  This is not the grievance Paula Moad signed.
21  She filed a grievance.  She signed a grievance, and I
22  signed it as her supervisor.  This is my personal

227

1   grievance that I filed with the Higher Ed Center or
2   with the DHRM, through UVA to DHRM for the Higher Ed
3   Center.
4      Q    All right.  And looking, again, looking
5   at -- go to the second page of the grievance
6   procedure form of Exhibit 101.
7      A    Uh-huh.
8      Q    And you can see there is two
9   paragraphs, and then there is, starting, Paula Moad
10  wage employee.  You see that?
11     A    Yes.
12     Q    As the supervisor for our Testing
13  Center.  And you talk about Ms. Brooks, and you talk
14  about the background check.
15     A    Uh-huh.
16     Q    Why would that have been included in
17  your grievance?
18     A    Because I felt like all of those were
19  violations of policy and unethical behavior.  I think
20  there was great attempt between Ms. Brooks,
21  Ms. Heitala, and Mr. Tolbert and Mr. Matlock to cover
22  up his intent to do things his way, because he was

228

1   the agency director as he stated many times.
2      Q    You have to agree with me that an
3   agency director of whatever agency has discretion in
4   the Commonwealth, don't they?
5      A    As long as they abide by the policies
6   of the Commonwealth.  He did not.
7      Q    All right.  Now, go to paragraph 28 of
8   your complaint, of the Amended Complaint.  Still
9   where we were on page eleven, paragraph 28.  And this
10  allegation in paragraph 28 says, "Carmack also wrote
11  a letter to members of the Board of Trustees of
12  Southwest Virginia Higher Ed Center on December the
13  7th of 2017."
14          And I'm sure you have seen this.  I'm
15  going to hand this to you.  I believe this is 102.
16
17          (Exhibit Number 102 was marked for
18      identification)
19
20  BY MR. KINCER:
21     Q    Is that your letter that you're
22  referencing?

Transcript of William D. Carmack
Conducted on March 12, 2019

58 (229 to 232)

229

1    A    It is.

2    Q    You're familiar with the contents of
3 that letter?

4    A    I am.

5    Q    And what was your purpose of writing
6 this letter?

7    A    Senator Carrico had established the
8 protection of Mr. Matlock from the Board of Trustees
9 using the Executive Committee. The bylaws of the
10 Higher Ed Center clearly states that the Board of
11 Trustees has the responsibility for hiring, firing
12 and directing the Center director.

13        At no time in three years of problems
14 and two years of complaining to various agencies, and
15 employees complaining directly to Mr. Matlock, did
16 any of those items ever come to the board.
17 Mr. Carrico would not allow it to be discussed if
18 another board member brought it up. And I felt like
19 that the Board of Trustees needed to be made aware of
20 the severeness and the morale issues that was going
21 on.

22        So I elected to write this letter. And

230

1 if you pay attention to the fact, I did not write it
2 with animus or to create great problem. I was simply
3 asking that a third party administrator come in,
4 interview the employees, including Mr. Matlock, and
5 make a report back to the Board so that some
6 constructive way could be devised for him to be
7 successful in the job, but that was never allowed to
8 happen by the Board.

9        As you will notice, one of the Board
10 members wanted to go into executive session to
11 discuss this, and Mr. Carrico prevented it.

12    Q    Let's talk about that. Was the Board
13 member Steve Cochran?

14    A    I believe that's right.

15    Q    That's in your complaint.

16    A    Okay. Well, it was.

17    Q    Okay. Now, how did Senator Carrico
18 prevent it?

19    A    I was called into the conference room
20 30 minutes before the board meeting by Senator
21 Carrico, and he asked me to explain what this letter
22 was. And he took notes, and he said, I want to know

231

1 what the problems are. And so we had 30 minutes
2 before the board meeting began, and I began to
3 outline in a professional manner what the issues were
4 that needed to be addressed, and that I felt like a
5 mediator should come in.

6        DHRM has a contract with four firms in
7 the State of Virginia that does this within state
8 agencies, but the individual agency has to pay for
9 it. I never felt like that it was ethical for me to
10 go ahead and approve that as CFO. I could have but I
11 felt like it was something that should have been
12 mutual between David and myself, and it was never an
13 option; it was never opened for discussion of that.

14        Senator Carrico said, I hate to cut you
15 short, but it's 2:00 and we need to go to the board
16 meeting. We got up to leave and he said, by the way,
17 I not going to bring this up today, because we need
18 to discuss it further. I said okay. We went to the
19 board meeting. When Mr. Cochran asked to go into
20 executive session, he refused for that to happen.

21        I never had any other conversation with
22 Mr. Carrico following that. But I did get this

232

1 letter in the mail where he said he investigated, and
2 I refused to provide him information he requested,
3 and he considered it closed. That was a lie.

4    Q    Okay. That was a lie. Okay. But if
5 Senator Carrico were to testify that there was,
6 indeed, a meeting with you before this meeting, you
7 expressed some concerns that you were having, and
8 Senator Carrico instructed you or advised you at that
9 time, look, if you're having all these problems, get
10 some people together and bring them to me, and let's
11 talk about them, that conversation would have never
12 happened?

13    A    I don't understand the question.

14        MR. GRIMES: Yeah, objection to the
15 form. That was a long question.

16        MR. KINCER: It was a long question,
17 but that's no objection.

18        THE WITNESS: I don't understand the
19 question.

20        MR. GRIMES: I don't understand it
21 either.

22

Transcript of William D. Carmack
Conducted on March 12, 2019

233

BY MR. KINCER:

2    Q    Okay.  Did Carrico tell you to get some
3  people together and he would talk to you?
4    **A    No, he did not.**
5    Q    And that would be a lie if he said
6  that, if Carrico said that?
7    **A    Yes.  He didn't say it to me.**
8    Q    Actually, you said Carrico, reading
9  from your complaint again, that Carrico prevented
10 this discussion at the meeting?
11   **A    He did.**
12   Q    All right.  Actually, when Cochran made
13 this motion, the motion fell for want of a second,
14 didn't it, Mr. Carmack?
15   **A    Not that I remember.**
16   Q    All right.  Well, can we agree the
17 minutes will speak?
18   **A    I can't agree to any of that.  I**
19 **haven't seen the minutes.**
20   Q    All right.  Also, but was it Carrico or
21 was it Senior Assistant Attorney General Elizabeth
22 Griffin?  What role did she have in having this

234

1  request denied?
2    **A    She wasn't present.  She was**
3  **telephonically dialed into the meeting, and she never**
4  **said a word.**
5    Q    Didn't she say this was a personnel
6  matter?
7    **A    No, not that I heard.**
8    Q    Okay.  So she didn't say a word?
9    **A    No.**
10   Q    So it's erroneous in your compliant
11 when you say, under advice of Attorney General
12 Elizabeth Griffin, because a mute does not provide
13 advice, correct?
14   **A    I'm not following you there again.**
15   Q    She didn't say anything; you said she
16 didn't say a word.
17   **A    During the board meeting she didn't say**
18 **anything.**
19   Q    All right.  So how was she responsible
20 for denying your request?
21   **A    Conversation prior to, I understand.**
22   Q    Were you party to that conversation?

