1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF VIRGINIA

3              ABINGDON DIVISION

4    ---------------------------

5    WILLIAM D. CARMACK,            )

6                                   )

7              Plaintiff           )

8    -vs-                          )   Case No. 1:18-CV-00031

9                                   )

10   COMMONWEALTH OF VIRGINIA,      )

11   et al                         )

12                                  )

13             Defendants          )

14   ---------------------------

15          DEPOSITION OF WILLIAM D. CARMACK

16   DATE:        March 12, 2019

17   TIME:        10:00 a.m.

18   LOCATION:    Law Office of Terry N. Grimes, PC

19                Franklin Commons

20                320 Elm Avenue, SW

21                Roanoke, Virginia  24016
     REPORTER:    MaryTheresa Ferris, RPR
22                Registered Professional Reporter #20149

1              WILLIAM D. CARMACK,

2    after having been duly sworn by Mary Theresa Ferris,

3    RPR, Notary Public in the Commonwealth of Virginia,

4    to tell the truth, the whole truth and nothing but

5    the truth, testified as follows:

6

7    (9:57 a.m.)

8

9                    EXAMINATION

10

11   BY MR. KINCER:

12        Q      Good morning, Mr. Carmack.

13        A      Good morning.

14        Q      I'm Lewis Kincer.  I have seen you in

15   several other depositions.  You have seen me.  You

16   have heard your attorney give numerous deponents

17   advice of how to give a deposition and what we are

18   doing here.

19        A      Yes.

20        Q      I won't repeat everything that

21   Mr. Grimes has previously said.  Most important thing

22   is give a verbal response instead of nodding.  Make

1   sure the court reporter understands your response,

2   you know, whether it's yes, no, I don't know, instead

3   of uh-huh or huh-uh or, just so she can get it on the

4   record.

5            If I ask you any questions that are

6   unclear to you or that you don't understand, stop me,

7   tell me the question, you don't understand it, it

8   makes no sense, and I will repeat it or rephrase it

9   until we are on the same page.  All right?

10           A    Okay.

11           Q    If you answer a question, I will assume

12   you understood it.  All right?

13           A    Fine.

14           Q    And I will ask you, are you feeling all

15   right to give a deposition today?

16           A    I am.

17           Q    And you have no health conditions that

18   would prohibit you from recollecting and giving

19   testimony?

20           A    None.

21           Q    Okay.  And you're undergoing no

22   personal, family crisis or upsets that would affect

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 3 of 283   Pageid#:
1048

```
1    you here today?

2         A    None.

3         Q    Okay.  State your full name.

4         A    William Duffy Carmack, Jr.

5         Q    And how old are you?

6         A    63.

7         Q    And single or married?

8         A    Married.

9         Q    How long have you been married?

10        A    33 years.

11        Q    First marriage?

12        A    Yes.

13        Q    Any children?

14        A    I have a stepdaughter.

15        Q    And so your wife was married before?

16        A    Correct.

17        Q    What is your wife's name?

18        A    Rebecca.

19        Q    Does she work outside the home?

20        A    She does not.

21        Q    And what's your stepdaughter's name?

22        A    Elizabeth Minnick.
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 4 of 283   Pageid#:
1049

1    Q    Is she in the Abingdon area?

2    A    She is.

3    Q    And what does she do?

4    A    She works for a company called Hapco,

5    H-a-p-c-o.

6    Q    What is Hapco?

7    A    It is a company that manufactures

8    aluminum poles for lighting and flags.

9    Q    Is she married?

10   A    She is.

11   Q    What does her husband do?

12   A    He is a surveyor.

13   Q    And his name?

14   A    Dan Pettingil, P-e-t-t-i-n-g-i-l.

15   Q    Do they have any adult children?

16   A    They do not.

17   Q    Okay.  Where are you currently

18   employed?

19   A    I am currently self-employed with a

20   company entitled Financial Health Solutions.

21   Q    Okay.  What does Financial Health

22   Solutions do?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 5 of 283   Pageid#: 1050

1       A       It is a consulting company that works

2   with medical management of physician practices, and

3   it also does estate advisement and settlement.

4       Q       What sort of estate advisement?

5       A       When someone passes away, if there is

6   not an executor, I am appointed by the Court for

7   that.  Or I am named as executor in various wills or

8   administrators or some fiduciary role; it varies from

9   account to account.

10      Q       But you don't purport to give legal

11  advice?

12      A       No.

13      Q       All right.  How long have you been

14  involved with Financial Health Solutions?

15      A       I started Financial Health Solutions

16  last January of 2018.

17      Q       Did you start it or did you convert a

18  previous corporation?

19      A       I converted a previous corporation.

20      Q       And tell me about that.

21      A       In 2008 I set up a corporation called

22  Carmack Health Management.  And at that time I served

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 6 of 283   Pageid#:
1051

1  as administrator for a group of ten physicians in

2  Abingdon, surgeons, who owned real estate that they

3  leased back to the hospital that's used for an

4  ambulatory surgery center.  And I served as their

5  business administrator for that real estate

6  transaction, and real estate includes equipment

7  also.

8       Q       What sort of equipment?  Office

9  equipment or medical?

10       A       Medical equipment.

11       Q       And this was -- the group that you did

12  this for was what group, what medical group?

13       A       The name of the corporation is Abingdon

14  Physicians Ambulatory Surgery Center, which I like to

15  abbreviate ASC Management Group.

16       Q       Right.  And what is their practice

17  specialty, if there is one?

18       A       There is not one; they are

19  multi-specialty.

20       Q       Okay.  Including surgeons?

21       A       They are all surgeons.

22       Q       They are all surgeons.  Who is -- is

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 7 of 283   Pageid#:
1052

1    there a Dr. McGarry?

2          A       Yes.

3          Q       Who's he?

4          A       Dr. Timothy McGarry is an orthopedic

5    surgeon in the Abingdon area.

6          Q       Okay.  Is he still in practice?

7          A       He is.

8          Q       Was he part of this group?

9          A       He is one of ten members.

10         Q       Okay.  Since you set it up in 2008,

11   have any of the members changed, of the professional

12   staff, professional members of the group?

13         A       Not yet, no.

14         Q       Okay.  From 2008, your Carmack Health

15   Management, was that an LLC?

16         A       It was.

17         Q       And were you the sole owner?

18         A       Yes, indeed.  Yes, I was.

19         Q       Okay.  And did you work out of your

20   home or do you have an -- do you have an --

21         A       Yes, worked out of the home.

22         Q       Okay.  And let's say the calendar year

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 8 of 283   Pageid#:
1053

1    2008, how much time per, whether you want to do it

2    day, week or month, did that occupy?

3         A       In 2008?

4         Q       Yes, sir.

5         A       During the formative years of building

6    the building, I would say it occupied 40 percent of

7    my time.

8         Q       Okay.  How long did you continue to

9    actively participate in Carmack Health Management?

10        A       I continued to participate in Carmack

11   Health Management through December 31st.  Well,

12   actually January, probably 15 of '18 until I changed

13   the name of the company.

14        Q       January 15th of 2018?

15        A       Yes.

16        Q       And then that was the conversion with

17   Financial Health Solutions?

18        A       That's correct.

19        Q       Okay.  And what is Financial Health

20   Solutions?

21        A       Financial Health Solutions is a

22   consulting firm that offers physician practice

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 9 of 283   Pageid#:
1054

1   management, surgical center management, to any

2   surgical or dental or medical specialty of their

3   offices.  And it also has a division that does

4   administrative estate settlement.

5        Q      That's what you mentioned earlier?

6        A      Yes.

7        Q      All right.  So what is the substantive

8   change between what Carmack Health Management was

9   doing from 2008 through 2018 and what Financial

10  Health Solutions is doing now?

11       A      The substantive change in Carmack

12  Health Management took place in 2010.  The first two

13  years that I worked for them was around 40 percent to

14  build the building, to equip the building and to hire

15  clinical operations managers of the building that's

16  there every day running the facility.

17              My role after that became simply the

18  administrator for the physicians, owners of the real

19  estate, and the equipment, because they had leases

20  back to the local hospital for the real estate and

21  the equipment.  So the physicians, in essence, became

22  a landlord, and the hospital was the tenant.  And I

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 10 of 283   Pageid#: 1055

```
 1    oversaw the business aspect of the real estate, the

 2    leasing of the real estate and the equipment.

 3         Q      The leasing to the hospital?

 4         A      Correct.

 5         Q      Is it Johnson Memorial?

 6         A      Johnston.

 7         Q      Johnston Memorial?

 8         A      Uh-huh.

 9         Q      Okay.  That's there in Abingdon?

10         A      Correct.

11         Q      Has either Carmack Health Management or

12    its successor, Financial Health Solutions, ever had

13    any other employees except you?

14         A      No.

15         Q      Has your work with Financial Health

16    Solutions, has that been your sole source of

17    employment since we, being the Southwest Virginia

18    Higher Ed Center --

19         A      It has.

20         Q      And unless either you or I qualify

21    somewhere else, let's say whenever we are talking

22    about that entity, I'm just going to say Center.
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 11 of 283   Pageid#: 1056

1          A        Okay.

2          Q        Unless we are talking about the

3    ambulatory surgical center, and we will differentiate

4    that.

5          A        Okay.

6          Q        So during the -- well, I think it would

7    make more sense.  Tell me starting, starting with

8    your -- you're from Abingdon, correct?

9          A        That's correct.

10         Q        Went to high school in Abingdon?

11         A        I did.

12         Q        Graduated from Emory and Henry?

13         A        Correct.

14         Q        What year?

15         A        1978.

16         Q        Okay.  And what years did you attend?

17         A        I graduated from high school in '74.  I

18    attended the Virginia Highlands Community College

19    until '76.

20         Q        Okay.

21         A        And Emory, finished in '78.

22         Q        Okay.  And you got an associate's

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 12 of 283   Pageid#:
1057

1    degree from --

2         A       No.  I simply used credits to

3    transfer.

4         Q       Okay.  Credits to transfer.  So your

5    degree from Emory and Henry was in what?

6         A       Bachelor of Arts in education.

7         Q       And when you got your BA in education,

8    you taught?

9         A       I taught seventh grade math.

10        Q       In Washington County?

11        A       In Washington County.

12        Q       What school?

13        A       Greendale Elementary.

14        Q       How many years did you do that?

15        A       Two-and-one-half.

16        Q       And would that have been from '78 until

17    mid-eighty?

18        A       I actually began teaching in December

19    of '77 before I graduated.  The school superintendent

20    came to me.  He knew that I lacked two courses

21    finishing at Emory.  He offered me a position at

22    Greendale.  They wanted a male teacher, and if I

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 13 of 283   Pageid#:
1058

1   could work out those two courses on independent

2   study, they gave me the job.

3               I worked it out.  So I went to work in

4   December of that year.  And I left, would have been

5   in '80 sometime.

6         Q     Okay.  And your reason for leaving?

7         A     I was offered a job with the State of

8   Virginia.  At that time it was the Virginia

9   Employment Commission Regional Office.

10        Q     Okay.  So you actually began teaching,

11  you became a full-time teacher without a

12  certificate?

13        A     That is correct.

14        Q     Okay.  And did you obtain a --

15        A     I did.

16        Q     All right.  You obtained a certificate,

17  you taught.  And the VEC job, what did that

18  involve?

19        A     It was called a contract officer.  It

20  was a regional job for the 17 counties in southwest

21  Virginia.  At that time Virginia Employment

22  Commission had federal grants for training industrial

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 14 of 283   Pageid#: 1059

1    workers in southwest Virginia.  So I administered

2    those funds from the Department of Labor through VEC

3    to the local industry.  It's called a contract

4    officer, was the title of the position.

5         Q       And that was from 1980 to when?

6         A       Probably '82.

7         Q       Okay.  And that was CETA money, wasn't

8    it?

9         A       Yes, it was.

10        Q       C-E-T-A Comprehensive Education and

11   Training Act.

12        A       I'm impressed.

13        Q       All right.  Then that job, that program

14   ultimately ended?

15        A       It ultimately ended, yes.  I left prior

16   to its ending.

17        Q       Okay.  And you left VEC work for

18   what?

19        A       I was offered a position by the local

20   Washington County Chamber of Commerce Board of

21   Directors as the Executive Director of the Chamber.

22        Q       Executive Director pretty much what it

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 15 of 283   Pageid#:
1060

1    sounds, running the programs, setting --

2          A      At that time the Chamber had tourism as

3    one of its arms.   At that time they had a contract

4    to do all of the marketing for the Virginia Highlands

5    Festival, which was a big arts and crafts festival

6    each year.  We did all of the publications,

7    brochures, work for that.

8                 Also, at that time we worked closely

9    with the Virginia Department of Economic Development

10   on recruitment of potential new industry into the

11   area.

12         Q      And was there a pay increase between

13   the VEC to when you went to the Chamber?

14         A      There was a pay increase with every

15   job.

16         Q      Okay.  Was that the primary reason for

17   leaving every job?

18         A      Yes.

19         Q      We will go through that.  And I have

20   got your resume, but I just want to see what you

21   remember.

22         A      It was professional growth and

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 16 of 283   Pageid#:
1061

1   financial benefit.

2        Q       All right.  Chamber of Commerce, how

3   long were you there?

4        A       I'm going to say two-and-a-half

5   years.

6        Q       And you left there because --

7        A       I was offered a position with what was

8   then Virginia National Bank.  It has merged into Bank

9   of America.  Virginia National Bank had a regional

10  office in Abingdon, and I was offered a position in

11  their management training program.

12       Q       What did that consist of?

13       A       Consisted of a year of training in

14  between Norfolk and Charlottesville.  It was a very

15  highly competitive program to enter.  You took a

16  barrage of tests.  I was fortunate enough to get in.

17  That consisted of working from beginning as a teller

18  and working your way up through every position in the

19  retail side of the bank, which took 12 months.

20               At that time you were placed in a

21  branch as either an assistant management or manager,

22  and then you were required to attend -- again, the

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 17 of 283   Pageid#:
1062

1   names have changed over the years, but at that time

2   it was called Virginia School of Bank Management, the

3   Darden School at UVA, for two years.

4           Q       Right, as a --

5           A       Certificate program.

6           Q       Right.  You were not on grounds?

7           A       Yes.  In summer we were there two

8   weeks.

9           Q       Okay.  A two-week program each summer,

10  but then it was, what, was it long distance?

11          A       It was long distance.  You had

12  assignments throughout the year with time lines to

13  turn in.

14          Q       Okay.  And then at the completion of

15  that program, you received a certificate?

16          A       Correct.

17          Q       From the banking association?

18          A       Yes.

19          Q       Not from Colgate Darden?

20          A       Correct.

21          Q       And so you successfully completed the

22  training program.  You got your certificate.  How

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 18 of 283   Pageid#:
1063

1    long were you at VNB?

2           A       12 years.

3           Q       At the same branch?

4           A       No.  My first position was branch

5    manager in Bristol, Virginia.  And they chose to open

6    a new branch in Bristol, and so I opened that branch

7    and moved to that location.  Approximately four years

8    later I was transferred to the Abingdon office, which

9    at that time was one of the larger offices in the

10   state with loans, deposits and services.  And I was

11   the senior vice-president and manager there.

12          Q       Okay.  And how many employees -- let's

13   go to the Abingdon bank.  How many employees directly

14   reported to you?

15          A       If my memory is correct, somewhere

16   between 30 and 35.

17          Q       Okay.  And so you were in Bristol and

18   you were in Abingdon for your bank job?

19          A       Yes.  I was in Bristol four years and

20   Abingdon for the balance.

21          Q       Okay.  Okay.  But through this point in

22   time, through the time of your, near the end of your

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 19 of 283   Pageid#:
1064

1    12-year period at VNB/BOA -- I don't know if they had

2    been bought out yet -- had they been bought out by

3    the time you left?

4         A       This was in the merger period.  Bank

5    mergers had just begun.  And so I was involved with

6    the initial merger, which was Sovereign, S-o-v-r-i-n,

7    (sic) Bank.  I became part of the merger team that

8    traveled around to various other smaller banks that

9    were bought.

10             We then became Nations Bank.  And then

11   following -- I left during Nations and then it became

12   Bank of America.

13        Q       And you left there for what reason?

14        A       I progressed as far as possible in the

15   professional realm with Nations in a rural market,

16   and they offered me a position to go to Charlotte.

17   At that time I was just not in a position personally,

18   with family members, my wife's business at that time

19   and her family, nor did I have the desire to leave

20   Abingdon.  So I began to seek employment elsewhere

21   while I was still employed.  I began to look around

22   for options to stay in that area.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 20 of 283   Pageid#:
1065

1          Q          You weren't being eliminated --

2          A          Oh, no.

3          Q          -- during any of these mergers?

4          A          No, I was asked to move.

5          Q          All right.  What was your wife's

6    business?

7          A          My wife's family had been in the tire

8    business.  The name of the company was Roberts Tire

9    and Recapping.  Her father and seven brothers all had

10   stores throughout southwest Virginia for over 40

11   years.  And although not a very likely profession for

12   a woman, she was one of three daughters, and so she

13   worked with her father in the tire business until he

14   retired and it was sold.

15         Q          Okay.  On the business side or on the

16   tire side?

17         A          On the business side.

18         Q          All right.  Where did you go after you

19   left VNB?

20         A          I was approached by then Johnston

21   Memorial Hospital's administrator, whose name was

22   Clark Beil, that's B-e-i-l, and Clark -- this was in

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 21 of 283   Pageid#:
1066

1    the, I'm going to say the Clinton days of managed

2    care, when the term was being thrown about loosely.

3    And Clark said that he would like for me to come to

4    the hospital to work in a position, newly created

5    position, called director of contracts and managed

6    care.

7              And his interest in me was because the

8    physicians, most of which had been my customers,

9    already had a trust level for me.  And it was going

10   to require a real stretch for them to get involved in

11   managed care.  So he offered me a job in

12   administration and I accepted that.

13        Q      What year did you accept that?

14        A      Would have been in, I think in the

15   early nineties.

16        Q      And you would have left the bank

17   when?

18        A      I was at the bank 12 years from

19   whatever our Chamber date was, and then I went

20   straight to the hospital.

21        Q      Okay.  Actually, I don't think I

22   had a -- I had a VEC leave date.

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 22 of 283  Pageid#:
1067

1    A        Okay.  What was the VEC leave date?

2    Q        Was that '82?

3    A        '82.  Okay.  So Chamber, three, four,

4    five.  Virginia National, five, so '85, '95, '96,

5    '97.  So would have been around '97 when I went to

6    the hospital.

7    Q        Okay.  And what did you do for them?

8    A        Initially I established what was called

9    a physician hospital organization.  And the purpose

10   of that entity was to negotiate payor contracts with

11   all insurance companies.  In approximately a

12   year-and-a-half after beginning, the chief operating

13   officer resigned, and I assumed the duties of that

14   individual.

15          And that was oversight for the various

16   programs of the Emergency Department, contracts with

17   insurance companies, risk management, case

18   management, Social Services for the 25 departments

19   that reported to me.

20   Q        And were you an employee?

21   A        I was an employee.

22   Q        Have anyone report to you in that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 23 of 283   Pageid#:
1068

1    job?

2         A      Yes.  I had approximately 50 people

3    report to me in that job.

4         Q      What type of personnel?

5         A      I had MDs and mid-level practitioners

6    in the Emergency Department.  And the remainder were

7    either social workers or registered nurses.  And

8    there were probably five clerical employees in that

9    staff.

10        Q      But, again, you mentioned quite a few

11   medical professionals, the nurses, doctors, etcetera,

12   you weren't managing their medical practice?

13        A      Not the medical side.  I managed the

14   hiring and recruitment for vacancies in those

15   departments.  I managed schedules.  I managed issues

16   that came about involving risk or involving

17   malpractice or risk management at the administrative

18   level, not clinical.

19        Q      And how long did you stay there?

20        A      Oh, I was at the hospital six years.

21        Q      And your reason for leaving?

22        A      A local ophthalmologist approached me,

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 24 of 283   Pageid#:
1069

1    and there were three small practices of ophthalmology

2    serving southwest Virginia.  And they had agreed to

3    merge and become what's known as Eye Physicians of

4    Southwest Virginia.  And they wanted to hire an

5    administrator to do their merger and to manage their

6    practices at various locations.

7                    Also, one goal was to set up optical

8    shops and get into the retail business.  So I went to

9    work for them as their CEO.

10          Q       And were you a salaried employee?

11          A       I was a salaried employee.

12          Q       Did you have any ownership interest in

13   the business?

14          A       I did not.

15          Q       And did optical shops get set up?

16          A       We established three optical shops.

17          Q       And I'm going to show you, before we

18   finish and introduce it, your resume.  I'm just going

19   through and want to know what you remember.  But I

20   have you working at Johnston Memorial Hospital from

21   '95 to '99.

22          A       Could be true.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 25 of 283   Pageid#:
1070

1      Q      All right.  So that would be four

2   years?

3      A      Close enough.  I can't remember the

4   exact dates.

5      Q      I'm going to let you see that.  And

6   then you went to Eye Physicians of Southwest

7   Virginia; that's what we have been talking about.

8      A      Following the hospital, yes, sir.

9      Q      And how long were you there?

10      A      Approximately ten years.

11      Q      Was that your full-time employment

12   during this ten years?

13      A      It was my full-time employment.  The

14   last two years that I worked for them overlapped with

15   the building of the surgery center, ambulatory

16   surgery center.  The ophthalmologists that were my

17   boss in that group were also going to be owners and

18   practitioners in the surgery center.  So they agreed

19   to allow me to work, continue my full-time work at

20   Eye Physicians to do the work that was necessary to

21   get the surgery center opened.

22             But I paid them back for the hours over

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 26 of 283  Pageid#: 1071

1    40 hours -- I'm sorry -- under 40 hours that I had

2    used working for the surgery center.  I reimbursed

3    them for my time so it came up to 40 hours a week.

4    So there was no financial loss to the Eye Physicians

5    at that time.

6         Q      They insisted on that, since you were

7    doing work elsewhere?

8         A      Yes.  Since basically 40 percent of my

9    time was spent benefiting them indirectly, I felt

10   that was fair and they felt that was fair.  But they

11   continued my benefits on a full-time basis since I

12   reimbursed them.  Once the surgery center was built,

13   my time spent with Eye Physicians returned to

14   basically 99 percent.

15        Q      And the center was built when

16   approximately?

17        A      2008.

18        Q      Okay.  And that's about, that is the

19   time that Carmack Health Management was founded?

20        A      That is correct.  Because for liability

21   purposes I wanted that money to flow through an LLC,

22   in the event there was some bizarre incident in

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 27 of 283   Pageid#:
1072

1    building the building or it would fall down, harm

2    someone, that I would have a protection of an LLC

3    Over my personal assets.

4           Q      And you left -- what's your next job?

5           A      I went to Southwest Virginia Higher

6    Education Center as chief financial officer.

7           Q      And what year was that?

8           A      2005.

9           Q      Who hired you?

10          A      Dr. Rachel Fowlkes was the founding

11   director of the Higher Ed Center concept, and she had

12   been the original director at the Center.  Dr.

13   Fowlkes approached me several years earlier about

14   coming to work there and I declined.  She offered me

15   a job based on my experience in health care, and I

16   was interviewed by a panel and selected based on my

17   experience.

18                 At that point in time with the Center

19   there was a great deal, there were funds from the

20   Virginia Tobacco Commission to build a medical school

21   in southwest Virginia and on the campus of the Higher

22   Education Center.  And they were interested in my

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 28 of 283   Pageid#:
1073

1    background and experience and connections in health

2    care to assist in that if it came true.

3                    Otherwise, Dr. Fowlkes was interested

4    in expanding health care programs at the Center at

5    the bachelor's level, and so that's why I was

6    hired.

7         Q      All right.  And your, the title of your

8    position that you were hired for in 2005 was?

9         A      Chief financial officer.

10        Q      All right.  Had that been the first

11   time that such a position existed at the Center?

12        A      Yes, that is correct.

13        Q      And what was it called before it was a

14   chief financial officer; do you know?

15        A      I don't know the exact name of that

16   position.

17        Q      So you were the first CFO at the

18   Center?

19        A      Yes.

20        Q      Named as such?

21        A      Correct.

22        Q      Okay.  And Dr. Fowlkes had asked you

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 29 of 283   Pageid#:
1074

1    even a couple years earlier to come earlier to come

2    on board?

3          A      She had.

4          Q      And you declined because of why?

5          A      I just wasn't interested in what she

6    had to offer.  The job wasn't challenging to me,

7    didn't offer any type of professional opportunity.

8    The pay was not satisfactory with me.  I just didn't

9    have a good feeling about it, so I declined it.

10         Q      Okay.  Did all of those things improve

11   in two years?

12         A      Yes, in the offer that was made to me

13   and the job description that was presented to me, it

14   did.

15         Q      And do you recall -- and I have got

16   your resume and, again, I'm going to give you this to

17   look at a copy if we need to refer to it.

18                What was your starting salary at the

19   Center?

20         A      I don't remember the exact number.  It

21   was somewhere in the approximate $105,000 range.

22         Q      How did you -- strike that.  Did you

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 30 of 283   Pageid#:
1075

1    know Ms. Fowlkes when she extended an offer to you?

2         A    I have known Ms. Fowlkes personally for

3    30 years, and her family.

4         Q    Okay.  How so?

5         A    Members of the same church.

6         Q    Presbyterian?

7         A    Yes.  Serving on boards together in the

8    community over the years.

9         Q    What's the name of Presbyterian

10   church?

11        A    Sinking Spring Presbyterian.

12        Q    You've been a member of that all your

13   life?

14        A    Since 27.

15        Q    Since when?

16        A    Since I was 27.

17        Q    All right.  And are you still friends

18   with Ms. Fowlkes?

19        A    Yes.

20        Q    You and Ms. Fowlkes are on good terms

21   now?

22        A    Yes, uh-huh.

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 31 of 283  Pageid#:
1076

1        Q       Who did you directly report to when you

2    were hired as CFO at the Center?

3        A       Dr. Fowlkes.

4        Q       And how many people directly reported

5    to you as CFO when you started?

6        A       Approximately seven.

7        Q       Okay.  And what type of positions?

8        A       All of the business office reported to

9    me, which included the employees paid by the Tobacco

10   Commission that administered the Tobacco Scholarship

11   Fund.  They were part of the business office.  Also,

12   the folks in the business department, the employee

13   who worked for the Foundation.

14              At various times I would, for specific

15   periods of time, I would have oversight into

16   maintenance.  The maintenance director was involved

17   in a motorcycle accident and lost a leg and he was

18   out of work for almost a year.  So the employees in

19   that department reported to me on an interim basis.

20       Q       All right.  The Tobacco Commission, at

21   the time you started as CFO, what was the role or

22   relationship of the Commission with the Higher

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 32 of 283   Pageid#: 1077

1    Education Center?  This gets confusing.

2         A        Okay.  The Tobacco Commission was

3    created from a class action lawsuit, tobacco causing

4    cancer, sometime eons ago before my interest in it,

5    and the settlement was placed into a fund.  The State

6    of Virginia elected instead of putting it as part of

7    the general fund monies, to set it aside and to let

8    the interest of that money benefit the two tobacco

9    regions of the state, that being southside Virginia

10   and southwest Virginia.

11               They appointed a Commission that was

12   approximately 25 members.  Southside Virginia had

13   more members than southwest; I think it was based on

14   the percentage of tobacco growers in the area.  They

15   set up various committees, for example, economic

16   development, education, are examples.  They set up a

17   scholarship program.  There were probably ten

18   different committees.  And those committees all had

19   pools of money, millions of dollars of money.

20               And parties in southwest Virginia or

21   southside Virginia could make application for grants

22   for these funds.  And the intent was to provide

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 33 of 283   Pageid#: 1078

1    economic development and jobs for the replacement of

2    the loss of tobacco funds in these markets.

3              Dr. Fowlkes had been very successful in

4    obtaining money for various types of educational and

5    economic development grants.  And when you add those

6    grants to the scholarship program -- and let me stop

7    right there and say that Dr. Fowlkes negotiated a

8    contract with the tobacco company to administer the

9    scholarship program; someone had to do that.

10             And so the Tobacco Commission paid the

11   Higher Ed Center 350, $400,000 a year, and that is to

12   set up an application process for scholarships, to

13   send that out, to receive the applications from the

14   students, to judge those applications as to who was

15   eligible and not, to receive payments from the

16   Tobacco Commission to send to the various schools.

17             As time grew and students transferred

18   and graduated, then the Tobacco Commission many times

19   switched between a loan program and a grant program.

20   So oftentimes the scholarship program changed its

21   rules, so we had to keep up with that.  We had to

22   create a database that could help with that.  We had

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 34 of 283   Pageid#:
1079

1  two funding cycles a year, and so for that work the

2  Center was paid a, through a grant, administrative

3  dollars for administering the scholarship program.

4            In addition to that, Dr. Fowlkes

5  probably received more tobacco grant dollars than any

6  other institution in the state.  We, at one time, had

7  looked at that number, and counting the scholarship

8  dollars had received over $40,000,000 in tobacco

9  grants of some type.

10       Q      Over what period of time?

11       A      Well, really since the beginning of the

12  Tobacco Commission.  And, I'm sorry, I don't know the

13  beginning date.

14       Q      Okay.

15       A      It would have probably been over a ten

16  to 15 year period of time.

17       Q      For what kind of programs?  That's a

18  lot of money.

