1       IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF VIRGINIA
2          ABINGDON DIVISION

3

4

5  WILLIAM D. CARMACK,     )
                       )
6       Plaintiff,     )
                       )
7  v.                )  NO. 1:18-cv-00031
                       )
8  COMMONWEALTH OF VIRGINIA,  )
  et al,             )
9                   )
       Defendants.    )
10

11

12       DEPOSITION UPON ORAL EXAMINATION OF

13        DAVID NORWOOD MATLOCK, JR.

14     TAKEN ON BEHALF OF THE PLAINTIFF

15         Richmond, Virginia

16      Thursday, January 24, 2019

17

18

19

20

21

22

23

24

25

2

1   Appearances:

2

3        GRIMES & HADDOX, PC
         By:  BRITTANY M. HADDOX, ESQUIRE

```
                          Matlock dep tran
 4                By:  TERRY N. GRIMES, ESQUIRE
                  320 Elm Street, SW
 5                Roanoke, VA  24016
                  bhaddox@terryngrimes.com
 6                tgrimes@terryngrimes.com
                  Counsel for the Plaintiff
 7

 8                OFFICE OF THE ATTORNEY GENERAL
                  By:  RYAN HARDY, ESQUIRE
 9                By:  E. LEWIS KINCER, JR., ESQUIRE
                  202 North 9th Street
10                Richmond, VA  23219
                  ekincerjr@oag.state.va.us
11                rhardy@oag.state.va.us
                  Counsel for the Defendant
12

13

14   Also Present:  Duffy Carmack

15

16

17

18

19

20

21

22

23

24

25
                                                        3
```

```
 1                     I N D E X

 2

 3   DEPONENT                                  PAGE

 4   DAVID NORWOOD MATLOCK, JR.

 5       Examination by Mr. Grimes              11

 6       Examination by Mr. Kincer             302

 7

 8                   E X H I B I T S
```

Page 2

23        Q        -- what we all do in conversation,

24    shaking our head for yes or no or making sounds.

25                Let me begin by asking you some basic

                                                            13


1    background information about yourself.

2                Are you married?

3        A        Yes.

4        Q        What is your wife's name?

5        A        Mary.

6        Q        Same last name, Matlock?

7        A        Yes.

8        Q        What is her maiden name?

9        A        Edgar.

10       Q        Do you have children who are 18 or older?

11       A        Yes.

12       Q        Beginning with your oldest child, give me

13    the names of your children who are 18 or older.

14       A        Michael.

15       Q        Same name, Matlock?

16       A        Yes.

17       Q        And Michael is how old?

18       A        30- -- we'll say 36.

19       Q        Married?

20       A        Yes.

21       Q        What's his wife's name?

22       A        Julie.

23       Q        Matlock?

24       A        Yes.

25       Q        Do they have any children who are 18 or

                                                            14


Page 11

1  older?

2       A    They do not.

3       Q    Do you have other children?

4       A    Yes.

5       Q    What's the name and age of your next

6  child?

7       A    Deborah.

8       Q    What's Deborah's last name?

9       A    Delp.

10      Q    How old is Deborah?

11      A    35.

12      Q    Deborah's married then?

13      A    Yes.

14      Q    What's her husband's name?

15      A    Jason.

16      Q    Delp?

17      A    Yes.

18      Q    Do they have children 18 or older?

19      A    They do not.

20      Q    Do you have other children?

21      A    I do not.

22      Q    Does your wife have other children?

23      A    She does not.

24      Q    How long have you and your wife been

25  married?

                                            15


1       A    39 years.

2       Q    Where are you from?

3       A    My current residence?

4       Q    No, let's get at it this way.  Where did

5  you go to high school?

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 4 of 250   Pageid#:
1674

6        A        Oh.  Parma, P-a-r-m-a, Missouri.

7        Q        You graduated from high school?

8        A        Yes, sir.

9        Q        In what year?

10        A        1978.

11        Q        Where is your wife from, that is, where

12    did she go to high school?

13        A        Portageville, Missouri.

14        Q        Earlier I asked you whether you had given

15    a deposition before, and you indicated that you had

16    not.

17                Have you ever given testimony under oath

18    in any proceeding?

19        A        I don't believe so.

20        Q        And when I say "any proceeding," court

21    would be one example.

22                You've never testified under oath in

23    court?

24        A        Okay.  I was a character witness once.

25        Q        In a case in which jurisdiction?

                                                    16


1        A        I -- I don't know about jurisdiction.  It

2    was a young man in my youth group.  He was a student at

3    Liberty University, I believe, so it was in Lynchburg.

4        Q        In Lynchburg.

5                And about how long ago was that?

6        A        Somewhere in the neighborhood I would say

7    at least ten years ago, maybe longer.

8        Q        Was that a criminal case?

9        A        You know, I was just there for -- to --

10    they brought me in to talk about his days in my Sunday

                            Page 13

11  school class.  I didn't -- I don't remember what it was
12  about, sir.
13          Q       Have you testified in any other court
14  proceeding?
15          A       I don't believe so.
16          Q       Have you testified in any administrative
17  proceedings?  Common examples would be unemployment
18  compensation, Workers' Compensation, Social Security
19  hearings, any administratings at all.
20          A       No, none of those mentioned.  I'm not
21  aware of any.
22          Q       Or any other administrative proceedings.
23          A       And that would include if I was sworn in,
24  is that -- that would be a deposition or is that --
25  where I would be sworn in?

                                                    17

1          Q       Well, I don't know whether it would be a
2   deposition.  It may or may not.
3                  But, yes, in any proceeding where you
4   were sworn in, as you just were, to testify under oath.
5          A       I have no memory of one.
6          Q       Your son, is he a teacher?
7          A       He's a principal.  He's an administrator.
8          Q       Principal.
9                  And he is a principal -- strike that.
10                 He serves as a principal in what school?
11          A      Bristol, Virginia Middle School.
12          Q      How long has he served as a principal?
13          A      Counting his years as assistant
14  principal, approximately five.  It could be six.  Five,
15  six years.

                          Page 14

16      Q      Did he teach before that?

17      A      Yes, sir.

18      Q      How many years did he have in teaching,

19  approximately?

20      A      Eight.

21      Q      Does his wife work outside the home?

22      A      Yes, she does.

23      Q      Where does she work?

24      A      She teaches for Washington County Public

25  Schools.

                                                    18


1      Q      Are you familiar with the robotics

2  competition that took place at James Madison University

3  involving your son some years ago?

4      A      Involving -- I'm aware of the robotics

5  competition that involved his school, yes, sir.

6      Q      And did your son attend that competition?

7      A      Yes, as an administrator he did.

8      Q      And was that in Harrisonburg or where?

9      A      I assume it was in Harrisonburg.

10      Q      And did the Center pay for your son to

11  take his students to the event?

12      A      The Center was a co-sponsor of the

13  Virginia Middle School team, yes, sir.

14      Q      A co-sponsor in the sense that it paid

15  money?

16      A      Yes, sir.

17      Q      And what was that amount?

18      A      I don't know the exact amount, sir.  I --

19  if I guessed, I would say somewhere in the neighborhood

20  of $1100.

                            Page 15

21        Q       Did you authorize that expenditure?

22        A       Well, I submitted the receipts, yes, sir.

23        Q       You submitted the receipts after the

24   event was over?

25        A       Yes, sir.

                                                    19


1         Q       What about before the event took place.

2    Did the Center plan to pay for the event?

3         A       Plan to pay for which event, sir?

4         Q       The event that we're talking about, the

5    robotics competition at James Madison University.

6         A       Our institution, our agency, had a long

7    history of sponsoring teams and sponsoring schools well

8    before I got there.  We are the regional host of the

9    LEGO robotics competition, and on a regular basis we

10   sponsor teams.

11               So, yes, sir, we have -- have before,

12   before I accepted the position, sponsored teams and

13   have sponsored teams since my arrival, multiple teams.

14        Q       And did the Center sponsor any other

15   schools to attend the robotics competition at

16   James Madison University?

17        A       The school did not sponsor any other --

18   some schools took their money for their team expenses.

19   Some -- Virginia Middle chose to take theirs for the

20   competition.

21        Q       Did the Center pay for any other schools

22   to attend the robotics competition?

23        A       In that year?

24        Q       Yes, sir.

25        A       Not in that year, but others, yes, sir.

                                                    20

                           Page 16

1        Q     How did you learn about the robotics

2 competition for that year?

3        A     It's held in our building, sir.

4        Q     So is that how you learned about it?

5        A     Well, yes, sir.  It's been in that

6 building for quite some time.  When I was

7 vice president, everyone in our community is aware that

8 the regional robotics competition is held in that

9 building.

10       Q     Who is aware?  Everybody?

11       A     I would say it's common within the K12

12 arena that schools who participate in robotics know

13 about it.

14       Q     So the competition was in Abingdon at the

15 Center and not in Harrisonburg?

16       A     No, sir.  There is a State competition.

17 You asked me how I knew about robotics competition.

18       Q     The robotics competition that your son

19 attended --

20       A     Yes, sir.

21       Q     -- took place, let's be specific, in the

22 State of Virginia; correct?

23       A     Yes, sir.

24       Q     In what city in Virginia?

25       A     The first competition was in Abingdon,

21

1 Virginia, which qualified him -- which qualified the

2 team -- not him, he did not participate -- which

3 qualified his students for the State competition, which

4 is historically held at the campus of JMU.

Page 17

5      Q      That's where it's historically held?

6      A      To my knowledge.  It may be held other

7   places, but in -- since my arrival at the Center, it's

8   my understanding that it's always held, because we

9   sponsored a team this year and they went to

10  Harrisonburg and a team last year as well.

11     Q      Did your son or his school apply for

12  funding to go to the competition in Harrisonburg?

13     A      There was no real application, no, sir.

14     Q      Well, how then did the Center know to pay

15  money for your son's school to go to the competition?

16     A      Each year since my arrival, when the

17  competition is finished at Abingdon, Virginia, I

18  congratulate each team that has qualified to move on to

19  the State, and I tell them that if they need some help

20  with travel, that we have sponsorship money, nongeneral

21  fund.  Most of it can come from the foundation.

22     Q      That year did any other middle schools in

23  Southwest Virginia attend the competition in

24  Harrisburg?

25     A      Yes.

                                                    22


1      Q      And did the Center pay for their travel

2   expenses?

3      A      No, they did not request it.

4             I believe some of those teams, we had

5   already given them $1200 to sponsor their team for the

6   year.

7             We had not done so for Virginia Middle

8   School.

9      Q      You said they did not request it;

                    Page 18

10    correct?

11         A    No one requested it, sir.

12         Q    Did someone from your son's school

13    request that the Center pay for the team's expenses?

14         A    The phone call, my initial phone call

15    came from a School Board and City Council member in

16    Bristol, Virginia, telling me that they would split it

17    50/50; that they had heard that we sponsored teams.

18         Q    And who was that call from, sir?

19         A    I believe it was a Miss Beth Rhinehart.

20         Q    Are you certain?

21         A    Somewhat certain, yes, sir.

22         Q    Somewhat certain in the sense that you

23    could be mistaken?

24         A    I don't think I'm mistaken.  I know I've

25    had conversations with her about that because they --

                                                          23


1     they paid the other half.

2          Q    Do you have a memory of Beth Rhinehart or

3     someone else associated with your son's school

4     requesting that the Center pay for the travel expenses?

5          A    I don't think the word "request" would be

6     the proper word there.  We had conversation that they

7     were going to pay half and they were looking for

8     someone to step up and do the other half.

9          Q    And that someone was the Center?

10         A    Yes, sir, because the conversation was

11    with me, yes, sir.

12         Q    But you don't consider that to be a

13    request; correct?

14         A    No more -- I mean, it was just a verbal

                        Page 19

15  conversation, no different than my conversation with

16  all the teams in attendance that day.

17          Q       Did those other teams in attendance that

18  day request that the Center pay for travel expenses?

19          A       No teams that day requested I pay for

20  travel expenses.

21          Q       Or any other day that year?

22          A       "Any other day that year" would not be a

23  fair statement because the request came that -- the

24  competition is held in December.

25                  So to be truthful, the request would have

                                                        24


1   been in the next year, in January.

2           Q       I'm sorry.  The request was the next year

3   or the event was the next year?

4           A       The event is held in December.  I believe

5   it's -- I believe it's the second weekend in December.

6           Q       And are you telling us that after the

7   event took place in December -- incidentally, what year

8   are we talking about?

9           A       I believe, sir, and I'm not certain, I'm

10  going to say December of '16.

11          Q       Are you telling us that the conversation

12  concerning payment of the expenses did not take place

13  until 2017, the following year?

14          A       I'm saying that the receipts were not

15  received until after the competition was over.  The

16  competition was held in December, it was Christmas

17  break, and I believe we -- I believe we received the

18  receipts upon their returning to school.

19          Q       Did your son ask that the Center pay for

                              Page 20

20    the travel expenses?

21         A     I solicited each school.  So the day of

22    the competition in Abingdon, Virginia, I solicited each

23    winning school.

24         Q     Did your son ask that the Center pay the

25    travel expenses?

                                                    25


1          A     My son submitted the receipts after the

2     team came back.

3          Q     And did your son ask that the Center pay

4     the travel expenses?

5          A     He asked for reimbursement, yes, sir.

6          Q     And did he submit the receipts to you?

7          A     I believe so.

8          Q     Again, is your memory clear on that?

9          A     Well, I think he -- I know he submitted

10    them to me, but I think he also submitted them to

11    someone in the foundation's office.

12         Q     Do you consider yourself to be a person

13    with a good memory?

14         A     Yes, sir.

15         Q     Are there things that you remember and

16    things that you forget?

17         A     Well, I'm a human being, sir.  I'm 58

18    years old.  I pride myself in having a fairly sharp

19    mind, but some details -- you know, I don't have any

20    information in front of me, but I believe what I've

21    said to you to be my recall.

22         Q     You believe it to be your recall?

23         A     Well, yes, sir.  This was investigated by

24    OSIG, and they found it to be unsubstantiated and

                         Page 21

25   cleared when all the documentation was provided to

1   them.

2        Q    I was just asking you how it all went

3   down, about your memory of it.

4             Is there any email correspondence or text

5   messages or any correspondence whatsoever with your son

6   concerning payment of the expenses?

7        A    Well, yes, sir.  I mean, he submitted --

8   he submitted the receipts, and then I'm sure he at some

9   point said, "Hey, we have not received a check" or

10  something.  I'm not -- that would be my recall today.

11       Q    So there are emails concerning this;

12  correct?

13       A    I don't have access to my email today.

14            Being my son, I correspond with him on a

15  regular basis.  So it could have just been a

16  conversation.

17       Q    All right.  So now are you telling me

18  that there may not be any emails concerning payment of

19  expenses; it could have all been done by conversation?

20       A    Well, there were emails.  I mean,

21  receipts were turned in.

22       Q    Was that done electronically or in

23  person?

24       A    I believe it was done electronically.

25       Q    And the email went to who?

1        A    Alicia Young, I believe.

2        Q    When you say you believe, is that a way

3    of saying you're not sure?

4         A    Well, I've not seen the email.  I don't

5    have the email in front of me.

6         Q    Right.

7         A    So it would be my understanding that

8    would be proper procedure, yes, sir.

9         Q    And were you copied on the email?

10        A    I don't remember.

11        Q    Was the email from your son?

12        A    I believe so.

13        Q    That year, did the Center offer to pay

14   the travel expenses of any other middle school in

15   Southwest Virginia?

16        A    I approached every team competing and

17   congratulated them and told them if they needed

18   assistance, that we had travel funds if we had not

19   already sponsored their team.

20        Q    Did you do that in writing or orally or

21   how did you do that?

22        A    Orally.

23        Q    There's no emails or writings concerning

24   that offer; correct?

25        A    That's correct.

                                                      28


1              MR. GRIMES:  Mark this, please, as 1.

2

3              (Compilation of documents:  Robotics
               Donation Information email dated 2/2/17
4              from Jason Matlock to David Matlock, W-9,
               Federal GSA Per Diem Calculator, Bristol
5              Virginia Public Schools field trip
               documents, Quality Inn Receipts,
6              restaurant receipts, Invoice to SWVHCE
               from Virginia Middle School marked as
7              Exhibit Number 1)

                        Page 23

8    BY MR. GRIMES:

9         Q     Perhaps this will refresh your memory.

10        A     It does.  It's 2017, two months later.

11        Q     I hand to you an email from Jason

12   Matlock --

13              And that's your son; correct?

14        A     Yes, that is correct.

15        Q     -- to you, David Matlock; correct?

16        A     That's correct.

17        Q     And it's dated February 10, 2017;

18   correct?

19        A     That's correct.

20        Q     And there your son writes, "Attached is

21   the original invoice expenditures with receipts and

22   W-9.  Let me know if you need anything else.  Thanks,"

23   with an exclamation point.

24              Did I read that correctly?

25        A     Yes, sir.

                                              29


1         Q     The documents that are attached to the

2    first page of Exhibit 1, are those the documents you

3    received on February 10, 2017, attached to the email?

4         A     I would assume so, yes, sir.

5         Q     That would be an assumption on your part;

6    correct?

7         A     Since I didn't produce this this morning,

8    it would be my assumption it would be correct, yes,

9    sir.

10        Q     Well, irrespective of whether you

11   produced it this morning, do you have a memory of these

12   documents being attached to the email?

                         Page 24

13    A    I have a memory of these documents and,

14  obviously, they were attached to the email.

15    Q    Look, please, at the sixth page in this

16  exhibit.  It's a -- purports to be a hotel receipt from

17  Quality Inn.  There's a signature or an initial at the

18  bottom of the page.

19         Do you recognize those initials?

20    A    I would suspect that looks like my son's

21  initials.

22    Q    Do you recognize your son's initials or

23  not?

24    A    You know, to be honest with you, in the

25  35 years I've known him, I don't know how many times

                                                    30

1  I've seen his initials.  This may be one of the first

2  times I've ever actually seen his initials.  But that

3  would look like something he would do.

4    Q    And whoever's initials are there, it's

5  something M 12/5/16; correct?

6    A    Yes, sir.  The competition took place in

7  December.

8    Q    When did the Center agree to pay your

9  son's school's travel expenses?

10    A    Well, the agreement was made -- the offer

11  was made the day of the competition.

12    Q    And that was in December of 2016;

13  correct?

14    A    The competition at the Abingdon location

15  may have been in November.  The competition in

16  Harrisonburg was in December.

17    Q    Would you recognize your son's signature?

Page 25

18      A    I believe so.

19      Q    Turn over another three pages.  There

20 appears to be a signature at the bottom of the page.

21           This is the page I'm focusing on

22 (indicating).

23      A    That looks like his signature.  His

24 signature is on page 2 as well, it looks like.

25           Okay.  I would say that's his signature.

                                                    31

1       Q    Is Exhibit 1 the only email concerning

2 the robotics competition?

3       A    Well, I couldn't be certain.

4       Q    In other words, you don't know; correct?

5       A    I would say that would be a fair

6 statement, yeah.

7            You know, the com- -- the back-and-forth

8 between my son and I because he's someone I see on a

9 regular basis, I would -- you know, this could be the

10 only one.  There could be another one.

11           I would suspect that probably if

12 Miss Alicia Young asked for additional documentation,

13 we would have requested it and there would have been

14 additional email.

15      Q    Are you a member of any clubs, societies,

16 or organizations?

17      A    I am.

18      Q    Tell me the names of those organizations.

19      A    I'm a member of the Bristol, Virginia,

20 Chamber of Commerce.  I'm a member of the Washington

21 County Chamber of Commerce.  I'm a member of the

22 Washington County Industrial Development Authority.

                         Page 26

23    I'm a member of the Washington County Rotary Club.

24            I think that might be the current

25    membership.

32

1            Obviously I'm a member of my church, if

2    you want to call that a club or organization.

3        Q    And what's the name of that church?

4        A    First Baptist Church, Damascus, Virginia.

5        Q    What's your address, incidentally?

6        A    Physical address or mailing address?

7        Q    Physical address.

8        A

9        Q    And in what city?

10       A

11       Q    And in what state?

12       A    Virginia.

13       Q    And what's the zip code?

14       A            I believe.  I think that's

15    correct,       I don't get mail there, so -- I think

16    that's correct.

17       Q    Have you held any offices with the

18    Bristol, Virginia, Chamber of Commerce?

19       A    I'm on their executive board as an

20    ex officio member representing education.

21       Q    Have you held any offices with the

22    Washington County Chamber of Commerce?

23       A    Yes.  I am the chair of their Education

24    Committee.

25       Q    Have you held any offices with the

33

1    Washington County Rotary?

Page 27

2     A     No.

3     Q     And the other organization you mentioned
4  was what?

5     A     I mentioned my church.

6     Q     Right.

7           And you mentioned another organization.
8  Do you remember?

9     A     Oh.  IDA, Washington County Industrial
10  Authority.

11     Q     Have you held any offices with that
12  entity?

13     A     Not an office.

14           I'm also a member of the Disabled
15  American Veterans, DAV.

16     Q     Have you held any office with that
17  organization?

18     A     No.  It's just a small membership.  I'm a
19  disabled veteran.

20     Q     You served from when to when?

21     A     1982 to 1985.

22     Q     And which branch of the service?

23     A     United States Marine Corps.

24     Q     And your rank at the time of discharge
25  was what?

                                   34

1     A     My discharge, I'm actually -- I'm
2  disabled in the line of duty, E4.

3     Q     And what's the nature of your disability?

4     A     In a broad sense of the term, I do not
5  have a large intestine.

6     Q     And how did you suffer that disability?

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 20 of 250   Pageid#: 1690

7      A      Service in the United States Marine

8  Corps.

9      Q      Right.

10            Could you be more specific?

11     A      We were on deployment, and I wake up in

12  Camp LeJeune at the Naval Hospital, and it was

13  explained to me that I had a issue with my large

14  intestine.  I had a -- it would not function like a

15  normal person anymore.

16     Q      So it was an illness or a medical

17  condition?

18     A      I think with the dis- -- with the

19  Veterans Administration and Armed Forces, it's

20  considered a disability.  It would be a -- what was the

21  two choices?

22     Q      An illness or a medical condition.

23     A      Medical condition, chronic, which led to

24  the removal of my large intestine.

25     Q      Has that condition prohibited you from

                                                    35


1  working?

2      A      No, I've been able to work.  I mean, it's

3  a condition that I would wish on no human being and it

4  has caused me lots of pain and struggle my entire life

5  to where I have missed work, but...

6      Q      But the condition has not prevented you

7  from working; correct?

8      A      No.  I've chose to work.

9      Q      And -- and you're able to work?

10     A      I believe so.

11     Q      The name of your church again was what?

                        Page 29

12      A      First Baptist, Damascus, Virginia.

13      Q      Have you held any offices or position

14  with that church?

15      A      I've been a Sunday school teacher,

16  bi-vocational youth minister.

17      Q      Anything else?

18      A      You used the word "held"; correct?

19      Q      Any other positions?

20      A      Any other positions held, is that the

21  question, sir?  I'm confused.

22      Q      Well, you seem to be focusing on the word

23  "held."

24              Have you served, held, participated in

25  any way, shape, or form whatsoever in any other

                                                        36


1   position with that church?

2       A      No.

3       Q      Not a trustee?

4       A      We don't have trustees -- well, we do

5   have trustees, but I'm not a trustee.

6               Now, I currently serve as a deacon.

7       Q      Deacon, all right.

8       A      And that was an appointment made in the

9   last few months.

10      Q      Does the church have a secretary or a

11  treasurer or --

12      A      I've never served as the secretary or

13  treasurer, no, sir.

14      Q      Does the church have a secretary or a

15  treasurer?

16      A      Yes, sir.

                    Page 30

17     Q     What about any committees?

18     A     We have a committee structure.

19     Q     Personnel Committee?  Any committee at

20  all?

21     A     You know, maybe when I was on my 20s I

22  served on the Van Driving Committee.  I have been there

23  a long time.  I did drive the van to pick up the

24  elderly.

25     Q     What about preaching?

1      A     I'm a youth minister, sir.

2      Q     I don't know what that means.

3            Does that involve preaching?

4      A     It can mean pulpit supply, yes, sir.

5      Q     I don't know what "pulpit supply" means.

6            Like water or juice or what?

7      A     No.  That means when there is no pastor

8  present, I may be asked to fill in to speak.

9      Q     And have you done that?

10     A     Oh, yes, sir.  That's part of being a

11  youth minister.

12     Q     At that church?

13     A     It's common throughout our association.

14     Q     And what about other churches?  Have you

15  preached at other churches?

16     A     I've been asked to speak.  I don't know

17  necessarily what you'd call what I do -- I'm not what

18  you call a peacher in the sense.  I'm more of a

19  teacher.

20           So have I spoken at other churches?  Yes,

21  sir, I have spoken at other churches.  I have spoken at

Page 31

22    church camps.

23              Q       And has all of that been on a volunteer

24    basis?

25              A       No.  When I was youth minister, I was

                                                                    38

1     paid a small stipend to --

2               Q       To do that work?

3               A       Yes, sir.

4               Q       And did that work require a certain time

5     commitment?

6               A       Well, the time necessary to mentor and to

7     teach some young people.

8               Q       Which takes time; correct?

9               A       It can.  It has its moments.

10              Q       You used the word "mentor" just now.

11              A       Um-hum.

12              Q       Have there been persons in your life who

13    you consider to have been your mentors?

14              A       Oh, yes, sir.

15              Q       Who would that be?

16              A       I had a coach named Ron James.

17              Q       Anybody else?

18              A       I had a coach by the name of Wayne

19    Hurley.

20              Q       Anybody else?

21              A       Ron Proffitt.  I would consider Ron

22    Proffitt a mentor.

23              Q       Anybody else?

24              A       No, sir.

25              Q       Have you heard a guy -- have you heard of

                                                                    39

Page 32

1    a guy named Dale Cook?

2         A    Yes, I know Dale Cook.

3         Q    And how do you know Mr. Cook?

4         A    We run together.  I met Mr. Cook years

5    ago.

6         Q    When you say "run," do you mean run as

7    for exercise?

8         A    Yes, sir.

9         Q    Have you told anyone at work or otherwise

10   that Dale Cook is one of your mentors?

11        A    I would not consider Dale Cook a mentor.

12        Q    My question is a little different.

13             Have you ever told anyone at work or

14   otherwise that Dale Cook was one of your mentors?

15        A    I don't believe so.

16        Q    In the sense you could be mistaken?

17        A    Well, I could be mistaken, yes, sir.

18        Q    All right.

19        A    Because -- I mean, he's a friend.  He's a

20   good friend.

21        Q    Do you receive church-related emails on

22   your work email from time to time?

23        A    From time to time.

24        Q    Are you affiliated with a particular

25   political party?

                                              40


1         A    No, sir.

2         Q    Have you ever been affiliated with a

3    particular political party?

4         A    Yes, sir.

                        Page 33

```
 5        Q       And which party?
 6        A       Both parties, if we're talking only about
 7   the Democratic Party and the Republican Party.
 8        Q       Well, there may be other parties in the
 9   United States, so let me ask:  Have you been affiliated
10   with any other political party other than the
11   Republicans or the Democrats?
12        A       No, those are the only two that I've had
13   affiliation with, an association with, I guess.  I'm
14   not sure what you mean by "affiliation."
15        Q       I guess it's like the word "held."
16                Have you been associated in any way,
17   shape, or form with any political party in the
18   United States?
19        A       Yes, the Republicans and the Democrats
20   both, sir.
21        Q       At the same time or at different times?
22        A       I guess you could say at the same time.
23        Q       You guess you could say that?
24        A       I would say that.
25        Q       Have you ever told anyone at work or
                                                          41

 1   otherwise that you are a Republican?
 2        A       Possibly.
 3        Q       Have you ever helped any candidate
 4   campaign?
 5        A       Yes.
 6        Q       Who most recently?
 7        A       Most recently -- I don't know if you'd
 8   call it "help."
 9                I had some signs in my yard.  My wife put
```

Page 34

10    some signs in the yard.  But it was both parties.  One

11    of my very good friends is the Sheriff of Washington

12    County, Democrat Fred Newman.

13        Q    Have you ever helped -- and I guess I'll

14    have to -- helped, assisted in any way, shape, or form

15    whatsoever a Republican candidate?

16        A    That's a very broad statement.  I'm not

17    quite sure how -- what you mean by that question, sir.

18            Could you help me out there?

19        Q    You don't understand that question?

20        A    Well, I have board members that I will

21    see out, and they will ask me to introduce them to

22    people.

23        Q    Do you know any Republican politicians in

24    Southwest Virginia?

25        A    Yes, sir, I know Republican politicians

                                                          42


1    in Southwest Virginia.

2        Q    Who?

3        A    Well, I have five.  Let's see.  Some

4    serve on our board.

5            So we have Senator Chafin, Senator

6    Carrico, Delegate O'Quinn, Delegate Kilgore, Delegate

7    Morefield and Delegate Pillion.  They all serve by the

8    Code of Virginia on my board.  I have to report to

9    them.

10        Q    Would Carrico be Bill Carrico?

11        A    Yes, sir, Senator Carrico.

12        Q    How long have you known Mr. Carrico?

13        A    I guess my first conversation where you

14    would actually say we interacted would be in the summer

                            Page 35

15  of '14 upon the arrival of President Gene Couch at the

16  community college.

17        Q    When did you arrive in Richmond for this

18  deposition?

19        A    I arrived yesterday morning.

20             (Mr. Kincer entered the room.)

21             MR. GRIMES:  Let the record reflect that

22  another person has entered the room.

23             Sir, could we have your name?

24             MR. KINCER:  Lewis Kincer, Assistant

25  Attorney General.

                                                        43


1              We've met before, Mr. Grimes.

2              MR. GRIMES:  Once you're seated and

3  comfortable, let us know and we'll proceed.

4              MR. KINCER:  Excuse me?

5              MR. GRIMES:  Once you're seated and

6  comfortable, let us know --

7              MR. KINCER:  I'm seated and very

8  comfortable.

9              MR. GRIMES:  -- and we'll proceed.

10             MR. KINCER:  Go ahead.

11  BY MR. GRIMES:

12        Q    Do you recall the last question?

13        A    I recall my last answer.  Yesterday

14  morning.

15        Q    And are you here with your wife?

16        A    No, sir.  My wife is home teaching

17  school.

18        Q    And did you have dinner last night?

19        A    Yes.

Case 1:18-cv-00031-MFU-PMS  Document 72-7  Filed 04/24/19  Page 28 of 250  Pageid#: 1698

20      Q      Where did you have dinner?

21      A      The Cheesecake Factory.

22      Q      Who were you with?

23      A      All by myself.  All my friends showed up.

24      Q      Have you met with anyone since you've

25      been in Richmond?  Other than counsel.

                                                    44

1       A      Are you asking have I met with any of

2       those board members?

3       Q      No, I used the word "anyone," actually.

4       A      Oh, yes, sir.  I met the waitress at the

5       restaurant last night.  She was quite nice.  I met -- I

6       bought some underwear at Dick's Sporting Goods.  I met

7       the cashier there.  I met a young lady in the

8       Pocahontas building that helped me find my way how to

9       get out.

10             Very limited contact yesterday.

11      Q      Anybody else?

12      A      There was a young lady, I don't recall

13      her name, that I left -- I stopped by to see if any --

14      I have two bills, budget amendments.  I went to check

15      on two budget amendments, and I left a note for one of

16      my patrons.

17      Q      Have you met with any board members?

18      A      No, sir.

19      Q      Have you spoken with any board members?

20      A      No, sir.

21      Q      Since you got here?

22      A      No, sir.

23      Q      When have you last spoken with Bill

24      Carrico?

                          Page 37

25          A     I guess -- I believe it was at the board
                                                        45

1    meeting in December.

2          Q     Was that in Abingdon?

3          A     Yes, sir.

4          Q     Do you serve on any boards or hold any

5    offices in any organizations other than the ones you

6    mentioned moments ago?

7          A     No, those are the only public

8    organizations that I -- those are the only public

9    organizations, sir.

10         Q     Well, what about private organizations?

11         A     Oh.  Now, my wife and I, we have a

12   foundation.

13         Q     Um-hum.  And what's the name of that

14   foundation?

15         A     Justin Foundation.

16         Q     J-u-s-t-i-n?

17         A     J-u-s -- yes, sir.

18         Q     And what is your affiliation with the

19   Justin Foundation?

20         A     I guess you could call me the creator.

21         Q     And when did you create the Justin

22   Foundation?

23         A     I'm going to say somewhere around 2003

24   maybe.

25         Q     What is your position with the Justin
                                                        46

1    Foundation?

2          A     Oh, I'm a board member.

3          Q     Who are the other members of the board?

                        Page 38

4      A      I don't have that list in front of me,

5  sir.  It's quite -- I think we have 20 board members.

6      Q      Is there an executive director?

7      A      We have a president, yes, sir.

8      Q      Who is the president?

9      A      Her name is April.

10      Q      Does April have a last name?

11      A      Yes.  April Hamby Crabtree.

12      Q      April what?

13      A      Hamby Crabtree.

14      Q      Any other officers?

15      A      The vice president would be --

16      Q      Do you remember?

17      A      I'd have to -- I'd have to call.  We have

18  a vice -- we have a vice president, a secretary and a

19  treasurer.

20      Q      You don't remember who those people

21  currently are?

22      A      I currently serve as treasurer.

23      Q      Why did you create the Justin Foundation?

24      A      To work with at-risk kids in our

25  community.

                                                    47

1              Justin was a friend of my son's, and he

2  died of a drug overdose at an early age while he was a

3  student at the community college.  And Justin had a

4  learning disability.  He didn't read very well.

5              And so I actually did his funeral.  And

6  coming home from the funeral, I told my wife that we

7  needed to make people in our community more aware of

8  maybe our little poor community, zip code 23426, which

                        Page 39

9    is Damascus, so I thought we could maybe raise some

10   funds to help the reading program at the elementary

11   school and also raise some funds to help at the middle

12   school and the high school.

13        Q    Does that foundation administer money?

14        A    Yes, sir.

15        Q    Does it receive money?

16        A    Yes, sir.

17        Q    From what sources?

18        A    Oh, we have a little auction at the

19   elementary school every year.  From time to time we've

20   had a 5K race.

21             Receipts are usually $20,000 or less for

22   the year, somewhere in that neighborhood.  It's a

23   small, very small foundation.

24        Q    Does the foundation have a bank account?

25        A    Yes.

                                              48


1         Q    Does it have a checking account?

2         A    Yes.

3         Q    Are you authorized to sign checks for

4    that foundation?

5         A    Yes.

6         Q    Is anyone else authorized to sign checks

7    for that foundation?

8         A    Yes.

9         Q    Who is that?

10        A    I believe Miss Crabtree is and I'm

11   certain whoever the secretary and treasurer -- it takes

12   two signatures -- whoever the other two officers are.

13        Q    Do you serve as an officer or director of

                          Page 40

14    any other organizations?

15         A    I don't believe so, sir.

16         Q    Have you since January 1 of 2015 served

17    as an officer or a director of any other organizations?

18         A    I don't believe so -- oh, wait, no.

19    There is another organization.

20              I serve as a volunteer, yes, sir, for

21    United Federal Southeast Credit Union.  I'm a -- I am a

22    board member for that credit union.

23         Q    You have served in that capacity for how

24    long, approximately?

25         A    Approximately six years.

                                                   49


1          Q    Since January 1 of 2015, have you served

2    as an officer or director of any other organization?

3          A    I don't believe so.

4          Q    And would you remember that if you had?

5          A    I would like to think I would.  I mean,

6    I'm trying -- I'm running through my mind right now of

7    all my, my volunteer service in the community.

