IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| WILLIAMS D. CARMACK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18-cv-31 |
| | ) | |
| v. | ) | |
| | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | By: Hon. Michael F. Urbanski |
| et al., | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In this employment action, the matter presently before the court is the defendants'
motion for summary judgment, ECF No. 63, filed on April 3, 2019 and brought pursuant to
Rule 56 of the Federal Rules of Civil Procedure. On June 1, 2018, plaintiff William D. Carmack
filed a Complaint in the Circuit Court for the County of Washington in Abingdon, Virginia,
alleging three causes of action related to his termination on January 4, 2018, as the Chief
Financial Officer of the Southwest Virginia Higher Education Center ("Center"). Count I
alleged a violation of Virginia's Fraud and Abuse Whistle Blower Protection Act, Va. Code §
2.2-3009, et seq. (1950) ("FAWBPA"), Count II set forth a cause of action for retaliation in
violation of First Amendment protections afforded speech, brought pursuant to 42 U.S.C. §
1983, and Count III alleged a state common law wrongful discharge claim (Bowman claim) —
against three defendants: (1) the Commonwealth of Virginia, (2) the Commonwealth of
Virginia: Southwest Virginia Higher Education Center, and (3) David N. Matlock, Executive
Director of the Center, in his individual and official capacities. ECF Nos. 1 & 2.

On July 6, 2018, this case was removed to the United States District Court for the

Western District of Virginia pursuant to 28 U.S.C. § 1331. ECF No. 1. The court granted the defendants' motion to dismiss, ECF No. 8, the Complaint on November 6, 2018, but provided Carmack with leave to amend pursuant to the court's order. See ECF No. 31. In his Amended Complaint, ECF No. 38, Carmack reasserted Counts I-III and added Count IV, asserting that he was retaliated against on the basis of his political affiliation in violation of the First and Fourteenth Amendments. Count IV was brought pursuant to 42 U.S.C. § 1983. The court granted the defendants' motion to dismiss, ECF No. 41, Carmack's Amended Complaint as to Count III and Count IV. See ECF No. 65. The only remaining claims in this case (Count I and Count II) are based on the same set of operative facts.

The court held a hearing on May 16, 2019 to address this motion and other motions noticed by the parties. On May 22, 2019, the court granted Carmack's motion for sanctions, ECF No. 71, allowing him to take supplemental depositions of several witnesses, and on June 11, 2019, the court granted in part and denied in part Carmack's related motion to strike, ECF No. 89, multiple defense declarations. See ECF No. 94. The parties filed their supplemental briefs, ECF Nos. 100 & 102, in accordance with the court's May 22, 2019 order. On August 6, 2019, Carmack again moved to strike, ECF No. 103, the declaration of Michael Maul, which the court denied. This matter is now ripe for decision. The court assumes familiarity with its prior memoranda opinions, ECF Nos. 31 & 65, and orders, ECF Nos. 79 & 94 in this case.

**I.**

This employment case arises from the termination (or "layoff," as characterized by the defendants) on January 4, 2018 of plaintiff William D. Carmack from the Southwest Virginia

2

Higher Education Center.[1] The defendants assert that the elimination of Carmack's Chief Financial Officer ("CFO") position was driven by legitimate, non-retaliatory considerations, namely perceived redundancies in the responsibilities of senior administrators, coupled with a budget reduction mandate from then-Virginia Governor Terry McAuliffe directing the Center to cut its budget by five (5) percent for fiscal years 2017 and 2018. ECF No. 64, at 1. The defendants further contend that the abolishment of the CFO position (along with two other positions) was implemented through and part of a "thorough, transparent, and meticulous" Workforce Transition Act, Va. Code Ann. § 2.2–3201 et seq. ("WTA") proposal formulated by Executive Director David N. Matlock over a fourteenth-month span and approved by multiple independent agencies, as well as the Center's Executive Committee. ECF No. 74, at 23. The defendants assert that Matlock determined that abolishing the CFO position, along with two other positions, was in the "best interests" of the Center and required to make the agency more "effective and efficient," and that Carmack's lawsuit "seeks to upend this managerial prerogative." ECF Nos. 64, at 2 & 64-1, at 16 (Matlock Decl.).

Carmack alleges that the "ever-changing," ECF No. 100, at 1, reasons proffered for eliminating the CFO position and terminating his employment were conjured up "post-discovery" and are entirely pretextual, and that the termination was in fact motivated by "retaliatory animus [Matlock] harbored because Carmack played by the rules and called [out] Matlock on his waste and abuse of state funds," ECF No. 72 at 12. See id. at 22 (alleging that his "firing" was retaliation for his "indicating that he would, and then following through with,

[1] The defendants consistently object to the characterization of the abolishment of the CFO position as a "termination." See ECF No. 74, at 2-3. The defendants state that "[plaintiff's] dogged referral to his departure as a 'termination' has no basis in fact, policy, law, or logic." Id. at 3. The court employs the term "termination" colloquially without endorsing any purported legal (or semantic) significance allegedly borne by this term.

holding Matlock's feet to the fire with respect to financial and compliance issues"); ECF No. 100, at 9 (implying that his firing was due to his "drawing to the forefront the policy violations and improprieties that Matlock was engaging in at the Center"). Carmack alleges that a variety of procedural and substantive inconsistences in the WTA process, as well as in Matlock's reasons for initiating it, belie the true reason for his termination, which was to "silence [his] complaints of fraud, waste, and abuse," ECF No. 72, at 24. In short, Carmack avers that, considering all the evidence, a reasonable jury could find that Matlock's story "does not hold water" and is a thin, and ultimately unconvincing, disguise for unlawful retaliation. ECF No. 100, at 1.

**A.**

The Southwest Virginia Higher Education Center was established in 1991 as an educational institution in the Commonwealth of Virginia. The core responsibilities of the Center include (1) encouraging the expansion of higher education degrees, adult and continuing education, workforce training, and professional development through partnerships with public and private institutions of higher education; (2) facilitating the delivery of teacher training programs leading to licensure and undergraduate and graduate degrees; (3) serving as a resource and referral center by maintaining and disseminating information on existing educational programs and resources; and (4) developing specific goals for higher education in southwest Virginia. See Va. Code Ann. § 23.1-3125. The Center operates "approximately 100,000 square feet of professional classrooms, large conference areas, labs, and administrative space," and hosts "hundreds of events annually." ECF No. 72, at 2 (citing the Center's website). The Center, from its inception, contracted with the University of Virginia in

4

Charlottesville, Virginia ("UVA") to administer and manage human resources issues for the Center. ECF No. 64-1, at 3 (Matlock Decl.); ECF No. 72-1, at 41 (Carmack Depo.). These services, among others provided by UVA, were memorialized in a formal five-year agreement in 2011. ECF No. 64-1, at 3 (Matlock Decl.). UVA discontinued providing human resources services to the Center on July 1, 2018, at which point these services were shifted to Virginia's Department of Human Resource Management.

The Center is governed by a twenty-three-member Board of Trustees consisting of members of the Virginia General Assembly, the chief executive officers of local universities (e.g., Virginia Tech, University of Virginia, Emory and Henry College) or their designees, and citizen members appointed by the Governor of Virginia who represent southwest Virginia public education and area business and industry. See Va. Code Ann. § 23.1-3126. The Board of Trustees appoints the Executive Director, who (1) supervises and manages the Center, (2) prepares and submits, upon the direction and approval of the Board, all requests for appropriations, and (3) employs such staff as necessary to enable the Center to perform its duties. See Va. Code Ann. § 23.1-3128. The Executive Director's "major duties" also include "develop[ing] plans for long-term educational programs and financial stability," as well evaluating and terminating Center staff with the Board of Trustee's authorization. ECF No. 72-30, at 94-95 (Ex. 30).[2] Within the Board of Trustees is an Executive Committee comprised of five members of the full Board. The Executive Committee (1) "oversees the affairs of the Center between Board meetings," (2) handles "sensitive issues such as personnel matter[s]

---

[2] The Executive Committee may exercise "all of the authority" of the Board of Trustees in managing the Center except that it may not amend, alter, or repeal the bylaws, appoint or remove any officer of the board, etc. ECF No. 72-30, at 92-93 (Ex. 30).

(where confidentiality is required and would be hard to ensure with a large group)," and "offers input into decisions that need a timely resolution for the efficient operation of the Center." ECF No. 64-1, at 2 (Matlock Decl.); see ECF No. 74-2, at 2 (Henry Decl.) (stating that "it is more appropriate for the Executive Director to bring sensitive and confidential [personnel] issues to the attention of the Executive Committee"). The Executive Committee also performs an annual evaluation of the Executive Director. Id.

## B.

David Matlock was appointed Executive Director of the Center, effective November 2, 2015, ECF No. 64-1, at 1 (Matlock Decl.), following the retirement of Dr. Rachel Fowlkes, the "founding director" of the Higher Education Center concept and the original Executive Director of the Center. ECF No. 72-1, at 28-29 (Carmack Depo.). In 2009, the Southwest Virginia Higher Education Center Foundation ("Foundation") was created as a 501(c)(3) non-profit organization to obtain research and development grants and to support the educational programs and activities of the Center. ECF No. 72-1, at 37 (Carmack Depo.). The grants, through which parties in southwest and southern Virginia can apply for funds, were provided by, among others, the Virginia "Tobacco Commission." Id. at 32-33, 37. The Foundation's grant and scholarship portfolio at one point exceeded eighteen (18) million dollars in funds. ECF No. 64-1, at 2 (Matlock Decl.). Workshare agreements between the Foundation and the Center allowed for the Center to be reimbursed for time its employees worked on Foundation-related projects and activities. ECF No. 64-1, at 3 (Matlock Decl.); ECF No. 72-1, at 50 (Carmack Depo.). In 2014, Virginia's Office of the Attorney General, represented by Senior Assistant Attorney General ("SAAG") Elizabeth Griffin, requested that the Foundation be

"operationally split" and "keep separate books" from the Center for legal reasons. ECF No. 72, at 3. The separation of Foundation and Center activities was apparently consistent with "best practices in state government, specifically within education agencies," ECF No. 64-48, at 2 (Rigdon Decl.).

## C.

Carmack was hired by Dr. Fowlkes in 2012 as the Chief Financial Officer of the Center. In 2014, reportedly at the request of SAAG Griffin, Carmack also served as the Chief Executive Officer ("CEO") of the Foundation.[3] ECF No. 64-52, at 3-4 (Carmack Depo.). While the percentage varied from year to year, the Foundation reimbursed the Center for approximately fifteen (15) to twenty-five (25) percent of Carmack's salary. ECF No. 72-1, at 50-51 (Carmack Depo.). In addition to Foundation reimbursements, Carmack's salary included non-general funds (i.e., funds raised by the Center through its various fundraising initiatives and lease agreements) and general funds provided directly by the Commonwealth of Virginia to the Center. ECF No. 72-7, at 79. Carmack's duties as CFO included, inter alia, (1) securing tenants involved in the research, manufacture, and development of "Clean Fuel Energy" products and systems for the "Energy Center,"[4] ECF No. 64-1, at 3 (Matlock Decl.); ECF No. 72-1, at 209 (Carmack Depo.), (2) securing research and development grants to develop growth-oriented, investment-worthy technology companies in rural southwestern and southern Virginia, ECF No. 64-1, at 3 (Matlock Decl.), (3) negotiating new programs coming into the Center, ECF No. 72-1, at 209 (Carmack Depo.), and (4) overseeing the Center's

---

[3] Matlock appeared to believe that Dr. Fowlkes, rather than SAAG Griffin, instigated the designation of Carmack as CEO of the Foundation. ECF No. 100-1, at 31 (Matlock 2d Depo.).

[4] Carmack asserts that the CFO position was not specifically created to develop the Energy Center and/or to obtain tenants. ECF No. 72-39, at 3 (Carmack Decl.).

financial affairs. Carmack also indicated that he "was very active in the academic world throughout the [s]tate in trying to recruit different programs and was very successful for laying the groundwork, of which Mr. Matlock reaped the fruit . . . ." ECF No. 72-1, at 209 (Carmack Depo.).

In January 2015, Dr. Fowlkes announced to the Board of Trustees that she would be retiring from the Center effective on June 30, 2015. ECF No. 72-1, at 70 (Carmack Depo.). In the spring of 2015, a job description was listed for her position and a national search soliciting applications from Virginia and beyond was conducted by the Center. Id. The Center received roughly forty (40) applications for the Executive Director position, including applications from defendant David Matlock and plaintiff William Carmack. Id. at 71. Carmack served as Interim Executive Director while this search and selection process was underway from approximately July 1, 2015 to October 15, 2015. Id. at 78, 104. Carmack claims that he was Dr. Fowlkes' "pick" to be her successor as Executive Director, but that Matlock was selected (by majority vote of the Board of Trustees as procedurally required) over him due to the "substantial influence," ECF No. 38, at 3 (Am. Compl.), of Virginia State Senator Charles William Carrico. ECF No. 72-1, at 71-74, 77, 94-97, 99 (Carmack Depo.).

### D.

The defendants assert that the process which ultimately led to the elimination of Carmack's position began on August 26, 2016, when Matlock received a memorandum via email from Paul Reagan, Chief of Staff for then-Governor Terry McAuliffe, requesting that all agencies, "excluding Institutions of Higher Education," submit a budget reduction plan for fiscal year 2017. ECF No. 64-2, at 2-4 (Ex. 1); see ECF No. 64-1 (Matlock Decl.); see also

ECF No. 72-7, at 108-09 (Matlock Depo.). The memorandum instructed agency heads to "prepare savings strategies for FY 2017 equal to five (5) percent of your agency's adjusted legislative general fund appropriation." ECF No. 64-2 at 2 (Ex. 1). The memorandum further stated that "it is important that the majority of your reduction strategies emphasize recurring savings rather than one-time savings." Id. On September 27, 2016, Matlock received a second memorandum via email from the Governor's office providing additional guidance with respect to budget savings plans. ECF No. 64-3, at 2-4 (Ex. 2). The second memorandum indicated that agencies "should plan for the five percent savings required in FY 2017 to continue into FY 2018," and reaffirmed that "saving strategies for FY 2018 should provide ongoing savings in future fiscal years in order to maintain structural balance." Id. at 3. Matlock stated that it was this second, "reminder" memorandum that "frightened" him and "made [him] realize that [he] needed to look for a more long-term [budgetary] solution." ECF No. 72-7, at 108-09 (Matlock Depo.); ECF No. 100-1, at 8, 16-17 (Matlock 2d Depo.). Matlock noted that the impact of the first email on his decision to commence the WTA process and eliminate the CFO was "very small." ECF No. 100-1, at 8 (Matlock 2d Depo.).

Matlock asserts that upon receipt of Governor McAuliffe's budget reduction mandate, he asked Carmack whether it applied to the Center given that it expressly exempted "Institutions of Higher Education." Id. at 21. Carmack reportedly "pointed out" that the Center did not qualify for the exemption. Id. Matlock claims to have reached out to Adam Henken, as well as Michael Maul, Associate Director of the Education and Transportation Division, from Virginia's Department of Planning and Budget ("DPB") to further discuss the

9

applicability of the mandate to the Center. Id. at 20.[5] Matlock states that his intent during his call with Henken and Maul was to "plead" that the Center was exempt from the mandate as an institution of higher education. Id. Henken and Maul reportedly confirmed that per the Code of Virginia, the Center was not a qualifying institution of higher education and therefore must comply with the mandate. Id. at 20-21.

Meanwhile, Carmack appears to have drafted and submitted budget savings plans on behalf of the Center for fiscal year 2017 on September 20, 2016, and a similar plan for fiscal year 2018 on November 7, 2016, as requested in the two memoranda. ECF No. 102-6, at 1-2 (Maul 2d Decl.). Matlock acknowledged that he approved Carmack's fiscal year 2017 budget savings submission and that the 2017 submission satisfied the five (5) percent budget reduction "in principle," see ECF No. 100-1, at 9, 29 (Matlock 2d Depo.). Matlock, however, did not appear to specifically recollect reviewing or approving a similar submission for fiscal year 2018, id. at 18-19. Maul confirmed that neither the 2017 nor the 2018 submission indicated that the WTA was going to be used to layoff existing employees, and that generally speaking, "[o]nce a budget submission has been approved by the General Assembly, it is anticipated [that] an agency will adhere to that budget." ECF No. 102-6, at 2 (Maul 2d Decl.).