235

1    **A    No.**
2    Q    So who told you that there was a
3  conversation before?
4    **A    Senator Carrico alluded to the fact**
5    **that he had spoke to the Attorney General's office**
6    **and had been advised not to bring it up at the**
7    **meeting.**
8    Q    Okay.  Now, alluded.  Did Carrico state
9  that?
10   **A    He stated that.**
11   Q    That's clear as day now.  Okay.  Let's
12 follow that up because you referenced it.  Senator
13 Carrico responded -- this would be 103.  Senator
14 Carrico responded in writing to your December 7th
15 letter, correct?
16   **A    After I was terminated, yes.**
17   Q    Well, January 9th would be after
18 January 4th.
19
20     (Exhibit Number 103 was marked for
21     identification)
22

236

1  BY MR. KINCER:
2    Q    You have read 103?
3    **A    Oh, yes.**
4    Q    And do you disagree with about
5  everything in Exhibit 103 after Dear Mr. Carmack?
6    **A    I mailed the letter a week prior to the**
7    **board meeting.  I don't know when he received it.  He**
8    **did not ask for any additional information.  He said**
9    **he would get back to me.  I basically don't agree**
10   **with any of the rest of it.  It is fabricated after**
11   **our conversation and doesn't pertain to what was**
12   **actually said.**
13   Q    Under your view?
14   **A    Correct.**
15   Q    All right.  The Heitela family; how
16 many Heitala family members were at the Center as of
17 the time you left?
18   **A    When I came to work at the Center,**
19 **Kathy was administrative assistant.  She remains so**
20 **with Mr. Matlock.  She had a daughter who worked**
21 **weekends.  She had a son, Eli, who was hired for**
22 **conference services, and there was a daughter,**

Transcript of William D. Carmack
Conducted on March 12, 2019

60 (237 to 240)

237

1  Hannah, that was an employee of UVA-Wise.
2     Sim Ewing, who was the CFO at UVA-Wise,
3  who was a partner school at our institution,
4  contacted me during my interim period and said, we do
5  not have the funds to keep Hannah on board; do you
6  have a need for a part-time person?  And we had a
7  need in our Testing Center, so she remained a UVA
8  employee with UVA benefits, and we reimbursed Sim 50
9  percent of her salary for her to work part-time.
10     Hannah was working in our Testing
11  Center.  I knew she was looking for a permanent,
12  full-time position.  And when all of this opening
13  opened up, when Austin Deirks wanted to go back to IT
14  and we were trying to hire employees, I went to
15  Hannah to say, would you be interested in working
16  full-time as the manager of the Testing Center?  And
17  this was in November of 2017.
18     She squirmed, and she goes, David and
19  mom are working on something for me so, no, I'm
20  waiting on something else.  I said thank you and
21  walked away.
22  Q    So now I'm not clear.

238

1  A    She was hired into a permanent,
2  full-time, new position after I was terminated by
3  Mr. Matlock.
4  Q    Who hired her?
5  A    Mr. Matlock.
6  Q    And but Kathy Heitala was hired by Dr.
7  Fowlkes?
8  A    Correct.
9  Q    And this Eli Heitala, he just set up
10  the tables at events?
11  A    Oh, he started out as wage, but then he
12  was hired as the, quote, manager of conference
13  services.  He was hired permanently.  To answer your
14  question, there was Kathy and two of her children
15  working full-time and one part-time.
16  Q    Okay.  Thank you.
17  A    And I think state policy says you're
18  not to hire family if you have any direct or indirect
19  influence over them.  She would certainly be in an
20  indirect position as David's administrative
21  assistant.
22  Q    Who would be, Kathy?

239

1  A    Kathy.
2  Q    So after Mr. -- strike that.  You told
3  me this morning that you sat in as interim director;
4  you sat in on a couple of the interviews.
5  A    I did.
6  Q    Well, in fact, you sat in David
7  Matlock's second interview; did you not?
8  A    I don't recall, but I did sit in on
9  some of his interview process.
10  Q    Some of Matlock's?
11  A    Yes.  He addressed the Center.  He came
12  down, he addressed.  It was an open meeting, frankly,
13  for the staff.  And he came down and talked about his
14  goals, ideas and objectives for the Center.
15  Q    Were you present for that?
16  A    I was.
17  Q    Did you lend any further communication
18  to matters that you were not personally knowledgeable
19  of, but that you heard about, he didn't do this and
20  he didn't do that, didn't follow through?
21  A    No, sir.
22  Q    You did not share any of that?

240

1  A    No, sir.
2  Q    All right.  You really wanted that
3  Executive Director's job, didn't you?
4  A    No.  I wanted ten years in the VRS
5  system at $109,000.
6  Q    All right.  And so it's your testimony
7  from all day that, essentially you tried to support
8  Mr. Matlock in his endeavors after he was hired as
9  Executive Director?
10  A    Yes, I did, and was retaliated against
11  continually by him.  I finally arrived at the idea he
12  had an agenda to rid my employment from the third
13  month he was there.
14     MR. KINCER:  This will be 104.
15
16     (Exhibit Number 104 was marked for
17  identification)
18
19 BY MR. KINCER:
20  Q    Let's go to the next, to the back page.
21 First of all, who is Deborah Bourne?
22  A    She was a former employee at the

Transcript of William D. Carmack
Conducted on March 12, 2019

61 (241 to 244)

241

1  Center.  She was director of Conference Services and
2  Operations for Dr. Fowlkes.
3      Q      She did not get along with Dr. Fowlkes,
4  did she?
5      A      Not toward the end of her employment.
6      Q      All right.  And she eventually ended up
7  in some position at Tech?
8      A      VIACOM, the osteopathic medical
9  school.
10     Q      All right.  October there is a,
11 starting with the e-mail from Deborah Bourne to you
12 on October 1, 2015.
13     A      Uh-huh.
14     Q      I heard the news.  I'm very upset.  Is
15 the news that Matlock was going to be Executive
16 Director?
17     A      Yes, uh-huh.
18     Q      And that you were not going to be?
19     A      Correct.
20     Q      Now, let's go back.  You replied to her
21 at 1:46 p.m., didn't you?
22     A      Yes, I did.