19       A      Yes.  She was able to get grants for

20  various colleges to bring programs there.  For

21  example, Virginia Commonwealth University, there was

22  a need for nurse anesthesiologists in our market;

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 35 of 283  Pageid#: 1080

```
 1    there was a shortage.  And she asked, worked with
 2    VCU, and they said, yes, we will bring it there, but
 3    we can't pay the faculty.  We can't buy the
 4    equipment.  We can't make the video connections
 5    between the two sites.
 6                   So the Tobacco Commission supplied
 7    funds to do that.  Most funds at the Tobacco
 8    Commission were matching funds.  If they put 500,000
 9    into the project, VCU had to put $500,000 into the
10    project.  So she was successful in bringing a number
11    of educational programs, degree programs, to
12    southwest Virginia to serve the citizens of southwest
13    Virginia that would not have otherwise been able to
14    obtain a certified nurse anesthetist degree or a
15    doctoral degree in education.
16                   We have school superintendents that
17    have graduated from there.  So primarily she used
18    those funds for building educational programs.
19         Q      I had asked you earlier when you first
20    took this CFO job at the Center what your pay was.
21    And you said approximately $105,000.  Now, at that
22    time when you first came aboard, was that all paid by
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 36 of 283   Pageid#:
1081

1    the Center or was that paid some by the Commission?

2          A       Initially, it was all paid by the

3    Center.

4          Q       All right.  And when did that change?

5    When did you start getting paid on a split basis?

6          A       Approximately a year before I came to

7    work there, Dr. Fowlkes created a Foundation for the

8    purpose of obtaining research and development grants

9    through the Tobacco Commission, and also for the

10   purpose of obtaining federal grants of various types

11   that would offer training programs for jobs in

12   southwest Virginia.

13               The Foundation, when I came on board,

14   consisted of Dr. Fowlkes, a chairman, and probably

15   two members.  They had worked with an attorney in

16   Richmond to create their bylaws and their operating

17   agreements, not the Attorney General's office, a

18   private attorney in Richmond, who specialized in

19   this.  And Dr. Fowlkes had hired an individual by the

20   name of Edwin Rogers who had a law degree, but did

21   not practice, whose position was to establish

22   research and development grant applications, both

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 37 of 283   Pageid#:
1082

1    federal, state and Tobacco Commission, to create

2    research and development in clean fuel energies in

3    our marketplace.

4           Q       And your pay became -- what --

5           A       Okay.  We have attorney --

6

7                   (Simultaneous colloquy interrupted by

8            the court reporter)

9

10   BY MR. KINCER:

11          Q       Your pay became split or apportioned,

12   when?

13          A       It became split two years after I began

14   working there, whatever year that was.

15          Q       What year was it?

16          A       Let's see, I started in 2012.  Oh, no

17   2014.

18          Q       And take a look at the document I put

19   in front of you.

20          A       Uh-huh.

21                  MR. KINCER:  Off the record for a

22           second.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 38 of 283   Pageid#:
1083

1              (Discussion off the record)

2

3    BY MR. KINCER:

4         Q      Now, look at the first page and I will

5    represent to you -- you can look through there -- I

6    will represent to you this is some materials for your

7    CFO application and the job when you came aboard.

8    You can just look through there and --

9         A      Uh-huh.

10        Q      It's a job description and resume.

11   Anything you think doesn't belong there, let me know.

12        A      (Witness complying).

13        Q      Did you review that, the documents that

14   I just handed you, which I'm going to ask be marked

15   as Exhibit 86?

16        A      Yes, I have reviewed them.

17               MR. GRIMES:   Counsel, do you know the

18        Bates stamps of these documents, by chance?

19               MR. KINCER:   No, I don't.  I didn't run

20        mine from the Bates stamp, but we can get

21        that.  I'm sure that they have been produced.

22        We can -- I will just make an exhibit that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 39 of 283   Pageid#:
1084

1          says what it says, and we can key them up

2          later if and when we use it.

3

4    BY MR. KINCER:

5          Q       That is your resume?

6          A       It is.

7          Q       And then does the CFO position, which

8    was vacant when you were hired, have you looked

9    through that?

10         A       Yes.

11         Q       Does that seem to be your

12   responsibilities?

13         A       That's correct.

14         Q       All right.  And then I have a resume

15   from you?

16         A       It is correct.

17         Q       Okay.  That is your resume?

18         A       Yes.

19         Q       That you submitted at the time?

20         A       Yes.

21         Q       And then help -- what is this?  At the

22   very end of this stack of Exhibit 86 there is

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 40 of 283   Pageid#:
1085

1   something that's marked with the University of

2   Virginia symbol logo, and it says staff application.

3   What was that?  Where did that come from?

4          A     To apply for the CFO position at

5   Southwest Virginia Higher Ed Center you had to apply

6   through the University of Virginia.  The Higher Ed

7   Center had a contract with UVA-Charlottesville to

8   administer the HR services for the Center.  So you

9   applied through UVA-Charlottesville using their

10  documents.

11         Q     And if we look at the very last

12  document on your stack, that is your cover letter to

13  UVA's Department of Human Resources applying for that

14  position, correct?  Very last document is yours.

15         A     That's correct.

16         Q     Okay.

17

18               (Exhibit Number 86 was marked for

19         identification)

20

21  BY MR. KINCER:

22         Q     We had asked about your education.  We

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 41 of 283   Pageid#:
1086

1    know about your education degree from Emory and

2    Henry, your bachelor's degree, and we know you got

3    the banking certificate.

4           A      Uh-huh.

5           Q      You also got an MBA?

6           A      I did.

7           Q      Tell me about that.  That's from

8    California Coastal?

9           A      Coastal University in Santa Barbara,

10   California.  When I was working for Johnston Memorial

11   Hospital, to progress in hospital administration, you

12   needed a master's degree.  I chose to do a master's

13   in business administration with a concentration in

14   health sciences.

15                 And at that time there were not many

16   on-line programs east of the Mississippi.  So I did a

17   lot of research.  This was an accredited program.  It

18   allowed me to obtain my master's within a two-year

19   period of time, visited campus twice in the summer

20   for a week.

21          Q      You received that degree in 1999?

22          A      If that's what that resume says.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 42 of 283   Pageid#:
1087

```
1          Q      Well, your resume, which is part of

2   a -- it's the resume you -- on your resume the first

3   thing listed is education, MBA 1999?

4          A      That would be correct.

5          Q      Then it says California.  I'm assuming

6   that's a typo?

7          A      It's a typo.

8          Q      It's not California Costal?

9          A      No, it's Coastal.

10          Q      And that's the resume you submitted for

11   the Higher Ed position?

12          A      I suppose so.

13          Q      All right.  Now, you also told me, you

14   told me that this California Coastal was accredited.

15   It wasn't accredited by anyone at the time that you

16   received your degree, was it?

17          A       It was accredited when I received my

18   degree.

19          Q      All right.  And your degree was in '99.

20   And it's not California Coastal; it's California

21   Coast, isn't it?

22          A      Yes, it was 1999.
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 43 of 283   Pageid#:
1088

1      Q       All right.  Just take a look.  And I

2   have got it in a different format.  I'm just doing

3   this for the, so we can get the hyper-link site for

4   the Diploma Mill Police.

5              Take a look at that report on

6   California Coast, and tell me if you agree or

7   disagree with their conclusion that California Coast

8   operated from 1973 to '05 without accreditation, and

9   it achieved DETC accreditation in 2005?

10     A       I have no knowledge of this.  When I

11  attended I had information that they were accredited

12  and the organization they were accredited by, because

13  I looked closely at that.  I don't have that

14  information before me, nor have I looked at it in ten

15  years.

16     Q       You have those documents?  Are they in

17  existence?

18     A       I have no idea.

19     Q       Do you know the difference -- you went

20  to Higher Education Center as the CFO.  Do you know

21  the difference between the geographical accreditation

22  agencies like the Association of Southern Schools and

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 44 of 283   Pageid#:
1089

1    Colleges that do Virginia Tech and Duke and UVA, and

2    the DETC, for example, which is a national

3    accreditation that California Coast received in

4    2005?

5         A    Yes, I do.

6         Q    What's the difference?

7         A    One is nationally recognized, the other

8    is, I'm going to say, regionally or state

9    recognized.

10        Q    Are you aware whether or not the only

11   purpose for DETC accreditation is to allow

12   for-Proffitt or proprietary schools to obtain

13   Department of Education benefits, money?

14        A    I have no knowledge of that.

15        Q    All right.  Did you pay for your

16   education or did you --

17        A    Yes.  I paid cash for my education.

18        Q    Okay.  There was no loans taken or no

19   federal money?