8          Q    You mentioned officiating at a funeral

9    just a moment ago; correct?

10         A    Um-hum.

11         Q    Have you officiated at other funerals

12   through the years in your ministerial capacity or

13   otherwise?

14         A    Yes, sir.

15         Q    Is that part of your ministerial duties?

16         A    I would call it part of my friendship

17   duties.  I mean, I would -- to conduct a funeral, you

18   don't have to be a minister.

                        Page 41

19    Q    Right.

20    A    But I have people who -- that I have

21    loved, and so, yes, I've done other funerals.

22         I do -- I did think of another committee.

23         You used the word -- the term "since

24    2015"; is that correct?  I wanted to make sure that we

25    get everything correct as far as committee and

                                                        50


1    organizations.

2         By virtue of being the agency, the

3    Southwest Virginia Higher Education Center, I'm

4    ex officio on the -- there's a Heartwood board.

5    Q    What is the Heartwood board?

6    A    Heartwood is an organization that

7    oversees -- there's a building on our campus, a

8    tourist, a regional effort to make people aware of the

9    artisans and our music heritage.

10        And so Miss Fowlkes before me served on

11   that board.  And so whoever holds the agency head of

12   the Southwest Virginia Higher Education Center is

13   listed as an ex officio member.

14   Q    Would Fowlkes be Rachel Fowlkes?

15   A    Yes, Dr. Rachel Fowlkes.

16   Q    Formerly the executive director of the

17   Center?

18   A    Yes, sir.

19   Q    Have you served since January 1 of 2015

20   as an officer or director of any other organizations?

21   Just take a moment to think.

22   A    I don't recall any at this time.

23   Q    It may be that something else comes to

                          Page 42

24      mind as we're sitting here.  If so, would you let me

25      know?

1               A       Of course.

2               Q       Other than what you've told us this

3       morning, today, do you have any other hobbies or

4       interests outside of work?

5               A       My grandchildren.

6               Q       Any others?

7               A       We've talked about church, we've talked

8       about giving back to the community, I run.  No, sir.

9               Q       Was Senator Carrico involved in any way,

10      shape, or form with your being hired as executive

11      director of the Center?

12              A       I don't believe so.  He didn't serve on

13      the Search Committee and he wasn't chairman during the

14      process, so I -- I'm not aware of -- if he did.

15              Q       Do you know whether he recommended that

16      you be hired as the executive director?

17              A       No, sir.

18              Q       You don't know that?

19              A       No, sir.

20              Q       After you came to the Center, didn't

21      Senator Carrico get you a reserved GOP tag for your

22      vehicle?

23                      MR. KINCER:  Excuse me.  What is a

24      reserved GOP tag?

25

1       BY MR. GRIMES:

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 35 of 250   Pageid#: 1705

2      Q     Would you answer the question?

3      A     I'm not sure what -- what -- I would have

4   to -- what do you mean by "reserved GOP tag"?

5            MR. GRIMES:  Objection to the speaking

6   objection, counsel.  I ask that you refrain from doing

7   that in the future.  He has just parroted your

8   question.

9            MR. KINCER:  No, I think he was as

10  perplexed as I was, Mr. Grimes.

11           MR. GRIMES:  No more speaking objection,

12  counsel.

13           MR. KINCER:  Just explain to the witness

14  what you're asking him.

15           MR. GRIMES:  The next time that happens,

16  we'll have a conference call with the Court, counsel.

17           MR. KINCER:  That's fine.  I'm available.

18  BY MR. GRIMES:

19     Q     After you came to the Center, did you get

20  a GOP tag?

21     A     I have a tag that says G I believe 58.

22     Q     It says G58?

23     A     I believe so, yes, sir.

24     Q     What does that mean?

25     A     Well, it was kind of a joke between me

                                             53

1  and my wife.  We -- it was a joke that we would -- you

2  know, I work for the Governor.  So it has a big G on

3  it.  I think I got that last year.  And so I was

4  getting ready to turn 58.

5     Q     So your tag has three characters on it, a

6  G and a 5 and an 8?

Page 44

7        A        I believe it's 58.  I've been mistaken

8    before.

9        Q        Do you not know what your license plate

10   says?

11       A        I believe it says G58.

12       Q        Was there a time when you had a GOP tag

13   for your vehicle?

14       A        Like a campaign?  Like a campaign tag?

15   I've never put a campaign sticker on any of my vehicles

16   ever at any time in my life, for either party, even

17   when I was campaigning for the other party.  I never

18   put a campaign sticker.  That's -- I wouldn't make my,

19   my preferences known to the public.

20       Q        When did you get your G58 tag?

21                MR. HARDY:  Asked and answered.

22   BY MR. GRIMES:

23       Q        What was your answer?

24       A        I believe it was at some point during the

25   year 2017.

                                                        54


1        Q        Did you have any tags or license plates

2    that indicated your party affiliation in 2016, 2017, or

3    2018?

4        A        I had that G tag.  That's the only tag

5    I've ever had that --

6        Q        And you say the G stands for governor;

7    correct?

8        A        That's what I tell my friends.

9        Q        What's the truth?

10       A        I'm not certain.  I just saw it and --

11   and I asked someone, "How do you get one of those?" and

                        Page 45

12   they said, "You have to fill out a D -- Department --
13   DMV application."

14        Q    What does the G stand for?

15        A    I have no idea.

16             I like to tell people it stands for
17   governor because, you know, I'm an agency head.  So I
18   guess there's a little ego there.

19        Q    Have you disposed of or gotten rid of any
20   tags or license plates in 2016, '17 or '18?

21        A    I believe it's when you trade vehicles
22   in, you don't transfer the tags; you have to turn those
23   back in.

24        Q    In 2016, '17 or '18, was there any
25   indication or writing on any of your vehicles that you

                                                           55


1   were affiliated with the Republican Party?

2        A    No.  I never -- I never put writings or
3   bumper stickers or anything on my vehicle.

4        Q    Do you hold any licenses other than a
5   driver's license?

6        A    Well, I have a license as an ordained
7   minister.  You can't marry people in Virginia without a
8   license to do that.

9        Q    And do you have a license to marry
10   people?

11        A    Yes.

12        Q    And do you officiate over marriage
13   ceremonies from time to time?

14        A    Yes.

15        Q    And that license is from one of the
16   churches?

                         Page 46

17      A     No, sir.

18      Q     From?

19      A     That license is from Washington County,

20  Virginia.

21      Q     Do you hold any other licenses?

22      A     No, sir.  I think that's the only two.  I

23  have a driver's license, and I don't think -- I don't

24  think anything else I do in life requires a license.

25      Q     Have you ever been arrested?

56

1      A     No, sir.

2      Q     Have you ever been a party to any

3  litigation?

4      A     I don't believe so.

5      Q     Let me ask about your education.

6           Did you go to college?

7      A     Yes, sir.

8      Q     Where did you go to college?

9      A     Oh, I went to -- I did dual enrollment at

10  Southeast Missouri State University as a school, high

11  school student.  I attended Mississippi State

12  University and Southern Illinois University.

13      Q     Did you obtain an undergraduate degree?

14      A     Yes, sir.

15      Q     From what university?

16      A     The undergraduate degree is from Southern

17  Illinois University.

18      Q     When did you get that degree?

19      A     1980- -- I'll say '85 today.  I'll have

20  to check.

21      Q     You don't remember?

Page 47

| | | |
|---|---|---|
| 22 | A | No, sir. |
| 23 | Q | And your degree was in what? |
| 24 | A | Management. |
| 25 | Q | Business management? |

57

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Do you have any other formal education? |
| 3 | A | Yes, sir. |
| 4 | Q | Do you have any other degrees? |
| 5 | A | Yes, sir. |
| 6 | Q | What degrees? |
| 7 | A | I have a master's degree in counseling. |
| 8 | Q | Would that be an MS or an MA? |
| 9 | A | It would be an MED. |
| 10 | Q | I couldn't hear you. |
| 11 | A | An MED. |
| 12 | Q | From where? |
| 13 | A | East Tennessee University. |
| 14 | Q | When did you get that degree? |
| 15 | A | I believe 1995. |
| 16 | Q | Are you not certain? |
| 17 | A | I'm fairly certain. |
| 18 | Q | Do you have any other degrees? |
| 19 | A | Formal degrees, no, sir. |
| 20 | Q | Do you have any other informal degrees? |
| 21 | A | I have graduate certificates. |
| 22 | Q | Are you working toward your Ph.D.? |
| 23 | A | I was. |
| 24 | Q | At what institution? |
| 25 | A | East Tennessee State University. |

58

Page 48

1    Q    Are you no longer working towards your

2    Ph.D.?

3    A    I placed that on hold.

4    Q    And why did you do that?

5    A    In the last four years of my life, I've

6    had four major surgeries.

7    Q    So for medical reasons?

8    A    Yes, sir.

9    Q    You were working toward a degree in what?

10    A    Higher education administration.

11    Q    Was it a requirement to have a Ph.D. to

12    become the executive director for the Southwest

13    Virginia Higher Education Center?

14    A    No, sir.

15    Q    Would you agree that not having a

16    doctorate closed some doors for the executive director

17    of the Center?

18    A    No, sir, I wouldn't agree with that.

19    Q    Did your predecessor have a Ph.D.?

20    A    Yes, sir, she did.

21    Q    And how long did she serve as the

22    executive director of the Center?

23    A    For its history.

24    Q    And the history began when?

25    A    I believe they were created by the Code

                                                        59


1    of Virginia in 1992.

2    Q    And when did the Southwest Virginia

3    Higher Education Center start functioning?

4    A    I believe when they were created by Code

5    in 1992.

                    Page 49

Matlock dep tran

6    Q    Was the Southwest Virginia Education
7  Center, which I'll refer to as the Center throughout
8  this deposition from time to time, the first such
9  center in the State of Virginia?

10    A    It's my understanding that, yes, it was.

11    Q    Are there other similar centers now in
12  Virginia?

13    A    Yes, there are.

14    Q    Where are they?

15    A    There is an agency in Danville -- it's
16  not Danville.  It's Martinsville.  It's called the
17  New College Institute.  Then there's the Southern
18  Virginia Higher Education Center.  That's a State
19  agency.

20         There's only three -- to my knowledge,
21  there's only three agencies.

22    Q    Is there a Higher Education Center there
23  by Hotel Roanoke in Roanoke?

24    A    That's an authority owned by the county
25  and the, I guess the municipalities there.

                                                    60


1    Q    What does the Southwest Virginia Higher
2  Education Center do?

3    A    We're in the opportunity business.

4    Q    So it sells or creates opportunity?

5    A    Provides opportunity, would be the way I
6  would like to phrase it.  We're about changing people's
7  lives from kindergarten to career.

8    Q    So it changes lives?

9    A    I believe so, yes, sir.

10    Q    How does the Southwest Virginia Higher
                Page 50

11  Education Center relate to the Higher Ed. Centers in
12  Virginia, if at all?

13          A       Relate as in -- could you -- what do you
14  mean by "relate"?  Help me out there, sir.

15          Q       Does the Southwest Virginia Higher
16  Education Center have any relation, relationship to the
17  other Higher Ed. Centers in Virginia?

18          A       We have a quarterly conference call we
19  have with each other.  We kind of just peer to peer
20  bounce things off.

21          Q       And do you have quarterly telephone calls
22  with the executive directors of the other higher
23  education centers in Virginia?

24          A       Yes, sir, that was my reference there.

25          Q       There's also something called the

                                                          61


1   Southwest Virginia Higher Education Center Foundation;
2   is that correct?

3           A       Yes, sir, that's correct.

4           Q       When was that created?

5           A       I don't know.

6           Q       Before or after the Center?

7           A       Oh, after the Center.

8           Q       What is the relationship between the
9   Foundation and the Center?

10          A       The sole purpose of the Southwest
11  Virginia Higher Education Center is to raise funds to
12  support the activities of the Southwest Virginia Higher
13  Education Center, as stated in their bylaws.

14          Q       Do you have any responsibility with
15  respect to the Foundation?

                        Page 51

16      A      The executive director of the Center is
17  an ex officio member of the Foundation board.
18      Q      What does that mean "ex officio"?
19      A      It means I attend the meetings and speak
20  when spoken to when they ask for advice and provide
21  guidance when asked.
22      Q      Does the Foundation have any employees?
23      A      The Foundation does not have its own
24  employees.  There is an MOU in place between the Center
25  and the Foundation where the -- we have -- for work

62

1   that is done on behalf of the Foundation by a center
2   employee, there's a percentage that's paid back yearly
3   to the Center.
4       Q      Has anyone associated with the Center,
5   any member of the board of directors or any officers,
6   ever said to you that you could not do any of your
7   church work while working for the Center?
8       A      No.  I wouldn't do church work -- I mean,
9   no, no one has said that to me.
10      Q      Or that you could not serve as an officer
11  or director of any of the other organizations you
12  mentioned earlier while working for the Center?
13      A      No.
14      Q      Where did you work just prior to going to
15  work for the Center?
16      A      Virginia Community College System,
17  Virginia Highlands Community College.
18      Q      And your position there was what?
19      A      My position there was vice president.
20      Q      Overseeing some particular aspect of the

Page 52

21  organization?

22      A       Yes, sir, marketing, alumni relations,

23  institutional advancement, institutional research were

24  probably the four broad categories.

25      Q       When did you go to work for the Virginia

1   Highlands Community College?

2       A       In January of 1992.

3       Q       And you worked there until when?

4       A       November 2nd of 2015.

5       Q       And you started at the Center when?

6       A       November 2nd, 2015.

7       Q       Did your job at the community college

8   require that you interact with the Center in any way?

9       A       Of course.

10      Q       In what way?

11      A       Well, the colleges that are there, UVA

12  Wise primarily, offer stackable credentials, so it was

13  important that we would align our programs at the

14  community college with the programs being offered by

15  UVA Wise so that our students had a clear pathway to

16  the world of work.

17      Q       How is the college related to the Center?

18  Is it just the way you've told me?

19      A       What I've told you is partially true -- I

20  mean, it is true, but I don't think that that's the

21  whole way that they are related.

22              They have a seat on the board, a voting

23  member of the board.  They donated the land.  The

24  Virginia Community College System donated the land.

25      Q       To build the Center?

Page 53

1       A       Yes, sir.

2       Q       Why did you leave the college?

3       A       Opportunity.  I loved my job at the

4    Virginia Highlands Community College.

5       Q       What do you mean "opportunity"?  Better

6    opportunity?

7       A       I had been there 25 years, and when I

8    looked at my legacy in life, I thought this was -- made

9    a very nice logical step to make a difference in the

10   lives of the people in our community.

11      Q       What was your rate of pay when you left

12   the college?

13      A       I believe at that time, somewhere around

14   $110,000.

15      Q       What's your rate of pay when you started

16   at the Center?

17      A       I believe it was $130,000.

18      Q       So more money; correct?

19      A       There was an increase in pay because of

20   the increase in responsibility, yes, sir, but that's --

21   I didn't leave because of money.

22      Q       How did you learn about the opening at

23   the Center for executive director?

24      A       Well, it -- we sit on the same campus.

25   Miss Fowlkes attended the board members -- the board

1    meetings for their community college, and she announced

2    her retirement at one of our board meetings.

3       Q       Dr. Fowlkes retired in or about June of

Page 54

4  2015; correct?

5       A    I believe it would probably be June 30th

6  of 2015, yes, sir.

7       Q    On that your memory is perfectly clear;

8  correct?

9       A    I believe that's true.  I have not seen

10  her retirement paperwork.  I didn't track that down.  I

11  just -- I just kind of from 28 years of service in the

12  Commonwealth, this kind -- the end of the fiscal year

13  is kind of a point in which a lot of things happen.

14       Q    Did you ever talk with Senator Carrico

15  about your interest in becoming executive director of

16  the Center?

17       A    I don't believe so.

18       Q    Are you certain of your answer?

19       A    (No response).

20       Q    Are you certain of your answer?

21       A    I'm trying to relive conversations that I

22  may or may not have had.

23            I'm not sure why I would have contacted

24  Senator Carrico.

25            I do recall having a conversation with

                                                          66


1  then chairman of the Search Committee, Democrat

2  Senator -- it slips me -- to find out what the

3  application process was.

4            So I can't say yes or no today.  I -- on

5  some reflection, I'll think on it as the day goes,

6  because I had several conversations, I mean, as anyone

7  might when you go to apply for a job; you let people

8  know that you're interested.  I'm trying to think who

                        Page 55

9    all I said that to.

10         I kept it quiet because I didn't want --

11   I didn't want anyone to know because I loved my job as

12   vice president of the community college and we had a

13   brand new president, and I didn't want him to perceive

14   that as not being loyal to him.  So I didn't apply

15   until a few minutes before midnight on the date on

16   which the application deadline occurred.

17        Q    Prior to the time you were hired as

18   executive director of the Center, did you have any

19   conversations with Senator Carrico about your interest

20   in the executive director position?

21        A    Prior to the date I was hired, that would

22   be a correct statement.

23        Q    It was actually a question.

24        A    Okay.  So that question, yes, sir, the

25   answer would be yes.

                                                    67


1         Q    When did you first have a conversation

2    with Senator Carrico about your interest in the

3    executive director position?

4         A    That I don't know, sir.

5              I do know I had conversations with him in

6    September before the job was offered to me, and that

7    had mostly to do with salary negotiation.

8         Q    When was the job offered to you?

9         A    I believe, and I didn't write this one

10   down, October 2nd, October 3rd.

11        Q    Of?

12        A    2015.

13        Q    How many applicants were there for the

                        Page 56

14      job?

15              A       I have no knowledge, sir.  It would be a

16      guess on my behalf based on hearsay.  I didn't see -- I

17      wasn't privy to the applicant pool.

18              Q       Do you know who any of the other

19      applicants for the job were?

20              A       Yes, because it was made known who the

21      final six candidates were.

22              Q       Who were they?

23              A       Mr. Duffy Carmack was in the final six,

24      Miss Cheryl Carrico was in the final six,

25      Miss Leanna -- I can't think of Leanna's last name.

                                                                68


1       She's the executive director at the New College

2       Institute -- was in the final six, myself, and I don't

3       know who the other two were.  I think it was a lady

4       from Michigan.  I'm not certain.  No one ever handed me

5       that list.

6               Those were just names that I was familiar

7       with because I had awareness of those people.

8               Q       Did anyone ever tell you why you were

9       chosen for the job?

10              A       I believe that when the job was offered

11      to me, members of the selection committee told me I was

12      selected because I was the best candidate.

13              Q       You believe that or you're certain of it?

14              A       Oh, I'm certain they told me based on my

15      25 years of experience, my dedication to the community,

16      my knowledge of educational programs, my relationship

17      with all the other colleges, that I was the best

18      candidate.

                        Page 57

19      Q       And that's precisely what the members of

20   the selection committee told you?

21      A       No, not precisely because it's been quite

22   some time.  I'm just giving you a broad remembrance of

23   what my ego remembers.

24              It was a very competitive process.  There

25   was a lot of very highly qualified candidates.  So

69

1    obviously I had to be highly qualified.

2       Q       Do you know a Richard Leigh?

3       A       Yeah.  He's a very good friend.

4       Q       Who is that?

5       A       Richard Leigh is a song writer.

6       Q       From?

7       A       Nashville now, sir.

8       Q       That's where he lives, isn't it?

9       A       No, sir, he lives in Crossville,

10   Tennessee.

11      Q       Where is he from?

12      A       I believe right here in Richmond

13   originally.  He -- he had five mothers and like four

14   daddies.  He was in and out of foster care.  So I think

15   when his parents were killed, he was from

16   Washington, D.C.

17      Q       Did he ever live in Southwest Virginia?

18      A       Yes, sir.  He's a graduate.  Yes, sir, he

19   did.

20      Q       Now you remember he's lived in Southwest

21   Virginia?

22      A       But he's not from there.  Your question

23   was where was he from.

Page 58

24    Q    Right.

25         Did he live there for a while, Southwest

1    Virginia?

2    A    He was a student at Virginia Highlands

3    Community College.

4    Q    Have you ever described him as your best

5    bud?

6    A    I've probably described him as my best

7    friend.  "Bud" is not a word I would normally use in my

8    vocabulary.  He likes to use the word "bud" all the

9    time and I may have replied to him, but I don't know if

10    I would ever say, "Everyone, please meet my best bud."

11         He is probably one of my best friends in

12    life.

13         MR. GRIMES:  Mark this as 2, please.

14         (1.10.18 email from Laura Pennington to
              David Matlock re:  Richard Leigh – 2018
15         Festival marked as Exhibit Number 2)

16    BY MR. GRIMES:

17    Q    At the top of the page is an email from a

18    Laura Pennington to you dated January 10, 2018;

19    correct?

20    A    That's correct.

21    Q    There she writes, "David, know you are

22    beyond busy, so just wanted to thank you in advance for

23    giving me a call as soon as you know Richard will be

24    swinging through town.  I'm looking forward to you

25    introducing me to your best bud."

1         Did you tell Laura Pennington that

2    Richard Leigh was your best bud?

Page 59

3       A     I probably referred to Richard Leigh as

4  my best friend.  I don't know if in my entire life I've

5  ever referred to anybody as my "best bud."  Again, that

6  would be -- that would be unique to my vocabulary.

7              Could I have?  Maybe.

8              But that, normally, no, sir.  I would say

9  no.

10            Would I say he's my best friend?  He's a

11  very good friend, yes, sir.

12       Q     Are you Richard Leigh's key man?

13       A     Richard likes to refer to me as his key

14  man.

15       Q     Are you his acting agent?

16       A     In a -- I guess in a 40,000 foot

17  approach, he will say that from time to time.  And

18  he'll ask me to speak to people on his behalf, which

19  could be implied that I might be an agent for him.

20            But best friend?  Yes, he's probably one

21  of my top three friends of my entire life.

22       Q     Have you ever told anyone that you are

23  Richard Leigh's key man?

24       A     I have probably used the word "key man"

25  in describing my relationship with Richard Leigh.

                                                     72

1       Q     Is that a yes?

2       A     That would be a maybe because I don't

3  know if I would ever say, "Hey, I'm his key man."  I

4  might say, "I'm acting as his key man," which --

5       Q     Have you --

6       A     -- which has a different meaning in

7  Nashville.

Page 60

8       Q       Have you ever told anyone that you are

9    Richard Leigh's acting agent?

10       A       I may have.

11       Q       Is that your answer?

12       A       Yes, sir.

13       Q       Is that true?

14       A       I believe it to be true.

15       Q       Irrespective of your belief, is it true?

16       A       I have acted as an agent for Richard

17   Leigh in a very broad sense of the words, but to

18   introduce myself and say that, probably -- probably

19   not.

20       Q       An agent helps a performer get work;

21   correct?  That's what an agent does, isn't it?

22       A       Yes.  And that's kind of why I use that

23   term loosely, because I never really helped him get

24   work.  I would help him transition with the work.

25               Richard does not like to be called by 20,

                                                        73

1    30, 40 people.  He only wants to talk to one person

2    when he comes to the town.

3               And since I'm his best friend, when he

4    comes to Abingdon, he really only wants to talk to me.

5    He doesn't want, you know, somebody calling him about

6    what kind of wine do you want in your refrigerator or

7    what time do you want to be picked up or this is what

8    you're going to wear.

9               MR. GRIMES:  Mark that, please, 3.

10              (8/30/17 email from Olivia Denton to
                David Matlock re: request for Richard
11              Leigh Mailing Address marked as Matlock
                Exhibit Number 3)
12

                          Page 61

13    BY MR. GRIMES:

14         Q      Exhibit 3, if you look at the second

15    email down the page, is an email from you to Olivia

16    Denton; correct?

17         A      Second email from me to Olivia -- okay.

18         Q      Correct?

19         A      Yes.

20         Q      And there you write, concerning Richard

21    Leigh, as his, quote, key man, closed quote, and acting

22    agent.

23                Do you see that?

24         A      Um-hum.

25         Q      Does that refresh your memory about

                                                    74


1     whether you've told anyone that you are Richard Leigh's

2     key man and acting agent?

3          A      Oh, yeah, I said it here, obviously.

4          Q      Did you start the annual fundraiser at

5     the college involving Richard Leigh?

6          A      Yes.  Well, it was a team of people.  It

7     just wasn't me.  It was a team of people.

8          Q      Where did you work prior to the college?

9          A      Prior to my career in 1991/1992 with the

10    community college?

11         Q      Yes, sir.

12         A      My job -- my, I guess, public job would

13    have been I was in the manufactured housing business.

14         Q      Working for whom?

15         A      Oh, no.  I was in the banking business.

16    I'm sorry.  I was a banker.

17         Q      You were a banker working for which bank?

                         Page 62

18     A     Central Fidelity Bank.

19     Q     From when to when?

20     A     It was in the fall -- it would have been

21  in the fall of '91, because the Dean of Students was a

22  customer, and he made me aware of a job that I applied

23  for in January of '92 -- or I applied for it in the

24  fall of '91.

25     Q     You started work with Central Fidelity in

75

1  the fall of '91?

2     A     It could have been the summer.  It was

3  late summer, early fall.

4     Q     And you worked there until when?

5     A     Until I took the job at Virginia

6  Highlands Community College.

7     Q     And that was when?

8     A     January -- beginning of the semester in

9  January of '92.

10     Q     So you were at the bank for three or four

11  months?

12     A     Thereabouts, I would say, yeah.

13     Q     What was your job at the bank?

14     A     I was in a management trainee program.

15     Q     Did you leave the bank for a better

16  opportunity?

17     A     If you're using the term "opportunity"

18  as you did earlier, by money, the answer is no, because

19  I took a pay in cut when I went to the college.

20          Did I take it because I felt like I could

21  make a better difference in the world?  That's why I

22  chose the community college.

Page 63

23  Q  Did you perceive it to be a better

24 opportunity?

25  A  I perceived it as it fit my personality

                  76

1 better, yes, sir.

2  Q  Did you perceive it as a better

3 opportunity?

4  A  I would say so.

5  Q  Prior to the bank, where did you work?

6  A  I was self-employed and employed in the

7 manufactured housing industry.

8  Q  Did you have a company?

9  A  I worked for the Connor Corporation.

10  Q  You also said you were self-employed;

11 correct?

12  A  I just did some freelance -- freelance

13 advising.

14  Q  Advising on what?

15  A  Value of homes.

16  Q  Manufactured housing?

17  A  Yes, sir.

18  Q  Is that mobile homes or prefabricated

19 homes or what?

20  A  All of the -- all of those.

21  Q  And when did you go to work in the

22 manufactured housing business?

23  A  Oh -- upon my discharge of being fully --

24 you know, my disability with the Marine Corps, which

25 would have been the summer or late fall -- late summer,

                  77

Case 1:18-cv-00031-MFU-PMS  Document 72-7  Filed 04/24/19  Page 56 of 250  Pageid#: 1726

1    early fall of '90- -- of '85, I believe, sir.

2         Q    Until when?

3         A    Until my employment with Central Fidelity

4    Bank.

5         Q    In the summer or fall of 1991?

6         A    Thereabouts, yes, sir.  I took -- I took

7    about a year and a half off.  My colon issue

8    hospitalized me and I couldn't work and I was extremely

9    sick and I had to draw long-term disability.  I was

10   unable to work.

11        Q    From?

12        A    The gap between the manufactured housing

13   business and the bank.

14        Q    Your long-term disability was from --

15   from whom?  An insurance carrier, a company?

16        A    Yes, sir.

17        Q    Social Security Administration or who?

18        A    No.  An insurance company.

19        Q    And you were out of work for about a year

20   and a half?

21        A    Somewhere around there, yes, sir.

22        Q    But you're able to run now; correct?

23        A    Yes, sir.  I had major surgeries to try

24   to get control of my -- at that time I was in terrible

25   shape.

                                                    78


1         Q    What's a typical training distance for

2    you?

3         A    My typical training distance is 3 miles.

4         Q    And have you run 5Ks?

5         A    Oh, yes, sir.

                     Page 65

6      Q      10Ks?

7      A      Not a 10K.

8             MR. HARDY:  We've been going for about an

9  hour and a half.

10            MR. GRIMES:  Take a break?

11            MR. HARDY:  Yes.

12            MR. GRIMES:  Do you need a break?

13            MR. HARDY:  I do.

14            THE WITNESS:  Yes, sir.

15            MR. GRIMES:  All right.

16            (A recess was taken from 10:44 a.m. until

17             10:57 a.m.)

18            MR. GRIMES:  Back on the record.

19  BY MR. GRIMES:

20      Q      You told us earlier, Mr. Matlock, that

21  "G" stands for governor; is that correct?

22      A      That's what I tell my friends.  It's kind

23  of an ego thing.  You know, you became an agency head

24  and in a small town, just as a joke with some of my

25  friends, you know, I thought -- I had seen the G plate,

1  and so I thought how cool would it be, being an agency

2  head, if I had a G plate.

3             And you could ask several of my friends,

4  and they would tell you I told them it stood for

5  governor.

6      Q      Have you told any people at work or any

7  of your friends that the G stands for GOP, the Grand

8  Old Party?

9      A      No.

10      Q      Do you deny that you've told anyone that

Page 66

11    the G on your license plate stands for GOP, the Grand

12    Old Party?

13          A     I don't believe I've ever said that.

14          Q     Do you deny it?

15          A     I don't believe I've ever said it.

16          Q     So is it possible you've said that?

17          A     I don't think I would.

18          Q     Is it possible?

19          A     I think all things are possible, but

20    that's just not -- that's just not -- I don't think I

21    would ever do that.

22          Q     Is your memory clear on that point?

23          A     I believe it is.

24          Q     As clear as on everything else you've

25    testified here on today?

                                                           80

1           A     (Nodding).

2                 THE COURT REPORTER:  I'm sorry.  Did you

3     answer?

4                 THE WITNESS:  Yes.  Yes.

5     BY MR. GRIMES:

6           Q     Have you ever been fired or resigned or

7     asked to resign from any job?

8           A     No, sir.

9           Q     Have you ever been disciplined at any

10    job?

11          A     No, sir.

12          Q     Who did you interview with prior to

13    starting work at the Center?

14          A     There was a selection committee.  There

15    were two, three, possibly four interviews in the

                          Page 67

16    process.

17         Q    With different people on the committee

18    each time?

19         A    The actual selection committee, the full

20    selection committee, I believe there were two

21    interviews behind closed doors in which they were in

22    charge of the process and a third in which they -- it

23    was heavily skewed toward them.

24         Q    What does that mean?

25         A    There were two closed door full

                                                    81


1     interviews like you would do for most employees in a

2     selection process.

3              Then there was a day in which I was at

4     the Center from like nine in the morning until eight in

5     the evening and it ended with a dinner that was hosted

6     by all board members who wanted to attend by the

7     selection committee, and there were informal questions

8     and answers, giving me an opportunity to interact with

9     the full board with the selection committee observing.

10         Q    Were the selection committee members not

11    members of the board?

12         A    No, sir.  The -- it's my understanding

13    that the selection committee contained a cross-section

14    of people.  I don't think they -- I don't believe they

15    were all board members.

16         Q    Who were members of the selection

17    committee?

18         A    There was a representative from UVA Wise

19    there.  There was a representative from Radford there.

20    There was representatives from the Foundation there.

                        Page 68

21  There was a representative from VCU.  I'm not sure who

22  some of the people represented.  It was very -- a very

23  broad committee.  I think there was about maybe 15

24  people, would be my guess.

25          Q      When were you first told that you had

                                                          82

1   been selected?

2           A      The official announcement came -- it may

3   have come the evening after the board meeting.

4                  Again, October 2nd, 3rd, 4th, somewhere

5   in there there was a board meeting.  Early October

6   there was a board meeting in which they voted.  I

7   believe I received a phone call that evening.

8           Q      From who?

9           A      At that time the chairman of the board,

10  not the selection committee, but the chairman of the

11  board at that time was Senator Carrico.  He had just

12  assumed the role I think as chairman at some point.

13          Q      So Senator Carrico told -- called you and

14  told you you had the job, isn't that what you just

15  said?

16          A      That's what I just said.  I'm trying to

17  make sure.  I want to be accurate here.

18                 I know that there was a phone call where

19  Senator Carrico called to arrange a meeting to

20  negotiate the salary.

21                 The first call, the very first call may

22  have come from the HR liaison, Miss Joyce Brooks.

23          Q      I'm not asking you to guess.

24          A      Yeah.

25          Q      Are you guessing?

                                                          83

Page 69

1         A     I'm trying to remember.  It would be one
2     of those two.
3               But, yeah, I got a phone call from both
4     of those people.  The sequence is a little vague.  I
5     don't remember the exact sequence, sir.
6         Q     But one of the persons who called you and
7     told you you had the job was Senator Carrico.
8         A     He needed to set up a -- yes, he wanted
9     to set up a meeting to -- he had been authorized by the
10    selection committee and the board to go into salary
11    negotiations and to execute the contract.
12        Q     And he congratulated you on your new job;
13    correct?
14        A     I'm not so sure if he used the words
15    "congratulations."  I don't even think Miss Brooks did.
16    I think -- the phone call was very professional.
17        Q     In your view is the word
18    "congratulations" not professional?
19        A     Well, I think "congratulations" may imply
20    something.  But for me, I think it was very
21    professional, the fact that -- you know, I had not
22    signed a contract yet.  Maybe congratulations came
23    after it was official.
24              I think that, if I remember correctly,
25    the conversations with both Miss Brooks and

                                                          84

1     Senator Carrico were, "The board voted and has selected
2     you and we need to enter into contract negotiations."
3               Now, I was not going to say, "Yes, I'm
4     going to take the job" that night.  I did not do that,

                        Page 70

5    because I wanted to see what the salary and benefits

6    was going to be.

7         Q    Wait just a minute.

8              After you were told that you'd been

9    chosen for the job, you did not accept the job because

10   you didn't know what the money would be yet?

11        A    Yeah, there was no -- I was told that

12   they had selected me and that we need to arrange a

13   meeting to talk about compensation.

14             He -- I think he'd been authorized to --

15   at that point, he was the chairman -- to negotiate with

16   the HR person and UVA on behalf of the board, and I

17   think they had given him a range.

18        Q    Did you accept the job before you knew

19   what the job paid?

20        A    I don't believe so.

21        Q    Do you know?

22        A    Well, I mean, I -- I may have said

23   something like, as anybody would, "I'm very interested

24   in working for you and I look forward to salary

25   negotiations," but until I signed a piece of paper, as

                                                    85


1    far as I was concerned, you know, I was the

2    vice president of Virginia Highlands Community College.

3         Q    Did you not know what the salary range

4    for the job was when you were seeking the job?

5         A    Yes, I knew.

6         Q    You had to; right?

7         A    I knew what the range was, and that's one

8    reason why I didn't sign.  I had heard rumors that the

9    offer was going to be significantly less than

                    Page 71

10      advertised.

11              Q       What was advertised?

12              A       $150,000.

13              Q       When did you first physically come to the

14      job site and begin work?

15              A       November 2nd, 2015.

16              Q       When did you accept the job?

17              A       At some point between that board meeting

18      and the first of November, we had multiple meetings on

19      the contract and start date, because I did not want to

20      start on November 2nd.  I did not want to start until

21      January of -- I begged.  I did not want to start until

22      January of '16.

23              Q       And you were told?

24              A       That the position would be this amount of

25      money and that I -- and that they had been authorized

                                                                86

1       to give me that amount of money, within that range, and

2       the start date would be November 2nd; that I

3       couldn't -- I couldn't postpone starting.

4               Q       And you were told that you could not

5       postpone or delay your start for what reason?

6               A       I was not -- I was personally not given a

7       reason.

8               Q       When did you give notice to the college

9       that you were leaving?