Matlock, apparently dissatisfied with the original submissions and of the opinion that the Center "needed to look for a more long-term solution," met with Maul in February 2017 and specifically mentioned the budget savings plans that had already been submitted in response to the memoranda. Id.; see ECF No. 100-1, at 21-22 (Matlock 2d Depo.) (expressing

---

[5] Michael Maul described his role as advising state agencies on policy, program, legislative and budget issues, including developing and executing budgets, and the capital outlay budget process. ECF No. 64-7, at 1 (Maul Decl.). Maul stated that he has held this position for twenty-two (22) years. Id.

skepticism that Carmack's submission, which proposed eliminating the marketing position, "would be the most strategic answer when you've got declining revenue and your center is struggling"); id. at 23 ("It's not unusual in the middle of a fiscal year to get a surprise where they'll say we want another five percent or ten percent reduction.").[6] Maul stated in his second declaration that Matlock approached him to discuss the WTA as an alternative means of responding to the mandate and specifically asked if he could use the WTA even though the Virginia General Assembly had already approved the 2017 and 2018 submissions. ECF No. 102-6, at 2 (Maul 2d Decl.); see ECF No. 64-47, at 1-2 (Maul Decl.). Maul informed Matlock that as Executive Director, "he had the flexibility to administer the budget reduction in the way that he saw fit because the General Assembly had not specifically directed how the Center was to implement the reductions to the budget." ECF No. 102-6, at 2 (Maul 2d Decl.).

Matlock indicated that following these preliminary inquiries, he began to research long-term budget savings options. ECF No. 72-7, at 86, 92 (Matlock Depo.). Matlock purportedly concluded that using general funds to cover the budget reductions would not be a viable long-term strategy because the mandate stressed recurring savings strategies for multiple fiscal years. ECF No. 64-1, at 4 (Matlock Decl.). Matlock further concluded that reorganization of the Center was the most appropriate and sustainable long-term option given what he observed to be significant overlap in responsibilities between senior administrators. Id. His proposed reorganization, ostensibly designed to expand the Center's program and to enable "significant savings," see ECF No. 64-1, at 15-16 (Matlock Decl.), included the elimination of several

---

[6] Matlock appeared to believe that the marketing position, which Carmack recommended abolishing in the original savings submission for fiscal year 2017, was "vital to increase Center awareness to students" and "key to ensure the Center is meeting the workforce needs of the region." ECF No. 64-22, at 5 (Ex. 22); see ECF No. 72-7, at 122.

positions. With respect to the CFO position, Matlock stated that when he began at the Center, "[t]wo things I noticed about Carmack was his dependence on Business Manager, Deborah Hensley, and the amount of time he was spending doing work for the Foundation." ECF No. 64-1, at 3 (Matlock Decl.). Matlock indicated that when he asked Carmack for financial data for the Center, Carmack would often ask Hensley to prepare the data for him.[7] Id. Matlock also claims that Carmack appeared to be spending significantly more time performing work for the Foundation than his workshare agreement allowed. Id.

Matlock ultimately decided to implement a workforce reorganization using the Workforce Transition Act, Va. Code Ann. § 2.2–3201 et seq., a process he claimed to be familiar with from his time at Virginia Highlands Community College ("VHCC"), where the WTA was used on multiple occasions.[8] Id. at 5. To determine whether the WTA could be used at the Center, Matlock contacted Christine Fields, the Vice President of Finance at the VHCC (and former Director of Finance and Legislative Affairs at the Center), to discuss the WTA process. Id. On or about October 28, 2016, Matlock also called Donna Kauffman, the UVA Human Resource Specialist assigned to the Center, to discuss a possible WTA plan. Id. Matlock claims that during this conversation, he stated that Joyce Brooks, William Carmack, and Douglas Viers may be potential candidates in his WTA proposal. Id. On November 4, 2016, Matlock asked Kauffman to provide the "WTA cost" for eliminating Brooks' position. Id.; see ECF No. 64-4, at 2 (Ex. 3) (containing email with retirement/severance cost estimate for Brooks and another email indicating that the Center "will not be filling her job due to state

---

[7] Carmack claims that it was the other way around, in that he "frequently answered questions from Hensley concerning budget and financial questions." ECF No. 72-39, at 3 (Carmack Decl.).

[8] The VHCC shares a campus with the Center.

budget cuts . . . [h]er job duties will be absorbed into other employee's responsibilities"). On November 9, 2016, Matlock received an email, ECF No. 64-5, at 2 (Ex. 4), from Kauffman with the WTA cost for eliminating the positions held by Carmack and Viers. Id. Upon receipt of these estimates, Matlock exchanged emails, ECF No. 64-6, at 2 (Ex. 5), with Kauffman regarding, among other things, Carmack's eligibility for WTA retirement benefits. Id. Kauffman advised Matlock not to inform any of the individuals whose positions were being considered for elimination until further details were "fleshed out." ECF No. 64-1, at 6 (Matlock Decl.).

On or around January 16, 2017, Matlock had another conversation with Fields to review the WTA process and to get a clearer understanding of the necessary steps. Id. Fields explained that Matlock needed approval from the DPB before moving forward. Id. Fields further explained that with DPB approval, the Virginia Retirement System ("VRS") would likely absorb the retirement/severance costs related to the WTA process such that they would not be incurred by the Center. Id. On January 26, 2017, Matlock met with Kauffman and Michelle Small of UVA to discuss the steps necessary to move forward with and submit a WTA request. Id. at 7. In an email, ECF No. 64-7, at 2 (Ex. 6), to Kauffman prior to the meeting, Matlock indicated that the positions of Janet Williams and Patricia Ball should also be considered for elimination under the WTA. Id. That same day, following the meeting with Kauffman and Small, Matlock received an email, ECF No. 64-8, at 2 (Ex. 7), from Kauffman with WTA estimates for Ball, Viers, Brooks, and Carmack. Id. Kauffman also forwarded to

Matlock a WTA exemption letter[9] template, ECF No. 64-9, at 2 (Ex. 8), from Deborah Rigdon of the Virginia's Department of Human Resource Management ("DHRM").[10] Id.

On February 2, 2017, Matlock met with Henken and Maul from the DPB to discuss his intention to move forward with his WTA plan at the Center. Id.; see ECF No. 64-10, at 2 (Ex. 9); ECF No. 64-47, at 2-4 (Maul Decl.). Matlock claims that Maul reviewed the WTA steps with Matlock and stressed the importance of seeking DPB and DHRM approval at the beginning of the process so that the VRS would cover the cost of implementing the WTA. ECF No. 64-1, at 7 (Matlock Decl.). Maul indicated that during this meeting, Matlock discussed eliminating the CFO position. ECF No. 64-47, at 2-4 (Maul Decl.). On February 3, 2017, Matlock received an email, ECF No. 64-11, at 2 (Ex. 11), from Kauffman with the updated WTA estimates for Brooks, Viers, Williams, Ball, and Carmack. ECF No 64-1, at 7 (Matlock Decl.). On February 15, 2017, Matlock claims to have had a lengthy conversation with Dr. Fowlkes, during which she purportedly agreed that the Center could be more efficient and that moving forward with a WTA proposal would address the ongoing savings mandate from Governor McAuliffe. Id.

Following these initial email exchanges and meetings related to the WTA, Matlock claims to have taken "time to observe all departmental daily operations and [to] conduct a thorough evaluation of productivity, departmental budgets, stewardship, and program development and support." ECF No 64-1, at 8 (Matlock Decl.). Matlock also claims to have

---

[9] The purpose of the exemption letter is to exempt the Center from paying the costs to the VRS for any enhanced retirement benefits for employees who are involuntarily separated from employment as a result of budget reductions. See ECF No. 72-55, at 5 (Ex. 55).

[10] Rigdon is a Senior Human Resource Management Consultant with the DHRM, which provides management consulting services to state agencies. ECF No. 64-48, at 1 (Rigdon Decl.). Rigdon stated that her role within DHRM is to provide guidance and consulting on policy interpretation, employee relations, and human resources best practices. Id.

consulted with senior members of the Center's leadership team, Center partners, and members of the Center's Board of Trustees to discuss effectiveness, efficiency, and long-term sustainability. Id. Further, Matlock shared his WTA proposal plan with SAAG Griffin, who was assigned to the Center as lead counsel. Id. Following this observation period (March and April 2017), Matlock ultimately decided that the WTA proposal could not include Viers or Ball because he "could not sustainably shift their responsibilities to other Center employees."[11] Id.

On May 1, 2017, Matlock asked Brooks, ECF No. 64-13, at 2 (Ex. 12), to arrange a conference call with Kauffman to further discuss the WTA proposal. ECF No 64-1, at 9 (Matlock Decl.). On May 2, 2017, Matlock directed Adam Tolbert, see ECF No. 64-14 (Ex 13), who worked as an Information Technology ("IT") specialist at the Center, to email Kauffman and provide her with a link to relevant portions of the Code of Virginia and state policy that explained the steps necessary for an agency to be exempt from bearing retirement/severance costs associated with workforce reductions under the WTA. ECF No 64-1, at 10 (Matlock Decl.). On May 22, 2017, Matlock received two emails, ECF No. 64-15, at 2-3 (Ex. 14), from Kauffman informing him that Susan Harris, Interim UVA Human Resources Benefits Supervisor, would be assisting with the WTA paperwork along with the WTA waiver template. Id. On May 25, 2015, Matlock called Fields at VHCC and asked if she could share a copy of the cover letter used by the VHCC when requesting WTA approval. Id. Shortly thereafter, Fields sent two emails containing copies of documents used by the VHCC

---

[11] Carmack notes that Janet Williams stated in her deposition that Viers was asked if he would retire. ECF No. 72-3, at 50 (Williams Depo.). Viers apparently stated that if he had better insurance, "he would have gone." Id.

during the implementation of its own WTA proposals, see ECF No. 64-16 (Ex. 15); ECF No. 64-17, at 3 (Ex. 16).

On June 30, 2017, Matlock met with the Executive Committee to conduct his annual review and discuss his WTA proposal. ECF No. 64-1, at 10 (Matlock Decl.). Matlock informed the Executive Committee that Carmack was included in the WTA proposal and that the Center did not require a CFO position as it had operated without one for fifteen (15) years prior to Carmack's arrival. Id. Donna Henry, a member of the Executive Committee present during the June 30, 2017 meeting, stated that Matlock "stressed that the responsibilities of the CFO position overlapped significantly with the responsibilities of other, lesser-paid, employees of the Center" and that his reason for eliminating the three positions was to "reduce spending and create more room in the budget for necessary structural repairs at the Center." ECF No. 74-2, at 2 (Henry Decl.). Matlock also apparently indicated that "he could perform the higher-level responsibilities of the CFO position." Id. Matlock received the imprimatur of the Executive Committee[12] to move forward with the implementation of the WTA proposal. Id.; see ECF No. 64-18, at 2 (Ex. 17) (containing meeting minutes indicating that the Executive

---

[12] While the meeting itself was conducted in closed session, Henry's declaration makes clear that Matlock discussed the abolishment of the CFO position and advanced justifications for the abolishment which were consistent with those memorialized in the WTA proposal itself and reflected in extensive email correspondence. The Executive Committee approved Matlock's proposal unanimously in open session, see ECF No. 64-18, at 2 (Ex. 17). These facts directly rebut Carmack's claim that there was no "proof" that Matlock received "the Executive Committee's blessing." ECF No. 72, at 9. In response to Carmack's claim that the Executive Committee "knew" of Carmack's "complaints," so "even if they were involved in 'approving' the termination, it changes nothing," ECF No. 72, at 9 n.7, the court would note that it is entirely unclear what "complaints" are being referred to – the OSIG complaint or pre-OSIG internal warnings and complaints. With respect to the former, the Executive Committee meeting during which Matlock's proposal was approved occurred on June 30, 2017, see ECF No. 64-18, at 2 (Ex. 17). Carmack's official Hotline complaint was not filed until July 2017, and there is no evidence that Matlock or any member of the Executive Committee was aware of the OSIG complaint until at least October 16, 2017, over three months later. Insofar as what is being referred to are the internal warnings and complaints, see infra, there is no evidence supporting this claim. Indeed, Exhibit 8, which is sole citation to the record related to this claim, see ECF No. 72, at 9 (citing ECF No. 72-8, at 2 (Ex. 8)), indicates only that Matlock informed Senator Carrico and Kauffman of "the existence of the Hotline complaint" after he was contacted by OSIG investigator Sadler on October 16, 2017. There is no mention of the sundry internal warnings and complaints discussed below.

Committee approved unspecified "employment actions that were discussed during closed session"). Matlock subsequently stayed in communication with his contacts at UVA to keep them apprised of the status of the proposal and provide them with documents justifying the personnel actions he intended to take. See ECF No. 64-20 (Ex. 19) (email dated September 28, 2017 to Kauffman containing draft WTA proposal); ECF No 64-21 (Ex. 20) (email exchange dated October 23-24, 2017 with Carol Summers from UVA concerning WTA).

On November 13, 2017, Matlock emailed the Center's WTA proposal (as reflected in the final exemption request), ECF No. 64-22 (Ex. 21), to Sara Wilson, Director of DHRM, and Dan Timberlake, Director of DPB. ECF 64-1, at 11 (Matlock Decl.). The proposal included Matlock's workforce reorganization plan, justifications for the elimination of three positions occupied by Joyce Brooks (Program Administration Manager I, or Director of Operations), Janet Williams (Public Relations and Marketing Specialist II, or Conference Services Specialist), and William Carmack (Financial Services Manager II, or Chief Financial Officer), and the expected savings which would accrue from implementation of the plan. ECF No. 64-22 (Ex. 21), at 2-5. The proposal explained that "[d]ue to budgetary shortfalls in the Commonwealth, the [Center] had experienced budgetary reductions of $108,058.00 (5%) for 2017-2018." Id. The proposal goes on to explain that these mandated reductions over two budget cycles, "coupled with certain organizational changes that are vital," led the Center to consider "where there were positions and/or duties that either could be or needed to be eliminated or reassigned," and that after "thorough evaluation, and in consultation with senior members of the leadership team and the Executive Committee," the elimination of the

aforementioned positions was deemed "necessary to remain responsive to regional needs and required fiscal accountability." Id. at 4.

With respect to the elimination of the CFO position, the proposal stated that "Financial Services Manager II [CFO] role was created in 2012 to do work that is no longer needed." Id. More specifically, the proposal states that the CFO position was created (1) to develop the Energy Center and secure tenants involved in the research, manufacture, and/or development of "Clean Fuel Energy," as well as (2) to secure research and development grants to develop early-stage, growth-oriented companies to rural southwestern and southern Virginia. Id. The proposal notes that because a long-term tenant was secured for the Energy Center in March 2017, and considering the declining portfolio of research grants (the remainder of which are managed by the Foundation, not the Center)[13], the CFO is no longer required to perform those duties. Moreover, because "the General Administration Manager I position [held by Hensley] oversees the majority of the business operations of the center," the Center "determined that the day-to-day operations can be managed by a Financial Services Manager I position,"[14] which would enhance efficiencies. Id. The proposal states that abolishing the CFO position and redistributing the CFO's remaining responsibilities to a lower administrative position would result in net yearly savings of $154,276. Id. The reorganization plan also proposed the (1) creation of a part-time grant writer position (at a cost of $41,355) that would focus on securing funds for the development of educational programs and services and (2)

---

[13] Carmack notes that Alicia Young stated that "there is more Tobacco Commission work, and part of it is with the [C]enter." ECF No. 72-2, at 20 (Young Decl.). It is unclear whether Young is referring to the time period relevant for this case, i.e., during the period Matlock observed a declining portfolio of research grants, or whether she is referring to March 2019, when her deposition was taken.

[14] Matlock's reorganization plan accounted for the promotion of Hensley, who worked for Carmack, from General Administration I to Financial Services Manager I.