242

1      Q      And so you described -- what were you
2  describing when you were talking about, "Debbie, Hi,
3  Well, the good part is this sick, sick underhanded
4  process is over."  What process were you talking
5  about?
6      A      The recruitment and hiring process for
7  a Director.
8      Q      Okay.  And it was sick, sick because of
9  all the reasons you told me this morning?  Or do you
10 have additional reasons that we didn't talk about
11 this morning?
12     A      There were additional reasons that
13 involved Leanna Blevins, who was the Executive
14 Director of the Higher Education Center in
15 Martinsville.  She applied for the position, got up
16 to interview and backed out.  There was some
17 political pressure from the Martinsville market for
18 her to stay.  So it was just a very problematic
19 process from the beginning.
20     Q      Okay.  Well, how did the Blevins matter
21 affect anything concerning you or Matlock in the
22     A      It was just another problem in the

243

1  process.  She backed out at the very last second of
2  her interview.
3      Q      All right.  Blevins did?
4      A      Yes.
5      Q      She wasn't offered the job?
6      A      Not to my knowledge.
7      Q      Okay.  Was another applicant offered
8  the job and declined?
9      A      Not that I'm aware of.
10     Q      Do you have who the three finalists
11 were for that position?
12     A      I did, but I couldn't tell you who they
13 are now.  David, Carol, and I don't remember the
14 third.
15     Q      Carol is who, Carrico?
16     A      No, a female.  Dr. Carol somebody from
17 the midwest.
18     Q      Okay.  I'm sorry.  Okay.  Then still
19 reading your e-mail back to Ms. Bourne, you say,
20 "Great relief.  Thank you for all of your support and
21 kindness.  It's very important to me.  I too have
22 a..." all caps, "...GREAT concern for the Center.

244

1  The five resident college partners were unanimously
2  opposed to this, but our great members of the General
3  Assembly did not find that important."
4          Now, first of all, who were the five
5  resident college partners you're talking about there?
6      A      UVA-Wise, Old Dominion, Virginia
7  Commonwealth University, VCU and Virginia Tech.
8      Q      And so they were unanimously -- and
9  when we say opposed to this, am I reading this
10 correctly, opposed to David Matlock being Executive
11 Director of the Center?
12     A      That was what I was told as interim
13 director from the president of these institutions
14 when he was named as the director.
15     Q      You were told by who?
16     A      The presidents of these various
17 institutions.
18     Q      Each president of these universities
19 that you have named personally told you that?
20     A      President or dean.
21     Q      Okay.  Well, let's go with what deans
22 of what school told you that?

Transcript of William D. Carmack
Conducted on March 12, 2019

62 (245 to 248)

---

**245**

1    A    Dean of ODU, dean at Virginia Tech.

2    Q    What dean?

3    A    At which location?

4    Q    Which? ODU first?

5    A    Okay. ODU would have been Cecil Drane,

6 because he was their board representative.

7 UVA-Charlottesville was Steve -- I cannot pull his

8 last name, but it will come to me. Virginia Tech

9 was, the president of the college told me that

10 himself. UVA-Wise, I was told that by Marcia Gilliam

11 that Donna Henry, who was president of UVA-Wise --

12    Q    That was secondhand?

13    A    Yes, yes.

14    Q    Okay.

15    A    I was told by -- let's see, who I'm

16 leaving out? Tech, Charlottesville, UVA-Wise, Old

17 Dominion, VCU was Cecil Drane. So that's the five

18 full-time college partners.

19    Q    Drane told you that?

20    A    Yes.

21    Q    All right. Who were the great members

22 of the General Assembly? Members as in plural, so it

---

**246**

1 has to be more than Carrico.

2    A    Our six southwest Virginia

3 representatives from southwest Virginia who all came

4 together, even though two of them's term had expired

5 on the Higher Ed board; the Governor had not replaced

6 them. They hadn't been to a meeting in several

7 months, but they did come in to be sure to support

8 Senator Matlock's vote of David unanimously.

9    Q    Did this include a Democrat?

10    A    No, they are all Republicans.

11    Q    Every one?

12    A    Uh-huh.

13    Q    Yes?

14    A    Yes.

15    Q    All right. But they only had a vote,

16 correct?

17    A    Correct.

18    Q    Of the 23 we talked about?

19    A    Correct.

20    Q    All right. Then continuing on with

21 your reply to Ms. Bourne, you said, "I will be fine.

22 As for Rachel..." Is that Rachel Fowlkes?

---

**247**

1    A    Yes, it is.

2    Q    "...best of luck to her. A sad case of

3 a self-absorbed woman, laughing emoticon."

4    A    I agree today.

5    Q    Okay. I thought you were good friends

6 with Ms. Fowlkes?

7    A    We are. We are. I tell her to her

8 face, you're just a self-absorbed...

9    Q    Now, let's go to the next page of 104.

10    A    Okay.

11    Q    And this is going from Bourne, again,

12 following back up October 1, 2015 back to you.

13 "Greetings, Duffy, do you intend to stay? I can't

14 imagine how awful this has been." You reply, Duffy

15 Carmack to Bourne, October 1, 1:58 p.m. "Yes, I

16 would certainly consider other opportunities within

17 the State system. I promise you that he will be

18 short-lived. It will be a slow drowning."

19         Was that in reference to David

20 Matlock's tenure as Executive Director at the

21 Center?

22    A    It's been my experience when you don't

---

**248**

1 have full support of Board of Trustees as your

2 governing body, it is a slow drowning, a short

3 tenure.