20        A    No, no.

21        Q    Was this program ineligible for federal

22   money at the time you attended?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 45 of 283   Pageid#: 1090

```
 1        A       I have no idea.
 2        Q       You never applied for any financial aid
 3   for that MBA from California?
 4        A       I did not.
 5        Q       Okay.  And is the -- would the typo in
 6   your resume of California Costal, and then that, and
 7   the on-line for California Coast -- is the
 8   institution that you have an MBA from California
 9   Coast University?
10        A       It is.
11        Q       All right.  Have you ever expressed any
12   concern or apprehension to anyone during any of the
13   job positions that you have made since receiving that
14   MBA from California Coast, that you were really
15   apprehensive that that was going to pass muster?
16        A       No, sir.
17        Q       Never told anyone that?
18        A       I never had any reason to have
19   concern.
20                MR. KINCER:  Would you make the Diploma
21          Police e-mail number 87.
22
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 46 of 283   Pageid#:
1091

1              (Exhibit Number 87 was marked for

2         identification)

3

4              MR. GRIMES:  Do we have another copy?

5              MR. KINCER:  I will get you another

6         copy.  The only difference is this one is,

7         that's the one we want that he wrote, and this

8         one is straight up.  You see?

9              MR. GRIMES:  Off the record.

10

11             (Discussion off the record)

12

13   BY MR. KINCER:

14        Q     Okay.  Mr. Carmack, you began work at

15   the Center in 2012?

16        A     That's correct.

17        Q     And you worked at the Center from 2012

18   through?

19        A     January 4, 2018.

20        Q     As the CFO?

21        A     Correct.

22        Q     Your job title never changed?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 47 of 283   Pageid#: 1092

1          A       It did not change.

2          Q       Tell me, since there is an obvious

3   overlap between your 2012 employment as CFO at the

4   Center and your association with Carmack Health

5   Management, how much work were you doing for Carmack

6   Health Management during any period of time that you

7   were employed by the Commonwealth of Virginia at the

8   Center?

9          A       Yes.  That was grandfathered in in my

10  initial interview process.

11         Q       Is it in writing?

12              MR. GRIMES:  Objection; you cut him

13         off.  He was right in the middle of his

14         answer.

15              MR. KINCER:  I did.

16

17  BY MR. KINCER:

18         Q       Finish your answer.

19         A       I, in the interview process, made all

20  parties aware that I had this relationship with

21  Abingdon Physicians, ASC Management, that I would be

22  continuing that.  My duties with that position were

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 48 of 283   Pageid#:
1093

1    to attend a board meeting one night a month; that was

2    from six p.m. forward.  It was to answer e-mails or

3    phone calls, which might be ten a week.

4          Q      Ten a week?

5          A      Maybe, that would come through.  I

6    might get an e-mail, someone asking a question.

7    There was one employee -- it was the clinical nurse

8    administrator -- that I was responsible for insuring

9    that her paycheck was written each week.  And I had

10   permission to house that information at the Center

11   and to do that information while at the Center.

12              And it was made very clear, I was paid

13   a salary, but I was to put in a minimum of 40 hours a

14   week.  Most weeks I put in more like 60 hours a week

15   at the Center while Dr. Fowlkes was there.  And at no

16   time, as I am a man of rules, at no time did I ever

17   use Center time that I did not work over or come in

18   early or insure that my 40 hours was put in by the

19   State, because ethically that is important to me.

20          Q      Now, so you're working 40 hours for the

21   Center, at least?

22          A      At least.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 49 of 283   Pageid#:
1094

1    Q    At least.  You're working how much for
2    the Tobacco Commission?
3    A    That was during the Center work,
4    because I was also -- two years into the job -- we
5    didn't finish answering this question awhile ago.
6         Two years into the job, the Attorney
7    General's Office came to Dr. Fowlkes and asked that
8    the Southwest Virginia Higher Education Center
9    Foundation be operationally split from the Center.
10   And that meant that Dr. Fowlkes could no longer be a
11   voting member of the board.
12        And our AG rep at that time was
13   Elizabeth Griffin, and she drafted a framework under
14   which she was comfortable with the Foundation
15   continuing.  She asked that I serve as CEO of the
16   Foundation and all Foundation work, and that my time
17   for that be maintained and the Foundation reimburse
18   the Center for that.  That was done each year.
19   Q    And when was that?  When was this
20   split?
21   A    Somewhere around 2014.
22   Q    So then the Tobacco would just pay part

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 50 of 283   Pageid#:
1095

1    of your wage?

2        A      Correct.  The Center was reimbursed out

3    of that tobacco grant that we got for administering

4    the program's portion of my salary.

5        Q      75/25?

6        A      And benefits.  It varied from

7    year-to-year, but the maximum was 75/25.

8        Q      Okay.  Do you know whether similar

9    allocations were used for your benefits?

10       A      Absolutely.

11       Q      And so it would have been at one point

12   as much as 75/25?

13       A      Yes.

14       Q      And that would be Center to

15   Foundation?

16       A      No, Foundation to Center.

17       Q      I'm sorry.  Yes.

18       A      Foundation to Center.

19       Q      We weren't clear or I did, your

20   attorney did have a valid objection when I did

21   interrupt you.  I want to know this.

22       A      Uh-huh.

1          Q       Do you have this, do you have this

2     permission to continue to do your Carmack Health

3     Management work in writing?

4          A       I do not.

5          Q       Who told you -- who granted you this

6     permission?

7          A       Dr. Fowlkes and the Board of Trustees

8     and the Interview Committee at that time was made up

9     of Senator William Wampler, a gentleman who worked at

10    the Center by the name of Jeremy Mitchell, Deborah

11    Hensley and Dr. Rachel Fowlkes, and it was discussed

12    openly with all.

13         Q       This was for an Interview Committee?

14         A       That was the Selection Committee,

15    yes.

16         Q       Okay.  And that's when this was

17    discussed?

18         A       It was discussed at every point.  It

19    was discussed in my interview initially with Dr.

20    Fowlkes.  It was discussed in the formal interview

21    with the committee.  And Dr. Fowlkes announced when

22    she introduced me to the Board of Trustees, which

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 52 of 283   Pageid#:
1097

1   many I knew, announced what I would be doing in the

2   new position of CFO, and that I would be an asset to

3   the Center because of my experience and connection in

4   the medical field.

5           And that was encouraged, that I

6   maintain that, so that as the programs grew and they

7   needed clinical sites and clinical managers, that

8   they would have inside party to be able to help

9   obtain those.

10          Q     All right.  Look, you mentioned the

11  grand vision or dream for all this tobacco money was

12  at one point we were going to have a medical school

13  in southwest Virginia.  Well, that didn't come to

14  fruition, did it?

15          A     No, it did not.

16          Q     So you remained on as CFO, but you

17  really weren't working much health care for the

18  benefit of the Center, were you?

19          A     Yes, I was working health care for the

20  benefit of the Center.  When I came on board, Dr.

21  Fowlkes was opposing the medical school being built.

22  So I did nothing with the medical school.  Frankly,

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 53 of 283   Pageid#:
1098

1   it was at its end of life when I came on board.  One

2   of the first things that she asked that I do is to

3   repair relationships between the Center and

4   Department of Planning and Budgeting in Richmond,

5   which had gone bad sometime over the previous four

6   years.

7                  Then she asked that I become involved

8   in helping to recruit and develop what's called, the

9   program through Virginia Commonwealth University

10  called Clinical Lab Science.  She asked that I do

11  assessments with all -- at that time we had multiple

12  hospitals in southwest Virginia.  They were not all

13  merged under Ballad Health, as they are today.

14                 I did health care needs assessments

15  where they were having issues in obtaining trained

16  employees.  We had several meetings with the

17  hospitals to determine what the training needs were.

18  We went to the Tobacco Commission to obtain funds to

19  set up these programs.  We established the programs

20  over a period of two to three years.

21                 In all medical programs, following the

22  classroom instruction is always on-site or clinical

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 54 of 283   Pageid#:
1099

1    rotation time.  That requires the commitment of the

2    medical facility, whether that's a hospital or a

3    physician practice or a laboratory.  It also requires

4    an instructor or proctor on site, whether it be a

5    physician, nurse manager.  So my job was to establish

6    these relationships, get contracts in place where we

7    would offer these services to health care, meet the

8    health care employment demands in southwest Virginia.

9            Q      And when you say we, you were speaking

10   of whom?  I didn't want to interrupt you during your

11   lengthy answer, but when you were referring to we,

12   we, we, we, who were you talking of?

13           A      Dr. Fowlkes, myself operationally, and

14   the Center's Board of Trustees who was behind the

15   development of these programs and could approve

16   them.

17           Q      Did you and Dr. Fowlkes have a

18   collegial relationship during your period of

19   employment with the Center?

20           A      We did.

21           Q      That was true up until the time you

22   left?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 55 of 283   Pageid#: 1100

1        A      Yes.

2        Q      You say that this outside, this work

3   for your Carmack Health Management, was discussed in

4   your interview and discussed with the folks that you

5   have identified earlier.

6        A      It was.

7        Q      And everyone said that was all right --

8        A      Yes.

9        Q      -- but you never obtained anything or

10  was given anything in writing?

11       A      That is correct, because I was told by

12  UVA at that time that they did not offer any sort of

13  contract.  It was no written document.

14       Q      Okay.  Told by -- UVA is a big place.

15  Who told you that?

16       A      UVA.  I don't recall the representative

17  of the Center at that time.  That rotated annually.

18  The lady -- it was a lady is all I can recall -- that

19  was working with me on my employment papers, did not

20  put anything in writing.  She said they did not offer

21  contracts.

22       Q      Moving forward then, but so you were --

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 56 of 283   Pageid#:
1101

1    the Center via Rachel Fowlkes, as head of the Center,

2    she was totally knowledgeable of this, your

3    affiliation with Carmack health Care?

4          A      She was.

5          Q      Health Management.  I'm sorry.  I

6    misstated it.

7          A      She was.

8          Q      Was David Matlock so equally

9    knowledgeable?

10         A      Mr. Matlock and I never had any

11   conversations about that.

12         Q      You never discussed that with him?

13         A      I never had the opportunity.

14         Q      Did you ever talk -- you knew -- now,

15   Mr. Matlock -- strike all that.

16                Mr. Matlock succeeds Rachel Fowlkes as

17   Executive Director of the Center, correct?

18         A      Correct.

19         Q      And you are still working at the Center

20   as the CFO, and you are answerable to the Executive

21   Director?

22         A      Correct.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 57 of 283   Pageid#:
1102

1          Q       Okay.  And never during the entire

2    period of time that you were at the Center, did you

3    ever mention to Mr. Matlock this oral agreement that

4    you had with his predecessor and ask if he was all

5    right with that?

6          A       Mr. Matlock never allowed that

7    opportunity for me to have a conversation, but he was

8    aware that I had the affiliation with the physicians,

9    because he asked me to establish a clinic, set up a

10   training clinic, for a primary care nurse

11   practitioner program that required knowledge of

12   equipment and instruments and so forth.

13                 He was fully aware of it.  Again, I was

14   never given the opportunity to have a professional

15   conversation with him.

16         Q       Okay.  How do you make the leap that

17   from setting up this program with the nurse

18   practitioner's program that that made Matlock

19   aware?

20         A       He said, you have this information.

21   You know how to get it.  Get it set up quick for

22   me.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 58 of 283   Pageid#:
1103

1          Q      You had this information being the

2    knowledge of?

3          A      Establishing what would be required in

4    a clinic environment for a training program because

5    of my background in health care.

6          Q      Did Mr. Matlock know you were

7    conducting Carmack Health Management business on

8    state time?

9          A      Yes.

10         Q      He did?  How did you learn this?

11         A      Same way everyone else knew that.

12         Q      Which is?

13         A      I would have conversations during the

14   day by phone.  I might have someone drop by, visiting

15   the Center.  There were physician training programs

16   there.  Physicians would come out and speak with me

17   and talk with me.  Everyone at the Center was aware

18   of it.

19         Q      Let me ask you, when you became CFO of

20   the Center in 2012, were you issued any -- strike

21   that.

22                What IT or communication devices were

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 59 of 283   Pageid#:
1104

1    you issued by the Center?

2          A      I was provided a cell phone and a

3    laptop.  And I paid 50 percent of the phone bills so

4    that we could -- this was universal, not just for me.

5    As an employee there, you could pay 50 percent of the

6    phone bill and use them as your personal devices.

7                 I also had a PC on my desk that

8    belonged to the Center.  And I had a PC on my desk

9    that belonged to me that I used for cutting a payroll

10   check twice a month.

11         Q      Okay.  A PC that belonged to you?

12         A      Yes.

13         Q      And you used that in your Carmack

14   Health business?

15         A      Yes.

16         Q      And did you have a tablet?

17         A      Only the laptop.

18         Q      Is that what you refer to as a

19   tablet?

20         A      I didn't recall a tablet.  I have a

21   cell phone.  iPad, I'm sorry.  I had a cell phone and

22   an iPad issued by the Center.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 60 of 283   Pageid#:
1105

1          Q       Uh-huh.

2          A       And I had a traditional computer with a

3     monitor on the desk, and then I had my laptop for

4     personal use.

5          Q       And the laptop was for personal use?

6          A       Correct.

7          Q       And that was for health care

8     business?

9          A       Correct.

10         Q       Only health care business?

11         A       Primarily.

12         Q       Well, primarily.  What else did you use

13     it for?

14         A       Nothing comes to mind of any

15     specific.

16         Q       Okay.  Then you had your PC that you

17     devoted exclusively to cutting checks for the health

18     care business?

19         A       That was that same PC.

20         Q       Okay.  That same -- Okay.  Are you

21     referring to -- a PC and a laptop, are we talking two

22     different animals here?  I always thought we were.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 61 of 283   Pageid#:
1106

1        A       It's a laptop like Terry is using.

2        Q       I'm a dinosaur, but I thought a PC was

3    the big machine that sat on your desk.

4        A       I had one of those provided by the

5    Center.

6        Q       Okay.  And then you had a laptop of

7    your own?

8        A       Correct.

9        Q       And then you had -- when I was saying

10   tablet I meant the iPad?

11       A       Okay.  iPad.

12       Q       And that was issued by the Center?

13       A       Correct.

14       Q       And you didn't use that for health care

15   business?

16       A       I used it for personal use, because I

17   paid half of the phone bill for the use of the iPad

18   and the telephone.  And that was commonplace of all

19   employees who were issued those devices.  We had

20   personal use.

21       Q       No, we didn't -- you told me earlier

22   you paid half price for the cell phone.  You paid 50

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 62 of 283   Pageid#:
1107

1    percent of your bill for the cell phone, as did all

2    the employees, right, that had the devices issued?

3          A       That chose to do that.  Some chose not

4    to use it as their personal phone.

5          Q       But did others have the same deal with

6    the iPad, which I consider as different?

7          A       Yes, they did.

8          Q       Okay.  So if you wanted to use it for

9    your personal device, you had to pay 50 percent?

10         A       Which was included in the phone bill.

11   They were connected together through Verizon.

12         Q       Okay.  So you made one 50 percent

13   payment --

14         A       Yes.

15         Q       -- for any State-issued device?

16         A       Yes.

17

18                 (Simultaneous colloquy interrupted by

19         the court reporter)

20

21                 MR. GRIMES:  Well, it goes both ways.

22                 MR. KINCER:  I think there is a worse

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 63 of 283   Pageid#:
1108

1          defender of that.

2                    MR. GRIMES:  Objection.  Shall we vote

3          on that?

4                    MR. KINCER:  Sure, we can, only if we

5          do Australian ballot.

6                    MR. GRIMES:  Well, Sid will canvass the

7          25 employees in the litigation section of the

8          AG's office and have the answer.

9

10  BY MR. KINCER:

11          Q      Okay.  Let me finish my question, and I

12  will let you finish my answer.  I tend to have slow

13  questions, and you tend to have lengthy, lengthy

14  answers.  So let's both be aware of that.  All

15  right?

16                    MR. GRIMES:  Objection to the

17          characterization of the witness' testimony;

18          it's not accurate.

19                    MR. KINCER:  Whatever.  I mean, you

20          know, we were doing so well.

21                    MR. GRIMES:  If you say whatever, why

22          did you bring it up?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 64 of 283   Pageid#: 1109

1           MR. KINCER:  Because I want him to quit

2      cutting my questions off.

3           MR. GRIMES:  And we want you to quit

4      cutting his answers off.

5           MR. KINCER:  He has answered every

6      question and more.

7

8  BY MR. KINCER:

9      Q      All right.  Any other communication

10 devices issued by the Center for your use?

11     A      No, sir.

12     Q      All right.

13          MR. KINCER:  Can we take a five-minute

14     break.  I'm getting to the Amended Complaint

15     and that will be lengthy.

16          MR. GRIMES:  Off record.

17

18          (A recess was taken)

19

20          (Exhibit Number 88 was marked for

21     identification)

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 65 of 283   Pageid#:
1110

BY MR. KINCER:

    Q    We are back from break.  I have handed you a copy of an Amended Complaint.  You have seen that document before, haven't you?

    A    I have.

    Q    And this lawsuit is presently pending against the Commonwealth and the Center and Mr. Matlock, and you're the plaintiff in that lawsuit, correct?

    A    Correct.

    Q    All right.  And I just wanted you to have it available for you.  I'm going to ask you some questions about it, and then we will go back to what we talked about.

    Looking at page two of the Complaint, paragraph 7, and I'm looking at the last line of paragraph 7.  That says, "Carmack was paid 75 percent by the Center and 25 percent by the Southwest Virginia Higher Education Foundation."

    And that's the numbers you gave me earlier, but you weren't differentiating between, that that had ever varied, that that...

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 66 of 283   Pageid#: 1111

1        A        It varied up to the 25, but the first

2    year that I was CEO of the Foundation it only

3    required maybe 15 percent of my time.  As grants

4    grew, my time involved with that, because activities

5    were greater, and so it worked up to 25.

6        Q        And in looking at the next paragraph, I

7    think you testified earlier, if I wrote your response

8    down correctly, that you thought it was about 2014

9    that the, Elizabeth Griffin from the OAG had made

10   that change, and that's my recollection too.

11              So is 2016 in paragraph eight, is that

12   incorrect?  Do you see in that, in 2016?

13       A        I think that would be 2014.

14       Q        Okay.  That's why we are doing this.

15       A        With that said --

16       Q        Go ahead.

17       A        With that said, Elizabeth brought to us

18   in 2014 an outline and excused herself from going any

19   further, because it was Foundation business.  The

20   Foundation hired their own attorney, who put together

21   the operating agreement and bylaws and was approved

22   by Elizabeth; however, Elizabeth became very

1    concerned in 2016 that the Center and the Foundation

2    were not totally separate.  And it had to do with the

3    collection process of the student loan program.

4         Q       Collection insofar as?

5         A       Student loans that were delinquent or

6    that we were making payments on.

7         Q       And if you turn the page and paragraph

8    8 continues.  I wanted to ask you about the last

9    line.  This is where the Foundation also built the

10   Energy Center.  Tell me about the Energy Center.

11        A       Prior to my coming on board, the

12   Tobacco Commission, through their research and

13   development division, had set aside money to build

14   three -- I'm going to refer to them as incubators or

15   three buildings throughout the tobacco region, whose

16   primary purpose was to be a place for start-up

17   companies that could get a foothold in the community

18   and hoped would grow and hire employees.

19             The other two regions, the other two

20   Centers were built first.  Dr. Fowlkes was very

21   reluctant to build the Center and she held out.  I

22   was on board probably a year, and the Tobacco

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 68 of 283   Pageid#:
1113

1    Commission finally said, Rachel, build it or lose the

2    money.  We want it out there.  And so she asked me to

3    take the project over, that it would be deeded to the

4    Foundation because it was a grant.  The building

5    would be deeded to the Foundation, because it's grant

6    funded.

7                 Preliminary studies had been done prior

8    to my coming that because southwest Virginia was the

9    coal bed for coal, natural gas, that it would be nice

10   if we could create jobs in those sectors.  Connected

11   with education, research and development is an

12   important part, aspect.  Dr. Fowlkes was very

13   academic minded and she wanted to see a building

14   built.  We named it the Research Center.

15                 The original intent of that building

16   was to create bays that companies that had an idea or

17   a start-up company could come in, use that space, do

18   further research and development that was grant

19   funded, to try to get their product to market to

20   create jobs in the area.  So the building was built

21   for that purpose.

22        Q      All right.  And was it later that you

1    had some role in leasing some space in that

2    building?

3         A       Much later.

4         Q       Much later.  We're jumping far ahead,

5    aren't we?

6         A       Yes.

7         Q       All right.  Let's continue on with the

8    Amended Complaint paragraph ten.  And this is where

9    we begin, "Matlock was selected for the Executive

10   Director position as a result of the substantial

11   influence of Senator Bill Carrico, Chairman of the

12   Board of Trustees of the Southwest Virginia Education

13   Center, due to his political affiliation."

14             I want to ask you, what facts do you

15   have to support the allegation of that first sentence

16   of paragraph ten, that Carrico had any substantial

17   influence in getting Matlock hired?

18        A       Dr. Fowlkes announced to the Board of

19   Trustees in January of '15 that she would be retiring

20   June 30th.  Sometime in the Spring of '15 a job

21   description was listed for her position and a posting

22   was put out for her position.  And it was a

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 70 of 283   Pageid#:
1115

1    nationwide posting.  It was not just limited to the

2    state.

3                    There were a number of applications

4    coming in.  I had access to those applications, and

5    at one time there were as many as 40, one of which

6    was mine.  I attended the Tobacco Commission meeting

7    in April of '15, and Senator Carrico took me to the

8    side and he said, I know you're applying for the job,

9    but I want to make you aware that I'm giving the job

10   to David Matlock.

11        Q      And what was the exact date of that

12   conversation with Bill Carrico?

13        A      All I can tell you is it was at the

14   April Tobacco Commission meeting that was in

15   Martinsville.  We would have to go back to look at

16   the Tobacco minutes to see the date.

17        Q      Okay.  But so if that conversation

18   occurred in April of 2015, Carrico wouldn't have been

19   the Chairman of the Board of Trustees, would he?  The

20   coal man was.

21        A      Kevin Crutchfield was chairman until

22   June.

1      Q    Okay.  Well, you see how that reads in

2  paragraph 10?  That's incorrect, isn't it, or

3  misleading, the way that reads in paragraph ten?

4      A    It depends on the time you're talking

5  about.

6      Q    It depends?  What do you mean by is?

7      A    Because Senator Carrico became Chairman

8  of the Board in the middle of June that year.  The

9  board met and named him chairman.

10     Q    He was not Chairman of the Board when

11  he allegedly had this conversation with you?

12     A    He was Chairman-elect at that time.

13     Q    Excuse me?

14     A    He was Chairman-elect at that time.

15     Q    Okay.  And what did you say to this

16  announcement by Senator Carrico that he apparently

17  had decided that Mr. Matlock was going to become

18  Executive Director?

19     A    I said, that's certainly your

20  privilege.

21     Q    Okay.  Well, who had the hiring

22  authority for that position?  You applied for the

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 72 of 283   Pageid#:
1117

1    position.  Who would have had to have hired you, had

2    you been hired?

3          A       The Board of Trustees.

4          Q       And how many people were on the Board

5    of Trustees at that time back in 2015 when this

6    position --

7          A       Approximately 23.

8          Q       Okay.  And that would require a

9    majority of the board vote?

10         A       Correct.

11         Q       Not Senator Carrico's sole vote?

12         A       Correct.

13         Q       Okay.  So whether you wanted the

14   position that these other 40 applicants that you've

15   mentioned wanted the position, or Dave Matlock wanted

16   the position, 23 members of the Board of Trustees of

17   the Center would have to agree, a majority of the 23

18   would have to agree?

19         A       Correct.

20         Q       So where was Bill Carrico's substantial

21   influence factually?

22         A       He commented to me on that same date

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 73 of 283   Pageid#:
1118

1    that he was going to make a visit to Kevin

2    Crutchfield to let him know of his wishes.  Prior to

3    that time frame, Kevin Crutchfield had said to me

4    personally that he supported me for the position and

5    I thanked him for that.  But as I told him, I took

6    the job for retirement purposes.  I did not take it

7    to become Executive Director.

8              I needed ten years in VRS, and so I

9    felt like that -- there were maybe seven people

10   interviewed, selected to be interviewed by the

11   Interview Committee.  I was one of those, and I felt

12   like my interview was very cursory; it was ten

13   minutes.  And that very evening before the interviews

14   were complete, I received a phone call that said that

15   they had a better qualified applicant.

16             And so I felt like that that was a

17   decision made quickly, and I felt like that that was

18   influenced by Senator Carrico's decision.

19        Q    Okay.  I felt like.  That's subjective

20   feelings.  What objective belief led you to feel that

21   way?

22        A    I had feedback from committee members

1    that Senator Carrico had contacted them and asked

2    them to support his desire.

3        Q       What committee member?  Which committee

4    members told you that?

5        A       Jeff Webb, Joyce Brooks, Philip

6    Puckett, Marcia Gilliam, Kevin Crutchfield, Sean

7    McMurray.

8        Q       Crutchfield, and who was our last?  You

9    mentioned Crutchfield.  I didn't catch the last?

10       A       Kevin Crutchfield.

11       Q       Okay.  And you named one more person,

12   didn't you?

13       A       Sean McMurray.

14       Q       Okay.  So those six people told you

15   that?

16       A       Yes.

17       Q       That Carrico had called them?

18       A       Yes.

19       Q       Any other board members except those

20   six tell you that, that Carrico had called them and

21   stated what you just said?

22       A       I think that's all.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 75 of 283   Pageid#:
1120

1      Q    All right.  And what was there

2  objectively about your job interview -- you say you

3  were one of seven interviewed.  What was there

4  objectively about that interview that led you to your

5  subjective belief that it was cursory?

6      A    I was not asked questions specifically

7  related to my ability to do the job as director.

8  Each person had a question that they asked.  The

9  majority of those around the board started their

10  question with, well, we already know you, we know

11  what you have done or can do, but my question is X.

12         They would ask their question.  I would

13  answer it.  Went around the room.  The end.  Out.  20

14  minutes.

15      Q    All right.  And this was certainly a

16  private interview with you and the board?

17      A    Yes.

18      Q    And so you were not in attendance at

19  any of the other interviews of the six additional

20  people?

21      A    Yes, I was.

22      Q    You got to attend each other's

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 76 of 283   Pageid#: 1121

1    interviews?

2          A       No.  But as interim director -- and I

3    had already been removed from the list -- I

4    participated in the interviews of two other

5    candidates.

6          Q       Who were they?

7          A       I don't recall.  Carol.  That's all I

8    can remember.  Dr. Carol someone from Minnesota.

9          Q       Hold one second.  Okay.

10         A       I don't remember the name of the other

11   candidate.

12         Q       Okay.  So it was a Carol from

13   Minnesota?

14         A       Uh-huh.

15         Q       And another candidate, male or

16   female?

17         A       It was female.

18         Q       And they were interviewed and you said

19   you participated.  What was your role in --

20         A       I asked Senator Carrico, who was

21   Chairman of the Board, as interim director did he

22   want me to participate in these activities, and he

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 77 of 283   Pageid#: 1122

1    said it was my choice.  I chose to be involved in all

2    aspects of the Center when I became interim

3    director.

4          Q      When did you become interim director?

5          A      July 1st when Dr. Fowlkes retired.

6          Q      When would you have been interviewed?

7          A      I was interviewed sometime that summer.

8    I could not tell you.

9          Q      Before or after July 1?

10         A      After.

11         Q      So you were the interim director when

12   you were interviewed?

13         A      Yes.

14         Q      So it would have to have been after

15   July 1?

16         A      Yes.

17         Q      You were named interim director by

18   whom?

19         A      The Board of Trustees.

20         Q      Okay.  The same Board of Trustees that

21   gave you a cursory interview?

22         A      Yes.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 78 of 283   Pageid#:
1123

1        Q       Okay.  And what did you understand your

2   role as interim director to be?

3        A       To continue the sound fiscal and

4   operational work of the Center.  I received a letter

5   from Senator Carrico approximately four days into my

6   position telling me what my limits were, that I was

7   to move forth as usual, except for those limits.

8        Q       And we will look at that.  We'll look

9   at that communication.  Essentially, what the limit

10  is, you're not going to make any big hiring and

11  firing changes here, that were your limits was with

12  personnel?

13       A       That was his statement.

14       Q       Right.  That was your only limits?

15       A       I would have to look at the

16  statement.

17       Q       All right.  We'll look at that this

18  afternoon after lunch.  Now, I'm going back to

19  paragraph ten, because we got ahead of ourself (sic)

20  with interim directorship and the interview.  So I'm

21  going back to -- we say -- the sentence that we left

22  off, we talked about him hiring Matlock.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 79 of 283   Pageid#:
1124

1          Where did, even in the statement that
2    you had earlier testified to that you say Carrico
3    made to you, the statements, where was political
4    affiliation ever discussed?
5          A      Mr. Carrico had made it very clear to
6    me that David had been a loyal supporter of his, and
7    that he had a lot of respect for Mr. Matlock's work
8    at the community college.  And Mr. Carrico runs on a
9    Republican ticket, so I would assume support would
10   mean supporting that.
11         Q      All right.  Carrico was familiar with
12   Matlock's work at the community college?
13         A      According to his statement, yes.
14         Q      According to Senator Carrico?
15         A      Yes.
16         Q      And you know that Senator Carrico, when
17   we see him on the TV screen, it's always Carrico and
18   it has got a little R after his name, correct?
19         A      Correct.
20         Q      He's a Republican?
21         A      I assume.
22         Q      So you assumed he was a Republican, and

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 80 of 283   Pageid#:
1125

1    you knew he knew David Matlock from the Community

2    College and thought highly of him, so, hence, you

3    make the leap that it's got to be because of his

4    political affiliation?

5           A      Mr. Carrico indicated to me in that

6    April statement that David had supported him, and to

7    me that meant supported him politically.

8           Q      But he didn't say that?

9           A      He did not say politically.

10          Q      Was there any other, in that April

11   statement, any other -- let's get the entire

12   statement, because this was additional to what we

13   talked about the first time.

14               Tell me everything else, if you haven't

15   stated it before, tell me anything else that Carrico

16   told you in that April statement except what we've

17   now discussed.

18          A      He just made the comment he was going

19   to see Kevin Crutchfield, who was then Chairman of

20   the Board, who had verbalized his support for me, to

21   let him know of his wishes.

22          Q      All right.  And then when is the

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 81 of 283   Pageid#:
1126

1    Matlock statement?

2          A       That was prior to that.  He opened

3    with, I want you to know that I am supporting David

4    Matlock for that position.

5          Q       All right.  Go ahead.  I'm sorry.

6          A       He followed by saying, I will be

7    speaking with Kevin Crutchfield, who was Chairman of

8    the Interview Committee, as well as the Board to let

9    him know of my feelings.  That was the

10   conversation.

11         Q       But Senator Carrico never directly or

12   expressly mentioned political affiliation at any time

13   he discussed this position with you?

14         A       At that time, correct.

15         Q       At any time?

16         A       He inferred it.

17         Q       My question was, did he ever expressly

18   say that?

19         A       I don't recall.

20         Q       All right.  Could have, could not

21   have?

22         A       Could not have, could have.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 82 of 283   Pageid#: 1127

1        Q       Uh-huh.  Now, next sentence in

2   paragraph ten, "Both Matlock and Senator Carrico are

3   Republicans."  It's not hard to figure that Senator

4   Carrico is a Republican.  How did you know Matlock's

5   political affiliation, if any?

6        A       He made it public throughout the

7   building, his comments of support of Senator Carrico.

8   When President Trump was running for office, he had a

9   personalized license plate with G, standing for grand

10  old party, on there.

11              He made it very obvious with

12  Ms. Brooks, who was a known Republican.  She would

13  tell you quickly that she was Republican.  They would

14  kind of laugh and make comments about the Republican

15  party.  And it appears that another employee, Adam

16  Tolbert, who was the 90th district congressional

17  chairman of the Republican party, had run for office,

18  local office on the Republican ticket.  He became

19  friendly with him, and they seemed to all support the

20  same beliefs with their comments they made at the

21  Center.

22              Q       All right.  Now, you've jumped ahead

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 83 of 283   Pageid#:
1128

1   and you told me a lot, and we will go back into all

2   that.  I'm just reading the line in your complaint.

3        A      Okay.

4        Q      So after we immediately -- and I know

5   you provided information.  You probably did not write

6   this pleading, but right after we talk about the

7   political affiliation, our next sentence is, "Both

8   Matlock and Senator Carrico are Republicans," which

9   is just a statement of fact.

10              I want to know how, at the time before

11  David Matlock's hiring, did you know what his

12  political affiliation, if any, was.

13       A      Prior to his hiring, I had no idea what

14  his political affiliation was.

15       Q      Right.  And when you were saying it was

16  clear in the building, and in all the comments that's

17  going to be in the record, and I'm not going to try

18  to repeat them, or repeat them verbatim, but your

19  comments about Joyce Brooks and it was all over that

20  they were Republicans and Trump was running and all

21  this stuff, that was after Matlock was hired?

22       A      Yes.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 84 of 283   Pageid#:
1129

1      Q      Okay.  I'm going through this paragraph

2   ten of the complaint where we are leading up to the

3   hiring.  So that's where my mindset is now.  So any

4   of that statement that you made earlier was after

5   Matlock had been hired?

6      A      Those statements were after Matlock was

7   hired.

8      Q      Okay.  Now, we have discussed -- no,

9   tell me this.  How, in the Commonwealth of Virginia,

10  does one register as a Democrat at age 18, or at any

11  age whatsoever?  How does one do that?

12     A      At the time I registered to vote, I had

13  to register as a Democrat or a Republican.

14     Q      Did you become a registered voter at

15  age 18 in another jurisdiction except the

16  Commonwealth of Virginia?

17     A      No, sir.

18     Q      So you don't know whether or not --

19  let's see, you say you're 63 years old.  You would

20  have registered to vote near the time I did.  Are you

21  saying at the time you registered to vote in

22  Washington County, Virginia, within the Commonwealth

1   of Virginia, that one expressed party affiliation

2   when they voted?

3          A      I did.

4          Q      That's your testimony under oath?

5          A      To the best of my memory I did.

6          Q      All right.  And then we talked,

7   "Carmack was told not to apply for the information."

8   You have already told me that.  Look at that

9   statement.  Have we already covered that with your

10  previous testimony?

11         A      Yes.

12         Q      Okay.  Anything additional you remember

13  except what is written and what we talked about,

14  "Carmack was told not to apply?"  Any other facts

15  come to you?

16         A      No.

17         Q      None?

18         A      None.

19         Q      Okay.  Thank you.  And then the next,

20  "In fact, when Carmack asked about an increase in pay

21  for filling in as interim, Senator Carrico told him

22  to ask Matlock when he arrived, despite the fact that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 86 of 283   Pageid#: 1131

1   Matlock had not been hired for the position yet."

2                When did that conversation occur?

3   That's another conversation.

4        A      That conversation took place after I

5   received the phone call from the Interview Committee

6   that I was not the selected candidate, but the final

7   candidate had not been named publicly.  And I spoke

8   with Bill, since he, quote, was my supervisor as

9   interim director, and suggested that they consider,

10  as is normal in state jobs when you take on

11  additional responsibilities, a temporary increase in

12  pay for the duties.

13               And he said that that would be up to

14  David, that I would need to ask him once he was on

15  board.

16       Q      And was this after your interview?

17       A      It was after my interview.

18       Q      Was it after the interview of these

19  other ladies that you participated in or before?

20       A      I can't remember.

21       Q      So you can't remember if you had

22  participated in any interviews as interim director at

1    the time this statement was made?

2          A      No, sir, I can't.  It was -- mine had

3    been over.

4          Q      And one thing, and I want to make sure

5    your testimony is clear and I'm clear, because I get

6    it confused in going through this stuff.  But there

7    is a difference between the hiring committee that we

8    are talking about and the board of the Foundation,

9    isn't there?

10         A      Correct.

11         Q      And wasn't Kevin Crutchfield -- he was

12   not chairman of the hiring committee, just the

13   board?

14         A      No.  He was chairman of the hiring

15   committee.

16         Q      He was chairman of the hiring

17   committee?

18         A      He was.

19         Q      And wasn't Senator Puckett serving as

20   the committee chair?

21         A      Not that I recall.

22         Q      You would defer to whatever the

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 88 of 283   Pageid#:
1133

1    official records show?

2          A      Sure.

3          Q      Do you know Senator Puckett's political

4    affiliation, sir?