10              A       Probably the day I signed the contract.

11              Q       How much notice did you give the college?

12              A       You know, I'm not certain.  I think it

13      was probably less than two weeks.

14                      But the president of the college is a

                                Page 72

15  voting board member, so he had full awareness of the

16  whole process once the selection -- once that meeting

17  took place at the dinner I spoke of.

18              He was not on the selection committee.

19  He -- so he knew -- whenever they advertised, "Here's

20  our final three people that we're going to be bringing

21  to the Center for a day's of activities," to my

22  knowledge, that's the first time my current employer

23  had knowledge of that.

24      Q    Have kids from your church ever come to

25  your office at the Center --

87

1       A    Of course.

2       Q    -- from time to time?

3       A    And my grandchildren come visit me a lot.

4       Q    I wasn't asking about your grandchildren,

5  actually.

6       A    Okay.  But they are members of my church,

7  my wife and my children.

8       Q    I was -- so the members of the -- of your

9  youth group come to your office from time to time?

10      A    I'm not sure if they always make it to

11  the office, but they come to the Center.  People that

12  I've mentored and if they are in the area, stop in to

13  say hello.

14      Q    During the day on -- on company business,

15  so to speak.

16      A    At all times.  I am sometimes there till

17  late at night, so I might see them at an event.  So to

18  say that they only visit me during the daytime would be

19  unfair.

Page 73

20      Q      I just asked a simple question.  Have

21  members of your church come to see you during your

22  regular office hours at the Center?

23      A      Yes.

24      Q      What are your job responsibilities as

25  executive director?

88

1      A      Well, to make sure that our agency is the

2  most efficient and effective as it can be, to make sure

3  that we are meeting the mission as well as we can, to

4  make sure that we have the resources necessary to carry

5  out that mission.

6      Q      Do you have a supervisor?

7      A      I report directly to the board.

8      Q      Do you have a supervisor?

9      A      As -- as someone who would like --

10      Q      Supervise you.

11      A      On daily basis?

12      Q      Daily, hourly, weekly, monthly, whatever.

13      A      No, sir.

14      Q      You don't have a supervisor?

15      A      No.

16             As an agency head, I think that my

17  structure is just like all the other agency heads in

18  the Commonwealth of Virginia.  I don't think I'm any

19  different when it comes to supervision.

20             I have outcomes, key performance

21  indicators.  I have board members in and out of the

22  building constantly, if not daily, with extreme

23  interaction.

24      Q      Has Senator Carrico served as your

Page 74

25  supervisor at any time?

1        A        According to the Code of Virginia, I
2   believe that I am directly -- I directly report to the
3   board of which, currently, Senator Carrico is the
4   chairman.
5             I don't do -- regardless of who the
6   chairman would be, I don't do much without support,
7   guidance from my executive board.
8        Q        Is Senator Carrico getting ready to
9   rotate off the board?
10       A        I believe he rotates off this summer.
11       Q        You believe he does or you know he does?
12       A        I believe that's the intent.
13       Q        Do you know a Donna Kauffman?
14       A        Extremely well, yes, I do.
15       Q        Who is she?
16       A        She is the chancellor president of the
17  University of Virginia College of Wise.  She serves on
18  the board, she serves on the executive board.  She was
19  treasurer or secretary for a long time of the executive
20  board.
21                MR. GRIMES:  Mark this, please.
22                (1/26/17 email from Donna Kauffman to
                  David Matlock re:  UVA ID Card Office
23                marked as Matlock Exhibit Number 4)
24  BY MR. GRIMES:
25       Q        Exhibit 4 is an email from Donna Kauffman

1   to you dated January 26, 2017.  There she writes, "Hi
2   David, so great to see you again and to meet Adam face

Page 75

3   to face."

4           That's Adam Tolbert; correct?

5       A   Yes, I assume that's who she's speaking

6   of.  I think he's the only Adam we have in our

7   building, and he's copied up at the top.  So, yes, sir.

8       Q   That's a clue, isn't it?

9       A   I mean, he is copied.

10      Q   The next sentence, she writes, "I called

11  ahead to the ID Card Office to inform them why I signed

12  for Nancy Rivers (even though you report to

13  Senator Carrico), so you should be good to go."

14          So is it true or false that you reported

15  to Senator Carrico?

16      A   Well, as stated, I report to the entire

17  board of which Senator Carrico is the chairman.  So

18  obviously when you have a board of 22 people, I'm not

19  going to call all 22 people.

20          My primary correspondence has always been

21  with the chairman and, when necessary, the executive

22  committee.

23      Q   Do you agree that Donna Kauffman said

24  that you report to Senator Carrico?

25          Don't you agree that's what she says

                                                91

1   right here?

2       A   Well, yeah, that's what she said, yeah.

3       Q   Is that true or false?

4       A   Well, it's true in the sense that he's

5   the chairman of the executive board.  He's the chairman

6   of the board and, according to the Code, that's who I

7   report to.

                    Page 76

8      Q    Who does the budget for the Center?

9      A    It's collaborative.

10     Q    Who are the collaborators?

11     A    Currently, myself, all department heads.

12     Q    And has the composition of the

13  collaborators changed during your employment?

14     A    Yes.

15     Q    When Mr. Carmack was employed, did you

16  ask a former employee to help you with the budget

17  instead of Mr. Carmack?

18     A    No.  What I asked a former employee was

19  for guidance in understanding the budget process.

20     Q    Did you ask a former employee for

21  guidance and understanding with respect to the budget

22  process?

23     A    Yes.

24     Q    Who was that former employee?

25     A    Dr. Rachel Fowlkes, former executive

1  director.  She was a great person to guidance because

2  she had held that job, and so I had questions that she

3  would have a tremendous amount of historical knowledge.

4        Chris Fields, who I worked with at VHCC

5  who is vice president of finance who had been the

6  budget manager/finance director at the Center for

7  somewhere around 15 years maybe and had developed many

8  of the early budgets.

9     Q    She was a former employee as well?

10     A    Yeah, both of those folks were former

11  employees of the Center.

12     Q    Did you consider asking Mr. Carmack, your

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 69 of 250   Pageid#: 1739

13    chief financial officer, for help understanding the

14    budget?

15         A     Oh, I did.

16         Q     Did you ask Mr. Carmack for help to

17    understand the budget?

18         A     Yes.

19         Q     Did your job duties require that you

20    speak from time to time with the Department of Planning

21    and Budget?

22         A     Yes.

23         Q     What is their role within the context of

24    the Center and the Foundation, the Department of

25    Planning and Budget?

                                                         93


1          A     I don't believe they have a role with

2     respect to the Foundation, sir.

3          Q     What about the Center?

4          A     Well, yes, sir, that's the Department of

5     Planning and Budgeting.  They work very closely.  We

6     have a strategic plan that we have to do for the

7     Governor's Office every two years, and so they -- they

8     are very involved in everything from fiscal needs to

9     budget amendments, to, you know, understanding the

10    allocations and where the money is supposed to go.  I

11    mean, they are exactly what it says; they are the

12    Department of Planning and Budgeting for State

13    agencies, of which we are one.

14         Q     Did Mr. Carmack's job as CFO require that

15    he speak with the Department of Planning and Budget?

16         A     Yes.

17         Q     At some point was he prohibited from

                              Page 78

18   speaking with the Department of Planning and Budget?

19        A    No.

20        Q    When you started working at the Center,

21   did you have a door with a window?

22        A    Yes, I did.

23        Q    Did you change that out to a solid door

24   with no window?

25        A    I did.

                                                        94


1         Q    And you did that for privacy?

2         A    I did.

3         Q    Did you add additional locks to your

4    office?

5         A    I did not add additional locks to my

6    office.

7         Q    How would you describe your relationship

8    with your predecessor?

9         A    Dr. Fowlkes.

10        Q    That would be her name.

11             How would you describe your relationship

12   with her?

13        A    We speak -- at the very beginning of the

14   transition, I would try to meet with Dr. Fowlkes

15   monthly and have lunch with her.

16             Obviously she had a wealth of knowledge.

17   So I think we have a professional working relationship

18   that's, I think, a good relationship.

19        Q    Was she a Democrat or a Republican?

20        A    I -- I don't know, sir.

21        Q    Is it your testimony --

22        A    She's not told me directly what she is.

                        Page 79

```
23        Q     Right.

24              But have you heard that she was a

25   Democrat?
```

```
 1        A     Well, I can say this.  I attended a

 2   Democratic rally for Senator Kaine in which she was

 3   present.

 4        Q     All right.  That's one indicator, isn't

 5   it?

 6              Have you heard that she was a Democrat?

 7        A     I don't believe so.

 8        Q     Are you certain of that answer?

 9        A     That someone told me that Rachel Fowlkes

10   was a Democrat?

11        Q     No, that you heard she was a Democrat.

12        A     I guess the best way for me to answer

13   that to be totally truthful with you is that I would

14   assume she was a Democrat.

15        Q     And you assume that based upon what

16   objective data?

17        A     Well, she parks beside me when she visits

18   the Center.  And I believe that during the last

19   election, she had a couple bumper stickers promoting a

20   candidate from the Democratic Party.  I believe that to

21   be true.

22        Q     Any other data that led you to assume

23   that Rachel Fowlkes was a Democrat?

24        A     No.  She -- Rachel and I never talked

25   about politics.  We talked about the Center's success.
```

```
 1        Q     Was artwork put up at the Center to
```

Page 80

2    recognize Dr. Fowlkes' accomplishments at the Center?

3         A     Yes.

4         Q     Describe the artwork.

5         A     It's a mobile that contains things that

6    represent her journey as the executive director of the

7    Center.  It has like a diploma, a light bulb, a car

8    with her license plates on it, just things that depict

9    the story of her journey in higher education.

10        Q     And an artist was commissioned to create

11   the artwork; is that correct?

12        A     That's what I was told.

13        Q     Do you remember the name of the artist?

14        A     I do.

15        Q     What was the name?

16        A     Her name is Val, V-a-l, Lyle.

17        Q     And the cost of the artwork was

18   approximately $9,000; correct?

19        A     Well, I believe, only because I have

20   recent work on this, 9,900 is what was stated in the --

21        Q     $9,900; correct?

22        A     Um-hum, of Foundation funds.

23        Q     Did you give orders to take down the

24   artwork at some point?

25        A     Did I give orders to take it down?

                                                          97


1         Q     Yes, sir.

2         A     No, sir.

3         Q     Yes, sir.

4               Was it taken down at some point?

5         A     Yes, sir.

6         Q     Upon whose instruction?

                        Page 81

7      A      When I arrived at the Center, the
8  building was 20 years old.
9      Q      Upon whose instruction?
10     A      It was the recommendation of the
11  facility's maintenance team.
12     Q      Did you have input in that decision as
13  the executive director of the Center?
14     A      Well, yeah.  Their recommendation made
15  perfect sense.
16     Q      And you approved that recommendation?
17     A      I really had no choice.  Yes, sir, I did
18  approve it.
19     Q      You had no choice?
20     A      There was construction work to be done,
21  sir, so it was either leave a shoddy ceiling or make it
22  look professional.
23     Q      And the mobile was taken down when?
24     A      Oh, I had been there about a year, so
25  sometime in the winter of '16.

                                                    98


1      Q      And the mobile was down for how long?
2      A      I'm going to say approximately 18 months.
3      Q      18 months?
4      A      Yes, sir.
5      Q      And the mobile was then put back up;
6  correct?
7      A      Yes, sir.
8      Q      After this lawsuit was filed; correct?
9      A      Well, yes, sir, I mean, it -- that would
10  be -- that's a fair statement.
11     Q      The mobile was put back up when?

                        Page 82

12      A     Sometime this early fall, I think.

13      Q     Do you remember who took the mobile down?

14      A     Well, whoever was working that day.

15           And I believe that the artist assisted as

16 well because she wanted to make sure it was handled

17 with care and she wanted to enhance it and make new

18 pieces for it.

19      Q     Didn't Joe Mitchell take down the mobile?

20      A     He was the maintenance supervisor at that

21 time.

22      Q     Didn't you tell Joe Mitchell to take down

23 the mobile?

24      A     No.

25      Q     You didn't?

                                99

1      A     Joe -- Joe made a recommendation.

2      Q     Did employees or members of the board

3 ever inquire about the whereabouts of the mobile?

4      A     I never had a single board member inquire

5 about the whereabouts of the mobile.

6      Q     Did employees or members of the board

7 ever ask that the mobile be put back up?

8      A     The only person that ever asked that the

9 mobile be put back up was Alicia Young and Duffy

10 Carmack.

11           I even had conversations about the delay

12 in getting it put back up with Dr. Fowlkes and

13 explained why it was taking us more than a year.

14      Q     Who gave instructions to put the mobile

15 back up?

16      A     Well, I did.  It's a nice piece of art.

Page 83

17      Q     Um-hum.

18           The mobile was taken down, you say, to

19  fix ceiling tiles; correct?

20      A     I didn't say that.

21      Q     You didn't?

22           Was the mobile taken down to fix ceiling

23  tiles?

24      A     Yes, it was.

25      Q     And how many years did it take to fix the

100

1  ceiling tiles?

2      A     I think those ceiling tiles were fixed

3  within a couple weeks of the mobile being taken down.

4      Q     Right.

5           Within two weeks the ceiling tiles were

6  repaired; correct?

7      A     That is correct.

8      Q     But it took another 17 months to get the

9  mobile back; correct?

10     A     That's correct.

11     Q     Did you hear from anyone that Dr. Fowlkes

12  had indicated that her choice for replacement as CEO

13  would be Duffy Carmack? Did you ever hear that?

14     A     I heard that from Mr. Carmack.

15     Q     Have you heard that from anybody else?

16     A     No.

17     Q     Like Dr. Fowlkes?

18     A     No.

19     Q     Are you sure?

20     A     Yeah.  I don't think Dr. Fowlkes would

21  ever tell me -- Dr. Fowlkes is a very professional

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 76 of 250   Pageid#: 1746

22    person.  She would not say publicly or privately if she

23    was endorsing a candidate to replace her.  In fact, I

24    don't -- no, Dr. Fowlkes did not tell me that.

25              Q      Did you ever hear why Duffy Carmack was

1    not selected to be the executive director?

2              A      No, sir.  I was not on the selection

3    committee.

4              Q      I didn't ask that question.

5                     Have you heard from anyone why Duffy

6    Carmack was not selected as executive director?

7              A      No, sir.

8              Q      He was employed as the CFO prior to your

9    being hired as executive director; correct?

10             A      That's correct.

11             Q      And then you obviously had no role in

12   hiring him; correct?

13             A      That's correct.

14             Q      Did you interact with Duffy Carmack for

15   work purposes while you were employed at the Center?

16             A      I did.

17             Q      Did you ever make any complaints about

18   him to anyone?

19             A      No.

20             Q      You were aware that Duffy Carmack was the

21   interim executive director after Dr. Fowlkes retired

22   and before you came; correct?

23             A      Yes, sir.

24             Q      And you didn't place him in that

25   position; correct?

Page 85

1          A     No, sir, I did not.

2          Q     Were you ever asked to compensate him for

3    serving as executive director?

4          A     No, sir.

5          Q     As interim executive director, I should

6    have said.

7          A     No, sir.

8          Q     Did the subject of compensating Duffy

9    Carmack for his work as an interim executive director

10   ever come up?

11         A     No, sir.

12         Q     Do you have any knowledge concerning why

13   Assistant General Attorney Elizabeth Griffin made the

14   Foundation a separate entity from the Center in 2016?

15         A     She did not, sir.  The Foundation was a

16   separate entity of the Center on the day it was

17   created.  It was not an act of the Attorney General's

18   Office, of our counsel.

19               The Foundation is solely a separate

20   entity of the Foundation -- of the Center and has

21   always been.

22         Q     Was Elizabeth Griffin involved in any way

23   in the decision to make the Foundation a separate

24   entity from the Center?

25         A     I don't think she was the -- I don't

                                                    103


1    know, because I don't know who counsel was when the

2    Foundation was created.

3          Q     Were you involved in the decision to make

4    the Foundation a separate entity from the Center?

                        Page 86

5       A       No, sir.  The Foundation existed before I

6   arrived.  I had nothing to do with its creation.

7       Q       Do you know how Carmack was paid while he

8   worked at CFO?  And by that I specifically mean his

9   source of funding.

10      A       Well, part of his funding came out of

11  general funds, some nongeneral funds, and we were

12  reimbursed for his duties based on an MOU with the

13  Foundation.

14      Q       What's an MOU?

15      A       Memorandum of Understanding.

16      Q       Was 25 percent of his compensation paid

17  by the Foundation?

18      A       I -- I believe that to be true.  I do not

19  know.  I have not looked at that number.  That sounds

20  like -- that sounds like a fair estimate.

21      Q       And 75 percent by the Center?

22      A       Of his salary?

23      Q       Yes, sir.

24      A       Yes, sir, that sounds like a fair

25  estimate.
                                                    104


1       Q       Well, I don't think we need to estimate.

2               What does the MOU say with respect to

3   Mr. Carmack's compensation?

4       A       I don't know, sir.

5       Q       You don't know?

6       A       I don't have it in front of me, no, sir.

7       Q       Nor do you have a memory of what it says.

8       A       I don't think it quite says 25 percent.

9   I think that it might say -- you know, exactly, I don't

                            Page 87

10    know, sir.

11                You know, it's -- it's -- it was always a

12    moving target that I could never wrap my arms around.

13                But, again, I would say that's a fair

14    estimate.

15        Q     What was a moving target that you could

16    never wrap your arms around?

17        A     Understanding when Mr. Carmack was acting

18    for the Foundation and when Mr. Carmack was acting for

19    the Center.

20        Q     And why was that of concern to you?

21        A     Well, because if, in fact, we're only

22    being reimbursed for 25 percent of his wages, I

23    wanted -- I didn't want to -- make sure that -- I

24    didn't want him doing 40 percent of his work.  I just

25    wanted to make sure that everything was fair and

                                                        105


1     equitable.

2         Q     And what did you do to help yourself wrap

3     your arms around that?

4         A     I asked Mr. Carmack to keep a log of when

5     he was working for the Foundation.

6         Q     Did you do anything else?

7         A     I tried to get a understanding of the

8     reimbursements to make sure that they were clearly

9     reflected.

10        Q     How did you do that?

11        A     Well, I asked for, you know, the

12    transfers, how it reflected in the budget.

13        Q     You asked who?

14        A     Miss Debbie Hensley.

                        Page 88

15    Q    Who is she?

16    A    She's the business manager.

17    Q    Speaking of Elizabeth Griffin, where was

18   her office?

19    A    I'm going to assume it was in this

20   building.

21    Q    In Richmond.

22    A    Yeah, in Richmond.

23    Q    In Richmond.

24          And did she have responsibility at the

25   time for oversight, that is, providing legal advice to

                                                        106


1    the Center and the Foundation?

2     A    No, never the Foundation.  She was always

3    very clear that she was legal counsel for the Center.

4     Q    For the Center?

5     A    And had nothing whatsoever to do with

6    legal counsel for the Foundation.

7     Q    Speaking of Elizabeth Griffin, do you

8    know anything about Mr. Carmack's emails to Elizabeth

9    Griffin being blocked in October of 2017?

10    A    They were not.

11    Q    They were not?

12    A    They were not.

13    Q    How do you know that?

14    A    Because when I read the Complaint, I

15   pulled all of our logs, and his emails to Miss Griffin

16   were not blocked in October of '17.

17    Q    Who was in IT at the time?

18    A    Nicky Rhley, Jeff Webb, Adam Tolbert,

19   Austin Dierks.

                        Page 89

20    Q    What was Adam Tolbert's involvement with

21    IT?

22    A    He probably answered -- he did a lot of

23    open tickets.  So if someone -- you know, if your

24    printer didn't work, you couldn't get on the Internet,

25    you were having problems with the -- the system in any

1    way, you would submit a ticket.  And they had a cycle

2    by which people would choose to answer tickets to make

3    sure that we would operate efficiently.

4    Q    Did he have a degree in information

5    technology?

6    A    No.  I believe Adam Tolbert's degree may

7    be business administration.

8    Q    You believe it is or you know it is?

9    A    No, I would have to say I believe.  I

10    don't know.

11    Q    But he worked in IT at the Center?

12    A    Yes, sir.

13    Q    Did you have the power to hire and fire

14    at the Foundation?

15    A    Oh, no, sir.

16    Q    Stated differently, did you have the

17    ability to remove Mr. Carmack as the CEO of the

18    Foundation?

19    A    No.

20    Q    Can the Center survive without the

21    Foundation?

22    A    Yes.

23    Q    Why does the Foundation exist then?

24    A    That's the question I asked upon my

Page 90

25    arrival, because the Foundation was created to raise

1    funds to support the activities of the Center, of which

2    it was not doing.

3              So, yes, we could operate all day long

4    without the help of the Foundation because in my

5    tenure, they were not raising funds to support the

6    Center.

7         Q    Do you know what grants are?

8         A    Yes, sir.

9         Q    What are grants?

10        A    Grants are monies distributed to

11    organizations or benefactors to complete a purpose

12    for -- in which they support.  That would be a very

13    broad definition.

14        Q    Doesn't the Foundation manage all grants

15    for the Center?

16        A    The Foundation manages all grants.

17        Q    For the Center.  It doesn't support

18    anything other than the Center, does it?

19        A    It's self-supported.

20        Q    Pardon?

21        A    They -- they supported grants of which --

22    yeah, the grants they supported did not support the

23    Center, if -- if that's where you're headed.

24        Q    The grants that the Foundation managed

25    supported what?

1         A    They had entered into an agreement to be

2    a fiscal agent for the Virginia Tobacco Commission to

3    manage grants in our region across, very broadly,

Page 91

4   Southwest Virginia, to enhance economic development,

5   kind of like a -- capital investments.  And, so, they

6   would award -- the Tobacco Commission would award

7   grants to company ABC to make widgets, then the

8   Foundation would manage grant ABC and make sure that

9   the widgets were being made properly.

10          Q      Did the grants exceed $25 million?

11          A      I'm sure there's times they exceeded more

12  than that.

13          Q      Did you have power to hire and fire at

14  the Center?

15          A      Yes, sir.

16          Q      Did you have to get approval by anyone to

17  hire and fire at the Center?

18          A      No, sir.

19          Q      If employees of the Center are terminated

20  and they were beyond their probationary period, are

21  they eligible to pursue the State grievance procedure?

22          A      If a employee is terminated --

23          Q      Yeah.

24          A      -- and they work -- so if they are

25  terminated, how are they going to work?  You lost me on

                                                        110

1   that one, sir.

2                  So if an employee is terminated and they

3   continue to work?

4           Q      No, sir.

5           A      Okay.  Help me out.

6           Q      You know what a probationary period is;

7   correct?

8           A      Yes, sir.

                    Page 92

9       Q      If an employee of the Center --

10      A      Okay.

11      Q      -- is beyond her probationary period --

12      A      Okay.

13      Q      -- and is terminated, can she use the

14  State grievance procedure to challenge her termination?

15      A      I would probably think so.  I've never

16  had that happen.

17      Q      If employees are terminated pursuant to

18  the Work Force Transition Act or WTA, are they eligible

19  to use the State grievance procedure?

20      A      I would have to consult with an HR

21  professional on that one.  I don't know, sir.

22      Q      How did you first learn of the WTA?

23      A      Through my experience with Virginia

24  Community College systems.

25      Q      So you say it's while you were working

111

1   for the college?

2       A      Virginia Highlands Community College,

3   yes, sir.

4       Q      Have you ever known the WTA to be used

5   before anywhere in the State?

6       A      Yes, sir.  It's my understanding it's

7   used quite frequently.

8       Q      And that understanding is based on what?

9       A      Consultation with DHRM.

10      Q      When did --

11      A      Department of Human Resource Management.

12      Q      And when did you consult with DHRM and

13  learn that?

Page 93

14          A       Well, I first learned about it during my

15   tenure as a vice president at Virginia Highlands

16   Community College.

17          Q       What is the process for invoking the WTA?

18          A       Well, it's my understanding that you have

19   to be, first of all, in a budget -- mandated budget

20   reduction.  And so if you're mandated, if you're in a

21   period in which the Governor has mandated a budget

22   reduction to your State agency, an option made

23   available to you is WTA.  Then you must seek approval

24   from DPB and DHRM.

25          Q       DHRM stands for what?

                                                         112


1          A       Department of Human Resource Management.

2          Q       And the other acronym stands for what?

3          A       DPB?  Department of Planning and

4    Budgeting.

5          Q       Did you ever use the WTA while working at

6    the college?

7          A       Are you referring to Virginia Highlands

8    Community College?

9          Q       Well, that's -- did you work for any

10   other college?

11         A       Well, no, sir.

12         Q       Well, then that's the one I'm referring

13   to.

14         A       Okay.  So you used the word "I."

15                 So the college did, sir, Virginia

16   Highlands Community College as well as Wytheville

17   Community College, Mountain Empire Community College,

18   Southwest Virginia Community College, a lot of our

                          Page 94

19    four-year public institutions, other State agencies, I

20    was very aware they had all used the WTA during times

21    of mandated government reductions.

22        Q    Did you prepare the paperwork, the WTA

23    paperwork, with respect to any reduction at the Center?

24        A    Did I prepare the paperwork?

25        Q    Yes, sir.

                                            113


1        A    I prepared the proposal that was shared

2    with all legal counsel, DPB and DHRM.

3        Q    So you prepared the proposal?

4        A    Yes, sir.

5        Q    And then you sent it to legal?

6        A    I think originally it went to DHRM and

7    DPB, and then I guess they bounce it off legal.

8        Q    You guess or you know?

9        A    I believe that to be true, yes, sir.

10        Q    Did anybody help you prepare the WTA

11    paperwork?

12        A    Well, I sought guidance.

13        Q    From?

14        A    The first place I sought it from was

15    someone who had done many of them, and that was Chris

16    Fields.

17        Q    Chris Fields?

18        A    Um-hum, former business manager.

19        Q    Former employee; correct?

20        A    Um-hum, um-hum.

21            MR. KINCER:  Yes?

22            THE WITNESS:  Yes, yes, former employee.

23            And then I sought guidance from DPB and

                    Page 95

24      DHRM.

25      BY MR. GRIMES:

                                                    114


1           Q       Who in DPB?

2           A       My Higher Education Center liaison, I'll

3       think of it, Michael Maul.

4           Q       Spell the last name?

5           A       I'm going to say M-a-u-l.

6           Q       Where was he?

7           A       His office is over in the -- the building

8       adjacent to the old courthouse.

9           Q       In Richmond?

10          A       Yes, sir.

11          Q       And who did you consult with at DHRM?

12          A       Debbie Rigdon.

13          Q       Also in Richmond?

14          A       Yes, sir.

15          Q       Before the executive committee of the

16      board approved the use of the WTA, did they know that

17      you were eliminating Carmack's job?

18          A       Yes.

19          Q       And you're certain of that?

20          A       I'm very certain of that.

21          Q       When did you let them know?

22          A       There was an executive meeting on or

23      about June 30th of 2017 in which I presented my WTA

24      proposal to the five members of the executive board.

25          Q       And did you tell them then that you were

                                                    115


1       getting rid of Carmack's job?

                        Page 96

2      A      Well, I -- we -- I told them, yes, we
3  were going to -- in the WTA, that Mr. Carmack's,
4  Miss Brooks' and Miss Williams' positions would be,
5  they would be offered a WTA incentive and that their
6  duties would be spread across the Center to make us
7  more efficient and more effective.

8              And WTA is a -- it's more of a -- it's a
9  layoff, is what it is.

10     Q      A layoff; right?

11     A      Yes, sir.

12     Q      So the idea is you lay off the employee
13  for a period of time and then bring the employee back
14  at some time; correct?

15     A      I don't think that's the idea.  I think
16  that the -- it depends on the options chosen by the
17  employee at the time of execution of the WTA.

18     Q      So the idea of a layoff is not to bring
19  somebody back ever.  They are done.

20     A      The idea of the layoff is to make the
21  Center, to make the agency, make the State government
22  more efficient and more effective to eliminate cost.

23             And it is my understanding that those
24  positions cannot be filled for a two-year period.

25     Q      In your mind as executive director, how

                                                   116


1  does a layoff differ from a termination, if at all?

2      A      Well, a layoff, there was options.  A
3  termination you say bye.  There was incentives.  There
4  was monetary incentives with this, with this WTA.

5      Q      Was Elizabeth Griffin involved in
6  eliminating Mr. Carmack's job?

                        Page 97

7  A  Elizabeth Griffin was in the -- in the
8 process of the -- she was part of the process for the
9 WTA.

10  Q  Is that a yes?

11  A  That's the way I would answer it.  I --
12 yes, sir.

13  Q  Was Senator Carrico involved in
14 eliminating Mr. Carmack's job?

15  A  Only to the fact that as a member of the
16 executive board, when I presented the WTA process to
17 the entire executive board, he was a member of the five
18 board members that day.

19  Q  And who are the five board members?

20  A  Senator Carrico was chairman or was
21 chairman at that particular time.  A gentleman by the
22 name of Saul Hernandez, a Governor appointee was the
23 vice chairman, Donna Henry is chancellor/president,
24 chancellor of UVA Wise, Brian Hemphill, president of
25 Radford University, and Gene Couch, president of VHCC.

117

1  Q  Did you reach out to certain board
2 members who were not on the executive committee and
3 talk with them about eliminating Carmack's job?

4  A  No.

5  Q  Never did that?

6  A  No.

7  Q  Did you have the authority to eliminate
8 Carmack's job without getting approval from the entire
9 board?

10  A  Yes.  The Code of Virginia I believe is
11 very clear that the agency head is responsible for the

Page 98

12    hiring and firing and operation of the Center.

13             The board is responsible for the hiring

14    and firing of the agency head.

15        Q    Did any members of the board tell you

16    that they did not support the layoff?

17        A    No.

18        Q    Do you know a Gary Hearl, H-e-a-r-l?

19        A    I do.

20        Q    Who is that?

21        A    Gary is now the current chairman of

22    the -- of the Center's Foundation.

23             MR. GRIMES:  Mark this, please.

24

25                                                  118


1             (Email string January/February 2018
              between Gary Hearl and David Matlock re:
2             Restructuring at SW Virginia Higher
              Education Center marked as Matlock
3             Exhibit Number 5)

4     BY MR. GRIMES:

5         Q    Exhibit 5 is an email string.  If you

6     look at the email at the bottom of the page, January 8,

7     2018 --

8         A    Okay.

9         Q    -- there the writer states, "David,

10    regarding the call, could we make it maybe tomorrow?

11    My father-in-law passed away this weekend and we are

12    making the arrangements today.  Am really disappointed

13    with the layoffs having to occur."

14             Is that what Mr. Hearl said to you?

15        A    That's what is printed there, yes.

16        Q    And on the next page you write,

Page 99

17   January 7, 2018, "Gary, would you be available for a

18   phone call tomorrow morning and then a possible lunch

19   together later in the week?  David."

20           Did I read that correctly?

21      A    That's correct.

22      Q    And what was Mr. Hearl's relationship to

23   the Center or the Foundation then?

24      A    He had no relationship to the Center

25   other than his duties as a member of the board for the

119

1   Foundation.  He -- he may have been -- I believe he was

2   the chairman of the Foundation board that day -- at

3   that time.

4      Q    Do you know a Patrick Callebs,

5   C-a-l-l-e-b-s?

6      A    I do.

7      Q    Who is that?

8      A    He is a member of the Foundation board.

9      Q    What did you tell him about the layoffs?

10     A    Basically what I told here in the email

11   that took place on January the 7th; that due to

12   budgetary shortfalls in the Commonwealth of Virginia,

13   that we were going to mandate -- these mandated

14   reductions resulted in us finding ways that were more

15   efficient and more effective.

16     Q    To get rid of people?

17     A    No, to make us more efficient and more

18   effective.

19     Q    Did that involve getting rid of people?

20     A    It would -- it resolve -- involved

21   reduction in force.

Page 100

22        Q        Which --

23        A        Very common in being efficient and

24    effective.

25        Q        Which required that you get rid of

1    people; correct?

2        A        It required us to offer people

3    incentives.

4        Q        To leave their jobs; correct?

5        A        Incentives, yes.

6                 (1/7/18 email string between Patrick
7                 Callebs and David Matlock re:
                  Restructuring at SW Virginia Higher
8                 Education Center marked as Matlock
                  Exhibit Number 6)

9    BY MR. GRIMES:

10        Q        Exhibit 6 is an email from you, the

11    second one down, January 7, 2018, and you write, "Pat,

12    would you be available for a phone conversation

13    tomorrow morning regarding the email below?  I value

14    your advice and friendship.  David."

15        A        Yes.

16        Q        Correct?

17        A        That's correct.

18        Q        Did Mr. Callebs oppose your reduction in

19    force?

20        A        No.

21        Q        He didn't?

22        A        No.

23        Q        Do you know Carol Jones?

24        A        Yes.

25        Q        Who is she?

Page 101

1  A  She's a Foundation board member.

2  Q  Did she oppose your reduction in force?

3  A  No.

4  Q  Did anyone oppose your reduction in

5 force?

6  A  There were a couple board members after

7 receiving this email who needed more explanation.

8  Q  They needed more explanation?

9  A  Um-hum.  These are Foundation board

10 members.  They have no -- it's a totally separate

11 entity.

12    (1/7/18 Email String between David
     Matlock and Carol Jones Re:
13    Restructuring at SW Virginia Higher
     Education Center marked as Matlock
14    Exhibit Number 7)

15    THE WITNESS:  And it was about a

16 different matter.

17 BY MR. GRIMES:

18  Q  Exhibit 7 concerns restructuring at the

19 Southwest Virginia Virginia Higher Ed- -- strike

20 that -- restructuring at Southwest Virginia Higher

21 Education Center; correct?

22  A  Um-hum.

23  Q  And those are your words, aren't they?

24  A  Um-hum.

25    THE COURT REPORTER:  If you could answer

                    122

1 for me.

2    THE WITNESS:  Yes.  Yes.

3 BY MR. GRIMES:

4  Q  The email is from you to Carol Jones --

5  A  Yes.

        Page 102

6      Q      -- on January 7, 2018; correct?

7      A      That is correct.

8      Q      There you write, "Carol, would you be

9  available for a short phone call with me tomorrow

10 afternoon regarding the email below?  I value your

11 friendship and advice.  Thank you.  David."

12            That's what you wrote, isn't it?

13     A      Yes.

14     Q      Did she oppose the reduction in force?

15     A      No, she did not.

16     Q      What did you tell her?

17     A      Pat Callebs and Carol Jones had concerns

18 about an investigation, and I wanted to make sure they

19 understood there were two separate pieces here.

20     Q      What investigation?

21     A      The Foundation -- OSIG investigated the

22 Foundation.

23     Q      Didn't OSIG investigate you?

24     A      Yes, sir.  But this is a totally separate

25 investigation.  OSIG investigated the Foundation.

                                                    123


1      Q      And not you.

2      A      OSIG investigated me based on Center

3  activity.

4             OSIG investigated the Foundation based on

5  Foundation activity.

6      Q      And what did you tell Miss Jones and what

7  did you tell Mr. Callebs?

8      A      That these were totally separate, that --

9  that this was necessary to make us more efficient and

10 more effective and that I would hope that the

                     Page 103

11  Foundation would do things necessary to do exactly what

12  their bylaws say.