18

filling a marketing director position which "has been frozen for the past three years." Id. at 5. The proposal concludes by noting that the net savings to the budget from the foregoing workforce actions would be $108,058, i.e., equal to the five (5) percent budget mandate. Id.

On November 21, 2017, the DPB preliminarily approved Matlock's WTA exemption request after reviewing it and finding that it was an appropriate response to Governor McAuliffe's budget reduction mandate. ECF No. 64-47, at 2 (Maul Decl.).[15] Maul stated that "[b]ecause the Center had been mandated by the General Assembly and Governor of Virginia to enact budget reductions for fiscal years 2017 and 2018, we were satisfied that Matlock's WTA proposal was proper." Id. at 2. DPB Director, Dan Timberlake, provided Matlock with a signed letter approving the WTA exemption request if the director of DHRM also approved the proposal. See ECF No. 64-47, at 12 (containing letter from Timberlake to Matlock stating that "[t]he positions in question meet the criteria of Item 475, paragraph M.1. of Chapter 836, 2017 Acts of Assembly; specifically, these separations are a result of budget reductions enacted in the Appropriations Act."). On November 22, 2017, Matlock received an email from Deborah Rigdon of DHRM, who replaced Kauffman in overseeing the Center's WTA process. Rigdon's email sought additional information about Matlock's proposal and offered assistance in its later implementation. ECF No. 64-23 (Ex. 22). Matlock and Rigdon spoke over the telephone the same day to review the proposal and the steps Matlock needed to take to receive the approval of DHRM. ECF No. 64-1, at 12 (Matlock Decl.). On November 27, 2017, Matlock forwarded to Rigdon the timeline for the WTA process and other

---

[15] The DPB's approval was conditioned on Matlock's ability to receive approval from DHRM. ECF No. 64-47, at 2 (Maul Decl.).

documentation she requested. ECF No. 64-1, at 12 (Matlock Decl.); ECF No. 64-24, at 2 (Ex. 23). Matlock claims that Rigdon requested job descriptions for Carmack and Hensley and the minutes from the June 30, 2017 Executive Committee meeting, but at no point shared with him why she wanted this information other than it being part of DHRM's standard review of WTA proposals. ECF No. 64-1, at 12 (Matlock Decl.).

Rigdon explained that because she was aware by this point that Carmack had filed a formal complaint against Matlock, she wanted to "make sure Matlock had provided sufficient justification to support the abolishment of Carmack's position." ECF No. 64-48, at 2 (Rigdon Decl.). Rigdon explained that her "main purpose was to ensure that the WTA process complied with state policy and protected the rights of the individuals affected by the WTA plan." Id. To that end, Rigdon requested the June 30, 2017 Executive Committee meeting minutes and timeline of events to "confirm that the decision to abolish Carmack's position occurred prior to any complaint Carmack had made." Id. Rigdon also requested and compared Hensley's employee work profile to Carmack's profile. Id. Rigdon stated that she did not inform Matlock that Carmack had complained about him or otherwise elaborate upon why she requested these documents. Id. Following her review of the requested materials, Rigdon concluded that "Matlock was justified in eliminating the CFO position" and that this action "made sense in the long run." Id. at 2-3. Specifically, she agreed with Matlock's conclusion that Hensley could absorb more of Carmack's duties, "which would create substantial savings because her salary was a fraction of Carmack's salary." Id. at 3. On December 8, 2017, Rigdon forwarded Matlock edits to the WTA proposal and restructuring analysis, see ECF No. 64-25,

at 2-4 (Ex. 24), and on December 18, 2017, forwarded severance benefit calculations for Carmack, Brooks, and Williams, see ECF No. 64-26, at 2-5 (Ex. 25).

On December 21, 2017, Matlock received an email from SAAG Griffin that contained correspondence with UVA counsel regarding the WTA process. ECF No. 64-27, at 2-5 (Ex. 26). In this email, associate university counsel for UVA discussed the presence of a police officer from VHCC to provide security on the date that Brooks, Williams, and Carmack were officially informed of the elimination of their positions. Id. On January 3, 2017, Matlock emailed Rigdon, Griffin, Kauffman, and Summers final documents related to the implementation of the WTA proposal, including a layoff notification letter for each impacted employee, documents related to severance benefits, and suggested talking points during the layoff meetings, for their review and suggestions. ECF No. 64-28, at 2-5 (Ex. 27). That same day, Rigdon informed Matlock of her approval of the WTA plan and confirmed that it conformed with state policy and the Code of Virginia. ECF No. 64-48, at (Rigdon Decl.).

On January 4, 2018, Matlock called Carmack into a conference room and informed him that his position was being eliminated. ECF No. 64-1, at 14 (Matlock Decl.). Matlock provided a letter to Carmack explaining that "in order to remain efficient and effective, and due to budgetary reductions and necessary restructuring decisions, your position . . . will be abolished at the close of business on January 19, 2018." ECF No. 64-34, at 2 (Ex. 33). Matlock also provided Carmack with documents, see ECF No. 64-34 (Ex. 33), explaining the benefits he was entitled to under the WTA. ECF No. 64-1, at 14 (Matlock Decl.). Brooks and Williams were similarly informed that their positions were being eliminated. Brooks, Williams, and Carmack were all escorted out of the Center by a VHCC police officer. ECF No. 64-1, at 15

(Matlock Decl.). On January 19, 2018, Matlock forwarded additional documents to Carmack, one of which enabled him to receive preferential hiring for any position within a state agency that is in the same role as his former position and for which he is minimally qualified. ECF No. 64-1, at 15 (Ex. 35). Matlock also informed the Board of Trustees via email, ECF No. 64-39, at 2 (Ex. 37), of the implementation of the WTA proposal. The email stated that "[d]ue to budgetary shortfalls in the Commonwealth, the [Center] has experienced budgetary reductions of $108,058.00 (5%) for 2016-2017 and $108,058.00 (5%) for 2017-2018." Id. The email further stated that in response to these mandated reductions over two budget cycles, Matlock concluded that "restructuring was necessary to become more responsive to the region's workforce, creating a greater return on investment for the Commonwealth and the citizens of SW Virginia." Id. at 2. On June 12, 2018, Matlock received final approval from DHRM of its WTA exemption request, which exempted the Center from incurring costs for any enhanced retirement/severance benefits under the WTA, see ECF No. 64-41 (Ex. 39).

## E.

Carmack indicated that shortly after Matlock took over as Executive Director of the Center in November 2015, "[he] was excluded immediately from meetings with what [he] call[ed] [Matlock's] disciples, and that's defined by Ms. [Kathy] Heitala, Mr. [Jeff] Webb, Mr. [Adam] Tolbert, and Ms. [Joyce] Brooks." ECF No. 72-1, at 120 (Carmack Depo.). Carmack indicated that when Matlock first started visiting the Center in October 2015, "[e]veryone went in his office and closed the door except me. I was not invited." Id. at 11; see also ECF No. 72-30 ("From his first day on the job Mr. Matlock has disregarded the CFO" and other members of the Finance Department.). Carmack further stated ". . . I felt very much on the

outside from, upon his arrival . . . [a]nd as he continued to work there that relationship only grew more estranged." ECF No. 64-52, at 29 (Carmack Depo.). In November or December 2015, Carmack asked Matlock for a pay increase for temporarily filling in as Interim Executive Director. Matlock refused, apparently stating that he thought Carmack was already overpaid in comparison to other department directors. ECF No. 72-1, at 89 (Carmack Depo.).

When asked whether he and Matlock had a "positive, constructive relationship," Carmack replied, "I never felt like we had a good relationship." ECF No. 64-52, at 29 (Carmack Depo.). In November 2015, Carmack stated that he met with Matlock, and "reminded him that [he] operated by the rules, [he] was the kind of guy that didn't deviate from [the rules], and that we were very careful to operate the Center according to – it's called CAPPs [Commonwealth Accounting Policies and Procedures]," which set forth the Commonwealth's accounting and audit guidelines. ECF No. 72-1, at 112-13 (Carmack Depo.). In response to this statement, Matlock allegedly told Carmack a story about "needling," which Matlock explained was when a mother bird puts sharp objects pointing upwards in its nest to encourage young birds to leave the nest. Id. Matlock allegedly stated that this "was the method [he] used to get people off the team that he did not want." Id. Carmack "took [this story]. . . as a pretty clear message that he didn't care for me being a part of his team based on the fact that I had been excluded to date from any conversation pertaining to the business of the Center or the finances of the Center." Id.

In January 2016, Carmack stated that he and Hensley met with Matlock two or three times to discuss the budget for the next fiscal year, but Matlock appeared "very disinterested" in what they had to say. ECF No. 72-1, at 122 (Carmack Depo.). Matlock purportedly stated

that he would contact Christine Fields, who oversaw the Center's finances prior to Carmack's tenure at the Center but who worked at the time at VHCC. Id. Carmack perceived Matlock's conduct as indicating either that Matlock had "no confidence" in him or "no interest" in anything he or Hensley had to say regarding the budget. Id. Carmack contends that although he tried to support Matlock as Executive Director, "I finally arrived at the idea [that] he had an agenda to rid [sic] my employment from the third month he was there." ECF No. 64-52, at 44 (Carmack Depo.).

## F.

In addition to a fraught and unconstructive working relationship, which the record suggests was manifest from the outset of Matlock's tenure as Executive Director, Carmack claims that not long after Matlock's appointment, he observed that policies and procedures related to hiring, accounts payable, accounts receivable, etc., were not being followed. ECF No. 72-1, at 121-22 (Carmack Depo.). Carmack alleges that he made numerous "internal warnings and complaints" to Matlock related to a variety of "policy and procedure violations," ECF No. 72, at 4, and/or "infractions," ECF No. 72-1, at 130 (Carmack Depo.). Cf. ECF No. 72-1, at 126 (Carmack Depo.) ("We would make . . . make comments to him or reminders [to] him of, this need[s] to be done or signed by a certain date, to try to help him along."). These alleged violations included, inter alia, Matlock's: (1) submitting an invoice for payment of $1,250 to reimburse a middle school where Matlock's son, Jason Matlock, was the principal for student travel to a robotics competition at James Madison University, (2) allowing for the approval of overtime for a husband and wife computer team (the Tates) whom Carmack suspected of collecting overtime in a fraudulent manner, (3) failing to submit invoices (e.g.,

24

travel invoices) in a timely fashion, (4) hiring a personal friend, Joe Mitchell, as a maintenance supervisor without going through the interview process, (5) failing to account for monies received during various fundraisers, (6) allowing a large piece of art to go missing, and (7) granting Tolbert access to human resource systems and confidential employee information (e.g., salaries and evaluations) without proper clearance.[16] See ECF No. 38, at 4-8 (Am. Compl.); ECF No. 72, at 5-7.

Carmack explained that after consistently complaining to Matlock about what he characterized as suspected fraud, waste, and abuse to little effect, and with the "frequency and severity of Matlock's improprieties . . . increasing," ECF No. 72, at 7, he decided to arrange a meeting with the Ombudsman at UVA. Carmack stated that although he initially thought that Matlock was "new" and would "figure it out," Matlock's consistent refusal to take corrective action led him to fear that if he failed to report the alleged violations, his own nonfeasance would be viewed as malfeasance. ECF No. 65-52, at 34 (Carmack Depo.). Carmack indicated, however, that "[i]t wasn't until the end of [2016] that I felt like, this is severe enough that . . . I could lose my job by not calling attention to it . . . ." ECF No. 64-52, at 36 (Carmack Depo.). On February 8, 2017, Carmack finally met with Ombudsman of UVA, Brad Holland, to discuss his concerns about suspected wrongdoing at the Center. ECF No. 72, at 7. Holland subsequently arranged a meeting between Carmack and various individuals at DHRM in Richmond, Virginia, including Deborah Rigdon. Carmack was ultimately advised by the acting

[16] Carmack alleges that several IT employees approached him in early 2016 and expressed their concerns about Matlock giving Tolbert full access to all senior level management human resource functions, which included access to their evaluations and salaries. ECF No. 72-1, at 124 (Carmack Depo.). Matlock claimed that Tolbert was merely "shadowing" Joyce Brooks. Id. Carmack claims that Matlock knew Brooks was retiring, and that Matlock was engaged in what he perceived to be pre-selection of her replacement. Id. Carmack reportedly told Matlock something to the effect of, "you need to follow the policies and procedures that are outlined; you can't just put someone in that job." Id.

director of DHRM that he should take his concerns to the Commonwealth's Office of State Inspector General ("OSIG"). Carmack attempted to file a formal complaint via Virginia's Fraud, Waste, and Abuse Hotline ("Hotline") in June 2017, but was asked to refile in July 2017. ECF No. 72-1, at 133 (Carmack Depo.). Carmack also spoke with the Office of the Secretary of Higher Education about the matter.

The Hotline complaint was assigned to State Hotline Manager Tim Sadler. ECF No. 64-42 (Ex. 40). The document Carmack ultimately sent to the OSIG contained a variety of allegations ranging from accusations of mismanagement and bullying to pre-selection of employees in violation of state policy and misuse of state resources. See ECF No. 72-30, at 10-16 (Ex. 30). In one instance, Carmack complains that "[m]orale is extremely poor," with Center staff "split into small groups of angry employees," resulting in the "quality of work . . . declin[ing] daily." Id. at 14. Carmack stated that his intent in filing the complaint was "to bring the issue of poor leadership and lack of integrity demonstrated from Mr. Matlock to the attention of the Commonwealth of Virginia" and warned that "[w]ithout intervention, the integrity and success of the [Center] will continue to lurch even further out of control." Id. at 16. The complaint, as supplemented in a letter with supporting documentation sent to OSIG investigator Shaun Cowardin on July 31, 2017, contained sixteen (16) items, see ECF No. 72-30, at 10-16, only six (6) of which the OSIG ultimately determined warranted further investigation by the OSIG. See ECF No. 72-1, at 137; ECF No. 66-44; ECF No. 64-49, at 1 (Sadler Decl.).[17]

---

[17] Cowardin explained to Carmack that the remaining allegations needed to be addressed by DHRM and that the OSIG would address only those allegations that pertained to fraud and abuse. See ECF No. 72-1, at 137 (Carmack Depo.).

The six (6) allegations the OSIG investigated are described below as they were characterized in the OSIG's report: (1) Tolbert, an IT professional at the Center, has inappropriate and unnecessary access to human resource systems; (2) two wage employees [the Tates] waste state funds performing programming and maintenance for a system that handles scholarships and loan funds; (3) Mr. Matlock inappropriately authorized grant funding for a robotics program at a school where his son was the principal, but not at other regional schools; (4) Matlock does not submit travel reimbursement requests in a timely manner; (5) Matlock does not record his time at work in the Center's time clock system as required by policy; and (6) Matlock approved sole sourcing a purchase after the purchase was made. ECF No. 64-44, at 1-6 (Ex. 42). Carmack informed Cowardin that the complaint need not remain anonymous because Matlock would know who made the complaint given that Carmack had been complaining to Matlock directly about these same issues. ECF No. 72-27, at 1 (Ex. 27). The OSIG agreed, as a courtesy, to notify Carmack before OSIG investigators spoke to Matlock. ECF No. 72-29, at 1 (Carmack Decl.).

On October 16, 2017, Sadler called Matlock and explained that someone had filed a Hotline complaint against him and that the Hotline provides a confidential method for state employees to report suspected fraud, waste, or abuse in state agencies. ECF No. 64-1, at 17 (Matlock Decl.). Sadler did not identify Carmack as the complainant. ECF No. 64-49, at 2 (Sadler Decl.). Matlock informed Sadler that he had initiated a process under the WTA "due to mandatory budget cuts," id. See ECF No. 64-1, at 17 (Matlock Decl.). Matlock stated that certain staff, including Carmack, would be laid off as part of a reorganization intended to make the Center more efficient. ECF No. 64-49, at 2 (Sadler Decl.). Matlock then reviewed the

steps he had taken during the WTA proposal and the timing of each step. ECF No. 64-1, at 17 (Matlock Decl.); ECF No. 64-49, at 2 (Sadler Decl.). Sadler reportedly told Matlock that the WTA process could continue if Matlock had documentation showing that he began the process prior to his knowledge of the anonymous caller's complaint. ECF No. 64-1, at 17 (Matlock Decl.). Sadler did not include Matlock's WTA process as part of his investigation. ECF No. 64-49, at 2 (Sadler Decl.).