4    Q    So the answer to my question is yes?

5    A    Yes, uh-huh.

6    Q    All right. And you wished that was

7 true, didn't you, when you wrote it?

8    A    No. I was sorry for the Center. I

9 think the Center always had an awful lot to offer our

10 community. I think the community college system has

11 done a great deal in our community, because in

12 southwest Virginia we need jobs and we need

13 education.

14         I have not seen our community college

15 grow under David's administration, and have not seen

16 our Higher Ed Center flourish under his

17 administration. So I think it's a loss to the

18 citizens of the southwest Virginia.

19    Q    You think that -- it's your opinion

20 that the Center is failing presently?

21    A    For leadership, yes.

22    Q    What's the distinction? How is it not

---

Transcript of William D. Carmack
Conducted on March 12, 2019

249

1 failing?

2 **A      It's not failing financially. It's**
3 **failing under what I would say integrity. It's**
4 **failing from lack of direction. It's failing from**
5 **some pretty negative publicity that's coming out.**

6      Q      What negative publicity?

7 **A      Public knowledge this lawsuit is taking**
8 **place.**

9      Q      So is the publicity being your filed
10 lawsuit?

11 **A      I have had a lot of people say they**
12 **read about it on-line, and I just look at them. I**
13 **don't know where they pull it up from.**

14      Q      Have you ever told anyone that the
15 reason that you left the Center was because of David
16 Matlock's improper or unlawful actions?

17 **A      No. I tell people I left the Center**
18 **because I was fired for a whistle blowing violation.**
19 **I complained to OSIG and David terminated my**
20 **employment.**

21      Q      That's what you believe today?

22 **A      Yes, sir.**

250

1      Q      Okay. Now, continuing with Exhibit
2 104, in the discussion between you and Ms. Bourne,
3 the next, her reply to your drowning message is,
4 "Yes, he will definitely sink. Who on earth
5 engineered his hiring?!" And then you e-mailed back
6 to her, "Are you available to talk?" She said, "Yes,
7 at my desk now." Did you talk to her to discuss the
8 situation about --

9 **A      I don't recall if I talked to her that**
10 **day, but I have spoken with Ms. Bourne. We have been**
11 **friends for 25 years, and so I have talked to her**
12 **probably four times a year, five times a year.**

13      Q      All right. And then go to the -- we're
14 working our way towards the first page. Go to the
15 second page.

16 **A      Uh-huh.**

17      Q      And this Debbie sends you a November
18 24, 2015 text. "Hi, Duffy I tried to reach you a few
19 times. I have been thinking about your (sic) and
20 hope you are doing okay. I can't imagine how the SW
21 HEC will fair under Dave Matlock. I just can't
22 imagine it. I see where Rachel put her positive

251

1 little spin on it. I'm sure she is absolutely
2 cringing at the thought of him running the place.
3 She did not care for him at all. Call or write me
4 when you can. Happy Thanksgiving to you." You
5 recall receiving that text from Debbie?

6 **A      When I read this, and yes, I assume I**
7 **read it.**

8      Q      All right. And what was she referring
9 to -- Rachel is Rachel Fowlkes again?

10 **A      Yes.**

11      Q      What was she referring to, "positive
12 little spin?"

13 **A      Rachel most of the time looked for the**
14 **positive in everything. Even if it was negative, she**
15 **tried to find a silver lining.**

16      Q      And what knowledge do you have versus
17 whatever Ms. Bourne had when we got to ask her about
18 that? What knowledge do you have that Rachel
19 disliked Dave Matlock?

20 **A      Ms. Fowlkes made very open comments**
21 **when Mr. Matlock applied for the job. She was very**
22 **vocal throughout the building that if David Matlock**

252

1 **got the job, it would just become a community**
2 **college. David Matlock did not have the experience**
3 **to be director, that he had always worked in the**
4 **community college system, and he didn't work directly**
5 **at the executive level of government. He always had**
6 **to go through Dr. Dubois, the State Chancellor of**
7 **Community College's office. She made those comments**
8 **every day about him up and down the hall to**
9 **everyone.**

10      Q      So insofar as executive -- strike that.
11 Insofar as education, training, experience or
12 ability, did you believe you were more qualified than
13 Dave Matlock for this job?

14 **A      As far as education, work experience, I**
15 **was qualified for the job. What I was interested in**
16 **was having a job with the State for ten years, and I**
17 **was very happy as chief financial officer. My job as**
18 **CFO was in my field of expertise, and I was very good**
19 **at it.**

20      Q      But you weren't happy from the time
21 Matlock became Executive Director until the time that
22 you left?

Transcript of William D. Carmack
Conducted on March 12, 2019

64 (253 to 256)

253

1      A    I wasn't happy with the way he treated
2  me with the abuse and harassment. I liked the job,
3  not the work environment.
4      Q    We will get to the first page of
5  Exhibit 104, and this is you back to Deborah Bourne
6  on November 24. And it says, "Hi, Debbie. I am
7  remiss in returning your call. Your interest and
8  thoughtfulness means so much to me. The place is a
9  living hell, only to become worse."
10        How was the place a living hell on
11  November the 24, 2015?
12     A    He had already created a division among
13  staff, because his five followers and he would go in
14  the room and shut the door. They would walk up and
15  down the hall and not speak to other people.
16  Mr. Matlock considered himself an excellent listener,
17  and would call us in to ask a question or to get our
18  opinion and talked the entire time and never listen.
19        People began to figure out that he
20  didn't quite have the management and people skills
21  that he talked that he did. And so the building
22  became very toxic. There were very hard feelings

254

1  between Ms. Heitela and Ms. Brooks, Mr. Tolbert and
2  Mr. Webb and the remainder of the staff.
3      Q    And who were -- again, I want to make
4  sure we have all the players that we talked about.
5  Who are the five followers?
6      A    Adam Tolbert, Jeff Webb, Kathy Heitala,
7  Joyce Brooks and Jeff Webb.
8      Q    I thought you said Jeff Webb twice.
9      A    Webb, Brooks, Heitala, Tolbert and --
10  All right. Kathy Heitala, Jeff Webb, Adam Tolbert,
11  Joyce Brooks. I'm blanking on the fifth.
12     Q    All right. Well, if it comes back to
13  you before we are through, let me know.
14     A    Okay.
15     Q    Okay. Then picking right up, "As bad
16  as it is I take delight in knowing Rachel's hell..."
17  and in the text it says I. Did you mean Rachel's
18  hell is probably worse?
19     A    More than likely, yes. That makes
20  sense, uh-huh.
21     Q    "I will call soon and bring you
22  up-to-date." Now, so why were you taking delight in