5          A      All I know about Senator Puckett is

6    what was in the press when he was in Democratic

7    office and resigned.

8          Q      Okay.  Look at, we are still on

9    paragraph ten.  You said, "Carmack never received

10   additional pay for being interim director."  Two

11   questions.  Did you ever ask for it?

12         A      I did.

13         Q      Who did you ask for it?

14         A      David Matlock.

15         Q      What did Mr. Matlock say when you asked

16   for interim pay for your short-term as director?

17         A      He told me I was paid too much in

18   comparison to the other department directors and he

19   wasn't going to do it.

20         Q      When did that conversation occur?

21         A      That conversation would have occurred

22   in probably November or December of '15.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 89 of 283   Pageid#:
1134

1     Q      Well, after he had come on as --

2     A      He came on 1st of November full-time.

3     Q      Okay.  Well, actually, we will get into

4  the next sentence and see which is right, your

5  testimony or the allegation in the Amended Complaint.

6  "Matlock was to begin work as Executive Director on

7  October 1, 2015, but he did not appear on the job

8  until October 15, 2015."  Which is correct?

9     A      Both.  I was told by Senator Carrico

10 that Mr. Matlock would begin work October 1st, but

11 because he had commitments at the community college

12 that he needed to fulfill, he would come down to the

13 building to say hello, but he was around two weeks

14 before he began to be there on any kind of regular

15 basis.  And for the month of October he was in and

16 out between the Higher Ed Center and community

17 college, which was next door.

18    Q      Right.  So he was working at both of

19 them?

20    A      Yes.

21    Q      Like you were working for your health

22 management company?

1          A      Yes.

2          Q      All right.  But he was on the job

3    October '15?

4          A      To the best of my knowledge.

5          Q      All right.  Did you know Mr. Matlock

6    before he was hired as Executive Director?

7          A      I knew him socially.

8          Q      What do you mean by that?

9          A      Well, I had met him in public many

10   times.  We belonged to the same Rotary Club.  Hello,

11   David, hello, Duffy was the extent of our

12   relationship, but yes, I knew him.

13         Q      Prior to the time he was hired as

14   Executive Director had you ever been to his house?

15         A      No.

16         Q      Had he ever been to yours?

17         A      No.

18         Q      Ever gone out to dinner together?

19         A      No.  Wait.  He invited us to a

20   Christmas dinner after he came on board.

21         Q      Yes, sir.  Thank you for the

22   clarification.  Did you like him, dislike him, before

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 91 of 283   Pageid#:
1136

1   he came on board?

2       A      I didn't have an opinion about

3   Mr. Matlock before he came on board.  I didn't have

4   enough interaction with him to have an opinion about

5   him.

6       Q      And you didn't have any, whether

7   opinion or knowledge, factual knowledge, you didn't

8   know anything about his job responsibilities and

9   qualifications while at the Community College,

10  Virginia Highlands?

11      A      I knew what his job title was at

12  Virginia Highlands, and I knew through public

13  speeches that he would make about the Foundation at

14  the community college or development or recruitment

15  of students, that those were the types of things that

16  he was involved with.

17      Q      So you had no opinion one way or the

18  other about his service while he was employed at

19  Virginia Highlands Community College?

20      A      Personally, no.

21      Q      Well, hearsay, scuttlebutt, anything

22  you want to reminisce about?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 92 of 283   Pageid#:
1137

1        A       No.

2        Q       So you would have no information from

3   any source?

4        A       No factual information from any

5   source.

6        Q       Okay.  Opinionated information?

7        A       I heard a lot of opinions about

8   Mr. Matlock through various committees that he served

9   on.

10       Q       When was that?

11       A       For years.

12       Q       And what opinions?

13       A       Didn't show up, late, didn't follow

14  through, always wanted to take credit for someone

15  else's work.  Those were the type of opinions I

16  heard, but I didn't know any of that to be true.

17       Q       Right.  You could not vouch for it but

18  you had heard such information?

19       A       Up to that point, that's correct.

20       Q       And that point would be before you even

21  started working for him?

22       A       Correct.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 93 of 283   Pageid#:
1138

1        Q       So would it be fair to say, at least by

2   reputation, that you had heard, nothing that you

3   could swear to, but by scuttlebutt or reputation or

4   gossip or ever how we want to characterize it, you

5   had heard some negative things about his work at the

6   community college?

7        A       Correct.

8        Q       All right.  Looking at paragraph

9   eleven, it says, "Dr. Fowlkes was a strong Democratic

10  supporter and she hired Carmack.  Carmack was Dr.

11  Fowlkes' pick to be the successor Executive

12  Director."  Several questions from paragraph eleven.

13       A       Uh-huh.

14       Q       First of all, it is a fact that Fowlkes

15  hired you as CFO?

16       A       She did.

17       Q       Okay.  Now, tell me what factual

18  information, what allows you to say that you were,

19  Fowlkes' pick to be successor Executive Director?

20       A       She said to me on many occasions, even

21  prior to hiring me, that she was looking for a

22  successor for her position.  I never accepted that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 94 of 283   Pageid#:
1139

1   answer, because I knew that that position would be a

2   very political position.

3              And what I looked at was that I was 57

4   years of age, and I didn't have a pension plan.  And

5   that state job looked very attractive to me, that if

6   I worked until the mandated age or worked until 70,

7   that I would have a reasonable pension from the

8   Commonwealth of Virginia.  So in talking to Dr.

9   Fowlkes, I never made the assumption I would be

10  director.  I negotiated a salary at the position that

11  I knew if I had that for ten years, I would receive a

12  nice retirement check.

13             Now, many people on the Board of

14  Trustees came up to me and said, oh, you would make a

15  great director.  We hope you're going to apply for

16  that.  I just took that as a compliment, said thank

17  you and went on, but that's not the reason I went to

18  work there.

19        Q    Who was making these at-a-boy

20  statements to you?

21        A    Members of Board of Trustees.

22        Q    Who?  Specifically which ones?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 95 of 283   Pageid#: 1140

1          A       Dr. Ron Proffitt, Kevin Crutchfield,

2    Marcia Gilliam, Susan Short, from Virginia Tech,

3    Cecil Drane from Old Dominion University.

4          Q       Anyone else you recall?

5          A       I can't recall who the members were

6    back then.

7          Q       All right.  So looking for successors,

8    when were you ever led to believe that you were going

9    to be that person by Ms. Fowlkes, by Dr. Fowlkes?

10         A       She said that to me before she hired

11   me, I want you to be my successor.

12         Q       All right.  Well, that's not a contract

13   of employment, is it?

14         A       It's not.

15         Q       And you didn't take it as such?

16         A       I did not.

17         Q       It was a complimentary confidence

18   builder to an employee coming on board, don't you

19   think?

20         A       I just viewed it as a compliment from a

21   controlling lady.  That was it.

22         Q       All right.  We spoke earlier and you

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 96 of 283   Pageid#:
1141

1　told me that for one to become Executive Director at

2　the Center, it would take a majority vote of 23 board

3　members?

4　　　　　A　　　Correct.

5　　　　　Q　　　So Rachel Fowlkes was not the hiring

6　authority for her successorship (sic), was she?

7　　　　　A　　　No, and I knew that when she made that

8　comment to me.

9　　　　　Q　　　All right.  So this statement that you

10　testified to just now, what does the fact that you

11　subjectively was her pick to be successor, what does

12　that mean to you?

13　　　　　A　　　It's misleading.

14　　　　　Q　　　How do you know it was untrue when

15　made?

16　　　　　A　　　I think it was true on her part, but

17　she didn't have the authority to make those

18　statements, but I knew that at the time.

19　　　　　Q　　　Okay.

20　　　　　A　　　But someone who didn't have that

21　knowledge could have been well mislead by that.

22　　　　　Q　　　But you weren't because --

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 97 of 283   Pageid#: 1142

1          A       No, I was not.

2          Q       All right.  Now, this just now occurred

3     to me, looking at paragraph eleven.  "Dr. Fowlkes was

4     a strong Democratic supporter and she hired Carmack."

5     Why is that important?

6          A       Rachel was a well-known Democrat in

7     Washington County, Virginia.  She was very active in

8     the Democratic party, as well as her former husband.

9     They gave lots of money.  They participated.  They

10    campaigned actively.  They had bumper stickers.  I

11    mean it was a known fact.

12         Q       Uh-huh.

13         A       When I was hired, there was an

14    assumption made by a group of folks in the center who

15    did not care for Dr. Fowlkes and was just ready for

16    her to move on, felt like that she had stayed long

17    enough, who all represented themselves as Republican.

18    And they would make the comment, if you got the job,

19    it would just be a continuation of another Democrat.

20    They did not know my political affiliation.

21         Q       Excuse me?

22         A       They did not know my political

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 98 of 283   Pageid#:
1143

1    affiliation.  But the comment was made, if you got

2    the job, it would be a continuation of Rachel and the

3    Democratic party.

4        Q      How could anyone have any basis in fact

5    for making that statement if we don't know your

6    political affiliation?

7        A      They made the assumption that because I

8    was Rachel's pick, I was a Democrat.

9        Q      You believe that?

10       A      I believe that.  It was said to me.

11       Q      All right.  So just in the blatancy

12   department, how is that any different than -- if

13   everything you said is true for purposes of my

14   question, and Carrico is making all these

15   behind-the-scenes political dealings for Republicans,

16   how is that any different than what happened to you

17   by getting signed on to CFO?

18       A      It's inappropriate on both parts.

19       Q      All right.  Comments -- and I'm on

20   paragraph 12.

21       A      Okay.

22       Q      "Comments were made to Carmack after

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 99 of 283   Pageid#:
1144

1   Matlock was hired that he, quote, 'belonged to the

2   wrong party,' end quote or, quote, 'you belong to the

3   other party', end quote, or words of that effect.

4   These comments were made by at least Adam Tolbert,

5   Jeff Webb and David Matlock."

6              My recollection is you testified a

7   little bit to that earlier, you had mentioned those

8   comments when we jumped ahead.  Now tell me every

9   time that Adam Tolbert made any partisan statement to

10  you.

11       A       Adam is a very introverted person.

12  He's a very intelligent person.  The only time I ever

13  heard Adam talk was about politics.  That was his

14  hobby, his passion, and he stayed current with

15  political actions.  And he was very active in the

16  Republican party and had worked as campaign chairman

17  for candidates in Roanoke and southwest Virginia in

18  the past, and would often make comments, you're on

19  the wrong side, the wrong party.

20       Q       Okay.  And the way you made it was

21  just, the way this sounded -- and this is not being

22  videotaped -- but that was just a matter-of-fact

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 100 of 283   Pageid#:
1145

1    statement?  Adam's statement to you was just a

2    matter-of-fact, you're in the wrong party?

3            A       Correct.

4            Q       Wouldn't any true believer, and I mean

5    true believer from the true blue to the true red,

6    isn't every true believer going to believe that their

7    opponents are of the wrong party or misguided?

8                    MR. GRIMES:  Objection;

9            argumentative.

10                   MR. KINCER:  It's not argumentative.

11           Are you telling him not to answer the

12           question?

13                   MR. GRIMES:  I'm just trying to get my

14           objection on the record.  Wait just a moment

15           and I'll be finished.

16                   MR. KINCER:  Okay.

17                   MR. GRIMES:  Objection to the form of

18           the question; argumentative.  Go ahead and

19           answer the question, subject to objection.

20                   THE WITNESS:  Dr. Fowlkes, despite the

21           fact that she was a Democrat in the community,

22           ran a very strict policy at the hiring center;

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 101 of 283   Pageid#:
1146

1    politics doesn't matter, because you are going

2    to always have a Republican administration or

3    Democratic administration and funding is going

4    to come from both, and that was instilled.

5    Everyone that worked there knew that, politics

6    was not discussed.  Politics was not brought

7    in during her administration.

8         Political division began when she

9    resigned and Senator Carrico became Chairman

10   of the Board.  And we had employees in the

11   building who became very vocal about being

12   Republican and supporting the Republican party

13   and they took the lead in surrounding

14   themselves with Mr. Matlock, and they began to

15   make comments openly about, positive comments

16   about the Republican party and Senator Carrico

17   and what a relief it would be to have Rachel

18   out of the building and new administration and

19   new leadership.

20

21   BY MR. KINCER:

22        Q    All right.  When did the shop that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 102 of 283   Pageid#:
1147

1    Rachel ran, the non-partisan, the neutral, there's

2    both parties and we don't mention it here, when did

3    that atmosphere change?

4           A      When David arrived.

5           Q      After he was already hired?

6           A      Yes.

7           Q      All right.  But when were you getting

8    the comments during your candidacy or potential

9    candidacy for Executive Director, well, that would be

10   great, because we can have another Democrat, this

11   will be a continuation of the Democratic leadership?

12   When did those occur, sir?

13          A      Those occurred to me during the

14   interview process by employees of the Center, two of

15   which were on the Interview Committee.

16          Q      And who were they?

17          A      Joyce Brooks and Jeff Webb.

18          Q      That was said to you in the

19   interview?

20          A      Said to me to my face at the Center.

21          Q      Okay.  Not in the interview?

22          A      Not in my interview.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 103 of 283   Pageid#:
1148

1        Q      Just pass them in the hall or --

2        A      Yes.

3        Q      Okay.  And that was before your

4   interview?

5        A      I don't remember whether it was before

6   or after.

7        Q      Okay.  So apparently Dr. Fowlkes'

8   non-partisanship had not extended to those two?

9               MR. GRIMES:  Objection to the form.  Go

10         ahead and answer the question.

11              THE WITNESS:  Dr. Fowlkes had already

12         left June 30.  This was after that.  This was

13         after David's announcement that he was going

14         to apply for candidacy and interviews were

15         taking place.

16

17  BY MR. KINCER:

18       Q      When was that announced?

19       A      I think we interviewed probably in

20   August.

21       Q      As interim director during you -- that

22   was from July 1 of 2015 and through when, October?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 104 of 283   Pageid#:
1149

1        A       I say October 15 but until David was

2    there full-time.

3        Q       Okay.  Of 2015?

4        A       Of 2015.

5        Q       During the hiring or recruiting process

6    for the executive director's position, did you have

7    access to applicant files and information,

8    references, curriculum vitae, that type of stuff?

9        A       All applications that came in for the

10   position were to be directed to Joyce Brooks as

11   Director of Human Resources.  So I did not see the

12   written applications of any of those people.  I just

13   knew the numbers that came in.

14       Q       So your response tells me that you told

15   me what the preferred method would be, that they were

16   to go to Joyce Brooks?

17       A       Correct.

18       Q       All right.  So leaving aside whether

19   they were or not, is it your testimony that you never

20   reviewed any other applicant's --

21       A       No, I did not.

22       Q       Let me finish my question.

1     A     Okay.

2     Q     You never reviewed any other

3 applicant's hiring materials and supporting documents

4 while interim director?

5     A     I did not.

6     Q     Thank you.

7     MR. KINCER:  Off the record.

8

9     (Discussion off the record)

10

11 BY MR. KINCER:

12     Q     All right.  You told me about Adam

13 Tolbert's comments that you were the wrong party.

14 With what frequency were those comments made to you

15 by Adam Tolbert?

16     A     They were made three times.

17     Q     All right.  And let's talk about Jeff

18 Webb.  Who is Jeff Webb?

19     A     Jeff Webb was the manager of

20 Information Technology Department.

21     Q     And what comments did he make to you

22 concerning any partisanship or party membership?

1          A       His comments were around his support

2     for Senator Carrico as a Republican.  His comments

3     were that, although we differed -- and I say that as

4     a quote -- he supported the Republican party and

5     President Trump.  And so, again, he inferred that I

6     was a Democrat.

7          Q       But those matter-of-fact statements,

8     are those statements the extent of Webb's comments to

9     you?

10         A       Yes.

11         Q       Okay.  And how many times were those

12    comments made to you?

13         A       Twice.

14         Q       Okay.  And this was after Matlock's

15    hiring?

16         A       One was prior to.

17         Q       One prior.  Whose?  Webb's?

18         A       Webb's.

19         Q       One comment prior and two after?

20         A       Yes.

21         Q       Okay.  Let's talk about the defendant,

22    David Matlock.  How many comments did he make to you

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 107 of 283   Pageid#:
1152

1    concerning partisanship?

2          A      I'm going to say four.

3          Q      Okay.  And this was, obviously, after

4    he was hired as director?

5          A      Yes.

6          Q      All right.  Tell me what the comments

7    were and when, to the best of your recollection, they

8    were made?

9          A      The comments -- his political

10   favoritism to the Republican party became obvious in

11   the building and upon arrival.  Those comments were

12   made to me in 2016.  Once was just kind of a

13   flippant, in the hall, you're in the wrong party

14   conversation.

15                Twice in my office where we were trying

16   to discuss budgetary measures, and he was letting me

17   know that he had the support of the Republican party,

18   particularly Senator Carrico, that I didn't need to

19   worry about preparing budget or requesting additional

20   funds, that he had a sugar daddy that would take care

21   of that, referring to Dr. Carrico.

22         Q      That was in his exact words?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 108 of 283   Pageid#:
1153

1        A       Yes.

2        Q       And that was in the budget discussion

3   with Matlock's office?

4        A       In my office.

5        Q       In your office in 2016?

6        A       Yes, sir.

7        Q       Anyone else present?

8        A       Debbie Hensley was present for one of

9   those comments.

10       Q       Which one was she present for?

11       A       That we didn't have to worry about

12  submitting a capital budget request, that Senator

13  Carrico would take care of that for us.

14       Q       Okay.  When is the sugar daddy comment

15  made?

16       A       Sugar daddy comment was made to me.  If

17  I remember correctly, it was in a manager's meeting

18  with Joyce Brooks, David, myself and Jeff Webb

19  present.

20       Q       All right.  And that's, so that's --

21  was there another statement made?  You prefaced your

22  answer that we're talking about that Matlock's

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 109 of 283   Pageid#: 1154

1   political favoritism was apparent upon his arrival

2   there.  Was that by way of comment or did you have

3   some other --

4        A        It was comments about his devotion

5   toward Senator Carrico, and how he supported Senator

6   Carrico, and that he would do great things for our

7   Center.  Senator Carrico would do great things for

8   our Center.

9        Q        And so what other comments did Matlock

10  ever make to you?

11       A        Those were behaviors.

12       Q        Excuse me?

13       A        Most were behaviors.

14       Q        What behaviors did he make evidencing

15  partisanship or predilections?

16       A        Shortly after arriving, I made -- as

17  interim director, prior to arriving, I went up to his

18  office to congratulate him on being named executor.

19  And he told me how relieved he was that I had come up

20  to speak with him, that he was concerned about the

21  fact that he got the job and I did not, and that he

22  looked forward to working with me hand-in-hand.  We

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 110 of 283   Pageid#:
1155

1    shook hands, and I went back to my office, and that

2    was that.

3            When he first started coming to the

4    building in October he came into the building, and

5    Kathy Heitala, who is his administrative assistant,

6    which is -- I'll tell you quick, she is a Republican,

7    and a very strong special friend of Senator

8    Carrico -- Joyce Brooks, Adam Tolbert and Jeff Webb,

9    who, at that time, your three department managers

10   were Joyce, Jeff and myself, and the maintenance guy,

11   Eddy Sproles, who, more than likely, was out on sick

12   leave during this time.

13           David came into the building.  Everyone

14   went in his office and closed the door except me.  I

15   was not invited.  Following whatever took place in

16   that conversation, it became very apparent that he

17   was taking his leads as to what the issues at the

18   Center were from Joyce, Kathy and Jeff.

19           In November of '15, I felt it

20   imperative to go in and say, I would like to bring

21   you up-to-date on what is going on as interim

22   director.  So, A, I let him know that the Higher

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 111 of 283   Pageid#:
1156

1    Education Center was fiscally sound, and I talked

2    with him about the various pots of money that we had.

3              Number two, I reminded him that I

4    operated by the rules, I was the kind of guy that

5    didn't deviate from that, and that we were very

6    careful to operate the Center according to -- it's

7    called CAPPs.  It stands for the Commonwealth

8    Accounting Policies and Procedures.  Those are the

9    guidelines under which UVA and the Commonwealth

10   operate from an audit perspective.

11             In that conversation he asked me if I

12   knew what needling meant, and I said I did not.  And

13   so he proceeded to tell me that needling was when a

14   mother bird built a nest, and she put sharp objects

15   pointing upwards.  After the birds were hatched, she

16   would begin to take threads of that nest loose,

17   leaving the sharp prongs, which incentivised the

18   birds to leave the nest.  And that that was the

19   method he used to get people off the team that he did

20   not want.

21        Q      Okay.  And that's November 2015?

22        A      Yes.

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 112 of 283  Pageid#:
1157

1        Q        What did you think about that?

2        A        I took that as a pretty clear message

3    that he didn't care for me being a part of his team

4    based on the fact that I had been excluded to date

5    from any conversation pertaining to the business of

6    the Center or the finances of the Center.

7        Q        From any conversation?

8        A        From any.

9        Q        But how long had Mr. Matlock been there

10   at the time this conversation occurred, a couple

11   weeks?

12       A        Six to seven weeks.  When I say any,

13   I'm talking about individual conversations between he

14   and I.

15       Q        All right.  Let's see if there is

16   something shorter than this.  This is going to be a

17   long --

18                       (Pause in proceedings)

19

20   BY MR. KINCER:

21       Q        That's for you to review.

22       A        (Witness complying).

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 113 of 283   Pageid#:
1158

1        Q        All right.  Have you had a chance to

2   look at the June 17th Duffy Carmack?

3        A        Yes.

4        Q        Who is Susan Carkeek?

5        A        Susan Carkeek was at that time our HR

6   representative from UVA-Charlottesville.

7        Q        Is she the lady that told you, we don't

8   do any contracts, so don't worry, we know you work at

9   the ambulatory center?

10       A        I don't recall.  Again, that position

11  turned over very frequently as to who our rep was.

12       Q        All right.  And you wrote this

13  e-mail?

14       A        I did.

15       Q        All right.  And go to the second page

16  of that.  I'm going to have that marked as Exhibit

17  89, I believe, jointly, the two e-mails.  Have you

18  had a chance to review that?

19       A        Yes.

20       Q        All right.  And this is the -- at the

21  bottom is an e-mail from -- it's Senate District 40.

22  That's Bill Carrico's district, isn't it?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 114 of 283   Pageid#:
1159

1        A       Yes.

2        Q       And it's an e-mail to you from the

3   Senator?

4        A       Yes.

5        Q       And that's advising of what?  How did

6   you take that?  Is that what we talked about earlier

7   about him limiting you?

8        A       No.  He wrote a specific letter to me

9   limiting my power to hire, fire and to make other

10  changes at the Center, but that's separate from this

11  communication.

12       Q       Excuse me?

13       A       That's separate from this

14  communication.

15       Q       He said, "Please see enclosed..." --

16  and I don't have the attachment -- "...resolution

17  passed by Executive Committee during yesterday's

18  meeting, which outlines your roles and

19  responsibilities as interim Executive Director."

20       A       Correct.

21       Q       Did you recall seeing such an

22  attachment?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 115 of 283   Pageid#:
1160

1          A      I do.

2          Q      Okay.  And that limited of what the

3    Board wanted you to do?

4          A      What the Executive Committee asked,

5    yes.

6          Q      Right.  The Executive Committee of the

7    Board?

8          A      Yes.

9          Q      Which consisted of how many people?

10          A      It varied.  I couldn't tell you.

11          Q      Well, what's the most you remember and

12    what's the fewest?

13          A      I can remember three being on it.  The

14    most I ever remember on it is probably five or six.

15          Q      All right.  And then going up, did

16    you -- but did the information provided or this

17    e-mail from the Senator, did that upset you or bother

18    you?

19          A      I found it unusual under the situation

20    that I had been there for five years, and would be,

21    in a very short period of time.  I had no plans to

22    make any major changes, only to keep the Center

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 116 of 283   Pageid#:
1161

1    running.  If someone left, I would attempt to fill a

2    position or post a position.  I had no agenda, so I

3    was surprised as to why he would send that.

4          Q     All right.  When you say you had been

5    there five years, you had been at the Center five

6    years.  You had been interim director for a grand

7    total of 31 days?

8          A     Sure.

9          Q     All right.  And had you made any

10   statements, whether orally or in writing, that there

11   was going to be some big changes made around here

12   during the Carmack interim?

13         A     None.

14         Q     Or words to that effect?

15         A     None.

16         Q     Okay.  But you seemed to thank Senator

17   Carrico for providing that information.  Is that what

18   the e-mail of July 31, which is going to be page two

19   of Exhibit 89, is that what that said?

20         A     I don't understand the question.

21         Q     "Bill, thanks for the information from

22   the Executive Committee.  It's helpful to have

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 117 of 283   Pageid#:
1162

1    direction from this group.  Please be advised we are

2    hiring additional wage employees part-time to fill

3    vacancies in our Conference Services Department, and

4    a receptionist to replace Nicole Farrar, who's

5    leaving next week.  These are all wage positions that

6    are needed to continue effective operations of the

7    Center."

8                    So is that what you were telling him,

9    you had very limited changes?

10        A       Based on his correspondence to me of no

11   changes, I felt like I needed to have his permission

12   to make those changes.  So that's why I sent the

13   e-mail.

14        Q       And we will talk about some specific

15   individuals later.  But in reference to your July 31

16   e-mail to the Senator, where you're referencing a

17   vacancy in the conference service department, was

18   that one of the hourly, set-up-the-table jobs --

19        A       Those vacancies were, yes.

20        Q       -- that you were referring to.  Go

21   ahead.  I'm through.

22        A       Ms. Farrar worked as a receptionist at

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 118 of 283   Pageid#:
1163

1    the front desk.  And at that time that position came

2    under Conference Services.  She was leaving.  She was

3    moving.  And so that's what vacated the position as a

4    receptionist at Conference Services.  It was -- she

5    was wage, but she worked a lot of hours.  She was a

6    smiling face you saw most days when she came in

7    there.

8            Q      All right.

9                   MR. KINCER:  And did you mark that 89?

10           Would you hand that to the court reporter?

11

12                  (Exhibit Number 89 was marked for

13           identification)

14

15   BY MR. KINCER:

16           Q      During Mr. Matlock's Executive

17   Directorship of the Center and your duties as CFO of

18   this Center, did you two have a constructive

19   relationship?

20                  MR. GRIMES:  Objection to the form, the

21           definition of the word constructive.  Go ahead

22           and answer, subject to the objection.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 119 of 283   Pageid#:
1164

1    BY MR. KINCER:

2        Q        Positive, constructive relationship for

3    the good of the Center?

4        A        I never felt like we had a good

5    relationship.

6        Q        And tell me why that you thought that.

7        A        Having been interim director, when he

8    came down the first time, he did not set down and say

9    fill me in, bring me up-to-date.  He had some

10   individual group meetings by department, again

11   nothing in detail or executive level discussion with

12   me.

13             I was excluded immediately from

14   meetings with what I call his disciples, and that's

15   defined by Ms. Heitala, Mr. Webb, Mr. Tolbert,

16   Ms. Brooks.  And so I felt very much on the outside

17   from, upon his arrival.  And as he continued to work

18   there that relationship only grew more estranged.

19       Q        And more estranged from a professional

20   relationship?

21       A        From a professional relationship.

22       Q        And you grew more alienated and hostile

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 120 of 283   Pageid#:
1165

1    towards him, didn't you?

2         A      No, sir.

3         Q      All right.  Let's look at paragraph 14

4    to the Complaint, and this is a preface before we

5    start getting into the OSIG complaint.  You say,

6    "Thereafter, overtime plaintiff discovered that

7    Matlock was wasting and misusing agency funds and

8    resources.  Examples include the following:"

9              Now, let me recap.  You are interim

10   director from July 1 of 2015 to sometime in October

11   of 2015?

12        A      Correct.

13        Q      And David Matlock comes on as Executive

14   Director of the Center.  We know he was hired on

15   October 1.  Whenever he was there or not there is of

16   no consequence for this.

17             During the period of time from October

18   of 2015 onward, how long did it take you to discover

19   that Mr. Matlock was wasting and misusing agency

20   funds and resources?

21        A      Beginning very early in 2016, I noticed

22   that policies and procedures that were in place at

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 121 of 283   Pageid#:
1166

1   UVA related to hiring, accounts payable, accounts

2   receivable, were not being followed.  We would make,

3   myself, Debbie Hensley, Alicia Young, all the Finance

4   Department would make comments to him or reminders of

5   him of, this need to be done or signed by a certain

6   date, to try to help him along.

7               Very early on in January it begins, we

8   begin to think about budget for the next fiscal year.

9   Ms. Hensley and myself met with him on two or three

10  occasions to talk about how the budget process

11  worked.  He was not a good listener.  He appeared

12  very disinterested in what we had to say, and made

13  the comment that he would contact Christine Fields,

14  who was the person in the finance position prior to

15  my arrival, who had worked, who was currently then

16  working at Virginia Highlands Community College.

17              Again, I perceived that as either no

18  confidence in what we had to offer or no interest in

19  what we had to offer regarding the budget.

20  Mrs. Brooks, Joyce Brooks, had -- while I was interim

21  director -- had said to me she would be retiring

22  sometime around November.  Her birthday was sometime

1    in November, and I assumed she turned 65.  That

2    precipitated my meeting with Susan Carkeek in

3    Charlottesville that was referenced in the earlier

4    e-mail.  She was a department manager.  She was the

5    head of HR.  She was also our operations director;

6    she wore a couple of hats.

7                So I wanted to talk to Susan about the

8    process of that decision, refilling that position,

9    the timeline in posting that position, because,

10   obviously, it was a management scale position.  I

11   knew that that might happen about the time

12   Mr. Matlock would be coming to work, but the

13   groundwork for that, as far as posting the position,

14   would have had to have been done while I was interim.

15               And back to January of '16.  As soon as

16   Ms. Brooks, again, let Mr. Matlock know that she was

17   thinking about retiring in the not too distant

18   future, he immediately moves Adam Tolbert, who is a

19   young man who had worked at the Center for maybe

20   three years in Information Technology, into, quote,

21   shadow Ms. Brooks or to train for her position.

22               I went to Mr. Matlock at that time and

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 123 of 283  Pageid#:
1168

1    said, pre-selection at UVA is an issue.  And you need

2    to follow the policies and procedures that are

3    outlined; you can't just put someone in that job.

4    The comment was, he's just shadowing her.  He's just

5    training.  The issue with that was he was given

6    access, total IT access, to all information that

7    Ms. Brooks had as a senior level management;

8    salaries, reviews, hiring, posting positions, the

9    whole nine yards and he was, frankly, an employee in

10   IT.

11               And I had several employees in IT -- I

12   had two employees in IT come to me and express

13   concern that their co-worker in the next cubicle had

14   access to their evaluations and their salaries.

15        Q       Who were the two that complained of

16   that?

17        A       Nicky Raley and Austin Deirks.

18        Q       And that complaint was made to you

19   approximately when?

20        A       Probably in the Winter of '16.

21        Q       All right.  And you thought -- well,

22   strike that.

1            There was nothing, per se, wrong with

2    anyone shadowing another employee to learn their

3    jobs, is there, at the Center?

4            A       To me that's a perception that they are

5    going to be given that job.

6            Q       Who's perception, Mr. Carmack's or

7    someone else's?

8            A       Mine and also, according to UVA policy,

9    if there is a job opening, it needs to be posted,

10   qualifications posted, applications taken, screened,

11   and a decision made.  They frowned against

12   pre-selecting someone for the job prior to that

13   process.

14           Q       There was no job position open, was

15   there, at the time that you were fielding this

16   concern?

17           A       No.

18           Q       No position was open, so none of those

19   requirements came into play?

20           A       It was -- I considered it to be

21   unethical.  The employees of the Center shared that

22   with me.  They considered it unethical.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 125 of 283   Pageid#:
1170

1      Q      Who shared that with you?

2      A      I can't think of an employee that

3   didn't.

4      Q      So --

5      A      Except, except Kathy Heitala and Jeff

6   Webb.

7      Q      So every employee considered that

8   unethical in the IT section?

9      A      Yes, except Jeff Webb.

10      Q      Well, Heitala wasn't in IT, was she?

11      A      Right.

12      Q      So this occurred, if I'm -- and I want

13   to go more in order, but this is where you started,

14   so this is where we will go.  You're talking about --

15   if you will go to paragraph, page 7, and it's your

16   paragraph G.  And I think that's what we are talking

17   about.  That's OSIG number one.

18      A      Uh-huh.

19      Q      You see there in December of 2015?

20      A      Yes.

21      Q      "Upon retirement of on Human Resource

22   manager..."  That's supposed to be of, isn't it?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 126 of 283   Pageid#: 1171

1        A      It should be upon announcement of the

2  retirement.

3        Q      Okay.  Thank you.

4        A      Although she didn't retire forever.

5        Q      Right, she did.  So that, besides

6  grammatically in error, it's factually in error,

7  number g?

8              MR. GRIMES:  Objection to the form.

9        What's the question?

10

11  BY MR. KINCER:

12        Q      14 g.?  Question mark.  Is that right?

13  Is that a correct statement?

14              MR. GRIMES:  Is what a correct

15        statement?

16

17  BY MR. KINCER:

18        Q      "In December 2015, of upon the

19  retirement on Human Resource Manager, Joyce

20  Brooks..."  Was Joyce Brooks retired in December of

21  2015?

22        A      She announced she was going to retire

1    in the future.

2         Q     Okay.  With the certitude you have just

3    expressed, announced she was going to retire in the

4    future?

5         A     Yes.

6         Q     Okay.  So the position wasn't open?

7         A     No.

8         Q     Okay.  "...Matlock moved Information

9    Technology employee Adam Tolbert to Human Resources."

10   Is that what you were talking about, the shadowing?

11        A     He did.

12        Q     All right.  While Adam Tolbert was

13   shadowing Joyce Brooks, when did Ms. Brooks

14   eventually leave employment at the Center?

15        A     January 4, 2018.

16        Q     So about three years later after this

17   approximately?

18        A     I guess.

19        Q     Well, do the math.  December 2015.

20        A     Sure.

21        Q     All right.  So why did it take -- so

22   that occurred in December, that incident occurred,

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 128 of 283   Pageid#:
1173

1    and you were aware of that when it occurred?

2         A     Yes, she made it publicly known

3    throughout the building, announced it several

4    times.

5         Q     I'm sorry.  I might not have been

6    clear, or you made an assumption.  But you were aware

7    of this shadowing that ethically offended you per

8    your earlier testimony, and you were aware of it in

9    December of 2015?

10        A     Yes.

11        Q     All right.  And why does it wait over

12   two years to show up in an OSIG complaint?

13        A     There were a variety of abuse and

14   harassments that Mr. Matlock continued to put toward

15   me over '16 and '17.  And I am not accustomed to

16   working in an environment in that level or being

17   treated in that manner.  I don't take it lightly, and

18   I was always optimistic that he and I could find some

19   positive ground on which to work.

20              And so when it became so severe that it

21   was just almost intolerable for me to physically be

22   present, and certainly impossible for me to do my job

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 129 of 283   Pageid#:
1174

1    as chief financial officer, then I was forced with

2    the dilemma of his infractions were creating

3    audit exceptions.  And so I went to the State to ask

4    for the most constructive way for resolution.

5    Immediately they told me to go to OSIG, and that

6    would have been February of 2017.

7              But I continued to work through the

8    various departments of DHRM, in hopes there would be

9    some mediation or some outside third party brought in

10   to bring a constructive, less damning outcome instead

11   of straight to OSIG.  But that didn't happen, and so

12   in June I had no other choice, and upon

13   recommendation of five individuals at the State, I

14   filed a complaint.

15        Q    Let's talk.  Five individuals.  Tell me

16   all five individuals with the State that told you to

17   file, to do this?

18        A    I began my concern with setting down

19   with the ombudsman at the University of Virginia.

20   His name will come to me in a moment.  He

21   immediately, after listening to my concerns, picked

22   up the phone and called DHRM in Richmond and asked if

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 130 of 283   Pageid#:
1175

1   they could meet with me the following morning.  So I

2   went to Richmond and met with Gretchen White in DHRM,

3   who referred me to Amanda Monaco, who referred me to

4   Alex Morgan.

5            And there was an internal director of

6   DHRM -- and, I'm sorry, I don't know his name at that

7   point -- because there was question as to whether or

8   not as classification of an employee that I was with

9   UVA, whether I had the right to file a grievance or

10  not.  And so they had to take it to the director who

11  said I was eligible to file a grievance, but he

12  suggested I just report it to OSIG.

13       Q    Do you have a written decision,

14  document that shows your eligibility to file a

15  grievance?

16       A    I don't know.

17       Q    Do you ever recall seeing such a

18  thing?

19       A    I recall getting word from the

20  Department of Human Resource Management, and I don't

21  remember if it was an e-mail or if it was a phone

22  call, that I had been deemed eligible to file a