13          (1/7/18 email between David Matlock and
                Joseph Johnson re:  Restructuring at SW
14              Virginia Higher Education Center marked
                as Matlock Exhibit Number 8)

15  BY MR. GRIMES:

16      Q    Exhibit 8 is an email from you to Joe

17  Johnson dated January 7, 2018; correct?

18      A    That's correct.

19      Q    So you sent out a series of emails to

20  these people on January 7th --

21      A    That's correct.

22      Q    -- of 2018; correct?

23      A    That's correct.

24      Q    And they all concern what you've written

25  there, restructuring at Southwest Virginia Higher

                                                    124


1   Education Center; correct?

2       A    That's correct.

3       Q    And you write there, "Good morning --"

4   excuse me, "Good afternoon, Joe.  Would you be

5   available for a short meeting with me later in the week

6   regarding the message below?  I value your guidance and

7   friendship.  Thank you.  David."

8            That's what you wrote; correct?

9       A    That is correct.

10      Q    What did you tell Joe?

11      A    Basically, I wanted to make sure that Joe

12  as well as we were talking about Carol and Pat, there

13  was knowledge of the other ongoing investigation.

14           But primarily these were key people in

15  our community.  This kind of word would get out.  And I

                        Page 104

16    wanted to make sure they had a clear understanding of

17    exactly what had taken place.  I valued their guidance

18    and their friendship.

19          Q       A clear understanding from the

20    perspective of David Matlock; correct?

21          A       A clear understanding of exactly what was

22    written there, based on the guidance from DHRM and DPB.

23          Q       From David Matlock; correct?

24          A       Again, sir, I did whatever -- I did what

25    was -- my guidance provided me from DHRM and DPB.

                                                          125


1           Q       Did Pat and Carol understand that

2     Mr. Carmack did nothing wrong with respect to Ed

3     Rogers?

4           A       I guess you would have to ask them that,

5     sir.  I don't know.

6           Q       Did you tell them that Mr. Carmack did

7     anything wrong with respect to Ed Rogers?

8           A       They read the OSIG investigation,

9     their -- the reports, their findings, and they would

10    have to draw their own conclusion.

11          Q       And you defended yourself in front of

12    them; correct?

13          A       Defended myself how, sir?

14          Q       In any way, shape, or form on the earth.

15          A       Again, what would I defend myself about?

16          Q       Did you receive any negative feedback or

17    comments from the board after eliminating Mr. Carmack's

18    job?

19          A       Three people from the Center's board

20    expressed concerns, I believe it was three, and they

                          Page 105

21  had discussions with the board chairman and legal

22  counsel, Elizabeth Griffin.

23          Q     And who were they?

24          A     I believe it was Cheryl Carolco -- Cheryl

25  Carrico, we had a new appointee from Lee County, his

                                                    126


1   name slips me, and Mr. Steve Cochran.  Those were the

2   three board members that after receiving the email --

3   they all received email, both Foundation and the Center

4   board members -- they wanted some guidance as to the

5   process, and legal counsel provided that to them.

6           Q     Which would be Elizabeth Griffin;

7   correct?

8           A     Yes, sir.

9           Q     Joshua Ely was --

10          A     Josh, that's the one.

11          Q     All right, Josh.

12                -- was very upset about what you did to

13  Duffy Carmack, wasn't he?

14                MR. HARDY:  Objection to form.

15  BY MR. GRIMES:

16          Q     Go ahead and answer.

17                MR. HARDY:  Answer to the best of your

18  ability.

19                THE WITNESS:  Okay.  He had questions.

20  BY MR. GRIMES:

21          Q     He wasn't upset?

22          A     I didn't pick up a tone of being upset

23  over the phone.  It was more of, "Can you explain this?

24  I'm brand new.  I don't -- I don't understand this.

25  How come --" you know, his big concern was -- I believe

                        Page 106

1   it was Josh.  It could have been someone else.  But I
2   think Josh's concern was, "I come to my very first
3   board meeting and you say revenue is good, but then I
4   see you say due to budgetary shortfalls in the
5   Commonwealth of Virginia, this is what you're going to
6   do."
7              He wanted some guidance on how to
8   understand that.
9        Q    Because you said at the very first board
10  meeting that he attended, revenue is good, didn't you?
11       A    Yes, revenue was good.
12       Q    And that was true, wasn't it?
13       A    Yes, that is true.
14       Q    And after that, you got rid of some jobs,
15  including Duffy Carmack; correct?
16       A    I made the Center more efficient and more
17  effective.
18              (1/7/18 email string between David
                Matlock and Joshua Ely re:  HEC Update
19              to Board Members marked as Matlock
                Exhibit Number 9)
20
21              MR. GRIMES:  What's the number?
22              THE COURT REPORTER:  9.
23  BY MR. GRIMES:
24       Q    Exhibit 9 is an email about the middle of
25  the page from Joshua Ely to you dated January 4, 2018,

1   three days before you sent the emails to the Foundation
2   board members we discussed earlier; correct?
3        A    I would have to look back at the date.

Page 107

 4  The seventh -- three days, yes.

 5        Q    And there Mr. Ely writes, "Hey, David.  I

 6  know that budget shortfalls are always hard to deal

 7  with and it's impossible to run an institution without

 8  balanced books and a clear focused team and mission,

 9  but is there any other area that could be cut without

10  having folks lose their jobs while continuing to offer

11  great services and ROI for our citizens?  Is this our

12  absolute only way forward?"

13             That's what he said, isn't it?

14        A    Yes.

15        Q    And Mr. Ely later sent a letter to

16  certain board members, including Gene Couch; correct?

17             MR. HARDY:  Object to form.  Vague.

18  BY MR. GRIMES:

19        Q    Go ahead and answer the question.

20        A    I'm not aware of what Mr. Ely did.

21        Q    Do you know whether Mr. Ely later sent a

22  letter to certain board members, including Gene Couch?

23        A    No, no.

24             (1/29/18 email string between David
             Matlock and Elizabeth Griffin marked as
25             Matlock Exhibit Number 10)
                                                    129


 1  BY MR. GRIMES:

 2        Q    Exhibit 10 is another email string;

 3  correct?

 4        A    Yes.

 5        Q    In the email at the bottom of the page,

 6  the email from you to Elizabeth Griffin dated

 7  January 29, 2018, in the third sentence, you write,

 8  "All major key performance indicators reflect an

                    Page 108

9  increase in Center activity and income since my

10  arrival."

11          Was that true?

12      A   Yes.

13      Q   And then the email from Elizabeth Griffin

14  to you at the top of the page, January 29, 2018, she

15  writes, "David, I believe all we need for you to do at

16  this time is schedule the call with Joshua Ely.  The

17  three of us should probably chat right before that

18  call."

19          Who are the three of you?

20      A   Looks like she's copied Senator Carrico.

21          So I think that her thoughts there were

22  that if it's, because of FOIA, she, you know, it

23  couldn't be a conversation with the entire board.

24      Q   So the three players that she's talking

25  about are herself and Bill Carrico and you; correct?

                                                    130


1       A   Yes, the chairman, um-hum.

2       Q   "The argument Duffy is making is that if

3   revenues and activity are up at the Center, then why

4   eliminate three positions."

5           And she tells you, "Don't respond to that

6   now"; correct?

7       A   That's what it reads, yes, sir.

8       Q   "But you need to be prepared to address

9   it with Joshua Ely"; correct?

10      A   Correct.

11      Q   You respond, "I got it," with two

12  exclamation points; correct?

13      A   Um-hum.

                        Page 109

14      Q      "Easy to explain.  I got this"; correct?

15      A      That's true.

16      Q      Who is Steve Cochran?

17      A      He is a board member that represents --

18  he's -- I believe he represents -- he's a Governor

19  appointee.  He represents the region of business and

20  industry.

21      Q      Did he state that your termination of

22  Duffy Carmack gave Mr. Carmack grounds for a

23  retaliation suit against the Center?

24      A      I'm not sure if he stated exactly that,

25  because we didn't terminate Mr. Carmack.  It was never

                                                    131


1   a termination.

2       Q      It was a layoff?

3       A      It was a WTA process, yes, sir.

4       Q      When's he coming back to work for the

5   Center?

6       A      I'm not going to fill in his position,

7   sir.

8       Q      Even as a janitor or something?

9       A      He could apply.  We have an opening.

10                     (1/4/18 email string between Elizabeth
                       Griffin and Steven Cochran, Senator
11                     Carrico, David Matlock re:  HEC Update to
                       Board Members marked as Matlock Exhibit
12                     Number 11)

13  BY MR. GRIMES:

14      Q      Exhibit 11.

15                     Well, would he have to interview with

16  you?

17      A      No.  He'd interview with a committee.

18                     I try not to be involved in the hiring

                         Page 110

19    process, you know.  We have a -- when we were UVA and

20    now with DHRM, there's pretty strict guidelines on how

21    that works and there's a process and a matrix and boxes

22    have to be checked.  And so I, you know, I don't

23    micromanage that way.

24            Q      Exhibit 11 is another string of emails;

25    correct?

132

1            A      Yes, sir.

2            Q      Let's look at the email at the bottom of

3    the second page of this exhibit --

4            A      Okay.

5            Q      -- from Steve Cochran to Elizabeth

6    Griffin copied to Bill Carrico and you and Mark

7    Herring; correct?

8            A      Correct.

9            Q      And Mark Herring, for the record, is the

10   Attorney General for Commonwealth of Virginia; correct?

11           A      That's correct.

12           Q      And there he writes, dated January 4,

13   2018, "As a member of the board and a human resources

14   professional, I am very concerned that this action will

15   give Mr. Carmack grounds to file a charge of

16   retaliation in response to him being --" excuse me

17   "-- him raising concerns about the working conditions

18   at the Center.

19           Does that refresh your recollection about

20   Mr. Cochran saying that he thought Mr. Carmack may have

21   grounds for a retaliation suit?  Do you remember now?

22           A      Well, yes, sir.  This email is made to

23   Elizabeth, and I was copied.  But he never made a

Page 111

24    direct statement to me.

25          Q    But you read the emails you're copied on,

1    do you not?

2          A    I do most of the time.  I can't say I

3    read them all.

4          Q    Cheryl Carrico also expressed concern

5    about what you were doing, didn't she?

6          A    Yes, sir.  Cheryl Carrico, Josh Ely and

7    Steve Cochran were the three that needed further

8    explanation.

9                (January 2018 email string between Cheryl
               Carrico, Elizabeth Griffin, Senator
10               Carrico, David Matlock re:  HEC update to
               Board members marked as Matlock Exhibit
11               Number 12)

12   BY MR. GRIMES:

13         Q    Exhibit 12, if you look at the second

14   page, there's an email from Cheryl Carrico to you dated

15   January 4, 2018; correct?

16         A    Yes.

17         Q    And there she writes, after talking about

18   Internet connectivity issues in Pennsylvania, she

19   writes, "Each meeting I have attended and at points in

20   between you report the finances are being good."

21               And that was true, wasn't it?

22         A    Yes.

23         Q    If it were not true, you would not have

24   said it, would you?

25         A    No.  Finances were good.

1          Q    "That the Center's revenue is up and

2    costs are down."

3        And you said that, didn't you?

4    A    Yeah.  We had -- nongeneral revenue has

5    gone up and nonvariable, nonfixed costs, we've worked

6    on getting those under control.

7    Q    You also reported being understaffed by

8    positions --

9    A    Yes.

10   Q    -- at the last two board meetings.

11        And that's what you have said; isn't it?

12   A    That is correct.

13   Q    "The $108,058," that's one zero eight,

14   comma, zero five eight, "mentioned below is less than

15   the total salaries will be, likely much less when

16   benefits are included, so the number of people and

17   positions is odd to me.  The positions of two people

18   are as the leads of those groups.  It seems that these

19   positions are essential to the Center's business, and I

20   am unclear how these positions are the ones to

21   eliminate."

22        That's what she said, isn't it?

23   A    That is what she said.

24   Q    So some members of the board did not at

25   all agree with what you were doing, did they?

135

1    A    Three out of 22 asked for additional

2    clarification.

3    Q    And opposed what you were doing?

4    A    I believe, sir, that at the conclusion of

5    the conference call, all three said they understood.

6    Q    You believe that?

7    A    I do, because they never mentioned it at

Page 113

Matlock dep tran

8 another board meeting.

9        Q      Was there also a discussion of
10 restructuring the board about the same time?

11        A      I don't think they've ever talked about
12 restructuring the board.

13              The board?  The governing board?

14              (1/7/18 and 4/1/18 emails between Danny
                Dixon and David Matlock RE:  HEC Update
15              to Board members marked as Matlock
                Exhibit Number 13)

16

17 BY MR. GRIMES:

18        Q      Exhibit 13 is an email from Danny Dixon
19 to you of January 7, 2018.

20              Who is Danny Dixon?

21        A      He's a former board member.

22        Q      He writes, "David, after our last
23 conversation and my receipt of a letter from the
24 Governor, I appear a bit uncertain about where I stand
25 relative to the board.  I understand you to say that

                                                136

1 the Governor was planning to restructure the board."

2        A      That's what he writes.

3        Q      Did you tell somebody that the Governor
4 was planning to restructure the board?

5        A      No.  The Governor, his appointees have a
6 term limit.

7              And obviously what happened there is
8 Danny, his term expired, and he got a letter from the
9 Governor, and he was replaced by somebody else.

10        Q      And do you know where the letter from the
11 Governor is?

12        A      No, sir.  That would -- I would not be
                      Page 114

13   included.

14          I probably may have gotten copied.  My

15   administrative assistant may have gotten copied.

16          But I don't routinely see those.  I

17   sometimes see the press releases, because every time

18   the Governor appoints people to boards and agencies

19   across the State, his press secretary does a press

20   release, and sometimes I get those.

21      Q    Where is your response to this email?

22      A    I'm not sure if there was one, other than

23   maybe a phone call.

24          Danny was coming in and out of the

25   building quite a bit then.  He was leaving a job at the

137

1    Center, and so --

2       Q    Do you have a memory of responding to

3    this email?

4       A    No.

5       Q    Is there a reason why HR was not switched

6    from UVA to DHRM until after the alleged restructuring

7    was done?

8       A    Oh, yeah.  Transfer from UVA to DHRM was

9    not initiated by the Southwest Virginia Higher

10   Education Center, our agency.  We weren't involved.  We

11   didn't have a choice.  That time line was set by UVA.

12      Q    Rachel Fowlkes was identified in

13   defendant's discovery responses as having knowledge

14   that the Center was developing a WTA plan.

15          Are you aware of that?

16      A    Yes.  I consulted with Rachel.

17          When you do something of this magnitude,

Page 115

18    I wanted to make sure that the plan was going to not

19    only make us efficient and effective, but sustainable.

20    I valued the opinion of the former executive director,

21    and I wanted to make sure that I got her -- her private

22    counseling feedback on that.

23         Q    When did you do that?

24         A    I believe it was in February of '17.

25         Q    How --

138

1          A    So February of -- yeah, February of '17.

2          Q    How did you do that?

3          A    She was -- I believe she was there taking

4    a class at the Center, and I asked her if we could have

5    a conversation.  We had several conversations during

6    that time; some over lunch, some in my office, some

7    just at a couch and chair in the lobby.

8               I believe that conversation took place in

9    my office.

10         Q    Are you aware of any emails to or from

11    Dr. Fowlkes about the WTA plan?

12         A    No.

13         Q    Similarly with respect to Chris Fields,

14    she was employed at the Center before Carmack; correct?

15         A    That's correct.

16         Q    And she was identified by the defendants

17    as someone having knowledge of the WTA plan.

18               What did she know about it?

19         A    Before my first trip -- okay.  So if we

20    go back to the summer of '16, I received correspondence

21    from the Governor's Office about fiscal year '15,

22    fiscal year '16, fiscal year '17 and potentially fiscal

Page 116

23  year '18 budget reductions, and they were asking for

24  our plans.

25           We got a reminder in September of '16

                                                    139


1   before I had been there a year, so I -- I reached out

2   to Miss Fields to ask her how she might respond to this

3   in her history.

4           And then in the early spring or late

5   winter, February, before my first trip to DHRM and DPB,

6   I asked her for templates of how she did the last one

7   at VHCC; could I see her templates so I had a good

8   understanding.  And I had her to walk me through the

9   process about my responsibilities to DPB and DHRM.

10          Q     Miss Fields was moved to the college by

11  Dr. Fowlkes; correct?

12          A     You mean she was hired by Dr. Fowlkes?

13          Q     She was moved to the college by

14  Dr. Fowlkes; correct?

15          A     "She was moved," I don't understand that

16  question.

17          Q     You don't?

18          A     Because Dr. Fowlkes had nothing to do

19  with the college because we're referring to VHCC today.

20          Q     Dr. Fowlkes -- I didn't mean to cut you

21  off.

22          A     Okay.

23          Q     Finish your answer.

24          A     Dr. Fowlkes had no authority at the

25  community college, so she couldn't move Chris.

                                                    140


Page 117

1     Q    Chris Fields left the Center, did she

2  not?

3     A    She did.

4     Q    And went to work where?

5     A    At the community college.

6     Q    Did you ever consider bringing Fields

7  back after firing Mr. Carmack?

8     A    No.

9     Q    Why are you getting Chris Fields' input

10  into decisions at the Center when she was a former

11  employee?

12     A    For the same reason I sought Rachel

13  Fowlkes. They were there from the beginning,

14  basically. They had a long history. They understood

15  institutional history, policies and procedures,

16  sustainability.

17        As I developed my WTA plan, I needed to

18  ask people who had a long history, will this work, is

19  there a flaw. I mean, I'm not going to do anything

20  without good, good advice.

21        (5/25/17 email from Christine Fields to
            David Matlock with attached VHCC

22        Restructuring Proposal Final October
            2014 marked as Matlock Exhibit Number

23        14)

24  BY MR. GRIMES:

25     Q    Exhibit 14 is an email from Chris Fields

                           141

1  to you dated May 25, 2017, and she writes there,

2  "David, here's the proposal sent to VCCS in 2014";

3  correct?

4     A    That is correct.

5     Q    And so you solicited this information

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 110 of 250   Pageid#: 1780

6    from Chris Fields; correct?

7         A     Um-hum.

8               THE COURT REPORTER:  I'm sorry?

9               THE WITNESS:  Yes.  I needed to write a

10   proposal of my own, and I just sought her guidance.

11              (5/25/17 email from Christine Fields to
                David Matlock re:  VHCC's Cover Letter to
12              DHRM for WTA Request and VHCC Memorandum
                of 11/19/14 from Debbie Rigdon to Laura
13              McClellan, Dr. Christopher Lee and Dr.
                Gene C. Couch, Jr.  RE:  VHCC Eligibility
14              for VRS Coverage of WTA Costs marked as
                Matlock Exhibit Number 15)
15

16   BY MR. GRIMES:

17        Q     Did you ever discuss with Miss Fields

18   what jobs you were eliminating?

19        A     I discussed with Miss Fields about the

20   possibility of eliminating up to six positions, and if

21   I did such a thing, based on her 15 years of

22   experience, was that sustainable.

23        Q     What does "sustainable" mean?

24        A     Is it going to work.

25        Q     Could you sell it?

                                                  142


1         A     Not that I could sell it.  I wasn't

2    interested in selling it.  I was interested in being

3    efficient and effective and if we made these changes

4    with increased revenue by decreasing expenses, was

5    this -- was this model, could the -- could the workload

6    be sustained by -- without hiring anybody else.

7         Q     So we have Exhibit 15.

8               Did you ever seek input from your chief

9    financial officer about eliminating the positions?

10        A     No.

                        Page 119

11      Q       You didn't want to know what he had to

12 say, did you?

13      A       I had reason to believe that he would

14 react negatively.

15      Q       If you wanted to know what he had to say,

16 you would have asked him; correct?

17      A       If I wanted to know his opinion on the

18 WTA, yes, sir, I would have asked him.

19      Q       Okay.  And why did you have reason to

20 believe that he would react negatively?

21      A       Things I had been told in the community.

22      Q       By whom?

23      A       I can't recall the gentleman's name right

24 now.

25      Q       Are you sure you can't recall it?

                                                    143


1       A       It was at a party.

2       Q       And you recall it, don't you?  You know

3 who it is?

4       A       No.  I recall a statement that was made.

5               The fact that a WTA was going to be

6 executed did not require input from the CFO.

7       Q       That's not what I asked you.

8               You recall the gentleman's name, don't

9 you?

10      A       No.

11      Q       It was at a party.  Where?

12      A       I don't recall.

13      Q       In the State of Virginia somewhere?

14      A       Probably.

15      Q       At somebody's house?

                        Page 120

16      A    I believe it was a reception.

17      Q    A reception where?

18      A    I believe it was in Bristol.

19      Q    Where in Bristol?

20      A    It could have been one of several places.

21 It's been so long ago...

22      Q    Why is your memory foggy on this

23 particular point?

24      A    Because I didn't take it -- take merit in

25 it.  I just -- you know, I blew it off as a party joke.

                                                 144

1      Q    Um-hum.  And what was the joke?  What did

2 he say?

3      A    Mr. Carmack had made a comment that he

4 would make sure that he had my job within a year and I

5 would be gone.

6      Q    Um-hum.  And that's what the gentleman

7 said to you?

8      A    That's what I heard.  I'm not quite

9 sure -- I'm assuming it was a man's voice.  I

10 overheard.  I mean, it wasn't like I got dragged, "Hey,

11 David, let me tell you something."

12          I heard someone talking in which I

13 overheard, we'll call it, water faucet gossip.

14      Q    But you said a moment ago that the

15 gentleman said to you Mr. Carmack will have your job

16 within a year.

17      A    That's what I heard, yeah.

18          But I didn't let that affect my

19 decisions.  I just knew that -- I just knew that

20 because Mr. Carmack's job was so intertwined with the

Page 121

21  finances of the Center, that not involving him was the

22  best way.

23      Q    But that's not my question.

24      A    Okay.

25      Q    I'm asking you about the party.

                                                    145


1            Were you there with your wife?

2       A    No.  It wasn't a -- it was a reception.

3       Q    Reception for what?

4       A    I have no idea.  I attend quite a few

5   galas and events.

6       Q    And when you heard the statement said,

7   did you look and see who was making the statement?

8       A    No.  I just walked away because I've

9   learned a long time in life that I shouldn't focus on

10  things I can't control.

11      Q    And the party was in Bristol.

12           Do you remember the month?

13      A    No.

14      Q    Or the year?

15      A    No.  It may have been -- it was very

16  close to my appointment, I mean, like the first couple

17  weeks I had gotten the job.

18      Q    That much you're sure of.

19      A    Well, it was early on in my

20  administration.  It was early.  It was early.

21      Q    Do you remember anything else about the

22  party --

23      A    No.

24      Q    -- or can you tell us one other human who

25  was there?  Even one.

                                                    146

                    Page 122

1       A       I assume there was, you know, council
2   members if it was in Bristol, I mean, you know.
3       Q       So your testimony is you went to a
4   reception; correct?
5               You say yes.
6       A       Yes, I went to a event.
7       Q       Now it's an event.  You went to an event;
8   correct?
9       A       That's correct.
10      Q       And you can't remember a single person
11  who was there other than yourself?
12      A       Well, I mean, there were council members
13  there, there were community members on.  I mean, I
14  could go and on.  There was board members of the
15  Foundation there.  I'm sure, you know, it was -- it was
16  an event like that, an event that had hundreds of
17  people at it.
18      Q       Looking back, what event would council
19  members and board members and you have been at about
20  that time?
21      A       My best guess, if I had to guess -- and,
22  again, I just blew this off -- would have been the
23  Bristol Chamber of Commerce Award Dinner.  It's held
24  every December.  Hundreds, hundreds of people there.  I
25  think I was introduced as the new executive director.
                                                     147


1       Q       Do you remember that much?
2       A       No.  I just said I think.  I don't
3   recall.
4               But something had to happen to make me
                        Page 123

5   the topic of some guys having, you know, conversation

6   around a water faucet.

7       Q    And are you certain that any one person

8   was there?  Can you give us one, just one name?

9       A    I'm sure the president of VHCC was there.

10      Q    I can't understand you, sir.

11      A    I'm sure the president of VHCC was there.

12   I would assume he would be there.

13      Q    You would assume or you have a memory of

14   him being there?

15      A    I'll say I believe he was there.

16      Q    Could you be wrong?

17      A    Oh, yes, sir, I can always be wrong.

18      Q    So what did you discuss with Jeff Webb

19   about eliminating Duffy Carmack's job?

20      A    Well, Jeff has been at the Center since

21   day one.  And in the WTA proposal, I consulted him to

22   see if we did these things, if these things were done,

23   would the Center be sustainable, can that workload be

24   distributed.

25      Q    Is that what you discussed with Jeff

                                             148

1   Webb?

2      A    I believe it to be, yes, sir.

3      Q    Well, what -- now, do you have a memory

4   of it or you just believe it?

5      A    Well, I mean, I had several meetings with

6   Jeff where I would, because he had been there since the

7   day the Center opened, where I would ask him to

8   clarify, you know, how operations worked, how business

9   flowed.  I would explain my understanding, was my

                       Page 124

10    understanding correct, am I missing something here.

11         Q    Let's try to get at it this way.  What

12    did Jeff Webb tell you about eliminating Duffy

13    Carmack's job?

14         A    Well, I think that he probably said that

15    my plan as I presented it to him was sustainable.

16         Q    You think that he probably said that?

17         A    That's correct.

18         Q    In -- in other words, you don't remember;

19    correct?

20         A    Well, that's what I remember.

21         Q    What did you discuss with Kathy --

22         A    Hietala.

23         Q    Hietala.

24              -- about eliminating Duffy Carmack's job?

25         A    Again, discussions with her centered

                                                        149


1     around the WTA process and not just one position;

2     multiple positions.  She had been there a very long

3     time, been the administrative assistant to Dr. Rachel

4     Fowlkes.

5          Q    What did she tell you?

6          A    She thought that the plan would probably

7     be sustainable.

8          Q    What did you discuss with Joyce Brooks

9     about eliminating Duffy Carmack's job?

10         A    I really didn't discuss much with Joyce

11    Brooks because she was part of the process.  And so,

12    therefore, I kept her out of the majority of the

13    conversations.  I didn't bring her into the

14    sustainability piece at all.

                    Page 125

15    Q    Adam -- go ahead.

16    A    She was on a need-to-know basis because

17    she was in HR, so I just didn't want her to know

18    things.

19    Q    You didn't want her to know things

20    because she was in HR.

21    A    I didn't want her to know things because

22    she was part of the process, is the primary reason.

23    Q    What did you discuss with Adam Tolbert

24    about eliminating Duffy Carmack's job?

25    A    Again, I had discussion with Adam about

150

1    the entire WTA process with multiple positions to make

2    sure that my decision-making, my rationale, was solid.

3    Q    Did you tell Tim Sadler, the OSIG

4    investigator, that you were firing or had fired

5    Carmack?

6    A    No.

7    Q    You never did that.

8    A    I told Mr. Sadler that, when he called

9    me, before he could say probably a sentence, that I was

10    in the process -- I was in the middle -- this was in

11    October of '17 -- that I was in the middle of a WTA

12    process; should I stop.

13    Q    Should you stop what?

14    A    Should I stop the WTA process.

15    Q    Should you fire or not fire Duffy

16    Carmack?

17    A    No, sir, should I stop the --

18    Mr. Carmack's name was never mentioned by Mr. Sadler.

19    It was the WTA process; should I stop the WTA process

Page 126

20    until the investigation was over.

21          Q      Was Mr. Carmack's name mentioned by you?

22          A      I mentioned everybody involved in the WTA

23    process.

24          Q      Including Duffy Carmack?

25          A      Yes, of which Mr. Sadler said -- he asked

                                                    151

1     for my timeline, and then he said, "Continue with your

2     WTA."  He would not disclose who had made the call.

3           Q      But you knew Duffy Carmack had made the

4     call; correct?

5           A      No, I did not know that.

6           Q      You didn't?

7           A      No.

8           Q      You never knew it?

9           A      I knew it on January 4th of 2018 when

10    Mr. Carmack looked me in the eye and said, "You know

11    I'm the one that called."

12          Q      Is your memory clear on that point -- is

13    your memory clear on that?

14          A      I remember because of -- yes.

15          Q      But you don't remember who stated at the

16    reception that -- reception or event or whatever it

17    was, that Duffy Carmack would have your job within a

18    year?

19          A      It was at a party.  It was -- I had been

20    on the job early on.  It didn't bother me.

21          Q      It didn't bother you.

22          A      No.

23          Q      Not at all?

24          A      No.  I gave Mr. Carmack outstanding

                          Page 127

25    evaluations.

1         Q      Who have you hired since the time you

2    started at the Center?

3         A      Hired?

4         Q      Hired or promoted.

5         A      The primary hire would be Joe Mitchell.

6    He is now the maintenance facilities manager.

7                We hired a couple of hourly people in

8    conference services.  We've hired a couple people in --

9    we had a couple work students.  We just hired a new

10   loans collection person in the tobacco loan collection

11   area.  We've had a couple of hourly people for the

12   testing center.

13        Q      And you promoted Adam Tolbert to head of

14   Human Resources; correct?

15        A      He is in charge of HR, yes.

16        Q      And you were involved in that decision;

17   right?

18        A      Yes, it was part of the WTA process.

19        Q      That he would become the head of HR?

20        A      That's correct.

21        Q      And his HR experience was what before

22   that?

23        A      He had been training, had gone through

24   all the training with UVA, been signed off by UVA, gone

25   through and gotten their approval, we had gotten their

1    letter of approval and --

2         Q      In other words, Adam Tolbert's job at

Page 128

3   Human Resources at the Center is his first job in HR;

4   correct?

5           A    Yes.

6           Q    And Ricky Rhley, R-h-l-e-y --

7           A    Nicky.

8           Q    -- became the assistant manager of

9   information technology; correct?

10          A    I'm not quite sure if that's exactly her

11  title.  She is over information systems.  She's

12  day-to-day manager of IT operations.

13          Q    And you put her in that position;

14  correct?

15          A    Part of the WTA process was trying to

16  explain to DHRM how we would distribute duties in an

17  equitable manner to make us more efficient and

18  effective so that we would be sustainable and, yes,

19  that was a result of that.

20          Q    That's a yes, isn't it?

21          A    Yes.

22          Q    And Jeff Webb became IT manager and

23  director of operations; correct?

24          A    He was already IT manager.  He just

25  assumed some responsibilities in operations.

                                                      154


1           Q    As the director of operations, yes.

2                And you put him in that position;

3   correct?

4           A    Yes.

5           Q    And Sonia Vanhook was put in the new

6   position involving education programs offered by the

7   Center; correct?

                   Page 129

8      A      Yes.

9      Q      And Joe Mitchell was put into the

10   position of director of maintenance; correct?

11      A      He was put in that position in the summer

12   of '17, I believe.

13      Q      And you made all those promotions;

14   correct?

15      A      Yes.

16      Q      Have you unfrozen any positions while

17   working for the Center?

18      A      Yes, we -- we have some positions that we

19   would like to fill in the very near future.

20      Q      What positions have you unfrozen?

21      A      We had a marketing position that was

22   frozen and we needed -- we needed, you know, to

23   increase our awareness, increase -- so marketing is

24   key.

25      Q      Marketing is key; correct?  It's a very

155

1   important position, isn't it?

2      A      Um-hum.

3      Q      Say yes.

4      A      Yes.

5      Q      And that position is now unfrozen and

6   you're looking for a marketing person; correct?

7      A      We have not advertised yet.

8      Q      But you're looking for a marketing

9   person, aren't you?

10      A      At some point in the future, yes, sir, we

11   will attempt to, if the budget allows, we will attempt

12   to hire a marketing position.

Page 130

13      Q      What other positions have you unfrozen?

14      A      I believe that's the only one I've

15 unfrozen, sir.

16      Q      Kathy Hietala?

17      A      Yes, sir.

18      Q      Does her mother work at the Center?

19      A      No, Kathy Heitala's mother does not work

20 at the Center.

21      Q      Hannah Hietala, who is that?

22      A      She is the conference services event

23 planner.

24      Q      And just, by chance, are Hannah Hietala

25 and Kathy Hietala related?

                                                    156


1      A      Yes.

2      Q      In what way are they related?

3      A      Kathy is the mother, Hannah is the

4 daughter.

5      Q      When did Hannah come to work for the

6 Center?

7      A      Mr. Carmack hired her when he was

8 interim.

9      Q      Did you unfreeze a position so that she

10 could work there at the Center?

11      A      No.

12      Q      Did you unfreeze a position to put her in

13 another position?

14      A      No.

15      Q      Was there a time when you told Hannah

16 that she would have a full-time position at the Center?

17      A      No.

                        Page 131

18    Q    How long have you known Joe Mitchell?

19    A    I've known him since 1986.

20    Q    And you know he's a Republican; correct?

21    A    I did not know that.

22    Q    As you sit here today, you did not know

23    he was a Republican?

24    A    No.

         And Joe changes when the wind blows.

                                                    157


1    Q    Was he interviewed by a selection

2    committee?

3    A    Yes, he was.

4    Q    Who sat on the committee?

5    A    Vice chairman Saul Hernandez, Joyce

6    Brooks, I think Doug Viers was on that committee, and I

7    believe there was one other community member at large.

8    Q    Did you approve Joe Mitchell's hire?

9    A    The approval was given at UVA, but, yes,

10   I endorsed it.

11   Q    Did Joe Mitchell have a contract with the

12   college?

13   A    Joe Mitchell was a faculty member at

14   VHCC, so, yes, he had a -- I think faculty members work

15   on a 12-month contract.

16   Q    Did Duffy Carmack ever ask you why

17   Mitchell would disappear out of payroll?

18   A    No.

19   Q    Did you ever tell Mr. Carmack to leave it

20   alone?

21   A    No.

22   Q    Did you and Joyce Brooks ever speak about

                        Page 132

23    what to do with Mitchell's employment?

24         A    The fact that we were going to hire him.

25         Q    Did Miss Brooks ever tell you that Duffy

                                                        158

1    Carmack was asking about Mitchell?

2         A    No.

3         Q    When you posted Mitchell's position, did

4    you say it had to be a current UVA employee?

5         A    I don't believe so.

6         Q    Could you be wrong about that?

7         A    I could be.  But we interviewed people

8    who were not current -- so I would say no, we did not.

9         Q    Was Mitchell officially hired as a

10   full-time employee about December 15, 2017?

11        A    Yes.

12        Q    Do you know an Ely Hietala?

13        A    Yes.

14        Q    Who is that?

15        A    Kathy's son.

16        Q    Did you hire him, too?

17        A    No.  He was working -- Ely, Hannah and

18   Kathy were all employed at the Center upon my arrival.

19        Q    When you were hired, was Ely working as a

20   wage employee, setting up and taking down for large

21   events?

22        A    Yes.

23        Q    How old is Ely?

24        A    21, 22, something like that.

25        Q    And is he a college dropout?

                                                        159

1         A    No, he's a college graduate.

                        Page 133

2     Q     From which college?

3     A     I believe Virginia Highlands Community

4 College.

5     Q     And you're certain of that?

6     A     Yes.

7     Q     After you were hired, did you and Joe

8 Mitchell bring Ely into a full-time position with

9 benefits?

10    A     Joe Mitchell would have nothing

11 whatsoever to do with that.

12        So the answer to that question would be

13 no, Joe Mitchell and I did not.

14    Q     Was the position that Ely filled posted?

15    A     Yes.

16    Q     And you're certain of that?

17    A     Yes.

18    Q     So there are documents concerning that;

19 correct?

20    A     Yes.

21    Q     Who were the candidates for that

22 position?  Who was interviewed?

23    A     I don't know.  That -- we had a committee

24 again.  That was through UVA.  And UVA had very strict

25 rules.  There was a matrix.  There had to be a

160

1 committee.  The people who served on the committee had

2 to go through training.