Shortly after the conversation with Sadler on October 16, 2017, Carmack stated that Matlock called Heitala, Webb, Brooks, and Tolbert into his office and "slammed his door." ECF No. 72-39, at 1 (Carmack Decl.); see ECF No. 72-7, at 169 (Matlock Depo.) (indicating that Matlock "had suspicions the day that the inspector called [him]" that Carmack was the complainant). On November 8, 2017, Matlock received an email from Sadler stating that he had completed his investigation. ECF No. 64-63, at 2 (Ex. 41). The OSIG review covered a period from January 2016 to September 2017. The OSIG's report, which was sent to the Commonwealth's Secretary of Education on November 17, 2017, contained "Findings of Fact" as to each of the six (6) allegations noted above. The OSIG found allegations (2), (3), and (5) "unsubstantiated," allegations (1) and (4) "partially substantiated," and allegation (6) "substantiated." ECF No. 64-44, at 1-6 (Ex. 42).

The OSIG reached the following conclusions and recommended the following corrective actions with respect to allegations (1), (4) and (6). Vis-à-vis allegation (1), the OSIG reviewed Tolbert's position description and found that it did not identify any need for access to human resources systems. ECF No. 64-44, at 3 (Ex. 42). The OSIG recommended that if Tolbert was to continue to have access to these systems, his position description should be

updated to reflect those responsibilities.[18] Id. at 3. With respect to allegation (4), the OSIG found that Matlock submitted travel reimbursements late and recommended he consider having administrative staff prepare his reimbursement requests for his signature within thirty (30) working days after his travel rather than preparing the requests himself. Id. at 4. Lastly, as to allegation (6), while the OSIG concluded that although Matlock's sole source justification "makes sense based on the service performed," Matlock "should ensure that future sole source justifications are approved prior to service performance." Id. at 6. The OSIG requested a response to its recommendations from the Commonwealth's Secretary of Education within thirty (30) days. Id.

## G.

In addition to filing a formal complaint with the OSIG in July 2017, on December 7, 2017, Carmack wrote a letter to the Center's Board of Trustees stating that he believed the "Center has been failing to effectively and properly achieve our mission as we have done in the past . . . ." ECF No. 72-18, at 1 (Ex. 18); ECF No. 72-1, at 224-25 (Carmack Depo.). The letter never refers to Matlock by name or specifically criticizes any of his conduct, but does request that the Center enlist a third-party mediator "to correct deficiencies that are preventing our Center from fully serving our important mission in this community." ECF No. 72-18, at 1-2 (Ex. 18). Carmack explained that the mediator should interview employees and report back to the Board "so that some constructive way could be devised for [Matlock] to be successful

---

[18] Matlock told the OSIG that Tolbert had system access to certain human resources records "to learn the system and serve as backup when needed." ECF No. 66-44, at 2. Brooks confirmed that she trained Tolbert "in case I ever had to be out for any reason," such as vacation. ECF No. 100-8, at 5 (Brooks Depo.). Brooks stated that Hensley served as prior backup for a few years, "but then she kind of got a lot more duties on her." Id.; see ECF No. 74-3, at 3-4, 11-12 (Tolbert Decl.) (indicating that Tolbert completed the training required for him to have access to human resources systems)

in the job." ECF No. 72-1, at 226 (Carmack Depo.). Carmack also requested that the Board of Trustees appoint a "six-member, bipartisan" committee to work with the mediators. ECF No. 72-18, at 2 (Ex. 18). On December 14, 2017, Carmack alleges that Board member Steve Cochran tried to persuade the Board to go into Executive Session to discuss Carmack's December 7, 2017 letter, but was unsuccessful." ECF No. 72-1, at 226-28 (Carmack Depo.). Carmack also alleges that after becoming aware of his OSIG complaint in October 2017, Matlock stopped meeting with him on a weekly basis and engaged in other conduct Carmack claims evinced retaliatory animus. ECF No. 72-39, at 2 (Carmack Decl.); see ECF No. 65, at 15-16 (summarizing alleged retaliatory acts).

On January 4, 2018, Carmack was notified that his position was being abolished. Carmack notes that the day of his termination, Matlock "detained [the staff] in [a] room for an hour and a half to two hours," ECF No. 72-2, at 22 (Young Depo.), and escorted him off the premises with an "armed guard," ECF No. 72, at 9. Carmack also noted that following his termination, "Board members reached out in outrage." See, e.g., ECF No. 72-37, at 1 (Ex. 37) (email to Matlock from Joshua Ely stating, "is there any other area that could be cut without having folks lose their jobs . . . . Is this our absolutely only way forward"); id. at 4 (email to Matlock from Cheryl Carrico stating "I do have concerns. Each meeting I have attended and at points in-between you report the finances as being good . . . . You also reported being understaffed by positions at the last two board meetings. The $108,058 mentioned below is less than the total salaries will be – likely much less when benefits are included so the number of people and positions is odd to me."). On June 1, 2018, Carmack filed a Complaint in the Circuit Court for the County of Washington in Abingdon, Virginia. On July 6, 2018, this case

30

was removed to the United States District Court for the Western District of Virginia pursuant to 28 U.S.C. § 1331.

## H.

In their motion for summary judgment, the defendants assert that the critical deficiency with Carmack's claims in Count I and Count II is that "he cannot dispute that his layoff was the result of a year-long analysis into how the Center should be reorganized to meet a budget reduction mandated by Governor McAuliffe." ECF No. 64, at 18. They further contend that Matlock (1) undertook a "laborious and document-intensive process to establish the best course of action for streamlining the Center to create a more efficient and effective state agency," id. at 23, (2) consulted with various individuals regarding the WTA process, and (3) "sought the approval of multiple independent agencies to ratify the WTA proposal." Id. This "thorough process," according to the defendants, when coupled with a "legitimate business justification" for eliminating the CFO position approved by the Center's Executive Committee, "inescapably surmounts any inference of . . . speech-based retaliatory animus." Id. In short, the defendants contend that a dispassionate review of the record belies any suggestion that Matlock was influenced by retaliatory animus and reveals that there is no genuine issue of material fact for a jury to decide.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013).

31

When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 309 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at

32

252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 635 (4th Cir. 2005) (quoting <u>Anderson</u>, 477 U.S. at 2495). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993) (citing <u>Perini Corp. v. Perini Const., Inc.</u>, 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

In Count I, Carmack asserts that he was terminated in violation of Virginia's Fraud and Abuse Whistle Blower Protection Act ("FAWBPA"), Va. Code. Ann. § 2.2-3009, <u>et seq.</u> (1950), after reporting multiple instances of alleged wrongdoing and financial malfeasance at the Center. The FAWBPA provides that it is the "policy of the Commonwealth that . . . employees of governmental agencies be freely able to report instances of wrongdoing or abuse committed by governmental agencies or independent contractors of governmental agencies." Va. Code Ann. § 2.2–3009. In particular, "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction." <u>Id.</u> at § 2.2–3011(A). In order to qualify as a whistle blower, the employee must make a "good faith report" of "wrongdoing or abuse" to "one of the employee's superiors, an agent of the employer, or an appropriate authority." <u>Id.</u> at § 2.2–3010(B).

The FAWBPA defines a "good faith report" as one "made without malice" and about conduct that the employee "has reasonable cause to believe is true." <u>Id.</u> at § 2.2-3010. In other

33

words, to be protected under the FAWBPA, an employee who discloses information about suspected wrongdoing or abuse "shall do so in good faith and upon a reasonable belief that the information is accurate." Id. at § 2.2–3010(B). "Wrongdoing" is defined as a violation, "which is not of a merely technical or minimal nature, of a federal or state law or regulation, local ordinance, or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public or employee." Id. at § 2.2-3010. The statute defines "abuse" as "an employer's or employee's conduct or omissions that result in a substantial misuse, destruction, waste, or loss of funds or resources belonging to or derived from federal, state, or local government sources." Id.

The FAWBPA provides two ways in which an employee who has been terminated in a retaliatory and/or statutorily proscribed manner may seek redress. Under § 2.2-3012, a whistle blower covered by the state grievance procedure, Va. Code Ann. § 2.2-3000 et seq., or a local grievance procedure established under Va. Code Ann. § 15.2-1506, may initiate a grievance alleging retaliation and requesting relief through those procedures. Under § 2.2-3011, a whistle blower may also, as was done here, "bring a civil action for violation of this section in the circuit court of the jurisdiction where the whistle blower is employed" without exhausting administrative remedies. See Slack v. Wash. Metro. Area Transit Auth., 325 F. Supp. 3d 146, 157 (D.D.C. 2018) (discussing whistleblower protections laws in Maryland and Virginia). The court, if it finds that a violation was "willfully and knowingly" made, may order appropriate remedies, including (1) reinstatement to the same position, or if the position is filled, to an equivalent position; (2) back pay; (3) full reinstatement of fringe benefits and seniority rights; or (4) any combination of these remedies. Va. Code § 2.2-3011(D). The court

may also impose upon the employer, "whether a writ of mandamus or injunctive relief is awarded or not, a civil penalty of not less than $500 nor more than $2,500, which amount shall be paid into the Fraud and Abuse Whistle Blower Reward Fund." Id.

**A.**

The central issue in dispute between the parties as to Count I and Count II relates to causation. In order to examine the causation element of Carmack's claims in Count I (and Count II), the court must first determine the extent of his protected activity. See Supinger v. Virginia, 167 F. Supp. 3d 795, 819–20 (W.D. Va. 2016) (analyzing each complaint to determine whether it alleged wrongdoing or abuse within the meaning of the statute). This was no easy task. The defendants are correct that hitherto, this litigation has centered exclusively on the June/July 2017 external complaint to the OSIG as the locus of Carmack's Count I and Count II claims, and that for the first time in this litigation, Carmack contends that his sundry "internal warnings and complaints" to Matlock, all of which predate his external complaint to the OSIG and occurred sporadically over the course of several years, constitute statutorily protected activity. See ECF No. 72, at 12 n.14. The court would note that Carmack makes this substantial pivot in a single footnote, and merely by recapitulating the relevant statutory language defining "[w]histle blower." Id. In its review of the pleadings, and to the extent the court was able to divine which of the bulleted items in Carmack's opposition brief were being advanced as protected activity under the FAWBPA, they are as follows:

1. **November 2015**: Carmack reminded Matlock that he would not deviate from Commonwealth Accounting Policy and Procedures, which Matlock responded to with the "needling story";
2. **December 2015**: Carmack complained to Matlock that he violated state policy by pre-selecting Tolbert;

35

3. **December 2016**: Carmack complained to Matlock about suspected fraud and abuse concerning the payment of overtime to the Tates;[19]
4. **January 2016**: "Matlock's fraud, waste, and abuse continues to grow, and Carmack's complaints continue[.]"
5. **September 2016**: Carmack met with Matlock to "caution" him about pre-selecting Joe Mitchell to be maintenance supervisor without being interviewed by a selection committee;
6. **February 2017**: Carmack complained to the Ombudsman at the University of Virginia; and
7. **June/July 2017**: Carmack filed his OSIG complaint.

See ECF No. 72, at 6, 13-14; ECF No. 72-30, at 10 (Ex. 30). The court would note that no attempt was made to explain why the antecedent "internal warnings and complaints" (Items 1-6), which are presented in bullet form, vaguely described, and intermixed in Carmack's opposition brief with plainly unprotected conduct, constitute statutorily protected whistleblowing under the FAWBPA. Nor does Carmack cite any authority whatsoever, persuasive or otherwise, justifying the court's treating this conduct as protected activity. Indeed, it is simply assumed that any warning or complaint, no matter how informal or picayune, is cognizable and qualifies for protection. The court, in the interest of brevity, will assume, without deciding, that the aforementioned conduct (Items 1-7) qualifies as protected activity under the FAWBPA.[20] The court will also assume, arguendo, that Carmack's "internal

---

[19] There was some confusion as to when this alleged complaint was made to Webb and Matlock given several typos in various briefs and declarations which became evident during the court's hearing on May 16, 2019. Carmack testified during this hearing that his complaint about the Tates was made to Webb and Matlock in December of 2016, not 2015. Matlock allegedly responded by telling Carmack that the Tates were no longer to report to him and that he was not to approve their timesheets. See ECF No. 72-39, at 1 (Carmack Decl.).

[20] The court will, however, make several observations for the sake of the record. Carmack's November 2015 statement to Matlock (Item 1) does not allege "wrongdoing or abuse," and therefore does not qualify as a good faith report. It is also questionable whether Carmack's complaints about the pre-selection of Tolbert and Mitchell (Items 2 & 5) concern violations that are more than "merely technical or minimal in nature." See Va. Code § 2.2-3010. What is more, as regards the complaint about the pre-selection of Tolbert (Item 2) in December 2015, it was not until October 2017, after Matlock learned of the OSIG complaint, that Matlock is alleged to have begun behaving in an overtly retaliatory, as opposed to merely disagreeable, manner. See ECF No. 72, at 8, 12-13. This twenty-two (22) month gap is simply too long to establish a prima facie showing of causation. See ECF No. 31, at 16-17 (collecting cases). With respect to the pre-selection of Mitchell (Item 5), Carmack notes that he merely "drew to the attention of Matlock" the fact that Mitchell needed to be

36

complaints and warnings" (Items 1-5) to Matlock qualify as complaints made to "one of [Carmack's] superiors."[21] See § 2.2–3010(B).[22]

**B.**

The guidance on the proper causation standard to apply in the FAWBPA context is limited. The Fourth Circuit has held that the causation requirement inherent in retaliation claims can be proven by either the (1) submission of direct evidence of retaliatory animus under "ordinary principles of proof," Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996), cert. denied, 520 U.S. 1116 (1997), and/or, where such evidence is unavailable or attenuated, (2) through the burden-shifting "pretext" framework posited in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Foster v. Univ. of Md.-E. Shore, 787 F.3d

---

interviewed by a selection committee. ECF No. 72, at 6; cf. ECF No. 72-30, at 10 ("I met with Mr. Matlock to caution him about 'pre-selecting' employees."). It is questionable whether statements of this sort qualify as a "report" of "wrongdoing or abuse." There was also some mention by plaintiff's counsel at the May 16, 2019 hearing of "funds disappearing . . . fall[ing] into the abuse category." ECF No. 95, at 44. This allegation was simply too vaguely described for the court to make anything of it. Likewise, Carmack's January 2016 complaint (Item 4), for which no specific details were provided, is too vague and substantively non-specific to constitute protected activity for purposes of his retaliation claim. See Supinger, 167 F. Supp. 3d at 819–20 (dismissing FAWBPA claim based on Hotline complaint alleging receipt of a gift in violation of state policy where the nature of the gift and its value were not specified). Insofar as Carmack's meeting with Holland (Ombudsman of UVA) in February 2017 (Item 6) involved discussion of the full panoply of allegations ultimately memorialized in Carmack's June/July 2017 OSIG complaint, that meeting would likely qualify as a report of "wrongdoing or abuse" to "an agent of the employer, or an appropriate authority." Id. at § 2.2–3010(B). However, because there is no evidence that Matlock was aware of this meeting prior to Carmack's termination on January 4, 2018, and because proof of the decision-maker's knowledge is an essential condition in a retaliation claim, accord Jones v. HCA, 16 F. Supp.3d 622, 635 (E.D. Va. 2014), this protected activity cannot support Count I or Count II. Lastly, as to Carmack's OSIG complaint in June/July 2017 (Item 7), see ECF No. 72-30, at 9-16, given the nature the allegations contained therein (taken as a whole), such a complaint would qualify as a "report of conduct defined . . . as wrongdoing or abuse" made to an "appropriate authority." See Va. Code Ann. § 2.2-3010; see also ECF No. 31, at 12-13.

[21] Matlock is specifically identified by the defendants in their corrected responses to plaintiff's first set of interrogatories as Carmack's supervisor from November 2, 2015 to January 21, 2018.