255

1  Rachel's hell, whom you apparently liked?
2      A    I like Rachel. Rachel can be very
3  manipulative. Rachel created a great deal of enemies
4  in former employees who had worked for the colleges
5  and had left over the years. I can't really think of
6  a single person that who had worked at the Higher Ed
7  Center, probably as many as ten, that worked for her
8  that left because of her manipulative, negative
9  behavior.
10        She was capable of doing that with
11  everyone. And I know the Center was her life. It
12  was her livelihood. It was her passion. It was her
13  invention. I know how hard she agonized over trying
14  to decide to retire. And so I'm sure having it in
15  the hands of someone that she verbally said daily
16  wasn't capable, was absolute hell to her.
17     Q    All right. Well, at a subsequent
18  time -- and if you recall the incident, you can tell
19  me when that was; if you don't recall that incident,
20  it doesn't matter when it happened.
21        At a subsequent time, did you go to
22  Rachel Fowlkes' house and have a verbal altercation

256

1  with her?
2      A    No. I had a conversation with her.
3      Q    Tell me about -- was the conversation a
4  loud conversation?
5      A    No.
6      Q    Was it a contentious conversation?
7      A    No.
8      Q    It was a friendly conversation?
9      A    Yes. And the man she dated in her life
10  was there for dinner, and we set around the kitchen
11  table and talked.
12     Q    All right. And who was she dating?
13     A    Oh, Lord.
14     Q    He's present for this conversation we
15  are going to talk about, right, the man? He was
16  there?
17     A    Yes. It too will come to me. Don,
18  Don, Don somebody.
19     Q    So Don, a friend of hers, was there and
20  you're talking to Rachel. You go to her home,
21  correct?
22     A    Correct.

Transcript of William D. Carmack
Conducted on March 12, 2019

65 (257 to 260)

257

1   Q       Did you tell her you were coming
2  over?
3       A    I don't recall.
4       Q    All right.  So you go to her home.
5  Where does she live?
6       A    On Main Street in Abingdon.
7       Q    All right.  You go to her home.  About
8  when was this visit?
9       A    It was dinnertime, so I'm going to say
10 between six and seven p.m.
11      Q    Date?
12      A    No idea.
13      Q    Cold out, warm out, spring, birds
14 chirping, hot?
15      A    Let me think.  I walk in the evenings.
16 So more than likely I was walking, so it was probably
17 warm.  That's all I can remember.
18      Q    Would this have been in -- what year
19 would this have been?
20      A    2015 or '16.
21      Q    What was this conversation?  What did
22 you say?  What did she say?

258

1       A    I went over to speak with Rachel about
2  the -- let me back up.
3       Q    All right.
4       A    Rachel became involved in her typical,
5  manipulative way of controlling the Interview
6  Committee for the Higher Ed Center's search for a
7  director.  And she went out and named who these
8  people were.  When the representative at that time at
9  the OIG's office found that out, he had issue with
10 that, and asked her not to be involved in any other
11 way at all.
12           Rachel always said to me that she
13 wanted, hoped that I would have the job when she
14 retired.  She made that no secret from the time
15 before I came on.  She made it no secret every day to
16 everyone.  Again, that's her desire, not mine, so
17 make a distinction of that.
18           Rachel's actions did not support a lot
19 of the words that she had said to me over the years.
20 Rachel had a lot of comments to me that she and I
21 talked about -- we traveled a lot together -- about
22 the Center, about me.  And so I went over and

259

1  confronted her on did she really support David for
2  the job?  Was she really satisfied with that?  Or was
3  she truly looking for some other form of leadership?
4  And so our discussion that evening took place with
5  that.
6       Q    All right.  And her response to you
7  was?
8       A    Well, her response was she said she was
9  surprised that David was hired as the director.  She
10 felt like that there were more qualified applicants.
11 I don't know how she had knowledge of who the
12 applicants were.  She and Kathy Heitela talked daily,
13 so I assume that that was her contact of information
14 through the Center.
15           We basically ended the conversation
16 that, okay, I just wanted to be clear on how you
17 stood.  Still friends.  And she followed me outside.
18 And I have no idea what she meant by this, but she
19 looked at me and she said, you know you can send me
20 to jail.  I laughed and I said, you're too skinny,
21 you wouldn't last long, and left.
22      Q    All right.  You can what?

260

1       A    Send me to jail.
2       Q    Oh, okay.  What do you think she meant
3  by that?
4       A    I have no idea.  I've never understood
5  that.
6       Q    All right.
7       A    Don Ault, A-l-u-t (sic), was his last
8  name.
9       Q    Okay.  Thank you.  But the conversation
10 ended on a good note?
11      A    Oh, yeah.  I see Rachel at church.  We
12 talk.  She e-mailed last week wanting an address for
13 someone.  I have conversations with her.
14      Q    All right.
15
16           (Exhibit Number 105 was marked for
17      identification)
18
19 BY MR. KINCER:
20      Q    Showing you another couple e-mails
21 between you and Betty Adams.
22      A    Yes.

261

1    Q    First of all, who is Betty Adams?
2    **A    Betty Adams is the Executive Director**
3    **for the Southern Higher Ed Center.**
4    Q    Going back to where this started,
5    September the 28th, Betty Adams, she has sent you an
6    e-mail that she's thinking about you.  "Hi, Duffy:
7    Just wanted to let you know I'm thinking about you.
8    Hope all goes well, or as well as it can go, at
9    today's board meeting.  Let me know if there is
10   anything I can do to help.  I'm a good listener.
11   Best, Betty."
12        And was this decision day, was
13   September 28, 2015?
14   **A    Oh, I have no idea.  You would have to**
15   **look back at the board minutes to see when they**
16   **voted.**
17   Q    Okay.  She says, "I hope all goes well,
18   or as well as it can go, at today's board meeting."
19   What would there have been a board meeting about in
20   September?
21   **A    We only have them twice a year.  They**
22   **only have board meetings twice a year.  And so this**