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 131 of 283   Pageid#: 1176

1    grievance.

2            Q       But you don't have that e-mail?

3            A       Not with me, and I don't know that I

4    have it in my presence.  I would have to look in my

5    files.

6            Q       And you don't know who sent you that

7    e-mail?

8            A       That e-mail would have come from Amanda

9    Monaco.

10           Q       Okay.  And have we exhausted all the

11   five people you talked to?  Are we missing -- is the

12   acting director the last one?

13           A       The acting director was the last one.

14   Now, following that visit, I had conversations with

15   the Secretary of Higher Education, who was Dietre

16   Trent's office, about this concern and that lady's

17   name was Alex Morgan.  And OSIG asked my permission

18   to send my complaints on to Peter Blake, who was the

19   director of what we call SCHEV, State Counsel of

20   Higher Education, to review, and Peter sent it back

21   and said it was not a SCHEV issue, it needed to be

22   dealt with with DHRM and ORT.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 132 of 283   Pageid#:
1177

1          Q       All right.  And what did you do next?

2          A       I waited.  Finally, by the end of June

3     I was feeling like that Mr. Matlock's errors, if I

4     didn't address them to OSIG, he would have just cause

5     in terminating me, because these errors had taken

6     place, and I had not followed up with them or

7     attempted corrective action.

8                  So I filed a report online at the end

9     of June to OSIG and, ironically, it did not go

10    through.  When you do a case on-line it's assigned a

11    case number.  I did this Thursday, and by Tuesday I

12    hadn't heard.  So I picked up the phone and called,

13    and Shawn Cowardin happened to be the investigator

14    who answered the phone.  I explained what had

15    happened.  He went into the system and looked.  And

16    he said, I see nothing.  He said, I don't understand

17    what happened, but resubmit it right now.  I

18    resubmitted it, and within an hour I had a case

19    number.

20         Q       All right.  So is the fact it didn't go

21    through of any significance to you?

22         A       Not at this point.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 133 of 283   Pageid#:
1178

1        Q      Okay.  You're just stating a fact?

2        A      Yes.

3        Q      All right.  But we started this, and we

4   will go back through the OSIG complaint in more

5   excruciating, painful detail after lunch.  But my

6   original question to you was, if you were aware in

7   December of 2015 that Mr. Matlock was doing something

8   unethical, why did you wait over two years to bring

9   that to anyone's attention?

10              MR. GRIMES:  Objection; asked and

11         answered.  Go ahead and answer that again.

12              THE WITNESS:  I had, first of all, it

13         smarts.  I thought, he's new, he'll learn,

14         he'll figure it out.  And it became apparent,

15         after six months of trying to assist him or

16         explain what the processes and policies were,

17         and those processes continued to be denied and

18         violated, they kind of grow on each other.

19              And so then the severity of them began

20         to increase.  And regardless of what feedback

21         we would give Mr. Matlock, it was ignored and

22         usually met with, I'm in a hurry.  I don't

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 134 of 283   Pageid#:
1179

1      have time.  I will deal with it later.

2             It wasn't until the end of '16 that I

3      felt like, this is severe enough that either I

4      could lose my job by not calling attention to

5      it, or I need to go to the state and ask for

6      assistance.

7

8   BY MR. KINCER:

9      Q      So you were concerned about any

10  nonfeasance on your part?

11     A      I was concerned that allowing it to

12  continue, I would be a party to it, having knowledge

13  of it.

14     Q      And that was one of the things that,

15  one of the factors that motivated you to file the

16  OSIG complaint when you did?

17     A      One of the factors.

18     Q      All right.

19     A      And may I just say, Brad Holland is the

20  ombudsman's name at UVA I could not recall.

21     Q      Thank you.  All right.

22             MR. KINCER:  What time is it?

1              MR. HARDY:  12:47.

2              MR. GRIMES:  Off the record.

3

4              (Discussion off the record)

5

6              (A lunch recess was taken)

7

8              (Exhibit Number 90 was marked for

9        identification)

10

11   BY MR. KINCER:

12        Q     Mr. Carmack, I put in an exhibit before

13   you marked number 90.  Have you seen that document

14   before?

15        A     I have.

16        Q     And what do you understand that

17   document to be?

18        A     I understand that to be correspondence

19   from the office of OIG that's addressed to then

20   Secretary Dietre Trent, Secretary of Education.

21        Q     You were hotline report 16077; were you

22   not?

1       A       According to this document, yes.

2       Q       All right.  Well, does this appear to

3  be the complaints that, or at least some of the

4  complaints you made to the --

5       A       Yes.

6       Q       -- Inspector General?

7       A       Yes.

8       Q       I want you to take a look through that

9  report, take all the time you need to, and you will

10 see there is an allegation and then some other stuff,

11 allegation, allegation.

12              Let me know after you look at Exhibit

13 90 if there were any other allegations that you

14 lodged that do not appear to be addressed in Exhibit

15 Number 90.

16      A       The document that I sent to the OSIG's

17 office had 16 items in those.  When I received a call

18 from Mr. Cowardin, several, probably two months after

19 I submitted it, he stated to me that a lot of those

20 items he felt like needed to be addressed by DHRM,

21 and he was sending those on to them, and that he was

22 going to address the ones that he felt like pertained

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 137 of 283   Pageid#:
1182

1    to fraud and abuse.

2         Q        So you originally made 16

3    allegations?

4         A        That's correct.

5         Q        And you told me -- was this the

6    investigator that you were talking with?

7         A        Yes, Mr. Cowardin at OSIG.

8         Q        And could you spell the last name?

9         A        C-o-w-d-i-n (sic).

10        Q        And the basic response to those that

11   are unaddressed in Exhibit Number 90 was that they

12   needed to be addressed to DHRM?

13        A        Correct.

14        Q        Did the investigator or anyone else at

15   OSIG ever tell you that of those 16 allegations you

16   filed, a good number of them were petty?

17        A        No, sir.

18        Q        All right.  Look on page 3 of 5 of

19   Exhibit 90, and this is allegation number four.  And

20   we won't go into it all, but your allegation was

21   essentially, well, stated here as being, "Mr. Matlock

22   does not submit travel reimbursement requests

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 138 of 283   Pageid#: 1183

1    timely." You made that allegation to the Inspector

2    General?

3         A      I did.

4         Q      And tell me why did you feel that

5    untimely submittal of travel reimbursements were

6    worthy of an OSIG complaint?

7         A      According to the CAPP manual, any type

8    of travel or expense needs to be invoiced, entered

9    and paid within 30 days of the time it was incurred.

10   If an auditor goes through a file and finds it in

11   excess of that, it's an exception. It's an audit

12   policy violation.

13        Q      Okay. And, again, we are referring to

14   the Commonwealth Accounting Policies and

15   Procedures?

16        A      Yes.

17        Q      I think I got from your earlier

18   testimony before the luncheon break, you're a pretty

19   by-the-book person?

20        A      Most of the time I try to be.

21        Q      All right. But you thought that this

22   should have been raised to a OSIG complaint?

1          A       As long as it went on, yes.

2          Q       Well, how many times did you ever

3    address that issue with Mr. Matlock?

4          A       It was addressed by me on two

5    occasions.  And I know it was addressed by

6    Ms. Heitala to him on one occasion that she

7    referenced to me that she had sent him a reminder by

8    e-mail, and addressed by Ms. Deborah Hensley at least

9    one time.

10         Q       All right.  So that's four times?

11         A       That I know of.

12         Q       That you know of, yes, sir.  And the

13   two times that you had addressed it, how did you do

14   that?

15         A       Just verbally, David, we need to have

16   these done within a 30 day time frame.

17         Q       What about Heitala; do you know how she

18   addressed it?

19         A       I don't.

20         Q       And what about Ms. Hensley?

21         A       Verbally.

22         Q       Okay.  Now, go back to page two of five

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 140 of 283   Pageid#:
1185

1    and look at allegation two.  It's "Two wage employees

2    waste state time for a system that handles

3    scholarships and loan funds."  Did you make that

4    complaint?

5         A      I did.

6         Q      And are these the Holts?

7         A      Barry and Elizabeth Tate.

8         Q      Tate.  I'm sorry.  So this concerned

9    the Tates?

10        A      Correct.

11        Q      Prior to filing an Inspector General

12   complaint against Mr. Matlock for that, did you ever

13   discuss that issue with him?

14        A      Many times.

15        Q      In what format?

16        A      Meetings.

17        Q      Always verbally?

18        A      No.  There were e-mails.  There were

19   verbal meetings.  There were meetings with Jeff Webb,

20   the Tobacco staff, Mr. Matlock and myself multiple

21   times.  There were meetings with the Tates present.

22   There were meetings with outside vendors to bid on

1    the job present.  It was discussed probably 15 times

2    in person and more times in e-mails.

3          Q      Well, you wanted to outsource that,

4    didn't you?

5          A      There came a time when I felt like in

6    order to get the deadline met and the program

7    developed, that it was cheaper to outsource the

8    program.  And the way we determined that was to have

9    a bid placed and a company place a bid to do the work

10   for around $50,000 less than what we were paying the

11   Tates combined annually.

12         Q      And was one of the vendors from whom

13   you sought a solicitation, was that Holston?

14         A      Holston IT.

15         Q      IT?

16         A      Uh-huh.

17         Q      Let me ask you this.  Did you have any

18   personal or business connection with that entity?

19         A      I did not.

20         Q      Through any of your companies or

21   otherwise?

22         A      I did not.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 142 of 283   Pageid#:
1187

1          Q      Now, that was around arm's length

2    solicitation?

3          A      Yes, yes.

4          Q      Right.  So let's switch.  You can keep

5    that nearby, but would you go back to exhibit -- was

6    that our --

7                 MR. HARDY:  What exhibit number is the

8          Amended Complaint?

9                 MR. HARDY:  88.

10                MR. KINCER:  I guess I could look on

11         mine too.

12

13   BY MR. KINCER:

14         Q      Go to page four of the Complaint.  And

15   this is paragraph 14 b.  And that begins, that

16   sentence begins, "When plaintiff learned that a

17   husband and wife computer team were, quote, 'working'

18   in a questionable manner from home and were seldom in

19   the agency building," and it continues on.

20                Is that the Tates that we are talking

21   about in paragraph b?

22         A      It is.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 143 of 283   Pageid#:
1188

1        Q        And then the complaint continues, and

2   I'm reading on page five.  "...the couple were close

3   personal friends of Agency Information Technology

4   Director Jeff Webb, and Webb had approved 111 hours

5   of overtime pay for the wife, between July and

6   November 2016..." and you say, "...plaintiff

7   complained about suspected fraud and abuse to Webb

8   and Matlock."  How did you make that complaint?

9        A        Multiple times in meetings between

10  Mr. Matlock, Mr. Webb, Mr. Tolbert was usually

11  present in those meetings and myself.  Oftentimes the

12  three ladies in the Tobacco Department would be

13  involved in these conversations.

14                It was repeatedly announced, repeatedly

15  complained about that we could not get the

16  scholarship program out of the Tates so that we could

17  keep up to date in posting scholarship payments and

18  keeping the ledgers up on each individual student.

19  We attempted initially to buy a canned program.  The

20  Tates volunteered to write it and they could have it

21  done within six months.  Two years later it was not

22  finished.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 144 of 283   Pageid#:
1189

1          I complained multiple times, and in

2     several of those meetings where the Tates attended,

3     Mrs. Tate admitted that she did not have the

4     programming knowledge to do the work and was

5     dependent upon her husband Barry, who was a full-time

6     employee with Crutchfield Corporation, to do the work

7     on his own time.

8          And Barry became very upset every time

9     we questioned his wife's work.  He became very angry,

10    and directed that anger toward me.  And Barry was

11    always defended by Mr. Webb in these meetings;

12    however, I will add one caveat.  When Mr. Webb and

13    Mr. Matlock and Mr. Tolbert and I met without the

14    Tates, Mr. Webb agreed that Ms. Tate did not have

15    those skills but Mr. Tate, did and we probably would

16    be better off to look at outsourcing and what it

17    would cost.

18          He also had concerns from a compliance

19    standpoint that that data that belonged to the

20    Tobacco Commission was actually being housed on

21    servers inside the Higher Ed Center.  He wanted to

22    get that off into the cloud base, and he needed

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 145 of 283   Pageid#:
1190

1    someone else to do that because the Tates didn't have

2    that, quote, expertise.  Mr. Tolbert and Mr. Webb

3    agreed to outsource that to Holston IT.

4           Q      Going back to -- and that is all in

5    that paragraph b, and thank you for expanding on

6    that.  One of the issues that you had was when Webb,

7    we read it before, Webb had approved 111 hours of

8    overtime pay.  Plaintiff complained about suspected

9    fraud and abuse to Webb and Matlock.  That

10   happened?

11          A      I'm sorry.  Who complained?

12          Q      Plaintiff.  I'm assuming plaintiff is

13   William D. Carmack?

14          A      Yes.  I just didn't understand your

15   word, yes.

16                 MR. KINCER:  Okay.  There you go.

17

18   BY MR. KINCER:

19          Q      Okay.  Take a look at this.  That will

20   be 91?

21          A      Uh-huh.

22          Q      See if you can identify that?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 146 of 283   Pageid#:
1191

1        A       Yes.

2        Q       Consists of seven pages.  What are

3    those pages, Mr. Carmack?

4        A       Time sheet requests for Elizabeth

5    Tate.

6        Q       Who was one of the people at issue?

7        A       Most of them are issued to Debbie

8    Hensley from Duffy Carmack.

9        Q       And let's look at the first sheet.

10   That is August 11 of 2016.  That e-mail was sent from

11   you to Deborah Hensley?

12       A       That's correct.

13       Q       We mentioned her name several times.

14   Did Ms. Hensley work for you?

15       A       She did.

16       Q       What was her title?

17       A       Business manager.

18       Q       All right.  And she reported to you

19   some of Elizabeth Tate's overtime.  This particular

20   one, this first sheet on Exhibit 91, is for $182.08;

21   is that correct?

22       A       That's correct.

1          Q      And Ms. Hensley is saying to you,

2     Elizabeth has $182.08 in overtime pay for pay period

3     16.  Please approve.  And then right above that is an

4     e-mail you sent, approved by William D. Carmack on

5     11/16?

6          A      Correct.

7          Q      So you were aware of this overtime?

8          A      I was aware that it was a continuing

9     process or issue problem.

10         Q      Okay.  And approved it on that time

11    period?

12         A      Yes.  This was what gave me the

13    awareness of it.

14         Q      Okay.  And let's go to the second,

15    sheet two, which is an e-mail from you to Ms. Hensley

16    dated August 25th of 2016?

17         A      Uh-huh.

18         Q      And I'm not going to read it all but,

19    again, that's some more overtime for Elizabeth, and

20    she is, Ms. Hensley is asking you to approve that

21    overtime.  And you write Ms. Hensley at 2:08 p.m. and

22    it says, "Overtime for Elizabeth Tate is approved for

1    pay period 17."  Did you write that?

2          A      Yes.

3          Q      All right.  So you approved another pay

4    period of Tate's overtime?

5          A      I did.

6          Q      Sheet three, your e-mail of September

7    9, 2016.

8          A      Yes.

9          Q      Is that another overtime request for

10   Elizabeth Tate?

11         A      Yes.

12         Q      Is that another overtime request that

13   you approved?

14         A      It is.

15         Q      Go to the October 10, 2016 e-mail.  And

16   this is a request for $564.43 in overtime pay for

17   Ms. Tate, please approve.  And you wrote her back,

18   approved overtime for Elizabeth Tate?

19         A      That's correct.

20         Q      Okay.  Let's go to the next e-mail in

21   Exhibit 91.  It's a October 26, 2016 e-mail from

22   Duffy Carmack to Deborah Hensley.  Overtime for

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 149 of 283   Pageid#:
1194

1    Elizabeth Tate in the amount of the $728.30 is

2    approved; is that correct?

3            A       That's correct.

4            Q       You wrote that?  You approved that?

5            A       I did.

6            Q       And let's go to your e-mail for

7    Wednesday, November 9, 2016, pay period 22.  That's

8    Ms. Hensley also asking you to approve 20 hours of

9    overtime pay?

10           A       Correct.

11           Q       And you just simply wrote back a one

12   word reply, approved?

13           A       Correct.

14           Q       And we will go to the next, number 6 in

15   Exhibit 91.  It's a November 21, 2016 e-mail.

16   "Elizabeth had 20 hours of overtime for pay period

17   23.  Please approve."  And you wrote Ms. Hensley

18   back, "approved OT, Elizabeth Tate," correct?

19           A       Correct.

20           Q       And the last one is pay period 24,

21   December 6, 2016 and that was approving six hours of

22   overtime for Elizabeth Tate and you wrote back,

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 150 of 283   Pageid#:
1195

1    "Approved E. Tate, six hours overtime," signed

2    Duffy?

3            A       That's correct.

4            Q       So there are six instances during the

5    time period that you put in your OSIG report citing

6    waste or fraud that you were not, you knew about, you

7    personally approved the expenditure?

8            A       Although I approved those expenditures,

9    you need to also understand that Mr. Webb had been

10   the approver of the Tates' time.  And in one of the

11   conversations that Mr. Matlock and Mr. Webb and I

12   had, sometime in July or August, about the Tates'

13   lack of performance and the fact that they did no

14   work for the Higher Ed Center, but worked exclusively

15   for the Foundation side, Mr. Matlock suggested that

16   the Tates report to me.  And so I began signing their

17   time sheets at that point.

18              Prior to that I had no awareness of how

19   much overtime was being incurred.  As the Fall

20   progressed, Mr. Matlock and Mr. Webb decided that if

21   the Tates continued to report to me and was held

22   accountable for their work, that they would quit or

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 151 of 283   Pageid#:
1196

1   they will take their data that they created and

2   leave, and we would be without a system.  So

3   Mr. Matlock made the decision to turn the approval

4   back over to Mr. Webb at the first of the year.

5                   So it was that quarter of approving

6   time sheets that I realized it was an ongoing,

7   regular basis of overtime, and made the inquiry of

8   Ms. Brooks as to the total we paid since July.

9        Q       And thus cited as potential fraud and

10  abuse overtime that you had approved?

11       A       It was entirely fraud and abuse for

12  anything the Tates was paid when matched to

13  production.

14       Q       All right.  Go to page 7 of Exhibit 88,

15  which is the Amended Complaint.  And I'm looking at,

16  I'm looking at number or letter little h. at the

17  bottom of the page there that begins, "When Matlock

18  worked at Virginia Highlands Community College, the

19  college hosted a fundraiser," and it continues on,

20  "When Matlock was hired at the Center, he wanted the

21  fundraiser to be hosted by the Center.  He and the

22  Community College had disputes about the issue."

1          Let me just ask you a discrete question

2     there.  What kind of disputes about the issue?

3          A     Mr. Matlock felt like that Richard

4     Leigh Songwriter Festival was an event that he

5     created and brought to the Community College.  And he

6     felt like for it to continue that he should be

7     involved, and that in some manner that the proceeds

8     from that should also come to the Higher Ed Center

9     Foundation, in addition to the Community College.

10         Q     All right.  And if we can continue, "He

11    and the Community College had disputes about the

12    issue, but ultimately the college hosted the

13    fundraiser.  Some of the proceeds of that fundraiser

14    though, have gone missing.  Moreover, Matlock, six

15    months later, attempted to host his own Richard Leigh

16    fundraiser on behalf of the Center, but the proceeds

17    of that fundraiser never made their way to the

18    Center."  Is that factually correct?

19         A     To the best of my knowledge it is.

20         Q     All right.

21

22              (Discussion off the record)

1          (Exhibit Number 91 and 92 were marked

2      for identification)

3

4  BY MR. KINCER:

5          Q      And I handed you an e-mail.  Who's

6  Alicia Young?

7          A      Alicia Young is the grant's director

8  and the financial administrator for the Foundation.

9          Q      Did she work for you?

10         A      She did.

11         Q      And I'm looking -- I think our exhibits

12 are straight.  I'm looking at an exhibit, it's an

13 e-mail from Alicia Young to you dated June 19,

14 2017?

15         A      Correct.

16         Q      Is the subject matter of this June 19

17 e-mail, is that explaining some proceeds from that

18 golf tournament and what she had done?  "We bought a

19 money order with the cash that was given to me for

20 the golf tournament.  I am not allowed to send cash

21 up to the UVA fund.  Could you tell me how to process

22 the $560?  I will need who paid, the amount paid and

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 154 of 283   Pageid#:
1199

1   what money was for, registration, sponsorship,

2   etcetera, for accounting purposes.  If I need to send

3   them a letter for sponsorship, I will also need the

4   complete address.  Thanks Alicia."  Did you receive

5   that e-mail?

6        A     I did.

7        Q     And are you on page two?  I started --

8   is there a page -- this prefaces -- this is a May 31,

9   2017 e-mail from Alicia dated Matlock and cc to Duffy

10  Carmack.  Is that correct?

11       A     That's correct.

12       Q     And it says subject is the golf

13  tournament?

14       A     Yes.

15       Q     And Alicia is saying to David Matlock,

16  you're copied on it, "I have a invoice from..." is

17  that Glenrochie?

18       A     Glenrochie.

19       Q     "...Glenrochie Country Club to pay for

20  the golf tournament.  Can you tell me who to contact

21  there to get a W9 so we can process payment to them?

22  Thanks, Alicia."  So was that done to your

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 155 of 283   Pageid#: 1200

1    knowledge?

2         A    I had no knowledge of the golf

3    tournament.  Mr. Matlock did not include Finance in

4    any of his projects.  He did not, even though they

5    were operated under the Foundation name or the Center

6    name, no one from the Finance Department which would

7    have been myself, Debbie Hensley or Alicia, were ever

8    included in the planning.  We had no idea it was

9    going on.

10                  Therefore, when it came time to post

11    proceeds, whether it was a contribution toward the

12    event, from patrons at the door, expenses, we had

13    nothing, because we were not there or involved in

14    setting up the checks and balances of the event

15    initially.

16         Q    But you were copied on an e-mail

17    showing that funds were being accounted for?

18         A    I was copied on an e-mail where Ms.

19    Young was asking questions as to, you know, what's

20    the 560, and how do we get cash, because we didn't

21    usually see cash, how do we get cash to

22    Charlottesville?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 156 of 283   Pageid#:
1201

1      Q       All right.  How do we get money from

2    this golf tournament to Charlottesville?

3      A       Correct.

4      Q       All right.

5           MR. KINCER:  And I will keep you in

6       charge, next sequential exhibit.

7

8           (Exhibit Number 93 was marked for

9       identification)

10

11   BY MR. KINCER:

12      Q       I have handed you Exhibit 93, which is

13   some, again, e-mails from Alicia Young to David

14   Matlock, cc to Duffy Carmack, starting at 9:06 a.m.

15   And this e-mail reads, "David, I need to send up the

16   fund from the golf tournament by Tuesday, June 27th

17   for the year end.  I will also need the expenses for

18   the golf tournament by Tuesday to record them in FY17

19   when the tournament was held.  Thanks Alicia."  Did

20   you get copied on that e-mail?

21      A       I'm listed as copied.

22      Q       Then if we go to the 9:08 a.m. e-mail

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 157 of 283   Pageid#:
1202

1    from David Matlock back to Alicia Young, copy to

2    Duffy Carmack shown on Exhibit 93, it says, "How

3    about we meet around two o'clock today to finish that

4    up?"  You were copied on that?

5          A      I was copied.

6          Q      All right.  So my question to you is,

7    looking at your Complaint concerning the fundraiser

8    and some of the proceeds of that money has gone

9    missing, what factual basis did you have to make that

10   allegation?

11         A      Based on comments that he made and

12   Sonia VanHook, who was another employee in the

13   building who attended the golf tournament, as to how

14   many people attended doesn't comprise the dollar

15   amounts collected.  And we did receive sponsorships

16   from some industry in the area, but no one was

17   advised what was to do with that money, if it went

18   toward paying the country club or toward food or

19   toward prizes.  There was no communication to Finance

20   at all.

21         Q      You didn't know about it?

22         A      No.

1       Q       All right.  So the fact that you didn't

2  know about it, you felt shut out?

3       A       The entire Finance Department felt shut

4  out, and complained to me about it.

5       Q       So that allowed you to tell the

6  Inspector General that funds had, quote, gone

7  missing?

8       A       We had no balance.  We were not able to

9  balance the income and receipts or expenses.

10      Q       And you don't know if that was done

11 through...

12      A       My last conversation with Ms. Young was

13 that it was never in balance.

14      Q       Is that by e-mail or was that...

15      A       Just verbally.

16      Q       Verbally.  All right.  Now, looking

17 back at the Amended Complaint, number 88, and this

18 is, this is f.  That was not in your OSIG complaint,

19 was it?

20              MR. GRIMES:  Objection; what is that?

21              MR. KINCER:  f, Sub-part f.  I thought

22         it would follow.

1              MR. GRIMES:   I thought you said that.

2        Sorry.

3              THE WITNESS:   I'm not following.   I

4        don't understand.

5              MR. GRIMES:   Let's try this again.

6        It's confusing.

7              MR. KINCER:   Confusing?

8

9   BY MR. KINCER:

10       Q      You're looking at Exhibit 88.   Look at

11  paragraph 14, little f on page 7.

12       A      Okay.

13       Q      Was that one of the, was that one of

14  the issues that you raised or attempted to raise with

15  Inspector General that they told you to take the

16  complaint to DHRM?

17       A      It is.

18       Q      This is some artwork, meaning this is a

19  $9,900 worth of artwork that was that mobile in the

20  center lobby?

21       A      That's correct.

22       Q      Going back, this complaint in f. was

1    that it had been removed?

2         A       We come back from Christmas break and

3    it's gone, right.

4         Q       And you said in other dep -- you know

5    that it was back, correct?  You know it is back,

6    correct?

7         A       Yes, I know it's back, uh-huh.

8         Q       You also know that it was removed due

9    to repairs to the ceiling of the Center?

10        A       That's what I hear in deposition.

11        Q       All right.  And do you personally have

12   any knowledge to the contrary, any facts to support

13   any allegation to the contrary?

14        A       I never understood why the mobile was

15   removed or missing for over a year.

16        Q       Okay.  We will go to another OSIG

17   complaint later, but staying on yours against

18   Mr. Matlock, did you, did you approve -- to the birth

19   of the mobile, did you approve this $9,900

20   expenditure without seeking Board approval?

21        A       This expenditure came through the

22   Foundation, and the Foundation, in discussion, agreed

1    that they wanted to put something in the building.

2    And a committee was created of Kathy Heitala, Joyce

3    Brooks, myself, I think Marcia Gilliam, and we

4    decided to do a piece of art and to also name a room,

5    which we called a tiered executive auditorium, after

6    Dr. Fowlkes in recognition of her work there.

7           Q      Well, did you have written authority to

8    expend $9,900 of Foundation funds for that mobile?

9           A      I had verbal authority from the

10   Foundation to do that.

11          Q      Okay.  The Foundation is an artificial

12   entity.  Who at the Foundation?  What person at the,

13   on the Foundation's behalf?

14          A      It was discussed openly at Foundation

15   meetings.  I don't know if it's in the minutes or

16   not, haven't looked.  It was approved.

17          Q      Can you name at least one person who

18   conveyed information to you that that would be a fine

19   thing?

20          A      Marcia Gilliam, who was the chairman of

21   the Foundation.

22          Q      And at which time was Gilliam chairman

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 162 of 283   Pageid#:
1207

1    of the Foundation?

2         A       Oh, goodness.  When I went to work

3    there she was chairman, and she served probably up

4    until 2000, maybe '16, '15, '16.

5         Q       Okay.  We are still on Exhibit 88.  Go

6    back to page four, paragraph 14, sub little a.

7         A       Okay.

8         Q       This is an invoice, Matlock's invoice

9    submitted for $1,250 to reimburse a Virginia middle

10   school for a robotics competition, correct?

11        A       Correct.

12        Q       Tell me about that allegation.

13        A       Again, having no former knowledge that

14   any of the dollars from the Center or the Foundation

15   were going to be spent -- and we did have budgets at

16   the Center that we tried to follow -- Foundation

17   money was not particularly earmarked for any one

18   project.  He laid this invoice on Ms. Young's desk

19   and asked that it be paid.

20              She brought it to me, and I found it

21   preposterous, actually, because, number one, the

22   Higher Ed Center had long time been a proponent of

1    STEM, and that's Science, Education, Technology and

2    Mathematics, particularly for girls.  And it exposed

3    young girls in southwest Virginia to jobs outside of

4    the traditional female stereotype roles.

5                    So for a number of years the Higher Ed

6    Center hosted a STEM competition called Lego

7    Robotics.  You had to have teams, like a church group

8    or cub scout team or home school team.  It had to be

9    a team of students that would come in to compete in

10   these competitions.  The problem that we had in

11   southwest Virginia were finding adult sponsors of

12   these teams, because it's very time-consuming.

13                   So the Higher Ed Center, through the

14   partnership with Virginia Tech, would always recruit

15   for adult leaders to create a team.  And we would

16   usually pay for two to three of these adult leaders

17   to go to the State training in hopes that they would

18   come back and create a Lego team.  At no time in the

19   history of the Center had I ever known us to pay for

20   students or a chaperone of students to go to a

21   robotics competition.

22        Q     All right.  And you say, continuing in

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 164 of 283   Pageid#: 1209

1    paragraph a. in the complaint, you state that, "When

2    questioned about this, Matlock stated that he had

3    offered this to all schools in southwest Virginia.

4    On information and belief, this is not true, and

5    Matlock produced no evidence that he had, in fact,

6    extended the offer to all the schools in southwest

7    Virginia, and it is improbable that only his son

8    accepted the offer."

9              Would you go back to the OSIG report,

10   Exhibit 90 please, on page two of five?  And this is

11   allegation three.

12       A    Oh, I'm sorry.  On the OSIG report?

13       Q    Yes, sir.  Has the seal?

14       A    Okay.

15       Q    And Inspector General addressing that

16   issue recites the basic allegation that we talked

17   about.  And the finding of fact to that allegation

18   that you made was that the OSIG reviewed records

19   related to the robotic support for FY2014 through

20   2017.  The disbursement summary shows the school

21   referred to above received support in FY2017 only.

22   Altogether, for the four fiscal years, disbursements

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 165 of 283   Pageid#:
1210

1    exceeded $22,000 for 22 items, including for six

2    other schools.

3         A       Correct.

4         Q       Could you not have found that out, that

5    information, not only the information and belief, but

6    on factual inquiry before filing a report with the

7    Inspector General?

8         A       The $22,000 for 22 items was not to pay

9    for teams of schools for children to go to

10   competitions; it was to pay for adults from various

11   localities to attend trainings to set up school

12   teams.

13        Q       So do you have any factual information

14   that that was, that that was any private, private

15   deal with, with that particular school?

16        A       It appears ironic to me that his son is

17   the middle school principal there.  And also having

18   lived and worked in southwest Virginia for 50 years

19   and knowing how poor the school systems are, if the

20   Higher Ed Center offered 1,200 or $1,500 to each

21   school, I can't imagine anyone not taking it.

22        Q       But you don't know any of that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 166 of 283   Pageid#: 1211

1    factually?

2                    MR. GRIMES:   Objection to the form.

3          What is that?

4                    MR. KINCER:   What is that?

5

6    BY MR. KINCER:

7          Q      Any of the conjecture, and it seems

8    ironic to me, leaving the irony and the information

9    and belief of your complaint aside, what facts do you

10   have that this was any particular program that others

11   were not eligible for had they applied?

12         A      The fact is I have never seen the offer

13   made to any other school.

14         Q      All right.  And you thought that was

15   enough information to warrant the OSIG complaint?

16         A      Yes, I do.

17         Q      All right.  And you first discovered

18   that in -- did you discover that soon after the

19   disbursement was made in 2016, December 2016?

20         A      Yes.

21         Q      All right.  Look on -- go back to the

22   Amended Complaint, paragraph 88, and look at

1   sub-section, page five, little d. as in dog?

2       A       Uh-huh.

3       Q       And this complaint, this complaint was

4   not in the OSIG report, was it, the Joe Mitchell,

5   hired a long-time friend to work as maintenance

6   supervisor?

7       A       That's one of my 16 items that I

8   submitted to OSIG.

9       Q       That was not included in the final

10  report?

11      A       Correct.

12      Q       All right.  And what I want to ask you

13  about is, you say that Matlock, A, he hired one of

14  his long-time friends, Joe Mitchell.  By his friends,

15  you mean Matlock's friend?

16      A       Correct.

17      Q       Well, he was your long-time friend too,

18  wasn't he?

19      A       He was a long-time acquaintance that I

20  knew, did business with in the banking business.  He

21  was one of my customers, no one I knew on an intimate

22  or friendly basis.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 168 of 283   Pageid#:
1213

1        Q       And you say that, "Matlock hired

2    Mitchell as a quote, 'wage' employee, without being

3    interviewed by selection committee as required by

4    Agency policy, then added him as a full-time employee

5    in July 2017."

6               So even though that was one of the

7    allegations not addressed by OSIG for the reasons

8    that you have stated before, that was one of the

9    allegations that you made, you felt warranted in

10   making to the Inspector General?

11       A       Correct.

12              MR. KINCER:   That is the next exhibit.

13

14              (Exhibit Number 94 was marked for

15         identification)

16

17   BY MR. KINCER:

18       Q       Would you take a look at Exhibit 94,

19   Mr. Carmack.   Is that an e-mail from you to Joyce

20   Brooks?

21       A       It is.

22       Q       She was in HR?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 169 of 283   Pageid#:
1214

1          A      She was.

2          Q      And you copied David Matlock on that,

3    didn't you?

4          A      I did.

5          Q      And the subject of this e-mail was

6    Interview Committee?

7          A      Correct.

8          Q      And you say in this e-mail dated March

9    31, 2017, "Joyce, I received a notice that I have

10   been selected to participate on an Interview

11   Committee.  Normally I am glad to participate in

12   this; however, I have known Joe personally for many

13   years and do not feel it would be fair to participate

14   in this selection process.  Thanks.  Duffy."

15         A      Correct.

16         Q      All right.  So whether, despite

17   whatever the status of Joe was to you, whether a good

18   friend or a business acquaintance or someone you had

19   known, you were aware, when you made that OSIG

20   complaint, that there was an Interview Committee?

21         A      There was an Interview Committee at the

22   time they were looking to fill the job permanently.

1    There was not an Interview Committee at the time they

2    hired him in a wage position.

3         Q      Did you make that clear in your

4    complaint?

5         A      To OSIG?

6         Q      Yes?

7         A      As clear as I could make it.

8         Q      All right.

9             MS. HADDOX:  Do you know the Bates

10            stamps for Exhibit 94?

11            MR. HARDY:  I'm sure it requests, ask

12            for it, but I'm not finding it in the ESI that

13            we produced.

14            MS. HADDOX:  Okay.

15

16   BY MR. KINCER:

17        Q      Earlier this morning I think we

18   discussed it's your recollection that you had, when

19   you first registered to vote in Washington County,

20   Virginia -- this was when you were a teen, correct,

21   or thereabouts?

22        A      Correct.

1          Q        -- that you registered as a Democrat?

2          A        Yes.

3          Q        Do you consider yourself to be a

4     Democrat?

5          A        I do.

6          Q        Okay.  But I think you also told us

7     about Dr. Fowlkes' fairly even keeled, non-partisan

8     status, that there is Democrats and Republicans, and

9     we get along with everybody, words to that effect?

10         A        Correct.

11         Q        Well, in your professional career at

12    the Center and in business in general, do you think

13    it's wise to hedge your bets politically?

14              MR. GRIMES:  Objection.  What does that

15         mean?

16

17    BY MR. KINCER:

18         Q        Do you think it's wise to support both

19    political parties, at least nominally?

20              MR. GRIMES:  Same objection.

21

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 172 of 283   Pageid#:
1217

1   BY MR. KINCER:

2          Q      By cash financial contributions?

3                 MR. GRIMES:  Same objection.  Go ahead

4          and answer the question, subject to objection.

5                 THE WITNESS:  Do I feel like it's okay

6          to send cash to either party?

7

8   BY MR. KINCER:

9          Q      Uh-huh.

10         A      I do.

11         Q      And you have?

12         A      Yes.

13                MR. KINCER:  Next exhibit.

14

15                (Exhibit Number 95 was marked for

16         identification)

17

18  BY MR. KINCER:

19         Q      We will start on Exhibit 95 on the

20  second page, and this is an e-mail from Rachel

21  Fowlkes to Duffy Carmichael dated December 17, 2013.

22  And this is the forward, Speaker Howell Reception.

1  Who's Speaker Howell?  Or who was Speaker Howell in

2  October of 2013?

3         A      I have no idea, but I would make the

4  assumption he was speaker of the house.

5         Q      All right.  And Rachel is asking you,

6  "Duffy, I can't tell if we can attend free or if we

7  have to pay a lot of money.  Obviously, this is a

8  fundraiser.  I'm thinking we should not go, but will

9  rely on your judgment.  Perhaps Joe Johnson can

10 advise us what we should do."  Who's Joe Johnson?

11        A      Joe Johnson is a former member of the

12 House of Delegates.  He's an attorney.  He is on the

13 Board of Trustees of the Higher Education Center.

14        Q      Is he a Democrat or Republican?

15        A      He always ran on the Democratic

16 ticket.

17        Q      Does he still do that?

18        A      I have no idea.  He's retired.

19        Q      Okay.  And you respond to Rachel

20 Fowlkes' e-mail, "I will RSVP today!  I will talk to

21 you at 1:30 on the conference call."

22               So you and Ms. Fowlkes are going to a

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 174 of 283   Pageid#:
1219

1    fundraiser for Speaker Howe?

2          A       That's what this pertains to, yes.

3          Q       Okay.  And let's go to the front of

4    Exhibit 95.  And who is Christie Heath?

5          A       I have no idea.

6          Q       Okay.  Well, this is an e-mail from

7    Christie Heath, November 10, 2014, to Duffy Carmack,

8    and it says Re: RSVP - Pillion.  And she is

9    apparently responding to you because you write at the

10   bottom, "Christie, I will be attending the reception

11   for Todd Pillion on Wednesday, November 12.  I will

12   bring a check for Todd's friends with me that

13   evening.  Thanks, Duffy Carmack."

14         A       Uh-huh.

15         Q       Is this Delegate Pillion?

16         A       Yes, it is.

17         Q       Is this Republican Delegate Pillion?

18         A       Yes, it is.

19         Q       All right.  And did you attend this

20   fundraiser?

21         A       I sent money.  I have no idea whether I

22   went or not.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 175 of 283   Pageid#: 1220