3        And so my role was simply, in all hires,

4 is after then UVA or DHRM now, after they do the matrix

5 and they -- interviews are done and the proposal, the

6 actual hire comes from UVA and now DHRM.  They actually

Page 134

7    make the formal request to the employee.

8         Q    Who all has been promoted from part time

9    to full time since you've been at the Center?

10        A    Part time to full time?  I'm going to

11   guess it would be Ely.  Again, it wasn't truly a

12   promotion.  He applied for a vacant position.

13        Q    Anybody else?

14        A    I don't -- I don't recall anybody else.

15        Q    Did you add a part-time grant writer to

16   the staff?

17        A    No.

18        Q    Have any Center employees received a

19   raise since you've been hired?

20        A    Yes.

21        Q    The budget permitted that?

22        A    Yes.  All --

23        Q    Have you received a raise?

24        A    The only raise I've received is whatever

25   the Governor puts in the budget, you know, when State

                                                         161

1    employees get 2 percent.

2         Q    And, in fact, Duffy Carmack received a

3    raise after you initiated the WTA process; correct?

4         A    I believe everybody at the Center in my

5    agency got a raise during that time because the

6    Governor's budget mandated a 2 or 3 percent pay raise

7    that year for fiscal year -- that may have been '18,

8    FY18.

9         Q    Did you ever consider just cutting out

10   the raises rather than firing Duffy Carmack?

11        A    No.

                    Page 135

12 Q It never occurred to you?

13 A I never fired Mr. Carmack.  Mr. Carmack

14 was not fired.

15 Q Okay.  He was just laid off?

16 A Yes.

17 MR. KINCER:  Asked and answered

18 repeatedly.

19 BY MR. GRIMES:

20 Q Did you receive -- you received a

21 3 percent raise on July 10, 2017; correct?

22 A Okay.  Yes, I think everybody did.

23 Q And you had already started the process

24 to eliminate Carmack's job due to financial reasons at

25 the time you received a raise; correct?

               162

1 A Everyone at the Center got the mandated

2 3 percent raise.

3 The restructuring, WTA, had to do with

4 the Commonwealth of Virginia's budget shortfall, not

5 the Center.

6 Q The 3 percent raise was how much money

7 for the Center employees?

8 A 3 percent of 700,000.  So what is that,

9 21,000?

10 Q And who did you negotiate your salary

11 with?

12 A On my date of hire?

13 Q Before your date of hire, on your date of

14 hire.

15 A Yeah.  Senator Carrico had -- and

16 Miss Brooks were in the room.  And Senator Carrico made

      Page 136

17    an offer, and I said, I said, "Wait a minute.  The

18    paper said 150."  He said, "We're not going to pay

19    that."  He said, "We're not authorized to pay that.

20    Your salary," he told me, "was mandated by the Code of

21    Virginia," and he said, "Here's what the Code says you

22    can be paid, and this is all you can be paid."  And I

23    said, "I don't have a choice?"  He said, "You don't

24    have a choice.  This is what you'll be paid," and I

25    couldn't be paid any more than that unless the

                                                    163


1     Foundation paid it.

2                    But with Commonwealth of Virginia general

3     fund money, it is in the Code what agency heads make.

4          Q        But you had this conversation with

5     Senator Carrico; correct?

6          A        That's correct.

7          Q        Have you told people that you and Carmack

8     did the same thing for the Center?

9          A        That me and Carmack did the same thing?

10         Q        Yeah.

11         A        No.  Mr. Carmack never did what I do.

12         Q        Did you ever consider eliminating your

13    position to save money?

14         A        I'm not so sure the Code of Virginia

15    would allow that.

16         Q        That's a different question.

17                  Did you ever consider eliminating your

18    position to save money?

19         A        No.

20         Q        You never considered resigning yourself?

21         A        No.

                        Page 137

22      Q      Or reducing your pay?

23      A      No.

24      Q      Did you try to find other work for Duffy

25   Carmack within the State of Virginia?

164

1      A      No.

2      Q      Did you ever consider making Debbie

3   Hensley and Carmack part time?

4      A      No.

5      Q      What was Hensley doing before

6   Mr. Carmack was fired?

7      A      She took care of the daily operations.

8   She was the business manager.

9      Q      You would agree one person has performed

10   the duty of the CFO from the time the Center was open

11   until Mr. Carmack was fired; correct?

12      A      No, I would not.

13      Q      You would not agree with that?

14      A      No.

15      Q      From 1996 to 2007, that position was

16   called budget manager; correct?

17      A      I would -- if that's what your research

18   shows.  I don't know.  We had -- Chris Fields occupied

19   a business manager position.

20      Q      From 1996 to 2007, Chris Fields had that

21   position; correct?

22      A      No, sir.  No, that's not correct.

23      Q      From 2007 to 2012 the position was called

24   director of finance and legislative affairs, and Chris

25   Fields held the job, correct?

165

Page 138

1    A    Okay, yes.  Chris Fields didn't leave
2  until 2012.  I'm not sure what she was always called,
3  but she was the business manager until 2012.
4    Q    And Duffy Carmack held the job from 2012
5  until January of 2018, and it was called director of
6  finance; correct?
7    A    I'm not sure if that was only internal.
8  He was considered to be the CFO.
9    Q    And now Debbie Hensley has the job, and
10  it's called director of finance; correct?
11    A    No, sir.  I believe she's called business
12  manager.
13    Q    Are you certain of that?
14    A    Fairly certain, yes, sir.
15    Q    Have you kept in contact with Joyce
16  Brooks since she retired?
17    A    All retirees are invited to retiree and
18  business building functions.  So she came to the
19  Christmas party.  We had a retirement party for her.
20  So, yes.
21    Q    She had a retirement party; correct?
22    A    Yes.
23    Q    And she's never returned to work since
24  she retired; correct?
25    A    That's correct.

                                                166

1    Q    Neither as a salaried employee or as a
2  wage employee; correct?
3    A    No, she has not returned.
4    Q    Janet Williams, do you know her?

Page 139

5        A      Yes, sir.

6        Q      Have you kept in contact with her since

7   she retired?

8        A      Yes, the same way with Miss Brooks, with

9   one exception.  Miss Williams' husband has some health

10  issues, and I checked on her once to see how her

11  husband was doing.

12       Q      And she has not returned to work as a

13  wage employee --

14       A      No.

15       Q      -- or as a salaried employee since the

16  time she retired; correct?

17       A      No, she has not.

18              MR. HARDY:  Terry, it's about quarter to

19  one right now.

20              Do you want to get -- take a lunch break

21  soon?

22              MR. GRIMES:  If you like.

23              MR. HARDY:  About how much more do you

24  think you'll need?

25              MR. GRIMES:  About five hours.

                                                    167


1               MR. KINCER:  We'll take a lunch break.

2               MR. HARDY:  That would run into way past

3   your seven-hour limit.

4               MR. GRIMES:  Off the record.

5               (Discussion off the record)

6               (A luncheon recess was taken from

7                12:46 p.m. until 1:31 p.m.)

8

9


                        Page 140

```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
                                                          168

```
 1              A F T E R N O O N   S E S S I O N

 2                         -   -   -

 3              (December 2016 to May 2017 email string
                between Donna Kaufmann, David Matlock,
 4              Adam Tolbert, Michelle Leigh Small,
                Joseph Esposito RE:  Time Sensitive:
 5              Southwest Virginia Higher Education
                Center Workforce Transition Act marked as
 6              Exhibit Number 16)

 7

 8                     CONTINUED EXAMINATION

 9   BY MR. GRIMES:

10         Q    Back on the record.

11              You've been handed Exhibit 16,

12   Mr. Matlock.

13              Take a look at the bottom of the page.

14         A    Okay.
```

Page 141

15          Q       It's an email string, again, the bottom

16   of the page is from Donna Kauffman to Joe Esposito, and

17   she writes, "Hi Joe." Then in the second paragraph,

18   "One or two of the retirees may be returning to work."

19               Do you know who that is?

20          A       No.  We asked for clarification if at

21   some point down the road any of the three, if their

22   services were needed in something specialized, but I --

23   I don't know what that means.

24          Q       Who were the retirees?

25          A       At that point, no one.

                                                        169


1          Q       Who were the retirees that are being

2    referred to in this writing?

3          A       Well, potentially, Mr. Carmack,

4    Miss Williams, Miss Brooks.

5          Q       Okay.  So three retirees.  Got it.

6                And Miss Williams was about how old?

7          A       I'd be afraid to guess.

8          Q       Miss Brooks was about how old?

9          A       I know they are in their 60s, is what I

10   would say.

11          Q       Of retirement age, in any event?

12          A       I would assume so.  I have not seen their

13   birth certificates.

14                (1/23/18 email string between David
                  Matlock and Adam Tolbert re:  Janet
15                Williams Job Description and General
                  Position Information marked as Matlock
16                Exhibit Number 17)

17   BY MR. GRIMES:

18          Q       Exhibit 17, again, an email at the top of

19   the page from David Matlock to Adam Tolbert,

                        Page 142

20  January 23, 2018, reference Janet Williams' job

21  description.

22          Why did Adam Tolbert send you Janet

23  Williams' job description after she retired?

24      A    I don't remember.

25      Q    Would you agree that in November 2016

                                                    170

1  when you would talk about what you now call the WTA

2  plan, that you would call it retirement/layoff in

3  emails?

4      A    WTA.  I tried to refer to it as WTA.

5      Q    Did you ever refer to it as, quote,

6  retirement/layoff, closed quote, in emails?

7      A    I may have.

8      Q    Did Mr. Carmack say anything to you about

9  pre-selecting employees in violation of agency policy?

10      A    Never.

11      Q    Did you tell Mr. Carmack at any time

12  something like "Bill Carrico has my back"?

13      A    Never.

14      Q    Have you ever told any employee that Bill

15  Carrico has your back or words to that affect?

16      A    Never.

17      Q    Have you ever told an employee not to

18  speak to Mr. Carmack?

19      A    No.

20      Q    Did you ever tell Mr. Carmack that he

21  belonged to the wrong party?

22      A    No.

23      Q    Did you ever hear anyone say something

24  like, "It's better to be a Republican than a Democrat"?

                        Page 143

25      A      No.

171

1       Q      Now, you've known Adam Tolbert for a
2   number of years; correct?
3       A      Yes.
4       Q      Did you have a relationship with him
5   prior to coming to work for the Center?
6       A      The relationship would be I knew of him.
7       Q      Have you ever known Mr. Tolbert to
8   campaign for any Republican candidates?
9       A      Yes.
10      Q      And who?
11      A      I guess any Republican candidate in the
12  Ninth District.
13      Q      And Ninth District, for the record, is
14  the Abingdon area?
15      A      I believe so.
16      Q      Where is the Ninth District?
17      A      I have no idea.
18      Q      Did Mr. Tolbert run for a constitutional
19  office once?
20      A      I don't know.
21      Q      Are you aware that there are
22  constitutional offices in the Abingdon area?
23      A      Yes.
24      Q      Do you know what they are?
25      A      The Sheriff is one; right?

172

1       Q      Yeah, the Sheriff would be one.
2       A      I don't know what else would be
3   constituted as a constitutional office.

Page 144

4        Q     After you were hired, did you move Adam
5 Tolbert into a management role?

6        A     No.

7        Q     When he moved from IT to Human Resources,
8 did he get an increase in pay?

9        A     He got -- yes.

10        Q     Debbie Hensley had served as an assistant
11 HR person for over ten years; correct?

12        A     I don't know that.

13        Q     You don't know.

14        Did you ask?

15        A     No.

16        Q     Did you want to know?

17        A     No.

18        Q     How long have you known Jeff Webb?

19        A     I first met Mr. Webb when he was a
20 student at the community college.

21        Q     So I don't know what that means.  Ten
22 years?  Twenty years?

23        A     More than twenty.

24        Q     Have you known him to help campaign for
25 any Republican candidates?

                                                        173

1        A     No.

2        Q     Does he have a college degree?

3        A     Yes.

4        Q     Do you know anything about an audit about
5 three or four years ago that showed that there were
6 reportable issues with Webb's IT department?

7        A     There was an audit four or five years
8 ago.  I don't remember a particular point about the IT.

Page 145

9   I remember inventory in the finance department was a

10  big issue.

11        Q     In the sense it hadn't been done?

12        A     No.  I think it was more in the sense it

13  could be better.

14        Q     The inventory could be better?

15        A     Again, I've not seen the report in a long

16  time.  I don't know.

17        Q     During that same audit, do you know

18  whether it also showed that there were issues with HR

19  records that Joyce Brooks was in charge of?

20        A     I do not know.

21              That audit, for the record, was auditing

22  Rachel Fowlkes' and Duffy Carmack's interim.

23        Q     Who is Sonia Vanhook?

24        A     She is a employee of the Center.

25        Q     And what does she do or what did she do?

                                                        174


1         A     She's done about every job in the Center.

2         Q     Was she permitted to work on her Ph.D.

3   while working on State time?

4         A     I'm not aware she ever worked on her

5   Ph.D.

6         Q     Did you approve funds to pay her tuition?

7         A     Yes.

8         Q     To work towards what?

9         A     I believe she was working on a second

10  master's.

11        Q     After Carmack was fired, did you create a

12  position for Sonia teaching class?

13              MR. KINCER:  Objection to the form of the

                         Page 146

14     question.

15     BY MR. GRIMES:

16          Q     Go ahead and answer.

17          A     Well, Mr. Carmack was not fired and

18     Miss Sonia Vanhook has an evolving position that has

19     changed since her first day on campus.

20          Q     And did that evolving position include

21     teaching classes to the College for Older Adults, a

22     noncredit program?

23          A     She was doing that upon my arrival.

24          Q     Does she also work with elementary school

25     children?

                                                        175

1           A     She monitors our field trips.

2           Q     Your wife is a teacher; is that correct?

3           A     That's correct.

4           Q     Your son was a teacher and now a

5     principal; correct?

6           A     That is correct.

7           Q     Where does your daughter -- son teach?

8           A     My son doesn't teach.

9           Q     Strike that.

10                Where does your wife teach?

11          A     Ray Valley Elementary School.

12          Q     Where is that?

13          A     Washington County.

14          Q     Is your daughter a teacher?

15          A     Yes.

16          Q     At which school?

17          A     Patrick Henry High School.

18          Q     Teaching what grade?

                         Page 147

19      A      High school.

20      Q      All right.  What class?

21      A      Health, PE and science, I believe.

22             (Southwest Virginia Higher Education
               Center First LEGO League Information
23             marked as Matlock Exhibit Number 18)

24  BY MR. GRIMES:

25      Q      Exhibit 18 is a document produced by the

                                                        176

1   defense in this case.

2              Do you see the Bates number at the bottom

3   of the page SWV681?

4              Turn to the second page, please.

5       A      Okay.

6       Q      Looking at this chart, when Dr. Fowlkes

7   was the director, there were donations made; correct?

8       A      I believe so.

9       Q      But when you became the director, those

10  donations go away and they are just reimbursements to

11  Smyth County School and Wallace Middle; correct?

12      A      I don't know about the donations.  That

13  would be a Foundation question.

14             We have nongeneral funds that we use to

15  support LEGO robotics.

16      Q      When you promoted Sonia Vanhook, you gave

17  her a raise; correct?

18      A      I don't believe Miss Vanhook has had a

19  raise that no one else has had.  She had the

20  across-the-board 3 percent.

21      Q      Sonia is Dale Cook's sister; correct?

22      A      That is correct.

23      Q      And you consider Dale Cook to be one of

                        Page 148

24    your mentors; correct?

25           A    I do.

1                  Miss Vanhook was the first hire of the

2    Center.

3           Q    At any time did you have Cook attend

4    meetings with you at the Center?

5           A    No.

6           Q    He is an insurance salesman in Abingdon;

7    correct?

8           A    That's correct.

9           Q    Do you know what needling is?

10          A    What?

11          Q    Needling?

12          A    No.

13          Q    Never heard of that?

14          A    No.

15          Q    Never used that term; correct?

16          A    Just saying "needling someone"?

17          Q    Have you ever used the term "needling"?

18          A    Maybe.

19          Q    Did you ever say anything to Duffy

20    Carmack about needling?

21          A    I don't have any memory of that.

22          Q    You're not denying you may have said it;

23    you just don't remember, correct?

24          A    I think I would remember if I had said

25    something to Mr. Carmack about needling.  That doesn't

1    seem like a word I would use in my normal vocabulary,

Page 149

2    my normal tone.

3         Q       Do you deny that you said something to

4    Mr. Carmack about needling?

5         A       I have no memory, yes, so I would deny

6    that.

7         Q       When was the first time that you learned

8    that Joyce Brooks was interested in retirement?

9         A       When Mr. Carmack told me upon my

10   arrival -- before I was even hired.  Mr. Carmack came

11   to visit me at the community college.

12        Q       And said something about Joyce Brooks

13   retiring?

14        A       He said that she may be interested in

15   retiring soon.

16        Q       When was that visit in relation to your

17   taking the job at the Center?

18        A       It was before the board met, so he must

19   have known something before I did.  I would say

20   September of '15.

21        Q       When, in fact, did she retire?

22        A       June 4th was the date of the WTA, and I

23   believe her retirement took effect February 1st of

24   2018.

25        Q       So before the WTA went into effect, you

1    knew that Joyce Brooks was thinking of retirement;

2    correct?

3         A       I know that everyone that works in my

4    building has thought of retirement.

5         Q       But specifically I'm asking about Joyce

6    Brooks.

Page 150

7              You met with Duffy Carmack when you were

8  at the college, and you learned that Joyce Brooks was

9  interested in retirement; correct?

10       A     My conversation with Mr. Carmack centered

11  around he told me he wanted to work five more years.

12  He thought Joyce wanted to work three or four more

13  years.

14       Q     Is that yes?

15       A     Well, yes.

16       Q     Who replaced Joyce Brooks?

17       A     No one replaced Joyce Brooks.

18       Q     Was it Hannah Hietala?

19       A     No.

20       Q     Hannah is Kathy's daughter?

21       A     That's correct.

22       Q     And Kathy is your assistant; correct?

23       A     That's correct.

24       Q     And before that, the Center reimbursed

25  UVA Wise for half of Hannah's salary; correct?

                                              180

1       A     That's correct.

2       Q     And after this, afterward, the Center

3  paid her entire salary; correct?

4       A     That's correct.

5       Q     Her salary is about what?

6       A     28,000.

7       Q     When you used the number $700,000 before

8  lunch, I asked you what the payroll was, was that

9  $700,000 a year or a month or what?

10       A     I believe -- no, it's not a month, no,

11  not at all.

Page 151

12      Q      Do you remember saying that earlier?

13      A      Oh, yes.  I think -- I think payroll is

14   somewhere in the 700 -- was in the 700 -- in the year

15   somewhere around, maybe it was $1.7 million.

16      Q      So earlier you said 700, but now you

17   think maybe 1.7 million?

18      A      I'd have to check.

19      Q      Going back to when Brooks first told you

20   that she was interested in retirement, how long after

21   this did you reach out to Donna Kauffman at UVA HR

22   about using the WTA?

23      A      Miss Brooks never filed paperwork to

24   retire or never approached me or sent me an email

25   saying she was planning on retiring.

                                                     181


1       Q      Well, I didn't say email.

2              But you learned that she was -- she might

3   retire even before you started work; correct?

4       A      Yes, the same as Mr. Carmack.

5       Q      Would you agree or disagree that

6   Mr. Carmack was the only person who lost his job that

7   was already not retiring in the near future?

8       A      I would totally disagree with that.

9       Q      Would you agree or disagree that between

10   Joyce Brooks, Janet Williams and Duffy Carmack was the

11   only one who was not aware that his job was going away

12   before it happened?

13      A      Miss Williams did not know the date in

14   which she was going to lose her job.  Miss Brooks did

15   not know the date in which the WTA process was going to

16   happen.

                        Page 152

17     Q    Did you give advance notice to Joyce

18 Brooks that she would be losing her job to give her

19 advance notice?

20     A    Miss Brooks was still in HR and she

21 worked closely with Donna Kauffman, so some of the

22 paperwork Miss Brooks would see because of the nature

23 of her job.  But I never discussed the details of WTA

24 with her or Miss Williams or Mr. Carmack.  They were

25 not included in the decision-making process.

                                                182

1     Q    But Miss Brooks by virtue of the fact she

2 worked in HR saw the paperwork that talked about her

3 job being eliminated; correct?

4     A    Miss Brooks saw some paperwork that

5 talked about WTA.

6           (5/22/17 email from Donna Kauffman to
                David Matlock, Adam Tolbert, Susan Harris

7           RE:  WTA contact marked as Matlock
                Exhibit Number 19)

8 BY MR. GRIMES:

9     Q    Exhibit 19, Mr. Matlock, is an email from

10 Donna Kauffman -- incidentally, is her office in

11 Charlottesville?

12     A    Yes.

13     Q    -- to you and Adam Tolbert, copied to

14 Susan Harris, reference WTA contact.

15     A    Um-hum.

16     Q    And at the bottom of the paper, the

17 writer states, "Susan is aware we are discussing

18 Douglas Viers, Joyce Brooks and William Carmack.  Susan

19 is also aware that William," quote, "Duffy," closed

20 quote, "is not aware that he is being impacted by the

21 WTA yet."

Page 153

22        Who is Susan?

23        A    It says that Susan is the interim

24   benefits supervisor in Charlottesville for UVA.

25        Q    So can you explain why Douglas Viers,

                                                    183

1    Joyce Brooks and Joyce -- and Joyce Brooks knew about

2    the WTA and its impact but Duffy Carmack did not?

3         A    Well, I can't assert that.  That's not

4    what that statement says.

5              (5/22/17, 5/31/17 and 6/1/17 emails
               between David Matlock, Susan Harris, Adam
6              Tolbert, Donna Kaufmann re:  WTA Contact
               marked as Matlock Exhibit Number 20)
7    BY MR. GRIMES:

8         Q    Exhibit 20 is more emails.  The top of

9    the page, David Matlock to Susan Harris, copied to

10   yourself, Adam Tolbert and Donna Kauffman.

11             And there you write -- and the date is

12   June 1, 2017 -- "I believe I have everything ready but

13   waiting to talk with Janet."

14             Who is Janet?

15        A    Janet Williams.

16        Q    "I also plan to share with my executive

17   committee of the board before I pull the trigger on

18   Duffy."

19             And pull the trigger on what?

20        A    The execution of the WTA plan.  I was

21   going to make sure that the executive board fully

22   understood what we were doing, that I had their

23   endorsement and that they had no questions, and if they

24   did, we'd get those questions answered.

25        Q    With respect to any other employee at the

                                                    184

                        Page 154

1  Center during the history of your employment, have you

2  ever made a reference in writing to pulling the trigger

3  on them other than Duffy Carmack?

4        A     "Pulling the trigger" is a common word in

5  my vocabulary.

6        Q     My question is a little different.

7              With respect to any employee other than

8  Duffy Carmack, have you ever made a reference in

9  writing to "pulling the trigger"?

10       A     I believe I probably have.

11       Q     Okay.  And have you looked at the

12  documents produced by the defendant in this case?

13       A     No.

14       Q     Have you seen any reference to "pulling

15  the trigger" referring to any employee other than Duffy

16  Carmack?

17       A     I have not looked, so I don't -- I just

18  know that's a common word in my vocabulary.

19       Q     Do you have a memory of a document

20  existing referencing "pulling the trigger" other than

21  the one I have just shown you, Exhibit 20?

22       A     I don't have a memory, but I would say it

23  could possibly exist.  That's a very common word in my

24  vocabulary.

25                                              185


1

2              (12/1/17 and 1/12/18 email strings
               between Donna Kaufmann, David Matlock,
3              Carol Summers RE:  Final business
               justification for SWVHEC WTA sent to DPB
4              marked as Matlock Exhibit Number 21)

5  BY MR. GRIMES:

                    Page 155

6      Q      Exhibit 21, more emails.

7             Bottom of the page, the email from you to

8   Donna Kauffman, copied to yourself or sent to yourself.

9             Why are you sending emails to yourself?

10     A      Sometimes I don't have -- it's a

11  self-filing system.  I do it quite frequently with

12  everything.

13            Q      All right.  So Donna Kauffman writes to

14  you below, December 1, 2017, "Hi, David.  Please send

15  Carol and I the final business justification sent to

16  DPB.  Thank you in advance," and you respond, "I will

17  send it in a few.  I don't think I changed everything,"

18  three question marks.

19            MR. KINCER:  Objection to the -- that's

20  misreading.  It's not "everything," it's "anything."

21            MR. GRIMES:  Under the -- I apologize.

22  BY MR. GRIMES:

23     Q      "I don't think I changed anything," three

24  question marks.  "DPB approved it as written, but DHRM

25  is going to have me completely rewrite everything."

                                                    186

1             And that's what DHRM told you; correct?

2      A      I don't think we rewrote everything, but

3   that could be some exaggeration in there, maybe

4   frustration.

5      Q      So sometimes you exaggerate when you are

6   frustrated; correct?

7      A      No.

8      Q      You don't, okay.

9             So is what you said there true, "DHRM is

10  going to have me completely rewrite everything"?  Is

                    Page 156

11     that true or false?

12          A     That's probably -- because I did not

13     rewrite everything, so I'll say that's false.

14          Q     "A long story, but they tell me asking

15     for volunteers completely violates State policy"?

16          A     Um-hum.

17          Q     So you considered asking for volunteers

18     to retire or leave their employment; correct?

19          A     I did consider that.

20          Q     "I am completely confused and ready to be

21     committed," and you have three exclamation points

22     there?

23          A     Um-hum.

24          Q     So were you confused that you had to jump

25     through hoops with the State or what's going on?

                                                    187


1           A     No.  I was confused.  UVA throughout the

2      history kept changing their position.  And it was very

3      frustrating because in my history with the Virginia

4      Community College System, it was always so cut and dry,

5      and UVA --

6           Q     What did the rewrite with DHRM consistent

7      of?

8           A     I don't -- I'd have to -- I don't know.

9           Q     Was it to omit from the report that the

10     employees except Carmack had been told about the

11     layoff?

12          A     It could have, but we didn't -- we could,

13     we could have.

14          Q     DHRM did not give the final approval

15     until almost mid 2018; correct?

                         Page 157

16      A     They didn't give approval to the
17 execution plan.

18      Q     Until mid 2018; correct?

19      A     The way DPB does it is their full
20 approval doesn't come until after the execution of the
21 WTA.  DPB pre, DHRM post.

22      Q     This was long after Carmack had already
23 been let go; correct?

24      A     That's correct.

25      Q     Who is Debbie Heath?

                                          188

1      A     Debbie Heath was a employee in the
2 conference services division.

3      Q     Did she retire?

4      A     Yes.

5      Q     Do you know why she retired?

6      A     She told me mixed things.

7      Q     She made some complaints to you; correct?

8      A     She complained against Mr. Joe Mitchell.

9      Q     She did.

10            And her complaints were what?

11     A     I don't remember.  She complained a lot.

12     Q     All right.  You have no memory -- is it
13 your testimony you have no memory of what her complaint
14 was about?

15     A     Probably most of them centered around
16 Mr. Mitchell trying to hold her accountable with
17 keeping security with doors locked.

18     Q     You used the word "probably."

19            Are you certain that's what she said?

20     A     I'm certain she used that at some point.

                        Page 158

21      Q       What did you do, if anything, to address
22 her complaints?

23      A       She never filed a formal complaint.

24      Q       Debbie Heath, in fact, retired at some
25 point; correct?

                                                        189


1       A       That's correct.

2       Q       And Ely Hietala filled her position;
3  correct?

4       A       Yes.  He applied for the job.

5       Q       So how many members of the Hietala family
6  did you have working for you at the most?

7       A       When I came to work at the Center, there
8  were four members either hired by Mrs. -- by
9  Dr. Fowlkes or Mr. Carmack.  They all worked there upon
10 my arrival.

11      Q       Was there a time when you were
12 considering eliminating Douglas Viers' position?

13      A       Yes, I was also -- and there was others.

14      Q       And he was made aware that his position
15 might be eliminated; correct?

16      A       No.

17      Q       Are you certain?

18      A       I'm certain.

19      Q       And his position was not, in fact,
20 eliminated; correct?

21      A       His position was not eliminated.

22      Q       Why are there emails about including him
23 in the WTA action plan -- strike that.

24              Why are there emails about including him
25 in the Work Force Transition Act plan but no emails

                    Page 159

1  about not including him in the Work Force Transition

2  Act plan?

3      A     When I started, I took a very broad

4  stroke and looked at a lot of different areas, and then

5  I tried to determine if that position is eliminated,

6  can that work be transferred to the point where we can

7  be sustainable for the next two years and beyond.

8      Q     Was there a time when you were

9  considering eliminating Patricia Ball's position?

10     A     Yes.

11     Q     Who was she?

12     A     She is the manager of the Virginia

13  Tobacco Commission scholarship loan program for the

14  Southwest region, for the whole region.

15     Q     Why was her position not eliminated?

16     A     Because I couldn't replace her.  That

17  meant that had I -- there was no, there was no way I

18  could backfill that position.

19     Q     Now, you've indicated that the Foundation

20  paid approximately 25 percent of Mr. Carmack's salary;

21  correct?

22     A     Yes.

23     Q     Thus, eliminating his job at most would

24  have saved the Center only 75 percent of his salary;

25  correct?

191

1      A     Yes.

2      Q     And would you agree that someone had to

3  perform the financial functions that were performed by

Page 160

4  Mr. Carmack?

5      A    For?

6      Q    For what -- for the Center.

7      A    Miss Hensley was doing that.

8      Q    You would agree that somebody has to do

9  Mr. Carmack's job?

10     A    Somebody was doing that.

11     Q    Um-hum.

12          (Southwest Virginia Higher Education
            Center Budget Reduction and Restructuring
13          Proposal marked as Matlock Exhibit Number
            22)
14

15  BY MR. GRIMES:

16     Q    Exhibit 22.  This is called Southwest

17  Virginia Higher Education Center Budget Reduction and

18  Restructuring Proposal.

19          Did you prepare this document?

20     A    Yes.

21     Q    You list Duffy's salary here as 162,477

22  estimated for 2017/'18 salary and benefits; correct?

23     A    Yes.

24     Q    Now, is that only the portion that's paid

25  by the Center or does that include the money paid by

                                                192

1  the Foundation?

2      A    That's total.

3      Q    So eliminating Mr. Carmack's position

4  from the Center would not save the Center $162,000,

5  would it?  Because 25 percent is paid by the

6  Foundation.

7      A    That would be a logical assumption.

8      Q    So that number is inflated by 25 percent;

                    Page 161

9   correct?

10          A   Well, I would say no.

11          Q   Did the Center pay rent to anyone?

12          A   We rent a -- so, yes.

13          Q   To whom?

14          A   I have no idea.

15          Q   How much?

16          A   3,000 a year.

17          Q   For what?

18          A   Storage.

19              (6/7/17 email strings between Donna
                Kauffman, David Matlock, Joyce Brooks re:
20              Adam marked as Matlock Exhibit Number 23)

21   BY MR. GRIMES:

22          Q   Exhibit 23 is the next document.

23              The bottom of the page is an email from

24   Joyce Brooks to Donna Kauffman dated June 7, 2017, and

25   she writes, "Hi Donna, when Adam takes on a lot of my
                                                        193

1    duties, would there be justification to give him more

2    than the customary 10 percent increase?"

3               And then above that, Miss Kauffman

4    writes, "Good afternoon Joyce, Please have David give

5    me a call on this one."

6               That's you, David Matlock; correct?

7          A    Yes.

8          Q    "The next step would be to send in a

9    revised job description with Adam's new job duties

10   incorporated."

11              And so did, in fact, Adam Tolbert get a

12   10 percent increase?

13         A    Part of the OSIG investigation was that

                      Page 162

14    Adam was not properly -- his EWP didn't properly align

15    with his duties and that led to an increase because of

16    the OSIG investigation.

17          Q    At the top of the page is an email from

18    Donna Kauffman to you dated June 7, 2017, concerning

19    Adam.  And she writes, "Good evening David, I would

20    rather have this conversation with you directly.

21    Please give me a call at your convenience if you want

22    to discus further."

23          Do you know why Donna Kauffman did not

24    want to put her concerns in writing?

25          A    Probably that was fishing by Joyce.

194

1    We -- I did not include Joyce, Miss Brooks, in any of

2    the conversations regarding the EWP plan.

3          And so obviously I'm not included in this

4    email, so she -- maybe she was just trying to get some

5    information from Donna, so maybe that's why Donna

6    wanted to talk to me directly.

7          Q    The numbers on Exhibit 22 -- if you would

8    get that before you.  Looking particularly at paragraph

9    1B, you see some names listed there which include Adam

10    Tolbert.

11          Do you see what I'm talking about?

12          A    Um-hum.

13          Q    Did that number include the 10 percent

14    raise which Adam Tolbert was about to get?

15          MR. HARDY:  Objection.  Assumes facts not

16    in evidence.

17    BY MR. GRIMES:

18          Q    Answer, please.

Page 163

19          MR. KINCER:  You can answer the question.

20          THE WITNESS:  Okay.

21              I don't know when Adam got a raise.  When

22    working on the WTA with UVA and DHRM, knowing that we

23    were going to distribute duties across the board to

24    people, the maximum the State will allow is 10 percent

25    for responsibility added.

                                        195


1

2              (October 2017 email strings between Adam
               Tolbert, Donna Kauffman, Joyce Brooks RE:
3              Austin Dierks Internal Salary Alignment
               marked as Matlock Exhibit Number 24)
4

5    BY MR. GRIMES:

6          Q    Exhibit 24 I have stamped 740, written

7    740 in the lower right-hand corner.

8              This concerns, at the top of the page,

9    Austin Dierks internal salary alignment; correct?

10         A    Um-hum.

11         Q    And what was his job?

12         A    He was an IT technician -- he is an IT

13   technician.

14         Q    Look on the second page.  The writer

15   Donna Kauffman sends an email to Joyce Brooks, copied

16   to Adam Tolbert, and says, "Based on the justification

17   sent forward with the salary increase for Austin, I

18   would have expected to see this 15 percent increase

19   (Austin's name) in the budget reduction and

20   restructuring -- budget reduction and restructuring

21   proposal that David sent to me for the WTA (attached).

22   Please advise."

23              And why wasn't that number in the

                        Page 164

24    proposal?

25         A    Well, first of all, what Austin was doing
                                                    196

1    was with the testing center, and that change in his

2    duties took place well before the WTA.

3         Q    Did you tell the board that you were

4    going to give Austin Dierks a 15 percent pay raise?

5         A    No.

6         Q    Did you want them to know?

7         A    In the history of the Center, I don't

8    believe anyone was ever told.

9                    (December 2017 email string between David
                     Matlock, Adam Tolbert, Debbie Rigdon, RE:
10                   Requested Information marked as Matlock
                     Exhibit Number 25)
11

12   BY MR. GRIMES:

13        Q    Exhibit 25.  Now, the savings associated

14   with a reduction in force are not realized for a number

15   of months or years; correct?

16        A    That's correct.

17        Q    If you look at your email here from David

18   Matlock, yourself, to Adam Tolbert dated December 20,

19   2017 and the one right below it from Debbie Rigdon to

20   you dated December 18, 2017, she writes in the last

21   sentence of the first paragraph, "Generally speaking,

22   it can take as much as two years to recover the costs

23   associated with layoff actions."

24             And that's true, isn't it?

25        A    Um-hum.  That's why you can't fill a
                                                    197

1    position.

2         Q    Layoffs took place when?
                    Page 165

3     A    January 4th.

4     Q    Of?

5     A    2018.

6     Q    And so this is January of 2019; right?

7     A    That's correct.

8     Q    So the cost savings have not yet been

9  recovered; correct?

10    A    Oh, I think they have.

11    Q    You do, okay.

12        (November 2016 - January 2017 email
           strings between Donna Kauffman, David
13        Matlock, Susan Harris RE:  Time
           sensitive, Southwest Higher Ed Center
14        SWVHEC (retirement/layoff) meeting today
           at 1:30 pm marked as Matlock Exhibit
15        Number 26)

16  BY MR. GRIMES:

17    Q    Incidentally, have you ever worked as an

18  accountant?

19    A    No.

20    Q    And you don't have a degree in

21  accounting; correct?

22    A    No.

23    Q    Exhibit 26 is an email from Donna

24  Kauffman to you dated January 26, 2017; correct?

25    A    That's correct.

                                               198


1    Q    Below that is an email from Susan Harris

2  to Donna Kauffman dated January 26, 2017.

3        And you see certain cost estimates listed

4  there for four people:  Patricia Ball, Douglas Viers,

5  Joyce Brooks and William Carmack; correct?

6    A    That's correct.

7    Q    Did the Center incur the costs listed

                 Page 166

8      here for purchased years of service?

9              A       No.

10             Q       None of these costs were incurred;

11     correct?

12             A       For years of service for those who took

13     retirement, no, that was completely covered.

14             Q       Was the board told that the Center would

15     not incur any of these costs?

16             A       Yes, the executive board.

17             Q       But not the whole board?

18             A       No.

19             Q       If so, what was the actual savings or

20     loss to the Center for using the WTA?

21             A       The actual savings?

22             Q       Yes, sir.

23             A       After when allowed to hire the marketing

24     position, in excess of $104,000 a year.

25             Q       And that's it, 104 a year?

                                                        199


1              A       In excess of $104,000 a year.

2              Q       Would you agree that there was a cost to

3      the Center for the amount of time you and staff spent

4      working on how to eliminate these jobs?

5              A       There was a cost related to the

6      processing and preparation of the WTA plan.

7              Q       And what was that cost?

8              A       I don't have a number.

9              Q       Did you ever -- sorry.

10                     (10/31/17 email from David Matlock to
                       Joyce Brooks, Adam Tolbert, Kathy
11                     Hietala, Jeff Webb RE:  Thank you marked
                       as Matlock Exhibit Number 27)
12

                             Page 167

13    BY MR. GRIMES:

14         Q     Did you ever attempt to quantify that

15    cost?

16         A     No.

17         Q     Did you want to know what it was?

18         A     No.

19         Q     To this day do you want to know what it

20    was?

21         A     No.

22         Q     Exhibit 27 is an email from you to Joyce

23    Brooks, Adam Tolbert, Kathy Hietala, and Jeff Webb.

24               There you write, "Thank you for your time

25    this morning.  I hate that we are having to spend so

                                                  200


 1    much time on something that should be rather simple."

 2               And the reality is the WTA process took a

 3    lot more time than you anticipated; correct?  And

 4    that's why --

 5         A     No.

 6         Q     -- you say this.

 7               No?

 8         A     I don't reference WTA in this.

 9         Q     And you say, "I've made Senator Carrico

10    of each step we are taking -- taking."

11               Let me read this again.  I'm going to

12    read it the way it's written.  "I have made

13    Senator Carrico of each step we are talking my and the

14    feedback from UVA.  I appreciate you.  David."

15               And you wrote this at 11:47 in the

16    morning; correct?

17         A     Yes, sir.

                        Page 168

18      Q      And the word "aware" is missing, isn't

19 it?

20      A      Yes, I would assume that would be what I

21 meant there.  My intent was "aware."

22      Q      And it's true, you kept Senator Carrico

23 aware of each step you were taking; correct?

24      A      I made Senator Carrico aware of every

25 step in every decision I've made.  He's the chairman of

201

1 my board, and I report directly to my board.

2      Q      Do you know of any Higher Ed. Center in

3 Virginia that does not have a CFO?

4      A      I think so, yeah.

5      Q      Well, which ones?

6      A      I think the New College Institute has a

7 business manager and I think Roanoke has a business

8 manager.  I'm not -- I think Southern has a CFO.

9      Q      Do you know of any other Higher Ed.

10 Center in Virginia that has used the Work Force

11 Transaction Act to eliminate a CFO's job?

12      A      No.

13      Q      In the history of the Commonwealth of

14 Virginia with respect to any agency in the State, are

15 you aware of any other agency that has used the Work

16 Force Transition Act to eliminate a CFO's job?

17      A      No.

18      Q      Why was Adam Tolbert involved in planning

19 the use of the WTA to eliminate Duffy Carmack's job?

20      A      Adam Tolbert was used in the entire WTA

21 process because he was backfill for Miss Brooks.  I

22 could not allow Miss Brooks to be in the weeds.

Page 169

23          UVA advised that I find someone other

24    than Miss Brooks to help navigate the process.

25          Q      Deborah Rigdon from DHRM was also

202

1    involved; correct?

2          A      Yes.

3          Q      Do you know whether she knew of

4    Mr. Carmack's complaint to DHRM about your alleged

5    financial improprieties?

6          A      She never made a statement directly to me

7    about that that I'm aware of.

8          Q      Irrespective of whether she made a

9    statement directly to you, do you know whether she knew

10   of Mr. Carmack's complaints to DHRM?

11          A      I'm aware that she knew there was a

12   complaint, but no one ever told me who made the

13   complaint.

14          Q      Why was Duffy Carmack not offered the

15   position that was unfrozen for Hietala?

16          A      There was no position unfrozen for

17   Hietala.

18          Q      Did it bother you that Duffy Carmack took

19   severance rather than enhanced retirement?

20          A      No. He -- it was his choice.

21          Q      With respect to Janet Williams, when was

22   the first time you learned that she was interested in

23   retirement?

24          A      Sometime in the summer of -- I will say

25   September, I think, September of '17.

203

Page 170

1    Q    And didn't she submit retirement

2  paperwork to you or Joyce Brooks in August of 2017?

3    A    No.

4    Q    Did she get a response to the request

5  right away?

6    A    She didn't submit paperwork, sir.

7    Q    When did she, in fact, retire?

8    A    The WTA was January 4 of 2018. I think

9  her retirement became effective February 1 of 2018.

10   Q    Did you tell her on January 4, 2018 that

11  she could retire?

12   A    I told her on January 4, 2018 that

13  according to the WTA process, she had two options, and

14  here's what they were.

15   Q    When was the first time that Joyce Brooks

16  told you anything about Janet Williams wanting to

17  retire?

18   A    I think it was in September of 2017.

19        (5/22/17 email string between David
          Matlock, Donna Kauffman, Adam Tolbert re:
20        Duffy's Notice + WTA Waiver marked as
          Matlock Exhibit Number 28)

21

22  BY MR. GRIMES:

23   Q    Exhibit 28, Bates 10835, email from David

24  Matlock to Donna Kauffman, copied to yourself and Adam

25  Tolbert, I may have said this, but dated May 22, 2017;

                                                    204

1  correct?

2    A    (No response).

3    Q    Correct, sir?

4    A    Yes.

5    Q    There you write, "Donna, thank you for

                    Page 171

6    completing this research for us."

7            So Donna had done some research for you;

8    correct?

9        A    Yes, she -- she was involved early in the

10   process.

11       Q    "I should have a letter ready for you

12   shortly, but was given a curve ball on Friday."

13           That's what you wrote; correct?

14       A    Um-hum.

15       Q    And the curve ball was that Joyce reports

16   that now Janet Williams might be interested?

17       A    Um-hum.

18       Q    You're talking about retirement; correct?

19       A    Um-hum.

20           THE COURT REPORTER:  I'm sorry?

21           THE WITNESS:  Yes.  Yes.

22   BY MR. GRIMES:

23       Q    So it was not September of 2017, was it?

24       A    It was May.

25       Q    It was May.

                                                 205

1            And in reality, you had heard even

2    earlier than that that Janet was thinking about

3    retiring; correct?

4        A    Janet spoke as all employees do about the

5    day they are going to retire and the wishing of

6    retirement.

7            (1/25-26/2017 email string between David
            Matlock, Donna Kauffman, Joyce Brooks RE:
8            Add on for incentive marked as Matlock
            Exhibit Number 29)

9

10   BY MR. GRIMES:

                    Page 172

11          Q       Exhibit 29.  The email at the bottom of

12   the page is from Joyce Brooks to Donna Kauffman dated

13   January 25, 2017, which you would agree is before

14   September of 2017 and before May of 2017; would you

15   not?

16          A       That's true.

17          Q       And there she writes, "Hi, could you add

18   Janet Williams to that list for possible early

19   retirement?"

20                  Did I read that correctly?

21          A       That's what it says, yes, sir.

22          Q       So you knew as early as January of 2017

23   that there was a chance that Janet Williams might

24   retire; did you not?

25          A       Adding her to the list does not mean that
                                                          206


 1   she was interested in retiring.

 2          Q       Oh, it doesn't?

 3          A       No, no more than on Exhibit 26, the other

 4   ones listed.

 5          Q       You do acknowledge receiving this email

 6   in January of 2017 --

 7          A       Yes.

 8          Q       -- do you not?

 9          A       Yes.

10          Q       How long after Williams had her job

11   eliminated did she retire?

12          A       Mrs. Williams' job was not eliminated;

13   she was laid off.

14          Q       How long after Williams had her job laid

15   off, use whatever word you want to use, did she retire?

                        Page 173

16  A  The WTA took place on January 4th, 2018,

17 and I believe her retirement was effective

18 February 1st.  It could have been March 1st.  I'm not

19 certain.  But there was choices.  There was paperwork

20 for them to sign and turn back in.

21  Q  Of what year?

22  A  Of 2018.

23  Q  Who replaced her?

24  A  No one.

25    We didn't replace -- all three positions

                  207

1 have not been replaced.

2  Q  Williams was approached before she was

3 laid off about whether she was willing to retire,

4 wasn't she?

5  A  She was made aware the WTA process would

6 be a potential option.

7  Q  Wasn't a retirement party held in 2018

8 for both Joyce Brooks and Janet Williams?

9  A  Yes.

10  Q  What month?

11  A  August maybe.

12  Q  Of?

13  A  2018.

14  Q  And who planned that?

15  A  Kathy Hietala that works in my office.

16  Q  Your assistant?

17  A  Yes.

18  Q  Did you attend?

19  A  Yes.

20  Q  When Brooks and Williams retired, did you

Page 174

21 move Adam Tolbert into Human Resources?

22       A    Yes.  On the day of the activation of the

23 WTA, the plan -- the work had to be distributed.

24       Q    And you've testified earlier he had no

25 background in HR, did he?

                                                        208

1       A    Well, yes, he did.  He was Miss Brooks'

2 assistant.

3       Q    Is Adam Tolbert the chairman of the Ninth

4 District Republican Party?

5       A    Yes, he is.

6       Q    Did moving Adam Tolbert into HR give him

7 access to salaries, performance reviews, personal

8 identifying information for employees?

9       A    Yes.

10       Q    Did this violate agency privacy policy?

11       A    No.  He, as an HR person -- at one point

12 Mr. Carmack had that same access and Mrs. Hensley upon

13 my arrival.  We were -- we needed to be in -- make sure

14 we were totally compliant.

15       Q    Would you agree the Center and State

16 could have saved by just permitting these women to

17 retire in the normal course?

18       A    If they would retire in the normal

19 course.

20              (2/3/17 email from Donna Kauffman to
                Susan Carol Harris and David Matlock RE:
21              WTA calculations for SW marked as Matlock
                Exhibit Number 30)
22

23 BY MR. GRIMES:

24       Q    Because implementation of the WTA

25 resulted in more retirement money for them; correct?

                                                        209

                    Page 175