[22] The prima facie case for retaliatory discharge claims generally requires a plaintiff to establish the following three elements by a preponderance of the evidence: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. See, e.g., Biggs v. Edgecombe Cty. Pub. Sch. Bd. of Educ., No. 4:16-CV-271-D, 2018 WL 4471742, at *9 (E.D.N.C. Sept. 18, 2018) (holding that to state a claim under North Carolina's Whistleblower Act, plaintiff must allege the same three elements above); United States ex rel. Cody v. Mantech Int'l Corp., 207 F. Supp. 3d 610, 621 (E.D. Va. 2016) ("[I]n order to establish a prima facie case of unlawful retaliation, a whistleblower plaintiff must establish that: (1) he engaged in 'protected activity'; (2) his employer knew or was reasonably on notice that he was engaged in protected activity; and (3) his employer took adverse action against him as a result of his protected activity."); Julie Easterbrooks v. Am. Red Cross, No. 2:17CV98, 2017 WL 3015809, at *2-3 (E.D. Va. July 14, 2017) (similar).

243, 249 (4th Cir. 2015); see also Guessous v. Fairview Prop. Inv., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the three steps of the McDonnell Douglas framework). Stated somewhat differently, a plaintiff may proceed by showing directly that he was fired in retaliation for protected activity, or by proving that any non-retaliatory justification for the termination was pretextual. Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018).

While no federal or state court in Virginia has directly held that the McDonnell Douglas burden-shifting scheme applies to FAWBPA cases, courts routinely apply this framework in adjudicating claims brought under similar state and federal whistleblower statutes. See, e.g., Barrick v. PNGI Charles Town Gaming, LLC, No. 3:17-CV-91, 2019 WL 508068, at *5 (N.D.W.Va. Feb. 8, 2019) (applying the McDonnell Douglas framework in assessing claim brought under the whistleblower protection provision of the Bank Secrecy Act); Nifong v. SOC, LLC, 234 F. Supp. 3d 739, 750–51 (E.D. Va. 2017) (applying McDonnell Douglas framework where plaintiff alleged retaliatory discharge for whistleblowing in violation of the False Claims Act); see also Murray v. Kindred Nursing Centers W. LLC, 789 F.3d 20, 25 (1st Cir. 2015) (analyzing a claim brought under Maine's Whistleblowers Protection Act using the McDonnell Douglas burden-shifting framework); Hilt v. St. Jude Med. S.C., Inc., 687 F.3d 375, 378 (8th Cir. 2012) (same as to Minnesota's Whistleblower Act); McCormick v. D.C., 899 F. Supp. 2d 59, 70 (D.D.C. 2012), aff'd, 752 F.3d 980 (D.C. Cir. 2014) (same as to D.C.'s Whistleblower Statute); Davis v. Durham Mental Health Developmental Disabilities Substance Abuse Area Auth., 320 F. Supp. 2d 378, 408 (M.D.N.C. 2004) (same as to North Carolina's Whistleblower Act); Smith v. Gentiva Health Servs. (USA) Inc., 296 F. Supp. 2d 758, 762 (E.D. Mich. 2003) (same as to Michigan's Whistleblowers' Protection Act); Shepard

v. City of Portland, 829 F. Supp. 2d 940, 954 (D. Or. 2011) (holding the McDonnell Douglas burden-shifting framework, although a federal procedural device, applies to employment retaliation claims brought under state law where the court is exercising supplemental jurisdiction).

Given the amenability of the FAWBPA to the application of the McDonnell Douglas framework, the regularity with which courts apply this framework in assessing the causation element in cases involving state whistleblower statutes and/or provisions, and finding no reason to depart from this approach, the court will apply this framework in the present matter.[23]

**D.**

Under the McDonnell Douglas framework, once a plaintiff shows a prima facie case, i.e., establishes the three elements described above, a presumption of unlawful retaliation arises, and the burden of production shifts to the employer to clearly articulate and produce evidence of a legitimate, non-retaliatory reason for its adverse employment action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 336 (4th Cir. 2011); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Hurst v. District of Columbia, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). If the employer carries this burden of production, the presumption raised by the prima facie case is rebutted, and "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for [retaliation].'" Hill v. Lockheed Martin

---

[23] Neither party explicitly analyzes Count I or Count II under the McDonnell Douglas framework in their respective briefs. Nevertheless, it is clear that both parties assume this proof scheme applies.

39

Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)); see also Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010). In order to carry this burden, a plaintiff must establish "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." Jiminez v. Mary Washington Coll., 57 F.3d 369, 378 (4th Cir.1995) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

Where an employer has proffered a legitimate, non-retaliatory reason required at step two of McDonnell Douglas, the court may skip the prima facie case and move directly to the question of retaliation vel non, i.e., the question of whether retaliatory animus motivated the adverse action. See, e.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (holding that once the employer "responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection," whether or not the plaintiff made out a prima facie case "is no longer relevant"); see also Glasgow v. United States Dep't of Def., No. 18-CV-136 (CRC), 2018 WL 5886654, at *3 (D.D.C. Nov. 9, 2018) (holding that where defendant identifies a "legitimate, nondiscriminatory reason" for the challenged action, district courts may skip the prima facie question at step one and instead answer "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason . . ."); Avant v. S. Maryland Hosp., Inc., No. GJH-13-02989, 2015 WL 435011, at *7 (D. Md. Feb. 2, 2015) ("[I]t is becoming 'a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment.'" (citation omitted)).

**E.**

In the instant case, because the defendants articulated non-retaliatory reasons for abolishing the CFO position, the court need not indulge or address disputes as to whether Carmack met his burden in establishing a prima facie case. See, e.g., Riser v. Target Corp., 458 F.3d 817, 820–21 (8th Cir. 2006) (citing Aikens, 460 U.S. at 715). The court will proceed directly to the second stage of the McDonnell Douglas analysis, wherein the question becomes whether the defendants have satisfied their burden of production vis-à-vis the non-retaliatory justification referenced above and discussed at length below.

The defendants have amassed and adduced substantial and specific record evidence, including numerous exhibits containing extensive correspondence, supporting their contention that Carmack's CFO position was eliminated as part of a "long-term solution that would meet Governor Terry McAuliffe's budget mandate" for 2017 and 2018 rather than motivated by retaliatory animus tied to either Carmack's "internal warnings and complaints" or external OSIG complaint. ECF No. 64, at 1. They assert that shortly after receiving two emails, see ECF No. 64-2 (Ex. 1) & 64-3 (Ex. 2), from Governor McAuliffe's office, Matlock began to research available budget savings options.

The memoranda contained in the aforementioned emails instructed all state agency heads to "prepare savings strategies for FY 2017 equal to equal to five (5) percent of . . . adjusted legislative general fund appropriation" and, while granting agency heads broad discretion to devise budget savings strategies, stressed the importance of "recurring savings rather than one-time savings," and indicated that agencies should anticipate another "projected revenue shortfall for FY 2018," ECF. 64-3, at 1 (Ex. 2). The memoranda further

41

advised agency heads to "focus on strategies that call for the modification or elimination of existing responsibilities that . . . are not mission critical for your agency," ECF No. 64-2, at 4 (Ex. 1). Considering the emphasis on "recurring savings" and admonition that "saving strategies . . . should provide ongoing savings in future fiscal years . . . to maintain structural balance," ECF No. 64-3 (Ex. 2), Matlock apparently concluded that neither of the original savings submissions nor the use of general funds to cover the budget reductions was a viable long-term strategy. See ECF No. 64-1, at 4 (Matlock Decl.); ECF No. 102-6, at 2 (Maul Decl.).

Instead of drawing on general funds to satisfy the budget reduction mandate or executing the original savings plans, Matlock formulated a workforce reorganization plan. This plan, which Matlock viewed as a sustainable long-term option that comported with the gubernatorial charge to find "recurring savings," was based on the fact that he "observed a great deal of responsibility overlap between senior administrators." ECF No. 64-1, at 4-5 (Matlock Decl.). Matlock concluded that by "streamlining the administrative responsibilities," the Center would become a "more effective and efficient state agency." Id. With respect to the CFO position specifically, Matlock stated that "[t]wo immediate things [he] noticed" upon his arrival at the Center was Carmack's dependence on Hensley, and the "amount of time he was spending doing work for the Foundation." ECF No. 64-1, at 3; see, e.g., ECF No. 64-12, at 5 (Ex. 11) (containing email wherein Carmack describes Hensley as the "brains" of our operations" and states that "you were better off with her than me!"). Matlock stated that when, "I would ask Carmack for financial data from the [Center], he would often ask Hensley to prepare the data for him." Id.

In order to "streamline redundant and duplicative administrative responsibilities and meet the required fiscal accountability requested by Governor McAuliffe," ECF No. 64-1, at 8, Matlock considered the elimination of several positions through the Workforce Transition Act of 1995, Va. Code Ann. § 2.2-3201 ("WTA"), the purpose of which is:

> to provide a transitional severance benefit, under the conditions specified, to eligible state employees who are involuntarily separated from their employment with the Commonwealth. "Involuntary separation" includes, but is not limited to, terminations and layoffs from employment with the Commonwealth, or being placed on leave without pay-layoff or equivalent status, due to budget reductions, agency reorganizations, workforce down-sizings, or other causes not related to the job performance or misconduct of the employee, but shall not include voluntary resignations.

Va. Code Ann. § 2.2-3200. The record indicates that at least five positions were considered to varying degrees for elimination. Those employees terminated under the WTA were able to elect to receive either severance benefits for twelve months after the date of involuntary separation, see Va. Code Ann. § 2.2–3203 (explaining the recurring and lump sum payments that comprise the transitional severance benefit), or, in lieu of transitional severance benefits, enhanced retirement, wherein the state "purchase[s] on [the employee's] behalf years to be credited to either his age or creditable service or a combination of age and creditable service . . . ."). Va. Code Ann. § 2.2-3204; see also ECF No. 64, at 7 n.1.[24]

Matlock indicated that he was familiar with the WTA as a "viable method" for reorganizing the Center from having used it "multiple times to find recurring savings options"

---

[24] The defendants correctly note that there was no way for Matlock to predict whether affected employees would take the severance package (paid for by the Center) or enhanced retirement benefits (covered by VRS). See ECF No. 102, at 21 n.13. Therefore, the fact that Carmack's decision to take the severance package may have negated some of the savings generated from abolishing his position is not especially probative as to pretext.

during his twenty-four (24) years working for Virginia Highlands Community College. ECF 64-1, at 5. Those employees initially included in and potentially affected by Matlock's proposal included Joyce Brooks, Douglas Viers, Patricia Ball, Janet Williams, and William Carmack. ECF No. 64-1, at 4-6 (Matlock Decl.). The record includes email correspondence indicating that Matlock asked Kauffman to provide him with a WTA cost for eliminating positions held by Brooks, Viers, and Carmack. ECF No. 64-4, at 2-3 (Ex. 3); ECF No. 64-5, at 2-3 (Ex. 4). Importantly, even if the court were to discredit Matlock's claims that he "first envisioned" using the WTA to eliminate the CFO position after receiving the September 27, 2016 memorandum, there is clear record evidence that Matlock identified the CFO position as early as November 2016.

Matlock consistently affirmed and reaffirmed that the budget reduction mandate prompted the WTA process, and that with the leasing of the Energy Center (to Dr. McGarry), "a declining portfolio of research grants," and a shift to separate the Foundation from the Center, he concluded that "Carmack's workload would decrease significantly with no corresponding decrease in salary." ECF No. 64-1, at 9 (Matlock Decl.); ECF No. 100-1, at 36 (Matlock 2d Depo.) (stating that once a tenant was found "that responsibility, which was in Mr. Carmack's job description, totally went away"); ECF No. 100-8, at 7 (Brooks Depo.) ("I know [Matlock] made us aware there was going to be a budget reduction"); ECF No. 100-7, at 5 (Williams Depo.) (suggesting that Matlock asked Williams if she wanted to retire due to budget reductions). Indeed, the record is replete with documents and testimony consistent with Matlock's proffered justifications for abolishing the CFO position. See, e.g., ECF Nos. 64-20, at 4 (Ex. 19); 64-22 (Ex. 21), at 2; 64-47, at 12 (Maul Decl.); 64-25, at 3 (Ex. 24); 64-41,

44

at 3 (Ex. 39). Matlock further concluded, and repeatedly stated in proposal-related materials that predated his learning of the OSIG complaint and many of the "internal warnings and complaints," that day-to-day operations, including "advanced fiscal bookkeeping, accounting, budgeting, and managing accounts receivable," could be managed by Hensley at a significantly lower salary than what the CFO was being paid. ECF No. 72-33, at 3.

Rigdon, who reviewed the employee work profiles for both Carmack and Hensley, concurred with Matlock's conclusion that Hensley could absorb more of the CFO's duties.[25] ECF No. 64-48, at 2 (Rigdon Decl.). Matlock further noted that the Center had operated without a CFO from 1992 until 2012, and that Hensley already provided "a great deal of the [Center's] leadership pertaining to budget oversight, procurement, [etc.] . . . all of which were in Carmack's job description." ECF 64-1, at 9 (Matlock Decl.). In short, the defendants have articulated legitimate, non-retaliatory reasons for eliminating Carmack's CFO position and produced substantial, competent evidence indicating that eliminating the CFO position (and two others), was part of a considered reorganization proposal conceived of as early as November 2016, prior to all of the alleged internal warnings and complaints, except those related to pre-selection[26], and at least eleven (11) months before Matlock first became aware

---

[25] Carmack claims that his job description was not accurate at the time his employment was terminated and that his duties differed form the description. See ECF No. 72-39, at 3 (Carmack Decl.). Minimal evidence was offered to support this claim.

[26] Carmack claims that in January 2016, see 72-1, at 123 (Carmack Depo.), he "complained to Matlock that he violated policy by pre-selecting Tolbert," ECF No. 72, at 13. Carmack claims that he "went to Matlock and said, pre-selection at UVA is an issue . . . you need to follow policies and procedures that are outlined; you can't just put someone in that job." ECF No. 72-1, at 123-24 (Carmack Depo.). There is no evidence that Matlock responded with meaningful hostility to this statement or any statement in September 2016 related to alleged pre-selection of Mitchell.

of the external OSIG complaint, which Carmack repeatedly characterizes as the primary inflection point in his relationship with Matlock.[27]

Workforce reductions and/or reorganizations resulting from budgetary constraints are well-recognized legitimate, non-retaliatory justifications for eliminating positions. See, e.g., Atkinson v. Food Lion, LLC, 433 F. Supp. 2d 628, 634-35 (M.D.N.C. 2005), aff'd, 173 F. App'x 248 (4th Cir. 2006) (finding that the employer's proffered reason for the plaintiff's termination, that the plaintiff's department was eliminated as part of cost-cutting efforts, was a legitimate business reason); Neal v. Green Ford, LLC, No. 1:17-CV-569, 2018 WL 6003547, at *5–6 (M.D.N.C. Nov. 15, 2018), aff'd, No. 18-2400, 2019 WL 1513513 (4th Cir. Apr. 8, 2019) (same); Bennett v. Charles Cty. Pub. Sch., No. AW-04-1501, 2006 WL 4738662, at *3 (holding that "[b]y averring that its wastewater plants were reaching the end of their useful life expectancies, and that it made business sense to eliminate some plants, replace others with modern facilities, and retain an independent contractor to oversee the plants that remained, [d]efendant has met its burden of stating a legitimate, nondiscriminatory reason for its employment decision"); Cooper v. Dall. Police Ass'n, 278 Fed. Appx. 318, 320 (5th Cir. 2008) (cost cuts were as a legitimate, nonretaliatory reason for the adverse employment action); Fierros v. Tex. Dep't of Health, 247 Fed. Appx. 478, 479 (5th Cir. 2007) (a budget shortfall satisfied the defendant's burden of presenting a legitimate nondiscriminatory reason for the adverse employment action).

---

[27] The court would note that Carmack's own deposition suggests his belief that it was the OSIG complaint, rather than his "internal warnings and complaints," which resulted in his termination. See ECF No. 72-1, at 245 (Carmack Depo.) ("I tell people I left the Center because I was fired for a whistle blowing violation. I complained to OSIG and [Matlock] terminated my employment.").