262

1    **would have been a called meeting, and there were**
2    **several called meetings in the Summer of 2015.  You**
3    **would have to refer to the minutes as to what the**
4    **purpose was.**
5    Q    And then let's go to the first page,
6    your reply back to her.  "Betty, thank you very much
7    for your concern.  This is one of the most difficult
8    days professionally that I have experienced in 40
9    years.  I will be in touch."
10        Does that jog your memory if that was
11   the most difficult day you've experienced
12   professionally in 40 years?
13   **A    It wasn't the announcement of hiring**
14   **Mr. Matlock; it was the process of that, that the**
15   **search committee and the six southwest Virginia**
16   **delegates went through.  And witnessing that process**
17   **was the most difficult of my experience.**
18   Q    All right.  And then she replies, "Hang
19   in there."  And you reply back to her on September
20   28, 2015 at 8:20, "Betty, the SW HEC is extending an
21   offer to the Virginia Highlands Community College
22   guy.  One bright spot, the hellish search is finally

263

1    over.  By the way, I'm just fine.  I do appreciate
2    your interest and support.  I will be around and
3    still working with the other Centers over the next
4    seven years, Duffy."
5    **A    Uh-huh.**
6    Q    What did you mean by that?
7    **A    I had no issue by the fact that David**
8    **Matlock was hired.  I was there to put seven more**
9    **years of honest, hard labor into the Higher Ed**
10   **Center.  So of the process, the search process, was**
11   **the most disturbing process to me, and so that's**
12   **simply what it meant.**
13        **I had no intention of leaving.  I had**
14   **every intention of taking him at his word and working**
15   **hand-in-hand with him and supporting him.  He never**
16   **gave me that opportunity.**
17   Q    Why do you think that was?
18   **A    I have no idea.  Never had that problem**
19   **in any of my other jobs.**
20
21        (Exhibit Numbers 106 was marked for
22   identification)

264

1    BY MR. KINCER:
2    Q    You recall this e-mail?
3    **A    Not yet.**
4    Q    Okay.  Take your time.
5
6        (Pause in proceedings)
7
8        THE WITNESS:  I don't recall it but I'm
9    reading it.  I understand it.
10
11   BY MR. KINCER:
12   Q    Okay.  Was this noted -- was this an
13   e-mail from whoever -- Bryan Garey says he's an
14   interim vice-president at UVA -- concerning some
15   organizational excellence, buzz word, buzz word, in
16   the administration of the HR department?
17   **A    My interpretation of the letter, as is**
18   **very commonplace with UVA, is that they were**
19   **continually realigning and readjusting and people**
20   **reporting to different departments.  And so I take**
21   **this to mean that Human Resources was going to start**
22   **reporting to under Finance, instead of whoever they**

265

1 were reporting to before.
2    Q    And that would -- Joyce Brooks at the
3 time this e-mail was sent to you, Joyce Brooks would
4 have been in HR, wouldn't she?
5    A    She and Adam together.
6    Q    All right.  And Alicia Young, whom we
7 have already identified as working for you,
8 correct?
9    A    Uh-huh, right.
10   Q    And she just forwards this or chimes in
11 on this and says, "Does this mean that whomever does
12 HR for the Center should answer to the finance
13 director (CFO for us)?"
14         And the CFO would, at this period of
15 time, would have been you, wouldn't it?
16   A    That's correct.
17   Q    All right.  And did you reply to
18 Ms. Young, "Well, that would be the icing on the
19 cake.  I see retirement in her future."  I don't know
20 what that icon is.  It will have to speak for itself.
21 What is it?  Do you know what icon that is, what
22 emoticon?

266

1    A    Like a devil skull and cross bones.
2    Q    That's what I thought.  Thank you.  So
3 were you taking glee in, perhaps, getting rid of
4 Ms. Young?
5    A    Ms. Brooks you mean?
6    Q    Yeah, Joyce Brooks.
7    A    Absolutely not taking glee.  I was
8 taking glee in the fact that if somehow she had to
9 report to me, she would rather retire and go out the door.
10 She couldn't stand me, and she made no excuses about
11 it to anyone.
12   Q    All right.
13
14         (Exhibit Number was 107 marked for
15    identification)
16
17         (Discussion off the record)
18
19 BY MR. KINCER:
20   Q    Mr. Carmack, you were also the
21 recipient of an OSIG complaint, the subject of an
22 OSIG complaint, weren't you?

267

1    A    Correct.
2    Q    And did this -- what position were you
3 in when these acts were complained of?
4    A    This was in my position as CEO of the
5 Foundation, but I was still CFO of the Higher Ed
6 Center also.
7    Q    All right.  And I just introduced it.
8 I'm not going to waste a lot of time on it.  You
9 admit you were the subject of an OSIG
10 investigation?
11   A    Yes.
12   Q    Anything can be relative, and we can
13 argue or not, but some rather serious charges?
14   A    Depends on how you look at them, but
15 the charges are all justified, substantiated and
16 documented.  And the Foundation had outside counsel
17 that represented us during that time, and you would
18 have to ask him for that information.
19   Q    All right.  Well, I just meant, again,
20 as compared to turning in your expense account 30
21 days late, you agree the matters that you were called
22 to task for --

268

1    A    I don't agree with that.  To me they
2 are one and the same.
3    Q    Okay.  Mr. Carmack, during the
4 interview process, the search process for the
5 Executive Director for the Center, did you attempt to
6 influence any member of the hiring body in any way?
7    A    Define influence.  I had conversations.
8 They had conversations with me about they hoped I got
9 it, or they thought I would be good at it, or they
10 thought I was weak in this area, but no type of
11 influence.
12   Q    Did you offer any members of the
13 possibility of a grant?
14   A    No.
15   Q    Okay.  What was the -- it has come up
16 in all the depositions before, and I was going to ask
17 you about it.  What was the Ann Dunham complaint?
18 Your attorney has asked that?
19   A    At Virginia Highlands Community
20 College, this is not the first OSIG complaint against
21 Mr. Matlock.  Ann Dunham, who was a employee at
22 Virginia Highlands Community College volunteered

Transcript of William D. Carmack
Conducted on March 12, 2019

68 (269 to 272)