```
1         Q      Okay.  But you sent money?

2         A      Sure.

3         Q      All right.

4                MS. HADDOX:  Just for the record,

5         Exhibit 95, neither e-mail was produced in

6         discovery.

7                MR. HARDY:  Nor were they asked, would

8         be our position.

9                MS. HADDOX:  I'm just making a record.

10        I don't have before me all the discovery

11        requests.  I can look at it later.  For the

12        record, neither e-mail in Exhibit 95 was

13        produced.

14               MR. KINCER:  So the best thing for us

15        to do is just to move on.

16               MS. HADDOX:  Which would be the

17        definition of making a record.

18

19   BY MR. KINCER:

20        Q      Mr. Carmack, you told me that you did

21   not have to file a -- that you had not -- strike

22   that.
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 176 of 283   Pageid#:
1221

1          Mr. Carmack, you told me that you had

2     nothing in writing concerning the Center's knowledge

3     of your Carmack Health Management, that it was,

4     everyone knew you were doing that and it was fine

5     with them and there was going to be no contracts?

6          A      That's correct.

7          Q      When you were hired as CFO?

8          A      Correct.

9          Q      All right.  During your time either in

10    state government or as a citizen appointed in state

11    government, have you ever filed any conflict of

12    interest statements?

13         A      Yes, I have.

14         Q      How many do you recall filing?

15         A      Several years' worth.  I have served on

16    various public boards and authorities.

17         Q      What authorities have you served on?

18         A      Most recently, the last ten years, I

19    have been Chairman of the Board of Zoning Appeals for

20    Washington County, Virginia.

21         Q      All right.  What about insofar as a

22    state office?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 177 of 283   Pageid#: 1222

1          A       I was appointed by the governor to the

2     Virginia Solar Authority.

3          Q       All right.  Let me make sure I have the

4     right date.  Yeah.

5

6                  (Exhibit Number 96 was marked for

7                  identification)

8

9     BY MR. KINCER:

10         Q       Mr. Carmack, I have handed you Exhibit

11    96.  Take your time to look at that.

12         A       Uh-huh.

13         Q       Do you know what it is?

14         A       It's a conflict of interest

15    statement.

16         Q       And was this the one electronically,

17    that purports to be electronically signed by you 1/31

18    of 2018?

19         A       Yes.

20         Q       And if you would take a moment to look

21    that over.  At least as of the time that you signed

22    this Conflict of Interest, is the, are these

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 178 of 283   Pageid#: 1223

1    disclosures that you list, are they accurate?

2          A      No.

3          Q      Why not?

4          A      Because I didn't work at the Southwest

5    Virginia Higher Ed Center January the 31st, 2018; I

6    had been terminated.

7          Q      Well, you were no longer in their

8    employ, were you?

9          A      I was no longer in their employ, and I

10   also resigned from the Virginia Solar Authority,

11   because that appointment was made because of my work

12   with Solar Energy Center, Research and Development

13   Center, and it was connected and I resigned.

14         Q      When did you resign?

15         A      I would have to look at the letter of

16   resignation.  It was sometime in January of 2018

17   following the termination.

18         Q      Okay.  Well, why did you even file a

19   Virginia Conflict of Interest Disclosure?

20         A      It came to me in the mail.

21         Q      And you filed it even though you were

22   no longer working there?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 179 of 283   Pageid#:
1224

1        A       I sent it back in to them.

2        Q       And you knew that you had already

3   resigned from the Solar Authority?

4        A       I was going to resign from the Solar

5   Authority before their next meeting.

6        Q       Which was when?

7        A       In February.

8

9                (Exhibit Number 97 was marked for

10          identification)

11

12   BY MR. KINCER:

13        Q       Have you had a chance to review that

14   document?

15        A       Yes.

16        Q       What is Exhibit 97?

17        A       Conflict of Interest and

18   Ethics Advisory Council Financial Disclosure

19   Statement.

20        Q       Similar document to the prior

21   exhibit?

22        A       Yes.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 180 of 283   Pageid#: 1225

1      Q      And what date does this show that you
2  electronically signed it?
3      A      There is no date that I see by the
4  signature.
5      Q      It's on the next to the last page on
6  the bottom?
7      A      January 11, 2017.
8      Q      All right.  You were still employed
9  with the Southwest Virginia Higher Ed Center?
10      A      I was.
11      Q      All right.  Were you still the sole
12  owner of Carmack Health?
13      A      Yes, I was.
14      Q      Is that listed on this form?
15      A      It is not.
16      Q      Why not?
17      A      It's an omission, just an error.
18      Q      What prompted your recall a year later
19  when you filed the 2018 disclosure where Carmack is
20  listed?
21      A      I try to always be open and truthful on
22  every form I fill out.  I guess it came to my mind

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 181 of 283   Pageid#:
1226

1   when I was filling it out.  I didn't think about it

2   the previous year.  Sometimes I'm in a hurry filling

3   them out, sometimes I'm not.

4          Q      It did not come to your mind that you

5   remained the sole owner of Carmack Health

6   Management?

7          A      No, because it's very secondary in my

8   life.  My primary employment was Southwest Virginia

9   Higher Ed Center.

10         Q      Well, let's go back from -- let's see,

11  you, in 2000, in 2014, for example, you were, in that

12  fiscal year, you were a CFO at the Center?

13         A      Correct.

14         Q      All right.  Well, how much income did

15  you make from your health care consultancy?

16         A      $95,000.

17         Q      All right.  And what was your salary

18  for the, for your services as CFO?

19         A      Base probably 105, benefits probably

20  147.

21         Q      Right.  But does -- and when you were

22  giving me the 95,000 figure for the health care work,

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 182 of 283   Pageid#:
1227

1    for Carmack Health Care, that was, that would have

2    been a profit?

3           A      Yes, it would have been.

4           Q      After expenses?

5           A      Sure.

6           Q      Sure.  And how much were you making

7    from the health management company in 2017?

8           A      It's always been the same amount.  It's

9    a contract.  It never changes.

10          Q      Thank you.  That will save us both.

11   It's always been 95,000 a year?

12          A      Correct.

13          Q      And so it's fixed rate, just whatever

14   comes your way you do.  And if a lot comes your way,

15   and if a little comes your way, you come out?

16          A      Right.

17          Q      Okay.  Thanks for clearing that up.

18          A      I might add one other thing for the

19   record to help with that.

20          Q      Okay.

21          A      Having a secondary job was commonplace

22   at the Higher Ed Center.  Mr. Matlock had one.  Adam

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 183 of 283   Pageid#:
1228

1    Tolbert had one.  Sonia VanHook had one.  It was all

2    done on State time, so the standard had already been

3    established.

4         Q      That's why they call them discovery

5    depositions.  What job did Mr. Matlock had?

6         A      Counseled adolescents from his

7    church.

8         Q      Excuse me?

9         A      Counseled adolescents from his

10   church.

11        Q      What is that job?

12        A      It means that some parents brings their

13   teenage son or daughter into the Higher Ed Center.

14   They wait in the foyer.  The child goes into his

15   office and the door is closed for counseling.

16        Q      All right.  Do you know if he makes any

17   money off that?

18        A      He has made comment that he's a paid

19   youth minister, so I assume so.

20        Q      Okay.  Go ahead.  Okay.  You finished?

21   What does Adam do in his part?

22        A      Adam has taught for Old Dominion

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 184 of 283   Pageid#:
1229

1    University on-line.  He has done a lot of work for

2    the Republican party -- I don't know that he's paid

3    for it -- on-line during Center time.  And

4    Ms. VanHook has taught for Savet, which is the

5    Governor's School.

6         Q      You don't know whether or not any of

7    those jobs have paid them $95,000?

8         A      I don't know what they were paid, but

9    they were paid.

10        Q      During your, let's say, last year of

11   employment at the Center, what were your work hours?

12        A      My normal work hours coming to the

13   Center -- the standard hours the Center is open is

14   basically, I'm going to say, 7:00, 7:30 in the

15   morning to nine or ten o'clock at night, because we

16   host all kind of students that go to night school and

17   public events.  Standard office hours were either

18   eight to four or nine to five.

19        Q      During those standard office hours that

20   you were there, approximately how much time, how much

21   time would you spend on working for your outside

22   interests?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 185 of 283   Pageid#: 1230

1          A          Meaning Carmack Health?

2          Q          Yes, sir.  Unless there is more for

3     profit?

4          A          Probably two hours a week.

5          Q          How much?

6          A          Two to three hours a week.

7

8                     (Exhibit Number 98 was marked for

9          identification)

10

11     BY MR. KINCER:

12          Q          Take a look at that document and let me

13     know when you're through with that, Mr. Carmack.

14          A          I'm very familiar with it.

15          Q          I have handed you Exhibit Number 98.

16     Who is Amberlea Breeding?

17          A          I have no idea.

18          Q          At firstbank.com?

19          A          I have no idea.

20          Q          Okay.  Is that an e-mail from her to

21     you dated 9/5 of 2012?

22          A          It is.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 186 of 283   Pageid#:
1231

1          Q       And were you working at the Center at

2    that time?

3          A       I was.

4          Q       And this continues.  This is how many?

5    This is seven of seven pages after we get past the

6    e-mail introduction.  It's attorney/client privilege.

7    Is this from an attorney, the attorney/client

8    privilege document starting on page one of seven?

9          A       Yes, uh-huh.

10         Q       And what is this document?  What is

11   this seven page document?

12         A       Well, this seven page document came

13   about as a result of the -- there are three LLCs that

14   make up the surgery center group, and there was a lot

15   of questions about changes to the management

16   agreement and trying to renegotiate leases with the

17   hospital.  And this started back before I began with

18   the hospital, began with the surgery center.

19                 Discussion started in 2012, early in

20   the year and continued out.  Takes a long time to

21   finalize items with the hospital, but we finally got

22   the leases negotiated.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 187 of 283   Pageid#: 1232

1      Q      Okay.  All right.  And this was sent to

2  you at 9:38 a.m.?

3      A      Yes.

4      Q      All right.  And then if we can continue

5  through here, and I'm not reading it all.  But it

6  seems like there is some, an auditor asking questions

7  about expenditures --

8      A      Yes.

9      Q      -- for one of the practice groups.

10  Were you to review that?

11      A      That was an auditor for the hospital

12  that was auditing the hospital's books.  And these

13  were items that had been paid under the management

14  company, which is one of the LLCs of the surgery

15  center.  And they wanted to know -- there was missing

16  documentation or receipts.  So we resubmitted those

17  to satisfy the audit requirement.

18      Q      And it was part of your $95,000 a year

19  contract to review documents like this?

20      A      Sure.

21      Q      And that was sent to you on a workday

22  at 9:38 in the morning?

1          A        Uh-huh.

2          Q        Did you look at it while you were at

3    work?

4          A        I'm sure I read it.

5          Q        All right.

6                   MR. KINCER:  Make that the next exhibit

7          please.

8

9                   (Exhibit Number 99 was marked for

10         identification)

11

12   BY MR. KINCER:

13         Q        What is that document, sir?

14         A        At the end of the year the

15   distributions of the company are made to the

16   physicians, and so the accounting firm that does the

17   work is Brown Edwards and Company.  And this is a

18   letter from Betty Jessee to me where she had

19   calculated the year-end distributions for the

20   physicians.

21                   And she had -- actually, her

22   administrative assistant lived in Abingdon.  And just

1    out of courtesy, they usually dropped things by the

2    front desk for me to pick up instead of paying

3    postage.

4         Q     All right.  Well, if I go back to the

5    first page of Exhibit -- that is 99 that you have in

6    your hand.  If I go back to the first page, I have

7    duffycarmack@hotmail.com?

8         A     Uh-huh.

9         Q     What's the hotmail.com address?

10        A     That is my personal e-mail address.

11        Q     Well, why do you use that for all your

12   outside business?

13        A     That's the only address I have other

14   than the Higher Ed Center address that I used.  There

15   may be old ones out there, but I don't remember the

16   names of them.

17        Q     All right.  Are you familiar with

18   HIPAA, H-I-P-P-A (sic)?

19        A     I am familiar.

20        Q     During the period of time that you

21   worked at the Center, would your various medical

22   clients send you HIPAA-sensitive information on

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 190 of 283   Pageid#:
1235

1    patients to your work e-mail?

2         A    I can't say they didn't.  I don't

3    recall any, but the doctors knew my Duffy Carmack

4    address, also knew I worked at the Higher Ed Center.

5    So I can't say some of them didn't address it to

6    Higher Ed.

7

8              (Exhibit Number 100 was marked for

9         identification)

10

11   BY MR. KINCER:

12        Q    I have handed you Exhibit 100, which

13   starts as an e-mail from Duffy Carmack to Deborah

14   Hensley, dated October 23, 2013.  First of all, who

15   is DPB?

16        A    Department of Planning and Budgeting.

17        Q    All right.  And Deborah Hensley is your

18   employee?

19        A    Yes.

20        Q    You shared your log-in passwords with

21   your --

22        A    Debbie was very knowledgeable in IT,

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 191 of 283   Pageid#:
1236

1   and sometimes I struggle, and I would have to get her

2   to help me connect to the various programs that I

3   didn't use every day.

4          Q      At the time you worked here in 2013,

5   are you familiar are State VITA policy?

6          A      Yes.

7          Q      Should you share your passwords?

8          A      You shouldn't.

9          Q      You did?

10         A      I could have changed it.

11         Q      All right.  Now, go to the very, go to

12  the very last two pages of Exhibit 100.  I want to

13  look at that one.  I asked you earlier about HIPAA.

14         A      Uh-huh.

15         Q      And this e-mail is from Robin Justice.

16  Who's msha.com?

17         A      Mountain State Health Alliance.

18         Q      Is that one of your clients?

19         A      No.  That's -- Johnston Memorial

20  Hospital was purchased by Mountain States Health

21  Alliance, who has now been purchased by Ballad

22  Health.

1      Q      Looking at this, and I see it's the
2  last addressee here is Duffy Carmack, and that's at
3  your southwestcenter.edu address?
4      A      Yes.
5      Q      That's your work e-mail?
6      A      It was.
7      Q      It was?  Now, I asked you earlier about
8  HIPAA, and you said you were knowledgeable with it.
9  And I'm not going to read these names, I will give
10  some initials.  If Exhibit 100 is to ever find its
11  way into the Court, I would recommend redaction.
12           Tell me this.  Looking at the, after
13  the good morning, and then the list of patients --
14      A      Uh-huh.
15      Q      -- do you think this patient should
16  know, this should be going to your work address, that
17  she's having this surgical procedure and that one is
18  having that one, and that one is having that one?
19  Isn't that privileged information?  Isn't that
20  protected health information?
21      A      Robin Justice is the manager of the
22  surgery center, and this was an e-mail that

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 193 of 283   Pageid#:
1238

1   Dr. McGarry had sent to her regarding scheduling

2   conflicts or, I'm going to say, canceled cases

3   because of issues with anesthesia.  So he was going

4   through these with her and he simply copied me on it

5   just so I was FYI, as the business administrator,

6   that this was an issue.

7                  So I consider the fact that e-mails

8   between the physicians and myself or the physicians

9   and Robin are proprietary e-mails.

10      Q       Even if sent to a Commonwealth of

11  Virginia work address?

12      A       Yes.  That's not good judgment, but I

13  didn't make the choice to send it across that.

14      Q       You didn't send that e-mail to

15  yourself, someone sent it to you?

16      A       Correct, uh-huh.

17      Q       Okay.  All right.  Now, go to the next

18  document and it's from the back.  We are doing the,

19  looking at the HIPAA stuff.  Look at the finance

20  charge and an invoice and then an e-mail, Duffy

21  Carmack, Wednesday 7/26/17, 10:48 a.m., two

22  attachments.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 194 of 283   Pageid#: 1239

1          It's talking about Debbie Ringley of

2   BTS Security, and she's sending you an e-mail to your

3   Center address and telling you this is past due?

4          A      Correct.

5          Q      And what is this invoice for?

6          A      It is for the burglar alarm line that

7   houses or transmits fire, smoke, burglar, whatever,

8   at the Energy Center.

9          Q      All right.  And let's see, this e-mail,

10  this e-mail is July 26.  When was this work done,

11  back in --

12         A      I don't know because it went to the

13  attention of Eddy Sproles, who was the Director of

14  Maintenance.  Eddy took care of all these invoices.

15  He had two really rough years in and out with health.

16  When he was not there, often these items would be

17  sent to me.  When he was there, he would take care of

18  them.  So that's all I know about it.

19         Q      And I think that, if I recall your

20  earlier testimony, I think that you, really his

21  department was under your bailiwick?

22         A      For a very, I'm talking three month

1    period of time; otherwise, he was under the

2    department of Joyce Brooks as operations.

3         Q      And under the CAPPS, C-A-P-P-S, you

4    would agree that it's not good for a State agency to

5    have an invoice that's overdue?

6         A      I don't think any agency should have an

7    invoice that's overdue.

8         Q      All right.

9         A      A lot of things went to Eddy's e-mail

10   and set there because no one was looking at it.

11        Q      Okay.  Turn back to -- all right.  This

12   is on Exhibit 100, and this will be page three of

13   five.  And it's an e-mail from Duffy Carmack to

14   Deborah Bourne Re: Health Fair Wednesday, dated

15   September 16 of 2014.

16               And we are talking about fair, and then

17   I'm going to the next page, which says page one of

18   two.  Who is Rod Harper?

19        A      On page?  I'm sorry what page are you

20   on again?

21        Q      Page one of two.  I just gave you

22   the -- I keyed you to the page three of five because

1    that looked pretty obvious.  Next one is the Energy

2    Center, says Energy Center.

3           A      Okay.  I will get there.

4           Q      Are you there?

5           A      Two of five?  Okay.

6           Q      Do you have that now?

7           A      I have page one of two that has Rod

8    Harper's name on it.

9           Q      Who's Rob Harper?

10          A      He worked for Bristol Sign.

11          Q      And what is Bristol Sign?  What did

12   Bristol sign do for the Center?

13          A      What did they do for the Center?

14          Q      What did they do, uh-huh.

15          A      I assume they made signs.

16          Q      All right.  Well, what I'm interested,

17   is Rod Harper to you, copy Alicia Young, January 18,

18   2016.  "Duffy, regarding your call today, 11/8/16,

19   the signs will be installed next week.  They are

20   getting close to completion.  Also, the invoice will

21   be dated for last year as you require.  If you need

22   to have it in hand sooner, let our bookkeeper know

1    that she needs to send it over to Alicia Young."

2                    Well, why are you asking him to prepare

3    you back-dated invoices?

4         A       Yes.  When we built the Energy Center,

5    we put this very large sign that you could read from

6    the Interstate with the logo of the Higher Ed Center

7    on it.  And when we rented the building commercially,

8    I needed Rod to take that down.  And the Tobacco

9    Commission grant that funded the Energy Center, you

10   have three years to close a grant out.

11                   And so we had some excess funds that

12   the Commission had asked us to hold onto, because

13   when we built the building it was a shell, and we

14   knew that there would be finishing work to be done.

15   And so when it was rented commercially, we needed to

16   pay to have our sign taken off the building.  And so

17   the Tobacco Commission asked that it be back-dated to

18   the previous year so they could run it through the

19   balance of that grant money.

20        Q       That's probably not CAPPS approved, is

21   it?

22        A       It probably would according to the

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 198 of 283   Pageid#:
1243

1   language of grant agreement.  You have 36 months

2   following the end of the grant.

3        Q     Go back to the first of Exhibit 100,

4   and go to the third page of that exhibit.

5        A     Uh-huh.

6        Q     Oh, I'm sorry, Mr. Carmack, the second

7   page.  And this is Hanging Display Systems, from Miss

8   Yanick Cusson.  Do you know who she was?

9        A     I do not.

10        Q     This is an August 21, 2014 e-mail, and

11   Ms. Cusson is writing you telling you your order will

12   be shipped out tomorrow, delivered in four business

13   days starting Monday, at One Partnership Circle in

14   Abingdon.  That's the Center's address, isn't it?

15        A     That's right.

16        Q     And did she also give you an FYI,

17   quote, "As a person working in the, quote,

18   'E-commerce', I would recommend not sending a credit

19   card number in an e-mail as it is not safe.  Smiley

20   face.  Sideways smiley face."

21        A     Uh-huh.

22        Q     Did you send -- you just sent a credit

1    card number, if we look below there, and that's from

2    Duffy Carmack to that business with all the

3    expiration date, the number, everything, over

4    unencrypted e-mail.

5         A      The e-mails from our center were

6    encrypted.

7         Q      Okay.  How did she -- that was not in

8    compliance with State policy, was it?

9         A      Went across a State computer.  I gave

10   the credit card out all the time to vendors that

11   asked for it.  It's my understanding from IT that

12   everything that went across our Center was encrypted,

13   and the receiver on the other end, she was able to

14   get it.  She got it.  It was not uncommon.  I give my

15   personal credit card for everything I order on-line

16   today.  It was commonplace then, too.

17        Q      So you don't think there's anything

18   wrong with that?