```
 1          A      Yes, and a cash settlement for
 2   Mr. Carmack.
 3          Q      And even if VRS -- strike that.
 4                 Even if VRS covered that extra
 5   retirement, that was still additional expense to the
 6   State; correct?
 7          A      It was additional expense to the Center,
 8   yes, which is the State -- it was to the State, not the
 9   Center.
10          Q      What is -- strike that.
11                 What is the notation of "cost to
12   department of severance" in this document referencing?
13          A      I'm not an HR expert.  I'm not quite
14   sure.
15          Q      Did Joyce Brooks or Janet Williams get a
16   severance package in addition to the benefits of the
17   enhanced retirement?
18          A      No.
19          Q      And in February 2017, Patricia Ball and
20   Douglas Viers are still on the list; correct?
21          A      Yes.
22          Q      When did they come off?
23          A      At some point in the planning process in
24   the spring, early summer, somewhere in there.
25          Q      When do you say today that you first
```

                                                    210

```
 1   learned that Duffy Carmack had made an OSIG complaint?
 2          A      January 4th, 2018.
 3          Q      When did you first suspect that Duffy
 4   Carmack had made an OSIG complaint?
```
                        Page 176

5          A      I had suspicions the day that the

6    inspector called me.

7          Q      And that was when, sir?

8          A      The middle of October of '17, middle to

9    late October, somewhere in that neighborhood, of '17.

10         Q      Had you already began -- begun taking

11   away some of Mr. Carmack's duties?

12         A      No.

13         Q      Tim Sadler called you on October 16, 2017

14   from the Inspector General's office; correct?

15         A      That's correct, if that's what it says.

16   I know it was in the middle of September -- middle of

17   October of '17.

18         Q      And that was before or after the

19   reception/event/dinner, whatever it was, in Bristol

20   where you overheard a conversation that Duffy Carmack

21   would have your job within a year?

22         A      Yeah, that was afterwards.

23         Q      After you overheard the comment at the

24   reception/event/dinner, did you speak with anybody

25   about that comment?

                                                    211


1          A      No.

2          Q      Nobody?

3          A      No.  People -- people talk about stuff

4    like that.  No.

5                 (7/26-27/17 emails between COV Hotline
                  and Duffy Carmack RE: Southwest Virginia
6                 Higher Education Center - Complaint
                  marked as Matlock Exhibit Number 31)
7

8    BY MR. GRIMES:

9          Q      When in --

                       Page 177

10          MR. KINCER:  Did we get -- oh, that's the

11    old one.

12          MR. GRIMES:  Sorry.  Yes, sir.

13    BY MR. GRIMES:

14          Q     When in your working career have you ever

15    overheard another conversation about somebody saying in

16    effect, "One day I'll have your job"?

17          A     Quite often.  I mean --

18          Q     Quite often?

19          A     I mean, in education, a counselor wants

20    to be a dean, a dean wants to be a VP, a VP wants to be

21    a P, you know.

22          Q     People are always looking for

23    opportunity; correct?

24          A     People are always looking for ways to

25    take another step up the rung.

                                                          212


1           MR. GRIMES:  What's the number of this

2     one?

3           THE COURT REPORTER:  The one we just

4     marked is 31.

5           MR. GRIMES:  All right.

6     BY MR. GRIMES:

7           Q     Exhibit 31 is an email exchange between

8     you and Duffy Carmack.  The print is small.

9           MR. HARDY:  I'm sorry, counselor.  Did

10    you say this is between David Matlock and Duffy

11    Carmack?

12          MR. GRIMES:  I may have, and if I did,

13    I'm mistaken.

14    BY MR. GRIMES:

                      Page 178

15      Q     It's an email exchange; correct --

16      A     Yes.

17      Q     -- Mr. Matlock?

18      A     Yes.

19      Q     And you see at the top of the page it's

20 dated July 27, 2017 and references a COV hotline.

21              What does COV stand for, do you know?

22      A     Commonwealth of Virginia would be my

23 guess.

24      Q     The second line, second email is from

25 Duffy Carmack to the hotline, July 27, 2017.  In there

                                            213

1 the writer states, "Shaun, good morning.  I am

2 comfortable in sending the information to SCHEV --"

3 that's the Higher Ed. Center; correct?

4      A     (No response).

5      Q     Mr.  Matlock?

6      A     Yes.

7      Q     "-- as presented.  In reality, it will be

8 known that the complaint was lodged by me for the

9 benefit of the Center and all employees."

10          MR. KINCER:  "It will be know."  There's

11 a typ- -- there's a grammar error there who you pointed

12 out on one of Mr. --

13          MR. GRIMES:  All right.

14 BY MR. GRIMES:

15      Q     So that's what Mr. Carmack wrote;

16 correct?

17      A     He writes, "It will be know"...

18      Q     You will agree at least from

19 Mr. Carmack's perspective he thought that you would

                             Page 179

20    know who was complaining; correct?

21         A    No.

22         Q    No?

23         A    No.

24         Q    Were you ever interviewed by OSIG

25    concerning Carmack's complaint?

                                                    214


1          A    I was interviewed by OSIG concerning a

2     hotline complaint.

3          Q    When?

4          A    The date in which Tim Sadler reports that

5     he called me.

6          Q    And what did you tell the investigator?

7          A    That I would comply and give him

8     everything he needed, but I want -- but when he said he

9     was calling for a hotline complaint, as I stated

10    earlier this morning, I stopped him in mid sentence and

11    said, "I have been working on a WTA for a year.  Do I

12    need to stop?"

13         Q    Did the investigator ask you about paying

14    for your son's school to go to the robotics

15    competition?

16         A    Yes.

17         Q    And what did you tell him?

18         A    I shared all the exhibits and all the

19    documentation, and it was found to be unsubstantiated.

20         Q    Were you asked about the husband and wife

21    computer team who was -- who were working from their

22    home, Barry and Elizabeth Tate?

23         A    Yes.

24         Q    What was Barry Tate's job title?

                          Page 180

25      A       He is a programmer.

1      Q       What's Elizabeth Tate's job title?

2      A       She's like an IT specialist, programmer,

3  analyst.

4      Q       What were they supposed to be doing for

5  the Center?

6      A       They weren't doing anything for the

7  Center.  They wrote the code for the Virginia Tobacco

8  Commission for their scholarship loan program for the

9  entire Commonwealth of Virginia administering roughly

10  7 million a year.

11      Q       Did they work from home predominantly?

12      A       They worked from home since the first

13  time they were hired prior to my arrival at least ten

14  years before I got there.

15      Q       Do you know who hired them?

16      A       I assume Dr. Fowlkes.

17      Q       Do you know whether the husband was a

18  contract agency vendor?

19      A       Yes.  He was not a employee.  He was a

20  contractor.

21      Q       And the wife was a full-time agency

22  employee with benefits; correct?

23      A       Not full time.  I think -- no, not full

24  time.

25      Q       Was the couple paid through a Tobacco

1  Commission grant?

2      A       Yes.

3       Q     What is the role of the Tobacco

4  Commission with respect to the Center and the

5  Foundation?

6       A     Depending -- fiscal agent.  We are the

7  fiscal agent for their scholarship and loan program.

8       Q     Is the couple still employed by the

9  Center or the Foundation?

10      A     Yes.

11      Q     Are they paid about a hundred thousand

12  dollars a year for their services?

13      A     I don't think it's that much.

14      Q     You don't?

15      A     No.

16      Q     Are the couple close friends with Jeff

17  Webb?

18      A     I don't know.

19      Q     Jeff Webb works at the agency, correct?

20      A     Yes.  He's their supervisor.

21      Q     Did he approve the couple's overtime?

22      A     If they were paid overtime, he approved

23  it.

24      Q     Do you know whether Jeff Webb approved

25  111 hours of overtime pay for the wife between July and

                                                        217

1  October 2016?

2      A     I don't know that to be a fact.  I assume

3  it's true if you've got that kind of information.

4      Q     Wasn't Duffy Carmack their supervisor?

5      A     Duffy Carmack was never their supervisor.

6      Q     Did Duffy Carmack ever speak with you

7  about this issue?

Page 182

```
 8        A     What issue?
 9        Q     The issue we're talking about, the fact
10   that they are working from home and the overtime pay.
11        A     No, because they work from home and
12   receive overtime pay when he was interim.
13        Q     Do you know whether Duffy Carmack ever
14   spoke with Jeff Webb about the issue involving the
15   couple?
16        A     About overtime?
17        Q     About all the things we're asking about:
18   The fact they worked from the home, the fact one is an
19   employee, one is a vendor, all those --
20        A     That was common knowledge.
21        Q     Have any practices with respect to this
22   couple's work been changed?
23        A     No -- well, upon my arrival, I mandated
24   that Elizabeth start coming to the Center once a week
25   or do a phone conference once a week.
                                                    218