The court views the record as presenting ample evidence substantiating the defendants' position that the elimination of the CFO position was in response to the budget mandate and was substantially justified from the perspective of Matlock, the Center's Executive Committee, and Rigdon from DHRM. The record also demonstrates that Matlock relied on and received significant guidance from DPB, DHRM, and UVA throughout the process. Considering the specific evidence marshalled by the defendants, the court concludes that they have met their second-stage burden to "produc[e] evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason." Reeves, 530 U.S. at 142.

## F.

Where, as in this case, an employer meets its second-stage burden, the burden then shifts back to the plaintiff to come forward with evidence rebutting the employer's evidence and generating genuine issues of material fact as to whether the employer's preferred reasons were pretextual. See Laing v. Fed. Exp. Corp., 703 F.3d 713, 721 (4th Cir. 2013); Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998) (citing Ross v. Communications Satellite Corp., 729 F.2d 355, 365 (4th Cir. 1985)). This showing generally requires the plaintiff to point to admissible record evidence that the defendants' stated justification is "dishonest or not the real reason for [his] termination[.]" Laing, 703 F.3d at 722 (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000)). This evidence may include evidence that the employer's explanation is unworthy of credence or that it is more likely that a retaliatory reason motivated the employer's actions. Pfeifer v. Lever Bros. Co., 693 F.Supp. 358, 365 (D.Md.1987), aff'd, 850 F.2d 689 (4th Cir. 1988); see Dennis v. Columbia Colleton Med. Ctr., 290 F.3d 639, 647 (4th Cir. 2002) (noting that the plaintiff may show pretext by, among other

methods, demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation); see also Mohammed v. Cent. Driving Mini Storage, Inc., 128 F. Supp. 3d 932, 947 (E.D. Va. 2015) (holding that a plaintiff may also prove pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action").

Crucially, federal courts do not serve to second-guess workplace decisions. Thus, a claim of retaliation cannot be based on mere disagreement with an adverse employment decision. In DeJarnette v. Corning, Inc., 133 F.3d 293 (4th Cir. 1998), the Fourth Circuit stated:

> [T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions . . . [o]ur sole concern is whether the reason for which the defendant discharged the plaintiff was [retaliatory]. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

Id. at 299 (internal quotation mark and citations omitted). For an employer's proffered non-retaliatory justifications to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. See Murphy v. Ohio State Univ., 549 F. App'x 315, 322 (6th Cir. 2013). "The employer's decision-making process need not be optimal, or leave no stone unturned; rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Id.

If the employee proves the employer failed to do so, the employer's decision-making process is "unworthy of credence . . . [and] any reliance placed by the employer in such a

process cannot be said to be honestly held." Id.; see Anderson v. Stauffer Chem. Co., 965 F.2d 397, 403 (7th Cir. 1992) ("The fact that an employee does some things well does not mean that any reason given for his firing is . . . pretext[ual] . . . . Unless he attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision, which we have consistently refused to review."); Fitzpatrick v. New York Cornell Hosp., No. 00 CIV. 8594 LAP, 2003 WL 102853, at *6 (S.D.N.Y. Jan. 9, 2003) (noting Second Circuit's reminder to "district courts that they do not have a 'roving commission to review business judgments' and that they 'must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process'").

## IV.

Carmack argues that Matlock's story has "more holes than swiss cheese," ECF No. 100, at 1, and that the process by which his position was eliminated contained discrepancies sufficient to raise a triable, genuine issue of material fact as to its legitimacy. See id. at 10 ("Matlock complied zero of the steps that were requested by the Governor's memoranda – because he was not eliminating Carmack because of the memoranda . . ."). The court will briefly summarize and subsequently assess each of Carmack's arguments roughly in the order in which they were presented in his opposition briefing. Notably, while Carmack is critical of the WTA process, he offers little by way of argument or evidence rebutting the underlying justifications for including the CFO position as part of the WTA process in the first place, namely that others could assume his diminishing and duplicative responsibilities.

## A.

49

Carmack first asserts that because the September 20, 2016 memoranda specifically "exclude[es] Institutions of Higher Education," "obviously," the five (5) percent mandate "did not apply to the Southwest Virginia Higher Education Center." ECF No. 72, at 12. Carmack notes that "tellingly," other Higher Education Centers subject to the same alleged budget reduction did not eliminate their CFOs. See ECF No. 72-42, at 1-2 (Ex. 42). Carmack's ipse dixit as to the applicability of the budget mandate is contradicted by sworn statements from employees of DHRM and DPB indicating that the mandate unquestionably applied to the Center, see, e.g., ECF No. 102-6, at 4 (Maul 2d Decl.) ("The 5% budget reduction for FY 2017 and FY 2018 absolutely applied to the Center, which is not considered an institution of higher education for budgeting purposes.").[28] Curiously, Carmack's own conduct and testimony also indicate that he himself believed the mandate applied to the Center and actively participated in formulating a plan that was responsive to the mandate, ECF No. 72-1, at 211-212 (Carmack Depo.); see ECF No. 100-2, at 5-9 (indicating that Carmack believed that the budget reduction mandate applied to the Center and, in fact, himself prepared a "budget reduction spreadsheet" to submit to DPB in response to the August, 26, 2016 email).

Carmack has presented no evidence, besides his own post-hoc interpretation of the 2016 memoranda, indicating that Matlock's embrace of the five (5) percent mandate was insincere or pretextual. To the contrary, Carmack's own apparent interpretation of the mandate as applying to the Center is strikingly incompatible with his (1) repeated assertion

---

[28] The defendants note that although the budget reduction mandate excluded "Institutions of Higher Education," the Center is not such an institution as defined by Va. Code Ann. § 23.1-100 (defining an institution of higher education as an "associate-degree granting" or "baccalaureate public institution of higher education in the Commonwealth"). Not only does Subtitle IV of Title 23.1 of the Code of Virginia not classify the Center as an "Institution of Higher Education," see Va. Code Ann. § 23.1-1300-2913, but the authority creating the Center, Va. Code Ann. § 23.1-3125, does not permit it to grant associate, bachelor, or advanced degrees.

throughout this litigation that the mandate did not apply to, see ECF No. 72, at 11, and/or "expressly excluded," ECF No. 100, at 2 n.3, the Center and (2) concomitant insinuation that Matlock's belief that it did was disingenuous or otherwise held in bad faith. See Tomasello v. Fairfax Cty., No. 1:15-cv-95, 2016 U.S. Dist. LEXIS 5578, at *39 (E.D. Va. Jan. 13, 2016) ("[I]n the Fourth Circuit . . . plaintiff must present evidence reasonably calling into question the honesty of the employer's belief."). Given that all of those advising Matlock, including Carmack, apparently believed the mandate applied to the Center, and in light of the complete absence of evidence suggesting Matlock knew otherwise, there is simply no reason to conclude that Matlock's belief in its applicability to Center was pretextual. See id. (stating that "an employer's proffered legitimate basis for an employment action is considered honestly held if the employer can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made").

## B.

Carmack next argues that despite Matlock's reliance on the budget mandate to justify the elimination of the CFO position, the Center never experienced a "budget shortfall." ECF No. 72, at 15. Carmack notes, inter alia, that "mere weeks" after Matlock terminated Carmack, Matlock wrote a letter to SAAG Griffin stating "[a]ll major key performance indicators reflect an increase in Center activity and income since my arrival." ECF No. 72-7, at 100-101 (Matlock Depo.). Carmack also points to other documents in the record suggesting that the Center was financially strong at the time Matlock decided to abolish the CFO position, including testimony where Matlock conceded that he told the Board of Trustees in a December 2017 meeting that the "overall financial strength of the Center was at an all time high." ECF No.

72-7, at 208 (Matlock Depo.). The defendants correctly note that Carmack's argument is a red herring, as they have never maintained that a budget shortfall within the Center itself justified the WTA proposal; rather it was "the statewide budget reduction mandate from Governor McAuliffe that precipitated Matlock's decision to go forward with the WTA." ECF No. 74, at 16.

Moreover, although Matlock apparently could have opted to use general funds to satisfy the budget mandate or rely on the original savings submissions, it was his prerogative, as Executive Director, to pursue a "recurring savings option" instead by eliminating positions in accordance with the mandate's emphasis on recurring, rather than one-time, savings. ECF No. 74, at 16. Neither Carmack's persistent misinterpretation of Matlock's rationale for eliminating the CFO position nor his disagreement with Matlock's approach to reducing the budget by five (5) percent casts doubt on the credence of the Matlock's proffered justifications. Carmack may disagree with the decision to terminate his position, or with the reasoning behind it, but that alone is insufficient to raise a triable question of unlawful retaliation. It is not the province of the court to second-guess managerial decision-making or business judgments of this sort absent evidence of retaliatory motive. See McCain v. Waste Mgmt., Inc., 115 F. Supp. 2d 568, 574 (D. Md. 2000) ("The federal courts do not serve to second guess workplace decisions; thus, the claim cannot be based on mere disagreement with the employment decision . . . [p]laintiff must come forward with admissible evidence that is more than self-serving opinions or speculation."); see also Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the

employer does not violate" applicable law."); EEOC v. Clay Printing Co., 955 F.2d 936, 946 (4th Cir. 1992) ("It is not . . . the function of this court to second guess the wisdom of business decisions.").

## C.

Carmack next argues that following his termination, Matlock hired and promoted numerous individuals, "unfroze" positions, and created others without any of those positions being offered to him. Specifically, Carmack notes that Matlock hired (1) Hannah Heitala, (2) moved Tolbert into human resources, (3) hired an administrative assistant ("Claire," ECF No. 72-2, at 38) to Kathy Heitala, (4) replaced Melissa Warden, "without the position being offered to Carmack," and (5) hired Eli Heitala in November 2017 into a new position. ECF No. 72, at 17 n.18. Carmack asserts, albeit in a conclusory manner, that by failing to place him in any of these positions, "Matlock chose not to follow the WTA." Id. at 17. Here, again, Carmack flags facts for the court without any bona fide attempt to explain their significance. Carmack appears to be asking the court to infer: (1) that because Matlock hired additional employees after his termination, there was no need to abolish the CFO position, and (2) that Matlock's failure to reemploy him in any of the aforementioned roles, ostensibly in violation of the WTA, is indicative of retaliatory animus.

Carmack's first argument elides the fact that the WTA proposal involved more than the mere elimination of positions. Indeed, it expressly provided for and incorporated the cost of creating and/or filling additional positions as part of an overall workforce reorganization and redistribution of duties. See ECF No. 64-22, at 5 (Ex. 21) (indicating that the existing duties/responsibilities of abolished positions will be redistributed to three other employees);

53

see also ECF No. 64-21, at 6 (Ex. 20) (email from Kauffman to Matlock related to the two new positions contemplated by the WTA); see also ECF Nos. 74 & 64-23, at 5 (indicating that Hannah Heitala was hired to fill a position explicitly incorporated into the proposal and that "her job was [merely] augmented to include more responsibilities" that belonged to Janet Williams, see ECF No. 72-7, at 226 (Matlock Depo.)). Further, Matlock's decision to hire new employees and/or to fill other, unrelated positions does not necessarily, or even logically, imply that the elimination of the CFO position was unjustified. There is no apparent contradiction in Matlock's decision to abolish the CFO position on the one hand, and, to hire, inter alia, a marketing director and grant writer on the other. These positions appear to serve different functions, and it is entirely possible that the Center could be overstaffed in one area and understaffed in another. See ECF No. 100-1, at 21-22 (Matlock 2d Depo.) (explaining the decision to unfreeze the marketing position).

With respect to the hiring of (1) Hannah Heitala (Director of Conference Services), (2) Eli Heitala (Manager of Conference Services)[29], and (3) "Claire," an administrative assistant for Kathy Heitala, the (4) replacement of Melissa Warden (Tobacco Collections Specialist), and (5) advertisement for a Loan Collections Specialist, ECF No. 72-17 (Ex. 17), Carmack has failed to explain how these employment actions are demonstrative of pretext except to the extent that those positions were not offered to him, ostensibly in violation of the WTA. Carmack does not, for example, indicate what these positions paid (or attempt to make the

---

[29] Eli Heitala appears to have been hired into Conference Services following the retirement of another Conference Services employee. See ECF No. 72-15, at 5.

distinction between wage and classified/salaried hires) or argue, for example, that by hiring new employees, Matlock negated the savings which accrued from implementing the WTA.

In its prior ruling on the defendants' second motion to dismiss, ECF No. 65, at 26-27, this court noted that the Workforce Transition Act of 1995, Va. Code Ann. § 2.2-3201, requires that prior to terminating an employee of a state agency, "the management of the agency or institution shall make every effort to place the employee in any vacant position within the agency for which the employee is qualified." Id.; see Va. Code Ann. § 2.2-3201(A). Carmack suggests that by failing to offer any of the aforementioned positions to him, Matlock violated the express terms of the WTA, from which Carmack then presumably expects the court to infer retaliatory animus. ECF No. 72, at 17-18. Crucially, the WTA only requires an employer to place the employee in "vacant" positions within the agency for which the employee is "qualified." The record indicates that the Tobacco Collections Specialist and Loan Collections Specialist positions did not become vacant and/or were not advertised until sometime in late 2018, see ECF No. 72-2, at 39-41 (Young Decl.), and October/November 2018, see ECF No. 72, at 17 n.18, respectively. In other words, these positions did not become "vacant" until after Carmack's termination in January 2018.

Furthermore, although state policy dictates that those employees terminated pursuant to a workforce reduction or reconfiguration are entitled preferential hiring for positions which later become vacant (such as the Tobacco and Loan Collection Specialist positions), this entitlement only applies to those positions "that are in the same [r]ole as their former position[] and for which they are minimally qualified." ECF No. 64-34, at 22. Carmack does not allege or argue that either of the aforementioned positions (i.e., the Specialist positions) would qualify

as providing for him with the "same [r]ole" as the CFO position.[30] Nor is there any evidence that Carmack applied for these positions.

With respect to those remaining positions identified,[31] some of which appear to have been vacant and/or were filled while Matlock was considering abolishing the CFO position, Carmack does not argue or provide evidence that he is "qualified," per the terms of the WTA, for these positions.[32] Indeed, Merriam Webster defines "qualified" as "fitted (as by training or experience) for a given purpose." Merriam Webster's Collegiate Dictionary 955 (10th ed. 1995). Carmack provides no basis for concluding that he "qualified," either by training or experience, for any of the positions he alleges Matlock failed to offer him.[33] In fact, during the court's May 16, 2019 hearing, counsel for Carmack made a variety of conclusory statements that Carmack was "eligible for" or "could have done" many of the positions that were available without any explanation as to why this was so. In light of this failure of proof, the court is unable to assess the significance of any decision not to reemploy or reassign Carmack to any the aforementioned vacancies.

The Center also represented in Carmack's layoff letter that "an effort . . . to identify valid vacancies within the [Center] for placement, and no positions were identified." ECF No.

---

[30] The Loan Collections Specialist, for example, offered a maximum salary of $35,000, ECF No. 72-17 (Ex. 17), compared to Carmack's salary of $116,807.00, see ECF No. 64-32, at 8 (Ex. 31), as CFO. The DHRM's manual defines "[r]ole" as a "broad group of positions in a Career Group assigned to a specific [p]ay [b]and that are assigned different levels of work at various skill or knowledge levels." ECF No. 64-34, at 22 (Ex. 33). In addition to apparent difference in pay band between these positions, Carmack does not provide any evidence suggesting that these positions fall within the same "Career Group."

[31] Director of Conference Services (Hannah Heitala), administrative assistant position ("Claire"), and Manager of Conference Services, see ECF No. 72-1, at 234 (Carmack Depo.), (Eli Heitala).

[32] The defendants note that Eli Heitala's position, which involved setting up tables for events and performing other routine cleaning, paid $24,000. ECF No. 74, at 22.