269

1  information openly to a group that she had filed a
2  complaint for harassment and work abuse by
3  Mr. Matlock. And it had been founded, and she was
4  later taken out from under his administration and
5  reported to someone else.
6      Q    When was this?
7      A    Prior to 2018 when he came to work
8  there. I'm sorry. 2015 when he came to work
9  there.
10     Q    And how were you aware of that?
11     A    She told me that.
12     Q    Who did?
13     A    Ms. Dunham.
14     Q    Is she a friend of yours?
15     A    Acquaintance, professional
16 acquaintance.
17     Q    You hesitated a little bit.
18     A    Again, I say, hello, Ann. Hi, Duffy.
19 I see her maybe twice a year. Ran into her at the
20 bank a few weeks ago.
21     Q    What is work abuse? That's very vague.
22     A    Creating a very hostile work

270

1  environment, treating the employees unfair. That's
2  purposefully antagonizing employees, setting them up
3  for failure and inability to do their job.
4      Q    Okay. But why is that an OSIG
5  matter?
6      A    You can call it abuse.
7      Q    Okay. Also, I wanted to ask you about
8  the G license plate. What is your understanding of
9  what that, the origin of that license plate?
10     A    Stands for Grand Old Party.
11     Q    Where do you reach that understanding?
12 How do you get that understanding?
13     A    Known that my entire life.
14     Q    Okay. Have you seen, have you seen W
15 plates?
16     A    I have seen all kinds of letter
17 plates.
18     Q    TK plates?
19     A    Sure, Governor's first names.
20     Q    Right. Isn't that a George Allen
21 plate? Isn't that G plate --
22     A    The people that I know that have the G

271

1  plates say it stands for Grand Old Party.
2      Q    Okay. So that's just the folklore of
3  the community, that's what it stands for, the
4  basis?
5      A    Yes, sir.
6      Q    Got you. Okay. When you applied for
7  executive director, did you say in your application
8  that your involvement with Carmack Health Care had
9  ended in 2011?
10     A    Not that I recall.
11     Q    If you had made that statement, would
12 it have been untrue?
13     A    It would have been untrue.
14     Q    Okay. Did you ever hold any meetings
15 using the Center facilities in support of private
16 business enterprises without paying appropriate fees
17 to the Center?
18     A    I used it for Abingdon Rotary Club. I
19 don't recall using it for any private entity, because
20 I remember paying for using the Center a couple of
21 times. But it wasn't really related to Carmack
22 Health Care in any way, so I don't recall that.

272

1      Q    Okay. Now, we had talked about
2  Dr. McGarry earlier and your relationship with him.
3      A    Uh-huh, yes.
4      Q    Now, you negotiated the energy building
5  lease, didn't you?
6      A    The energy building lease was
7  negotiated by Philip Hearl, who was the
8  representative, the attorney representative for the
9  Foundation. But since his brother happened to be
10 Chairman of the Board, it was a conflict of interest.
11        We received notification, Mr. Matlock
12 received notification in July, both from the state
13 level and through Senator Carrico, and the Attorney
14 General's office, that the end of the year no more
15 state dollars, period, could be used at the Energy
16 Center. We couldn't send our repairman down there,
17 mow the yard, scrape your driveway; it had to be
18 self-sufficient, had to have income.
19        The Energy Center had been marketed for
20 three years. It had been marketed internationally.
21 It had been marketed locally. It had been shown by
22 the state numerous times. We had had people from

Transcript of William D. Carmack
Conducted on March 12, 2019

69 (273 to 276)

273

1  Germany here. We had had people from Israel here.
2  And the bottom line is that building wasn't built for
3  a specific purpose; it was a shell. And it was a
4  very expensive shell, and it was designed -- out of
5  15,000 square feet, there's only about 7,800 of it
6  complex. The rest is atriums, open
7  lobbies, wide hallways, what I call common areas.
8        So our Board at the Foundation realized
9  they were going to have to have a tenant. I went to
10 Evan Feinman, who was director of the Tobacco
11 Commission, and asked their permission for us to be
12 able to rent it commercially. That was granted. It
13 was talked about whether they would take it back,
14 whether they should sell it. And Evan made the
15 decision, you may rent it commercially at this time,
16 and so followed that up in writing.
17       That went on to, back to the Foundation
18 Board. We had two realtors on that Foundation Board.
19 We talked for weeks about rent value. That building
20 is a state-of-the-art model of what can be done in
21 alternative energy construction. And it was built
22 for that purpose, which means it has redundant

274

1  systems in it. If you, as a private landlord were
2  going to build it, you would put one heating system
3  in, not two or three.
4        It was the first building that created
5  its own energy through solar panels, and we had
6  worked endlessly for two years with Bristol Virginia
7  Utilities and TVA, Tennessee Valley Authority, in
8  getting a net metering agreement, which means that
9  with the energy we produce, it's credited back to our
10 building. And so we are saving money.
11       And if we create enough energy, they
12 pay us back what we over-created. And that is the
13 way that we paid for all of that energy equipment,
14 solar panels. We have a windmill, which primarily is
15 just for symbolism, although it does power enough
16 energy to probably power a hair dryer. It has a
17 underground deep well, geothermal heating and cooling
18 system. It has a green roof. It has swells. It has
19 no holding pond. It has every kind of feature you
20 can think of, because the idea early on was to build
21 this energy center, energy being both synonymous with
22 creating synergy energy to bring jobs to the area, as

275

1  well as creating energy for itself.
2        Now, all of that is very expensive to
3  maintain and very complicated to operate. Our
4  agreements with TVA and BVU are 15 years long. And
5  so to rent that building commercially was very
6  complex. We couldn't separate -- for example, if we
7  put two tenants in there, you couldn't put two
8  electric meters. We couldn't break out the
9  utilities.
10       So in the discussion of who and how do
11 we rent this building, we decided that we would look
12 for one tenant. Then there was great discussion in
13 what we would charge for rent, and we were all over
14 the board. We had had a fair market evaluation done
15 in previous years. There were no comps to that
16 building for an appraiser to use, nothing comparable
17 to it, nothing comparable bought or sold in a 1,000
18 mile radius to it.
19       Q    Did you rent it to McGarry?
20       A    Foundation Board rented it to
21 Dr. McGarry.
22       Q    Did they know he was a client of

276

1  yours?
2        A    Yes.
3        Q    That was clear and --
4        A    Absolutely.
5        Q    Divulged to all?
6        A    Absolutely.
7        Q    And he got an arm's length deal?
8        A    No.
9        Q    He got a sweet deal?
10       A    No. He took the lease that the --
11 Brian Ely, attorney in Abingdon, was used to
12 represent the Foundation because of Hearl conflict.
13 And the board set a rental value that has an
14 inflation clause each year. Tim had to invest a
15 certain amount of money in the building itself, which
16 included real estate value, and they agreed to rent
17 it to him and he signed the lease.
18       Q    Okay. Did you receive any additional,
19 any finders fee, any additional compensation of any
20 kind above and beyond your $95,000 a year?
21       A    No, nothing.
22       Q    Okay.