19        A      Not a thing.

20        Q      All right.

21             MR. GRIMES:  Counsel, we have been

22        going an hour-and-a-half.  Let's take a

```
1         comfort break.

2                   MR. KINCER:  Let's do.  Thanks.

3

4                   (A recess was taken)

5

6   BY MR. KINCER:

7         Q      Mr. Carmack, looking at number, Exhibit

8   Number 88, which is the Amended Complaint --

9         A      I'm sorry.  Which one?

10        Q      You have the right exhibit now.  Turn

11  to page 9 of that Complaint.

12        A      Okay.

13        Q      And I'm looking particularly at

14  paragraph 20.  It says, "After learning of Carmack's

15  complaint..." and that's referring to your OSIG

16  Complaint, "...in October 2017, Carmack's e-mails

17  were blocked with Senior Assistant Attorney General

18  Elizabeth Griffith, leaving Griffith with the

19  impression Carmack was ignoring her."  Tell me about

20  that.  What's that allegation about?

21        A      Okay.  Earlier that calendar year the

22  Tobacco Commission asked me and Evan Feinman, the
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 201 of 283   Pageid#:
1246

1    Director of the Commission, asked if the Higher Ed

2    Center would assume the debt collection piece of the

3    scholarship program that had been done by his office

4    in the Department of Collections in Richmond.

5             I told him that we would.  He told us

6    he would pay us additional money for that.  I went to

7    Richmond, the AG's office, several times and we met

8    with Elizabeth Griffin, our AG for the Higher Ed

9    Center.  There was a variety of attorneys for the

10   Tobacco Commission, so they were always included.

11   Stephanie Kim, from the Tobacco Commission, and Evan

12   Feinman and myself laid out the structure of how the

13   debt collection piece would work.  The note, the

14   promissory note, that the students signed had to be

15   changed.

16             So we spent months working together as

17   a team to create the process and the documents to

18   make this functional.  David Matlock and I had

19   virtually no communication.  And one day in October,

20   late September, October, he comes into my office and

21   shoves the cell phone in my face and said, what did

22   you do to piss Elizabeth Griffin off?  She sent David

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 202 of 283   Pageid#: 1247

1    some scathing e-mail that I wasn't responding to the

2    questions she asked, so on and so forth.

3              I hadn't received any e-mails from her.

4    I went back and looked at my e-mails, tried to

5    research what the problem was.  Elizabeth traveled a

6    great deal.  I called.  I left her a voice message.

7    Couple days later he made the comment that he hoped

8    we got a new Governor, maybe they would replace

9    Elizabeth.  She could be very inconsistent with her

10   work with me, in my experience.

11             Finally, I reached her by phone.  She

12   said, why are you not responding to my questions?  I

13   said, I'm not seeing your e-mails.  So I got up and I

14   walked down to our IT Department, and I asked Jeff

15   and Adam, who were in Jeff's office -- that's Jeff

16   Webb and Adam Tolbert -- and I said I'm not receiving

17   E-mails from Elizabeth Griffin.

18             Jeff turns around, oh, it was blocked.

19   It's fixed.  And that was the only party that my

20   e-mails were blocked to, in addition to Peter Blake.

21   I have no idea why.  Once that was unblocked, I saw

22   Elizabeth's e-mail chains, and I understand why she

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 203 of 283   Pageid#:
1248

1    was angry.  I responded back to her.  Blocked, didn't

2    know why.  Apologized, and we moved forward.

3         Q      And you have no factual information

4    that Mr. Carmack was in any way responsible for the

5    e-mail solely to Elizabeth Griffin being blocked?

6         A      Mr. Carmack wasn't, but I think --

7         Q      I'm sorry.  That Mr. Matlock blocked

8    your e-mails?

9         A      I'm of the opinion that those e-mails

10   were blocked because they are the only e-mails that

11   didn't go out in a very crucial time.

12        Q      You're of the opinion.  You have no

13   facts to support that opinion?

14        A      I do have facts to support that someone

15   in IT would had to have had the knowledge to do

16   that.

17        Q      Who could have had that knowledge?

18        A      Adam and Jeff who stayed in his office

19   and he constantly ruled with their opinions, so,

20   yeah.

21        Q      He constantly what?

22        A      Worked against me as a group.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 204 of 283   Pageid#:
1249

1          Q       All right.  So you are of the opinion

2    that Mr. Matlock had had your --

3          A       I am of that opinion.

4          Q       Based on what you just told me?

5          A       Yes, sir.

6          Q       And that's all?

7          A       Correct.

8          Q       All right.  Now, when was the first

9    time that you ever learned that you had been

10   mentioned as a possible candidate for a work force

11   transition at reduction?

12         A       January 4, 2018.

13         Q       Before January 4, 2018.  That was the

14   day you were given the WTA paperwork, correct?

15         A       Correct.

16         Q       It's your testimony under oath that no

17   one ever told you that or you never learned that from

18   any source before that date?

19         A       That is correct.

20         Q       Not one of your employees, not one of

21   your friends?

22         A       No, sir.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 205 of 283   Pageid#:
1250

1      Q      Okay.  Didn't learning of that

2  information, wasn't that what really prompted you to

3  file that OSIG complaint?

4      A      No, sir.  The harassment and abuse and

5  behavior of Mr. Matlock, who was wasting tax payers

6  money, fraud and abuse, is what prompted me to file

7  the complaint seven months before that date.

8      Q      It was motivated by spite against

9  Matlock because he got the job that you wanted?

10      A      Oh, no.  It was motivated by not doing

11  right by the citizens of the Commonwealth in the way

12  we used our funds and our services.  The Higher Ed

13  Center is an important gem to southwest Virginia.

14      Q      When did you file your written

15  complaint with OSIG?

16      A      It was filed the second time in July of

17  '17.

18      Q      When did you attempt to file it the

19  first time?

20      A      The very end of June, the previous

21  week.

22      Q      So there is a week off?

1          A       Sure.

2          Q       All right.  And you called the

3    hotline?

4          A       I called the hotline and Mr. Cowardin

5    answered.  I identified myself.  I told him I needed

6    to file a complaint and had not done that before.

7    And he sort of walked me through the process.  We

8    talked about did it need to be anonymous or not.  We

9    talked about the process.

10               He told me the first step in filing my

11   compliant would be a forensic audit.  That audit was

12   never done.

13         Q       To your knowledge?

14         A       To my knowledge.

15         Q       Look at paragraph 19 of the Amended

16   Complaint, the last line.  We are talking about after

17   your learning of the OSIG complaint again.  Last line

18   is, "Carmack was also cut off from communication with

19   the Department of Planning and Budget."  Was this

20   some more e-mail tomfoolery?

21         A       Prior to March of '16, I had direct

22   communication from our analyst or the director of DPD

1   on all budget information.  Following a visit of

2   Mr. Matlock to that department, I received very few

3   e-mails.  And when I called to inquire about that, I

4   was told by our analyst that all correspondence now

5   had to go to the director.

6            So oftentimes we didn't know what the

7   budget submission deadlines were or the criteria,

8   because David did not communicate that to Ms. Hensley

9   or to myself.

10      Q      Do you know when your position was

11  first considered for WTA?

12      A      As far as I know January the 4th of

13  2018.

14      Q      We talked earlier today about your

15  interview with the Committee for the Executive

16  Director position.  During one of those interviews,

17  did you tell the members, any members of the

18  Committee that one of the first things that you would

19  do, if you were hired as Executive Director, was to

20  eliminate your job?  Did you make that statement?

21      A      No, sir, never made that statement.

22      Q      How much were you dependent upon your

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 208 of 283   Pageid#:
1253

1    staff, that we have identified and talked about

2    earlier, to do the day-to-day work of your

3    position?

4         A       I did my own day-to-day work.   The

5    position of the chief financial officer is very

6    different from that of the Center director.   It's

7    very different from the business manager or from the

8    grants administrator.   My job was an executive level.

9    It should have and was, up until the time Mr. Matlock

10   came.   I was involved very closely with our college

11   partners, which paid us rent.

12              I was involved in the negotiations of

13   new programs coming into the Center.   Usually that

14   required obtaining matched money or State budgeted

15   funds.   I was involved in the MOU, Memorandum of

16   Understanding, which is basically a contract with any

17   tenant in the building, which had to meet certain

18   guidelines for audit purposes, for finance purposes.

19              I was very active in the academic world

20   throughout the State in trying to help recruit

21   different programs and was very successful in laying

22   the groundwork, of which Mr. Matlock reaped the fruit

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 209 of 283   Pageid#: 1254

1   for East Tennessee University to have a nurse

2   practitioner program, Radford to have a licensed

3   clinical social work program, and ODU, I'm sorry, VCU

4   to have a clinical life science program.

5        Q       All right.  When did you become aware

6   of any potential budget cuts coming, budget cut

7   reduction or requests coming from Richmond to the

8   Center?

9        A       We were notified -- gosh, I don't

10  remember the year, 2016 maybe -- that all State

11  agencies -- State was short in general funds and all

12  State agencies needed to prepare for a five percent

13  cut in budget.  We had always prepared the budget at

14  the Center.

15               The budget is complicated.  We received

16  general funds and had received approximately the same

17  amount of general funds every year since the Center

18  was established in 1987.  That's about $2,500,000.

19  Our operations exceeded that, and we were responsible

20  as a Center for raising that money.  And so the way

21  we did that was by renting space at our conference

22  service activities.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 210 of 283   Pageid#:
1255

1          So we always had surplus money at the
2   end of the year.  We were very conservative and
3   carried that money forward and had almost $1,000,000
4   in funds.  And the purpose for that was in the event
5   of any type of layoff or mandated budget cut, we
6   would not have to lay off employees.
7          So when we saw the five percent
8   reduction, we went into the budget, and there was a
9   position there, a marketing position that had
10  formerly been filled.  We eliminated that position,
11  which was about $89,000 of the 150 we needed to cut.
12  And then we went through and -- what we called
13  maintenance reserve, which is repairs to the
14  building, like carpet, HVAC, part of the real estate
15  fixture, was usually padded pretty heavy.  And so we
16  reduced the balance of that $150,000 out of that, so
17  that made our cut.
18          Shortly into the next fiscal year, we
19  received notice that the State was in better shape
20  than they thought, and so they slowly began to give
21  some of that money back on to us.  For the second
22  year, they did ask us to leave that frozen, but there

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 211 of 283   Pageid#: 1256

1    was never a budget shortfall.  We always lived within

2    the budget and always had funds left over for a

3    contingency fund at the end of the year.

4           Q       Do you know of more than one reduction

5    request coming from Richmond?

6           A       There was the one the first year, and

7    then the second year they talked of one.  But the

8    same five percent cut we made the previous year, we

9    used again going forth.  They left it on the table.

10   They didn't make it ten percent, if that makes sense.

11   It was just a total five percent cut over two

12   years.

13          Q       But you didn't know that another one

14   would not be implemented?

15          A       Pretty much from what -- the

16   correspondence we had received from the Governor's

17   office was that that would be it, five percent should

18   be it.

19          Q       I'm looking at paragraph 26 of your

20   Complaint on page ten, and this is the Paula Moad

21   contacting UVA HR incident?

22          A       Yes.

1        Q       I believe you have been present in

2    Abingdon for all the, for the depositions we have

3    taken, Joyce Brooks' deposition, for example.

4        A       Yes.

5        Q       Now, did hearing Joyce Brooks'

6    testimony about what this incident was over Ms. Moad

7    contacting UVA, did that affect your, does that

8    affect your view of this paragraph number 26 in your

9    complaint, how it's drafted?

10       A       No.  Because Ms. Brooks was untruthful

11   in her deposition.

12       Q       She was?

13       A       Yes.

14       Q       All right.  So this did not have to do

15   with Ms. Moad contacting UVA about an applicant whose

16   application was rejected because of some adverse

17   information on a State Police background check?

18       A       That is correct, and that information

19   is correct.

20       Q       Okay.  What was untruthful about her

21   testimony?

22       A       The position in of the Testing Center

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 213 of 283   Pageid#: 1258

1   had been opened for approximately a month.  We were

2   critically short, and we were trying to get someone

3   into those part-time wage positions because -- IT was

4   one, David and Jeff Webb were wanting to move Austin

5   Deirks, who was helping us in the Testing Center,

6   back to IT full-time.  And so they were really

7   pushing to get those positions filled.

8              I submitted the requisition to Joyce

9   and, in typical fashion, she held the requisition for

10  approximately a month because she didn't like me.

11  And so it became even more critical, and I would

12  mention it to her.  She would say, I will send up

13  today, I'll send it up to UVA today to post.  It

14  didn't happen.

15             Eventually, I was leaving to go to

16  Richmond for a meeting and Paula came into my office

17  that morning in December, and she said, is it okay if

18  I call and see what the status is on those postings?

19  I said, yes, because Ms. Brooks would not communicate

20  with me, and when she did, I had difficulty believing

21  what she said most of the time.

22             So with my permission, Paula called UVA

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 214 of 283   Pageid#:
1259

1   and UVA disclosed the information to her.  Paula is a

2   retired school principal, very professional, very

3   discrete.  And so when someone from UVA let Joyce

4   know that she had called, Joyce took Adam and went

5   upstairs and berated Paula to the point of tears.

6   Paula called me on my cell phone.

7           And we're talking about a 70-year-old

8   female, retired principal.  She's not a soft cookie.

9   And she said, I have never been talked to so rudely

10  in my life, and I want to file a complaint.  Joyce

11  all but yelled in my face that I didn't have the

12  right to do what I did, and Adam stood there and said

13  nothing.

14          So later that afternoon I was called to

15  Mr. Matlock's office with Ms. Brooks.  And he

16  basically chewed me out, and both told me never to

17  have a conversation with you again.  She said, I want

18  to file a grievance.  I said, I will be back in the

19  morning, and I will sign your grievance form.

20      Q       But it was Moad reporting that

21  conversation to you?

22      A       That is correct.

1   Q  And you were not a party to that

2 conversation?

3   A  Correct.

4   Q  All right.  And she wants to file a

5 grievance?

6   A  Correct.

7   Q  And did she file a grievance?

8   A  She filed a grievance form.  She pulled

9 it off line.  She filled it out.  She brought it to

10 me to sign as her supervisor, and it was sent to UVA.

11 Approximately about four days later it was laying in

12 my mailbox with a note on it, sent to the wrong

13 address, which I know that information would have

14 come back to Joyce Brooks' office, where Adam and

15 Joyce worked, because it was UVA HR information.

16   Q  Do you have a copy of that?

17   A  I have a copy of her grievance.

18   Q  All right.  But this is in addition to

19 your grievance?

20   A  I attempted to file a grievance in

21 early 2017.

22   Q  Yes, sir.  In, well, in November of

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 216 of 283   Pageid#:
1261

1    '17, right?

2         A      I don't remember the month, but it was

3    in '17.

4         Q      Let's give your attorney that, make

5    this the next exhibit.

6

7              (Exhibit Number 101 was marked for

8         identification)

9

10   BY MR. KINCER:

11        Q      All right.  Have you had a chance to

12   see that?

13        A      Yes, sir.

14        Q      Is that the grievance you're referring

15   to?

16        A      It is.

17        Q      And but it's not early of '17, it's

18   November 14 of '17, correct?

19        A      My personal grievance I filed was early

20   in '17.  Ms. Moad's was filed toward the end of the

21   year of '17.

22        Q      All right.  But in this grievance you

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 217 of 283   Pageid#:
1262

1   say -- Exhibit 101 is your personal grievance,

2   correct?

3           A       No.  That's Paula Moad's grievance.

4           Q       Well, that's November 14 of '17.  Is

5   that not your signature there beside that date there

6   on Exhibit 101?

7           A       It is.  I made the assumption that

8   that's where the employer signed but, obviously, it's

9   employee.  That's her grievance.

10          Q       All right.  So she did file a

11  grievance?

12          A       She did.

13          Q       All right.  We are not going to read

14  the whole thing, but Exhibit 101, in that grievance

15  aren't you discussing what Ms. Moad's complaints and

16  your complaints?  I mean isn't it a conglomeration?

17  Take a look at it.

18          A       I share some of these concerns but they

19  are Ms. Moad's complaints.

20          Q       But Ms. Moad's signature is not on that

21  grievance, yours is?

22          A       That is correct, which is an error and

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 218 of 283   Pageid#:
1263

1    I suspect --

2         Q       Well, the document will speak for

3    itself, but I just want to read you a little bit

4    here.  Aren't you -- why would Ms. Moad be

5    complaining about, "When awareness of an OSIG

6    complaint was known I was blocked from seeing the

7    directors calendar.  I consider this a retaliatory

8    act."

9              That would not be Ms. Moad saying that;

10   that would be you saying that, wouldn't it, Mr.

11   Carmack?

12        A       It certainly would.

13        Q       All right.  So you still say Exhibit

14   101 is Ms. Moad's grievance?

15        A       I do.

16        Q       All right.  So her grievance was,

17   indeed, filed.  Is that correct?

18        A       We sent the grievance to UVA and it was

19   returned.

20        Q       And UVA was handling --

21        A       The HR.

22        Q       -- the HR work for the Center,

1    correct?

2         A        Uh-huh.

3         Q        All right.  Yes?

4         A        Yes.

5         Q        That's the first time you have done

6    that all day, and you should be commended.

7         A        Thank you.

8         Q        Now, so then Matlock and Brooks did not

9    stop the grievance process?

10        A        The grievance process was returned, and

11   I found it very unusual that when a grievance form is

12   filed with HR and UVA, that even if it had gone to

13   the wrong address, it would have been forwarded to

14   the proper address.

15        Q        Let's go to paragraph 27 then.  Looks

16   like we have another grievance we are talking about.

17   Paragraph 27 of the Complaint, of your Amended

18   Complaint.

19                 It says, "After learning Matlock's

20   actions, Carmack filed his own grievance noting that

21   he felt this was retaliation for his OSIG complaint."

22                 Isn't that in the grievance I read you

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 220 of 283   Pageid#:
1265

1    from excerpts --

2          A       Similar, yes.

3          Q       -- of 101?

4          A       Very similar, yes.

5          Q       You say this grievance also was not

6    addressed.  What happened to your personal grievance

7    you cite in 27?

8          A       I sent it to UVA and never heard

9    anything else.  I made the assumption it was returned

10   to Ms. Brooks and trashed.  She would do anything to

11   protect Mr. Matlock.

12         Q       Excuse me?

13         A       I assumed she threw it away.  And I

14   made the assumption she would do anything to protect

15   Mr. Matlock, so she destroyed the grievance.

16         Q       And you make that assumption because

17   you don't think Joyce Brooks liked you?

18         A       Well, she said in her deposition she

19   didn't like me.

20         Q       Well, yeah.  We'll have her deposition.

21   You don't like her either?

22         A       I don't trust her.  I don't find her to

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 221 of 283   Pageid#:
1266

1    be very integretous (sic) person.

2          Q       Look at the -- go back to Exhibit 101.

3    Do you still have that before you?

4          A       Uh-huh.

5          Q       Look at the grievance Form A, Duffy

6    Carmack.  That's your -- to Duffy Carmack.  You see

7    this is from EDR, edr@dhrm.virginia.gov?

8          A       Right.

9          Q       And it says, "Dear DHRM Employee,

10   Dispute Resolution Department.  Please find grievance

11   Form A for attention to a sizeable matter at

12   Southwest Virginia Higher Ed Center.  Please feel

13   free, Respectfully, and it's William D. Carmack."

14              And that's the grievance you filed

15   with --

16         A       Let me make a correction now that I

17   have read this.

18         Q       Okay.  All right.

19         A       This is the grievance I filed on my

20   behalf.  This is not the grievance Paula Moad signed.

21   She filed a grievance.  She signed a grievance, and I

22   signed it as her supervisor.  This is my personal

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 222 of 283   Pageid#:
1267

1    grievance that I filed with the Higher Ed Center or

2    with the DHRM, through UVA to DHRM for the Higher Ed

3    Center.

4         Q     All right.  And looking, again, looking

5    at -- go to the second page of the grievance

6    procedure form of Exhibit 101.

7         A     Uh-huh.

8         Q     And you can see there is two

9    paragraphs, and then there is, starting, Paula Moad

10   wage employee.  You see that?

11        A     Yes.

12        Q     As the supervisor for our Testing

13   Center.  And you talk about Ms. Brooks, and you talk

14   about the background check.

15        A     Uh-huh.

16        Q     Why would that have been included in

17   your grievance?

18        A     Because I felt like all of those were

19   violations of policy and unethical behavior.  I think

20   there was great attempt between Ms. Brooks,

21   Ms. Heitala, and Mr. Tolbert and Mr. Matlock to cover

22   up his intent to do things his way, because he was

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 223 of 283   Pageid#:
1268

1    the agency director as he stated many times.

2            Q       You have to agree with me that an

3    agency director of whatever agency has discretion in

4    the Commonwealth, don't they?

5            A       As long as they abide by the policies

6    of the Commonwealth.  He did not.

7            Q       All right.  Now, go to paragraph 28 of

8    your complaint, of the Amended Complaint.  Still

9    where we were on page eleven, paragraph 28.  And this

10   allegation in paragraph 28 says, "Carmack also wrote

11   a letter to members of the Board of Trustees of

12   Southwest Virginia Higher Ed Center on December the

13   7th of 2017."

14                   And I'm sure you have seen this.  I'm

15   going to hand this to you.  I believe this is 102.

16

17                   (Exhibit Number 102 was marked for

18           identification)

19

20   BY MR. KINCER:

21           Q       Is that your letter that you're

22   referencing?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 224 of 283   Pageid#:
1269

```
 1        A       It is.

 2        Q       You're familiar with the contents of

 3   that letter?

 4        A       I am.

 5        Q       And what was your purpose of writing

 6   this letter?

 7        A       Senator Carrico had established the

 8   protection of Mr. Matlock from the Board of Trustees

 9   using the Executive Committee.  The bylaws of the

10   Higher Ed Center clearly states that the Board of

11   Trustees has the responsibility for hiring, firing

12   and directing the Center director.

13              At no time in three years of problems

14   and two years of complaining to various agencies, and

15   employees complaining directly to Mr. Matlock, did

16   any of those items ever come to the board.

17   Mr. Carrico would not allow it to be discussed if

18   another board member brought it up.  And I felt like

19   that the Board of Trustees needed to be made aware of

20   the severeness and the morale issues that was going

21   on.

22              So I elected to write this letter.  And
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 225 of 283   Pageid#: 1270

1   if you pay attention to the fact, I did not write it

2   with animus or to create great problem.  I was simply

3   asking that a third party administrator come in,

4   interview the employees, including Mr. Matlock, and

5   make a report back to the Board so that some

6   constructive way could be devised for him to be

7   successful in the job, but that was never allowed to

8   happen by the Board.

9              As you will notice, one of the Board

10  members wanted to go into executive session to

11  discuss this, and Mr. Carrico prevented it.

12       Q      Let's talk about that.  Was the Board

13  member Steve Cochran?

14       A      I believe that's right.

15       Q      That's in your complaint.

16       A      Okay.  Well, it was.

17       Q      Okay.  Now, how did Senator Carrico

18  prevent it?

19       A      I was called into the conference room

20  30 minutes before the board meeting by Senator

21  Carrico, and he asked me to explain what this letter

22  was.  And he took notes, and he said, I want to know

1   what the problems are.  And so we had 30 minutes

2   before the board meeting began, and I began to

3   outline in a professional manner what the issues were

4   that needed to be addressed, and that I felt like a

5   mediator should come in.

6           DHRM has a contract with four firms in

7   the State of Virginia that does this within state

8   agencies, but the individual agency has to pay for

9   it.  I never felt like that it was ethical for me to

10  go ahead and approve that as CFO.  I could have but I

11  felt like it was something that should have been

12  mutual between David and myself, and it was never an

13  option; it was never opened for discussion of that.

14          Senator Carrico said, I hate to cut you

15  short, but it's 2:00 and we need to go to the board

16  meeting.  We got up to leave and he said, by the way,

17  I not going to bring this up today, because we need

18  to discuss it further.  I said okay.  We went to the

19  board meeting.  When Mr. Cochran asked to go into

20  executive session, he refused for that to happen.

21          I never had any other conversation with

22  Mr. Carrico following that.  But I did get this

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 227 of 283   Pageid#: 1272

1   letter in the mail where he said he investigated, and

2   I refused to provide him information he requested,

3   and he considered it closed.  That was a lie.

4        Q     Okay.  That was a lie.  Okay.  But if

5   Senator Carrico were to testify that there was,

6   indeed, a meeting with you before this meeting, you

7   expressed some concerns that you were having, and

8   Senator Carrico instructed you or advised you at that

9   time, look, if you're having all these problems, get

10  some people together and bring them to me, and let's

11  talk about them, that conversation would have never

12  happened?

13       A     I don't understand the question.

14             MR. GRIMES:  Yeah, objection to the

15       form.  That was a long question.

16             MR. KINCER:  It was a long question,

17       but that's no objection.

18             THE WITNESS:  I don't understand the

19       question.

20             MR. GRIMES:  I don't understand it

21       either.

22

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 228 of 283  Pageid#:
1273

BY MR. KINCER:

     Q     Okay.  Did Carrico tell you to get some people together and he would talk to you?

     A     No, he did not.

     Q     And that would be a lie if he said that, if Carrico said that?

     A     Yes.  He didn't say it to me.

     Q     Actually, you said Carrico, reading from your complaint again, that Carrico prevented this discussion at the meeting?

     A     He did.

     Q     All right.  Actually, when Cochran made this motion, the motion fell for want of a second, didn't it, Mr. Carmack?

     A     Not that I remember.

     Q     All right.  Well, can we agree the minutes will speak?

     A     I can't agree to any of that.  I haven't seen the minutes.

     Q     All right.  Also, but was it Carrico or was it Senior Assistant Attorney General Elizabeth Griffin?  What role did she have in having this

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 229 of 283   Pageid#: 1274

1  request denied?

2       A      She wasn't present.  She was

3  telephonically dialed into the meeting, and she never

4  said a word.

5       Q      Didn't she say this was a personnel

6  matter?

7       A      No, not that I heard.

8       Q      Okay.  So she didn't say a word?

9       A      No.

10      Q      So it's erroneous in your compliant

11  when you say, under advice of Attorney General

12  Elizabeth Griffin, because a mute does not provide

13  advice, correct?

14      A      I'm not following you there again.

15      Q      She didn't say anything; you said she

16  didn't say a word.

17      A      During the board meeting she didn't say

18  anything.

19      Q      All right.  So how was she responsible

20  for denying your request?

21      A      Conversation prior to, I understand.

22      Q      Were you party to that conversation?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 230 of 283   Pageid#:
1275

1          A      No.

2          Q      So who told you that there was a

3    conversation before?

4          A      Senator Carrico alluded to the fact

5    that he had spoke to the Attorney General's office

6    and had been advised not to bring it up at the

7    meeting.

8          Q      Okay.  Now, alluded.  Did Carrico state

9    that?

10         A      He stated that.

11         Q      That's clear as day now.  Okay.  Let's

12   follow that up because you referenced it.  Senator

13   Carrico responded -- this would be 103.  Senator

14   Carrico responded in writing to your December 7th

15   letter, correct?

16         A      After I was terminated, yes.

17         Q      Well, January 9th would be after

18   January 4th.

19

20                (Exhibit Number 103 was marked for

21         identification)

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 231 of 283   Pageid#: 1276

1    BY MR. KINCER:

2         Q       You have read 103?

3         A       Oh, yes.

4         Q       And do you disagree with about

5    everything in Exhibit 103 after Dear Mr. Carmack?

6         A       I mailed the letter a week prior to the

7    board meeting.  I don't know when he received it.  He

8    did not ask for any additional information.  He said

9    he would get back to me.  I basically don't agree

10   with any of the rest of it.  It is fabricated after

11   our conversation and doesn't pertain to what was

12   actually said.

13        Q       Under your view?

14        A       Correct.

15        Q       All right.  The Heitela family; how

16   many Heitala family members were at the Center as of

17   the time you left?

18        A       When I came to work at the Center,

19   Kathy was administrative assistant.  She remains so

20   with Mr. Matlock.  She had a daughter who worked

21   weekends.  She had a son, Eli, who was hired for

22   conference services, and there was a daughter,

1    Hannah, that was an employee of UVA-Wise.

2                    Sim Ewing, who was the CFO at UVA-Wise,

3    who was a partner school at our institution,

4    contacted me during my interim period and said, we do

5    not have the funds to keep Hannah on board; do you

6    have a need for a part-time person?  And we had a

7    need in our Testing Center, so she remained a UVA

8    employee with UVA benefits, and we reimbursed Sim 50

9    percent of her salary for her to work part-time.

10                    Hannah was working in our Testing

11   Center.  I knew she was looking for a permanent,

12   full-time position.  And when all of this opening

13   opened up, when Austin Deirks wanted to go back to IT

14   and we were trying to hire employees, I went to

15   Hannah to say, would you be interested in working

16   full-time as the manager of the Testing Center?  And

17   this was in November of 2017.

18                    She squirmed, and she goes, David and

19   mom are working on something for me so, no, I'm

20   waiting on something else.  I said thank you and

21   walked away.

22           Q      So now I'm not clear.

Case 1:18-cv-00031-MFU-PMS  Document 72-1  Filed 04/24/19  Page 233 of 283  Pageid#:
1278

1          A       She was hired into a permanent,

2     full-time, new position after I was terminated by

3     Mr. Matlock.

4          Q       Who hired her?

5          A       Mr. Matlock.

6          Q       And but Kathy Heitala was hired by Dr.

7     Fowlkes?

8          A       Correct.

9          Q       And this Eli Heitala, he just set up

10    the tables at events?

11         A       Oh, he started out as wage, but then he

12    was hired as the, quote, manager of conference

13    services.  He was hired permanently.  To answer your

14    question, there was Kathy and two of her children

15    working full-time and one part-time.

16         Q       Okay.  Thank you.

17         A       And I think state policy says you're

18    not to hire family if you have any direct or indirect

19    influence over them.  She would certainly be in an

20    indirect position as David's administrative

21    assistant.

22         Q       Who would be, Kathy?

1        A       Kathy.

2        Q       So after Mr. -- strike that.  You told

3   me this morning that you sat in as interim director;

4   you sat in on a couple of the interviews.

5        A       I did.

6        Q       Well, in fact, you sat in David

7   Matlock's second interview; did you not?

8        A       I don't recall, but I did sit in on

9   some of his interview process.

10       Q       Some of Matlock's?

11       A       Yes.  He addressed the Center.  He came

12  down, he addressed.  It was an open meeting, frankly,

13  for the staff.  And he came down and talked about his

14  goals, ideas and objectives for the Center.

15       Q       Were you present for that?

16       A       I was.

17       Q       Did you lend any further communication

18  to matters that you were not personally knowledgeable

19  of, but that you heard about, he didn't do this and

20  he didn't do that, didn't follow through?

21       A       No, sir.

22       Q       You did not share any of that?

1        A        No, sir.

2        Q        All right.  You really wanted that

3    Executive Director's job, didn't you?

4        A        No.  I wanted ten years in the VRS

5    system at $109,000.

6        Q        All right.  And so it's your testimony

7    from all day that, essentially you tried to support

8    Mr. Matlock in his endeavors after he was hired as

9    Executive Director?

10        A        Yes, I did, and was retaliated against

11    continually by him.  I finally arrived at the idea he

12    had an agenda to rid my employment from the third

13    month he was there.

14                MR. KINCER:  This will be 104.

15

16                (Exhibit Number 104 was marked for

17        identification)

18

19    BY MR. KINCER:

20        Q        Let's go to the next, to the back page.

21    First of all, who is Deborah Bourne?

22        A        She was a former employee at the

1    Center.  She was director of Conference Services and

2    Operations for Dr. Fowlkes.

3         Q       She did not get along with Dr. Fowlkes,

4    did she?

5         A       Not toward the end of her employment.

6         Q       All right.  And she eventually ended up

7    in some position at Tech?

8         A       VIACOM, the osteopathic medical

9    school.

10         Q       All right.  October there is a,

11    starting with the e-mail from Deborah Bourne to you

12    on October 1, 2015.

13         A       Uh-huh.

14         Q       I heard the news.  I'm very upset.  Is

15    the news that Matlock was going to be Executive

16    Director?

17         A       Yes, uh-huh.

18         Q       And that you were not going to be?

19         A       Correct.

20         Q       Now, let's go back.  You replied to her

21    at 1:46 p.m., didn't you?

22         A       Yes, I did.

1    Q    And so you described -- what were you

2    describing when you were talking about, "Debbie, Hi,

3    Well, the good part is this sick, sick underhanded

4    process is over."  What process were you talking

5    about?

6    A    The recruitment and hiring process for

7    a Director.

8    Q    Okay.  And it was sick, sick because of

9    all the reasons you told me this morning?  Or do you

10   have additional reasons that we didn't talk about

11   this morning?

12   A    There were additional reasons that

13   involved Leanna Blevins, who was the Executive

14   Director of the Higher Education Center in

15   Martinsville.  She applied for the position, got up

16   to interview and backed out.  There was some

17   political pressure from the Martinsville market for

18   her to stay.  So it was just a very problematic

19   process from the beginning.

20   Q    Okay.  Well, how did the Blevins matter

21   affect anything concerning you or Matlock?

22   A    It was just another problem in the

1    process.  She backed out at the very last second of

2    her interview.

3         Q      All right.  Blevins did?

4         A      Yes.

5         Q      She wasn't offered the job?

6         A      Not to my knowledge.

7         Q      Okay.  Was another applicant offered

8    the job and declined?

9         A      Not that I'm aware of.

10        Q      Do you have who the three finalists

11   were for that position?

12        A      I did, but I couldn't tell you who they

13   are now.  David, Carol, and I don't remember the

14   third.

15        Q      Carol is who, Carrico?

16        A      No, a female.  Dr. Carol somebody from

17   the midwest.

18        Q      Okay.  I'm sorry.  Okay.  Then still

19   reading your e-mail back to Ms. Bourne, you say,

20   "Great relief.  Thank you for all of your support and

21   kindness.  It's very important to me.  I too have

22   a..." all caps, "...GREAT concern for the Center.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 239 of 283   Pageid#:
1284

1    The five resident college partners were unanimously

2    opposed to this, but our great members of the General

3    Assembly did not find that important."

4              Now, first of all, who were the five

5    resident college partners you're talking about there?

6         A    UVA-Wise, Old Dominion, Virginia

7    Commonwealth University, VCU and Virginia Tech.

8         Q    And so they were unanimously -- and

9    when we say opposed to this, am I reading this

10   correctly, opposed to David Matlock being Executive

11   Director of the Center?

12        A    That was what I was told as interim

13   director from the president of these institutions

14   when he was named as the director.

15        Q    You were told by who?

16        A    The presidents of these various

17   institutions.

18        Q    Each president of these universities

19   that you have named personally told you that?