 1        Q     Right.
 2        A     Yeah.
 3        Q     So that's one thing that's changed, isn't
 4   it?
 5        A     Um-hum.
 6        Q     Still working overtime?
 7        A     No, her overtime was stopped.  We stopped
 8   her overtime after we did some investigation.  We
 9   determined that she technically isn't allowed that.
10        Q     Right.
11        A     And so we have capped her at, it may be
12   20 hours a week now.  I'm not certain.  But she's been
```

Page 183

13    capped and she is not allowed to work overtime anymore.

14          Q       Did you ever tell Duffy Carmack to back

15    off or the couple might quit?

16          A       No.

17          Q       Were you asked about the timely

18    submission of invoices?

19          A       By?

20          Q       By the OSIG.

21          A       Yes.

22          Q       Are invoices due each month?

23          A       Invoices are due within 30 days of

24    receipt.

25          Q       When Carmack was employed, did you submit

                                                              219


1     invoices always by the 15th of each month?

2           A       No, there's no policy that says the 15th

3     of each month.

4           Q       Who all worked in the finance department

5     at the time Carmack was employed?

6           A       I believe he supervised Miss Hensley.

7           Q       Anybody else?

8           A       He supervised Alicia Young, he supervised

9     Melissa -- the name slips me right now.  Melissa.  He

10    supervised the testing center, which had maybe three

11    part-time hourly wage employees, and he supervised

12    Sonia Vanhook.

13          Q       Would you agree or disagree that you

14    excluded the finance department from financial

15    decisions?

16          A       I would disagree.

17                  (November 2016 email string between
                    Shirley Carlson, Duffy Carmack, Kathy
                                    Page 184

18          Hietala, Deborah Hensley, Sonia Vanhook
            RE:  Mt. Rogers Adult Education marked as
19          Matlock Exhibit Number 32)

20   BY MR. GRIMES:

21          Q       Exhibit 32 is another series of emails.

22                  Did you include the finance department in

23   the decision to commit additional classrooms to your

24   friends at Mt. Rogers?

25          A       I included Mr. Carmack in all decisions

                                                          220


1    related to room utilization.

2                   And as far as friends go, they are

3    vendors.

4           Q       Were they also friends?

5           A       I really didn't know them before they

6    came to the Center.

7           Q       Did they become friends?

8           A       Professional acquaintance.  I don't dine

9    with them.

10          Q       Do you call them friends or not?  In your

11   mind.

12          A       I would call them a friend.

13          Q       That's what I was trying to ask.

14          A       We work in the same building.

15          Q       Did you ever purchase nonbudgeted items

16   without the finance department's knowledge?

17          A       No.

18          Q       Did you ever approve for someone else to

19   purchase nonbudgeted items without the finance

20   department's knowledge?

21          A       No.

22          Q       Were you aware that someone purchased

                            Page 185

23    nonbudgeted items without the finance department's

24    knowledge?

25           A    No.

                                                      221


1            Q    What's a Senior Expo?

2            A    Senior Expo is an event for people over

3     the age of 50.  It coincides with our College of Older

4     Adults.  It's a health fair.

5            Q    Did you exclude Duffy Carmack from

6     planning meetings related to Senior Expo?

7            A    No.

8            Q    Have you ever held a community golf

9     tournament under the name of the Foundation?

10           A    Yes.

11           Q    How many times?

12           A    Once.

13           Q    Were there planning meetings held before

14    the tournament?

15           A    Yes.

16           Q    Was the finance department included in

17    those meetings?

18           A    They were invited.  Mr. Carmack was

19    invited.

20           Q    But they didn't participate; correct?

21           A    He chose not to.

22           Q    Who chose not to?

23           A    Mr. Carmack.

24           Q    Did he tell you that?

25           A    Yes.

                                                      222


1            Q    Did you advertise for the tournament?

                        Page 186

2    A    Yes.

3    Q    How did you advertise?

4    A    Flyer.

5    Q    About how many attendees were there?

6    A    32.

7    Q    Was there a cost for entry?

8    A    Yes.

9    Q    What was the cost?

10   A    I believe it was $400 a team or a hundred

11   dollars an individual.

12   Q    How much money was collected?

13   A    I would say in excess of $5,000.

14   Q    What was the net gain to the Foundation

15   from the tournament?

16   A    It was terrible.  It was about $600.

17   Q    Where did the money go?

18   A    The Foundation has it.

19   Q    Were there any invoices submitted for the

20   expenses of the event?

21   A    Yes.

22   Q    To whom?

23   A    To the Foundation.

24   Q    Did Mr. Carmack ever ask you where the

25   money went from the tournament?

                                        223


1    A    It was -- no.

2    Q    Did he ever ask you where the invoices

3    were for the expenses for the tournament?

4    A    No.

5    Q    Did you keep all your emails about the

6    golf tournament?

                    Page 187

7       A    I believe I did.  I don't delete
8  anything.
9       Q    Do you have them still?
10      A    If they exist.
11      Q    You gave Alicia Young some cash at some
12  point; correct?
13      A    Yes.
14      Q    About $500?
15      A    I would say that's a fair guess, 5, $600.
16      Q    Was that all the money that was realized
17  from the golf tournament?
18      A    That was some cash that was collected the
19  morning of.
20      Q    Did she ask you orally for information
21  concerning who -- concerning who paid, what they paid,
22  why they paid, et cetera?
23      A    She asked questions to make sure that
24  people who made donations received their tax credit.
25      Q    Were all the donations in cash?

                                                224


1       A    Oh, no.
2       Q    Checks?
3       A    Yes, the majority was all checks.
4       Q    The expenditures for cost, was that done
5  by cash or check?
6       A    It was done by a personal check.
7       Q    Personal check?
8       A    Yes.
9       Q    Who wrote the personal check?
10      A    I did the personal check.
11      Q    And do you still have those checks?

                      Page 188

12      A     I'm sure my bank keeps them.

13            I got reimbursed by the Foundation out of

14      the proceeds.

15            (June 26, 2017 email string between
              Alicia Young, David Matlock, Duffy
16            Carmack RE:  End of year marked as
              Matlock Exhibit Number 33)

17

18      BY MR. GRIMES:

19      Q     So did you submit a request for

20      reimbursement to the Foundation from the proceeds?

21      A     Yes.

22      Q     Is that consistent with the accounting

23      practices of the Center?

24      A     It wasn't a Center event; it was a

25      Foundation event.

                                                        225


1       Q     Same question.  Is that consistent with

2       the accounting practices of the Foundation?

3       A     I believe it was consistent.

4       Q     Exhibit 32 [sic] is some emails between

5       you and Alicia Young and some were copied to Duffy

6       Carmack.

7             So look at the bottom of the page.  You

8       will see an email from Alicia Young to you, June 26,

9       2017.  She writes, "David, I need to send up the funds

10      from the golf tournament by Tuesday, June 27th for year

11      end.  I will also need the expenses for the golf

12      tournament by Tuesday to record them in FY17 when the

13      tournament was held," and that's what she asked;

14      correct?

15      A     Um-hum.

16            MR. KINCER:  Yes?

                   Page 189

17          THE WITNESS:  Yes.  Sorry.  Yes.

18   BY MR. GRIMES:

19          Q       And does the fiscal year of the Center

20   end on June 30 of each year?

21          A       Yes.

22          Q       And you responded on June 26, 2017, "How

23   about we meet around two o'clock today to finish that

24   up"; correct?

25          A       Yes.

                                                    226


1           Q       The golf tournament occurred when?

2           A       June '17.

3           Q       It was June 17?

4           A       June in 2017.  I don't recall the date.

5           Q       And who held the cash between the time it

6    was received and the time it went to Alicia Young?

7           A       When the tournament started, I had an

8    employee of UVA Wise with me.  I put it in a box.

9           Q       A box?

10          A       Like a money lockbox and locked it in my

11   truck.

12          Q       Have you ever received any training in

13   how to handle agency money?

14          A       Yes.

15          Q       Is the practice you've just described

16   consistent with your training?

17          A       The practice I just explained was

18   nonagency money; it was Foundation money.

19                  (5/31/17 email from Alicia Young to David

20                  Matlock and Duffy Carmack re:  Golf
                    Tournament marked as Matlock Exhibit

21                  Number 34)

                    Page 190

22    BY MR. GRIMES:

23         Q    And why did you run the golf tournament

24    through the Foundation and not the agency?

25         A    So that the vendors, the people who were

                                                    227


1     writing checks, could get their tax information.  The

2     Foundation is a 501(c)(3).

3                   MR. GRIMES:  Did you say 33?

4                   THE COURT REPORTER:  34.

5     BY MR. GRIMES:

6          Q    Exhibit 34, an email from Alicia Young to

7     you, copied to Duffy Carmack, May 31, 2017.  "David, I

8     have an invoice from Glenrochie Country Club to pay for

9     the golf tournament."

10                  I take it that's where the tournament was

11    held; correct?

12         A    That's correct.

13         Q    "Could you tell me who to contact there

14    to get a W-9 so I can process payment to them?"

15                  Did I read that correctly?

16         A    That is correct.

17         Q    Did you respond to this email?

18         A    I'm sure I did.

19         Q    Where is the response?

20         A    I probably walked up.  Her office is a

21    few feet from me.

22         Q    When you were employed at the college,

23    you hosted a Richard Leigh Songwriters Festival in the

24    name of the college; correct?

25         A    The -- the Foundation of VHCC hosted a

                                                    228


                         Page 191

1  fundraiser in the name of the VHCC.

2      Q      Was it physically held at the Center's

3  building?

4      A      A portion of it, yes.

5      Q      Then when you came to the Center, did you

6  have a disagreement with the college president about

7  something?

8      A      About something?

9      Q      Yeah.  Did you have a disagreement with

10  the college president about the fact you felt like the

11  fundraiser should follow you when you left the college

12  and be in the name of the Center or the Foundation and

13  not the college?

14      A      There was no disagreement about that.

15      Q      Did you want the fundraiser to be held in

16  the name of the Center or the Foundation and not the

17  college?

18      A      Not the college's foundation, no, sir.

19      Q      The fundraiser that year was still put on

20  by the college; correct?

21      A      By the college's foundation.

22      Q      Have you heard that there's some money

23  missing from that fundraiser?

24      A      No, sir.  I didn't work there.

25      Q      You also -- well, sometimes you hear

                                                    229


1  things when you don't work places.

2              You also attempted to put on your own

3  Richard Leigh fundraiser six months later; correct?

4      A      Incorrect.

                        Page 192

5    Q    Did you attempt to put on a Richard Leigh

6  event about six months later?

7    A    Not about six months later, no, sir.

8    Q    Well, I feel like we're playing some game

9  with words.

10          When did it occur?

11    A    We worked with the town of Abingdon, with

12  the tourism department.

13    Q    Who is "we"?

14    A    The Center.

15    Q    The Center worked with the town of

16  Abingdon tourism department and did what?

17    A    Held an event for the Abingdon tourism

18  department.

19    Q    That featured Richard Leigh in some way?

20    A    Yes.

21    Q    And it was when in relation to the

22  fundraiser put on by the college?

23    A    The fundraiser put on by the college is

24  every Memorial Day.

25    Q    Um-hum.

                                               230


1    A    And our event with the town of Abingdon,

2  we've had two, very profitable, July of 6 -- July of

3  '17 and November '18.

4    Q    And how much money was raised by that

5  event?

6    A    Directly, probably just $2,000.

7    Q    Directly, indirectly?

8    A    Indirectly, another 5 or $6,000.

9    Q    And who held the money that time?

                        Page 193

10    A    Everything went through the VH- -- the

11  Center's web account.

12    Q    Did the Center ever receive any money

13  from that event?

14    A    Yes.

15    Q    How much?

16    A    I think gross receipts were probably

17  5,000, expenses were 3,000, something like that.

18    Q    Was there -- was there some thought of

19  using tour bus companies with respect to that Richard

20  Leigh event?

21    A    That's what the town of Abingdon -- we

22  were part -- yes.

23    Q    To do what?

24    A    To be part of a series of tour bus stops.

25

                                                    231


1              (12/11/15 email from David Matlock to
               David Matlock RE:  Draft Proposal and
2              attached Eastman Credit Union Proposal
               marked as Matlock Exhibit Number 35)
3

4   BY MR. GRIMES:

5     Q    Exhibit 35 is an email David Matlock to

6   David Matlock at the top of the page.

7              Below that is an email from David Matlock

8   to K. Helms.

9              Who is K. Helms?

10    A    She is a vice president with Eastman

11  Credit Union.

12    Q    Dated September 26, 2013.

13    A    Yes.

14    Q    You write, "Kristy, attached is a draft

                    Page 194

15    of the proposal requesting $10,000 to support the Great

16    Expectations Program (foster care) at VHCC by becoming

17    the major sponsor for the Richard Leigh Songwriters

18    Music Festival."

19        A    Um-hum.

20        Q    And why are you writing to Miss Helms

21    here?

22        A    In 2013, I was the vice president of

23    VHCC, and I was soliciting $10,000 on behalf of VHCC's

24    foundation.

25        Q    Why did you send this email to yourself

                                                    232


1    27 months later in December of 2015?

2        A    Because I wanted to get my sponsorship

3    contribution requests so that I could see how to write

4    another one for future events that we may or may not

5    have at the Center.

6            (4/29/16 emails between Sean Webb and
             David Matlock RE:  Richard Leigh Music
7            Festival questions marked as Matlock
             Exhibit Number 36)

8

9    BY MR. GRIMES:

10        Q    You're familiar with something called

11    Facebook; correct?

12        A    Yes.

13        Q    And you know that sometimes people

14    advertise on Facebook; correct?

15        A    Yes.

16        Q    Here is an email from Susan Webb to David

17    Matlock dated April 29, 2016.

18            MR. HARDY:  Quick correction.  You mean

19    Sean Webb.

                        Page 195

20          MR. GRIMES:  Sean Webb.

21   BY MR. GRIMES:

22          Q     And she writes -- man or woman, Sean

23   Webb, Mr. Matlock?

24          A     Yes.

25          Q     Is it a?

                                                        233


1           A     Man.

2           Q     "Hello David, Monica Hall from Abingdon

3    CVB has some questions about the table for group tour

4    operators at the Richard Leigh Festival coming up:

5    One, what time does it start on Saturday?  It isn't

6    listed on the website or Facebook."

7                 Why was it not advertised on Facebook?

8           A     This is a VHCC event.

9           Q     Okay.

10          A     As I stated earlier, I am working with

11   the town of Abingdon about future events for the Center

12   to bring in tour buses to help them promote tourism.

13          Q     So --

14          A     I had asked the college if they would,

15   based on my years of good will with them, if they would

16   comp a table so that I could bring tour bus companies

17   in to see Richard Leigh.

18          Q     Is Sean Webb Jeff Webb's son?

19          A     Yes.

20                (5/23/17 email string between David
                  Matlock, Jan Reeves, Doris Shuman, Amy
21                Osborne, RE:  Need info on Richard Leigh
                  event marked as Matlock Exhibit Number
22                37)

23   BY MR. GRIMES:

24          Q     Exhibit 37, more emails.  About the

                          Page 196

25    middle of the page, the writer asks -- and it appears

1    to be Doris Shuman.

2              Who is she?

3         A    She was the treasurer for the Rotary Club

4    at the time.

5         Q    She writes, "Last year we bought it from

6    Blue Ridge Beverage."

7         A    Um-hum, yes.

8         Q    It looks like, "Walling is used in the

9    past too.  Total was 1027.79.  David Matlock paid and I

10   was never given the receipt."

11             What receipt did she not get?

12        A    The day that they delivered the beer for

13   Rotary, no one was there to sign for it for Rotary, and

14   if they didn't have beer, there was going to be no

15   beer.  I paid for that out of my pocket and waited on

16   my money.

17        Q    She writes right below what I just read,

18   "385.60 was wine and 642.19 was beer.  But if you will

19   remember there was a ton left over."

20             So did you ever turn in the receipt?

21        A    Yes.  This Rotary paid me.  This is a

22   Rotary event.  Rotary paid me as a Rotary member.  I

23   got reimbursed.

24        Q    Have you ever tried to set up a nonprofit

25   for Richard Leigh?

1         A    We've talked about it, so the answer is

2    no.

3              (May 2017 email string between Regina

Page 197

                    Belcher, David Matlock, Phillip Hearl RE:
4                   Scan from a Xerox WorkCentre marked as
                    Matlock Exhibit Number 38)
5

6   BY MR. GRIMES:

7         Q     Did the Foundation's attorney ever help

8   with trying to set up a nonprofit for Richard Leigh?

9         A     No.

10        Q     Who is the Foundation's attorney?

11        A     It's Phillip, as referenced here.

12        Q     Phillip; last name?

13        A     Hearl, H-e-a-r-l.

14        Q     Did you ever provide a written statement

15  concerning Carmack's complaints to the Office of

16  Inspector General?

17        A     Yes.

18        Q     Did you ever email anyone concerning his

19  complaint?

20        A     I don't recall.

21        Q     You don't remember whether you ever sent

22  or received any emails concerning Carmack's complaint

23  to the OSIG; is that correct?

24        A     That's a different question.

25              The OSIG communicated with me about a

                                                       236


1   complaint.  I never knew it was Mr. Carmack.

2               (10/17/17 email from Tim Sadler to
                dm4qb@virginia.edu RE: Hotline – SWVHEC
3               info 1 with attachments marked as Matlock
                Exhibit Number 39)
4

5   BY MR. GRIMES:

6         Q     Do you get a paycheck stub from your job

7   at the Center?

8         A     No.  There's -- there's a website you can

                        Page 198

9      go and look at them.

10         Q      Do you know whether the paycheck stubs

11     for State employees have something written if you have

12     a complaint concerning fraud, waste and abuse, call

13     this number?

14         A      I don't know if it's on the check stub.

15     We have it posted all over our building.

16         Q      Exhibit 39 is some documents produced by

17     the defendant in this case.

18             On the first page, Mr. Sadler writes --

19     and, incidentally, who is Dm4qb@virginia.edu?

20         A      That's me.

21         Q      Is this your Center email address?

22         A      That's the first time I think I've seen

23     someone use that address.

24             I'm not so certain that I actually

25     received that email that way.

                                                    237


1          Q      But that is one of your email addresses?

2          A      I've never used it.

3          Q      In October of 2017, did you have more

4      than one email address?

5          A      In October of '17, I only had the

6      South -- swcenter.edu.

7          Q      You didn't have a personal email address?

8          A      I have one.

9          Q      What's your personal email address?

10         A      I don't -- I don't have it anymore.  I

11     don't know, hotmail something.

12         Q      When did you shut it down?

13         A      I don't even know if it's shut down.  I'm

                           Page 199

14 not even sure.

15          When my children were in college years

16 ago, they showed me how to set one up.  I don't even

17 know -- I barely used it.

18          Q     But it's hotmail?

19          A     It could be.  That was my best guess

20 today.

21          Q     Is it your testimony that you don't know

22 your personal email address?

23          A     That would be a fair statement.

24          Q     Is it a true statement?

25          A     Yeah.

                                                    238


1          Q     Here Mr. Sadler writes to you, "Dear

2  Mr. Matlock, thank you for speaking with me yesterday

3  regarding certain matters I am reviewing at Southwest

4  Virginia Higher Education Center.  As mentioned, I am

5  sending you six emails in order of our discussion.

6  This one involves the HR access which is documented

7  along with the position description and the attached

8  items."

9          Did you make any changes in the access to

10 HR documents following this email?

11         A     That would be a true statement.

12         Q     What changes did you make?

13         A     Those recommended by OSIG.

14         Q     What were they?

15         A     That Mr. Tolbert's job description be

16 updated and he be paid appropriately for the access

17 that he had.

18         Q     So he's going to be paid more money?

                         Page 200

| 19 | A | Yes. |
| 20 | Q | At a time you're laying off people? |
| 21 | A | Responsibility, restructuring. |

22          (October 2017 emails between Tim Sadler,
            David Matlock RE: Holston IT Proposal,
23          Tim Meredith, Multi-Period Expense
            Comparison attachment marked as Matlock
24          Exhibit Number 40)

25                                                    239

1  BY MR. GRIMES:

2          Q    Exhibit 40 is another email from Tim

3  Sadler to you dated October 17, 2017. He writes,

4  Attached is a vendor proposal to perform work similar

5  to the Tate's," T-a-t apostrophe S [sic], "and cost

6  comparison with their pay for 2016. My contact

7  indicated that the Tate's annual pay was similar for

8  the three to four years prior to the 2016 provided."

9          Did I read that correctly?

10         A    Um-hum.

11              MR. KINCER:  Yes?

12              THE WITNESS:  I'm sorry, yes.

13 BY MR. GRIMES:

14         Q    Did you continue to employ the Tates'

15 services after the date of this email?

16         A    Yes.

17              (10/17/17 email from Tim Sadler to David
                Matlock re:  Hotline - SWVHEC and
18              attachments related to grant given to
                Virginia Middle School marked as Matlock
19              Exhibit Number 41)

20 BY MR. GRIMES:

21         Q    Exhibit 41 is another email from Tim

22 Sadler to you. He writes, "Attached is documentation

23 related to the grant given to Virginia Middle School.

                      Page 201

24    In response, I am looking for documentation showing

25    that other schools were notified during this time

                                                              240

1    period of grant money available for a similar use."

2              Did you provide that notification that

3    other schools were notified?

4         A    I provided Tim Sadler the information to

5    justify his finding that it was -- it was an

6    unsubstantiated claim.

7         Q    My question is a little different.

8              Did you provide to him documentation

9    showing that other schools were notified?

10        A    No.

11        Q    Because that documentation never existed;

12    correct?

13        A    The action existed.

14              (10/17/17 email from Tim Sadler to David
                 Matlock re:  Hotline - SWVHEC info 4 with
15              attached calendar marked as Matlock
                 Exhibit Number 42)
16

17    BY MR. GRIMES:

18        Q    Exhibit 42 is another email from Tim

19    Sadler, OSIG, to you dated October 17, 2017.

20              He writes, "Attached is your calendar

21    with dates highlighted in yellow where you may have

22    traveled and not submitted a travel voucher.  At

23    link --" and then he described a link "-- page 9, first

24    sentence, is listed the retirement to submit travel

25    reimbursements within 30 days of travel."

                                                              241

1              Were you not doing that?

                        Page 202

2     A    No, not consistently.

3            (10/17/17 email from Tim Sadler to David
4            Matlock re:  Hotline - SWVHEC info 6 with
             attached maintenance contract and sole
5            source documentation marked as Matlock
             Exhibit Number 43)

6  BY MR. GRIMES:

7     Q    Exhibit 43 is an email from Mr. Sadler to

8  you dated October 17, 2017.  There he writes, "Attached

9  is the maintenance contract documentation and sole

10  source document which supports that the sole source

11  approval occurred after the work was completed."

12         And that was true, wasn't it?

13     A    Yes.

14            (10/17/17 email from Tim Sadler to David
15            Matlock re:  Hotline - SWVHEC info 5 with
             attached clocked work dates/times for
16            1016-1017 marked as Matlock Exhibit
             Number 44)

17  BY MR. GRIMES:

18     Q    Exhibit 44 is another email from Tim

19  Sadler to you dated October 17, 2017.  There he writes,

20  "Attached is your clocked work dates and times for 2016

21  to 2017.  At the back of the document, at pages 23 and

22  24, is the policy issued by your predecessor."

23         Your predecessor was Rachel Fowlkes;

24  correct?

25     A    Yes.

                                      242

1     Q    Did you violate this policy in any way?

2     A    No.

3            (10/25-26/17 email string between Richard
4            Scholl and David Matlock marked as
             Matlock Exhibit Number 45)

5  BY MR. GRIMES:

6     Q    Exhibit 45 is an email at the top of the

Page 203

7    page from Richard Scholl to you.

8               And who is he?

9        A    He is a police officer inside the Office

10   of OSIG.

11       Q    About the middle of the page, he writes,

12   "Dear Mr. -- Mr. Matlock, thank you for meeting with us

13   today.  We really appreciated your time.  It was

14   extremely helpful.  Thank you for this follow-up as

15   well.  We still plan to be at your office at 8:15 to

16   8:30 and speak with Mr. Carmack."

17               What were your discussions with Richard

18   Scholl referenced here?

19       A    An ongoing investigation into Mr. Carmack

20   and the Foundation.

21       Q    And what did Mr. Scholl want to talk with

22   Mr. Carmack about?

23       A    He didn't tell me.

24       Q    Do you know what he wanted to talk with

25   Mr. Carmack about?

                                              243


1        A    No.

2        Q    Did you ever learn what he wanted to talk

3    with Mr. Carmack about?

4        A    I assume the Foundation.

5        Q    The Foundation is a business entity;

6    correct?

7        A    It's a private foundation separate from

8    the Center, yes.

9        Q    Specifically, have you learned or

10   heard -- have you heard what Mr. Scholl wanted to talk

11   to Mr. Carmack about?

                    Page 204

12      A    When I read his report, yes.

13      Q    And what was it?

14      A    What was...

15      Q    What is it that Mr. Scholl wanted to talk

16 with Mr. Carmack about?

17      A    Well, I only know what the findings said,

18 sir.  I don't know what they talked about.

19      MR. GRIMES:  Mark that, please.

20      (10/27/17 email from Tid Sadler to David
          Matlock re:  Hotline State Policies
21      marked as Matlock Exhibit Number 46)

22 BY MR. GRIMES:

23      Q    Exhibit 46 is another email to you from

24 Mr. Sadler dated October 27, 2017.  He says, "Following

25 are links to the policies we talked about, lunch break
                                   244

1 and sole source procurement."

2      And what is sole source procurement?

3      A    That's the area handled by our finance

4 division if you have a vendor that may be the only

5 vendor within reason that can execute a need, provide a

6 need for a particular product.

7      Q    What is the lunch break issue that was of

8 concern to Mr. Sadler?

9      A    I don't think there was a concern with

10 Mr. Sadler with lunch break.  I believe that was my

11 concern.

12      Q    When was your concern?

13      A    An ongoing policy inherited.

14      Q    Which was what?

15      A    That some employees -- Miss Fowlkes did

16 not want people to leave the building.  So if they

Page 205

17 stayed in the building and they remained on call, they

18 could count that as their lunch.  They didn't have to

19 clock out.

20               Primarily around exempt employees.

21               (1/17/18 email from Kathleen Shaw to
              David Matlock re:  FOIA 2018-051 SWBHEC

22               Case Report 16077 and attached responsive
              documents marked as Matlock Exhibit

23               Number 47)

24 BY MR. GRIMES:

25       Q    Exhibit 47 is an email from Sean --

                                       245

1 excuse me, Kathleen Shaw at the Inspector General's

2 Office to you dated January 27, 2018.

3               Right behind that is a letter dated

4 November 17, 2017, from Michael Westfall, CPA, Acting

5 State Inspector General, to Dietra, D-i-e-t-r-a, Trent.

6               Did you FOIA a copy of this file right

7 after Carmack's employment ended?

8       A    I FOIA'd the file -- wanted to see the

9 file.

10               And when Miss Trent called me, Secretary

11 Trent called me in November to tell me she had a

12 letter, I asked if I could see it, and she said at that

13 point I couldn't, but I could FOIA -- fill out the

14 paper work for the FOIA.

15               So at some point early there in November,

16 I wanted to get a copy of everything.

17       Q    And did you request that in writing?

18       A    I believe that was a phone conversation.

19       Q    Your FOIA request was by phone?

20       A    It was -- it was a informal request.  I

21 mean, I wanted to find out what do I need to do.  I had

                       Page 206

22  seen a draft copy from Tim Sadler.  Tim had -- I
23  believe it was Tim that provided a draft copy, because
24  he told me I would need to start working on my -- I
25  would have 30 days to work on my responses.

246

1           When I didn't hear anything, I
2  immediately called Dietra Trent at some point.
3      Q     Did you tell anyone about the OSIG
4  complaint?
5      A     Well, I'm sure I did.
6      Q     Who did you tell?
7      A     I told my wife.  I had to tell
8  Mrs. Hensley because she had to help me get some of
9  this documentation.  I had to tell people at HR at UVA
10  to help me with some responses.
11      Q     What about the chairman of the board?
12      A     Oh, yes, I told him, and I told
13  Elizabeth, the Attorney General.
14      Q     Bill Carrico?
15      A     Bill Carrico, yes.
16      Q     You told him about the OSIG investigated
17  complaint?
18      A     I called him and told him there had been
19  a complaint made against me, yes.  I think a board
20  chairman should know that.
21      Q     And what did he say?
22      A     To work with Elizabeth.
23      Q     Did he say anything else?
24      A     No.
25      Q     Who is the first person you told about

247

Page 207

1  the complaint after you spoke with the investigator?

2      A    Probably my wife.

3      Q    who is the next person?

4      A    Probably Kathy Hietala.

5      Q    I don't want you to guess.  Do you know?

6  Do you know that to be true?

7      A    I know that to be my recollection.

8      Q    Your memory.

9      A    Yeah.

10     Q    After getting off the phone with the

11 investigator, you had a meeting in your office with

12 Kathy Hietala, Jeff Webb, Joyce Brooks and Adam

13 Tolbert; correct?

14     A    No.

15     Q    You did not?

16          Are you certain of that?

17     A    I'm certain that I have no recollection

18 of -- your question was immediately getting off the

19 phone I had a meeting.

20     Q    I didn't say "immediately."  After you

21 got off the phone.

22          So reconsider your answer, please.

23          Did you have a meeting in your office

24 with Kathy Hietala, Jeff Webb, Joyce Brooks and Adam

25 Tolbert?

                                          248


1      A    Possibly.  I met with them quite often,

2  so I would say yes, possibly.

3      Q    Yes, possibly.

4      A    Um-hum.

5      Q    So possibly yes?

                  Page 208

6     A     Possibly yes.

7     Q     And possibly no?

8     A     Possibly yes.

9     Q     Possibly yes or possibly no?

10    A     Possibly yes.

11    Q     And possibly no?

12    A     Possibly yes.

13    Q     Let me try to understand what you're
14    saying.

15          After you got off the phone with the
16    investigator, did you have a meeting with Kathy
17    Hietala, Jeff Webb, Joyce Brooks and Adam Tolbert?

18    A     That's a long time ago.  I don't remember
19    if I did or didn't, but there's a strong possibility
20    that I did.  I met with them on a regular basis.

21    Q     But as you sit here today, you don't have
22    a memory of that meeting; correct?

23    A     No.

24          MR. GRIMES:  Next exhibit.

25                                                    249


1          (11/29/17 email from David Matlock to
           Debbie Rigdon re:  WTA Request SW
2          Virginia Higher Education Center marked
           as Matlock Exhibit Number 48)
3

4     BY MR. GRIMES:

5     Q     Exhibit 48 is an email from you to Debbie
6     Rigdon at DHRM; correct?

7     A     Yes, that's correct.

8     Q     Dated November 29, 2017.

9     A     Um-hum.

10    Q     And there you write, "Debbie, is there
                        Page 209

11    anything else you need from me at this time?  I had a

12    conversation with Tim Sadler, State Hotline Manager,

13    and can bring you up to speed on that when you can

14    talk.  Thanks for your help.  David."

15            What did you tell Debbie Rigdon on

16    November 29, 2017?

17        A    I believe that I probably told her that

18    Mr. Sadler had called me to tell me the investigation

19    had been concluded, and I'm certain he's the one that

20    called and said, "I've written my recommendation and

21    forwarded it on to the Secretary of Education."

22        Q    While working as the executive director

23    of the Center, did you meet with every department

24    manager every week?

25        A    Not every week, no, sir.

                                                    250


1         Q    Did you stop meeting with Carmack at some

2    point on a weekly basis?

3         A    No.

4         Q    Did you meet with him on a weekly basis

5    until the time his employment ended?

6         A    I met with him on a consistent basis, on

7    a -- we had weekly meetings.  We had weekly meetings

8    with the team, and sometimes we didn't always meet.

9    They were scheduled.

10        Q    Do you know which employees of the Center

11    the OSIG investigator spoke with?

12        A    They didn't tell me anything like that.

13        Q    When you spoke with the investigator for

14    the first time, did you wonder who made the complaint?

15        A    Well, I thought it would probably be

                        Page 210

16    someone in the building, so, yeah, I wondered, yes.

17         Q    Did any employee ever talk -- tell you

18    that he or she had spoken with the OSIG investigator?

19         A    I don't believe so.

20              (11/17/17 letter from Michael C. Westfall
                with the Office of the State Inspector
21              General to Dr. Dietra Y. Trent, Secretary
                of Education marked as Matlock Exhibit
22              Number 49)

23    BY MR. GRIMES:

24         Q    Exhibit 49 is a letter dated November 17,

25    2017.
                                                    251


1               When did you first learn of this letter?

2          A    I don't recall.

3          Q    How did you first learn of this letter?

4          A    It's possible that -- it's possible that

5     Elizabeth sent me a copy or Tim Sadler sent me a copy.

6     I did receive a draft at some point from someone.

7          Q    A draft or the letter?

8          A    I believe it was a draft.

9          Q    Did you make all of the changes set forth

10    in this letter?

11         A    Yes.

12         Q    Were there any changes that you failed to

13    make?

14         A    No.

15              (10/31/17 and 11/8/17 email string
                between Tim Sadler and David Matlock re:
16              State Hotline review with attached
                Westfall letter marked as Matlock Exhibit
17              Number 50)

18    BY MR. GRIMES:

19         Q    Exhibit 50 is more emails.  The one at

20    the top of the page is from Tim Sadler to you dated

                        Page 211

21    November 8, 2017, and there he writes, "Mr. Matlock,

22    thank you for the information.  I have completed the

23    draft of my investigation report."

24         A    Okay.

25         Q    "Although it is not -- although it has

                                                      252


 1    not been reviewed by my supervisor, I do not expect

 2    that significant changes will be made.  Please review

 3    the attached and let me know your thoughts."

 4              Did you get back with him and let him

 5    know your thoughts?

 6         A    I don't recall.  I know that I read the

 7    draft, and my big concern was, when I read the draft,

 8    was the timeliness of getting all this done.  I was

 9    very concerned about the 30 days.

10         Q    Did you respond to this email as he

11    requested?

12         A    "Please review --"

13              I probably did if he asked for that.  It

14    says "know your thoughts."

15         Q    Do you have a memory of responding to

16    this email?

17         A    No.

18         Q    Did you do so in writing?

19         A    It could have been a phone call.

20         Q    Do you have a memory of responding at

21    all?

22         A    I think I did, because I was concerned

23    about the 30 days.

24         Q    Do you have a memory of what you told

25    him?

                          Page 212

1          A     I would get right on it.

2          Q     Did you ever ask for an extension of

3     time?

4          A     No.

5          Q     Did you ever shoot him an email saying,

6     "Good to hear from you.  30 days might be problematic,"

7     ask for extension, anything of that nature at all?

8          A     I don't remember if I did.

9          Q     Did you send the letter to Elizabeth

10    Griffin on January 10, 2018?

11         A     I would like to think I sent it to her

12    before then.

13         Q     But you don't know one way or the other;

14    correct?

15         A     I don't -- I don't remember.  There was a

16    lot going on.

17                MR. HARDY:  Actually, Exhibit 50 is a

18    good round number.

19                Can we take a break?

20                MR. GRIMES:  Sure.

21                (A recess was taken from 3:21 p.m. until

22                 3:29 p.m.)

23                MR. GRIMES:  Back on the record.

24    BY MR. GRIMES:

25         Q     Did Bill Carrico ever say anything

1     negative about Duffy Carmack?

2          A     No.

3                (3/26/18 email string between David
                 Matlock, Elizabeth Griffin, Kathy Hietala
                 Page 213

```
                        Matlock dep tran
 4                      re: OSIG Response letter and 3/26/16
                        letter from David Matlock to The
 5                      Honorable Atif Qarni, Secretary of
                        Education marked as Matlock Exhibit
 6                      Number 51)

 7   BY MR. GRIMES:

 8          Q      Exhibit 51, more emails.  The one at the

 9   top of the page from you to Elizabeth Griffin, copied

10   to Kathy Hietala.  And you write, "Attached is the

11   final singed version --" supposed to be "signed," just

12   an error.  "Thanks for your support, David"; correct?

13          A      Yes.

14          Q      Is this your response to the OSIG's

15   letter of November 17, 2017?

16          A      Yes.

17          Q      So it took you four and a half months to

18   respond?

19          A      Yes.

20          Q      And you say to Elizabeth Griffin, "Thanks

21   again for your support."

22                 Did you feel that Elizabeth Griffin had

23   supported you through this difficult time?

24                 MR. HARDY:  Objection, attorney/client

25   privilege.
                                                        255


 1                 Do not answer.

 2   BY MR. GRIMES:

 3          Q      Why are you thanking Elizabeth Griffin

 4   for your support -- for her support?

 5          A      I assume she, I mean, she provided

 6   guidance and she always seemed to go over the top in

 7   representing the Center, so I just was being nice and

 8   saying thank you.

                        Page 214
```

9        "Thank you for your support" is kind of a

10   signature that I use a lot.

11        Q    My question to you was, did you feel that

12   Elizabeth Griffin had supported you?  I wasn't asking

13   what she said to you.  But did you feel that she had

14   supported you?

15        A    She did her job well.

16        Q    Have you heard from any Center employee

17   that he or she thought that the complainant was Duffy

18   Carmack?

19        A    No.

20        Q    Did you ever discuss the OSIG complaint

21   with Joyce Brooks?

22        A    Yes.

23        Q    For what purpose?

24        A    Navigating the process to do what Tim

25   Sadler said was necessary for Adam Tolbert.

                                              256


1         Q    Did you show the OSIG letter of

2    November 17, 2017, to anyone other than Elizabeth

3    Griffin?

4         A    I don't recall.

5         Q    Did you show it to any Center employees?

6         A    I don't recall.

7         Q    Can you rule out the possibility that you

8    showed the letter to any Center employees?

9         A    I couldn't rule it out.

10        Q    Did you show it to the chairman of the

11   board?

12        A    I'm certain I did.

13        Q    How frequently does the board of

                        Page 215

14    directors meet?

15        A    Twice a year.

16        Q    Is the financial position of the Center

17    presented at each meeting?

18        A    Yes.

19        Q    Who typically would be responsible for

20    presenting that information?

21        A    I'm not sure before I came.  Under my

22    tenure, it was a 50/50 split between myself and

23    Mr. Carmack.

24        Q    And do you know when Mr. Carmack last

25    presented the financial information to the board?

                                                    257


1        A    Maybe December '16, but he continued to

2    present the financial information of the Foundation at

3    every board meeting.

4             THE COURT REPORTER:  Excuse me.

5             (Discussion off the record)

6    BY MR. GRIMES:

7        Q    December of 2016?

8        A    (Nodding).

9        Q    Did you report the financial information

10    to the board during the December 2017 meeting?

11        A    Yes.

12        Q    Did you report that the overall financial

13    strength of the Center was at an all time high?

14        A    I believe I did.

15        Q    And that was true, wasn't it?

16        A    Nongeneral revenue was at an all time

17    high.

18        Q    And who was Paula Moad, M-o-a-d?

                        Page 216

19    A    Paula Moad is currently the testing

20   center coordinator.  She's an hourly position.

21    Q    At the Center?

22    A    Yes.

23    Q    Did she contact UVA HR at some point

24   about the status of a position that was open?

25    A    I was told she did.

258

1    Q    Was that the position that was ultimately

2   given to Hannah Hietala, Kathy Hietala's daughter?

3    A    No.

4    Q    How did you find about Moad contacting

5   UVA HR?

6    A    I believe Donna Kauffman called me.

7    Q    Did you fuss at Paula Moad for contacting

8   UVA HR?

9    A    No.

10    Q    Did she file a grievance?

11    A    I'm not aware of a grievance filed by

12   Paula Moad.

13    Q    So you don't know what happened to the

14   grievance?

15    A    I don't think a grievance ever existed.

16    Q    That's what you believe?

17    A    That's what I believe, yes, sir.

18    Q    Do you know whether Joyce Brooks ever

19   stopped the grievance process?

20    A    No.

21    Q    Was Carmack Paula Moad's immediate

22   supervisor?

23    A    Yes.

Page 217

24      Q     Was the position given to Hannah Hietala

25  without posting it first?

                                                                 259

1       A     Was the position given -- can you

2  rephrase that and give me a time frame?

3       Q     The time frame is ever.

4            And was the position that Hannah Hietala

5  took given to her without it being posted?

6       A     You're talking about the complaint that

7  you alleged by Paula?

8       Q     Um-hum.

9       A     No.

10      Q     Or any position that Hannah Hietala ever

11  filled, did she fill it without it being posted?

12      A     Yes.

13      Q     Which position?

14      A     Her current position.

15      Q     Which is?

16      A     She is the special events coordinator.

17      Q     And that's what she does, coordinate

18  special events?

19      A     That's the majority of her job.

20      Q     Did you ever think of eliminating that

21  position to save money?  Maybe bringing on a marketing

22  person?

23      A     No.

24      Q     Did you become aware that Duffy Carmack

25  filed his own grievance after the Paula Moad incident?

                                                                 260

1       A     No.

2      Q     You never learned of that.

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 210 of 250   Pageid#: 1880

3      A      No.

4      Q      Did you ever hear that Duffy Carmack told

5  the ombudsman of UVA about the concerns he later

6  reported to the OSIG?

7      A      I was never contacted by anyone from UVA.

8      Q      My question is a little different.

9            Did you ever become aware that Duffy

10  Carmack had told the UVA ombudsman about the concerns

11  he later reported to the OSIG?

12      A      I became aware the same day the board

13  did.

14      Q      What was UVA's role with respect to the

15  Center at the time?

16      A      Being the first -- we contracted them to

17  do our fiscal practices and our HR practices.  We paid

18  for back room service.

19      Q      What does "back room service" mean?

20      A      Some of the heavy lifting; processing

21  payroll, processing payments, cutting checks, holding

22  all of our funds.  It keeps us from having to have as

23  many employees.

24      Q      So it's a cost-saving thing?

25      A      Exactly.

                                                    261


1      Q      Did you ever learn that Carmack also

2  reported his concerns to DHRM?

3      A      I learned when -- the letter that he

4  wrote in December of '17 was my first knowledge of

5  that.

6      Q      Would you agree that both UVA and DHRM

7  played some role in the WTA process?

                        Page 219

8        A     Yes.

9        Q     Are you familiar with the Whistleblower

10   Act?

11       A     Yes.

12       Q     What is it?

13       A     It's, in summary, it's just a protection;

14   if someone makes a allegation that is true, that they

15   get some protection.

16       Q     What if it's not true but they believe it

17   to be true?

18             MR. HARDY:  Objection to the extent it

19   calls for a legal conclusion.

20             MR. GRIMES:  All right.

21             MR. HARDY:  Please answer.

22             THE WITNESS:  Oh.  I would like to think

23   they'd still be protected.  That would be my

24   understanding of the rule and the law and seems to be

25   the fair way.

                                            262

1    BY MR. GRIMES:

2        Q     Of your years of service with the State,

3    have you been the subject of other OSIG complaints?

4        A     No.

5        Q     This is the first?

6        A     Yes.

7        Q     Did you become aware that Duffy Carmack

8    wrote a letter to the board of directors of the

9    trustees for the Center in December of 2017?

10       A     Yes, I became aware that he wrote a

11   letter.

12       Q     How did you become aware of that?

                         Page 220

13      A      Mr. Carmack came into my office I believe

14  the day before the meeting and shared the letter with

15  me.

16      Q      Did you ever discuss the letter with

17  Senator Carrico?

18      A      I know I called Elizabeth.  I don't

19  recall if I discussed it with Senator Carrico.

20      Q      Do you -- so maybe you did; correct?

21      A      Maybe, but I don't recall.

22      Q      Do you know about Senator Carrico's

23  discussions with Carmack right before the board of

24  trustees meeting in December about the letter?

25      A      Yes.

263

1       Q      How did you hear about that?

2       A      It is my understanding that Elizabeth

3   required him to have a meeting in the boardroom with

4   Mr. Carmack.

5       Q      "Him" would be Senator Carrico?

6       A      Yes.

7              I believe she instructed him to, as

8   chairman of the board, he needed to address -- to

9   investigate concerns of any employee.

10             (12/7/17 letter to Members of the Board
               of Trustees Southwest Virginia Higher
11             Education Center from William D. "Duffy"
               Carmack, CFO marked as Matlock Exhibit
12             Number 52)

13  BY MR. GRIMES:

14      Q      Exhibit 52 is the letter dated

15  December 7, 2017.

16             When did you first see this letter in

17  relation to its date?

Page 221

18    A    I think I stated earlier I think it would

19  have been December 6th, the day before the meeting.

20    Q    Do you know whether Elizabeth Griffin

21  recommended that the board not go into closed session

22  to discuss the letter?

23    A    I don't recall.

24    Q    Didn't board member Steve Cochran move to

25  go into closed session and, due to Elizabeth Griffin

                                                    264

1  and Senator Carrico, the request was denied?

2    A    I do remember Mr. Cochran asking if they

3  would be discussing this and if they needed to go into

4  closed session.  I don't -- I don't remember a motion

5  being made, but that would be in the minutes.

6    Q    Did they or did they not go into closed

7  session?

8    A    They did not go into closed session.

9    Q    Was a third-party mediation ever

10  attempted to resolve the issues raised by Mr. Carmack

11  in his letter?

12    A    No.

13    Q    Did you ever use mediators in your

14  business?

15    A    From time to time.

16          (1/11/18 letter from William D. Carmack
            to Senator Carrico marked as Matlock
17          Exhibit Number 53)

18  BY MR. GRIMES:

19    Q    Exhibit 53 is a letter to

20  Senator Carrico -- Senator Carrico dated January 11,

21  2018, from Mr. Carmack.  There, among other things, he

22  writes in the first paragraph that you have stated that

                    Page 222

23    "Senator Carrico is my sugar daddy."

24            Have you ever referred to Senator Carrico

25    as your "sugar daddy"?

                                                    265


1            A    No.

2            Q    Are you aware that Senator Carrico did

3    not send this letter to the rest of the board until

4    February 1, 2018?

5            A    Mr. -- no.

6                 (2/1/18 and 2/9/18 emails between David
7                 Matlock and Elizabeth Griffin, Senator
                  Carrico re:  Duffy Carmack's Letter of
                  January 11 marked as Matlock Exhibit
8                 Number 54)

9    BY MR. GRIMES:

10            Q    The email at the bottom of the page is an

11    email from Bill Carrico addressed to Fellow Board

12    Members dated February 1, 2018.

13            In the second paragraph of his email, he

14    writes, "First, I ask that you not respond to this

15    letter independently."

16            Do you know why he said that?

17            A    I do not.

18                 (2/20/18 letter from Charles W. Carrico,
                   Sr. to William D. Carmack marked as
19                 Matlock Exhibit Number 55)

20    BY MR. GRIMES:

21            Q    Exhibit 55 is a letter from Bill Carrico

22    to Duffy Carmack dated February 20, 2018.

23            Have you seen this before?

24            A    I don't believe so.

25            Q    He says in the first sentence, "Over the
                                                    266


Page 223

1    past few weeks I have personally consulted with

2    numerous members of the board of trustees regarding

3    your letter of January 11, 2018."

4              Do you know who he spoke with on the

5    board of trustees?

6         A    No.

7         Q    Do you know whether this letter was

8    actually drafted by Elizabeth Griffin?

9         A    No.  I would have no knowledge of that.

10              (February 2018 emails between David
                Matlock, Elizabeth Griffin, Kathy
11              Hietala, Senator Carrico re:  Conference
                Call Monday 2/12/18 marked as Matlock
12              Exhibit Number 56)

13   BY MR. GRIMES:

14        Q    Exhibit 56 is a series of emails.  If you

15   look on the second page, you will see there an email

16   from Elizabeth Griffin to you dated February 15, 2018.

17   And there she writes, "David and Senator Carrico,

18   please see attached draft letter to Duffy Carmack.  As

19   we discussed earlier this week, I intentionally kept it

20   brief."

21              Do you recall receiving this email on

22   February 15, 2018?

23        A    Yes.

24        Q    Does that refresh your recollection about

25   whether you saw the letter I showed you moments ago,

                                                      267

1    Exhibit 55?

2         A    Yes, I must have seen it.

3              (2/20/18 email from Elizabeth Griffin to
               Kathy Hietala, Senator Carrico re:
4              Letter from Senator Carrico and 2/16/18
               letter from Charles W. Carrico, Sr. to
5              William D. Carmack marked as Matlock
               Exhibit Number 57)

                    Page 224

6

7    BY MR. GRIMES:

8          Q      Exhibit 57 is another email from

9    Elizabeth Griffin to Kathy Hietala and copied to you.

10   And there she writes, "Kathy, please prepare the

11   attached letter for sending on Higher Ed. Center

12   letterhead."

13              And if you look at Exhibit 55, you will

14   see it is actually on Higher Ed. Center letterhead;

15   correct?

16         A      Yes, that's correct.

17         Q      Now, you called Duffy Carmack into your

18   office on January 4, 2018 and terminated his

19   employment; correct?

20              MR. HARDY:  Object to form.

21              THE WITNESS:  Incorrect.  I met with

22   Mr. Carmack in a boardroom to inform him of his choices

23   with the WTA.

24   BY MR. GRIMES:

25         Q      Did you tell him that his work was

                                                      268


1    impeccable?

2          A      Maybe.

3          Q      Is there a particular reason you chose

4    the date January 4, 2018?

5          A      No.

6                (1/2/18 email from David Matlock to Carol
                  Summers, Donna Kauffman, Debbie Rigdon
7                 marked as Matlock Exhibit Number 58)

8    BY MR. GRIMES:

9          Q      Exhibit 58 is an email from you to

10   Elizabeth -- strike that -- Carol Elizabeth Summers and

                        Page 225

11    Donna Kauffman and Debbie Rigdon.  And there you write

12    By email dated January 2, 2018, "Due to commitments

13    with the Tobacco Commission, I do not plan to pull the

14    trigger on the WTA until Thursday, January 4th."

15            What were your commitments?

16        A    I believe that there was a series of

17    Tobacco Commission meetings earlier that week, the 2nd

18    and the 3rd.

19        Q    Where were those meetings?

20        A    I believe they were over here on Seventh

21    and the -- the Tobacco Commission is located next to

22    Hampton Inn's -- a hotel next to them.  They like to

23    have a lot of meetings there.  I believe that could be

24    where it was at, Richmond, Virginia.

25        Q    Do you have a memory of being at Tobacco

                                                          269


1    Commission meetings on January 2nd or 3rd --

2        A    Yes.

3        Q    -- of 2018?

4        A    Yes, I believe I was there.

5            (5/22/17 email from Donna Kauffman to
             David Matlock, Adam Tolbert RE:  Duffy's
6            notice + WVA Waiver marked as Matlock
             Exhibit Number 59)
7

8    BY MR. GRIMES:

9        Q    There's an email from Donna Kauffman to

10    you dated May 22, 2017.  "We had discussed --" strike

11    that.  Back up.

12            Salutation -- or greeting, "Hi David and

13    Adam, we had discussed Duffy being paid leave during

14    his notice time and not coming back into the office."

15            Do you remember seeing this email?

                      Page 226

16          A      Yes.

17          Q      Why was Carmack not permitted to work

18    during his notice period?

19          A      This was a scenario.

20          Q      On January 4, 2018, when you told

21    Mr. Carmack that his employment was ending --

22          A      Right.

23          Q      -- did you have armed security guards

24    walk him out?

25          A      We had armed security guards walk all

270

1     three WTA out -- affected people walk out, all three of

2     them.

3           Q      Is that a yes?

4           A      Yes.

5           Q      Weren't all the employees put into one

6     room until Carmack left alone?

7           A      No, all employees were not.

8           Q      Did Carmack leave alone?

9           A      I was not in his presence when he left.

10          Q      Did armed security guards walk out Janet

11    Williams?

12          A      It's my understanding that they were

13    instructed to walk out all three.

14          Q      But you weren't there, is that what

15    you're saying?

16          A      I was in another room.  They did not all

17    happen at the same time.  They were -- it was

18    sequenced.

19          Q      So are you telling us you don't know

20    whether armed security guards walked out Janet Williams

Page 227

21    or Joyce Brooks; correct?

22         A    I know they were instructed.  I know that

23    Miss Brooks cried and felt unworthy after her years of

24    service.

25         Q    What was the name of the security guard

271

1    who walked out Joyce Brooks?

2         A    I believe it was -- again, I wasn't

3    there.  The police chief for VHCC was in charge of that

4    duty.

5         Q    If you don't know, say "I don't know."

6         A    Okay.  I don't know.

7         Q    Who was the security guard who walked out

8    Janet Williams?

9         A    It was a police officer.  I don't know.

10    I don't know who walked out Duffy, I don't know who

11    walked out Janet, I don't know who walked out Joyce.

12         Q    Have there been any positions available

13    since the time Mr. Carmack was laid off?

14         A    Yes.

15         Q    Was there a test center proctor position

16    posted on March 14, 2018, and a loan collections

17    specialist -- strike that.

18              Was there a test section -- center

19    proctor position posted March 14, 2018?

20         A    I don't know if that's the exact date.

21              We have hired a test proctor in the last

22    year.

23         Q    And a loan collections specialist

24    administrative and office specialist three available in

25    October or November of 2018?

272

Page 228

```
1        A    Yes.