[33] DHRM's manual defines "minimally qualified" as possessing the "necessary knowledge, skills, abilities" and "other bona fide job requirements as outlined in the Employee Work Profile . . . ." ECF No. 64-34, at 21. Carmack does provide any argument as to his qualifications for these positions that rise above vague self-assessments.

56

64-34, at 2. While the court does not assume the veracity of this representation, the facial dissimilarity between the positions described above and the CFO position previously held by Carmack buttresses the commonsense appeal of the defendant's contention that Carmack cannot create a triable issue of fact "by complaining that he was not offered a position [as] administrative assistant when he [was] CFO." ECF No. 74, at 22.

Inasmuch as Matlock's failing to offer any of the aforementioned positions to Carmack was technically violative of the WTA, there is no basis for concluding that it is indicative of retaliatory animus. See Vaughan v. Metrahealth Companies, Inc., 145 F.3d 197, 203 (4th Cir. 1998) ("The mere fact that an employer failed to follow . . . procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent . . . . Federal courts cannot ensure that business decisions are always informed or even methodical."). Carmack has provided no evidence contradicting or casting doubt on the defendants' representation that it failed to identify "valid vacancies" or showing that Matlock or the Center actually violated the applicable policies and procedures by failing to offer him positions for which he has offered no evidence or argument that he was qualified.

## D.

Carmack next cites a variety of facts in blunderbuss fashion that he contends evince retaliatory animus and/or indicate that he was the actual and only target of the WTA proposal. First, Carmack notes that only he was "kept in the dark" about the WTA proposal. Second, Carmack points to Matlock's use of the phrase "pulling the trigger" in an email referring to his termination. Third, Carmack cites Young's response, when asked during her deposition whether she had spoken with Carmack following his termination, that although she saw him

at an event: (1) "I was kind of scared to be in contact with him"; (2) "I didn't know about retaliation since he was my boss, if my position was in jeopardy"; (3) "I was fearful of losing my job if he could lose his job, you know, because I didn't know why he was let go." ECF No. 72-2, at 49-50 (Young Depo.). Fourth and finally, Carmack notes that Brooks and Williams were both "replaced" and that "Matlock even looked into Brooks and Williams being able to return to work if they wanted." Id. at 20.

With respect to Matlock's use of what Carmack characterizes as a "telling metaphor," i.e., "pulling the trigger," and Young's testimony that she feared losing her job, ECF No. 72-2, at 49-50, neither fact necessarily, or even likely, reflects retaliatory animus. Carmack provides no basis for inferring from Matlock's colloquial use of "pull[] the trigger" in a single email, see ECF No. 72-45, at 1 (Ex. 45) ("I also plan to share with the [E]xecutive [C]ommittee . . . before I pull the trigger on [Carmack]"), a retaliatory intent related to his alleged whistleblowing. Matlock explained that "pulling the trigger" is a common phrase in his vocabulary. ECF No. 72-7, at 147. There is simply no basis for wringing a more insidious meaning or purpose from this common figure of speech. Young's statements, as reflected above, are plainly speculative and impressionistic, and therefore are of minimal value in a pretext analysis.

Furthermore, while Carmack appears to have been "kept in the dark" about the elimination of his position under the WTA, this fact appears to reflect nothing more than Matlock's belief that Carmack, and only Carmack, would "react negatively" to the elimination of his position. ECF No. 72-7, at 112 (Matlock Depo.). Carmack himself notes that "Matlock knew perfectly well that Brooks and Williams wanted to retire and that [he] did not," ECF No.

72, at 18. The defendants suggest that it is this very fact that explains why Carmack alone was not informed that his position was going to be abolished. That some employees were aware their positions would eliminated, although not in strict compliance with the WTA's confidentiality requirement, is a thin reed upon which to infer pretext. See ECF No. 64-48 (Rigdon Decl.) ("I had advised Matlock not to inform individuals that they could potentially be impacted by the WTA; confidentiality was a requirement. In my experiences, these kinds of issues are not unusual and do not automatically invalidate a WTA plan."); see also ECF No. 72-49, at 1 (email suggesting that Matlock was unaware that asking for volunteers violated stated policy).

When asked whether an employee typically has advance notice that their position is going to be eliminated through the WTA, Fields explained that at VHCC, the president, when faced with budget cuts, would "ask[] anyone that might be interested in retirement . . . to talk directly to their supervisors." ECF No. 72-4, at 77. Fields further explained that some employees would inform their supervisors that "if you need me to retire, I'll consider that." Id. at 78. In other words, "[s]ome . . . employees that had come forward knew that they were potential [sic], so they weren't surprised when we had individual meetings with them, and some did not know." Id. at 79; see ECF No. 72-5, at 42 (Brooks Depo.) (indicating that Matlock received conflicting advice from UVA and/or DHRM about the need for confidentiality, i.e., whether to inform individuals potentially affected); accord Dixon v. Pulaski Cty. Special Sch. Dist., 578 F.3d 862 (8th Cir. 2009) (holding that an employer's failure to follow procedures may be evidence of pretext, but it is not always enough to create a triable question of fact on the issue at the summary judgment stage; this is especially the case where the procedural

violation was in accordance with long-standing practice); <u>Downing v. Tapella</u>, 729 F. Supp. 2d 88, 97–98 (D.D.C. 2010) (noting that a violation of human resources protocol does not create a per se inference of a Title VII violation unless the violation itself constituted a suspicious act).

Carmack also appears to assert that although the WTA proposal purportedly abolished three positions, in actuality, his position was the only one eliminated because Hannah Heitala replaced Janet Williams and Tolbert replaced Joyce Brooks. The WTA proposal, however, specifically contemplates that Hensley would "replace" Carmack in the sense that she will assume many of his responsibilities. <u>See</u> ECF No. 74-4, at 21 (Ex. 8). Indeed, the net yearly savings calculation contained in the proposal accounts for the cost of increasing Hensley's salary by $8,201, presumably to compensate her for assuming additional duties. <u>Id.</u> This salary increase was subtracted from the estimated savings of abolishing the Carmack's position, $162,477, resulting in a net savings to $154,276. <u>Id.</u> This same formula was applied to the other two other positions "abolished" by the WTA, wherein the responsibilities of higher pay band positions abolished by the proposal are redistributed to lower pay band employees (some of whom received raises which appear to be incorporated into the net savings calculations). <u>Id.</u> at 21-22.

Finally, Carmack attempts to establish that Matlock treated Williams and Brooks more favorably by "look[ing] into Brooks and Williams being able to return to work if they wanted to . . . ." <u>See</u> ECF No. 72, at 20. This particular allegation relies on a May 15, 2017 email from Kauffman to Joseph Esposito, a human resources manager at UVA, in which she states, "[o]ne or two of the retirees may be returning to work." ECF No. 72-48, at 1. Carmack speculates

that this email referred to Brooks and Williams but not to him. Matlock explained, however, that this inquiry related to the potential return of all three employees, "if their services were needed in something specialized." See ECF No. 72-7, at 134 (Matlock Depo.). Carmack's attempt to interpolate his exclusion into a vaguely worded email which does not mention any specific employee by name, and associated argument that this imagined exclusion is evidence of pretext, is entirely speculative.

## E.

Carmack next argues that the defendants "make much to-do[sic] about getting the proper approval[s]" throughout the WTA process. ECF No. 72, at 22. Specifically, Carmack asserts that (1) the OSIG never approved Matlock's termination of Carmack, ECF No. 72, at 22, and that (2) the DHRM did not approve the WTA plan until six (6) months after Carmack's position was abolished, id. at 21. These arguments misconstrue the defendants' claims and the record. First, the record does not indicate that the defendants ever claimed that they received the "blessing of the OSIG to fire Carmack" or that the OSIG approved Carmack's termination. ECF No 72, at 22. The defendants simply provided evidence that Matlock (1) informed OSIG investigator Sadler that he was in the midst of eliminating several positions due to mandatory budget reductions, (2) stated that one of those positions was the CFO position held by Carmack (the Hotline complainant), and (3) asked Sadler whether he should "stop the WTA process until the investigation was over," ECF No. 72-7, at 118-19 (Matlock Depo.). The defendants then noted that Sadler did not investigate the WTA process further. See ECF No. 64, at 16. In short, the defendants' claims stop substantially short of asserting

that the OSIG "bless[ed]" Carmack's termination. See ECF No. 64-49, at 2 (Sadler Decl.);

ECF No. 72-7, at 119 (Matlock Depo.).

Carmack also selectively excerpts and truncates part of Matlock's testimony in an attempt to show that Sadler and Matlock contradicted each other as to what was said when Sadler called Matlock on October 16, 2017. ECF No. 72, at 22. Specifically, Carmack excerpts a statement where Matlock, in response to a question about whether he told the OSIG investigator that he was "firing or had fired Carmack," Matlock says "No," ECF No. 72-7, at 118). This quote omits the next line of Matlock's testimony, which clearly indicates that Matlock's answer, "No," related to counsel's characterization of Carmack's termination as a "firing," and not to the question of whether he informed Sadler that Carmack was included in the WTA proposal. This question is answered unequivocally in the affirmative by Matlock in a follow-up question:

> **Q**: Was Mr. Carmack's name mentioned by you?
> **A**: I mentioned everybody involved in the WTA process.
> **Q**: Including Duffy Carmack?
> **A**: Yes, of which Mr. Sadler said -- he asked for my timeline, and then he said, "Continue with your WTA." He would not disclose who had made the call.

ECF No. 72-7, at 119 (Matlock Depo.). When reviewed in full, Matlock's testimony is entirely consistent with his own declaration and Sadler's declaration. Lastly, Carmack's argument regarding when DHRM finally approved the WTA proposal, see ECF No. 72, at 21, is immaterial. The record clearly indicates that DHRM reviewed Matlock's WTA proposal at multiple points in the process and concluded that it was "sufficiently justified" despite the fact

that it abolished the position of an employee DHRM knew had an outstanding complaint with the OSIG. ECF No. 64-48, at 2-3 (Rigdon Decl.).

## F.

Carmack next argues that the WTA did not save the Center money, but "what was saved, or so Matlock thought, was the [Center] from getting sued." ECF No. 72, at 22. Carmack appears to be arguing that because the WTA proposal did not save the Center money, it is reasonable to infer that Matlock's budget reduction rationale for eliminating Carmack's position was pretextual. Specifically, Carmack argues that the retirement benefits for Brooks and Williams were costly to the Center. The defendants, however, provided undisputed evidence that by receiving approval from DHRM and DPB, those costs were not borne by the Center, but absorbed by the VRS. Indeed, the record shows that Matlock and Kauffman spent a considerable amount of time crafting the WTA exemption request and coordinating its production with DHRM so that these retirement costs were not incurred by the Center.

In his supplemental opposition, ECF No. 100, Carmack argues in the alternative that because Matlock's plan proposed that the VRS absorb any enhanced retirement costs associated with implementing the WTA reorganization, it plainly ran afoul of language in the mandate proscribing the Center from reducing its budget by shifting expenses to another agency, namely, the VRS. Specifically, Carmack asserts that "both memoranda had the same goal: save state funds," and therefore a "critical part of getting approval by the Governor was that the savings plan did not shift expenses to another agency." Id. at 5. Carmack speculates that the reason Matlock never proposed eliminating the CFO position to the Governor's office in response to the mandate was because Matlock knew it would not have been approved. Id.

Carmack is correct that the budget reduction memoranda explicitly prohibited budget reduction strategies that "simply pass[ed] on additional costs to another state agency . . . ." ECF No. 64-2, at 4 (Ex. 1). However, as Michael Maul noted, "the WTA proposal that Matlock proposed and implemented does not conflict with the Governor's instruction that savings plans may not pass on additional costs to another agency." ECF No. 102-6, at 3 (Maul 2d Decl.). Maul explained that:

> Using the WTA with VRS absorbing the costs associated with enhanced retirement options does not conflict this prohibition because those costs do not affect VRS' budget. In fact, having VRS absorb these costs has been an available option to state agencies subject to budget cuts since the recession. This policy was authorized in the budget by the General Assembly and Governor to help minimize the costs to state agencies hit with budget reductions . . . [p]assing these costs onto the VRS is not at odds with the prohibition against passing costs onto other state agencies.

Id. at 3. In other words, from Maul's perspective, Matlock's WTA proposal was a legitimate response to the budget mandate and lawfully shifted certain costs while still complying with state policy as articulated in the memoranda.

With respect to Carmack's claim that Matlock did not submit his WTA proposal to Governor's office because the proposal "would have" been rejected, ECF No. 100, at 5, Maul indicated that he was "not aware of any law or policy that required Matlock to submit the WTA proposal to Governor's office because only the approval of the DPB and [DHRM] was needed in order for the [VRS] to absorb the costs of the enhanced retirement." ECF No. 102-6, at 2 (Maul 2d Decl.). Paul Reagan, Chief of Staff for then-Governor Terry McAuliffe, explained that "[w]hat's binding on the agency ultimately is the savings that need to be achieved," and that there was minimal oversight to ensure that agencies would "follow the

exact procedure that was outlined." ECF No. 100-6, at 55 (Reagan Depo.). Crucially, Reagan

testified that if an agency wished to make changes to their initial budget savings submission,

they would "probably" have to resubmit their proposal to the Governor's office or their

budget manager at DPB. Id.; see ECF No. 64-2, at 3 (Ex. 1) (advising that "[a]ny questions or

suggestions about this process, or the subsequent budget decisions that will be made, should

be directed to the Office of the Secretary of Finance or the Department of Planning and

Budget"). Reagan identified Michael Maul as the person the Center would consult regarding

budget reductions and explained that he himself relied "extensively" on Maul's input and

guidance. ECF No. 100-6, at 56 (Reagan Depo.).

Notably, Maul is precisely the person Matlock contacted to discuss the availability of

the WTA after the initial budget savings plans were submitted. Maul stated that nothing

prevented Matlock from eliminating positions through the WTA:

> Unless the General Assembly specifically directs how an agency's
> budget reductions are to be implemented, it lies within the
> discretion of the head of that agency to determine how those
> reductions are implemented. In other words, the budget savings
> submission the Center submitted for FY 2017 and 2018 were not
> legally binding as the General Assembly did not delineate the
> approved budget reductions through language in the budget.

ECF No. 102-6, at 2 (Maul 2d Decl.). Thus, Matlock's decision to abolish positions through

the WTA in lieu of the budget savings plans Carmack previously submitted was within

Matlock's managerial discretion as the scope of his authority was explained to him by Maul.

In sum, there is no evidence that the implementation component of the original budget savings

plans for fiscal years 2017 and 2018 were binding on the Center or that Matlock knew the

WTA was unavailable because those budget savings plans were already submitted and recorded

by the Virginia General Assembly. Therefore, Matlock's pursuit of a course of action different from that spelled out in the original savings submissions is not particularly relevant to the pretext inquiry.

## G.

Carmack next claims that pay raises provided to Austin Dierks and Hensley were omitted from the calculation of alleged savings from the WTA. Id. at 22. Yet, as noted earlier, the WTA proposal expressly incorporated pay raises related to the redistribution of Carmack's responsibilities to Hensley. Hensley's pay raise of $8,201 was subtracted from the $162,477 saved from abolishing the CFO position.[34] Moreover, in an email exchange titled "Austin Dierks Internal Salary Alignment" between Kauffman, Brooks, and Tolbert, Kauffman appears to approve keeping his internal salary alignment separate from the WTA proposal. See ECF No. 74-4, at 17 (Ex. 7). Matlock explained that this pay raise related to changes in Dierks' duties that predated the WTA proposal. ECF No. 72-7, at 156 (Matlock Depo.). The defendants also correctly note that regardless of the way in which Dierks' pay raise was accounted for in the budget, Carmack has provided no basis for concluding that Matlock's approach to handling this collateral accounting issue indicates that his justifications for abolishing the CFO position were false or unworthy of credence.

Carmack further argues that the savings calculation associated with eliminating the CFO position was "off" because Matlock did not account for the fact that twenty-five (25) percent of Carmack's salary came from Foundation rather than Center funds. ECF No. 72, at

---

[34] Carmack also asserts that the Center "quickly increased Hensley's pay above what they said they were going to," ECF No. 72, at 22. This contention was not sufficiently explained or supported for the court to consider its materiality.