Transcript of William D. Carmack
Conducted on March 12, 2019

70 (277 to 280)

277

1      A      Mr. Matlock thanked me for renting the
2  building.  He said it was an objective of Senator
3  Carrico to have the building rented by year end, and
4  he appreciated my efforts.
5      Q      So he wasn't mean to you all the
6  time?
7      A      Not every day.
8      Q      All right.  Martha Gilliam -- and I
9  think her deposition is coming up -- and I know a
10 little bit about her.  Tell me, did they have an
11 insurance agency?
12     A      Marcia is partner in an insurance
13 agency.
14     Q      All right.  And do you have any
15 business relationship with her?
16     A      I have personal policies and my clients
17 have policies with her.
18     Q      Have you placed client policies with
19 her agency?
20     A      Let me think.  Not that I can think of,
21 with one exception.  This was before I ever went to
22 work at the Higher Ed Center.  Her company has the

278

1  insurance policies on the surgery center, but that
2  was eleven, 12 years ago.  And they are still there
3  at that agency, but they weren't placed with her.
4      Q      Did you divulge to any other
5  employees -- strike that.
6             Did you divulge to anyone else that you
7  were filing your OSIG complaint against Matlock until
8  you had done so?
9      A      My wife.
10     Q      And that was the only person?
11     A      Yes.
12     Q      All right.  And it's your testimony
13 that Mr. Matlock just would not discuss any
14 substantive business matter with you?
15     A      That's correct.
16     Q      During the entire overlap between him
17 assuming the executive director's job and you leaving
18 employment there on January the 4th of 2018?
19     A      We had several conversations that was
20 an attempt at what I would call to be constructive
21 conversations, but they never worked out that way.
22 For example, my employee review; all employee reviews

279

1  were due to UVA by April the 15th.  All employees
2  reviews were done except mine.  Mine got done on June
3  the 29th, the day before raises went out.
4             And he admitted in the office, he said,
5  I know you and I have problems; let me know if you
6  ever want to work on it.  And I said, I'm ready and
7  willing any time.  That was my employee review.
8  Could have been a constructive conversation.  Could
9  have been an olive branch time, but it didn't turn
10 out that way.
11     Q      Since leaving the Center in 2018, have
12 you sought any other employment anywhere?
13     A      I completed a resume to send to the
14 Town Council of Abingdon when they had an anticipated
15 opening for Town Manager.  And other than that, I
16 have just put my time and efforts into Financial
17 Health Solutions.
18     Q      And does your compensation remain the
19 same, the $95,000, or has it changed?
20     A      It remains the same.
21     Q
22

280

1
2
3
4
5
6
7      Q
8      A
9      Q
10     A
11     Q
12
13
14     A
15     Q
16     A
17     Q
18     A
19     Q
20
21     A
22

Transcript of William D. Carmack
Conducted on March 12, 2019

71 (281 to 284)

**281**

```
1
2
3
4    A
5    Q
6    A
7    Q
8
9
10   A
11
12   Q
13
14
15   A
16   Q
17   A
18   Q
19
20   A
21
22
```

**282**

```
1    Q
2
3    A
4    Q
5    A
6
7
8
9    Q
10
11
12   A
13
14
15   Q
16
17   A
18   Q
19
20   A
21   Q
22
```

**283**

```
1         A
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16 E
17
18
19
20
21
22
```

**284**

```
1
2         Q
3
4
5         A
6
7
8         Q
9
10
11   A
12
13   Q
14
15   A
16
17   Q
18        MR. KINCER:  I don't have any further
19   questions.
20        MS. HADDOX:  While we are still on your
21   time, let me finish my objection from earlier.
22   I think I got through 95.  So Exhibits 96
```

Transcript of William D. Carmack
Conducted on March 12, 2019

72 (285 to 288)

---

285

1 through 101 and 104 and 106 were not produced.
2 Like the others, they are subject to
3 production and numerous requests for
4 production. Requests for production number
5 two seeks the personal health insurance or
6 other files of Carmack in any form and all
7 other documents concerning or pertaining to
8 his employment, including and not limited to
9 his job duties, his performance, records of
10 misconduct or violation of company rules,
11 which is precise reason defendant allegedly
12 used them today.
13     In addition -- I won't go through all
14 of the justification; you can read it
15 yourself. Request for production five, six,
16 seven, 19, 21, 23, would also cover the
17 documents not produced.
18     MR. KINCER: Okay.
19     MS. HADDOX: That's all for the
20 objection on the record.
21     MR. GRIMES: And he'll read.
22     MR. KINCER: All right.

---

286

1     THE COURT REPORTER: Okay. Can you all
2 tell me what you need?
3     MR. KINCER: I want the original, .pdf
4 with exhibits.
5     THE COURT REPORTER: How about you,
6 Terry?
7     MR. GRIMES: We want the usual. We
8 want an E-tran only. We do not need exhibits.
9 We have them.
10     THE COURT REPORTER: When you say
11 E-tran, do you mean ASCII? Or do you want the
12 actual E-tran?
13     MS. HADDOX: ASCII. The main thing is
14 that we can convert it to text, which we can
15 do with ASCII.
16
17 (The deposition concluded at 5:21 p.m.)
18
19
20
21
22

---

287

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2     I, MaryTheresa Ferris, Registered
3 Professional Reporter, the officer before whom the
4 foregoing proceedings were taken, do hereby certify
5 that the foregoing transcript is a true and correct
6 record of the proceedings; that said proceedings were
7 taken by me stenographically and thereafter reduced
8 to typewriting under my supervision; and that I am
9 neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 22nd day of
14 March, 2019.
15
16 My Commission expires December 31, 2021
   Notary Registration Number 228190
17
18
19 _Mary Theresa Ferris_
20 NOTARY PUBLIC IN AND FOR
21 THE COMMONWEALTH OF VIRGINIA
22

---