20        A    President or dean.

21        Q    Okay.  Well, let's go with what deans

22   of what school told you that?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 240 of 283   Pageid#:
1285

```
 1        A       Dean of ODU, dean at Virginia Tech.

 2        Q       What dean?

 3        A       At which location?

 4        Q       Which?  ODU first?

 5        A       Okay.  ODU would have been Cecil Drane,

 6   because he was their board representative.

 7   UVA-Charlottesville was Steve -- I cannot pull his

 8   last name, but it will come to me.  Virginia Tech

 9   was, the president of the college told me that

10   himself.  UVA-Wise, I was told that by Marcia Gilliam

11   that Donna Henry, who was president of UVA-Wise --

12        Q       That was secondhand?

13        A       Yes, yes.

14        Q       Okay.

15        A       I was told by -- let's see, who I'm

16   leaving out?  Tech, Charlottesville, UVA-Wise, Old

17   Dominion, VCU was Cecil Drane.  So that's the five

18   full-time college partners.

19        Q       Drane told you that?

20        A       Yes.

21        Q       All right.  Who were the great members

22   of the General Assembly?  Members as in plural, so it
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 241 of 283   Pageid#:
1286

1  has to be more than Carrico.

2      A      Our six southwest Virginia

3  representatives from southwest Virginia who all came

4  together, even though two of them's term had expired

5  on the Higher Ed board; the Governor had not replaced

6  them.  They hadn't been to a meeting in several

7  months, but they did come in to be sure to support

8  Senator Matlock's vote of David unanimously.

9      Q      Did this include a Democrat?

10     A      No, they are all Republicans.

11     Q      Every one?

12     A      Uh-huh.

13     Q      Yes?

14     A      Yes.

15     Q      All right.  But they only had a vote,

16  correct?

17     A      Correct.

18     Q      Of the 23 we talked about?

19     A      Correct.

20     Q      All right.  Then continuing on with

21  your reply to Ms. Bourne, you said, "I will be fine.

22  As for Rachel..."  Is that Rachel Fowlkes?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 242 of 283   Pageid#:
1287

1      A      Yes, it is.

2      Q      "...best of luck to her.  A sad case of

3   a self-absorbed woman, laughing emoticon."

4      A      I agree today.

5      Q      Okay.  I thought you were good friends

6   with Ms. Fowlkes?

7      A      We are.  We are.  I tell her to her

8   face, you're just a self-absorbed...

9      Q      Now, let's go to the next page of 104.

10     A      Okay.

11     Q      And this is going from Bourne, again,

12  following back up October 1, 2015 back to you.

13  "Greetings, Duffy, do you intend to stay?  I can't

14  imagine how awful this has been."  You reply, Duffy

15  Carmack to Bourne, October 1, 1:58 p.m.  "Yes, I

16  would certainly consider other opportunities within

17  the State system.  I promise you that he will be

18  short-lived.  It will be a slow drowning."

19             Was that in reference to David

20  Matlock's tenure as Executive Director at the

21  Center?

22     A      It's been my experience when you don't

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 243 of 283   Pageid#: 1288

1  have full support of Board of Trustees as your

2  governing body, it is a slow drowning, a short

3  tenure.

4       Q      So the answer to my question is yes?

5       A      Yes, uh-huh.

6       Q      All right.  And you wished that was

7  true, didn't you, when you wrote it?

8       A      No.  I was sorry for the Center.  I

9  think the Center always had an awful lot to offer our

10 community.  I think the community college system has

11 done a great deal in our community, because in

12 southwest Virginia we need jobs and we need

13 education.

14           I have not seen our community college

15 grow under David's administration, and have not seen

16 our Higher Ed Center flourish under his

17 administration.  So I think it's a loss to the

18 citizens of the southwest Virginia.

19      Q      You think that -- it's your opinion

20 that the Center is failing presently?

21      A      For leadership, yes.

22      Q      What's the distinction?  How is it not

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 244 of 283   Pageid#:
1289

1    failing?

2         A     It's not failing financially.  It's

3    failing under what I would say integrity.  It's

4    failing from lack of direction.  It's failing from

5    some pretty negative publicity that's coming out.

6         Q     What negative publicity?

7         A     Public knowledge this lawsuit is taking

8    place.

9         Q     So is the publicity being your filed

10   lawsuit?

11        A     I have had a lot of people say they

12   read about it on-line, and I just look at them.  I

13   don't know where they pull it up from.

14        Q     Have you ever told anyone that the

15   reason that you left the Center was because of David

16   Matlock's improper or unlawful actions?

17        A     No.  I tell people I left the Center

18   because I was fired for a whistle blowing violation.

19   I complained to OSIG and David terminated my

20   employment.

21        Q     That's what you believe today?

22        A     Yes, sir.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 245 of 283   Pageid#:
1290

1          Q       Okay.  Now, continuing with Exhibit

2      104, in the discussion between you and Ms. Bourne,

3      the next, her reply to your drowning message is,

4      "Yes, he will definitely sink.  Who on earth

5      engineered his hiring?!"  And then you e-mailed back

6      to her, "Are you available to talk?"  She said, "Yes,

7      at my desk now."  Did you talk to her to discuss the

8      situation about --

9          A       I don't recall if I talked to her that

10     day, but I have spoken with Ms. Bourne.  We have been

11     friends for 25 years, and so I have talked to her

12     probably four times a year, five times a year.

13         Q       All right.  And then go to the -- we're

14     working our way towards the first page.  Go to the

15     second page.

16         A       Uh-huh.

17         Q       And this Debbie sends you a November

18     24, 2015 text.  "Hi, Duffy I tried to reach you a few

19     times.  I have been thinking about your (sic) and

20     hope you are doing okay.  I can't imagine how the SW

21     HEC will fair under Dave Matlock.  I just can't

22     imagine it.  I see where Rachel put her positive

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 246 of 283   Pageid#:
1291

1    little spin on it.  I'm sure she is absolutely

2    cringing at the thought of him running the place.

3    She did not care for him at all.  Call or write me

4    when you can.  Happy Thanksgiving to you."  You

5    recall receiving that text from Debbie?

6          A       When I read this, and yes, I assume I

7    read it.

8          Q       All right.  And what was she referring

9    to -- Rachel is Rachel Fowlkes again?

10         A       Yes.

11         Q       What was she referring to, "positive

12   little spin?"

13         A       Rachel most of the time looked for the

14   positive in everything.  Even if it was negative, she

15   tried to find a silver lining.

16         Q       And what knowledge do you have versus

17   whatever Ms. Bourne had when we got to ask her about

18   that?  What knowledge do you have that Rachel

19   disliked Dave Matlock?

20         A       Ms. Fowlkes made very open comments

21   when Mr. Matlock applied for the job.  She was very

22   vocal throughout the building that if David Matlock

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 247 of 283   Pageid#:
1292

1    got the job, it would just become a community

2    college.  David Matlock did not have the experience

3    to be director, that he had always worked in the

4    community college system, and he didn't work directly

5    at the executive level of government.  He always had

6    to go through Dr. Dubois, the State Chancellor of

7    Community College's office.  She made those comments

8    every day about him up and down the hall to

9    everyone.

10          Q      So insofar as executive -- strike that.

11    Insofar as education, training, experience or

12    ability, did you believe you were more qualified than

13    Dave Matlock for this job?

14          A      As far as education, work experience, I

15    was qualified for the job.  What I was interested in

16    was having a job with the State for ten years, and I

17    was very happy as chief financial officer.  My job as

18    CFO was in my field of expertise, and I was very good

19    at it.

20          Q      But you weren't happy from the time

21    Matlock became Executive Director until the time that

22    you left?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 248 of 283   Pageid#:
1293

1      A      I wasn't happy with the way he treated

2 me with the abuse and harassment.  I liked the job,

3 not the work environment.

4      Q      We will get to the first page of

5 Exhibit 104, and this is you back to Deborah Bourne

6 on November 24.  And it says, "Hi, Debbie.  I am

7 remiss in returning your call.  Your interest and

8 thoughtfulness means so much to me.  The place is a

9 living hell, only to become worse."

10            How was the place a living hell on

11 November the 24, 2015?

12      A      He had already created a division among

13 staff, because his five followers and he would go in

14 the room and shut the door.  They would walk up and

15 down the hall and not speak to other people.

16 Mr. Matlock considered himself an excellent listener,

17 and would call us in to ask a question or to get our

18 opinion and talked the entire time and never listen.

19            People began to figure out that he

20 didn't quite have the management and people skills

21 that he talked that he did.  And so the building

22 became very toxic.  There were very hard feelings

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 249 of 283   Pageid#: 1294

1   between Ms. Heitela and Ms. Brooks, Mr. Tolbert and

2   Mr. Webb and the remainder of the staff.

3        Q     And who were -- again, I want to make

4   sure we have all the players that we talked about.

5   Who are the five followers?

6        A     Adam Tolbert, Jeff Webb, Kathy Heitala,

7   Joyce Brooks and Jeff Webb.

8        Q     I thought you said Jeff Webb twice.

9        A     Webb, Brooks, Heitala, Tolbert and --

10  All right.  Kathy Heitala, Jeff Webb, Adam Tolbert,

11  Joyce Brooks.  I'm blanking on the fifth.

12       Q     All right.  Well, if it comes back to

13  you before we are through, let me know.

14       A     Okay.

15       Q     Okay.  Then picking right up, "As bad

16  as it is I take delight in knowing Rachel's hell..."

17  and in the text it says I.  Did you mean Rachel's

18  hell is probably worse?

19       A     More than likely, yes.  That makes

20  sense, uh-huh.

21       Q     "I will call soon and bring you

22  up-to-date."  Now, so why were you taking delight in

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 250 of 283   Pageid#:
1295

1   Rachel's hell, whom you apparently liked?

2        A      I like Rachel.  Rachel can be very

3   manipulative.  Rachel created a great deal of enemies

4   in former employees who had worked for the colleges

5   and had left over the years.  I can't really think of

6   a single person that who had worked at the Higher Ed

7   Center, probably as many as ten, that worked for her

8   that left because of her manipulative, negative

9   behavior.

10           She was capable of doing that with

11  everyone.  And I know the Center was her life.  It

12  was her livelihood.  It was her passion.  It was her

13  invention.  I know how hard she agonized over trying

14  to decide to retire.  And so I'm sure having it in

15  the hands of someone that she verbally said daily

16  wasn't capable, was absolute hell to her.

17       Q      All right.  Well, at a subsequent

18  time -- and if you recall the incident, you can tell

19  me when that was; if you don't recall that incident,

20  it doesn't matter when it happened.

21           At a subsequent time, did you go to

22  Rachel Fowlkes' house and have a verbal altercation

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 251 of 283   Pageid#:
1296

1    with her?

2          A      No.  I had a conversation with her.

3          Q      Tell me about -- was the conversation a

4    loud conversation?

5          A      No.

6          Q      Was it a contentious conversation?

7          A      No.

8          Q      It was a friendly conversation?

9          A      Yes.  And the man she dated in her life

10   was there for dinner, and we set around the kitchen

11   table and talked.

12         Q      All right.  And who was she dating?

13         A      Oh, Lord.

14         Q      He's present for this conversation we

15   are going to talk about, right, the man?  He was

16   there?

17         A      Yes.  It too will come to me.  Don,

18   Don, Don somebody.

19         Q      So Don, a friend of hers, was there and

20   you're talking to Rachel.  You go to her home,

21   correct?

22         A      Correct.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 252 of 283   Pageid#: 1297

1        Q      Did you tell her you were coming

2    over?

3        A      I don't recall.

4        Q      All right.  So you go to her home.

5    Where does she live?

6        A      On Main Street in Abingdon.

7        Q      All right.  You go to her home.  About

8    when was this visit?

9        A      It was dinnertime, so I'm going to say

10   between six and seven p.m.

11       Q      Date?

12       A      No idea.

13       Q      Cold out, warm out, spring, birds

14   chirping, hot?

15       A      Let me think.  I walk in the evenings.

16   So more than likely I was walking, so it was probably

17   warm.  That's all I can remember.

18       Q      Would this have been in -- what year

19   would this have been?

20       A      2015 or '16.

21       Q      What was this conversation?  What did

22   you say?  What did she say?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 253 of 283   Pageid#:
1298

1          A       I went over to speak with Rachel about

2     the -- let me back up.

3          Q       All right.

4          A       Rachel became involved in her typical,

5     manipulative way of controlling the Interview

6     Committee for the Higher Ed Center's search for a

7     director.  And she went out and named who these

8     people were.  When the representative at that time at

9     the OIG's office found that out, he had issue with

10    that, and asked her not to be involved in any other

11    way at all.

12              Rachel always said to me that she

13    wanted, hoped that I would have the job when she

14    retired.  She made that no secret from the time

15    before I came on.  She made it no secret every day to

16    everyone.  Again, that's her desire, not mine, so

17    make a distinction of that.

18              Rachel's actions did not support a lot

19    of the words that she had said to me over the years.

20    Rachel had a lot of comments to me that she and I

21    talked about -- we traveled a lot together -- about

22    the Center, about me.  And so I went over and

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 254 of 283   Pageid#: 1299

1    confronted her on did she really support David for

2    the job?  Was she really satisfied with that?  Or was

3    she truly looking for some other form of leadership?

4    And so our discussion that evening took place with

5    that.

6          Q      All right.  And her response to you

7    was?

8          A      Well, her response was she said she was

9    surprised that David was hired as the director.  She

10   felt like that there were more qualified applicants.

11   I don't know how she had knowledge of who the

12   applicants were.  She and Kathy Heitela talked daily,

13   so I assume that that was her contact of information

14   through the Center.

15               We basically ended the conversation

16   that, okay, I just wanted to be clear on how you

17   stood.  Still friends.  And she followed me outside.

18   And I have no idea what she meant by this, but she

19   looked at me and she said, you know you can send me

20   to jail.  I laughed and I said, you're too skinny,

21   you wouldn't last long, and left.

22          Q      All right.  You can what?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 255 of 283   Pageid#: 1300

1      A       Send me to jail.

2      Q       Oh, okay.  What do you think she meant

3  by that?

4      A       I have no idea.  I've never understood

5  that.

6      Q       All right.

7      A       Don Ault, A-l-u-t (sic), was his last

8  name.

9      Q       Okay.  Thank you. But the conversation

10  ended on a good note?

11     A       Oh, yeah.  I see Rachel at church.  We

12  talk.  She e-mailed last week wanting an address for

13  someone.  I have conversations with her.

14     Q       All right.

15

16             (Exhibit Number 105 was marked for

17             identification)

18

19  BY MR. KINCER:

20     Q       Showing you another couple e-mails

21  between you and Betty Adams.

22     A       Yes.

1        Q        First of all, who is Betty Adams?

2        A        Betty Adams is the Executive Director

3    for the Southern Higher Ed Center.

4        Q        Going back to where this started,

5    September the 28th, Betty Adams, she has sent you an

6    e-mail that she's thinking about you.  "Hi, Duffy:

7    Just wanted to let you know I'm thinking about you.

8    Hope all goes well, or as well as it can go, at

9    today's board meeting.  Let me know if there is

10   anything I can do to help.  I'm a good listener.

11   Best, Betty."

12            And was this decision day, was

13   September 28, 2015?

14       A        Oh, I have no idea.  You would have to

15   look back at the board minutes to see when they

16   voted.

17       Q        Okay.  She says, "I hope all goes well,

18   or as well as it can go, at today's board meeting."

19   What would there have been a board meeting about in

20   September?

21       A        We only have them twice a year.  They

22   only have board meetings twice a year.  And so this

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 257 of 283   Pageid#: 1302

1    would have been a called meeting, and there were

2    several called meetings in the Summer of 2015.  You

3    would have to refer to the minutes as to what the

4    purpose was.

5          Q      And then let's go to the first page,

6    your reply back to her.  "Betty, thank you very much

7    for your concern.  This is one of the most difficult

8    days professionally that I have experienced in 40

9    years.  I will be in touch."

10                Does that jog your memory if that was

11   the most difficult day you've experienced

12   professionally in 40 years?

13         A      It wasn't the announcement of hiring

14   Mr. Matlock; it was the process of that, that the

15   search committee and the six southwest Virginia

16   delegates went through.  And witnessing that process

17   was the most difficult of my experience.

18         Q      All right.  And then she replies, "Hang

19   in there."  And you reply back to her on September

20   28, 2015 at 8:20, "Betty, the SW HEC is extending an

21   offer to the Virginia Highlands Community College

22   guy.  One bright spot, the hellish search is finally

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 258 of 283   Pageid#: 1303

1    over.  By the way, I'm just fine.  I do appreciate

2    your interest and support.  I will be around and

3    still working with the other Centers over the next

4    seven years, Duffy."

5         A        Uh-huh.

6         Q        What did you mean by that?

7         A        I had no issue by the fact that David

8    Matlock was hired.  I was there to put seven more

9    years of honest, hard labor into the Higher Ed

10   Center.  So of the process, the search process, was

11   the most disturbing process to me, and so that's

12   simply what it meant.

13              I had no intention of leaving.  I had

14   every intention of taking him at his word and working

15   hand-in-hand with him and supporting him.  He never

16   gave me that opportunity.

17        Q        Why do you think that was?

18        A        I have no idea.  Never had that problem

19   in any of my other jobs.

20

21              (Exhibit Numbers 106 was marked for

22        identification)

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 259 of 283   Pageid#:
1304

1    BY MR. KINCER:

2          Q      You recall this e-mail?

3          A      Not yet.

4          Q      Okay.  Take your time.

5

6                 (Pause in proceedings)

7

8                 THE WITNESS:  I don't recall it but I'm

9          reading it.  I understand it.

10

11   BY MR. KINCER:

12         Q      Okay.  Was this noted -- was this an

13   e-mail from whoever -- Bryan Garey says he's an

14   interim vice-president at UVA -- concerning some

15   organizational excellence, buzz word, buzz word, in

16   the administration of the HR department?

17         A      My interpretation of the letter, as is

18   very commonplace with UVA, is that they were

19   continually realigning and readjusting and people

20   reporting to different departments.  And so I take

21   this to mean that Human Resources was going to start

22   reporting to under Finance, instead of whoever they

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 260 of 283   Pageid#:
1305

1   were reporting to before.

2          Q       And that would -- Joyce Brooks at the

3   time this e-mail was sent to you, Joyce Brooks would

4   have been in HR, wouldn't she?

5          A       She and Adam together.

6          Q       All right.  And Alicia Young, whom we

7   have already identified as working for you,

8   correct?

9          A       Uh-huh, right.

10         Q       And she just forwards this or chimes in

11  on this and says, "Does this mean that whomever does

12  HR for the Center should answer to the finance

13  director (CFO for us)?"

14                 And the CFO would, at this period of

15  time, would have been you, wouldn't it?

16         A       That's correct.

17         Q       All right.  And did you reply to

18  Ms. Young, "Well, that would be the icing on the

19  cake.  I see retirement in her future."  I don't know

20  what that icon is.  It will have to speak for itself.

21  What is it?  Do you know what icon that is, what

22  emoticon?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 261 of 283   Pageid#: 1306

1        A       Like a devil skull and cross bones.

2        Q       That's what I thought.  Thank you.  So
3   were you taking glee in, perhaps, getting rid of
4   Ms. Young?

5        A       Ms. Brooks you mean?

6        Q       Yeah, Joyce Brooks.

7        A       Absolutely not taking glee.  I was
8   taking glee in the fact that if somehow she had to
9   report to me, she would retire and go out the door.
10  She couldn't stand me, and she made no excuses about
11  it to anyone.

12       Q       All right.

13

14              (Exhibit Number was 107 marked for
15       identification)

16

17              (Discussion off the record)

18

19  BY MR. KINCER:

20       Q       Mr. Carmack, you were also the
21  recipient of an OSIG complaint, the subject of an
22  OSIG complaint, weren't you?

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 262 of 283   Pageid#:
1307

1       A       Correct.

2       Q       And did this -- what position were you

3  in when these acts were complained of?

4       A       This was in my position as CEO of the

5  Foundation, but I was still CFO of the Higher Ed

6  Center also.

7       Q       All right.  And I just introduced it.

8  I'm not going to waste a lot of time on it.  You

9  admit you were the subject of an OSIG

10  investigation?

11       A       Yes.

12       Q       Anything can be relative, and we can

13  argue or not, but some rather serious charges?

14       A       Depends on how you look at them, but

15  the charges are all justified, substantiated and

16  documented.  And the Foundation had outside counsel

17  that represented us during that time, and you would

18  have to ask him for that information.

19       Q       All right.  Well, I just meant, again,

20  as compared to turning in your expense account 30

21  days late, you agree the matters that you were called

22  to task for --

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 263 of 283   Pageid#:
1308

1          A          I don't agree with that.  To me they

2    are one and the same.

3          Q          Okay.  Mr. Carmack, during the

4    interview process, the search process for the

5    Executive Director for the Center, did you attempt to

6    influence any member of the hiring body in any way?

7          A          Define influence.  I had conversations.

8    They had conversations with me about they hoped I got

9    it, or they thought I would be good at it, or they

10   thought I was weak in this area, but no type of

11   influence.

12         Q          Did you offer any members of the

13   possibility of a grant?

14         A          No.

15         Q          Okay.  What was the -- it has come up

16   in all the depositions before, and I was going to ask

17   you about it.  What was the Ann Dunham complaint?

18   Your attorney has asked that?

19         A          At Virginia Highlands Community

20   College, this is not the first OSIG complaint against

21   Mr. Matlock.  Ann Dunham, who was a employee at

22   Virginia Highlands Community College volunteered

1    information openly to a group that she had filed a

2    complaint for harassment and work abuse by

3    Mr. Matlock.  And it had been founded, and she was

4    later taken out from under his administration and

5    reported to someone else.

6           Q      When was this?

7           A      Prior to 2018 when he came to work

8    there.  I'm sorry.  2015 when he came to work

9    there.

10          Q      And how were you aware of that?

11          A      She told me that.

12          Q      Who did?

13          A      Ms. Dunham.

14          Q      Is she a friend of yours?

15          A      Acquaintance, professional

16   acquaintance.

17          Q      You hesitated a little bit.

18          A      Again, I say, hello, Ann.  Hi, Duffy.

19   I see her maybe twice a year.  Ran into her at the

20   bank a few weeks ago.

21          Q      What is work abuse?  That's very vague.

22          A      Creating a very hostile work

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 265 of 283   Pageid#: 1310

1    environment, treating the employees unfair.  That's

2    purposefully antagonizing employees, setting them up

3    for failure and inability to do their job.

4           Q       Okay.  But why is that an OSIG

5    matter?

6           A       You can call it abuse.

7           Q       Okay.  Also, I wanted to ask you about

8    the G license plate.  What is your understanding of

9    what that, the origin of that license plate?

10          A       Stands for Grand Old Party.

11          Q       Where do you reach that understanding?

12   How do you get that understanding?

13          A       Known that my entire life.

14          Q       Okay.  Have you seen, have you seen W

15   plates?

16          A       I have seen all kinds of letter

17   plates.

18          Q       TK plates?

19          A       Sure, Governor's first names.

20          Q       Right.  Isn't that a George Allen

21   plate?  Isn't that G plate --

22          A       The people that I know that have the G

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 266 of 283   Pageid#:
1311

1    plates say it stands for Grand Old Party.

2          Q        Okay.  So that's just the folklore of

3    the community, that's what it stands for, the

4    basis?

5          A        Yes, sir.

6          Q        Got you.  Okay.  When you applied for

7    executive director, did you say in your application

8    that your involvement with Carmack Health Care had

9    ended in 2011?

10         A        Not that I recall.

11         Q        If you had made that statement, would

12   it have been untrue?

13         A        It would have been untrue.

14         Q        Okay.  Did you ever hold any meetings

15   using the Center facilities in support of private

16   business enterprises without paying appropriate fees

17   to the Center?

18         A        I used it for Abingdon Rotary Club.  I

19   don't recall using it for any private entity, because

20   I remember paying for using the Center a couple of

21   times.  But it wasn't really related to Carmack

22   Health Care in any way, so I don't recall that.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 267 of 283   Pageid#: 1312

1          Q        Okay.  Now, we had talked about

2    Dr. McGarry earlier and your relationship with him.

3          A        Uh-huh, yes.

4          Q        Now, you negotiated the energy building

5    lease, didn't you?

6          A        The energy building lease was

7    negotiated by Philip Hearl, who was the

8    representative, the attorney representative for the

9    Foundation.  But since his brother happened to be

10   Chairman of the Board, it was a conflict of interest.

11               We received notification, Mr. Matlock

12   received notification in July, both from the state

13   level and through Senator Carrico, and the Attorney

14   General's office, that the end of the year no more

15   state dollars, period, could be used at the Energy

16   Center.  We couldn't send our repairman down there,

17   mow the yard, scrape your driveway; it had to be

18   self-sufficient, had to have income.

19               The Energy Center had been marketed for

20   three years.  It had been marketed internationally.

21   It had been marketed locally.  It had been shown by

22   the state numerous times.  We had had people from

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 268 of 283   Pageid#:
1313

1    Germany here.  We had had people from Israel here.

2    And the bottom line is that building wasn't built for

3    a specific purpose; it was a shell.  And it was a

4    very expensive shell, and it was designed -- out of

5    15,000 square feet, there's only about 7,800 of it

6    that's usable space.  The rest is atriums, open

7    lobbies, wide hallways, what I call common areas.

8            So our Board at the Foundation realized

9    they were going to have to have a tenant.  I went to

10   Evan Feinman, who was director of the Tobacco

11   Commission, and asked their permission for us to be

12   able to rent it commercially.  That was granted.  It

13   was talked about whether they would take it back,

14   whether they should sell it.  And Evan made the

15   decision, you may rent it commercially at this time,

16   and so followed that up in writing.

17           That went on to, back to the Foundation

18   Board.  We had two realtors on that Foundation Board.

19   We talked for weeks about rent value.  That building

20   is a state-of-the-art model of what can be done in

21   alternative energy construction.  And it was built

22   for that purpose, which means it has redundant

1   systems in it.  If you, as a private landlord were

2   going to build it, you would put one heating system

3   in, not two or three.

4              It was the first building that created

5   its own energy through solar panels, and we had

6   worked endlessly for two years with Bristol Virginia

7   Utilities and TVA, Tennessee Valley Authority, in

8   getting a net metering agreement, which means that

9   with the energy we produce, it's credited back to our

10  building.  And so we are saving money.

11             And if we create enough energy, they

12  pay us back what we over-created.  And that is the

13  way that we paid for all of that energy equipment,

14  solar panels.  We have a windmill, which primarily is

15  just for symbolism, although it does power enough

16  energy to probably power a hair dryer.  It has a

17  underground deep well, geothermal heating and cooling

18  system.  It has a green roof.  It has swells.  It has

19  no holding pond.  It has every kind of feature you

20  can think of, because the idea early on was to build

21  this energy center, energy being both synonymous with

22  creating synergy energy to bring jobs to the area, as

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 270 of 283   Pageid#:
1315

1    well as creating energy for itself.

2            Now, all of that is very expensive to

3    maintain and very complicated to operate.  Our

4    agreements with TVA and BVU are 15 years long.  And

5    so to rent that building commercially was very

6    complex.  We couldn't separate -- for example, if we

7    put two tenants in there, you couldn't put two

8    electric meters.  We couldn't break out the

9    utilities.

10           So in the discussion of who and how do

11   we rent this building, we decided that we would look

12   for one tenant.  Then there was great discussion in

13   what we would charge for rent, and we were all over

14   the board.  We had had a fair market evaluation done

15   in previous years.  There were no comps to that

16   building for an appraiser to use, nothing comparable

17   to it, nothing comparable bought or sold in a 1,000

18   mile radius to it.

19       Q      Did you rent it to McGarry?

20       A      Foundation Board rented it to

21   Dr. McGarry.

22       Q      Did they know he was a client of

```
 1   yours?

 2         A      Yes.

 3         Q      That was clear and --

 4         A      Absolutely.

 5         Q      Divulged to all?

 6         A      Absolutely.

 7         Q      And he got an arm's length deal?

 8         A      No.

 9         Q      He got a sweet deal?

10         A      No.  He took the lease that the --

11   Brian Ely, attorney in Abingdon, was used to

12   represent the Foundation because of Hearl conflict.

13   And the board set a rental value that has an

14   inflation clause each year.  Tim had to invest a

15   certain amount of money in the building itself, which

16   included real estate value, and they agreed to rent

17   it to him and he signed the lease.

18         Q      Okay.  Did you receive any additional,

19   any finders fee, any additional compensation of any

20   kind above and beyond your $95,000 a year?

21         A      No, nothing.

22         Q      Okay.
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 272 of 283   Pageid#: 1317

1        A     Mr. Matlock thanked me for renting the

2  building.  He said it was an objective of Senator

3  Carrico to have the building rented by year end, and

4  he appreciated my efforts.

5        Q     So he wasn't mean to you all the

6  time?

7        A     Not every day.

8        Q     All right.  Martha Gilliam -- and I

9  think her deposition is coming up -- and I know a

10  little bit about her.  Tell me, did they have an

11  insurance agency?

12        A     Marcia is partner in an insurance

13  agency.

14        Q     All right.  And do you have any

15  business relationship with her?

16        A     I have personal policies and my clients

17  have policies with her.

18        Q     Have you placed client policies with

19  her agency?

20        A     Let me think.  Not that I can think of,

21  with one exception.  This was before I ever went to

22  work at the Higher Ed Center.  Her company has the

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 273 of 283   Pageid#: 1318

1    insurance policies on the surgery center, but that

2    was eleven, 12 years ago.  And they are still there

3    at that agency, but they weren't placed with her.

4         Q       Did you divulge to any other

5    employees -- strike that.

6                 Did you divulge to anyone else that you

7    were filing your OSIG complaint against Matlock until

8    you had done so?

9         A       My wife.

10        Q       And that was the only person?

11        A       Yes.

12        Q       All right.  And it's your testimony

13   that Mr. Matlock just would not discuss any

14   substantive business matter with you?

15        A       That's correct.

16        Q       During the entire overlap between him

17   assuming the executive director's job and you leaving

18   employment there on January the 4th of 2018?

19        A       We had several conversations that was

20   an attempt at what I would call to be constructive

21   conversations, but they never worked out that way.

22   For example, my employee review; all employee reviews

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 274 of 283   Pageid#: 1319

1    were due to UVA by April the 15th.  All employees

2    reviews were done except mine.  Mine got done on June

3    the 29th, the day before raises went out.

4                    And he admitted in the office, he said,

5    I know you and I have problems; let me know if you

6    ever want to work on it.  And I said, I'm ready and

7    willing any time.  That was my employee review.

8    Could have been a constructive conversation.  Could

9    have been an olive branch time, but it didn't turn

10   out that way.

11        Q    Since leaving the Center in 2018, have

12   you sought any other employment anywhere?

13        A    I completed a resume to send to the

14   Town Council of Abingdon when they had an anticipated

15   opening for Town Manager.  And other than that, I

16   have just put my time and efforts into Financial

17   Health Solutions.

18        Q    And does your compensation remain the

19   same, the $95,000, or has it changed?

20        A    It remains the same.

21        Q

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 275 of 283   Pageid#:
1320

```
 1

 2

 3

 4

 5

 6    BY MR. KINCER:

 7            Q

 8            A

 9            Q

10            A

11            Q

12

13

14            A

15            Q

16            A

17            Q

18            A

19            Q

20

21            A

22            Q
```

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 276 of 283   Pageid#:
1321



1

2

3

4       A

5       Q

6       A

7       Q

8

9

10      A

11

12      Q

13

14

15      A

16      Q

17      A

18      Q

19

20      A

21

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 277 of 283   Pageid#: 1322

1       Q

2

3       A

4       Q

5       A

6

7

8

9       Q

10

11

12      A

13

14

15      Q

16

17      A

18      Q

19

20      A

21      Q

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 278 of 283   Pageid#: 1323

1          A

2

3              MR. KINCER:

4

5

6

7

8

9              MR. KINCER:

10

11

12

13

14

15

16  BY MR. KINCER:

17          Q

18

19

20

21

22          A

1

2          Q

3

4

5          A

6

7

8          Q

9

10

11         A

12

13         Q

14

15         A

16

17         Q

18                MR. KINCER:  I don't have any further

19         questions.

20                MS. HADDOX:  While we are still on your

21         time, let me finish my objection from earlier.

22         I think I got through 95.  So Exhibits 96

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 280 of 283   Pageid#:
1325

1    through 101 and 104 and 106 were not produced.

2    Like the others, they are subject to

3    production and numerous requests for

4    production.  Requests for production number

5    two seeks the personal health insurance or

6    other files of Carmack in any form and all

7    other documents concerning or pertaining to

8    his employment, including and not limited to

9    his job duties, his performance, records of

10   misconduct or violation of company rules,

11   which is precise reason defendant allegedly

12   used them today.

13          In addition -- I won't go through all

14   of the justification; you can read it

15   yourself.  Request for production five, six,

16   seven, 19, 21, 23, would also cover the

17   documents not produced.

18          MR. KINCER:  Okay.

19          MS. HADDOX:  That's all for the

20   objection on the record.

21          MR. GRIMES:  And he'll read.

22          MR. KINCER:  All right.

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 281 of 283   Pageid#:
1326

1           THE COURT REPORTER:  Okay.  Can you all
2       tell me what you need?
3           MR. KINCER:  I want the original, .pdf
4       with exhibits.
5           THE COURT REPORTER:  How about you,
6       Terry?
7           MR. GRIMES:  We want the usual.  We
8       want an E-tran only.  We do not need exhibits.
9       We have them.
10          THE COURT REPORTER:  When you say
11      E-tran, do you mean ASCII?  Or do you want the
12      actual E-tran?
13          MS. HADDOX:  ASCII.  The main thing is
14      that we can convert it to text, which we can
15      do with ASCII.
16
17      (The deposition concluded at 5:21 p.m.)
18
19
20
21
22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 282 of 283   Pageid#: 1327

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2           I, MaryTheresa Ferris, Registered

3   Professional Reporter, the officer before whom the

4   foregoing proceedings were taken, do hereby certify

5   that the foregoing transcript is a true and correct

6   record of the proceedings; that said proceedings were

7   taken by me stenographically and thereafter reduced

8   to typewriting under my supervision; and that I am

9   neither counsel for, related to, nor employed by any

10  of the parties to this case and have no interest,

11  financial or otherwise in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set my

13  hand and affixed my notarial seal this 22nd day of

14  March, 2019.

15

16  My Commission expires December 31, 2021
    Notary Registration Number 228190
17

18

19  *MaryTheresa Ferris*

20  NOTARY PUBLIC IN AND FOR

21  THE COMMONWEALTH OF VIRGINIA

22

Case 1:18-cv-00031-MFU-PMS   Document 72-1   Filed 04/24/19   Page 283 of 283   Pageid#: 1328