2        Q    As well as other positions; correct?

3        A    Some hourly positions, yes, sir.

4        Q    So you're continuing to hire.

5        A    Those positions were people who -- they

6   were hourly positions where people left our service.

7   No one else was laid off.  They were replaced.

8        Q    You're continuing to hire new people;

9   correct?

10       A    I'm continuing to keep the employment

11  level at the same as it was in June of '14.

12       Q    Are or are you not continuing to hire new

13  people since the time Duffy Carmack's employment ended?

14       A    We have hired new people.

15            MR. GRIMES:  Mark that please.

16            (Recall dated 10/1/14 marked as Matlock
              Exhibit Number 60)
17

18  BY MR. GRIMES:

19       Q    Exhibit 60 is a document called Recall.

20            Have you seen this policy before?

21       A    No.

22       Q    Was this policy followed with respect to

23  Duffy Carmack?

24       A    No.

25                                              273
```

```
1            (March to May 2018 email string between
             David Matlock, Kathy Hietala, Adam
2            Tolbert, Deborah Rigdon re:  WTA
             Exemption Letter marked as Matlock
3            Exhibit Number 61)

4   BY MR. GRIMES:
```

Page 229

5       Q     Exhibit 61 is another string of emails,

6  including an email from you to Kathy Hietala and Adam

7  Tolbert on May 7, 2018, at the top of the page and an

8  email from you to Debbie Rigdon on April 12, 2018;

9  correct?

10       A     Yes.

11       Q     And there you write, in the second half

12  of the paragraph, "Things are going well.  We are

13  investing in new programs and look forward to

14  advertising for the marketing position at some point

15  after the first of July.  Thank you for all your help.

16  David."

17          So you're looking for a marketing person;

18  correct?

19       A     Not yet.

20       Q     You planned to advertise after the first

21  of July of what year?

22       A     I don't know.

23       Q     Well, when you wrote the email and you

24  used the word "July" on April 12, 2018 --

25       A     That would have been '18.

                                           274

1       Q     -- what year did you have in mind?

2       A     I thought about '18.

3       Q     Speaking of the new marketing position,

4  you had Adam Tolbert change the organizational charts

5  in late 2017; correct?

6       A     Our organizational charts have changed,

7  yes, sir.

8       Q     At your direction?

9       A     Yes, sir.

10      Q      And Adam Tolbert changed them; correct?

11      A      Yes.

12              (12/18-19/17 emails between Donna
                Kauffman, Joyce Brooks, Adam Tolbert re:
13              Org chart with no UVA number marked as
                Matlock Exhibit Number 62)
14

15  BY MR. GRIMES:

16      Q      Exhibit 62 is an email from Donna

17  Kauffman to Adam Tolbert dated December 19, 2017.

18              And if you look at the second page,

19  you'll see an organizational chart; correct?

20      A      Correct.

21      Q      Dated August 2017; correct?

22      A      Correct.

23      Q      And there was only one vacancy at the

24  time; correct?  One vacant position.

25              Just take a moment to read it.

                                                    275


1       A      As reflected in that chart, it -- it

2   notates that there's a vacancy in housekeeping.

3       Q      Look in the boxes on the left side of the

4   page, second row, vacant building and grounds.  Do you

5   see a vacancy there?

6       A      Oh, yes, I do.

7       Q      Is that housekeeping or no?

8       A      No, that's buildings and grounds.

9               (10/23/17 email from Adam Tolbert to
                David Matlock re:  Org Chart - Updated
10              and attached Organization Chart marked as
                Matlock Exhibit Number 63)
11

12  BY MR. GRIMES:

13      Q      Exhibit 63 is an email from Adam Tolbert

14  to you dated October 23, 2017.

                        Page 231

15          In there you write, "David, attached is

16     the organization chart you requested to be developed."

17          So you had Adam develop an org chart;

18     correct?

19     A     Correct, yes.

20     Q     You say, "I believe this to be accurate

21     based on our conversation last week."

22          So you provided the input into the org

23     chart; correct?

24     A     Yes.

25     Q     And there's one black box on the org

                                              276


1     chart.  What is that for?  If you know.

2          Do you know, sir?

3     A     No.  It looks like that would be the

4     person, though, of the supervised conference services.

5          (10/23-24/17 emails between Adam Tolbert

6           David Matlock re:  Org Chart - Updated

           and attached Organization Chart marked

7           as Matlock Exhibit Number 64)

8     BY MR. GRIMES:

9     Q     Exhibit 64 is another email from Adam to

10    you October 24, 2017, and he writes, "David, Per our

11    discussion this morning, here is version two of the

12    draft."

13          So as early as October of 2017, you were

14    planning to have a marketing director position;

15    correct?

16    A     As early -- earlier than that.

17          The WTA process began in '16 and this is

18    a draft.

19    Q     Aren't people the life blood of your

                    Page 232

20    business?

21          A      Yes.

22                 (12/11/17 email between Adam Tolbert,
                   David Matlock RE:  ReOrg#2 and attached
23                 Organization Chart marked as Matlock
                   Exhibit Number 65)
24    BY MR. GRIMES:

25          Q      Exhibit 65 is an email from Adam Tolbert

                                                        277

1     to you dated December 11, 2017.  There he writes,

2     "David, Attached is the updated chart.  Let me know if

3     more changes are needed."

4                 Now, with respect to this chart, it looks

5     like your assistant's son was placed in the trades

6     technician spot between October 24, 2017 and

7     December 11, 2017; is that correct?

8           A      I'm not sure when he was hired, but he

9     did take a full-time job.

10          Q      Was this a newly-created position or a

11    position that existed when you were hired at the

12    agency?

13          A      We spoke earlier of a young lady named

14    Debbie who retired.

15          Q      It looks like your assistant's daughter

16    was placed in the building, scheduling and event data

17    entry spot sometime between October 24, 2017 and

18    December 11, 2017; correct?

19          A      Incorrect.  This is a proposed

20    reorganization plan chart, "draft" in the upper

21    left-hand corner, just to go along with the wording of

22    the WTA.

23          Q      But the draft was provided and created

24    with your input; correct?

                         Page 233

25      A      Yes.

278

1          Q      Was the position I've just described,

2      building, scheduling and event data entry, a newly

3      created position or one that existed when you were

4      hired at the agency?

5          A      That's a position that involved a lot of

6      Mrs. Williams' duties.  Mrs. Williams did a lot of

7      that.

8          Q      So in about a six-week time frame, you

9      hired both of Kathy Hietala's kids to work at the

10     Center; correct?

11         A      All of Kathy Hietala's kids worked at the

12     Center.  When I was hired, they worked at the Center.

13                Mr. Carmack is the one who hired Hannah.

14     I did not.  They were already employed there.

15                (1/30/18 email from Adam Tolbert to Donna
                  Kauffman, David Matlock RE:  Meeting
16                w/David and Adam? marked as Matlock
                  Exhibit Number 66)
17

18     BY MR. GRIMES:

19         Q      This WTA looks like an administrative

20     pain in the butt.

21                Did you find it to be that way or no?

22         A      No.

23         Q      Exhibit 66 is an email from Adam Tolbert

24     to you dated -- excuse me, Adam Tolbert to Donna

25     Kauffman, copied to you, dated January 30, 2018.

279

1                There Adam writes, "Hi Donna, David

2      wanted me to reach out and see if you had any time

Page 234

3    available tomorrow (Wednesday, 1/31) to do a phone

4    meeting to discuss some post WTA position changes."

5                    And what position changes were taking

6    place right after Carmack was fired?

7                    MR. HARDY:  Object to form.

8                    MR. KINCER:  Object.

9    BY MR. GRIMES:

10            Q    You can answer.

11            A    After the WTA process was initiated, it

12    took several months to make all of that transition line

13    up with the org chart.  It just didn't happen

14    overnight.  We had vacancies, and it took a while.

15            Q    Did you give any thought to creating a

16    new position for Carmack or let him absorb duties of

17    anybody else who wanted to retire, like Patricia Ball

18    or Doug Viers?

19            A    No.  We were eliminating positions, not

20    people.

21                    (2015-2016 email string between Donna
                     Kauffman, Erica Anne Wheat, Christina
22                    Lynn Landes, Bryan Garey, David Matlock,
                     Darrell Kozuch, William Carmack RE:
23                    UStaff potential conversions at the
                     SWVHEC marked as Matlock Exhibit Number
24                    67)

25
                                                         280


1    BY MR. GRIMES:

2            Q    Did you consider eliminating Debbie

3    Hensley's position?

4            A    No, not her position.

5            Q    Why not?

6            A    Got to have a business manager.

7            Q    Got to have an accountant, too; right?

                         Page 235

8       A       Debbie Hensley covers that.  Debbie

9  Hensley's position covers that.

10      Q       Exhibit 67 is an email from Donna

11  Kauffman to Erica Wheat, copied to a number of people,

12  including you, referencing UStaff potential conversions

13  at the Southwest Virginia Higher Education Center, it's

14  marked high priority, dated January 28, 2016; correct?

15      A       Correct.

16      Q       And she writes, "Good afternoon Erica,

17  Duffy Carmack, the Center's chief financial officer,

18  stopped by to see me today on his way to Richmond.  One

19  of the topics I brought up was if their classified

20  staff were still interested in potentially converting

21  to university staff.  The answer is a resounding,"

22  quote, "yes," closed quote, exclamation point.

23              So was that a possibility --

24      A       Yes.

25      Q       -- to move employees to university staff?

281

1       A       Yes.

2       Q       Would that have saved the Center money?

3       A       I don't believe so.  It was more of a

4  convenience for -- for the employees.

5       Q       Did you redo your job description before

6  implementing the WTA?

7       A       No.

8       Q       Do you remember?

9       A       I'm not even sure if I know where my job

10  description is.

11      Q       Well, but my question was, did you redo

12  your job description before implementing the WTA, do

Page 236

13    you know?

14          A    I believe the answer would be no.  I

15    don't recall, but I believe it's no.

16                (10/31/17 email from David Matlock to
                  Donna Kauffman RE:  Position Descriptions
17                with attached position descriptions for
                  Executive Director/Agency Head and CFO
18                marked as Matlock Exhibit Number 68)

19    BY MR. GRIMES:

20          Q    Exhibit 68 is an email from you to Donna

21    Kauffman dated October 31, 2017.  There you write, "If

22    you review my job description, it states the minimum

23    requirement of ten years of educational experience in

24    an upper leadership position," question mark, question

25    mark.  "I will call you later to discuss."

                                                    282


1                That's what you wrote; correct?

2           A    Um-hum.

3           Q    So you --

4                MR. KINCER:  Yes?

5                THE WITNESS:  Yes.  I'm sorry.  Yes.

6     BY MR. GRIMES:

7           Q    So you thought your job description ought

8     to be revised?

9           A    No.  I think I'm just stressing that it

10    states a minimum of ten years of educational

11    experience.

12          Q    In the forward that is below, did you

13    delete the date line?

14          A    I don't know.

15          Q    Can you tell me why a date line is not

16    there?

17          A    No, I cannot.

                    Page 237

18    Q    Why is Adam Tolbert emailing you the job

19 description for both the executive director/agency head

20 and the chief financial officer?

21    A    As we started the process to switch from

22 UVA to DHRM, it was discovered that I was out in orbit

23 and didn't really belong.  I wasn't properly

24 classified.

25         All the other agency heads had agency

                                                    283

1 head contracts with the Governor.

2         UVA was not aware of that when I was

3 hired.  So at that point, I was trying to get an agency

4 head contract.

5    Q    You were trying to get an agency head

6 contract?

7    A    I was trying to make us compliant.

8         I have an agency head contract.  That was

9 an oversight.

10    Q    Why?

11    A    Because UVA was our fiscal agent.

12    Q    Therefore, you wanted an agency head

13 contract?

14    A    No, sir.

15         An agency head contract was what the

16 Secretary of Education told me I needed to have.

17         (10/30-31/17 email string between David
           Matlock, Donna Kauffman, Carol Summers
18         RE:  SW marked as Matlock Exhibit Number
           69)
19

20 BY MR. GRIMES:

21    Q    Exhibit 69 is an email from you to Donna

22 Kauffman of October 31, 2017.  And you write to Donna

                        Page 238

23  Kauffman, "I will be reviewing with the senior members

24  of my leadership team this afternoon and should have

25  some input for you early tomorrow."

284

1           And, David, Duffy Carmack was a member of

2   your -- senior member of your leadership team; correct?

3       A    He was.

4       Q    But you did not meet with him that

5   afternoon, did you?

6       A    I did not meet with Joyce Brooks as well.

7   I did not meet with anyone who I would normally meet

8   with that was a part of the WTA process.

9       Q    My question was whether you met with

10  Duffy Carmack, and the answer is no, isn't it?

11      A    If it's about this email, the answer

12  would be no.

13      Q    "After first read I would like to make

14  the following observations.  First, I have 27 years of

15  continuous service with the State.  The second thing is

16  the statement that the CFO and the executive

17  director/agency head have similar duties."

18           And that's how the job descriptions read,

19  isn't it, the duties are similar?

20      A    I don't think so.

21      Q    But that's what you wrote here; correct?

22      A    I write that, "The second thing is the --

23  is the statement --" I believe that statement was

24  written by Carol Summers.

25      Q    Irrespective of who wrote it, Carol

285

1   Summers or the Pope, it really doesn't matter.  You

Page 239

2    say, "The statement that the CFO and the executive

3    director/agency head have similar duties."  And that

4    was of concern to you, wasn't it?

5         A     Yes, it's an observation.

6         Q     And then you say, "That is really not an

7    accurate statement."

8               That's what you wrote; correct?

9         A     That is correct.

10        Q     So you wanted it changed; correct?

11        A     I wanted what changed, sir?

12        Q     You wanted the job description changed.

13        A     No, sir.

14        Q     You didn't?

15        A     No.  This email is not about a job

16   description.

17        Q     When you got rid of Duffy Carmack, did

18   you spread the CFO duties over different people?

19        A     Yes, I did.

20        Q     To whom?

21        A     Debbie Hensley.

22        Q     What duties did she assume?

23        A     She continued to do what she was doing,

24   and that was managing the daily operations of the

25   business office.  She's the business manager.

                                             286

1         Q     Right.

2               What CFO duties were spread to Debbie

3    Hensley?

4         A     Daily business management.

5         Q     Which is what she was doing before;

6    correct?

                   Page 240

7          A      Exactly.

8          Q      Who else?

9          A      Pat Ball took on responsibility, more
10 responsibility with the Tobacco Commission.

11          Q      Specifically what?

12          A      The employees that administer the program
13 now report to her.

14          Q      And who is that?

15          A      Melissa, Paul.

16          Q      Anybody else?

17          A      No.

18          Q      And who else received some of
19 Mr. Carmack's duties?

20          A      I took on all the DPB liaison day-to-day
21 duties.

22          Q      Who else?

23          A      Adam Tolbert took on the testing center.

24          Q      And that requires that he do what?

25          A      Supervise three hourly employees, three

                                                287


1 wage -- three wage employees, part-time wage employees.

2          Q      Did you and Mr. Carmack discuss his OSIG
3 or whistleblower complaint during the termination
4 meeting?

5                 MR. HARDY:  Object to form.

6 BY MR. GRIMES:

7          Q      You can go ahead and answer.

8          A      Mr. Carmack at some point in the WTA
9 activation process turned to me and said, "You know I'm
10 the one that called OSIG."

11          Q      And you said?

                        Page 241

12      A       No.

13      Q       Turning to the executive committee

14   meeting on June 30, 2017, what was discussed at that

15   meeting?

16      A       My evaluation and the WTA plan.

17      Q       Would the Center save money if you had

18   not received your 3 percent raise?

19      A       Of course.

20      Q       Did you feel badly that you were getting

21   a raise while you were planning to get rid of other

22   people?

23              MR. KINCER:  Objection to the form of the

24   question.

25                                                      288


1   BY MR. GRIMES:

2       Q       Was that of any concern to you?

3       A       My concern as an agency head was to make

4    the Center the most efficient and effective operations

5    for the maximum return on investment for the taxpayer.

6    I felt good about that.

7       Q       Marcia Gilliam or Marsha Gilliam --

8       A       Yes.

9       Q       -- who is that?

10      A       She's a former member of the Foundation

11   and the designee for the State chancellor of the

12   Virginia Community College System to the board, to the

13   Center board.

14      Q       Donna Henry is what?

15      A       She's chancellor, UVA Wise.

16      Q       And Gene Couch is what?

                        Page 242

17    A    President of VHCC.

18    Q    What's happened to his employment?

19    A    He currently is on special assignment
20  with the chancellor of the Virginia Community College
21  System.

22    Q    What was he doing before that?

23    A    He was president of VHCC.

24    Q    So that sounds like something happened,
25  when you're the president and now you're on special

1  assignment.  That doesn't sound like a good thing.

2    A    That's --

3    Q    You don't know?

4    A    I have my own plate to worry about, sir.

5    Q    Yeah.

6         So he's no longer the president?

7    A    No.

8    Q    He has been put on special assignment?

9    A    Yes, sir.

10    Q    Is somebody else acting as president?

11    A    Yes.

12    Q    Who is that?

13    A    Charlie White.

14    Q    What are Gene Couch -- what's his new
15  special assignment?

16    A    I don't know, sir.  I don't work for the
17  Virginia Community College System anymore.

18    Q    Well, but you hear things sometimes,
19  don't you?

20    A    You always hear things.

21    Q    What have you heard about his special

Case 1:18-cv-00031-MFU-PMS   Document 72-7   Filed 04/24/19   Page 235 of 250   Pageid#: 1905

22    assignment?

23         A      He's researching poverty in the golden --

24    in the Golden Crescent, as the chancellor likes to

25    refer to it.

                                                        290

1          Q      Say it again?

2          A      The chancellor refers to the poor

3     Appalachian counties of western Virginia as the

4     Golden -- he has a word for it, the horseshoe.  The

5     horseshoe.  And I think that what I read was that

6     President Couch is now doing research to support the

7     chancellor's initiative with poverty in the Appalachian

8     mountains.

9          Q      Outside of the executive committee, when

10    did the rest of the board first learn that they would

11    be losing their CFO?

12         A      January 4th, 2018.

13         Q      They didn't know before?

14         A      No, sir.

15         Q      And that's the way you wanted it;

16    correct?

17         A      That's the way I was advised that it had

18    to happen.

19         Q      By?

20                MR. HARDY:  Objection to the extent that

21    the answer would implicate attorney/client privilege.

22    BY MR. GRIMES:

23         Q      Go ahead and answer if you can.

24         A      I --

25                MR. KINCER:  If it doesn't, go ahead.  If
                                                        291

                        Page 244

1    it does --

2                    THE WITNESS:  I think it would be

3    attorney/client privilege.

4    BY MR. GRIMES:

5         Q    Because it comes from Elizabeth Griffin?

6                    MR. KINCER:  Objection.

7    BY MR. GRIMES:

8         Q    Well, I mean, did it come from Donna

9    Kauffman?

10        A    The fact that I didn't tell anybody?

11        Q    Yeah.

12        A    I don't recall.

13        Q    Well, then I -- there can't be a good

14   objection then.

15                   Who -- why did you decide not to let the

16   rest of the board know that you were getting rid of

17   your CFO until January 4, 2018?

18        A    Because, first of all, they aren't

19   responsible for the hiring and firing of employees of

20   the Center.

21        Q    Now, does their -- does the Foundation

22   have a fund of money available to it?

23        A    I believe they have a few thousand

24   dollars.

25        Q    A few thousand dollars?

                                                    292


1         A    Yes, sir.

2         Q    Did they not have about $800,000

3    available?

4         A    It's my understanding and, again, I don't

                        Page 245

5    have their books in front of me, that they have about

6    380,000 in unrestricted funds available to them.

7         Q     At the time that you let Duffy Carmack

8    go, how much did the Foundation have available?

9         A     I have no idea.

10        Q     No idea.

11              And you've never asked --

12        A     No, sir.

13        Q     -- correct?

14              Did you want to know?

15        A     No.

16        Q     Didn't want to know.

17              (Southwest Virginia Higher Education
                 Center Board of Trustees register marked
18               as Matlock Exhibit Number 70)

19   BY MR. GRIMES:

20        Q     The Center had about $800,000 at the time

21   that Duffy Carmack was let go; correct?

22        A     The Center in nongeneral carry forward

23   revenue is what you're relying -- relaying -- talking

24   about?

25        Q     I don't -- I don't know what you call

                                                    293


1    "money."  To me, it's all money.

2         A     At the time of the WTA, we had in

3    nongeneral revenue fund -- what was the number you

4    used, sir?

5         Q     I used $800,000.

6         A     And what was your question again?

7         Q     You don't remember the question?

8         A     No, sir.

9         Q     Why don't we start over.

                    Page 246

10      A       Okay.  Start over.

11      Q       At the time Duffy Carmack's employment

12  ended, the Center had about how much money available?

13  And don't put any qualifiers on the money.  Just call

14  it money.

15      A       800, $900,000 in nongeneral revenue.

16      Q       That was my question.  8 or $900,000;

17  correct?

18      A       Right.

19      Q       Just say yes.

20      A       Yes.

21      Q       Look at the next exhibit, please.

22              MR. GRIMES:  What's the number of that

23  one?

24              THE COURT REPORTER:  70.

25                                              294


1  BY MR. GRIMES:

2       Q       Do you recognize this document?

3       A       It appears to be from June, fiscal year

4  '13.

5       Q       Right.

6               If you turn the pages, all of the other

7  years are there, too.

8               Have you seen this document before?

9       A       Yes, sir.  I examine this document

10  monthly.

11      Q       Is there a budget shortfall shown by this

12  document?

13      A       No.  The Center, no.

14      Q       Does the Center have a surplus of funds

                        Page 247

15  each year that you have worked there?

16      A    Yes, sir.

17          (Southwest Virginia Higher Education
            Center Board of Trustees Minutes dated
18          12/14/17 marked as Matlock Exhibit Number
            71)
19

20  BY MR. GRIMES:

21      Q    Exhibit 71 is some minutes of the board

22  of trustees from December 14, 2017; correct?

23      A    Yes, sir.

24      Q    And that was the meeting just before

25  Duffy Carmack was told that he was losing his job;

                                                    295

1   correct?

2       A    Yes, sir.

3       Q    If you look at the third page, which is

4   347, in the lower right-hand corner, there's the

5   financial report.  And that paragraph states, "Noting

6   that he was celebrating his two-year anniversary as the

7   Center's director, Matlock presented a comparison of

8   the Center's current revenues to those of FY 2014.

9   Total revenue for FY 2017 was 3.8 million, an increase

10  of nearly $700,000 over FY 2014.  With total expenses

11  increasing approximately $160,000 for the same period,

12  the Center realized a net gain of nearly $510,000.  He

13  attributed the increase to the hard work of the

14  Center's staff and academic partners."

15          And that was all true, wasn't it?

16      A    Yes, sir.

17      Q    And six positions were being advertised

18  at that time; correct?

19      A    I don't know how many.  We had positions

                        Page 248

20   open.  We had housekeeping and part-time hourly wages,

21   yes, sir.

22         Q     And the Center had a rainy day fund

23   with -- with more than $700,000 in nongeneral fund

24   revenue; correct?

25         A     Correct.

                                                        296


1          Q     And their full-time -- three full-time

2    employees who were paid by the Tobacco Commission;

3    correct?

4          A     There are three full-time employees paid

5    by the Tobacco Commission, yes, sir.

6          Q     Who are they?

7          A     That would be Pat Ball, Melissa, and

8    Paul.

9          Q     In other words, they are not on the

10   Center's payroll; correct?

11         A     If flows through.  It washes.

12         Q     So it's a wash; correct?

13         A     That's correct.

14         Q     Did you include their salaries in your

15   budget numbers that you submitted concerning the Work

16   Force Transition Act?  Did you include their salaries

17   in the budget numbers you submitted concerning the Work

18   Force Transition Act?

19         A     I don't believe so.

20         Q     To the extent you did, they shouldn't be

21   in there, should they?

22         A     It's a wash.

23         Q     And the financial strength of the Center

24   was good throughout Carmack's employment, wasn't it?

                          Page 249

25      A      Yes.

1              (7/21/16 email from David Matlock to HEC
               Staff RE:  Please Review!! Lunch will be
2              ready at 12:30 today! marked as Matlock
               Exhibit Number 72)
3

4    BY MR. GRIMES:

5      Q      Exhibit 72 is an email from David Matlock

6    to HEC staff dated 21 July 2016.

7      A      Um-hum.

8      Q      And there you write concerning the

9    2015/2016 school year.

10             The first bullet point, "we finished the

11   year with a strong increase in overall Center activity

12   and our financial position remains very solid,"

13   exclamation point.  "For the year, revenues were up by

14   32 percent for Cooking Along the Crocked road,

15   22 percent (largest dollar increase) for leased space

16   and 59 percent for the testing center," exclamation

17   point, exclamation point.

18             And all that's true, wasn't it?

19     A      The percentages are -- I'm going to

20   assume they are correct.  I try to be as accurate as

21   possible.

22     Q      Exhibit 73 is an email from David

23   Matlock -- that's you.

24     A      That's -- my 73 is just a blank sheet of

25   paper.

1              MR. HARDY:  I have a partial email.

2              MR. GRIMES:  Let's see what we have.

3    BY MR. GRIMES:

Page 250

4        Q        Debbie Hensley, does she have a master's

5    degree?

6        A        I don't believe she does.

7        Q        Is that a requirement for the CFO

8    position?

9        A        No.  She's -- she's not the CFO.

10        Q        Pardon?

11        A        She's not the CFO.

12        Q        Because she couldn't be because she

13    doesn't have a master's degree; correct?

14        A        We don't need a CFO.

15        Q        You made that decision long ago, haven't

16    you?

17        A        January 4, 2018.

18        Q        Who does Carmack's duties for the

19    Foundation now?

20        A        What needs to be done, the Foundation

21    operates with the assistance of Alicia Young.

22        Q        Carmack was never written up, was he?

23        A        Not to my knowledge, not by me.

24

25                                                      299


1                (11/1-2/17 emails between Richard Scholl,
                 Eric Myer, Jeff Webb, David Matlock RE:
2                Follow-up Information marked as Matlock
                 Exhibit Number 73)
3

4    BY MR. GRIMES:

5        Q        Exhibit 73; have you seen this document

6    before?

7        A        I believe so, yes, sir.

8        Q        Pardon?

                        Page 251

```
 9          A       Yes, sir.

10          Q       And can you tell me what this document

11    concerns?

12          A       It appears that the police officer with

13    OSIG is requesting, I believe -- I believe the

14    request -- let me read -- let me read through.

15                  I believe they were requesting multiple

16    years of Mr. Carmack's emails.

17          Q       And did you send them in the form of a

18    zip file?

19          A       It -- it appears that Jeff Webb did.

20          Q       Where is that zip file?

21          A       Eric Myer, maybe.  I don't know.

22          Q       You don't know?

23          A       No.

24          Q       But somebody sent a zip file with

25    Carmack's emails to OSIG; correct?
```

300

```
 1          A       As requested, sir.

 2                  MR. GRIMES:  Ryan, could we get that, by

 3    chance, the contents of the zip file?

 4                  MR. HARDY:  We'll look into it, yes.

 5                  MR. KINCER:  Of Mr. Carmack's email

 6    account.

 7                  MR. GRIMES:  Whatever was in the zip

 8    file.  Whatever is described here.  The zip file.

 9                  MR. KINCER:  Right, right.

10                  But you had said Mr. Carmack's emails

11    here, not the Commonwealth's emails.

12                  MR. GRIMES:  He said that.

13                  MR. KINCER:  I don't think so.
```

Page 252

14          MR. GRIMES:  I don't know what's in the
15     zip file.
16          MR. KINCER:  Okay.
17          MR. GRIMES:  Whatever -- whatever was
18     sent by Jeff Webb to OSIG referenced in this email of
19     November 2, 2017, Exhibit 73.
20     BY MR. GRIMES:
21          Q     Do you know anything about Ann Dunham's
22     report to OSIG?
23          A     No.
24          Q     The Center had to use nongeneral revenue
25     for approximately the last two months for wages to

                                                    301

1      employees; correct?
2          A     That is correct.  That is correct.
3          Q     Why not just use it for three months
4      then?
5          A     Because general funds, I'm given so many
6      dollars of general funds to pay salaries and maintain
7      the Center, and I'm not given enough by the General
8      Assembly to operate for 12 months.
9                So the standard practice before I
10     arrived, during Mr. Carmack's interim and it continued,
11     was you spend your general fund money on general fund
12     approved expenditures first, and then I'm tasked with
13     maintaining an agency with money that we raise.
14               If we don't raise it, that's why we have
15     a reserve.
16          Q     Who have you pulled the trigger on other
17     than Duffy Carmack who did not already want to retire?
18          A     The WTA was three people:  Joyce Brooks,
                          Page 253

19    Janet Williams and Duffy Carmack.

20         Q      And Williams and Brooks had already

21    talked about retiring; correct?

22              MR. KINCER:  Asked and answered.

23    BY MR. GRIMES:

24         Q      You can answer.

25         A      Mr. Carmack, Mrs. Brooks and

                                                        302

1    Mrs. Williams had all talked to me about their

2    retirement at some point in the future.

3         Q      In the sense that everybody who works

4    talks about retirement at some point in the future?

5         A      In that sense.

6                My duty is to look out for the future of

7    the Center.

8         Q      You would agree that some of us are

9    closer to retirement than others; correct?

10         A      It's a general statement that I believe

11    to be true.

12         Q      And some people talk more about

13    retirement than others?

14         A      That is true.  Some people talk a lot

15    about retirement.

16              MR. GRIMES:  All right.  I believe that

17    I -- I'm just about finished.  Let me find a conference

18    room and have a conversation.

19              (A recess was taken from 4:40 p.m. until

20    4:44 p.m.)

21              MR. GRIMES:  No additional questions.

22

23                     EXAMINATION

                     Page 254

24    BY MR. KINCER:

25              Q     I have a couple for you, sir, before we

1    leave here today.

2              Question, who is Sean Webb?

3         A     Sean is the -- doing most of the

4    marketing lifting now.  But that's not his degree.  He

5    is a graphic designer.

6         Q     What is Cooking Along the Crooked Road?

7         A     That is a -- was a program that provided

8    a -- fun, personal enrichment classes where you could

9    learn knife skills, how to cook with different types of

10   onions, cooking pizza the Mellow Mushroom way.  Just

11   different chefs would come in, and you could sign up

12   for a class on Monday night.

13             MR. KINCER:  That's all the questions I

14   have.

15             Does that prompt anything further?

16             MR. GRIMES:  It does not.

17             He will read?

18             MR. HARDY:  He will read.

19             MR. GRIMES:  Thank you very much.

20             (Whereupon, the deposition was concluded

21             at 4:45 p.m.)

22

23

24

25

1

Page 255

2

3

4    February 20, 2019

5

6    Office of the Attorney General
     E. Lewis Kincer, Jr., Esq.
     202 North 9th Street
7    Richmond, VA 23219

8

9    In RE:   Carmack v. Commonwealth of Virginia

10

11   Dear Mr. Kincer:

12   Please have the witness read and sign the transcript
     and execute the errata pages before a notary public.
13   Once executed, the executed errata pages should be
     returned to:
14
                    Terry N. Grimes, Esq.
15                  Grimes & Haddox, PC
                    320 Elm Avenue, SW
16                  Roanoke, VA  24016

17   The timeline is 30 days in which to have the transcript
     read and signed.  If the transcript is not read and
18   signed within 30 days, it is deemed signed and may then
     be used as though signed.
19
     Thank you for your prompt attention to this matter.
20
     Kerry E. Zahn, RMR-CRR
21

22   cc:  Terry N. Grimes, Esq.

23

24

25
                                                      305

1          I, DAVID N. MATLOCK, do hereby certify that I

2    have read the foregoing transcript of my testimony and

3    further certify that said transcript, with the

4    corrections noted below, is a true and accurate

5    transcript of said testimony.

6          Dated at _____ this _____ day of _____,

                    Page 256

12    Subscribed and sworn to before me this _____

13  day of _____, 2019.

14

15

16

17

18

19    _____

20

21  MY COMMISSION EXPIRES:               Notary Public

22  _____

23

24

25
                                                    307

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2       I, Kerry E. Zahn, RMR-CRR, Notary Public for

3  the Commonwealth of Virginia at Large, of qualification

4  in the Circuit Court of the City of Norfolk, Virginia,

5  and whose commission expires March 31, 2021, do hereby

6  certify that the within named deponent, DAVID N.

7  MATLOCK, appeared before me at Richmond, Virginia, as

8  hereinbefore set forth, and after being first duly

9  sworn by me, was thereupon examined upon his oath by

10  counsel for the parties; that his examination was

11  recorded in Stenotype by me and reduced to computer

12  printout under my direction; and that the foregoing

13  constitutes a true, accurate and complete transcript of

14  such proceeding.

15       I further certify that I am not related to nor

16  otherwise associated with any counsel or party to this

Page 258

17    proceeding, nor otherwise interested in the event

18    thereof.

19         Given under my hand and notarial seal this

20    20th day of February, 2019, at Norfolk, Virginia.

21

22

23

24    Kerry E. Zahn RMR-CRR
      Notary Registration No. 209810

25