21. While Matlock acknowledged that it would be "logical" that if twenty-five (25) percent of Carmack's salary was paid by the Foundation then the savings to the Center would not be the estimated $162,000, he specifically denied that this figure was inflated. ECF No. 72-7, at 153-54 (Matlock Depo.). Moreover, Carmack asserted in his briefing that "at the end of the day, all three pools of money [Foundation funds, non-general funds, and general funds] make up one pile of money that the Center decides how to spend to support its mission." ECF No. 72, at 4. In light of this assertion, Carmack's argument then that the WTA calculation was "off" because it did not treat Foundation and Center funds as separate pools is at a minimum, confusing. Carmack's "one pile" contention perhaps explains why those who calculated and reviewed the WTA savings figures overlooked or discounted the distinction between Foundation and Center funds.

In any event, even if the court were to assume, arguendo, that there was some error in calculating the savings figures, Carmack again has provided no basis for concluding that Matlock's reliance on these calculations specifically or the WTA process generally, both of which were reviewed by UVA, DHRM, and DPB, was pretextual. See Mohammed v. Cent. Driving Mini Storage, Inc., 128 F. Supp. 3d 932, 946 (E.D. Va. 2015) (holding that pretext "'a lie or deceit designed to cover one's tracks,' not merely a business error" (citations omitted)); Smith v. Print Mach., Inc., No. CV 3:16-2918-JFA-SVH, 2017 WL 5593291, at *4 (D.S.C. Mar. 7, 2017), aff'd, 696 F. App'x 103 (4th Cir. 2017) ("Even a reasoned decision based on incorrect facts is not evidence of pretext."); Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 559 (7th Cir. 1987) (noting that plaintiff confounded "pretext" with "mistake or irregularity" and holding if "you honestly explain the reasons behind your decision, but the decision was

ill-informed or ill-considered, your explanation is not a 'pretext'"). In sum, even if the above-referenced calculation was "off," there is no basis for construing such a mistake as evidence of pretext.

## H.

Carmack's final argument is that Hensley is neither qualified to, nor ever has, performed his duties in the past, and therefore Matlock's claim that the CFO position was duplicative is false. ECF No. 72, at 23. In support of this claim, Carmack cites only the testimony of Fields, Carmack's predecessor, who agreed with a proposition from counsel that "You [Fields] could do everything she [Hensley] did, but she couldn't do everything you did; is that a fair statement?" ECF No. 72-4, at 26 (Fields Depo.). To the extent Fields' opinion regarding Hensley's capabilities in relation to her own is relevant in assessing Hensley's ability to assume Carmack's responsibilities, the court would note that just prior to the statement quoted above, Fields also suggested that there was redundancy between her and Hensley's roles, stating, "We both did the same type of work." Id. In any case, Fields lacks any personal knowledge of the allocation of work between Carmack and Hensley and the relative capabilities of the latter in relation to the former since she has not worked at the Center since 2011, see id., at 17.

Furthermore, Carmack's personal views of Hensley's capabilities are largely beside the point, as it is well established that a former employee's subjective self-appraisal is not relevant in a pretext analysis. See Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980) (holding that plaintiff's "perception of himself . . . is not relevant; it is the perception of the decision maker which is relevant"); Mackey v. Shalala, 360 F.3d 463, 469-70 (4th Cir. 2004) (holding that "[a]

plaintiff's own self-serving opinions, absent anything more, are insufficient" to establish the required causal connection in a retaliation claim). Matlock appears to have believed that Hensley, "who has greater seniority than Mr. Carmack (. . . 12 years of continuous state service)," ECF No. 62-22, at 5, was qualified to assume many of the responsibilities of the CFO at a much lower cost to the Center. Carmack has not proffered any evidence that this belief was disingenuous, or that its underlying assumptions are false. The fact that Carmack disagrees with the conclusion of Matlock and others (e.g., Rigdon, the Center's Executive Committee) that Hensley could absorb many of the CFO's duties does not prove pretext. Carmack has not provided more than a scintilla of evidence rebutting or otherwise disproving Matlock's claim that "[w]ith the leasing of the Energy Center, a declining portfolio of research grants, and a shift to separate activities of the Center from the Foundation," Carmack's "workload would decrease significantly." See ECF No. 64-1, at 9 (Matlock Decl.).

## V.

Considering the record as a whole, including the parties' arguments, exhibits, and the applicable law, Carmack has failed to show, by direct or circumstantial evidence, that Matlock's decision to eliminate the CFO position was causally related to his alleged internal warnings and complaints or external complaint to the OSIG. While Carmack repeatedly characterized Matlock's reasons for abolishing the CFO position as "evolving" and/or "ever-changing," ECF No. 100, at 1-2, contemporaneous documents, deposition testimony, and declarations from knowledgeable, neutral third parties indicate that Matlock's rationale for eliminating Carmack's position was consistently, albeit not always explicitly (see, e.g., ECF No. 64-4, at 2 (Ex. 3) (November 2016 email from Kauffman referring to "state budget cuts,"); ECF No.

64-20, at 3-4 (referring to "budget reductions enacted in the Appropriations Act"), predicated upon the mandate announced in the 2016 memoranda.

Indeed, a thorough review of the voluminous record shows Matlock's sworn statements and testimony during this litigation are consistent with pre-litigation documents and with Matlock's representations to others with whom he consulted both within and without the Center. Matlock testified at his first deposition that he began seeking guidance about the WTA after "receiv[ing] correspondence from the Governor's Office about fiscal year '15, fiscal year '16, fiscal year '17, and potentially fiscal year '18 budget reductions." ECF No. 72-7, at 108 (Matlock Depo.). In his declaration, Matlock again confirmed that he received two emails requesting budget savings plans for fiscal year 2017 and advising that there could be additional cuts for fiscal year 2018. ECF No. 64-1, at 4-5 (Matlock Decl.). Finally, Matlock again explained in his second deposition that the September 27, 2016 "reminder" email "really triggered my conversations, the two together, but that one was the one that made me realize I needed to look for a more long-term solution." ECF No. 100-1, at 16-17 (Matlock 2d Decl.).

The record also shows that the WTA process began in October or November 2016, see, e.g., ECF No. 64-4, at 2 (Ex. 3), approximately eleven (11) months before the earliest date (October 16, 2017) on which it is alleged that Matlock became aware that Carmack filed the OSIG complaint. As for the various "internal warnings and complaints" predating the OSIG complaint, Carmack has not presented sufficient evidence from which a reasonable jury could conclude that they contributed to Matlock's decision to abolish the CFO position. To the extent Carmack claims that the WTA process itself contained irregularities, the court is unpersuaded that any of these alleged irregularities amount to anything more than "pinprick

objections" and/or minor discrepancies that, rather than casting doubt on the validity of Matlock's explanation, merely invite the placement of "routine personnel decisions in judicial hands." See Hux v. City of Newport News, Va., 451 F.3d 311, 313 (4th Cir. 2006). What is more, the record clearly shows that at nearly every stage of the WTA process, Matlock in fact sought guidance, as he claimed in his second deposition, from "DPB, DHRM, and UVA HR and legal." ECF No. 100-1, at 24 (Matlock 2d Depo.). Thus, despite allegations that Matlock may have foot-faulted in several instances, there is little evidence "reasonably calling into question the honesty of [Matlock's] belief" that abolishing the CFO position was permissible under state policy and in the best long-term interests of the Center. Tomasello, 2016 WL 165708, at *11 (citing DeJarnette, 133 F.3d at 299).

Moreover, the conduct which Carmack asserts to be retaliatory appears to be more the product of clashing personalities (a dynamic that preexisted all of the alleged internal complaints) rather than acts in retaliation for Carmack's holding Matlock's "feet to the fire with respect to . . . compliance issues." ECF No. 72, at 22. Indeed, discovery in this case revealed that much of the conduct Carmack interpreted as evincing retaliatory animus was explainable without resort to speculative assertions of unlawful retaliation. Carmack, for example, claimed that after Matlock became aware of his OSIG complaint, Matlock "blocked" his emails to SAAG Griffin such that Carmack was not receiving emails Griffin claimed to have sent him. ECF No. 38, at 9. Carmack simply assumed, without any basis, that "Matlock cut off my emails to [her], giving her the impression that I was ignoring her." ECF No. 72-1, at 201-209 (Carmack Depo.); ECF No. 72-39, at 2 (Carmack Decl.). Carmack insinuates elsewhere that Webb, Matlock, and Tolbert, who "[w]orked against me as a group," conspired

71

together to "block" emails to him from Griffin. Id. at 208-209. Tolbert, responding to a "user support request" from Carmack, investigated the issue and discovered Griffin's missing emails in Carmack's junk mail folder. ECF No. 74-3, at 2 (Tolbert Decl.).[35] Tolbert later discovered that Griffin's email address was on a "blocked senders" list, and stated that "[o]nly Carmack, or someone he provided his account access credentials," had the capability to add someone to that list. Id. at 2-3.

In sum, absent evidence of pretext, the court will refrain from second-guessing the correctness of every decision made by Matlock and those with whom he coordinated and implemented the WTA process. See Rowe v. Marley, Co., 233 F.3d 825, 831 (4th Cir. 2000) (holding an employer's decision to discharge one employee over another is the type of decision this court is reluctant to second guess); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005); Henson, 61 F.3d at 277; DeJarnette, 133 F.3d at 299; Sagar v. Oracle Corp., 914 F.Supp.2d 688, 695 (D. Md. 2012) ("It is well established that 'in employment . . . cases involving a reduction in force, it is not the court's duty to second guess the business judgment of defendant's employees and managers' or the manner in which the reduction in force is carried out. (citations omitted)); Long v. Forsyth Cty. Dep't of Soc. Servs., No. 1:15CV683, 2016 WL 7496122, at *6 (M.D.N.C. Dec. 30, 2016) (holding that "[c]ourts should be careful not to engage in a reweighing of an employer's legitimate employment considerations").

---

[35] There also seems to be little basis for Carmack's claim that he was "cut off" from communication with DPB. See ECF No. 74-1, at 2-3 (Henken Decl.).

The elimination of the CFO position was conceived of prior to all of Carmack's alleged complaints, except those related to pre-selection, which do not appear in any way to have inspired retaliatory animus on the part of Matlock. The WTA proposal position was subsequently approved by the Center's Executive Committee. Thereafter, its implementation was scrutinized and reviewed by DHRM and DPB. Carmack largely failed to address or demonstrate that the articulated justifications for abolishing the CFO position were unworthy of credence. Indeed, many of the arguments made and much of the evidence cited, including a chart provided to the court during the May 16, 2019 hearing, reflect mere disagreements with Matlock's decision to reduce the budget by abolishing positions rather than making use of the Center's surplus funds or standing by the original savings plans. For reasons already stated, the wisdom or correctness of Matlock's decision is not the province of the court. Merely disagreeing with Matlock's judgment or the way in which he carried out the budget reduction is insufficient as a matter of law. The mere fact that there was some temporal overlap between conduct that may qualify for protection under the FAWBPA and the WTA process is, in and of itself, not demonstrative of pretext. Accordingly, the court **GRANTS** the defendants' motion as to Count I.

## VI.

In Count II, Carmack brings a claim under 42 U.S.C. § 1983 asserting that for the same reasons his termination constituted a violation of the FAWBPA in Count I, it also constituted a violation of the First Amendment. The right to free speech guaranteed by the First Amendment "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Industries v.

McGraw, 202 F.3d 676, 685 (4th Cir. 2000). When public officials engage in retaliatory acts, they "place informal restraints on speech 'allow[ing] the government "to produce a result which it could not command directly. Such interference with constitutional rights is impermissible." Id. (quoting Perry v. Sindermann, 408 U.S. 593, 597 (citations omitted)).

The Fourth Circuit has explained that to establish a First Amendment retaliatory discharge or whistleblower claim pursuant to 42 U.S.C. § 1983, a plaintiff must prove three elements: (1) "that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern," Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990); (2) "that the alleged retaliatory action deprived him of some valuable benefit," id. at 1140; and (3) that there was a causal relationship between the protected expression and the retaliatory action. See Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993); see also Mt. Healthy, 429 U.S. at 287; Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 416–17 (1979). The court assumes, without deciding, that Carmack's alleged whistleblowing activities satisfy the first two elements of the foregoing framework, and focuses it attention on the third requirement, that of causation.

In Wagner v. Wheeler, 13 F.3d 86 (4th Cir. 1993), the Fourth Circuit explained that per the Supreme Court's holdings in Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), and Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979):

> The initial burden lies with the plaintiff, who must show that his protected expression was a "substantial" or "motivating" factor in the employer's decision to terminate him. If the plaintiff successfully makes that showing, the defendant still may avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination.

Id. at 90 (citations omitted); see Gillen v. Huggins, 127 F.3d 1099 (4th Cir. 1997). This "but for" causation requirement is "rigorous." Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990). "[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." Id. The Fourth Circuit in Wagner stated "[t]his causation requirement was the result of the . . . desire to prevent a government employee from insulating himself from legitimate termination simply by engaging in protected speech." Wagner, 13 F.3d at 90; see Eastlake v. City of Cayce, 7 F.3d 223 (4th Cir. 1993) (stating that "[a]t the outset, the court must determine the reason the employee was discharged, because unless his exercise of free speech was the 'but for' cause for dismissal, the action must be dismissed"). Nevertheless, because the issue of causation is a factual one, it "can be decided on 'summary judgment only in those instances where there are no causal facts in dispute.'" Dunn v. Millirons, 176 F. Supp. 3d 591, 605 (W.D. Va. 2016), aff'd, 675 F. App'x 314 (4th Cir. 2017).

Viewing the record in the light most favorable to Carmack, the court concludes that, as with and for the same reasons given with respect to Count I, the defendants are entitled to summary judgment on Count II. Carmack simply has not presented sufficient evidence for a reasonable jury (1) to conclude that his various complaints were a "substantial" or "motivating" factor in, let alone a but for cause of, his termination, (2) to discredit the underlying justifications for abolishing the CFO position, or (3) to cast doubt on the legitimacy of the WTA process. Carmack's somewhat scattershot attempt to discredit the WTA process and raise a genuine question of material fact as to whether the non-retaliatory explanations for

abolishing the CFO position were pretextual, upon a thorough review of the record, proved ultimately unavailing. While raising numerous questions about Matlock's management style and the wisdom of some his conduct generally, none of those questions are germane to the inquiry of concern to the court or present a genuine issue of material fact sufficient to survive summary judgment on Count II. See Wagner, 13 F.3d at 90–91 (evidence indicating that reports of regulatory violations "in some way irritated" defendant "caused him to monitor" plaintiff's performance more closely is insufficient to carry plaintiff's initial burden under Mt. Healthy of establishing that his protected activity was a "substantial" or "motivating" factor in his dismissal). Accordingly, the court **GRANTS** the defendants' motion as to Count II.

## VI.

For the foregoing reasons, the defendants' motion for summary judgment, ECF No. 63, is **GRANTED** as to the remaining counts. These claims are **DISMISSED with prejudice.**[36]

An appropriate Order will be entered this day.

Entered: 08-29-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge

---

[36] Counsel for Carmack claims that had they received the 2016 memoranda during the original discovery period, additional discovery would have included, "among other things, determining who the authors of the memoranda were, the history of the memoranda, including but not limited to discovery of documentary evidence such as emails and meeting minutes that reflected development of the policy, precisely who developed and promulgated the 5% budget reduction plan set forth in the memoranda, exactly how that policy was to have been implemented, whether the persons . . . who drafted and promulgated the policy intended that it result in termination of employees such as Mr. Carmack, whether employees of other agencies were terminated as a result of the memoranda, whether the reduction was intended to apply to institutes of higher learning in the Commonwealth such as the Southwest Virginia Higher Education Center, the nature and extent of contacts by Mr. Timberlake, and other matters." ECF No. 100-9, at 2 (Grimes Decl.). The court is unpersuaded that additional discovery on any of the specific matters noted above is warranted or would impact the disposition of this motion. The only relevant question is whether Matlock reasonably believed that the mandate applied to the Center, and on this point, the record could not be clearer.